# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHILIP MORRIS CAPITAL CORPORATION and HNB INVESTMENT CORP., | |
| Plaintiffs, | No.   19 CV 10378 |
| - vs. - | **COMPLAINT** |
| NATIONAL RAILROAD PASSENGER CORPORATION, | |
| Defendant. | |

## TABLE OF CONTENTS

OVERVIEW OF THE ACTION .................................................................................. 3

JURISDICTION AND VENUE ................................................................................. 8

CHOICE OF LAW ..................................................................................................... 9

PARTIES ...................................................................................................................... 9

FACTUAL ALLEGATIONS ................................................................................... 12

   I.   THE TRANSACTION AND OPERATIVE CONTRACTS ........................... 12

  II.  AMTRAK DEEMS THE LOCOMOTIVES "UNFIT FOR COMMERCIAL USE" AND "UNECONOMICAL TO REPAIR" UNDER LEASE SECTION 7 ...................... 17

       A.   Amtrak Determines that the Locomotives are "Unfit for Commercial Use" and/or "Uneconomical to Repair" ............................................................................ 18

       B.   Amtrak Refuses to Pay Casualty Value for the Retired Locomotives ..................... 21

 III.  AMTRAK FAILS TO MAINTAIN THE UNITS UNDER LEASE SECTION 12.1 ...... 23

       A.   Amtrak Cannibalizes the Locomotives for Parts and Fails to Perform Required Maintenance .................................................................................................. 23

       B.   Amtrak Fails to Cure its Deficient Maintenance ...................................................... 29

 IV.  AMTRAK PROPOSES A BUYOUT TO ADDRESS PLAINTIFFS' CLAIMS............ 31

       A.   Amtrak Proposes a Buyout of Plaintiffs' Interest in the Units ................................. 33

       B.   Amtrak Stalls and Terminates Key Members of the Negotiating Team ................... 34

   V.  AMTRAK RENEGES ON THE BUYOUT PROPOSAL AND BLOCKS PLAINTIFFS' GUARANTEE PAYMENT ............................................................................... 37

       A.   Amtrak Terminates Buyout Discussions and Plaintiffs Invoke the Guarantee ........ 37

       B.   Amtrak Denies Default to Avoid Disclosures and Block Plaintiffs' Demand ......... 40

       C.   Amtrak Further Interferes with Resolution of Plaintiffs' Claims ............................ 43

CAUSES OF ACTION ............................................................................................ 49

FIRST CAUSE OF ACTION ................................................................................. 49

       DECLARATORY JUDGMENT OF LEASE EVENTS OF DEFAULT ........................ 49

i

SECOND CAUSE OF ACTION ............................................................... 50

    BREACH OF CONTRACT.............................................................. 50

THIRD CAUSE OF ACTION .................................................................. 51

    BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING... 51

FOURTH CAUSE OF ACTION ............................................................... 52

    TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS...................... 52

FIFTH CAUSE OF ACTION .................................................................... 54

    FRAUDULENT CONCEALMENT.................................................... 54

SIXTH CAUSE OF ACTION .................................................................... 54

    QUANTUM MERUIT.................................................................... 54

SEVENTH CAUSE OF ACTION IN THE ALTERNATIVE ...................................... 55

    UNJUST ENRICHMENT ............................................................... 55

EIGHTH CAUSE OF ACTION ................................................................. 56

    BREACH OF CONTRACT – THIRD PARTY BENEFICIARY ................... 56

PRAYER FOR RELIEF ........................................................................... 57

Plaintiffs Philip Morris Capital Corporation and HNB Investment Corp. (together "Plaintiffs") bring this action for declaratory judgment and legal and equitable relief against Defendant National Railroad Passenger Corporation ("Amtrak").  In support of their claims, Plaintiffs allege as follows:

1.      This case concerns Amtrak's breach of contracts for $250 million of high-speed rail equipment that Amtrak acquired for its popular Northeast Corridor route from Washington to Boston.  Plaintiffs provided the capital investment that allowed Amtrak to acquire the equipment.  But Amtrak misused the equipment in violation of the contracts, concealed that misuse from Plaintiffs, and blocked the Plaintiffs' 2017 demand for a $92 million payment the contracts guaranteed as a remedy.  Left unaddressed, Amtrak's breaches and unscrupulous business practices will deter exactly the type of private investment in public infrastructure and operations the contracts were designed to protect.

2.      Such investment is particularly important to Amtrak's operation as a "for-profit corporation" statutorily required to "minimize United States Government subsidies."  *See* 49 U.S.C. §§ 24301(a)(2)-(3), 24101(c).  Amtrak's President and CEO Richard Anderson testified in Congress earlier this year that "capital funding is the key ingredient for reliable service and effective networks," and that "[w]ithout higher levels of capital investment" the Northeast Corridor route will experience operational difficulties.[1]  That is not surprising, because Mr. Anderson stated that the "cost of outstanding fleet acquisitions . . . could approach some $3.5 billion through FY2024," and that Amtrak "must secure funding to pay for its upcoming orders of locomotive options."[2]  In exchange for such funding, Amtrak must honor its contracts with investors.  Here it

---

[1] Testimony of Richard Anderson before the United States House of Representatives, House Committee on Transportation & Infrastructure, *The Cost of Doing Nothing:  Why Investing in our Nation's Infrastructure Cannot Wait*, at 2, 3 (Feb. 7, 2019), Ex. A.

[2] *Id*. at 18.

breached them and concealed its misconduct from Plaintiffs and other business partners to avoid disclosing the risk and consequences of its defaults to its auditors and in its financial statements. Amtrak then compounded these transgressions by interfering with Plaintiffs' attempts to vindicate their rights.  After Plaintiffs uncovered Amtrak's defaults and sent Amtrak and its Guarantor a demand for payment, Amtrak urged the Guarantor to reject Plaintiffs' demand and misled Plaintiffs with false promises of a buyout proposal.  As detailed below, an Amtrak official admitted to Plaintiffs in mid-2017 that, when Amtrak told Plaintiffs to "expect[]" a "prompt" buyout bid on their contract claims in December 2016, Amtrak knew it was in no position to make such a bid. But Amtrak nonetheless assured Plaintiffs they could expect a proposal, and strung Plaintiffs along while Amtrak prepared certifications and financial statements denying any default.  Amtrak's misconduct both before and after Plaintiffs' demand is memorialized in the correspondence and other documents cited herein, including Amtrak's 2018 and 2019 financial statements.  These statements confirm the "history of recurring operating losses" and desire to avoid "cross-default to other Amtrak indebtedness" that apparently drove Amtrak's improper denial of Plaintiffs' contract claims, obstruction of Plaintiffs' associated Guarantee rights, and deceptive stalling of Plaintiffs' buyout discussions.

3.     Amtrak's misconduct is particularly egregious here because Amtrak expressly "induce[d]" Plaintiffs to underwrite Amtrak's acquisition of the equipment in issue by agreeing to specific contract protections for Plaintiffs' investment.  Notably, the relevant contracts require Amtrak to use and maintain Plaintiffs' equipment in accordance with certain standards, and expressly state that Amtrak's failure to do so entitles Plaintiffs to specified payments.  Amtrak triggered these payment provisions multiple times, first by taking all of the Plaintiffs' locomotives out of service, then by cannibalizing them for parts and otherwise improperly maintaining them, and finally by concealing this mistreatment and otherwise interfering with Plaintiffs' timely

2

demand for the agreed compensation.  These acts of interference included Amtrak urging its Canadian Guarantor to refuse Plaintiffs' demand with no adequate process, in violation of the Guarantee's express terms.  As a result, Plaintiffs have been wrongfully deprived of at least the $92,947,365 payment they timely demanded in December 2017.  Plaintiffs have also been forced to incur further costs, including attorneys' fees for which Amtrak is responsible under the Lease, in pursuing claims against Amtrak that should have been resolved through the Guarantor.  The parties' agreements expressly authorize immediate relief on these claims in this Court.

### OVERVIEW OF THE ACTION

4.      ***Leveraged Equipment Leases.***  Amtrak acquired the rail equipment at issue in this case through a contractual arrangement known as a leveraged lease.  Leveraged leases are critical to the transportation industry because they allow service providers like Amtrak to acquire the costly equipment they need without prohibitive capital outlays.  These leases are "leveraged" because the equipment owners (here Plaintiffs) pay a portion of the total equipment cost up front, and then borrow the remaining funds required to purchase the equipment.  A lender provides these funds in exchange for notes that guarantee repayment of the debt on certain terms.  The owners typically create a trust to hold their equity and the borrowed funds, and the trust manager (normally a bank or trust company) uses the trust assets to purchase the equipment and lease it to a transportation provider (here Amtrak).  The lessee (Amtrak) then agrees to:  (i) pay rent sufficient to repay the debt and any cash rent due to the owners; and (ii) maintain the equipment for return to the owners at the end of the lease term.

5.      ***The Operative Contracts***.  The leased equipment at issue here consists of eight locomotives and six high-speed trainsets that were custom manufactured for Amtrak by Canadian manufacturer Bombardier, in coordination with French engineering company Alstom.  Plaintiffs are the ultimate owners of the equipment, which Amtrak leased from Plaintiffs' trust to service

Amtrak's Northeast Corridor route.  The transaction was memorialized in a series of agreements (Operative Contracts) that leased the equipment to Amtrak for a term of over 20 years (from 2000 through at least 2022) subject to several provisions that protect Amtrak's rights as a service provider and Plaintiffs' equity interest in the equipment.  As relevant here, the Lease permitted Amtrak to stop using and maintaining the equipment before the end of the lease only in exchange for taking title to the units and making a contractually-specified payment (Casualty Value) to cover the remaining debt and Plaintiffs' ownership interest.  To further entice Plaintiffs to participate in the transaction, the Operative Contracts included an Equity Guarantee pursuant to which a Canadian guarantor—Export Development Canada ("EDC")—agreed to pay Plaintiffs a specified guarantee amount in the event Amtrak breached any Lease provision triggering Casualty Value obligations.  The Guarantee was a material "induce[ment]" for Plaintiffs because it ensured they would receive contractually-specified damages in the event Amtrak breached its use or maintenance obligations before returning the equipment to Plaintiffs at the end of the Lease.

6.     Amtrak has upended these contractual protections on Plaintiffs' investment.  After breaching the Lease in several respects, Amtrak misled Plaintiffs with the prospect of a buyout and then reversed course and urged EDC to deny Plaintiffs' timely demand for the $92 million Guarantee payment.  EDC took Amtrak's side without any independent factual investigation, and then filed a protective action on the Guarantee in Canada that forced Plaintiffs to pursue direct claims against Amtrak that EDC should have asserted under the Operative Contracts.

The contract rights supporting Plaintiffs' claims are set forth in several express provisions, notably:  (i) Lease Section 7's requirement that Amtrak pay Plaintiffs an agreed sum to take title to any unit Amtrak deems "uneconomical to repair" or "unfit for commercial use from any cause" during the Lease term; (ii) Lease Section 12's requirement that Amtrak pay specified damages for failing to maintain the equipment "in as good condition as when delivered (ordinary wear and tear

4

excepted)"; and (iii) Lease Section 13.2's provisions stating that Amtrak's uncured breach of any of the provisions above entitles Plaintiffs to "liquidated damages" for "all units covered by the Lease," as well as "all reasonable legal fees and other costs and expenses incurred by [Plaintiffs]."

7.      ***Amtrak's Breaches***.   Approximately halfway through the lease term, Amtrak observed that maintenance and reliability issues with the Bombardier-Alstom locomotives made them unsuitable for continued intercity rail use, and proposed to replace them with new locomotives from Siemens.   But Amtrak had leased the locomotives "as-is, where is, with all faults," and expressly acknowledged that neither Plaintiffs nor any other party made "any representation or warranty, express or implied, as to" the "fitness" of the equipment for any "particular use."   (Lease § 10.1.)   Accordingly, Amtrak's only option under the Operative Contracts was to replace or pay Casualty Value for any unit that Amtrak deemed "*uneconomical to repair*" or "*unfit for commercial use from any cause*."[3]  (*Id*. § 7; Participation Agreement Annex A-4.)

8.      Unbeknownst to Plaintiffs, Amtrak deemed Plaintiffs' locomotives both "unfit for commercial use" and "uneconomical to repair" at some point in 2015, but concealed these determinations from Plaintiffs.   In May 2016 Plaintiffs noticed press reports suggesting that Amtrak might take some of Plaintiffs' trainsets out of service.   Plaintiffs promptly wrote Amtrak that same month to inquire about the status of all of their equipment.   Amtrak represented at the time that no decision had been made on the trainsets, and concealed its treatment of the locomotives despite Plaintiffs' inquiry.   Plaintiffs' efforts to gather more information from Amtrak went unanswered.   In late 2016, however, Plaintiffs discovered that Amtrak had permanently retired Plaintiffs' locomotives, and issued a November 2016 letter claiming "all amounts due"

---

[3]  All emphasis in this document is supplied unless otherwise noted.

under the Operative Contracts, "including Casualty Value."  In December 2016, Amtrak advised

that it would propose a buyout of Plaintiffs' interests with the goal of resolving all Lease claims

by February 2017.  Plaintiffs relied on this representation based on the Operative Contracts and

discussions with Amtrak.  But in January 2017, Amtrak replaced its CFO and Treasurer and began

the campaign of duplicity and delay that forced this action.

9.      ***Amtrak's Bait and Switch.***   From January through March 2017, Plaintiffs

corresponded with Amtrak in anticipation of Amtrak's buyout proposal.  But in April 2017,

Amtrak reversed course and asked Plaintiffs to send a proposal to Amtrak.  Plaintiffs did so on

April 25, 2017, and ordered a third party inspection of the leased equipment that confirmed it was

out of service and being stored in breach of Amtrak's maintenance obligations.  On July 24, 2017,

Plaintiffs wrote the only remaining member of Amtrak's buyout team about the inspection report

and requested a buyout commitment by August 4, 2017.  But that official, too, then abruptly left

Amtrak.  Shortly thereafter, Amtrak's then-CFO, William Feidt, wrote Plaintiffs a letter denying

any Lease Event of Default and disputing the meaning of the inspection report.

10.     In September 2017, Plaintiffs issued formal notices of uncured defaults arising out

of Amtrak's retirement and improper maintenance of the leased equipment.  The following month

Plaintiffs commissioned a second independent inspection that confirmed the equipment remained

out of service, and that at least one unit was "in a total disassembled state" and had previously

been "cannibalized for parts."  In disregard of these developments, Amtrak again denied any

default and refused to explain its reversal of position on proposing a buyout of Plaintiffs' claims.

Subsequent communications and documents suggest that Amtrak intended to mislead Plaintiffs

about a buyout in order to delay action on Plaintiffs' contract rights.  An Amtrak official conceded

in mid-2017 that, when Amtrak told Plaintiffs to "expect[]" a "prompt" bid in December 2016,

Amtrak was in no position to make a bid and could not do so until, "[a]t the earliest, [completion

of its] 2018 budget process."[4]  Amtrak's own financial statements also suggest that the railroad's "history of recurring operating losses" and desire to avoid acknowledging defaults that could "result in cross-default to other Amtrak indebtedness"[5] drove its stonewalling of Plaintiffs' Lease rights and termination of the management team negotiating the buyout.  This conduct violated the Operative Contracts in several respects that independently triggered Plaintiffs' Guarantee rights, but Amtrak nonetheless urged its Guarantor to deny Plaintiffs' claims in further frustration of the Operative Contracts and controlling law.

11.     ***Amtrak Induces EDC to Deny Plaintiffs' Guarantee Payment.***  The Equity Guarantee exists to protect Plaintiffs from the Amtrak breaches at issue here, which is why Plaintiffs accompanied their December 2017 default notices to Amtrak with a demand to EDC for Plaintiffs' agreed $92 million Guarantee payment.  But Amtrak—which Plaintiffs understand may have undisclosed indemnity obligations to EDC—responded by denying any event of default.[6] Based on Amtrak's position, EDC denied Plaintiffs' claim and filed suit in Canada for a declaration that "no amounts are immediately due and payable" under the Guarantee while Plaintiffs and Amtrak dispute the existence of an underlying Lease default.[7]

12.     Stymied by both Amtrak and EDC, Plaintiffs turned to negotiating an agreement to stay the Canadian action pending resolution of their claims "concerning Amtrak's compliance with

---

[4] *See* Ex. B (E-mail from Amtrak (Vabner) to Plaintiffs dated June 23, 2017).

[5] *See* Ex. C, Amtrak FY2016 Financial Statements at 9, 26 available at https://www.amtrak.com/content/dam/projects/dotcom/english/public/documents/corporate/financial/Audited-Consolidated-Financial-Statements-FY2016.pdf.

[6] *See* Ex. D (Ltr. dated Dec. 29, 2017, from Amtrak to Plaintiffs (via Lessor) (sent via e-mail and overnight courier)).

[7] No. 18-25823, Application, *Export Dev. Canada v. HNB Inv. Corp. and Nat'l R.R. Passenger Corp.* (Ontario Superior Court of Justice) (Mar. 13, 2018) (Ex. E).

the Lease and related documents."[8]   The parties executed this Standstill Agreement in early 2019,

and on May 27, 2019, Plaintiffs received notice that the Canadian court had "stayed [EDC's action]

in accordance with the [S]tandstill [A]greement."[9]

13.     Plaintiffs now seek a declaration of Amtrak's Lease defaults as well as all relief to

which they are entitled on the counts herein, including attorneys' fees pursuant to Section 13.2 of

the Lease.   Such relief is necessary to enforce the Operative Contracts and avoid chilling

investment in leveraged lease transactions critical to the transportation sector and other capital-

intensive industries.  Amtrak subverted the parties' buyout negotiations and the entire Transaction

when it reneged on its buyout proposal and baited EDC to deny Plaintiffs' Guarantee demand.  The

Operative Contracts are clear.  Amtrak leased the equipment in issue "as-is," and agreed to pay a

contractually-specified sum in the event it chose to discontinue using and maintaining the

equipment in accordance with the Operative Contracts before the end of the Lease term.  Amtrak's

breach of this obligation had legal consequences under the Lease, and triggered Plaintiffs' rights

under the Equity Guarantee that "induce[d]" their investment.  EDC agrees that the existence of

Lease default(s) triggering Plaintiffs' Guarantee rights must be addressed, and that the Operative

Contracts provide for resolution of this question in New York.  Accordingly, the claims in this

action are ripe for review and redress in this Court.

### JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C.

§ 1332(a) because the amount in controversy exceeds seventy-five thousand dollars ($75,000) and

there is complete diversity of citizenship among the parties.  Additionally, this Court has subject

---

[8] *See* Ex. F (Standstill Agreement and Court Order dated May 8, 2019).

[9] *Id.*

8

matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1349 because Amtrak is incorporated under federal law and more than one-half of its capital stock is owned by the United States.

15.     This Court has personal jurisdiction over defendant Amtrak by virtue of Amtrak's consent to jurisdiction in this venue under the Participation Agreement,[10] and by virtue of Amtrak's transaction of business in this District under N.Y. C.P.L.R. § 302(a)(1).

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the Transaction closed in this District, and because Amtrak consented to venue in this District under the Participation Agreement.

## CHOICE OF LAW

17.     The Lease, Participation Agreement, and Tax Indemnity Agreement are governed by the laws of the District of Columbia without regard to conflict of laws principles or choice of law provisions.  The Indenture Agreement, to which Amtrak is not a party, is governed by the laws of New York without regard to conflict of laws principles.[11]

## PARTIES

18.     Plaintiff Philip Morris Capital Corporation ("PMCC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Stamford, Connecticut.

19.     Plaintiff HNB Investment Corp. ("HNB") is also a corporation organized and existing under the laws of the State of Delaware that has its principal place of business in Stamford,

---

[10] *See* Ex. G (Participation Agreement dated Nov. 6, 2000, between, *inter alia*, Plaintiffs and Amtrak) § 14.13 (providing Amtrak's consent to "any suit, action or proceeding against Amtrak" arising under any "Operative Documents," including the Lease).

[11] The Guarantee Agreement, to which Amtrak is also not a party, is governed by the laws of the province of Ontario and the federal law of Canada.

Connecticut, and is a wholly-owned subsidiary of PMCC.  For ease of reference, HNB and PMCC are collectively designated herein as "Plaintiffs."

20.　　Defendant National Railroad Passenger Corporation ("Amtrak") is a corporation and railroad common carrier organized and existing under the Rail Passenger Service Act of 1970, as amended (recodified at 49 U.S.C. § 24101 *et seq.*), and under the laws of the District of Columbia.  Amtrak has its principal place of business in Washington, D.C.

21.　　Amtrak's authorizing statutes, portions of which Amtrak has invoked in correspondence with Plaintiffs, contain several provisions relevant to the contracts and claims at issue here.  These provisions are summarized in the following chart:

| Relevant Amtrak Statutory Powers and Obligations | |
|---|---|
| 49 U.S.C. § 24101 | Emphasizes the need for "cooperation . . . among Amtrak . . . the private sector [and] suppliers of services and equipment to Amtrak to achieve a performance level sufficient to justify expending public money," and expressly states that "Amtrak is encouraged to make agreements with the private sector . . . ." |
| 49 U.S.C. § 24301 | States that Amtrak "shall be operated and managed as a for-profit corporation," "is not a department, agency, or instrumentality of the United States Government," and "is qualified to do business in each State in which Amtrak carries out an activity authorized under this part . . . ." |
| 49 U.S.C. § 24305 | Expressly authorizes Amtrak to "acquire, operate, maintain, and make contracts for the operation and maintenance of equipment and facilities necessary for intercity and commuter rail passenger transportation . . . ," including to "make and carry out appropriate agreements" and to "buy or lease rail rolling stock," . . . . subject to approval for foreign equipment purchases under the statute's "domestic buying preference[] . . . ." |
| 49 U.S.C. § 24310, 49 U.S.C. § 24315 | Expressly render Amtrak management accountable for the performance of Amtrak's statutory and other legal duties, including through review by the "Inspector General of the Department of Transportation," . . . . "the President and Congress," . . . . and audits by "independent certified public accountant[s]," . . . . and the "Comptroller General . . . ." |
| 49 U.S.C. § 24320 | Requires Amtrak to "submit to Congress and the Secretary of Transportation final 5-year business line plans and 5-year asset plans prepared in accordance with this section," . . . . including for "all Amtrak-controlled rolling stock, locomotives, and mechanical shop facilities that are used to overhaul equipment . . . ." |

22.     In an apparent effort to avoid the type of Amtrak mismanagement that gave rise to this suit, Congress in late 2015 augmented the provisions above with a new statutory provision requiring Amtrak to make detailed submissions to several federal entities "[p]rior to entering into any contract in excess of $100,000,000 for rolling stock and locomotive procurements." 49 U.S.C. § 24322(a)-(b).  The statute requires Amtrak to "submit a business case analysis to the Secretary of Transportation, the Committee on Commerce, Science, and Transportation and the Committee

11

on Appropriations of the Senate, and the Committee on Transportation and Infrastructure and the Committee on Appropriations of the House of Representatives, on the utility of such procurements." *Id*. And the statute specifies that the "business case" must address "total lifecycle costs and the anticipated benefits related to revenue, operational efficiency, reliability, and other factors." *Id*.

## FACTUAL ALLEGATIONS

## I.    THE TRANSACTION AND OPERATIVE CONTRACTS

23.    ***The Transaction***.   This case arises out of the leveraged lease transaction ("Transaction") in which Plaintiffs worked with a trust, a lender, and several other entities to purchase the $250 million of high-speed rail equipment from Canadian manufacturer Bombardier and French engineering company Alstom for lease to Amtrak as described above.

24.    The specific equipment at issue consists of eight Bombardier-Alstom HHP-8 electric locomotives ("Locomotives") and six high-speed trainsets ("Trainsets") (together "Units" or "Leased Equipment") that Amtrak leased through at least 2022 with an option to extend the Lease or purchase the Units at the end of the initial term.

25.    The Transaction was memorialized in a series of contracts initially executed on November 6, 2000, and supplemented six times through March 29, 2002 (collectively the "Operative Contracts").

26.    ***Operative Contracts***.   All parties were represented by counsel in negotiating the Operative Contracts, which include as relevant here the five contracts summarized in the following chart and explained further below[12]:

---

[12] The Transaction also implicated a Tax Indemnity Agreement between Plaintiffs and Amtrak that is not presently at issue in this dispute, and on information and belief may also have given rise to a separate indemnity agreement between EDC and Amtrak that is potentially relevant to the claims in this action.

| Agreement | Parties |
|---|---|
| Lease | Amtrak Trust HS-EDC-1 (Lessor) via WTC (Owner Trustee); Amtrak (Lessee) |
| Participation Agreement | Amtrak (Lessee); PMCC (HNB) (Owner Participant); EDC (Loan Participant); M&T Bank (Indenture Trustee); Amtrak Trust HS-EDC-1 (Lessor); WTC (individually and as Owner Trustee) |
| Equity Guarantee | EDC (Guarantor); PMCC (HNB) (Direct Beneficiary) |
| Indenture Trust | Amtrak Trust HS-EDC-1 via WTC (Owner Trustee); M&T Bank (Indenture Trustee) |
| Tax Indemnity | Amtrak (Lessee); PMCC (HNB) (Owner Participant) |
| Owner Trust | HNB (Owner Participant); WTC (Owner Trustee) |

(a)      the **Lease**[13] is the contract between the trust that Plaintiffs created to purchase the equipment—Amtrak Trust HS-EDC-1 (Lessor)—and Amtrak (Lessee);

(b)      the **Participation Agreement** details the rights and obligations of all the parties to the Transaction, including: Amtrak as Lessee; Plaintiffs as Owner Participants; Plaintiffs' trustee, Wilmington Trust Company (WTC), as Owner Trustee; M&T Bank (formerly AllFirst Bank) as Indenture Trustee acting for the benefit of note holders on the debt that financed the Transaction; and EDC as both Loan Participant (the entity that holds the secured debt) and Equity Guarantor of Plaintiffs' equity interest in the Units;

(c)      the **Equity Guarantee Agreement**[14] is the contract in which EDC (formerly Export Development Corporation) agreed to pay Plaintiffs a contractually-specified amount for their equity interest in the event Amtrak engaged in a Guarantee Triggering Event, which the Guarantee defines to include actions that require a Casualty Value payment under the Lease;

---

[13] *See* Ex. H (Lease dated Nov. 6, 2000, between Lessor and Amtrak).

[14] *See* Ex. I (Equity Guarantee Agreement dated Nov. 6, 2000, between Plaintiffs and EDC).

(d)      the **Indenture Trust Agreement**[15] addresses the role and responsibilities of the trust created to represent the interests of note holders entitled to repayment of the loan that financed the Transaction; and

(e)      the **Owner Trust Agreement**[16] outlines the relationship between Plaintiffs and WTC as Plaintiffs' Owner Trustee and manager of the Lessor trust.

27.      ***Key Contract Provisions.***  In keeping with Amtrak's obligation to provide intercity rail service on a safe and reliable basis in accordance with various federal laws, the Operative Contracts give Amtrak operational flexibility over the Lease term, and expressly contemplate that Amtrak may decide not to continue using or maintaining the Units for the full duration of the Lease.

28.      The provisions granting Amtrak this option also contain terms that expressly protect both Plaintiffs' equity interest and the interests of the note holders on the Transaction debt. Notably:

(a)      **Section 7 of the Lease** permits Lessor (Plaintiffs' trust) to recover Casualty Value from Amtrak upon a Casualty Occurrence, which includes, *inter alia* and as relevant here, any determination by Amtrak that: (i) any of the Units is "*unfit for commercial use*"; or (ii) any of the Units is "*uneconomical to repair*";[17] and

(b)      **Section 12.1 of the Lease** independently protects Plaintiffs' interest in the residual value of the Units by prescribing care and maintenance standards

---

[15] *See* Ex. J (Indenture Trust Agreement dated Nov. 6, 2000, between Plaintiffs and EDC).

[16] *See* Ex. K (Owner Trust Agreement dated November 6, 2000, between Plaintiffs and WTC).

[17] The Operative Contracts' definition of Casualty Occurrence also includes situations in which, "as a result of any rule, regulation, order or other action by the United States government or any Instrumentality, the use of [any] Unit in a manner consistent with Lessee's normal business activities shall have been prohibited for a period of 18 consecutive months (or beyond the end of the remaining Lease Term, if it first occurs)."  Participation Agreement Annex A-4.

to ensure, *inter alia*, "that each Unit is in as good condition as when delivered, normal wear and tear excepted."[18]

29.    The Operative Contracts draw on the foregoing provisions to protect Plaintiffs' equity interest in the equipment.  Notably, the Lease provides:

> **Remedies.**  In the event Amtrak takes any action that constitutes a breach (Lease Event of Default) under *either* Section 7's casualty value provisions *or* Section 12's maintenance provisions:
>
> - Section 13.2 permits the Lessor (Plaintiffs' trust) to declare the entire Lease in default and demand payment of Casualty Value for all Units as liquidated damages for loss of the Lease bargain; and
>
> - Section 13.2(i) allows the Lessor to "proceed by appropriate court action . . . to recover damages for the breach [of the Lease]."[19]
>
> In addition, the Equity Guarantee separately provides that:
>
> - "[A]ny Lease Event of Default resulting from [Amtrak's] failure to pay . . . [Section 7] Casualty Value" or from "any Lease Event of Default . . . [arising from Amtrak's maintenance] obligations set forth in Section 12.1 of the Lease" constitutes a Triggering Event under the Equity Guarantee.

30.    Because the Lessor is a trust administered by Owner Trustee WTC for the benefit of Plaintiffs as Owner Participant(s), Plaintiffs are the ultimate beneficiaries of the Lessor's rights under the Lease.  However, in directing WTC to exercise those rights in a manner that protects Plaintiffs' equity interests, Plaintiffs must abide certain provisions that safeguard the note holder(s)

---

[18]   Section 26 of the Lease also permits Amtrak, at its option, to terminate the Lease entirely by paying a contractually-specified Termination Value for the respective Units.

[19] *See id.* § 13.2(i),(ix).

on the debt.[20]   Accordingly, and to spare Plaintiffs delay and entanglement with the debt,[21] the Operative Contracts provide Plaintiffs the immediate protection of an Equity Guarantee payment in exchange for assigning their Lease rights to EDC, the sole Loan Participant.

31.     The Guarantee, which EDC executed to "induce [Plaintiffs] to participate in [the Transaction]," Equity Guarantee Agreement at 1, binds EDC "as primary obligor and not merely as surety," and states that EDC "guarantees[] prompt payment to [Plaintiffs]" of a contractually-defined sum following a Triggering Event, *id.* § 2.1.

32.     The Guarantee defines a "Triggering Event" to include "any Lease Event of Default resulting from a failure to pay Base Rent, Termination Value, or Casualty Value . . . which shall have occurred and be continuing," *id.* § 3.1, and provides that "[a]fter the occurrence and during the continuance of a Triggering Event [Plaintiffs] may make a single demand for payment on the Guarantor," *id.* § 3.2.

33.     The Guarantee further provides that, "[a]fter [Plaintiffs] ha[ve] made a demand on the Guarantor for payment in accordance with Section 3.2 . . . the Guarantor will, on the payment date specified in such demand . . . pay to [Plaintiffs] in Dollars, in immediately available funds,

---

[20] Here, the sole note holder is EDC, which is represented in its capacity as Loan Participant by M&T Bank (formerly Allfirst Bank), the Indenture Trustee that acts for the benefit of EDC as the sole Indenture note holder.  The Operative Contracts provide that, if "the Indenture" that protects the note holders is "in effect" when a Casualty Value payment becomes due, "any payment received by Indenture Trustee . . . with respect to a Casualty Occurrence" shall be distributed to the note holders (Lease § 7.3; *see* Indenture Trust Agreement §§ 3.02(c), 3.03), with the residual balance paid to the Owner Trustee (*see* Indenture Trust Agreement § 3.03), who shall then remit it to Plaintiffs as Owner Participant(s) (*see* Owner Trust Agreement § 5.01(b)).

[21] In addition to addressing allocation of certain Casualty Value payments under the Lease, *see supra* note 20, the Indenture Trust Agreement provides that, following a Lease Event of Default, the Indenture Trustee may pursue "any and all of the remedies pursuant to Section 13.2 of the Lease and under any other Indenture Document and may take possession of all or any [of the Units] . . . and may exclude [Owner Participant(s) from] claiming [such remedies]."  Indenture Trust Agreement § 4.04.

the Guaranteed Amount," *id.* § 3.3, in exchange for Plaintiffs "assign[ing] EDC all of its rights, title and interest in and to such Unit or Units," *id.* § 3.4.

34.     The Guarantee states that EDC "waives diligence, presentment, protest, any right of set-off and any requirement that [Plaintiffs] exhaust any right or take any action against or give notice to the [Amtrak] or [EDC] or any other Person, except for any demand [under Section 3.2]," *id.* § 3.6.  The Guarantee also makes EDC's "obligations" under the Guarantee "direct, general, unconditional, unsubordinated and unsecured obligations of the Guarantor," and as such "direct general unconditional, unsubordinated and unsecured obligations of Canada," for which EDC "is not entitled to claim any sovereign or other similar immunity from suit in its own courts," *id.* § 5.1(f)–(g).

35.     Plaintiffs' claims concern Lease Events of Default arising out of both Casualty Occurrence and maintenance breaches under the Lease that constitute Triggering Events under the Guarantee.  As noted, on information and belief, the conduct giving rise to this suit may also be informed by an indemnity agreement between EDC and Amtrak.

## II.     AMTRAK DEEMS THE LOCOMOTIVES "UNFIT FOR COMMERCIAL USE" AND "UNECONOMICAL TO REPAIR" UNDER LEASE SECTION 7

36.     Sections 7.1 and 7.3 of the Lease prescribe the steps that Amtrak must take in the event of a Casualty Occurrence.  Each of Amtrak's failures to abide these contractual obligations constituted a Lease Event of Default that Plaintiffs are entitled to enforce under the Operative Contracts.

37.     The first Casualty Occurrence arose out of Amtrak's permanent retirement of Plaintiffs' Locomotives from rail service based on its determination that the locomotives were

"unfit for commercial use" and/or "uneconomical to repair."[22]  Such determinations fall within the express contractual definition of a Casualty Occurrence, which applies to fitness and repair determinations based on "*any cause whatsoever*," (Participation Agreement at Annex A-4).  This language reflects that Amtrak, a sophisticated repeat player in these transactions, leased the Units "as-is, where is, with all faults," and expressly acknowledged that neither Plaintiffs nor any other party made "any representation or warranty, express or implied, as to" the "fitness" of the equipment for any "particular use."  Lease § 10.1.  Accordingly, Amtrak expressly assumed the risk that the Units may not be fit for their intended use over the full Lease term, and bargained for early termination of its use and maintenance obligations only at the cost of replacing the Units or paying Casualty Value.  *See* Lease § 7.

### A.   Amtrak Determines that the Locomotives are "Unfit for Commercial Use" and/or "Uneconomical to Repair"

38.     In 2012, Amtrak issued a "Fleet Strategy" memo recommending replacement of the majority of its fleet of locomotives and cars for its Northeast passenger rail routes.  The Fleet Strategy included a plan to procure seventy new electric locomotives that could replace some or all of the leased Locomotives in the coming decade.[23]

39.     The Fleet Strategy memo described Amtrak's concerns over the reliability of the leased Locomotives as a "critical issue."  *See* Ex. L at 24.

---

[22] The Operative Contracts state that a Casualty Occurrence with respect to a "Unit" (i.e., a locomotive or trainset) occurs when "such Unit suffers an actual or constructive total loss (including any damage to any Unit which results in an insurance settlement on the basis of a total loss) *or shall be or become* worn out or shall be destroyed or *irreparably damaged, or uneconomical to repair, or rendered unfit for commercial use from any cause whatsoever during the Lease Term* or until such Unit is returned pursuant to [] the Lease."  *See* Participation Agreement at Annex A-4 (defining "Casualty Occurrence").

[23] *See* Ex. L ("Amtrak's Fleet Strategy") at 24-25.

40.     In 2013, Amtrak's then-President and CEO Joseph Boardman wrote in a report (the "Boardman Memo")[24] to Amtrak's Inspector General that Amtrak recommended "retir[ing]" its HHP-8 electric locomotives because Amtrak found them unreliable and otherwise unfit for continued use "despite several efforts to improve their performance."  *See* Boardman Memo at 34.

41.     The Boardman Memo also recommended retirement of the Locomotives on the grounds that they were uneconomical to repair because the Locomotives' "maintenance is challenged by many parts no longer being in production by their original manufacturers."  *Id.*

42.     The Boardman Memo acknowledged the observation from Amtrak's Office of Inspector General[25] that "applying more intensive maintenance practices [to the Locomotives could] extend [their] useful life indefinitely," but stated that "[Amtrak's engineers] are not confident that such a strategy would result in a level of improvement commensurate with the level of additional resources that would be required."  *Id.*

43.     Part of the reason for Amtrak's assessment that the Locomotives were uneconomical to repair lays in the trains' power system.  The Locomotives are equipped with 27 Alstom E2B power modules that include a glycol cooling system and porcelain piping.  If a power module's porcelain piping develops a crack, the glycol sprays out and short circuits the unit, requiring costly repairs.[26]

---

[24]  *See* Ex. M (Amtrak Report No. OIG-E-2013-014 (May 28, 2013), Appendix III at 34) ("Boardman Memo").

[25]  Office of Inspector General Audit Report No. CR-2013-056, Federal Railroad Administration (Mar. 27, 2013), available at https://www.oig.dot.gov/sites/default/files/Amtrak%27s%20New%20Cost%20Accounting%20System%20Report%5E3-27-13.pdf.  (Ex. N.)

[26] Ex. O (Biggs Inspection Report dated October 2017 ("Biggs Report")) at 3.

44.     In February 2016, Amtrak issued a "Five Year Financial Plan" for "FY 2016–

2020."[27]  With regard to locomotives, the very last page of that 163-page document stated:

> All of the seventy new electric locomotives being manufactured by Siemens are
> *expected to be received by the end of 2016*.  The new locomotives allow Amtrak to
> retire the existing electric locomotive fleet and standardize the fleet to include only
> the new Siemens units and the Acela power cars.[28]

45.     With respect to trainsets, the Five Year Financial Plan referenced "[c]ontinuation

of the multi-year Acela Overhaul Program addressing the system overhaul needs of the Acela train

sets," which "program will enable Amtrak to maintain equipment in a state of good repair, to return

the assets to current Amtrak standards, improve reliability and availability of equipment, enhance

overall customer experience, comply with applicable Federal regulations and mitigate equipment

failures . . . ."[29]

46.     In May 2016, press reports suggested that Amtrak had contracted for trainsets that

could cause Plaintiffs' Trainsets to be permanently retired.  In response, Plaintiffs contacted

Amtrak in May 2016 to inquire about the status of *all* of the Leased Equipment.  Amtrak responded

that no decision had been made regarding the Trainsets, and did not address the status or treatment

of Plaintiffs' Locomotives despite Plaintiffs' inquiry and the fact that Amtrak's 2016 "Five Year

Financial Plan" did not include any HHP-8 locomotives in the Plan's list of "Active Units."  As

detailed below, Plaintiffs followed up with Amtrak in an August 2016 email asking for an update

---

[27] *See* Ex. P ("The National Passenger Railroad Corporation FY 2016 Budget & Business Plan,
FY 2017 Budget Request Justification, FY 2016 – 2020 Five Year Financial Plan").

[28] *Id.* at 163; *see also id.* at 23 (stating that the Siemens "locomotives are replacing the AEM-7 and
HHP-8 locomotives used on Northeast Regional, Keystone and various State Supported and Long
Distance trains that operate over the electrified sections of the NEC"; that the "first locomotive
entered revenue service on February 7, 2014 and, as of this writing, 62 new locomotives have been
delivered"; and also that "[t]hese locomotives have replaced all 15 HHP-8 locomotives and nearly
all AEM-7 type locomotives").

[29] *Id.* at 150.

20

based on further press reports and Amtrak's promise in May 2016 to "provide a full update" to Plaintiffs "if something gets signed" that would affect Plaintiffs' equipment.[30]  It was only in late 2016, after months of stonewalling, that Plaintiffs were able to deduce from a combination of public information and Amtrak's responses to Plaintiffs' inquiries that Plaintiffs' Locomotives had been permanently retired.

47.    That the Locomotives were permanently retired pursuant to a determination that they were unfit for commercial use and/or uneconomical to repair is evidenced by Amtrak's January 2017 financial statements referencing Amtrak's fiscal year 2016 recording of $29.3 million in depreciation for the removal of the Locomotives from active service.  In its 2016 Consolidated Financial Statements, published on January 27, 2017, Amtrak stated that it claimed this depreciation because "[t]he Company concluded that the locomotives *would not be returned to active service*."[31]  This statement and the accompanying accounting treatment confirmed that the Locomotives were prematurely and permanently retired, as does Amtrak's 2016 financial statement in describing the Locomotives' removal before observing that, *in contrast*, "[t]here were *no* significant *premature retirements* of depreciable property . . . in [fiscal year] 2015."[32]

48.    Amtrak's 2017 Consolidated Financial Statements repeated the fiscal year 2016 recording of $29.3 million in depreciation, as well as the characterization of the locomotives' retirement as "premature."[33]

**B.    Amtrak Refuses to Pay Casualty Value for the Retired Locomotives**

49.    Section 7.1 of the Lease required Amtrak to notify Plaintiffs and all other

---

[30] *See* Ex. Q (Plaintiffs' e-mail to Amtrak (Vabner) dated Aug. 30, 2016).

[31] *See* Ex. R ("Amtrak's FY 2016 Financial Statements"), Notes at 13.

[32] *See id.*

[33] *See* Ex. S ("Amtrak's FY 2017 Financial Statements"), Notes at 13.

participants in the Transaction "within 5 Business Days after [Amtrak's] determination" that the Locomotives were unfit for use and/or uneconomical to repair, which determination constituted a Casualty Occurrence under the terms of the Lease.

50.    When Amtrak retired the Locomotives, it had the option to proceed under either Lease Section 7.2, requiring substitution of the Locomotives, or Lease Section 7.3, requiring the payment of Casualty Value.

51.    Amtrak's "failure to provide [its] notice of election . . . constitute[d] an election to proceed in accordance with Section 7.3,"[34] and obligated Amtrak to make an Aggregate Casualty Payment to the Indenture Trustee on behalf of the debt holder(s), and to the Owner Trustee on behalf of Plaintiffs.

52.    Based on the evidence Amtrak concealed until 2016, Plaintiffs' November 21, 2016, notice stated that Amtrak should have notified Plaintiffs that the Locomotives were retired by February 2015 and made an Aggregate Casualty Payment by June 3, 2015.[35]   Amtrak did neither.  Indeed, Amtrak failed to notify Plaintiffs of a Casualty Occurrence even in January 2017, when Amtrak confirmed the 2016 accounting treatment reflecting Amtrak's premature and permanent retirement of Plaintiffs' Locomotives that year.

53.    Under Lease Section 13.1(i), Amtrak's undisputed "fail[ure] to make any payment of . . . Casualty Value . . . within 5 Business Days after the same shall become due" "constitute[d] [a] Lease Event[] of Default" entitling Plaintiffs to remedies including a Guarantee payment.

---

[34] Lease § 7.1.

[35] *See* Ex. T (Ltr. from Plaintiffs to Amtrak dated Nov. 21, 2016 (sent via e-mail and overnight courier)) (premising Plaintiffs' demand on the Operative Contracts' provisions requiring payment "on the Casualty Value Determination Date with respect to such Unit or Units suffering a Casualty Occurrence," which is "the first monthly Casualty Value Determination Date set forth in Schedule IV to the Lease Supplement applicable to such Unit that is at least 90 days after such Casualty Occurrence").

## III.    AMTRAK FAILS TO MAINTAIN THE UNITS UNDER LEASE SECTION 12.1

### A.    Amtrak Cannibalizes the Locomotives for Parts and Fails to Perform Required Maintenance

54.    Section 12.1 of the Lease states, *inter alia*, that Amtrak must "maintain and service each Unit . . . so that each Unit is in as good condition as when delivered (ordinary wear and tear excepted)."[36]  Section 12 further states that "[i]n no event shall any Unit be maintained with less care or scheduled for maintenance on a basis less frequent than . . . other rolling stock similar to the Units owned by or operated for or by [Amtrak] . . . ."[37]

55.    To facilitate compliance with these and other maintenance provisions in the Operative Contracts, the Lease states that Amtrak "may take a Unit out of service *while awaiting repair* so long as [Amtrak] takes reasonable care to *prevent deterioration* of the condition of such Unit beyond that attributable to the circumstances necessitating such repair . . . ."[38]

56.    In addition to imposing the foregoing maintenance obligations, the Lease requires Amtrak "to comply in all material respects with all laws, rules or regulations of (i) the United States and any jurisdictions into which its operations involving the Units may extend, and (ii) . . . the Federal Railroad Administration ['FRA']," including various federal laws and FRA regulations governing the use and maintenance of the Leased Equipment.[39]

57.    To help substantiate compliance with these maintenance obligations, the Lease requires Amtrak to "maintain all records, logs and other materials required by the [Association of

---

[36] Lease § 12.1(i)(a)(w).

[37] *Id.* § 12.1(ii).

[38] *Id.*

[39] *Id.* § 11.1.

American Railroads,] or the United States Department of Transportation, or any other Governmental Authority having jurisdiction over the Units or [Amtrak],"[40] including the FRA.

58.     The foregoing maintenance and record-keeping obligations in the Lease survived the Casualty Occurrences described above because Section 7.6 of the Lease expressly states that "[Amtrak] shall *not* be released from its obligations hereunder in the event of . . . any Casualty Occurrence . . . ."[41] This provision is important because in this case, Amtrak's inspection reports and maintenance records show several maintenance breaches with respect to the Units both before and after their removal from service.[42] For example, Amtrak's own maintenance records indicate that numerous parts from several Locomotives were "cannibalized" or "robbed," notably:

- May 28, 2008: Locomotive #685's[43] rear end "fireman's side step" (required for operation under 49 C.F.R. §§ 231.30(c)–(d), 231.29) was robbed;[44]

- April 1, 2009: Locomotive #681's filter capacitor (a device which is required to protect electronic equipment from potentially catastrophic damage) was robbed;[45]

- August 24, 2010: Locomotive #690's battery chargers were robbed;[46]

- September 17, 2010: Locomotive #692's "F end MFD," "PSP2 Pressure Switch," and parking brake pressure switch were all robbed;[47]

---

[40] *Id.* § 12.1(i)(b).  Lease § 9(i) permits Plaintiffs to inspect the Units and records at any reasonable time.

[41] *Id.* § 7.6.

[42] Although retired equipment is subject to reduced maintenance requirements under FRA regulations, Amtrak was contractually obligated under the Lease to maintain the Leased Equipment on par with "similar rolling stock."  Lease § 12.1(ii).

[43] Amtrak re-numbered the Locomotives in 2015.  *See* Ex. U (Ltr. from Amtrak (McGee) to WTC ("Statement of New Railcar Reporting Marks")).  Accordingly, references herein are to the new reporting marks for the Locomotives.

[44] *See* Ex. V (Consolidated Ten-Year Locomotive Maintenance Records) at 66.

[45] *See id.* at 13.

[46] *See id.* at 96.

[47] *See id.* at 111.

- September 28, 2010: Locomotive #692's "R end MFD" was robbed;[48]

- November 4, 2010: Locomotive #690's Automatic Train Control Card (a safety system required to be maintained in working order for operation of the unit, *see generally* 49 C.F.R. § 236.0) was robbed;[49]

- December 30, 2010: Locomotive #690's event recorder (a device required under 49 C.F.R. § 229.135, which is "designed to resist tampering, that monitors and records data," *see* 49 C.F.R. § 229.5) was robbed;[50]

- March 17, 2011: Locomotive #681's speed sensor power supply was "cannibalized";[51]

- June 27, 2011: Locomotive #681's front end coupler knuckle (a locking mechanism required to operate the rolling stock) was "cannibalized" for a locomotive not covered by the Operative Contracts with Plaintiffs;[52]

- July 22, 2011: Locomotive #692's AGATE (a programmable device used to interface with the Locomotive's network of electronic systems) was cannibalized;[53] and

- March 3, 2014: Locomotive #682 had multiple parts cannibalized and not replaced for nearly three years (until December 13, 2016).[54]

59.     Amtrak's maintenance records for the Leased Equipment also reveal that Amtrak

failed properly to inspect and test numerous locomotives within a period that "may not exceed 92

days" under 49 C.F.R. § 229.23 and other applicable laws, notably:

- Locomotive #684 missed the deadline on its required 92-day inspection, which was conducted on August 25, 2015—283 days overdue.[55]

- Locomotive #685 missed the deadline on its required 92-day inspection, which was conducted on December 17, 2013—31 days overdue.[56]

---

[48] *See id.*

[49] *See id.* at 96.

[50] *See id.*

[51] *See id.* at 10.

[52] *See id.*

[53] *See id.* at 108.

[54] *See id.* at 19.

[55] *See* Ex. W (Card 684 8-25-15).

[56] *See* Ex. X (Card 655 12-17-13).

- Locomotive #690 missed the deadline on its required 92-day inspection, which was conducted on January 30, 2013—74 days overdue.[57]

- Locomotive #692 missed the deadline on its required 92-day inspection, which was conducted on February 25, 2012—8 days overdue.[58]

60.     Amtrak's responses to Plaintiffs' inquiries also indicate that Amtrak failed to maintain copies of Form FRA F 6180–49A, in violation of 49 C.F.R. § 229.23, for at least six of the Locomotives (Nos. 681, 682, 685, 686, 690, and 692) for the period from May 30, 2012, to August 21, 2012, and for a seventh Locomotive (No. 694) from October 17, 2013, to May 16, 2014.

61.     The maintenance records and other information available to Plaintiffs further document Amtrak's failure to perform several required maintenance procedures in the years leading up to Amtrak's retirement of the units as unfit for commercial use and/or uneconomical to repair.  Notably, these records indicate that:

- Inspection of Main Transformer (procedure #EXEH-24-0066) was not completed for Locomotive Nos. 681, 682, 684, 685, 686, 690, or 692;

- Testing of Pressure Switch and FCU Detection (procedure #EXEH-01-0009) was not completed for Locomotive Nos. 681, 682, 684, 685, 686, 690, or 692;

- Testing of the Fire Control Unit (procedure #EXEH-01-0007) was not completed for Locomotive Nos. 684, 685, 686, 690, 692, or 694;

- Inspection and Sampling of Main Transformer Oil Level (procedure #EXEH-24-0064) was not completed for Locomotive Nos. 681, 682, 684, 685, 686, 690, or 692, and was not completed for Locomotive No. 694 every six months as recommended;

- Inspection of Air Compressor and Replenishment of Air Dryer Desiccant (procedure #EXEH-21-0038) was not completed for Locomotive Nos. 684 and 692; and

- Replacement of Auxiliary Air Compressor Intake Filter (procedure #EXEH-21-0006) was not timely completed for Locomotive Nos. 681, 682, 684, 685, 686, 690, 692, or 694.

---

[57] *See* Ex. Y (Card 660 1-30-13).

[58] *See* Ex. Z (Card 662).

62.     Reports from both of the independent inspections Plaintiffs ordered in 2017 confirm Amtrak's ongoing maintenance failures under the Operative Contracts.

63.     The first inspection was conducted by independent third party inspector David Witt of TSA Railcar Services in June 2017.[59]

64.     That inspection confirmed that all eight Locomotives were retired no later than February 9, 2015.  At the time of the inspection, four of the Locomotives (Nos. 681, 684, 685, and 690) were being stored outdoors and the other four (Nos. 682, 686, 692, and 694) were being stored in various disassembled states on truck frames.[60]  Notably, the report observed that "all" of the eight locomotives addressed in the inspection were "retired" by early 2015, and that "four of them" were "being stored in a[n] unusual condition":[61]



---

[59] *See* Ex. AA (TSA Railcar Services, David Witt Inspection Report of June 2017 ("Witt Report")).

[60] *See id.*

[61] *Id.*

| **Witt Report** | **TSA RAILCAR SERVICES, INC.**<br>**2168 N. WESTMORELAND DR.**<br>**PALATINE, IL. 60074-1221** |
|---|---|
| | **AMTRAK LOCOMOTIVE REPORT** |

During June I set up and completed inspections of 8 Units at the AMTRAK shop in Wilmington, DE. **All of them are being renumbered and the last one's to operate were retired on February 9th, 2015** . As of now they are **all covered under the FRA 49 CFR 229.33 (out of use credit) rule** that designates times of inspection. **Four of them are inside the shop being stored in a unusual condition** as the pics will show. They are being checked by FRA standards, and since they are all out of service this is a slow project. Here is a pic with the Pantographs removed and the center open.

 

65.    The Witt Report further referenced reliability defects consistent with Amtrak deeming the units "uneconomical to repair" and/or "unfit for commercial use" under Section 7 of the Lease.[62]    For example, the report included the following picture of the extracted "air compressor for [Unit] 694" along with a statement that "[w]hy it is outside is unknown":[63]

 

---

[62] *Id.* The report also references conditions with Amtrak's potential sale of the Units, which would have triggered Lease termination under Lease Section 26. *Id.* at 2.

[63] *Id.* at 2-3.

66.     These and other findings in the Witt report confirmed that the Units were removed from service in breach of the Operative Contracts, because Lease Section 12.1(ii) permits the Units to be taken out of service only "while awaiting repair," and only "so long as [Amtrak] takes reasonable care to prevent deterioration of the condition of such Unit beyond that attributable to the circumstances necessitating such repair."

67.     In response to the Witt report and the absence of maintenance records documenting contractually permitted repairs, Plaintiffs' trustee WTC, in its capacity as Lessor, sent Amtrak a written Notice of Lease Default in September 2017 for the improper maintenance and use of the Locomotives in breach of Section 12 of the Lease, and advised Amtrak that it had 30 days to cure the default.[64]

### B.    Amtrak Fails to Cure its Deficient Maintenance

68.     Under Lease Section 13.1(v), Amtrak had 30 days after Plaintiffs' September 2017 notice to effect a cure or, "if such failure is curable but not capable of being cured within such 30-day period, such longer period not to exceed 90 days (or 365 days in the case of a maintenance default with respect to not more than two (2) Locomotives . . .) during which [Amtrak] shall be diligently attempting to cure such failure."

69.     To the extent that any of Amtrak's maintenance defaults were curable, Amtrak failed to cure or diligently pursue a cure in accordance with the Lease, and both of the extended cure periods have now lapsed.

70.     Amtrak's failure to cure the maintenance default Plaintiffs documented in June 2017 was evident from the second inspection Plaintiffs commissioned by independent inspector Edward Biggs of Biggs Appraisal in October 2017.[65]

---

[64] *See* Ex. BB (Ltr. from WTC to Amtrak dated September 7, 2017).
[65] *See* Biggs Report.

71.     The Biggs Report agreed with the Witt Report that all eight Locomotives had been

retired.  The Biggs Report further noted that three of the Units (Nos. 682, 685, and 694) were in

the shop with one (No. 682) in a "completely disassembled" state.[66]  The Biggs Report concluded

that this Unit had previously developed a major electrical issue following a traction motor fire and

had burnt cables that were listed in Amtrak's maintenance records as repaired in December 13,

2016.  But Inspector Biggs found that the cables were still not in working order when he inspected

them ten months later in October 2017.[67]

72.     Based on these and other findings, including that Unit 682 had been "cannibalized

for parts," Biggs concluded that Amtrak had stored the Leased Equipment in an unrepaired and

unserviceable condition:[68]

### EDWARD D. BIGGS III, LLC
### D/B/A BIGGS APPRAISAL
### ACCREDITED SENIOR APPRAISER

Unit AMTK 682 (old number 652) is in the back of the shop in a total disassembled state sitting on jack stands. The 10-year maintenance records for this unit show that on 11/13/2013 this unit was reported as having burnt cables. This was reported as completed on 12/13/2016 but the cable repairs were not completed as of October 12, 2017 when the unit was inspected. It is

unit due to the disassembled state of the unit. This unit appears to have been stored in an unserviceable condition that is not in compliance with Lease section 12.1 (ii). This unit shows that it was cannibalized for parts on 3/3/2014 with parts reported as replaced on 12/13/2016.

While I believe that each of these units can be repaired to an operationally ready condition to meet the requirements of the lease, it appears that there have not been any efforts made to improve the reliability of the key power modules that operate these locomotives. Rather than improve the power modules new replacement locomotives were acquired. Unit 682 was not maintained in accordance with the lease. It was

---

[66] *Id.* at 6.

[67] *Id.*

[68] *Id.* at 4.

73.     The Biggs findings confirmed Amtrak's continuing breach of its obligations under Lease Section 12.1 to maintain the units in keeping with the Operative Contracts, and specifically to: (i) perform timely, legally-required maintenance to ensure that at the end of the Lease term "each Unit is in as good condition as when delivered (ordinary wear and tear excepted)," Lease § 12.1(i)(a)(w); and (ii) with respect to any Unit requiring repair, to take "reasonable care to prevent deterioration of the condition of such Unit beyond that attributable to the circumstances necessitating [its] repair," *id.* § 12.1(ii).

74.     Under Lease Section 13.1(v), Amtrak's "fail[ure] to perform or observe any material covenant"—including its failure properly to use and maintain the Units as prescribed by Lease Section 12.1—if not timely cured "after written notice . . . constitute[s] [an independent] Lease Event[] of Default" for which Plaintiffs are entitled to seek remedies including a Guarantee payment.

## IV.     AMTRAK PROPOSES A BUYOUT TO ADDRESS PLAINTIFFS' CLAIMS

75.     The two 2017 inspections detailed above were part of Plaintiffs' efforts to preserve their rights and secure resolution of their claims following Amtrak's offer to negotiate a buyout in December 2016.

76.     As noted, the discussions precipitating that proposal began in May 2016, when Plaintiffs inquired about the status of the Leased Equipment with Amtrak officials.  In these initial discussions Amtrak told Plaintiffs that, if Amtrak finalized an agreement to purchase new units that would replace the Leased Equipment, Amtrak would discuss appropriate relief.

77.     In the ensuing months, Plaintiffs followed up on the discussions that occurred in the wake of the May 2016 press reports regarding Amtrak's purchase of new trainsets from Alstom. Notably, on August 30, 2016, Plaintiffs responded to additional press reports by emailing Amtrak an inquiry about the status of Plaintiffs' Leased Equipment that specifically referenced Amtrak's

May 2016 promise to provide "a full update" in the event "something gets signed" that would affect Plaintiffs' equipment.[69]  Amtrak did not respond.

78.     On October 7, 2016, Amtrak conceded that it "never got back to [Plaintiffs] on" their August inquiry and offered to discuss it.[70]  Plaintiffs made several further efforts to schedule the discussion Amtrak offered on October 7, and generally to discover the status of the Leased Units.  On October 21, 2016, Plaintiffs again emailed Amtrak and asked to speak "as soon as possible about our HHP-8 locomotives" because Plaintiffs had been researching the 2016 financial disclosures and associated 2016 reports concerning Northeast Corridor equipment.[71]  In their October 21 email, Plaintiffs informed Amtrak that this "research indicates that the locos were retired by Amtrak in 2014 [but] [*Plaintiffs*] *had no knowledge or notice of this.*"[72]  Again Amtrak did not respond, and its evasiveness, combined with 2016 press and financial reports, caused Plaintiffs to believe their equipment was being retired in violation of the Operative Contracts. Accordingly, on November 21, 2016, Plaintiffs wrote Amtrak asserting their claim that Amtrak's discretionary retirement of the Units and accompanying failure to maintain them triggered an obligation to pay Casualty Value.  Plaintiffs' November 21, 2016 letter further stated that, if Amtrak continued to disregard Plaintiffs' good faith outreach, Plaintiffs would direct WTC as Lessor to issue: (i) a notice of Lease Event of Default for failure to pay Casualty Value under Section 7 of the Lease; and (ii) a notice of Lease Default for failure properly to use and maintain the Locomotives under Section 12 of the Lease.[73]

---

[69] *See supra* note 30, Ex. Q.

[70] *See id.*

[71] *See* Ex. CC (E-mail from Plaintiffs to Amtrak (Vabner) dated Oct. 21, 2016).

[72] *Id.*

[73] *See supra* note 35, Ex. T.

A.      **Amtrak Proposes a Buyout of Plaintiffs' Interest in the Units**

79.      One week later, on November 29, 2016, Amtrak told Plaintiffs it would meet to discuss a buyout of Plaintiffs' equity interest.[74]  On December 1, 2016, Amtrak sent senior officials (Michael McGee, Treasurer, and Reuben Vabner, Senior Director of the Treasury Department) to meet with Plaintiffs.  In that meeting, the Amtrak officials proposed that, instead of paying Casualty Value (which could trigger various unrelated liabilities according to Amtrak's financial statements), Amtrak simply terminate the Lease and buy out Plaintiffs' equity interest in the Locomotives.

80.      Amtrak promised to send Plaintiffs a written proposal memorializing this relief within a few weeks.  Amtrak confirmed its intent to submit a buyout proposal on December 9, 2016, when Senior Director Vabner advised Plaintiffs by email that Amtrak is "finishing up running numbers (including numbers on an equity-only basis)," and that Plaintiffs should "[p]lease expect to hear from [Amtrak] shortly."[75]

81.      A week later, after Plaintiffs and Amtrak had confirmed residual payment totals, Vabner wrote that Amtrak "plan[s] to come back to [Plaintiffs] with a proposal.  Hopefully, within [the] next week."[76]

82.      The December holidays intervened and, on January 4, 2017, Plaintiffs emailed Amtrak to follow up on the buyout proposal.  Amtrak responded that it was "behind schedule" in getting its proposal to Plaintiffs, but stated that it "ha[d] a complete analysis in front of top finance

---

[74] *See* Ex. DD (Ltr. from Amtrak (McGee) to Plaintiffs dated Nov. 29, 2016 (sent via e-mail and overnight courier)).

[75] *See* Ex. EE (E-mail from Amtrak (Vabner) to Plaintiffs dated December 9, 2016).

[76] *See* Ex. FF (E-mail from Amtrak (Vabner) to Plaintiffs dated December 16, 2016).

dept. management and [is] hoping for go-ahead to communicate a proposal to [Plaintiffs] very shortly."[77]

83.    On January 13, 2017, Amtrak wrote Plaintiffs that the Treasury team's recommendation regarding an early termination has "made it up to the CFO level who said [the team] should go ahead and take it to [Amtrak's then-]President, Wick Moorman, for his review."[78] Amtrak hoped to revert to Plaintiffs with the proposal by the end of the following week.[79]

**B.    Amtrak Stalls and Terminates Key Members of the Negotiating Team**

84.    Unbeknownst to Plaintiffs, Amtrak was in early 2017 executing a major reorganization in which Treasurer Michael McGee, who was part of the team that proposed the buyout to Plaintiffs in 2016, left Amtrak and was replaced by Rhonda Lynn Seegal, who would serve briefly as Treasurer under new Chief Financial Officer William Feidt before she, too, abruptly departed.

85.    In February 2017, Amtrak's Senior Director Vabner advised Plaintiffs that they would have to wait another month for Amtrak's buyout proposal, but did not reveal the impact of Amtrak's reorganization and instead reassured Plaintiffs that Amtrak was proceeding as discussed.

86.    On March 10, 2017, Plaintiffs emailed Amtrak to inquire about the status of the promised proposal.  Vabner replied that he and the new Treasurer, Rhonda Seegal, were planning to meet with new CFO Feidt and then-President Moorman about the proposal.  Vabner further stated that, "[d]epending on guidance given, we may be ready to come back to you by end of next week.  If there is any delay, I would still hope we can be back to you within March 2017."[80]

---

[77] *See* Ex. GG (E-mail from Amtrak (Vabner) to Plaintiffs dated January 13, 2017).

[78] *See id.*

[79] *See id.*

[80] *See* Ex. HH (E-mail from Amtrak (Vabner) to Plaintiffs dated March 10, 2017).

87.     Throughout March 2017, Seegal and Vabner continued to dialogue with Plaintiffs about Amtrak's forthcoming buyout proposal.  But in April 2017, Amtrak abruptly reversed course and asked Plaintiffs to send Amtrak written buyout terms instead.

88.     On April 25, 2017, Plaintiffs in good faith complied with Amtrak's request and provided Amtrak with two alternative buyout proposals.[81]

89.     Plaintiffs waited approximately two weeks for Amtrak to respond before contacting Senior Director Vabner on or about May 8, 2017 to inquire about Amtrak's reactions to the proposals.

90.     On May 16, 2017, Plaintiffs again followed up, this time by emailing both Amtrak Treasurer Rhonda Seegal and Senior Director Vabner with a request to discuss the pending buyout terms.[82]  The next day, on May 17, 2017, Vabner replied that he and Seegal would "coordinate a time to discuss with you and come back with that proposed time.  It should be within this week [by May 19, 2017]."[83]

91.     On June 2, 2017, Plaintiffs again wrote to Vabner and Seegal expressing concerns about the ongoing delay in finalizing a buyout to address Amtrak's lease defaults:

> It has been over six months since [Plaintiffs] met with [Amtrak] to discuss the issues outlined in our letter dated November 21, 2016. When we met . . . on December 1st 2016, Reuben [Vabner] and Michael [McGee] said that Amtrak would be coming back to [Plaintiffs] within weeks with a proposal to address the matter but after several months you asked us instead to make a proposal. On an April 21st telephone call we verbally made a proposal to modify the leases to which you asked if we could put the proposal in writing. On April 24th [Plaintiffs] forwarded the written proposal and to date are still waiting for your response.

---

[81] *See* Ex. II (E-mail from Plaintiffs to Amtrak (Vabner and Seegal) dated June 2, 2017).

[82] *See id.*

[83] *See id.*

[Plaintiffs] have been very patient. First waiting for the proposal you said that Amtrak would provide but never did and now waiting for a response to the proposal we sent you. [Plaintiffs] very much would like to arrive at an arrangement that works for all of us but if [Plaintiffs] do not hear from [Amtrak] shortly and make progress toward a solution [Plaintiffs] will have to proceed as outlined in [the] November 21st letter.[84]

92.     That same day, on June 2, 2017, Seegal responded to Plaintiffs and scheduled a call for June 6, 2017, to discuss buyout terms.

93.     On June 6, 2017, Plaintiffs spoke with Vabner and Seegal, who advised Plaintiffs that Amtrak was planning to present a revised proposal to Plaintiffs soon and offered to speak again the week of June 19, 2017—hopefully with that proposal in hand.

94.     But less than two weeks later, on June 15, 2017, Seegal e-mailed Plaintiffs to say she was leaving Amtrak and that the company would continue to "work through these important issues" with Vabner and others.[85]

95.     On June 23, 2017, more than six months after Amtrak offered a buyout proposal to address Plaintiffs' contract claims, Vabner e-mailed Plaintiffs and acknowledged that "[Amtrak] set [Plaintiffs'] expectations towards the prompt delivery of a bid from Amtrak to terminate the [Lease] between [Plaintiffs] and Amtrak."  But, Vabner explained, Amtrak had decided not to honor those expectations, and had "decided not to make a proposal at this time."  He then admitted that, when Amtrak led Plaintiffs to "expect[]" a "prompt" bid in December 2016, Amtrak was actually in no position to offer one and that, "[a]t the earliest, [Amtrak] will be in a position to make a proposal after our 2018 budget process has moved towards completion, at the end of July 2017."[86]

---

[84] *See id.*

[85] *See* Ex. JJ (E-mail from Amtrak (Seegal) to Plaintiffs to dated June 15, 2017).

[86] *See supra* note 4, Ex. B.

96.     In the same e-mail, Vabner noted that he would be Plaintiffs' new "point of contact from here on" and encouraged further discussion of the buyout proposal.[87]  But shortly thereafter Vabner, too, abruptly departed Amtrak.   On information and belief, he was terminated due to disagreements with Amtrak's management about honoring Plaintiffs' contract claims and buyout proposal.

## V.     AMTRAK RENEGES ON THE BUYOUT PROPOSAL AND BLOCKS PLAINTIFFS' GUARANTEE PAYMENT

### A.     Amtrak Terminates Buyout Discussions and Plaintiffs Invoke the Guarantee

97.     In October 2017, Amtrak's new Treasurer Swati Sharma sent a letter to Lessor WTC (Plaintiffs' trustee) in which Amtrak conceded its "operational decision to transfer the [leased] locomotives to reserve status from active service," but asserted that this "action did not violate the Lease."[88]  Amtrak further asserted its "disagreement as to the proper interpretation of (i) the findings of the Witt inspection, (ii) the maintenance provisions of the Lease; and (iii) [Amtrak] statements contained in the report of Amtrak's Inspector General."[89]   Amtrak then accused  Lessor of asserting the maintenance Lease Default under Section 12 "not with the goal of having the locomotives maintained, but in the hope of leveraging its position with Amtrak (and EDC as the equity guarantor) with respect to all of the leased equipment and thereby shifting this residual risk to Amtrak."[90]

98.     On December 15, 2017, WTC (Plaintiffs' trustee) responded to Amtrak's October 2017 correspondence by sending Amtrak a formal Notice of Lease Events of Default for both (i) Amtrak's failure to pay Casualty Value as required under Section 7 of the Lease; and (ii) Amtrak's

---

[87] *See id.*

[88] *See* Ex. KK (Ltr. dated Oct. 13, 2017 from Amtrak (Sharma) to Plaintiffs) at 1.

[89] *Id.* at 1.

[90] *Id.* at 2.

failure properly to maintain and use the Units as required by Section 12.1 of the Lease.[91]   In contrast to the sweeping and unsupported assertions in Amtrak's October letter, WTC's December 2017 Notice supported the claimed Lease Events of Default (and responded to Amtrak's October correspondence) with a detailed recitation of evidence and relevant Lease provisions, notably:

- **Lease Events of Default – Locomotive Use and Maintenance**:

  - "Lessor hereby notifies Amtrak that a Lease Event of Default has occurred and is continuing under clauses (i) and (v) of Section 13.1 of the Lease due to (1) the failure of Amtrak to pay Casualty Value within 5 Business Days of the respective Casualty Value Determination Dates for each of the Locomotives it has retired from service and (2) the failure of Amtrak to cure the [maintenance] Lease Defaults identified in the Notice of Lease Default within 30 days of Amtrak's receipt of such notice," Ex. LL at 2;

  - Amtrak's "assertion" that "[n]othing in the Lease limits Amtrak's right to make operational decisions with respect to scheduling and utilization of the locomotives" is "clearly contradicted by the terms of Section 12 of the Lease, which is entitled USE AND MAINTENANCE" and expressly "limits Amtrak's rights with respect to scheduling of the Locomotives by requiring that the Locomotives not be scheduled for maintenance on a basis less frequent than [that] for other rolling stock similar to the Locomotives owned by or operated for Amtrak," and also "require[s] that each Locomotive [be] used in a manner consistent with its design and intended use . . . [and] in a manner that permits all of the maintenance and service required by the Lease," *id*. ¶ 2;

- **Casualty Occurrence – Locomotive Retirement**

  - Amtrak's "statutory duty to provide common carrier intercity rail service to the public" does not excuse Lease liability for "remov[ing] the Locomotives due to their unacceptable reliability issues," because any determination that the Locomotives are "unfit for commercial use for *any cause whatsoever* during the Lease Term" is expressly defined in the Lease as a "Casualty Occurrence," *id*.;

  - In invoking these provisions of the Lease and other Operative Contracts, "Lessor and Owner Participant are not attempting to shift any risk or obligation to the Lessee that it has not *already assumed* when it agreed to comply with the provisions of the Lease," during which "Amtrak as Lessee assumes responsibility for all costs and expenses associated with the use and maintenance of the Locomotives including the obligation to pay Casualty Value and all other amounts due under Section 7.3," *id*.; and

---

[91] *See* Ex. LL (Ltr. dated Dec. 15, 2017, from WTC to Amtrak (Sharma)).

- **Casualty Occurrence – Locomotive Maintenance**

  - "Amtrak has failed to maintain the Locomotives in accordance with Section 12 of the Lease, and in making the determination that the Locomotives are unfit for commercial use without paying Casualty Value has failed to comply with . . . [Lease] Section 7," *id.* ¶ 6.

99.     In parallel with serving the December 15, 2017, Notice of Lease Events of Default on Amtrak, Plaintiffs issued a Demand to EDC for the payment of Equity Casualty Value in the amount of US$92,947,365.00 (the "Guaranteed Amount"), on the basis of the defaults detailed in the Amtrak Notice.[92]

100.     The Demand stated that the following Triggering Events "have occurred and are continuing":    1)    a "Triggering Event under [] Section 3.1[(A)] of the Guarantee for a "Lease Event of Default . . . due to [Amtrak's] failure to pay Casualty Value within 5 Business Days of the respective Casualty Value Determination Dates for each of the Locomotives that it has retired from service;" and 2) a "Triggering Event [] Section 3.1[(C)] of the Guarantee for a "Lease Event of Default . . . due to [Amtrak's] failure to cure Lease Defaults under Section 12.1 of the Lease [requiring proper use and maintenance of the Units] within 30 days of [Amtrak's] receipt of notice of such default."[93]   The Demand then attached the December 2017 Notice to Amtrak, including Schedule 1, which detailed evidence of:

  (a)   Amtrak communications confirming that Amtrak "removed the Locomotives from service because the unacceptable reliability issues with the Locomotives rendered them unfit to provide the intercity rail service Amtrak is statutorily obligated to provide," thus triggering a "Casualty Occurrence under Section 7 of the Lease," Ex. MM, Schedule 1 at I; and

  (b)   "Lease Events of Default" under the maintenance provisions of the Lease that "exist and are continuing," including under:

---

[92] *See* Ex. MM (Ltr. Demand from Plaintiffs to EDC dated Dec. 15, 2017).

[93] *See id.*

(i) "Section 12(i) of the Lease, [which] requires Amtrak to 'use the Equipment in any manner consistent with [its] design and intended use,'" *id.* Schedule 1 at II(1);

(ii) "Section 12.1(i)(a)(w) of the Lease, [which] requires Amtrak to 'maintain and service each Unit . . . (w) so that each Unit is in as good condition as when delivered (ordinary wear and tear excepted),'" *id.* Schedule 1 at II(2);

(iii) "Section 12.1(i)(a)(y) of the Lease, [which] requires Amtrak to 'maintain and service each Unit . . . (y) . . . in accordance with the Amtrak maintenance plan for the Locomotives,'" *id.* Schedule 1 at II(3);

(iv) "Section 12.1(i)(a)(z) of the Lease, [which] requires Amtrak to 'maintain and service each Unit . . . (z) in a manner that will permit the Units to be capable of operation (A) . . . (2) in the case of Locomotives, [at] a maximum continuous speed of up to 125 miles per hour in revenue service and a maximum continuous test speed of up to 140 miles per hour . . .,'" *id.* Schedule 1 at II(4);

(v) "Section 12.1(ii) of the Lease, [which] prohibits Amtrak from maintaining the Locomotives 'with less care of schedul[ing] the [Locomotives] for maintenance on a basis less frequent than either the maintenance or maintenance scheduling basis employed by [Amtrak] for other rolling stock similar to the [Locomotives] . . . ,'" *id.* Schedule 1 at II(5); and

(vi) "the second sentence of Section 12.1(ii) of the Lease, [which] permits Amtrak to 'take a [Locomotive] out of service while awaiting repair' . . . so long as [Amtrak] takes reasonable care to prevent deterioration of the condition of such [Locomotive] beyond that attributable to the circumstances necessitating such repair . . . ,'" *id.* Schedule 1 at II(6).

**B.    Amtrak Denies Default to Avoid Disclosures and Block Plaintiffs' Demand**

101.    On December 29, 2017, Amtrak responded to Plaintiffs' December 15 Notice of Default by "reject[ing] [Plaintiffs'] allegations."[94]   Notably, Amtrak asserted a "wholly unrestricted right, as it deems appropriate, to deploy or hold idle any of its rolling stock," and "reject[ed] any allegation to the contrary" despite the terms of numerous Lease provisions.[95]

---

[94] *See supra* note 6, Ex. D.

[95] *Id.*

102.     On January 26, 2018, in knowing disregard of Plaintiffs' December 15, 2017 Notice of Lease Events of Default and accompanying evidence, Amtrak's Treasurer certified in Amtrak's January 26, 2018, Financial Statements that "no default or event of default nor any event or condition, which, with the giving of notice or lapse of time or both, would become an event of default under the financing agreement(s) with respect to Amtrak, has occurred and is continuing."[96]

103.     On March 13, 2018, "[b]ased on Amtrak's responses" to the December 2017 Notice, EDC "reject[ed] [Plaintiffs'] December 15, 2017 Guarantee [demand]" on the grounds that "there is no basis to conclude that a Triggering Event has occurred that would obligate EDC to make any payment to you in accordance with the terms of the Guarantee."[97]

104.     EDC then "filed a Notice of Application before the Ontario Superior Court of Justice to address [Plaintiffs'] demand for immediate payment, which was made notwithstanding the fact that alleged Triggering Events were in dispute."[98]  EDC's Application asked the Ontario Court for a "declaration that the Guarantee Agreement . . . requires the occurrence of a 'Triggering Event' before payment can be due," and "alternative[ly]" for a ruling on the "issue of whether EDC has any liability under the Guarantee."[99]

105.     After its Application was on file, EDC asked to "arrange a call between counsel for the parties to discuss" the Canadian lawsuit.[100]

106.     On April 10, 2018, Amtrak's Senior Debt Portfolio Manager Jaret Ings e-mailed Plaintiffs requesting a phone call to discuss the parties' dispute.[101]  On May 3, 2017, Plaintiffs

---

[96] *See* Ex. NN (Amtrak Financial Statement Compliance Certificate dated January 26, 2018).

[97] Ex. OO (Ltr. from EDC to Plaintiffs dated March 13, 2018).

[98] *See* Ex. PP (Ltr. from EDC counsel to Plaintiffs dated March 13, 2018).

[99] *See supra* note 7, Ex. E.

[100] *See supra* note 98, Ex. PP.

[101] *See* Ex. QQ, (E-mail from Amtrak (Ings and Maciver) to Plaintiffs dated April 10, 2018).

spoke with Ings and Amtrak's Assistant Treasurer Nathan Maciver.  In that discussion, Plaintiffs

recounted the events to date, emphasizing that Plaintiffs had responded to Amtrak's request for a

buyout proposal over a year ago and that a response or counterproposal would be productive.

Maciver and Ings responded that they wished to keep communications "open," but did not address

the merits of any proposal.

107.    On May 15, 2018, Plaintiffs e-mailed Ings and Maciver to follow up on their May

3, 2018, call and reiterated that:

> [I]n December 2016 (after [Plaintiffs] alerted Amtrak to the initial lease defaults),
> [Plaintiffs] met in person with Amtrak representatives to resolve this matter and
> [were] told Amtrak would make a termination proposal to [Plaintiffs].  After
> Amtrak did not make a proposal, Amtrak asked if [Plaintiffs] would.  [Plaintiffs]
> then submitted a written proposal in April 2017 that addressed specific concerns
> Amtrak had (e.g., financing a termination/buyout).  Since then, Amtrak has never
> constructively responded to [Plaintiffs'] April proposal.
>
> . . . .
>
> [Plaintiffs] understand that Amtrak is interested in resolving this matter outside
> litigation.  Since [Plaintiffs'] offer has been on the table since April of last year,
> and if Amtrak is unwilling to accept it, then it is [Plaintiffs'] expectation that
> Amtrak will provide us in good faith with a reasonable written counter-proposal.[102]

Plaintiffs concluded the May 15 email with a request that Amtrak "please let [Plaintiffs] know

whether and when we can expect [a written counter-proposal]."[103]

108.    On June 18, 2018, Amtrak notified Plaintiffs that all of the Locomotives had

allegedly undergone maintenance and offered to schedule a new inspection.  To verify Amtrak's

representations before incurring the cost of a third inspection, Plaintiffs wrote Amtrak on July 2,

---

[102] *See* Ex. RR (E-mail from Plaintiffs to Amtrak (Ings and Maciver) dated May 15, 2018).

[103] *See id.*

2018, and, reserving all rights, requested that Amtrak send complete maintenance records for the Units for the period following their removal from service.[104]

109.    On September 12, 2018, Amtrak provided an incomplete set of maintenance records that excluded several documents, including Form FRA F 6180–49A, which Amtrak is required to maintain pursuant to 49 C.F.R. § 229.23, and shop-originated maintenance records.   After reviewing the September production and noting the deficiencies, Plaintiffs wrote Amtrak on October 16, 2018, again requesting a complete set of maintenance records for the Units.[105]

110.    On January 8, 2019, Amtrak provided only some of the missing records, and again failed to include any shop-originated maintenance documents.

### C.    Amtrak Further Interferes with Resolution of Plaintiffs' Claims

111.    *Amtrak's Financial Statements Disregard Plaintiffs' Claims.*  On January 28, 2019, Amtrak's Treasurer again certified that "no default or event of default nor any event or condition, which, with the giving of notice or lapse of time or both, would become an event of default under the financing agreement(s) with respect to Amtrak, has occurred and is continuing."[106]

112.    This certification echoed the 2018 certification that prompted EDC to refuse Plaintiffs' Guarantee demand, *see* supra note 96, and both certifications were issued in relation to Consolidated Financial Statements highlighting the consequences to Amtrak of acknowledging any Lease Events of Default:

> Amtrak is subject to various covenants and restrictions under its leasing arrangements.  Amtrak has given guarantees or entered into reimbursement agreements in connection with certain of these lease transactions.  *A default by Amtrak or acceleration of Amtrak's indebtedness may result in cross-default to*

---

[104] *See* Ex. SS, (E-mail from Plaintiffs to Amtrak (Ings) dated June 2, 2018).

[105] *See* Ex. TT (E-mail from Plaintiffs to Amtrak (Ings) dated October 16, 2018).

[106] *See* Ex. UU (Amtrak Financial Statement Compliance Certificate dated January 26, 2019).

*other Amtrak indebtedness, and may have a material adverse effect on the Company.*"[107]

113.    Both Amtrak's 2017 and 2018 certifications implicate Amtrak's obligations to its auditors at Ernst & Young LLP, whose audit reports state that "[Amtrak's] Management is responsible for the preparation and fair presentation of [its] consolidated financial statements . . . free of material misstatement, whether due to fraud or error."[108]   Amtrak's 2017 and 2018 certifications denying any defaults on Plaintiffs' contracts were undeniably material to Amtrak's associated Financial Statements, which expressly state that a "default" on Amtrak's obligations under its "lease transactions" may "have a material adverse effect on the Company."[109]

114.    Amtrak's certifications confirm that Amtrak had a strong motive to conceal its treatment of Plaintiffs' equipment, mislead Plaintiffs in the buyout negotiations, and interfere with Plaintiffs' rights under the Equity Guarantee.

115.    Amtrak's 2019 certification mirrors its 2018 certification that "no default or event of default . . . has occurred and is continuing," *see supra* note 106.  This language expressly tracks the Guarantee language that:  (i) EDC relied upon to refuse Plaintiffs' demand on the basis that "Amtrak has categorically denied that any Lease Event of Default has occurred";[110] and (ii) EDC cited in its Canadian lawsuit for a declaration that there "is no obligation for EDC to pay any sum under the Guarantee unless a Triggering Event has occurred and is continuing,"[111]

---

[107] *See supra* note 33, Notes at 27 (emphasis added); *see also supra* note 96, Notes at 27.

[108] *See supra* note 5, Ex. C at 1; note 33, Ex. S at 1; Ex. VV (Amtrak's FY 2018 Audited Consolidated Financial Statements) at 1.

[109] *See supra* note 108, Ex. VV at 28.

[110] *See supra* note 97, Ex. OO at 1.

[111] *See supra* note 7, Ex. E ¶ 2(i).

116.     Amtrak made the 2018 certification in knowing disregard of the unrebutted evidence of defaults referenced in Plaintiffs' December 2017 Notice.   Amtrak's Treasurer certification states that it concerns matters through the end of Amtrak's 2017 fiscal year, and that Amtrak "ha[d] evaluated subsequent events through January 26, 2018 . . . [and t]here were no other events that require adjustments to or disclosure in the Company's financial statements for FY2017."[112]

117.     Amtrak's repeat certification in 2019 further evidences Amtrak's deliberate failure to disclose known claims and risks of default.   That is particularly true because the 2019 certification contradicts the portions of EDC's 2018 Canadian suit:  (i) acknowledging a "dispute" over the Lease Events of Default Plaintiffs cited as Triggering Events under the Guarantee, Ex. E ¶¶ 2(f)-(k); and (ii) expressly reserving the right to adjudicate the "issue of whether EDC has any liability under the Guarantee," which proceedings *could* establish—in direct contravention of Amtrak's 2019 certification denying any default—that one or more Triggering Events *did* "occur" and *is* "continuing,"  *id*. ¶¶ 2(m)-(n) ("nam[ing]" "Amtrak . . . [as] a necessary party whose rights may be affected by the outcome of this application").

118.     ***Plaintiffs Negotiate a Standstill of EDC's Canadian Suit.***  From 2018 through the first quarter of 2019, Plaintiffs pursued a Standstill Agreement in the Canadian action that would allow Plaintiffs to seek a U.S. judgment of the Amtrak defaults triggering Plaintiffs' Guarantee rights.  In early 2018, Plaintiffs, EDC, and Amtrak executed the Standstill Agreement stating that EDC's Canadian action will be "stayed . . . until such time as the dispute among [Plaintiffs] and Amtrak [] concerning Amtrak's compliance with the Lease and related documents, including but

---

[112] *See supra* note 33, Ex. S at 46.

not limited to the existence of any Lease Event of Default ('Underlying Dispute'), is resolved."[113] In May 2019, the Canadian court entered an order agreeing to "stay" EDC's Canadian suit "in accordance with the [S]tandstill [A]greement."[114]

119.   The Operative Contracts provide that New York is the proper venue for resolving this "Underlying Dispute," *see* ¶¶ 14-16 *supra*, and the Canadian stay order incorporates the Standstill Agreement provision expressly stating that the stay does not "limit or otherwise prejudice [Plaintiffs'] rights or positions concerning the Underlying Dispute, and for the avoidance of doubt shall not limit or otherwise constrain the jurisdiction, venue, adjudication or other pursuit of proceedings concerning the Underlying Dispute," Ex. F at 3 ¶¶ 3-4.[115]

120.   For these reasons alone, the parties' dispute over Amtrak's Lease defaults and related liabilities is ripe for resolution in this Court.  Plaintiffs worked with Amtrak in good faith to finalize a buyout solution to their claims on terms that would complement Amtrak's efforts to comply with federal demands for improved operations and accounting procedures.  These demands grew out of a 2005 Government Accountability Office (GAO) Report and 2008 legislation designed to improve Amtrak's business practices.[116]  Notably, a 2013 Inspector General Audit Report cited continuing concern with Amtrak business decisions that "increase[] the risk that

---

[113] *See supra* note 8, Ex. F at 3-4.

[114] *See id.* at 1.

[115]  Section 2.3 of the Equity Guarantee Agreement states that "amounts due and payable by the Guarantor hereunder are payable when due hereunder . . . notwithstanding that the obligations of the Lessee under the Lease, or any other Operative [Contract], are not due and payable at such time."  *See* Ex. I.

[116]  *See* Ex. WW, No. CR-2013-56, Federal Railroad Administration, Office of Inspector General Audit Report, *Amtrak's New Cost Accounting System Is a Significant Improvement But Concerns Over Precision and Long Term Viability Remain*, at 1 (March 27, 2013) (citing a 2005 Government Accountability Office Report and the Passenger Rail Investment and Improvement Act of 2008 (PRIIA), Pub. L. No. 110-432 Div. B.).

revenues and expenses . . . will be misstated."[117]  And Amtrak's subsequent financial statements concede the railroad's "history of recurring operating losses" and "dependen[ce] on subsidies from the Federal Government" before expressly tying the company's financial prospects to avoiding any acknowledged lease defaults.[118]

121.    The buyout Amtrak proposed in December 2016 would have addressed Plaintiffs' claims in a manner that could avoid such exposure.  But Amtrak instead chose to mislead Plaintiffs on the prospects of a buyout and perpetuate the questionable business practices that have prompted mounting criticism of Amtrak operations.  A 2019 industry report observed that, in a desperate response to this criticism, Amtrak tied "short- and long-term management bonus incentives" to "slashing expenses," including "cost cutting through 2017 management buyouts [that] eliminated field personnel and resulted in a loss of institutional knowledge . . . that has permanently diminished U.S. passenger-rail expertise."[119]

122.    This history helps explain—but does not excuse—Amtrak's efforts to avoid liability for its Lease defaults and corresponding interference with Plaintiffs' contract rights.  As noted, the heavily-negotiated Operative Contracts document Amtrak's business decision to lease the Bombardier-Alstom Units "as-is," with no warranty, and that Amtrak's decision to stop using and maintaining them in accordance with the Operative Contracts before the end of the Lease term constituted Casualty Occurrences entitling Plaintiffs to remedies under the Lease and Guarantee.

123.    Amtrak's improper denial of these facts has frustrated Plaintiffs' claims arising out of the Casualty Value provisions of the Lease, and Plaintiffs' concurrent right to payment under

---

[117] *See* Ex. XX, GAO Report 16-67, *Better Reporting, Planning, and Improved Financial Information Could Enhance Decision Making*, at 24 (January 2016), *available at* https://www.gao.gov/assets/680/674520.pdf.

[118] *See supra* note 5, Ex. C at 9; *supra* note 33, Ex. S at 9; *supra* note 108 Ex. VV at 9.

[119] *See* Ex. YY (B. Johnston, *Amtrak's Money Mystery*, TrainsMag.com (January 2019)).

the Equity Guarantee. This interference is ongoing, as evidenced by exchanges between Plaintiffs and Amtrak as recently as August 2019.

124. ***Amtrak Misleads Plaintiffs on Another Buyout Proposal.*** After the parties executed the May 2019 Standstill Agreement on the Canadian action, Amtrak agreed to meet with Plaintiffs to discuss potential resolution of the claims the Standstill Agreement reserved for this litigation. Amtrak refused to allow counsel to participate in the proposed meeting, and invited only Plaintiffs' business personnel to Amtrak headquarters on July 11, 2019, to meet with Amtrak's Assistant Treasurer Nathan Maciver and Senior Debt Portfolio Manager Jaret Ings. Plaintiffs presented a business proposal that Amtrak said it needed to discuss internally, and that if accepted would have to be approved by Amtrak's Board and possibly the Secretary of Transportation. Amtrak did not respond to the proposal within the timeframe the parties discussed at the July 11 meeting. Accordingly, Plaintiffs followed up in August 2019 about Amtrak's position. On August 9, 2019, Plaintiffs spoke by telephone with Ings and Maciver. During the call, Maciver advised that he would be leaving Amtrak in the coming weeks, and asked some clarifying questions about Plaintiffs' proposal that focused on the possibility of allowing Amtrak to retain the Trainsets after returning the Locomotives. Plaintiffs requested a counterproposal, but Amtrak's representatives declined to provide one.

125. On November 7, 2019, in the wake of Amtrak's repeated stonewalling and misdirection, Plaintiffs (via Lessor) formally declared the Lease to be in default, pursuant to Lease § 13.2.[120]

\* \* \* \* \*

126. For any or all of the foregoing reasons, the causes of action in this Complaint are

---

[120] *See* Ex. ZZ (Notice of Default from Lessor (Plaintiffs' trust) to Amtrak dated Nov. 7, 2019).

ripe for relief under the declaratory, legal, and equitable causes set forth below, as well as under Lease Section 13.2, which renders Amtrak "liable for . . . all reasonable legal fees and other costs and expenses incurred by [Plaintiffs] by reason of the occurrence of any Lease Event of Default or the exercise of any of Lessor's rights, powers or remedies with respect thereto."

127.    Left unaddressed, Amtrak's refusal to abide the Operative Contracts will chill investment in finance arrangements necessary to serve public markets by signaling to investors that they cannot rely on contracts with Amtrak—or foreign equipment manufacturers like Bombardier and its guarantor EDC—to price risk, protect their equity, and otherwise ensure that such parties will honor their obligations to U.S. stakeholders.  Relief is warranted.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## DECLARATORY JUDGMENT OF LEASE EVENTS OF DEFAULT

128.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

129.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

130.    Amtrak has repeatedly denied the occurrence of its Lease Events of Default and deliberately subverted good faith discussions to resolve this dispute through the buyout Amtrak proposed in 2016, through Plaintiffs' demand for a Guarantee payment from EDC, and through the buyout Plaintiffs proposed in July 2019.

131.    As a result of the acts described herein, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that Amtrak

has engaged in one or more Lease Events of Default that have occurred and are continuing for purposes of the Operative Contracts.

## SECOND CAUSE OF ACTION
### BREACH OF CONTRACT

132.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

133.    As alleged above, Amtrak, a sophisticated party represented by counsel, executed the Operative Contracts with Plaintiffs, and in so doing undertook various duties and obligations, including the obligation to:

(a)    pay Casualty Value following a Casualty Occurrence under Lease § 7;

(b)    properly maintain the Units consistent with Lease § 12.1;

(c)    comply with all federal laws and regulations pursuant to Lease § 11; and

(d)    properly maintain all records and logs as required by Lease § 12.1(i)(b).

134.    Amtrak materially breached each of these sections of the Lease by:

(a)    failing to pay Casualty Value after determining that the Leased Equipment was unfit for commercial use and/or uneconomical to repair during the Lease term;

(b)    failing properly to use and maintain the locomotives;

(c)    failing to comply with all applicable laws and regulations with respect to the use and maintenance of the locomotives; and

(d)    failing properly to maintain all records and logs as required by Lease § 12.1(i)(b).

135.    These breaches caused Plaintiffs to suffer damages, including, *inter alia*, (a) the loss of their share of the Aggregate Casualty Payment to which the Lease entitles them; (b) impairment of the Units' residual value due to Amtrak's failure properly to use and maintain the

Units; (c) the loss of the Equity Guarantee payment to which Plaintiffs were entitled in December 2017; and (d) the outlay of legal costs and attorneys' fees that Amtrak is required to pay pursuant to Lease Section 13.2, which renders Amtrak "liable for . . . all reasonable legal fees and other costs and expenses incurred by [Plaintiffs] by reason of the occurrence of any Lease Event of Default or the exercise of any of Lessor's rights, powers or remedies with respect thereto."

**THIRD CAUSE OF ACTION**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING**

136.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

137.    The Operative Contracts imply a promise that Amtrak would uphold its end of the bargain in good faith and deal fairly with Plaintiffs during the Lease term, and this promise prohibited Amtrak from taking any actions that injured Plaintiffs' right to receive the benefit of their bargain under the Operative Contracts.

138.    In breach of this promise and covenant, Amtrak acted in bad faith to deprive Plaintiffs of their contractual benefits and remedies, including and particularly Plaintiffs' right to a buyout, Guarantee payment, or other monetary compensation for the residual equity value of the lease Units that Amtrak prematurely decommissioned and failed properly to maintain.

139.    Amtrak failed to notify Plaintiffs of the Casualty Occurrences that attended its decision to retire the leased Units as unfit for service or uneconomical to repair.

140.    Amtrak also failed properly to use and maintain the Units at a level commensurate with other rolling stock when it decommissioned and effectively abandoned them for scrap, "cannibaliz[ing]" and "robb[ing]" their parts.[121]

---

[121] *See supra* ¶ 58.

141.    Further, following proper notice of its maintenance defaults, Amtrak failed diligently to attempt to cure any of those defaults, to the extent they were curable, thereby exacerbating Plaintiffs' injuries from Amtrak's breach of its covenant of good faith and fair dealing.

142.    Instead of working with Plaintiffs in good faith to resolve the Lease dispute, Amtrak engaged in subterfuge to delay paying Plaintiffs Casualty Value and forestall Plaintiffs from taking legal action.[122]  Indeed, Amtrak admitted that while it had "set [Plaintiffs'] expectations towards the prompt delivery of a bid from Amtrak" in late 2016, it was actually "in no position to make a proposal" at that time.[123]

143.    Amtrak's conduct deliberately and inequitably interfered with Plaintiffs' Guarantee rights against EDC, which "[b]ased on Amtrak's responses" refused to pay Plaintiffs Equity Cash Value under the Guarantee Agreement, prolonging this dispute and forcing Plaintiffs to incur further and unnecessary risk, damages, and dispute-related costs.[124]

**FOURTH CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

144.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

145.    The Equity Guarantee Agreement is a valid, enforceable contract between Plaintiffs and EDC.

---

[122] *See supra* ¶ 97-124.

[123] *See supra* ¶ 95.

[124] *See supra* ¶ 103.

146.    Amtrak had knowledge of the Equity Guarantee Agreement at all times relevant to this suit.[125]

147.    Amtrak intentionally induced EDC materially to breach the Equity Guarantee Agreement by, among other things, improperly denying that any Lease Events of Default had occurred or were continuing as necessary to trigger Plaintiffs' Guarantee rights.

148.    Upon information and belief, EDC would have recognized "a Triggering Event . . . obligat[ing] EDC to make [a] payment to [Plaintiffs]" and paid Plaintiffs the Guaranteed Amount but for "Amtrak's responses," which caused EDC to reject Plaintiffs' Demand under the Equity Guarantee Agreement.[126]

149.    Amtrak used wrongful means, including improperly and maliciously denying the existence of its Lease Events of Default, despite simultaneously "setting [Plaintiffs'] expectations on the prompt delivery of a bid from Amtrak" to buy out the Lease.[127]

150.    By reason of Amtrak's interference with the Equity Guarantee Agreement, Plaintiffs were wrongfully deprived of the Guarantee payment on their December 2017 demand to EDC, and have suffered damages in the amount of the Guaranteed Amount plus interest and all legal    costs    and    expenses    incurred    in    pursuing    the    claims    herein.

---

[125] The Participation Agreement, signed by Amtrak, includes a copy of the Equity Guarantee Agreement.  *See* Participation Agreement, Ex. G.  Additionally, the Participation Agreement includes numerous references to the Equity Guarantee Agreement, including a provision that Amtrak's counsel must review and provide an opinion on the Equity Guarantee Agreement.  *See* Participation Agreement § 5.1(xiv).

[126] *See supra* ¶ 103.

[127] *See supra* ¶ 95.

## FIFTH CAUSE OF ACTION
## <u>FRAUDULENT CONCEALMENT</u>

151.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

152.   Amtrak engaged in a course of conduct designed to conceal evidence of its contract breaches and other misconduct.

153.   This course of conduct included affirmative misrepresentations regarding Amtrak's treatment of Plaintiffs' equipment, deliberate concealment or omission of material facts and information concerning Amtrak's use and maintenance of Plaintiffs' equipment, and refusal to provide complete maintenance records for the equipment as Plaintiffs requested.

154.   Plaintiffs were not on actual or constructive notice of the facts and evidence that Amtrak concealed, despite Plaintiffs' exercise of diligence, which included public research and repeated inquiries to Amtrak regarding equipment use and records that were in Amtrak's sole possession, custody, or control.

155.   By reason of Amtrak's misrepresentations, concealment, and omissions, Plaintiffs were deprived of notice and evidence relevant to their claims under the Operative Contracts, including the Lease and Equity Guarantee, and are entitled to all available relief and recovery from Amtrak alleged and requested herein.

## SIXTH CAUSE OF ACTION
## <u>QUANTUM MERUIT</u>

156.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

157.   By leasing the Units to Amtrak, Plaintiffs provided both goods and services that conferred a benefit on Amtrak by, among other things, enabling Amtrak to use the Units to service its intercity passenger route from Washington, D.C. to Boston.

54

158.    Amtrak accepted these goods and services for the Lease term.

159.    Plaintiffs provided these goods and services with the expectation that they would be compensated by Amtrak if Amtrak determined that any of the Units was "unfit for commercial use" or "uneconomical to repair," or if any of the Units was inadequately maintained.

160.    By reason of Amtrak's inequitable conduct, Plaintiffs are entitled to recover from Amtrak in equity Plaintiffs' fair share of the Units' unpaid Casualty Value and/or the value of the Guarantee Plaintiffs demanded from EDC.

## SEVENTH CAUSE OF ACTION IN THE ALTERNATIVE
## UNJUST ENRICHMENT

161.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

162.    Plaintiffs conferred a benefit on Amtrak by, among other things, leasing the Units to Amtrak with the option to retire them in return for Casualty Value.

163.    Plaintiffs provided this benefit with the expectation that they would be compensated by Amtrak if Amtrak determined that any of the Units was "unfit for commercial use" or "uneconomical to repair" or if any of the Units were inadequately maintained.

164.    Plaintiffs relied on Amtrak's representations to that effect in the Lease and elsewhere.

165.    Amtrak had knowledge of the benefit that Plaintiffs conferred upon it.

166.    Amtrak has not provided Plaintiffs with compensation for that benefit.

167.    Accordingly, Amtrak has been unjustly enriched at Plaintiffs' expense, and its retention of this benefit without compensating Plaintiffs would be inequitable.

168.    By reason of Amtrak's inequitable conduct, Amtrak was unjustly enriched, and Plaintiffs unjustly deprived, by the amount of the Units' unpaid Casualty Value and/or any portion of a Guarantee payment for which Amtrak would have been required to indemnify EDC.

**EIGHTH CAUSE OF ACTION**
**BREACH OF CONTRACT – THIRD PARTY BENEFICIARY**

169.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

170.    As alleged above, Amtrak, a sophisticated party represented by counsel, entered into the Lease, which on its face demonstrates an intent to benefit Plaintiffs in identifying "Amtrak Trust HS-EDC-1," a trust of which Plaintiffs are the sole beneficial owner,[128] as the "Lessor."

171.    The Lease defines the parties' rights and obligations in relation to the other Operative Contracts,[129] which:  (a) mention Plaintiffs by name;[130]  (b) explicitly provide that Plaintiffs' participation in the Lease "inure[s] to the[ir] benefit;"[131] and (c) make clear that any payments received by the Lessor "shall be promptly paid to" Plaintiffs.[132]

172.    As alleged above, Amtrak owed Plaintiffs various duties and obligations under the Lease.  Amtrak was required to, *inter alia*:

    (a)    pay Casualty Value following a Casualty Occurrence pursuant to Lease § 7;

    (b)    properly maintain the Units consistent with Lease § 12.1;

---

[128] *See* Owner Trust Agreement § 2.02, Ex. K (noting that the trust was established "for the use and benefit of [Plaintiffs]").

[129] *See* Lease § 22 ("*Except for the other Operative [Contracts]*, this Lease exclusively and completely states the rights of Lessor and Lessee with respect to the leasing of the Units . . . ." (emphasis added)).

[130] *See, e.g.*, Participation Agreement, at PA-1 ("HNB INVESTMENT CORP., a Delaware corporation ('*Owner Participant*') . . . .").

[131] *See id.* § 14.2.

[132] *See* Owner Trust Agreement § 5.01(b).

(c)     comply with all federal laws and regulations pursuant to Lease § 11; and

(d)     properly maintain all records and logs as required by Lease § 12.1(i)(b).

173.    As alleged above, Amtrak materially breached each of these sections of the Lease by failing to:

(a)     pay Casualty Value after determining that the locomotives were unfit for commercial use and/or uneconomical to repair;

(b)     properly use and maintain the locomotives;

(c)     comply with numerous laws and regulations with respect to the use and maintenance of the Locomotives; and

(d)     properly maintain all records and logs as required by Lease § 12.1(i)(b).

174.    These breaches caused Plaintiffs to suffer damages, including, *inter alia*, (a) Plaintiffs' lost share of the Aggregate Casualty Payment to which the Lease entitles them; (b) a decline in the Units' residual value caused by Amtrak's failure to properly use and maintain the Units; and (c) the value of the Equity Guarantee payment from EDC.

## PRAYER FOR RELIEF

175.    WHEREFORE, Plaintiffs respectfully request that the Court:

(a)     Declare that a Lease Event of Default resulting from Amtrak's failure to pay Casualty Value under Lease § 7 has occurred and is continuing;

(b)     Declare that a Lease Event of Default resulting from Amtrak's failure properly to use and maintain the Units in accordance with Lease § 12.1 has occurred and is continuing;

(c)     Declare that a Lease Event of Default resulting from Amtrak's failure to comply with all applicable laws and regulations under Lease § 11 has occurred and is continuing;

(d)     Find Amtrak liable for the damages incurred by Plaintiffs;

(e)     Award Plaintiffs damages in an amount to be determined at trial;

(f)     Award Plaintiffs all attorneys' fees and costs due and payable under Lease

§ 13.2 or otherwise available in law or equity;[133] and

(g)     Order such other, further, and general relief as is just and proper.


Dated: New York, New York
      November 7, 2019

GIBSON, DUNN & CRUTCHER
By:   */s/ Mark A. Kirsch*

Mark A. Kirsch
Patrick Hayden
200 Park Avenue
New York, NY, 10166
(212) 351-2662
(212) 351-6362 (fax)
mkirsch@gibsondunn.com

Elizabeth Papez (*pro hac vice* forthcoming)
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8608
(202) 530-9698 (fax)
epapez@gibsondunn.com

WINSTON & STRAWN LLP
Lawrence Slusky (*pro hac vice* forthcoming)
1700 K Street, N.W.
Washington, DC 20036
(202) 282-5322

---

[133] Pursuant to Lease § 13.2, Amtrak is "liable for . . . all reasonable legal fees and other costs and expenses incurred by [Plaintiffs] by reason of the occurrence of any Lease Event of Default or the exercise of any of Lessor's rights, powers or remedies with respect thereto." Additionally, pursuant to Lease § 9(iii), Amtrak is liable for inspections of the Units "[d]uring the continuance of a . . . Lease Event of Default."

(202) 282-5100 (fax)
lslusky@winston.com

*Counsel for Plaintiffs*
*Philip Morris Capital Corporation*
*and HNB Investment Corp.*