# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

PHILIP MORRIS CAPITAL CORPORATION and
HNB INVESTMENT CORP.,

           *Plaintiffs*,

    v.

NATIONAL RAILROAD PASSENGER
CORPORATION,

           *Defendant*.

No. 19 Civ. 10378 (MKV)

**CORRECTED FIRST AMENDED
COMPLAINT**

# TABLE OF CONTENTS

OVERVIEW OF THE ACTION ................................................................................................. 3

JURISDICTION AND VENUE ............................................................................................... 13

CHOICE OF LAW ................................................................................................................... 14

PARTIES ................................................................................................................................... 14

FACTUAL ALLEGATIONS .................................................................................................... 16

I.  THE TRANSACTION AND OPERATIVE CONTRACTS ........................................... 16

II.  AMTRAK DEEMS THE LOCOMOTIVES "UNFIT FOR COMMERCIAL USE" AND
"UNECONOMICAL TO REPAIR" UNDER LEASE SECTION 7 ......................... 23

  A.  Amtrak Permanently Retires the Locomotives As "Unfit for Commercial Use"
  and/or "Uneconomical to Repair" ........................................................................ 24

  B.  Amtrak Refuses to Pay Casualty Value for the Retired Locomotives ................. 27

III.  AMTRAK FAILS TO MAINTAIN THE UNITS UNDER LEASE SECTION 12.1 ...... 29

  A.  Amtrak Cannibalizes the Locomotives for Parts and Fails to Perform Required
  Maintenance ......................................................................................................... 29

  B.  Amtrak Fails to Cure its Deficient Maintenance .................................................. 36

IV.  AMTRAK PROPOSES A BUYOUT TO ADDRESS PLAINTIFFS' CLAIMS ............. 39

  A.  Amtrak Proposes a Buyout of Plaintiffs' Interest in the Units ............................. 41

  B.  Amtrak Stalls and Terminates Key Members of the Negotiating Team ............... 42

V.  AMTRAK RENEGES ON THE BUYOUT PROPOSAL AND DENIES PLAINTIFFS'
CLAIMS FOR CONTRACT BREACH AND RELATED RELIEF ......................... 46

  A.  Amtrak Reverses Course and Plaintiffs Invoke Their Contract Rights ............... 46

  B.  Amtrak Further Breaches the Operative Contracts and Harms Plaintiffs ............. 49

  C.  The Standstill of EDC's Canadian Suit ................................................................ 54

CAUSES OF ACTION .............................................................................................................. 60

FIRST CAUSE OF ACTION .................................................................................................... 60

  DECLARATORY JUDGMENT OF AMTRAK LEASE EVENTS OF DEFAULT .............. 60

SECOND CAUSE OF ACTION ............................................................................... 61

  BREACH OF CONTRACT BY AMTRAK ......................................................... 61

THIRD CAUSE OF ACTION .................................................................................. 63

  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING .......... 63

FOURTH CAUSE OF ACTION ............................................................................... 64

  EQUITABLE AND JUDICIAL ESTOPPEL.......................................................... 64

FIFTH CAUSE OF ACTION .................................................................................. 65

  FRAUDULENT CONCEALMENT ..................................................................... 65

SIXTH CAUSE OF ACTION .................................................................................. 66

  QUANTUM MERUIT ...................................................................................... 66

SEVENTH CAUSE OF ACTION IN THE ALTERNATIVE ........................................... 67

  UNJUST ENRICHMENT ................................................................................. 67

EIGHTH CAUSE OF ACTION ............................................................................... 68

  BREACH OF CONTRACT – THIRD PARTY BENEFICIARY ................................... 68

PRAYER FOR RELIEF ........................................................................................ 70

Plaintiffs Philip Morris Capital Corporation and HNB Investment Corp. (together, "Plaintiffs") bring this action for declaratory judgment and legal and equitable relief against Defendant National Railroad Passenger Corporation ("Amtrak").  In support of their claims, Plaintiffs allege as follows:

1.    This case arises out of Amtrak's breach of contracts for $250 million of high-speed rail equipment that Amtrak acquired for its popular Northeast Corridor route from Washington to Boston.  Plaintiffs provided the capital investment that allowed Amtrak to acquire the equipment. But Amtrak misused the equipment in violation of the contracts, concealed that misuse from Plaintiffs, and then denied the grounds on which Plaintiffs sought relief including in a 2017 demand for a $92 million contract payment.  Left unaddressed, Amtrak's breaches and unscrupulous business practices will deter exactly the type of private investment in public infrastructure and operations that the contracts were designed to protect.

2.    Such investment is particularly important to Amtrak's operation as a "for-profit corporation" statutorily required to "minimize United States Government subsidies."  *See* 49 U.S.C. §§ 24301(a)(2)–(3), 24101(c).  Amtrak's President and CEO Richard Anderson recently testified in Congress that "capital funding is the key ingredient for reliable service and effective networks," and that "[w]ithout higher levels of capital investment" the Northeast Corridor route will experience operational difficulties.[1]  That is not surprising, because Mr. Anderson stated that the "cost of outstanding fleet acquisitions . . . could approach some $3.5 billion through FY2024," and that Amtrak "must secure funding to pay for its upcoming orders of locomotive options."[2]  In

---

[1] Ex. 1 (Testimony of Richard Anderson before the United States House of Representatives, House Committee on Transportation & Infrastructure, *The Cost of Doing Nothing:  Why Investing in Our Nation's Infrastructure Cannot Wait*, at 2, 3 (Feb. 7, 2019)).

[2] *Id*. at 18.

exchange for such funding, Amtrak must honor its contracts with investors. Here it breached them and concealed its misconduct from Plaintiffs and other business partners to avoid disclosing the risk and consequences of its defaults to its auditors and in its financial statements. Compounding these transgressions and violating the spirit of the parties' agreements, Amtrak for months falsely assured Plaintiffs that it would propose terms for buying out their interest in the equipment Amtrak misused. As detailed below, an Amtrak official admitted to Plaintiffs in mid-2017 that, when Amtrak told Plaintiffs to "expect[]" a "prompt" buyout bid in December 2016, Amtrak knew it was in no position to make such a bid. In the months that followed, Amtrak continued to assure Plaintiffs that they could expect a proposal. Amtrak made these assurances even while it was preparing certifications and financial statements denying any default. This and other misconduct is memorialized in the correspondence and other documents cited herein, including Amtrak's 2018 and 2019 financial statements. These statements acknowledge Amtrak's "history of recurring operating losses" and desire to avoid "cross-default to other Amtrak indebtedness" that apparently drove Amtrak to stonewall Plaintiffs' claims and force this suit.

3.       Amtrak's misconduct is particularly egregious here because Amtrak expressly "induce[d]" Plaintiffs to underwrite the acquisition of the equipment at issue by agreeing to specific contract protections for Plaintiffs' investment. Notably, the relevant contracts require Amtrak to use and maintain Plaintiffs' equipment in accordance with certain standards, and expressly state that Amtrak's failure to do so entitles Plaintiffs to specified payments. Amtrak triggered these payment provisions multiple times, first by taking all of the locomotives out of service, then by cannibalizing them for parts and otherwise improperly maintaining them, and finally by concealing this mistreatment and otherwise interfering with Plaintiffs' timely demands for compensation. As a result, Plaintiffs have been wrongfully deprived of at least the $92,947,365 payment they timely demanded in December 2017. Plaintiffs have also been forced to incur further

costs, including attorneys' fees for which Amtrak is contractually responsible, in litigating this action and a separate action that Amtrak's Guarantor filed in Canada. The parties' agreements, including a Standstill Agreement entered by the court in the Canadian action last year, expressly authorize the declaratory judgment and other relief Plaintiffs seek in this suit.

## OVERVIEW OF THE ACTION

4.     *Leveraged Equipment Leases.*  Amtrak acquired the rail equipment at issue in this case through a contractual arrangement known as a leveraged lease. Leveraged leases are critical to the transportation industry because they allow service providers like Amtrak to acquire the costly equipment they need without prohibitive capital outlays. These leases are "leveraged" because the equipment owners (here, Plaintiffs) pay a portion of the total equipment cost up front and then borrow the remaining funds required to purchase the equipment. A lender provides these funds in exchange for notes that guarantee repayment of the debt on certain terms, which in this case are set forth in an Indenture Trust Agreement ("Indenture"). The owners typically create a trust to hold their equity and the borrowed funds, and the trust manager (normally a bank or trust company) uses the trust assets to purchase the equipment and lease it to a transportation provider (here, Amtrak). The lessee (here, Amtrak) then agrees to:  (i) pay rent sufficient to repay the debt and any cash rent due to the owners; and (ii) maintain the equipment for return to the owners at the end of the lease term.

5.     *The Operative Contracts*.  The leased equipment at issue here consists of eight locomotives and six high-speed trainsets that were custom-manufactured for Amtrak by Canadian manufacturer Bombardier, in coordination with French engineering company Alstom. Plaintiffs are the ultimate owners of the equipment, which Amtrak leased from Plaintiffs' trust to service Amtrak's Northeast Corridor route. The transaction was memorialized in a series of agreements ("Operative Contracts") that leased the equipment to Amtrak for a term of over 20 years (from

2000 through at least 2022) subject to several provisions that protect Amtrak's rights as a service provider and Plaintiffs' equity interest in the equipment.  As relevant here, the Lease permitted Amtrak to stop using and maintaining the equipment before the end of the lease only in exchange for taking title to the units and making a contractually specified payment ("Casualty Value") to cover the remaining debt and Plaintiffs' ownership interest.  To further entice Plaintiffs to participate in the transaction, the Operative Contracts included an Equity Guarantee pursuant to which a Canadian guarantor—Export Development Canada ("EDC")—agreed to pay Plaintiffs a specified guarantee amount in the event Amtrak breached any Lease provision triggering Casualty Value obligations.  The Guarantee was a material "induce[ment]" for Plaintiffs because it ensured they would receive contractually specified damages in the event Amtrak breached its use or maintenance obligations before returning the equipment to Plaintiffs at the end of the Lease.

6.    Amtrak has upended these contractual protections on Plaintiffs' investment.  After breaching the Lease in several respects, Amtrak violated the letter and spirit of the parties' agreements and the transaction under controlling law by:  (i) refusing to pay Casualty Value or otherwise perform its obligations under the Operative Contracts; (ii) intentionally misleading Plaintiffs with the prospect of a buyout of their interest in the equipment; and (iii) urging EDC to deny Plaintiffs' timely demand for a $92 million payment under Guarantee provisions EDC raised in a Canadian suit that is stayed pending entry of a final judgment or settlement in this action.

7.    Plaintiffs' primary contract claims against Amtrak arise out of several express provisions in the Operative Contracts, including the following provisions from the Lease, Participation Agreement, and Indenture.

8.     With respect to the Lease[3]:  (i) Section 7 requires that Amtrak pay Plaintiffs an agreed sum to take title to any unit Amtrak deems "uneconomical to repair" or "unfit for commercial use from any cause" during the Lease term; (ii) Section 12 requires that Amtrak pay specified damages for failing to maintain the equipment "in as good condition as when delivered (ordinary wear and tear excepted)"; (iii) Section 13.1 defines "Lease Events of Default" to include, among other things, Amtrak's "fail[ure] to make any payment of . . . Casualty Value" and Amtrak's "fail[ure] to perform or observe any material covenant"; and (iv) Section 13.2 states that Amtrak's uncured breach of various provisions and obligations, including any of the Lease provisions above, entitles Plaintiffs to, among other things:

- "declare th[e] Lease in default by a written notice to Lessee [Amtrak] . . . ; and

- "at any time thereafter" to "exercise one or more of" a series of contractually specified "rights, powers or remedies as Lessor in its sole discretion shall determine to the extent not prohibited by . . . Applicable Law then in effect," notably:

The "rights, powers or remedies" referenced in Section 13.2 include:

- "proceed[ing] by appropriate court action or actions, either at law or in equity, to enforce performance by Lessee [Amtrak] of the applicable covenants of this Lease or to recover damages for the breach thereof," including "liquidated damages" for "all units covered by the Lease," as well as "all reasonable legal fees and other costs and expenses incurred by [Plaintiffs] by reason of the occurrence of any Lease Event of Default or the exercise of any of Lessor's rights, powers or remedies with respect thereto"; and

- "except as otherwise expressly agreed herein, exercis[ing] any other right, power or remedy which may then be available under any of the Operative Documents or which may be available to Lessor under Applicable Law."

In addition, Section 13.3 of the Lease states that, "[e]xcept as otherwise expressly agreed herein, the remedies provided in this Lease in favor of Lessor shall not be deemed exclusive, but shall be cumulative and may be exercised concurrently or consecutively, and shall be in addition to all

---

[3] *See* Ex. 8.

other remedies in its favor existing at law or in equity."  Section 13.5 further provides that "Lessee [Amtrak] hereby waives any mandatory requirements of law, now or hereafter in effect, which might limit or modify the remedies herein provided . . . ."

9.      With respect to the Participation Agreement[4]:  (i) Section 6.2(i) states that "Amtrak hereby agrees to assume liability for, and does hereby agree to indemnify . . . each Indemnified Party . . . from and against any and all . . . losses [and] damages . . . incurred by  . . . an Indemnified Party . . . in any way relating to or arising or alleged to arise out of . . . any other Operative document . . . [and] any violation, or alleged violation, by Amtrak of any provision of this Agreement, the Lease, or any other Operative Document to which Amtrak is a party, or of any agreement, law, rule, regulation, ordinance or restriction, affecting or applicable to the Equipment, Owner Trustee or Owner Participant . . . .";[5] (ii) Section 8 of the Participation Agreement states that, "after the end of each fiscal year" Amtrak must "present fairly the financial condition of Amtrak . . . as of the end of such fiscal year" and include a "certificate of a Responsible Officer of Amtrak[] to the effect that such Responsible Officer has no actual knowledge that any Lease Default or Lease Event of Default has occurred and is continuing, or if one has occurred, describing the status thereof"; (iii) Section 9.4 covenants that "for the benefit of" Plaintiffs, "Amtrak shall . . . comply with its obligations under the Lease . . . ."; and (iv) Section 15 states that "[a]ll covenants, agreements (including indemnities), representations and warranties made herein and in certificates delivered pursuant hereto or in connection herewith by any party hereto . . . shall unless otherwise expressly provided therein survive the expiration or other termination of such Operative Documents."

---

[4] *See* Ex. 7.

[5] Annex A to the Participation Agreement defines "Indemnified Parties" for "purposes of Sections 6.1 and 6.2 of the Participation Agreement" to include "Owner Participant" and "Owner Trustee" and "their respective . . . Affiliates."  Ex. 7, Annex A.

10.     With respect to the Indenture,[6] while it is in effect:  (i) Section 5.01 states that, "[i]n the event Indenture Trustee shall have knowledge of an Event of Default . . . Indenture Trustee shall give prompt written notice thereof to Owner Trustee, Owner Participant" and others, where Indenture Trustee is "deemed to have knowledge of an Event of Default . . ."; and (ii) Section 6.10(a) identifies various rights that "shall be reserved to Owner Trustee," including "the right, in addition to, and independent of, Indenture Trustee to:  [1] receive from Lessee . . . all information [Lessee] is permitted or required to give or furnish to Owner Trustee pursuant to any Operative Document"; [2] "exercise all rights of Owner Trustee under Section 7 of the Lease"; [3] "seek specific performance of the covenants of Lessee set forth in Sections . . . 7 [and] 12 . . . under the Lease"; and [4] "give notice of . . . any default under the Lease or any other Operative Document, any failure to perform any covenant or to observe any term of any Operative Document or any misrepresentation pursuant to any Operative Document."  Section 6.10(d) further states that, "at all times, each of Owner Trustee, Trust Company and Owner Participant shall have the right, to the exclusion of Indenture Trustee, [1] to exercise any election or option or make any decision or determination or to give or receive any notice, consent, waiver or approval in respect of any Excepted Payment or [2] to demand, collect, sue for or otherwise receive and enforce the payment of Excepted Payments due and payable to it."[7]

---

[6] *See* Ex. 10.

[7] The Indenture defines the "Excepted Payments" referenced in Section 6.10(d) to include, among other things:  "(i) indemnity or other payments . . . paid or payable by Lessee in respect of Owner Participant, Trust Company or any of their respective affiliates . . . pursuant to Sections 6.1, 6.2 and 7.3 of the Participation Agreement and any payments of costs and expenses of Owner Trustee and Owner Participant payable by Lessee pursuant to the Operative Documents"; . . . "(vi) all right, title and interest of Owner Trustee and/or Owner Participant in and to the Equity Guarantee Agreement and any payment paid or payable thereunder;" . . .  "(viii) any right to exercise any election or option or make any decision or determination, or to give or receive any notice, consent, waiver or approval, or to take any other action in respect of, but in each case only to the extent related to, any Excepted Payments;" "(ix) any right to restitution from Lessee in respect of, but only to the extent relating to, any Excepted Payment resulting from a determination of invalidity

11.     The spirit and purpose of the foregoing and other provisions was to separate the rights of the Owner Trustee and/or Owner Participant, on the one hand, from the rights and remedies conferred on the Indenture Trustee and Note Holder(s), on the other hand, in the event of a Lease default or Event of Default or other misconduct by Amtrak.

12.     This spirit and purpose is reflected in the history and structure of the transaction, including the provisions of the Indenture providing for the issuance of secured notes to the "Loan Participant," which Annex A of the Participation Agreement defines as "EDC in its capacity as holder of a Secured Note and any subsequent holder of a Secured Note from time to time."

13.     ***Amtrak's Breaches***.   Approximately halfway through the lease term—and unbeknownst to Plaintiffs at the time—Amtrak observed that maintenance and reliability issues with the Bombardier-Alstom locomotives made them unsuitable for continued intercity rail use, and proposed replacing them with new locomotives from Siemens.  But Amtrak had leased the locomotives "as-is, where is, with all faults," and expressly acknowledged that neither Plaintiffs nor any other party made "any representation or warranty, express or implied, as to" the "fitness" of the equipment for any "particular use."  (Lease § 10.1.)  Accordingly, Amtrak's only option under the Operative Contracts was to replace or pay Casualty Value for any unit that Amtrak deemed "*uneconomical to repair*" or "*unfit for commercial use from any cause.*"[8]  (*Id.* § 7; Participation Agreement Annex A-4.)

---

of such Excepted Payment"; . . . "(xi) any right to demand, collect or otherwise receive and enforce the payment of any amount described in clauses (i) through (x) [of the definitions], or to enforce the Equity Guarantee Agreement;" and "(xii) all proceeds of the foregoing."  These "Excepted Payments" are the same payments referenced in the portion of Indenture § 6.10(d) stating that the "Indenture Trustee shall at all times have the right, to the exclusion of Owner Trustee and Owner Participant, to (A) declare the Lease to be in default under Section 13.2 thereof except to the extent necessary to enforce the exercise of rights with respect to Excepted Payments and (B) . . . exercise the remedies set forth in such Section 13.2 (other than in connection with Excepted Payments)."

[8]  All emphasis herein is supplied unless otherwise noted.

14.     Unbeknownst to Plaintiffs, Amtrak permanently retired Plaintiffs' locomotives as both "unfit for commercial use" and "uneconomical to repair," but concealed these actions from Plaintiffs.  In May 2016, Plaintiffs noticed press reports suggesting that Amtrak had decided to take at least some of Plaintiffs' equipment out of service.  Plaintiffs promptly wrote Amtrak to inquire about the status of their equipment.  Amtrak represented at the time that no decision had been made on the trainsets, and concealed its treatment of the locomotives despite Plaintiffs' repeated inquiries.  Plaintiffs' efforts to gather more information from Amtrak went unanswered. In late 2016, despite Amtrak's stonewalling and the absence of any confirmed evidence, Plaintiffs became concerned that Amtrak had permanently retired their locomotives and issued a November 2016 letter claiming "all amounts due" under the Operative Contracts, "including Casualty Value." In December 2016, Amtrak advised that it would propose a buyout of Plaintiffs' interest with the goal of resolving all Lease claims by February 2017.  Plaintiffs relied on this representation, trusting that Amtrak would act in good faith and in the spirit of the Operative Contracts.  But in January 2017, Amtrak replaced its CFO and Treasurer and began the campaign of duplicity and delay—including several independent contract breaches—that forced this action.

15.     ***Amtrak's Bait and Switch.***  In reliance on Amtrak's statements and assurances, Plaintiffs waited for—and repeatedly and diligently inquired about—Amtrak's promised buyout proposal.  Then, in April 2017, Amtrak abruptly reversed course and, with no explanation, asked Plaintiffs to send a proposal to Amtrak instead.  Plaintiffs did so on April 25, 2017, and ordered a third-party inspection of the leased equipment, which confirmed that it was out of service and being stored in breach of Amtrak's maintenance obligations.  On July 24, 2017, having heard nothing from Amtrak regarding its promised proposal, Plaintiffs wrote the only remaining member of Amtrak's buyout team about the inspection report and requested a buyout commitment by August 4, 2017.  But that official, too, then abruptly left Amtrak.  Shortly thereafter, Amtrak's

then-CFO, William Feidt, wrote Plaintiffs a letter denying any Lease Event of Default and disputing the meaning of the inspection report.

16.     In September 2017, Plaintiffs issued formal notices of uncured defaults arising out of Amtrak's retirement and improper maintenance of the leased equipment.  The following month, Plaintiffs commissioned a second independent inspection, which confirmed that the equipment remained out of service, and that at least one unit was "in a total disassembled state" and had previously been "cannibalized for parts."  In disregard of these developments, Amtrak again denied any default and refused to explain its failure to deliver the promised proposal to buy out Plaintiffs' interest in the equipment.  Subsequent communications and documents suggest that Amtrak intended to mislead Plaintiffs about a buyout in order to delay action on Plaintiffs' contract rights. In mid-2017, for instance, an Amtrak official conceded that, when Amtrak told Plaintiffs to "expect[]" a "prompt" bid in December 2016, Amtrak was in no position to make a bid and could not do so until, "[a]t the earliest, [completion of its] 2018 budget process."[9]  Amtrak's own financial statements also suggest that the railroad's "history of recurring operating losses" and desire to avoid acknowledging defaults that could "result in cross-default to other Amtrak indebtedness"[10] drove its stonewalling of Plaintiffs' Lease rights and termination of the management team negotiating the buyout.  This conduct violated the Operative Contracts in several respects that independently triggered Plaintiffs' contractual and other rights to relief, but Amtrak nonetheless denied any breach and urged its Guarantor to do the same.  This course of

---

[9] See Ex. 2 (E-mail from Amtrak (Vabner) to Plaintiffs dated June 23, 2017).

[10] See Ex. 3 (Amtrak FY2016 Financial Statements at 9, 26, *available at* https://www.amtrak.com/content/dam/projects/dotcom/english/public/documents/corporate/financial/Audited-Consolidated-Financial-Statements-FY2016.pdf).

conduct by Amtrak further frustrated and prejudiced Plaintiffs' claims under the Operative Contracts, the spirit of those contracts, and controlling law.

17.     ***Amtrak Induces EDC to Resist Plaintiffs' Guarantee Demand.***   The Equity Guarantee exists to protect Plaintiffs from the Amtrak breaches at issue here, which is why Plaintiffs accompanied their December 2017 default notices to Amtrak with a parallel demand to EDC for a $92 million Guarantee payment.  But Amtrak—which Plaintiffs understand may have undisclosed indemnity obligations to EDC—responded by denying any event of default and advising EDC of this denial.[11]

18.     On March 13, 2018, EDC sent Plaintiffs a letter stating that Amtrak "has categorically denied that any Lease Event of Default has occurred," and that Amtrak has advised that "Amtrak will vigorously assert its contractual and legal rights in respect of any action" concerning the asserted defaults.[12]  EDC's letter then stated that, "[b]ased on Amtrak's responses, there is no basis to conclude that a Triggering Event has occurred that would obligate EDC to make any payment to you in accordance with the terms of the Guarantee."[13]  That same day (March 13, 2018), EDC sent Plaintiffs a separate letter advising Plaintiffs that EDC had filed suit in Canada for a declaration that "no amounts are immediately due and payable" under the Guarantee while Plaintiffs and Amtrak dispute the existence of an underlying Lease default.[14]

19.     Stymied by both Amtrak and EDC, Plaintiffs turned to negotiating an agreement to stay the Canadian action pending resolution in New York of their claims against Amtrak

---

[11] *See* Ex. 4 (Letter dated Dec. 29, 2017, from Amtrak to Plaintiffs (via Owner Trustee)).

[12] Ex. 41 (Letter dated Mar. 13, 2018, from EDC to HNB Investment Corp.).

[13] *Id.*

[14] Ex. 42 (Letter dated March 13, 2018 from EDC to HNB Investment Corp.); *see also* Ex. 5 (Application, No. 18-25823, *Export Dev. Canada v. HNB Inv. Corp. and Nat'l R.R. Passenger Corp.* (Ontario Superior Court of Justice) (Mar. 13, 2018)).

"concerning Amtrak's compliance with the Lease and related documents, including but not limited to the existence of any Lease Event of Default ('Underlying Dispute')." In obtaining the stay of the Canadian action pursuant to this Standstill Agreement, Plaintiffs negotiated with Amtrak and EDC—and the Canadian court endorsed—an express provision stating that "nothing in this Agreement is intended to or shall limit or otherwise prejudice [Plaintiffs'] rights or positions concerning the Underlying Dispute," and further that "nothing in this Agreement shall prohibit [Plaintiffs] from pursuing third party discovery or other legal process against [EDC] as they or a court of competent jurisdiction may deem necessary or appropriate in resolving the Underlying Dispute."[15] The parties executed this Standstill Agreement in early 2019, and on May 27, 2019, Plaintiffs received notice that the Canadian court had entered a public order endorsing the agreement and "stay[ing] [EDC's action] in accordance with the [S]tandstill [A]greement."[16]

20.     Plaintiffs now seek a declaration of Amtrak's Lease defaults as well as all other relief to which they are entitled at law or in equity on the facts alleged herein, including attorneys' fees pursuant to Section 13.2 of the Lease. Such relief is necessary to enforce the Operative Contracts and to avoid chilling investment in leveraged lease transactions critical to the transportation sector and other capital-intensive industries. Amtrak's conduct goes beyond breach of various provisions of the Operative Contracts. Through misrepresentations and misdirection, Amtrak has subverted the spirit and structure of the entire Transaction to its benefit, and to Plaintiffs' direct detriment. The Operative Contracts and expectations under the agreements are clear. Amtrak leased the equipment at issue "as-is," and agreed to pay a contractually specified sum in the event that it chose to discontinue using and maintaining the equipment in accordance

---

[15] *See* Ex. 6 sched. A §§ 3–4 ("Standstill Agreement").

[16] *Id*. at 1.

with the Operative Contracts before the end of the Lease term.  Amtrak's breach of this obligation had legal consequences under the Lease, and along with Amtrak's other misconduct triggered Plaintiffs' claims for relief, including their 2017 demand under the Equity Guarantee.  EDC agrees that the existence of Lease default(s) triggering Plaintiffs' Guarantee rights must be addressed, and in both correspondence and the Standstill Agreement filed in Ontario Court acknowledges that the Operative Contracts provide for resolution of the Underlying Dispute between Plaintiffs and Amtrak in New York.  Accordingly, the claims in this action are ripe for redress in this Court.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because the amount in controversy exceeds seventy-five thousand dollars ($75,000) and there is complete diversity of citizenship among the parties.  Additionally, this Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1349 because Amtrak is incorporated under federal law and more than one-half of its capital stock is owned by the United States.

22.     This Court has personal jurisdiction over defendant Amtrak by virtue of Amtrak's consent to jurisdiction in this venue under the Participation Agreement,[17] and by virtue of Amtrak's transaction of business in this District under N.Y. C.P.L.R. § 302(a)(1).

23.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the Transaction closed in this District, and because Amtrak consented to venue in this District under the Participation Agreement.

---

[17] *See* Ex. 7 ("Participation Agreement" dated Nov. 6, 2000, between, *inter alia*, Plaintiffs and Amtrak) § 14.13 (providing Amtrak's consent to "any suit, action or proceeding against Amtrak" arising under any "Operative Documents," including the Lease).

**CHOICE OF LAW**

24.     The Lease, Participation Agreement, and Tax Indemnity Agreement are governed by the laws of the District of Columbia without regard to conflict of laws principles or choice of law provisions.  The Indenture, to which Amtrak is not a party, is governed by the laws of New York without regard to conflict of laws principles.[18]

**PARTIES**

25.     Plaintiff Philip Morris Capital Corporation ("PMCC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Norwalk, Connecticut.

26.     Plaintiff HNB Investment Corp. ("HNB") is also a corporation organized and existing under the laws of the State of Delaware that has its principal place of business in Norwalk, Connecticut, and is a wholly owned subsidiary of PMCC.  HNB has been a wholly owned subsidiary, without interruption, throughout the time period relevant in this action and has been publicly identified as such.[19]  For ease of reference, HNB and PMCC are collectively designated herein as "Plaintiffs."

27.     Defendant National Railroad Passenger Corporation ("Amtrak") is a corporation and railroad common carrier organized and existing under the Rail Passenger Service Act of 1970,

---

[18] The Guarantee Agreement, to which Amtrak is also not a party, is governed by the laws of the province of Ontario and the federal law of Canada.  *See* Ex. 9 art. 6.1.

[19] *See, e.g.*, *Philip Morris Capital Corp. v. Kmart Corp.*, 2007 WL 3171316, at *1 (N.D. Ill. Oct. 24, 2007) (recognizing "Philip Morris Capital Corporation and its wholly-owned subsidiary, HNB Investment Corp." as early as "May 1995"); *see also HNB Investment Corp*, Bloomberg, https://www.bloomberg.com/profile/company/0523812D:US (last visited Jan. 21, 2020) (identifying "www.philipmorriscapitalcorp.com" as HNB's webpage); Participation Agreement § 13.1 (noting that HNB's address is in the care of PMCC).

as amended (recodified at 49 U.S.C. § 24101 *et seq.*), and under the laws of the District of Columbia.  Amtrak has its principal place of business in Washington, D.C.

28.     Amtrak's authorizing statutes, portions of which Amtrak has invoked in correspondence with Plaintiffs, contain several provisions relevant to the contracts and claims at issue here.  These provisions are summarized in the following chart:

| Select Relevant Amtrak Statutory Powers and Obligations | |
|---|---|
| 49 U.S.C. § 24101 | Emphasizes the need for "cooperation . . . among Amtrak . . . the private sector [and] suppliers of services and equipment to Amtrak to achieve a performance level sufficient to justify expending public money," and expressly states that "Amtrak is encouraged to make agreements with the private sector . . . ." |
| 49 U.S.C. § 24301 | States that Amtrak "shall be operated and managed as a for-profit corporation," "is not a department, agency, or instrumentality of the United States Government," and "is qualified to do business in each State in which Amtrak carries out an activity authorized under this part . . . ." |
| 49 U.S.C. § 24305 | Expressly authorizes Amtrak to "acquire, operate, maintain, and make contracts for the operation and maintenance of equipment and facilities necessary for intercity and commuter rail passenger transportation . . . ," including to "make and carry out appropriate agreements" and to "buy or lease rail rolling stock," . . . . subject to approval for foreign equipment purchases under the statute's "domestic buying preference[] . . . ." |
| 49 U.S.C. § 24310, 49 U.S.C. § 24315 | Expressly render Amtrak management accountable for the performance of Amtrak's statutory and other legal duties, including through review by the "Inspector General of the Department of Transportation," . . . . "the President and Congress," . . . . and audits by "independent certified public accountant[s]," . . . . and the "Comptroller General . . . ." |
| 49 U.S.C. § 24320 | Requires Amtrak to "submit to Congress and the Secretary of Transportation final 5-year business line plans and 5-year asset plans prepared in accordance with this section," . . . . including for "all Amtrak-controlled rolling stock, locomotives, and mechanical shop facilities that are used to overhaul equipment . . . ." |

29.     In an apparent effort to address the type of Amtrak mismanagement that gave rise to this suit, Congress in late 2015 augmented the provisions above with a new statutory provision requiring Amtrak to make detailed submissions to several federal entities "[p]rior to entering into any contract in excess of $100,000,000 for rolling stock and locomotive procurements."  49 U.S.C.

§ 24322(a)–(b).  The statute requires Amtrak to "submit a business case analysis to the Secretary of Transportation, the Committee on Commerce, Science, and Transportation and the Committee on Appropriations of the Senate, and the Committee on Transportation and Infrastructure and the Committee on Appropriations of the House of Representatives, on the utility of such procurements."  *Id*.  The statute further specifies that the "business case" must address "total lifecycle costs and the anticipated benefits related to revenue, operational efficiency, reliability, and other factors."  *Id*.

## FACTUAL ALLEGATIONS

## I.   THE TRANSACTION AND OPERATIVE CONTRACTS

30.   ***The Transaction***.   This case arises out of the leveraged lease transaction ("Transaction") in which Plaintiffs worked with a trust, a lender, and several other entities to purchase the $250 million of high-speed rail equipment from Canadian manufacturer Bombardier and French engineering company Alstom for lease to Amtrak as described above.

31.   The specific equipment at issue consists of eight Bombardier-Alstom HHP-8 electric locomotives ("Locomotives") and six high-speed trainsets ("Trainsets") (together, "Units" or "Leased Equipment") that Amtrak leased through at least 2022 with an option to extend the Lease or purchase the Units at the end of the initial term.

32.   The Transaction was memorialized in a series of contracts initially executed on November 6, 2000, and supplemented six times through March 29, 2002 (collectively, the "Operative Contracts").

33.   ***Operative Contracts***.  All parties were represented by counsel in negotiating the Operative Contracts, which include as relevant here the six contracts summarized in the following

chart and explained further below[20]:

| Agreement | Parties |
|---|---|
| **Lease** | Amtrak Trust HS-EDC-1 (Lessor) via WTC (Owner Trustee); Amtrak (Lessee) |
| **Participation Agreement** | Amtrak (Lessee); PMCC (HNB) (Owner Participant); EDC (Loan Participant); M&T Bank (Indenture Trustee); Amtrak Trust HS-EDC-1 (Lessor); WTC (individually and as Owner Trustee) |
| **Equity Guarantee** | EDC (Guarantor); PMCC (HNB) (Direct Beneficiary) |
| **Indenture Trust** | Amtrak Trust HS-EDC-1 via WTC (Owner Trustee); M&T Bank (Indenture Trustee) |
| **Tax Indemnity** | Amtrak (Lessee); PMCC (HNB) (Owner Participant) |
| **Owner Trust** | HNB (Owner Participant); WTC (Owner Trustee) |

(a)   the **Lease**[21] is the contract between the trust that Plaintiffs created to purchase the equipment—Amtrak Trust HS-EDC-1 (Lessor)—and Amtrak (Lessee);

(b)   the **Participation Agreement** details the rights and obligations of all the parties to the Transaction, including: Amtrak as Lessee; Plaintiffs as Owner Participants; Plaintiffs' trustee, Wilmington Trust Company (WTC), as Owner Trustee; M&T Bank (formerly AllFirst Bank) as Indenture Trustee acting for the benefit of note holders on the debt that financed the Transaction; and EDC as both Loan Participant (the entity that holds the secured debt) and Equity Guarantor of Plaintiffs' equity interest in the Units;

(c)   the **Equity Guarantee Agreement**[22] is the contract in which EDC (formerly Export Development Corporation) agreed to pay Plaintiffs a contractually specified

---

[20] The Transaction also implicated, among other agreements, a Tax Indemnity Agreement between Plaintiffs and Amtrak that is not presently at issue in this dispute, and on information and belief may also have given rise to a separate indemnity agreement between EDC and Amtrak that is potentially relevant to the claims in this action.

[21] *See* Ex. 8 ("Lease," dated Nov. 6, 2000, between Lessor and Amtrak).

[22] *See* Ex. 9 ("Equity Guarantee Agreement," dated Nov. 6, 2000, between Plaintiffs and EDC).

amount for their equity interest in the event Amtrak engaged in a Guarantee Triggering Event, which the Guarantee defines to include actions that require a Casualty Value payment under the Lease;

(d)     the **Indenture**[23] addresses the role and responsibilities of the trust created to represent the interests of note holders entitled to repayment of the loan that financed the Transaction; and

(e)     the **Owner Trust Agreement**[24] outlines the relationship between Plaintiffs and WTC as Plaintiffs' Owner Trustee and manager of the Lessor trust.

34.     ***Key Contract Provisions.***  In keeping with Amtrak's obligation to provide intercity rail service on a safe and reliable basis in accordance with various federal laws, the Operative Contracts give Amtrak operational flexibility over the Lease term, and expressly contemplate that Amtrak may decide not to continue using or maintaining the Units for the full duration of the Lease.

35.     The provisions granting Amtrak this option also contain terms that expressly protect both Plaintiffs' equity interest and the interests of the note holders on the Transaction debt. Notably:

(a)     **Section 7 of the Lease** permits Lessor (Plaintiffs' trust) to recover Casualty Value from Amtrak upon a Casualty Occurrence, which includes, *inter alia* and as relevant here, any determination by Amtrak that:  (i) any of the Units is "***unfit for commercial use***"; or (ii) any of the Units is "***uneconomical to repair***"[25]; and

---

[23] *See* Ex. 10 ("Indenture Trust Agreement," dated Nov. 6, 2000, between Plaintiffs and EDC).

[24] *See* Ex. 11 ("Owner Trust Agreement," dated November 6, 2000, between Plaintiffs and WTC).

[25] Lease § 7.  The Operative Contracts' definition of Casualty Occurrence also includes situations in which, "as a result of any rule, regulation, order or other action by the United States government or any Instrumentality, the use of [any] Unit in a manner consistent with Lessee's normal business activities shall have been prohibited for a period of 18 consecutive months (or beyond the end of the remaining Lease Term, if it first occurs)."  Participation Agreement Annex A-4.

(b)     **Section 12.1 of the Lease** independently protects Plaintiffs' interest in the residual value of the Units by prescribing care and maintenance standards to ensure, *inter alia*, "that each Unit is in as good condition as when delivered (ordinary wear and tear excepted)."[26]

36.     The Operative Contracts draw on the foregoing provisions to protect Plaintiffs' equity interest in the equipment.  The Participation Agreement, for instance, unambiguously states that "Amtrak hereby covenants and agrees that, for the benefit . . . [of Plaintiffs] . . . Amtrak shall . . . comply with its obligations under the Lease," and obligates Amtrak to indemnify Plaintiffs for various "losses."[27]  Further, the Lease itself provides that, in the event Amtrak takes any action that constitutes a breach (Lease Event of Default) under either Section 7's casualty value provisions or Section 12's maintenance provisions, Plaintiffs can notice the defaults[28] and pursue a series of remedies.[29]  In addition, Section 13.2 of the Lease:

- permits the Lessor (Plaintiffs' trust) to declare the entire Lease in default and demand payment of Casualty Value for all Units as liquidated damages for loss of the Lease bargain; and

- allows the Lessor to "proceed by appropriate court action . . . to recover damages for the breach [of the Lease]."[30]

The Equity Guarantee in turn and separately states that:

---

[26] Lease § 12.1.  Section 26 of the Lease also permits Amtrak, at its option, to terminate the Lease entirely by paying a contractually specified Termination Value for the respective Units.  *Id.* § 26.

[27] Participation Agreement § 9.4(ii); *see also id.* § 6.2.

[28] As detailed below, this action addresses, among other things, the Amtrak defaults that Plaintiffs' trustee identified in the Notice of Lease Default dated September 7, 2017, *see* Ex. 28, and the Notice of Lease Event of Default dated December 15, 2017, *see* Ex. 38.  Amtrak's responses did not object to Plaintiffs' right to issue these notices.  *See, e.g.*, Ex. 30 (Letter dated Nov. 29, 2016 from Amtrak (McGee) to Plaintiffs); Ex. 53 (Letter dated Sept. 14, 2017 from Amtrak (Sharma) to Plaintiffs); Ex. 37 (Letter dated Oct. 13, 2017 from Amtrak (Sharma) to Plaintiffs via Owner Trustee); Ex. 4 (Letter dated Dec. 29, 2017, from Amtrak to Plaintiffs (via Owner Trustee)).

[29] Lease §§ 7, 12, 13.1 and 13.3.

[30] Lease §§ 13.2(i), (ix).

- "[A]ny Lease Event of Default resulting from [Amtrak's] failure to pay . . . [Section 7] Casualty Value" or from "any Lease Event of Default . . . [arising from Amtrak's maintenance] obligations set forth in Section 12.1 of the Lease" constitutes a Triggering Event under the Equity Guarantee.[31]

37.     Because the Lessor—Amtrak Trust HS-EDC-1—is a trust administered by Owner Trustee WTC for the benefit of Plaintiffs as Owner Participant(s), Plaintiffs are the ultimate beneficiaries of the Lessor's rights under the Lease.  As noted, however, in directing WTC to exercise those rights in a manner that protects Plaintiffs' equity interests, Plaintiffs must abide by certain provisions that safeguard the note holder(s) on the debt.  Here, the sole note holder is EDC, which is represented in its capacity as Loan Participant by M&T Bank (formerly AllFirst Bank), the Indenture Trustee acting for the benefit of EDC as the sole Indenture Note Holder.

38.     The Indenture addresses certain rights and remedies that the Indenture Trustee is empowered to invoke under, or with respect to, the Operative Contracts while there is outstanding debt owed to the Note Holder(s) on the leased equipment.  These Indenture provisions recognize Plaintiffs' rights in this action both directly under the Operative Contracts and as ultimate beneficiaries of the Casualty Value provisions and payments at issue in this suit.  Among other

---

[31] The Equity Guarantee at issue in the Canadian Action covered by the parties' Standstill Agreement addresses circumstances in which Lease defaults trigger Plaintiffs' independent right to seek a guarantee payment in exchange for assigning their Lease rights to EDC, the sole Loan Participant. *See* Ex. 9 ¶¶ 3.3, 3.4 ("[a]fter [Plaintiffs] ha[ve] made a demand on the Guarantor for payment in accordance with Section 3.2 . . . the Guarantor will, on the payment date specified in such demand . . . pay to [Plaintiffs] in Dollars, in immediately available funds, the Guaranteed Amount," *id*. § 3.3, in exchange for Plaintiffs "assign[ing] EDC all of its rights, title and interest in and to such Unit or Units," *id*. § 3.4).  The Canadian Standstill Agreement arose out of Plaintiffs' December 2016 demand under the Guarantee, which references EDC in its capacity "as primary obligor and not merely as surety," and states that EDC "guarantees[] prompt payment to [Plaintiffs]" of a contractually defined sum following a Triggering Event as defined in the contract. Ex. 9 ¶ 2.1; *see also id*. ¶¶ 3.1–3.2 (stating that a "Triggering Event" includes "any Lease Event of Default resulting from a failure to pay Base Rent, Termination Value, or Casualty Value . . . which shall have occurred and be continuing," *id*. § 3.1, and that, "[a]fter the occurrence and during the continuance of a Triggering Event, [Plaintiffs] may make a single demand for payment on the Guarantor," *id*. § 3.2).

things, and to the extent relevant here, the Indenture prescribes the order and priority of Casualty Value payments while the Indenture is in effect.  Specifically, the Operative Contracts provide that, during any period in which the Indenture is "in effect" when a Casualty Value payment becomes due, "any payment received by Indenture Trustee . . . with respect to a Casualty Occurrence" must be distributed first to the note holders (Lease § 7.3; *see* Indenture §§ 3.02(c), 3.03), with the residual balance paid to the Owner Trustee (*see* Indenture § 3.03), who must then remit it to Plaintiffs as Owner Participant(s) (*see* Owner Trust Agreement § 5.01(b)).

39.     Amtrak has not made any Casualty Value payments to the Indenture Trustee that implicate the foregoing payment protocol.  Nor has the Indenture Trustee noticed any defaults that would implicate such provisions.  And to the extent defaults requiring casualty payments have occurred, Plaintiffs' rights are not confined to the payment process outlined above.  Notably, and as relevant here, the Operative Contracts provide Plaintiffs with the direct rights, protections, and remedies set forth in the Lease, Participation, and Indenture provisions alleged in paragraphs 8, 10–12, and 35–36 herein.

40.     Following a Lease Event of Default, the Indenture does provide that the Indenture Trustee may pursue "any and all of the remedies pursuant to Section 13.2 of the Lease"[32] in some circumstances "to the exclusion" of Plaintiffs and their trust.[33]   Critically, however, these provisions regarding the Indenture Trustee's exclusive rights, to the extent they are relevant here at all:  (i) are limited to the pursuit of remedies under Section 13.2 of the Lease; and (ii) even then do not apply to Section 13.2 claims involving "Excepted Payments," which the Indenture and Participation Agreement define as claims that Plaintiffs may pursue directly, including for

---

[32] Indenture § 4.04(a).

[33] *Id.* § 6.10(d).

damages and remedies addressed in Section 13.2 of the Lease.[34]  As noted, "Excepted Payments" include:

- "indemnity or other payments . . . paid or payable by Lessee in respect of Owner Participant, Trust Company or any of their respective affiliates . . . pursuant to Sections 6.1, 6.2 and 7.3 of the Participation Agreement and any payments of costs and expenses of Owner Trustee and Owner Participant payable by Lessee pursuant to the Operative Documents"; . . .

- "all right, title and interest of Owner Trustee and/or Owner Participant in and to the Equity Guarantee Agreement and any payment paid or payable thereunder;" . . . ;

- "any right to exercise any election or option or make any decision or determination, or to give or receive any notice, consent, waiver or approval, or to take any other action in respect of, but in each case only to the extent related to, any Excepted Payments;"

- "any right to restitution from Lessee in respect of, but only to the extent relating to, any Excepted Payment resulting from a determination of invalidity of such Excepted Payment";

- "any right to demand, collect or otherwise receive and enforce the payment of any amount described in clauses (i) through (x) above, or to enforce the Equity Guarantee Agreement;" and

- "all proceeds of the foregoing."[35]

41.    Claims under Section 13.2 of the Lease for remedies relating to "Excepted Payments" do not require this Court to "adjudicate" any of the Guarantee issues covered by the Canadian Standstill Agreement.  They simply address certain remedies (including monetary remedies beyond the declaratory relief Plaintiffs have the independent right to seek in this suit) that the Indenture itself permits Plaintiffs to pursue directly from Amtrak, and that the Standstill Agreement expressly reserves for determination in this action.[36]

---

[34] *Id.*; *see id.* art. I, at I-6–I-7.  Further, any dispute regarding Plaintiffs' right to seek Section 13.2 remedies against Amtrak in this action would turn on proof of the Indenture Trustee's performance of its obligations under the Indenture that Amtrak has not presented and, regardless, would not affect: (i) Plaintiffs' right to notice Amtrak's defaults under Section 13.1 of the Lease; or (ii) Plaintiffs' independent right to seek a declaratory judgment of Amtrak's defaults under Sections 7 and 12 of the Lease and/or other provisions of the Operative Contracts.

[35] *Id.* art. I, at I-6–I-7.

[36] Standstill Agreement sched. A § 1; Indenture art. I, at 1-6.

42.     Finally, and independent of their direct contractual rights to seek monetary relief from Amtrak under Section 13.2 of the Lease, Plaintiffs may pursue such relief in this action as the ultimate and intended beneficiaries of the Indenture Trustee.  As noted, the Indenture states that any Casualty Value amounts payable to the Indenture Trustee under the Indenture and Section 13.2 of the Lease must be distributed first to EDC in its capacity as noteholder while the indenture is in effect, and that any residual amounts must be paid to Plaintiffs' trustee, who then must remit those amounts to Plaintiffs.  *See supra* ¶ 38.  As a result, the Operative Contracts, including the Indenture, evince an intent and purpose to ensure that Amtrak's liability, and specifically any casualty payments due under the Indenture and Section 13.2 of the Lease, will ultimately inure to the benefit of Plaintiffs.  *See, e.g.*, Participation Agreement § 9.4(ii) ("Amtrak hereby covenants and agrees that, for the benefit of . . . Owner Participant . . . Amtrak shall . . . comply with its obligations under the Lease . . . .").

## II.    AMTRAK DEEMS THE LOCOMOTIVES "UNFIT FOR COMMERCIAL USE" AND "UNECONOMICAL TO REPAIR" UNDER LEASE SECTION 7

43.     Sections 7.1 and 7.3 of the Lease prescribe the steps that Amtrak must take in the event of a Casualty Occurrence.  Each of Amtrak's failures to abide by these contractual obligations constituted a Lease Event of Default that Plaintiffs are entitled to enforce under the Operative Contracts.

44.     The first Casualty Occurrence arose out of Amtrak's permanent retirement of Plaintiffs' Locomotives from rail service based on its determination that the locomotives were "unfit for commercial use" and/or "uneconomical to repair."[37]  Such determinations fall within the

---

[37] The Operative Contracts state that a Casualty Occurrence with respect to a "Unit" (*i.e.*, a locomotive or trainset) occurs when "such Unit suffers an actual or constructive total loss (including any damage to any Unit which results in an insurance settlement on the basis of a total loss) **or shall be or become** worn out or shall be destroyed or **irreparably damaged, or uneconomical to repair, or rendered unfit for commercial use from any cause whatsoever**

express contractual definition of a Casualty Occurrence, which applies to fitness and repair determinations based on "***any cause whatsoever***," (Participation Agreement at Annex A-4). This language reflects that Amtrak, a sophisticated repeat player in these transactions, leased the Units "as-is, where is, with all faults," and expressly acknowledged that neither Plaintiffs nor any other party made "any representation or warranty, express or implied, as to" the "fitness" of the equipment for any "particular use." Lease § 10.1. Accordingly, Amtrak expressly assumed the risk that the Units may not be fit for their intended use over the full Lease term, and bargained for early termination of its use and maintenance obligations only at the cost of replacing the Units or paying Casualty Value. *See* Lease § 7.

A.  **Amtrak Permanently Retires the Locomotives As "Unfit for Commercial Use" and/or "Uneconomical to Repair"**

45.    In 2012, Amtrak issued a "Fleet Strategy" memorandum recommending the replacement of the majority of its fleet of locomotives and cars for its Northeast passenger rail routes. The Fleet Strategy included a plan to procure seventy new electric locomotives from Siemens that could replace some or all of the leased Locomotives in the coming decade.[38]

46.    The Fleet Strategy memo described Amtrak's concerns over the reliability of the leased Locomotives as a "critical issue." *See* Ex. 12 at 24.

47.    In 2013, Amtrak's then-President and CEO Joseph Boardman wrote in a report (the "Boardman Memo")[39] to Amtrak's Inspector General that Amtrak recommended eventually "retir[ing]" its HHP-8 electric locomotives because Amtrak found them unreliable and otherwise

---

***during the Lease Term*** or until such Unit is returned pursuant to [] the Lease." Participation Agreement at Annex A-4 (defining "Casualty Occurrence").

[38] *See* Ex. 12 ("Amtrak's Fleet Strategy") at 24–25.

[39] *See* Ex. 13 (Amtrak Report No. OIG-E-2013-014 (May 28, 2013), Appendix III at 34).

unfit for continued use "despite several efforts to improve their performance."  Boardman Memo at 34.

48.     The Boardman Memo also recommended eventual retirement of the Locomotives on the grounds that they were uneconomical to repair because the Locomotives' "maintenance is challenged by many parts no longer being in production by their original manufacturers."  *Id*.

49.     The Boardman Memo acknowledged the observation from Amtrak's Office of Inspector General[40] that "applying more intensive maintenance practices [to the Locomotives could] extend [their] useful life indefinitely," but stated that "[Amtrak's engineers] are not confident that such a strategy would result in a level of improvement commensurate with the level of additional resources that would be required."  *Id*.

50.     Part of the reason for Amtrak's assessment that the Locomotives were uneconomical to repair lies in the trains' power system.  The Locomotives are equipped with 27 Alstom E2B power modules that include a glycol cooling system and porcelain piping.  If a power module's porcelain piping develops a crack, the glycol sprays out and short circuits the unit, requiring costly repairs.[41]

51.     In February 2016, Amtrak issued a "Five Year Financial Plan" for "FY 2016– 2020."[42]  With regard to locomotives, the very last page of that 163-page document stated:

> All of the seventy new electric locomotives being manufactured by Siemens are ***expected to be received by the end of 2016***.  The new locomotives allow Amtrak

---

[40] Office of Inspector General Audit Report No. CR-2013-056, Federal Railroad Administration (Mar. 27, 2013), *available at* https://www.oig.dot.gov/sites/default/files/Amtrak%27s%20New%20Cost%20Accounting%20System%20Report%5E3-27-13.pdf  (Ex. 14).

[41] Ex. 15 (Biggs Inspection Report dated October 2017 ("Biggs Report")) at 3.

[42] *See* Ex. 16 ("The National Passenger Railroad Corporation FY 2016 Budget & Business Plan, FY 2017 Budget Request Justification, FY 2016 – 2020 Five Year Financial Plan").

to retire the existing electric locomotive fleet and standardize the fleet to include only the new Siemens units and the Acela power cars.[43]

52.     With respect to trainsets, the Five Year Financial Plan referenced "[c]ontinuation of the multi-year Acela Overhaul Program addressing the system overhaul needs of the Acela train sets," which "program will enable Amtrak to maintain equipment in a state of good repair, to return the assets to current Amtrak standards, improve reliability and availability of equipment, enhance overall customer experience, comply with applicable Federal regulations and mitigate equipment failures . . . ."[44]

53.     In May 2016, press reports suggested that Amtrak had contracted for trainsets that could cause Plaintiffs' Trainsets to be permanently retired.   In response, Plaintiffs promptly contacted Amtrak in May 2016 to inquire about the status of *all* of the Leased Equipment.  Amtrak responded that no decision had been made regarding the Trainsets, but that statement was belied by the fact that Amtrak's own 2016 "Five Year Financial Plan" did not include any HHP-8 locomotives in the Plan's list of "Active Units."  Expecting Amtrak to be more forthcoming in the spirit of the parties' agreements, Plaintiffs followed up with Amtrak in an August 2016 e-mail, asking for an update based on further press reports and Amtrak's promise in May 2016 to "provide a full update" to Plaintiffs "if something gets signed" that would affect Plaintiffs' equipment.[45] But it was only in late 2016, after months of stonewalling by Amtrak, that Plaintiffs deduced from

---

[43] *Id.* at 163; *see also id.* at 23 (stating that the Siemens "locomotives are replacing the AEM-7 and HHP-8 locomotives used on Northeast Regional, Keystone and various State Supported and Long Distance trains that operate over the electrified sections of the NEC"; that the "first locomotive entered revenue service on February 7, 2014 and, as of this writing, 62 new locomotives have been delivered"; and also that "[t]hese locomotives have replaced all 15 HHP-8 locomotives and nearly all AEM-7 type locomotives").

[44] *Id.* at 150.

[45] *See* Ex. 17 (Plaintiffs' e-mail to Amtrak (Vabner) dated Aug. 30, 2016).

a combination of public information and Amtrak's evasive responses to Plaintiffs' inquiries that Plaintiffs' Locomotives likely had been permanently retired.

54.    On January 27, 2017, Amtrak published its 2016 Consolidated Financial Statements, in which Amtrak revealed—for the first time—that it had prematurely and permanently retired the Locomotives.  These financial statements explicitly note that:

> During [fiscal year] 2016 . . . [Amtrak] *removed from active service older electric locomotives* for use in the NEC, [Amtrak] removed from active service older electronic locomotives . . . [and] *concluded that the locomotives would not be returned to active service* and, as a result, $29.3 million in additional depreciation expense was recorded in FY2016.[46]

Amtrak's January 27, 2017 financial statements further confirmed Amtrak's permanent retirement of the Locomotives by recording $29.3 million in depreciation for the removal of the Locomotives from active service.  These statements confirmed that the Locomotives were indeed prematurely and permanently retired, as did the financial statements' observation that, *in contrast* to the Locomotives' removal, "[t]here were *no* significant *premature retirements* of depreciable property . . . in [fiscal year] 2015."[47]

55.    Amtrak's 2017 Consolidated Financial Statements, published on January 26, 2018, repeated the fiscal year 2016 recording of $29.3 million in depreciation, as well as the characterization of the Locomotives' retirement as "premature."[48]

**B.    Amtrak Refuses to Pay Casualty Value for the Retired Locomotives**

56.    Section 7.1 of the Lease required Amtrak to notify Plaintiffs and all other participants in the Transaction "within 5 Business Days after [Amtrak's] determination" that the Locomotives were unfit for use and/or uneconomical to repair, which determination constituted a

---

[46] Ex. 18 ("Amtrak's FY 2016 Financial Statements"), notes at 13.

[47] *Id.*

[48] *See* Ex. 19 ("Amtrak's FY 2017 Financial Statements"), notes at 13.

Casualty Occurrence under the terms of the Lease.

57.     When Amtrak retired the Locomotives, it had the option to proceed under either Lease Section 7.2, requiring substitution of the Locomotives, or Lease Section 7.3, requiring the payment of Casualty Value.

58.     Amtrak's "failure to provide [its] notice of election . . . constitute[d] an election to proceed in accordance with Section 7.3,"[49] and obligated Amtrak to make an Aggregate Casualty Payment to the Indenture Trustee on behalf of the debt holder(s), and to the Owner Trustee on behalf of Plaintiffs.

59.     Plaintiffs' November 21, 2016 notice drew upon information that Amtrak had concealed regarding the permanent nature of the equipment decommissions to demand that Amtrak should have notified Plaintiffs that the Locomotives were retired as early as February 2015 and made an Aggregate Casualty Payment by June 3, 2015.[50]   Yet Amtrak did neither.   Beyond concealing the permanent nature of the retirements, Amtrak affirmatively represented that the removal of locomotives from service through 2015 was for contractually permitted maintenance. Indeed, Amtrak failed to notify Plaintiffs of a Casualty Occurrence even in January 2017, when Amtrak's 2016 Consolidated Financial Statements first disclosed Amtrak's premature and permanent retirement of Plaintiffs' Locomotives.  *See supra* ¶ A.54.

60.     Under Lease Section 13.1(i), Amtrak's undisputed "fail[ure] to make any payment of . . . Casualty Value . . . within 5 Business Days after the same shall become due" "constitute[d]

---

[49] Lease § 7.1.

[50] *See* Ex. 20 (Letter from Plaintiffs to Amtrak dated Nov. 21, 2016) (premising Plaintiffs' demand on the Operative Contracts' provisions requiring payment "on the Casualty Value Determination Date with respect to such Unit or Units suffering a Casualty Occurrence," which is "the first monthly Casualty Value Determination Date set forth in Schedule IV to the Lease Supplement applicable to such Unit that is at least 90 days after such Casualty Occurrence").

[a] Lease Event[] of Default" that triggered Plaintiffs' right to seek various remedies under the Operative Contracts, including Plaintiffs' demand for a Guarantee payment.

## III.   AMTRAK FAILS TO MAINTAIN THE UNITS UNDER LEASE SECTION 12.1

### A.   Amtrak Cannibalizes the Locomotives for Parts and Fails to Perform Required Maintenance

61.     Section 12.1 of the Lease states, *inter alia*, that Amtrak must "maintain and service each Unit . . . so that each Unit is in as good condition as when delivered (ordinary wear and tear excepted)."[51]  Section 12 further states that "[i]n no event shall any Unit be maintained with less care or scheduled for maintenance on a basis less frequent than . . . other rolling stock similar to the Units owned by or operated for or by [Amtrak] . . . ."[52]

62.     To facilitate compliance with these and other maintenance provisions in the Operative Contracts, the Lease states that Amtrak "may take a Unit out of service ***while awaiting repair*** so long as [Amtrak] takes reasonable care to ***prevent deterioration*** of the condition of such Unit beyond that attributable to the circumstances necessitating such repair . . . ."[53]

63.     In addition to imposing the foregoing maintenance obligations, the Lease requires Amtrak "to comply in all material respects with all laws, rules or regulations of (i) the United States and any jurisdictions into which its operations involving the Units may extend, and (ii) . . . the Federal Railroad Administration ['FRA']," including various federal laws and FRA regulations governing the use and maintenance of the Leased Equipment.[54]

64.     To help substantiate compliance with these maintenance obligations, the Lease requires Amtrak to "maintain all records, logs and other materials required by the [Association of

---

[51] Lease § 12.1(i)(a)(w).

[52] *Id.* § 12.1(ii).

[53] *Id.*

[54] *Id.* § 11.1.

American Railroads,] or the United States Department of Transportation, or any other Governmental Authority having jurisdiction over the Units or [Amtrak],"[55] including the FRA.

65.     The foregoing maintenance and record-keeping obligations in the Lease survived the Casualty Occurrences described above because Section 7.6 of the Lease expressly states that "[Amtrak] shall **not** be released from its obligations hereunder in the event of . . . any Casualty Occurrence . . . ."[56]   This provision is important because in this case, despite Amtrak's representation to Plaintiffs that "the Locomotives are stored in accordance with best practices and manufacturer's guidelines and are being maintained in accordance with the terms of the Lease," Amtrak's own inspection reports and maintenance records show several maintenance breaches with respect to the Units both before and after their removal from service.[57]   For example, Amtrak's own maintenance records indicate that numerous parts from several Locomotives were "cannibalized" or "robbed," notably:

- May 28, 2008: Locomotive #685's[58] rear end "fireman's side step" (required for operation under 49 C.F.R. §§ 231.30(c)–(d), 231.29) was robbed;[59]

- April 1, 2009: Locomotive #681's filter capacitor (a device which is required to protect electronic equipment from potentially catastrophic damage) was robbed;[60]

---

[55] *Id.* § 12.1(i)(b).  Lease § 9(i) permits Plaintiffs to inspect the Units and records at any reasonable time.

[56] *Id.* § 7.6.

[57] *See* Ex. 30.  Further, although retired equipment is subject to reduced maintenance requirements under FRA regulations, Amtrak was contractually obligated under the Lease to maintain the Leased Equipment on par with "similar rolling stock."  Lease § 12.1(ii).

[58] Amtrak re-numbered the Locomotives in 2015.  *See* Ex. 21 (Letter from Amtrak (McGee) to WTC ("Statement of New Railcar Reporting Marks")).  Accordingly, references herein are to the new reporting marks for the Locomotives.

[59] *See* Ex. 22 (Consolidated Ten-Year Locomotive Maintenance Records) at 66.

[60] *See id.* at 13.

- August 24, 2010: Locomotive #690's battery chargers were robbed;[61]

- September 17, 2010: Locomotive #692's "F end MFD," "PSP2 Pressure Switch," and parking brake pressure switch were all robbed;[62]

- September 28, 2010: Locomotive #692's "R end MFD" was robbed;[63]

- November 4, 2010: Locomotive #690's Automatic Train Control Card (a safety system required to be maintained in working order for operation of the unit, *see generally* 49 C.F.R. § 236.0) was robbed;[64]

- December 30, 2010: Locomotive #690's event recorder (a device required under 49 C.F.R. § 229.135, which is "designed to resist tampering, that monitors and records data," *see* 49 C.F.R. § 229.5) was robbed;[65]

- March 17, 2011: Locomotive #681's speed sensor power supply was "cannibalized";[66]

- June 27, 2011: Locomotive #681's front end coupler knuckle (a locking mechanism required to operate the rolling stock) was "cannibalized" for a locomotive not covered by the Operative Contracts with Plaintiffs;[67]

- July 22, 2011: Locomotive #692's AGATE (a programmable device used to interface with the Locomotive's network of electronic systems) was cannibalized;[68] and

- March 3, 2014: Locomotive #682 had multiple parts cannibalized and not replaced for nearly three years (until December 13, 2016).[69]

66.     Amtrak's maintenance records for the Leased Equipment also reveal that Amtrak failed properly to inspect and test numerous locomotives within a period that "may not exceed 92 days" under 49 C.F.R. § 229.23 and other applicable laws, notably:

---

[61] *See id.* at 96.

[62] *See id.* at 111.

[63] *See id.*

[64] *See id.* at 96.

[65] *See id.*

[66] *See id.* at 10.

[67] *See id.*

[68] *See id.* at 108.

[69] *See id.* at 19.

- Locomotive #684 missed the deadline on its required 92-day inspection, which was conducted on August 25, 2015—283 days overdue.[70]

- Locomotive #685 missed the deadline on its required 92-day inspection, which was conducted on December 17, 2013—31 days overdue.[71]

- Locomotive #690 missed the deadline on its required 92-day inspection, which was conducted on January 30, 2013—74 days overdue.[72]

- Locomotive #692 missed the deadline on its required 92-day inspection, which was conducted on February 25, 2012—8 days overdue.[73]

67.     Amtrak's responses to Plaintiffs' inquiries also indicate that Amtrak failed to maintain copies of Form FRA F 6180–49A, in violation of 49 C.F.R. § 229.23, for at least six of the Locomotives (Nos. 681, 682, 685, 686, 690, and 692) for the period from May 30, 2012, to August 21, 2012, and for a seventh Locomotive (No. 694) from October 17, 2013, to May 16, 2014.

68.     The maintenance records and other information available to Plaintiffs further document Amtrak's failure to perform several required maintenance procedures in the years leading up to Amtrak's retirement of the units as unfit for commercial use and/or uneconomical to repair.  Notably, these records indicate that:

- Inspection of Main Transformer (procedure #EXEH-24-0066) was not completed for Locomotive Nos. 681, 682, 684, 685, 686, 690, or 692;

- Testing of Pressure Switch and FCU Detection (procedure #EXEH-01-0009) was not completed for Locomotive Nos. 681, 682, 684, 685, 686, 690, or 692;

- Testing of the Fire Control Unit (procedure #EXEH-01-0007) was not completed for Locomotive Nos. 684, 685, 686, 690, 692, or 694;

---

[70] *See* Ex. 23 (Card 684 8-25-15).

[71] *See* Ex. 24 (Card 655 12-17-13).

[72] *See* Ex. 25 (Card 660 1-30-13).

[73] *See* Ex. 26 (Card 662).

- Inspection and Sampling of Main Transformer Oil Level (procedure #EXEH-24-0064) was not completed for Locomotive Nos. 681, 682, 684, 685, 686, 690, or 692, and was not completed for Locomotive No. 694 every six months as recommended;

- Inspection of Air Compressor and Replenishment of Air Dryer Desiccant (procedure #EXEH-21-0038) was not completed for Locomotive Nos. 684 and 692; and

- Replacement of Auxiliary Air Compressor Intake Filter (procedure #EXEH-21-0006) was not timely completed for Locomotive Nos. 681, 682, 684, 685, 686, 690, 692, or 694.

69.     Reports from both of the independent inspections Plaintiffs ordered in 2017 revealed Amtrak's ongoing maintenance failures under the Operative Contracts.

70.     The first inspection was conducted by independent third party inspector David Witt of TSA Railcar Services in June 2017.[74]

71.     That June 2017 inspection demonstrated that:  (i) unbeknownst to Plaintiffs at the time, all eight Locomotives had been removed from active service no later than February 9, 2015; and (ii) despite Amtrak's contrary representations to Plaintiffs, the units were not being maintained consistent with the Operative Contracts.  Notably, Lease Section 12.1(ii) permits the Units to be taken out of service only "while awaiting repair," and only "so long as [Amtrak] takes reasonable care to prevent deterioration of the condition of such Unit beyond that attributable to the circumstances necessitating such repair."  At the time of the June 2017 inspection, four of the Locomotives (Nos. 681, 684, 685, and 690) were being stored outdoors and the other four (Nos. 682, 686, 692, and 694) were being stored in various disassembled states on truck frames.[75] Notably, the report observed that "all" of the eight locomotives addressed in the inspection were "retired" from active service by early 2015, and that "four of them" were "being stored in a[n]

---

[74] *See* Ex. 27 (TSA Railcar Services, David Witt Inspection Report of June 2017 ("Witt Report")).

[75] *See id.*

unusual condition" as documented in the photographs below.[76]  These and other observations from

the June 2017 inspection revealed that, from the time the Units were removed from active service

in or around 2015 to their permanent retirement in 2017, Amtrak did not "prevent deterioration of

the[ir] condition" or otherwise maintain them in the manner the Operative Contracts require.

**Witt Report**

### TSA RAILCAR SERVICES, INC.
### 2168 N. WESTMORELAND DR.
### PALATINE, IL. 60074-1221

## AMTRAK LOCOMOTIVE REPORT

During June I set up and completed inspections of 8 Units at the AMTRAK shop in Wilmington, DE. All of them are being renumbered and the last one's to operate were retired on February 9th, 2015. As of now they are all covered under the FRA 49 CFR 229.33 (out of use credit) rule that designates times of inspection. Four of them are inside the shop being stored in a unusual condition as the pics will show. They are being checked by FRA standards, and since they are all out of service this is a slow project. Here is a pic with the Pantographs removed and the center open.



---

[76] *Id.*

34

 

72.      The 2017 Witt Report further referenced reliability defects with the Units that accord with Amtrak deeming them "uneconomical to repair" and/or "unfit for commercial use" under Section 7 of the Lease.[77]  For example, the report included the following picture of the extracted "air compressor for [Unit] 694" along with a statement that "[w]hy it is outside is unknown":[78]

 

73.      These and other findings in the Witt report confirmed that, unbeknownst to Plaintiffs at the time of the report:  (i) after removing the Units from active service, Amtrak did not maintain them in accordance with the Operative Contracts, including Lease Section 12.1(ii), which as noted permits the Units to be taken out of service only "while awaiting repair," and only

---

[77] *Id.*  The report also references conditions with Amtrak's potential sale of the Units, which would have triggered Lease termination under Lease Section 26.  *Id.* at 2.

[78] *Id.* at 2–3.

"so long as [Amtrak] takes reasonable care to prevent deterioration of the condition of such Unit beyond that attributable to the circumstances necessitating such repair"; and (ii) the condition of the Units in June 2017 supports the conclusion that Amtrak permanently retired them that year because they were "unfit for commercial use" and/or "uneconomical to repair" under Lease Section 7.

74.     In response to the Witt report and the absence of maintenance records documenting contractually permitted repairs, Plaintiffs' trustee WTC, in its capacity as Lessor, sent Amtrak a written Notice of Lease Default in September 2017 for the improper maintenance and use of the Locomotives in breach of Section 12 of the Lease, and advised Amtrak that it had 30 days to cure the default.[79]

### B.     Amtrak Fails to Cure its Deficient Maintenance

75.     Under Lease Section 13.1(v), Amtrak had 30 days after Plaintiffs' September 2017 notice to effect a cure or, "if such failure is curable but not capable of being cured within such 30-day period, such longer period not to exceed 90 days (or 365 days in the case of a maintenance default with respect to not more than two (2) Locomotives . . . ) during which [Amtrak] shall be diligently attempting to cure such failure."

76.     On September 14, 2017, Amtrak responded to Plaintiffs' notice in a letter that did not raise or otherwise take issue with Plaintiffs' right or standing to issue (through their trustee) notice of Amtrak's Lease defaults, and again simply disputed the defaults on the merits.  Notably, Amtrak's letter:  (i) asserted that "the Lease does not require that Amtrak keep the Locomotives 'in service'"; and (ii) argued that the June 2017 inspection report "confirmed that the Locomotives are being maintained in accordance with the Lease" by "show[ing] that a number of the

---

[79] *See* Ex. 28 (Letter from WTC to Amtrak dated September 7, 2017).

Locomotives are in the maintenance shop for maintenance work in compliance with the Lease." Ex. 53.

77.     On October 13, 2017, Amtrak sent Plaintiffs a further letter that, like Amtrak's September 7 correspondence, similarly did not contest Plaintiffs' right to issue (through their trustee) the notice of Lease default to Amtrak.[80]  Amtrak's October 13 letter instead reiterated Amtrak's substantive position that "Amtrak's use and maintenance of the Units, including, the Locomotives, is in full compliance with the express terms of the Lease."[81]  Specifically, Amtrak's October 13 letter asserted that "Amtrak made the prudent operational decision to transfer the locomotives to reserve status from active service," and that "[t]his action did not violate the Lease" because, "[w]hile being held in reserve status, the locomotives are being maintained by Amtrak, consistent with its obligations under the Lease."[82]

78.     To the extent that any of Amtrak's maintenance defaults were curable, Amtrak failed to cure or diligently pursue a cure in accordance with the Lease, and both of the extended cure periods have now lapsed.

79.     Amtrak's failure to cure the maintenance default Plaintiffs documented in June 2017 was evident from the second inspection Plaintiffs commissioned by independent inspector Edward Biggs of Biggs Appraisal in October 2017.[83]

80.     The Biggs Report agreed with the Witt Report that all eight Locomotives had been retired.  The Biggs Report further noted that three of the Units (Nos. 682, 685, and 694) were in

---

[80] Ex. 37.

[81] *See* Ex. 37 at 1.

[82] Ex. 37.

[83] *See* Biggs Report.

the shop with one (No. 682) in a "completely disassembled" state.[84]  The Biggs Report concluded that this Unit had previously developed a major electrical issue following a traction motor fire and had burnt cables that were listed in Amtrak's maintenance records as repaired in December 13, 2016.  But Inspector Biggs found that the cables were still not in working order when he inspected them ten months later in October 2017.[85]

81.    Based on these and other findings, including that Unit 682 had been "cannibalized for parts," Biggs concluded that Amtrak had stored the Leased Equipment in an unrepaired and unserviceable condition:[86]

## EDWARD D. BIGGS III, LLC
## D/B/A BIGGS APPRAISAL
## ACCREDITED SENIOR APPRAISER

Unit AMTK 682 (old number 652) is in the back of the shop in a total disassembled state sitting on jack stands. The 10-year maintenance records for this unit show that on 11/13/2013 this unit was reported as having burnt cables. This was reported as completed on 12/13/2016 but the cable repairs were not completed as of October 12, 2017 when the unit was inspected. It is

unit due to the disassembled state of the unit. This unit appears to have been stored in an unserviceable condition that is not in compliance with Lease section 12.1 (ii). This unit shows that it was cannibalized for parts on 3/3/2014 with parts reported as replaced on 12/13/2016.

While I believe that each of these units can be repaired to an operationally ready condition to meet the requirements of the lease, it appears that there have not been any efforts made to improve the reliability of the key power modules that operate these locomotives. Rather than improve the power modules new replacement locomotives were acquired. Unit 682 was not maintained in accordance with the lease. It was

82.    The Biggs findings confirmed Amtrak's continuing breach of its obligations under Lease Section 12.1 to maintain the units in keeping with the Operative Contracts, and specifically

---

[84] *Id.* at 6.

[85] *Id.*

[86] *Id.* at 4.

to:  (i) perform timely, legally required maintenance to ensure that at the end of the Lease term "each Unit is in as good condition as when delivered (ordinary wear and tear excepted)," Lease § 12.1(i)(a)(w); and (ii) with respect to any Unit requiring repair, to take "reasonable care to prevent deterioration of the condition of such Unit beyond that attributable to the circumstances necessitating [its] repair," *id.* § 12.1(ii).

83.     Under Lease Section 13.1(v), Amtrak's "fail[ure] to perform or observe any material covenant"—including its failure properly to use and maintain the Units as prescribed by Lease Section 12.1—if not timely cured "after written notice . . . constitute[s] [an independent] Lease Event[] of Default" for which Plaintiffs are entitled to seek remedies, and that triggered their notices of default to Amtrak as well as their demand for a Guarantee payment.

## IV.   AMTRAK PROPOSES A BUYOUT TO ADDRESS PLAINTIFFS' CLAIMS

84.     The two 2017 inspections detailed above were part of Plaintiffs' efforts to preserve their rights and secure resolution of their claims following Amtrak's offer to negotiate a buyout in December 2016.

85.     As noted, the discussions precipitating that proposal began in May 2016, when Plaintiffs learned of press reports suggesting that Amtrak might take some of Plaintiffs' Trainsets out of service, and Plaintiffs then promptly inquired about the status of the Leased Equipment with Amtrak officials.  In these initial discussions, Amtrak told Plaintiffs that *if* Amtrak finalized an agreement to purchase new units that would replace the Leased Equipment, Amtrak would discuss appropriate relief.

86.     Expecting Amtrak to be candid about the status of the Leased Equipment in keeping with its obligations under the Participation Agreement, Plaintiffs repeatedly followed up with Amtrak in the ensuing months to obtain information available only to Amtrak about how Plaintiffs' equipment was being used and maintained, including and particularly the nature and intent behind

Amtrak's removal of the Locomotives from service.  On August 30, 2016, Plaintiffs responded to additional press reports by e-mailing Amtrak an inquiry about the status of Plaintiffs' Leased Equipment, and specifically referenced Amtrak's May 2016 promise to provide "a full update" in the event "something gets signed" that would affect Plaintiffs' equipment.[87]   Amtrak did not respond.

87.     On October 7, 2016, Amtrak conceded that it "never got back to [Plaintiffs] on" their August inquiry and offered to discuss it.[88]  Plaintiffs made several further efforts to schedule the discussion Amtrak offered on October 7 and generally to discover the status of the Leased Units.  On October 21, 2016, Plaintiffs once again e-mailed Amtrak and asked to speak "as soon as possible about our HHP-8 locomotives" because Plaintiffs had been researching the 2016 financial disclosures and associated 2016 reports concerning Northeast Corridor equipment.[89]  In their October 21 e-mail, Plaintiffs informed Amtrak that this "research indicates that the locos were retired by Amtrak in 2014 [but] [Plaintiffs] *had no knowledge or notice of this*."[90]  Again Amtrak did not respond.  Accordingly, even as late as October 21, 2016, Amtrak's evasive and misleading statements about its treatment and plans for Plaintiffs' equipment deprived Plaintiffs of fair notice of the breaches at issue in this case.  Notwithstanding that, Plaintiffs deduced from Amtrak's evasiveness, combined with 2016 press and financial reports, that their equipment appeared to be retired—permanently rather than for permitted maintenance work—in violation of the Operative Contracts.  Accordingly, on November 21, 2016, Plaintiffs wrote Amtrak asserting their claim that Amtrak's discretionary retirement of the Units and accompanying failure to

---

[87] *See supra* ¶ II.A.53; Ex. 17.

[88] *See id*.

[89] *See* Ex. 29 (E-mail from Plaintiffs to Amtrak (Vabner) dated Oct. 21, 2016).

[90] *Id*.

maintain them triggered an obligation to pay Casualty Value.  Plaintiffs' November 21, 2016 letter further stated that, if Amtrak continued to disregard Plaintiffs' good faith outreach, Plaintiffs would direct WTC as Lessor to issue: (i) a notice of Lease Event of Default for failure to pay Casualty Value under Section 7 of the Lease; and (ii) a notice of Lease Default for failure properly to use and maintain the Locomotives under Section 12 of the Lease.[91]

### A.  Amtrak Proposes a Buyout of Plaintiffs' Interest in the Units

88.    On November 29, 2016, Amtrak told Plaintiffs it would meet to discuss a buyout of Plaintiffs' equity interest.[92]   On December 1, 2016, Amtrak sent senior officials (Michael McGee, Treasurer, and Reuben Vabner, Senior Director of the Treasury Department) to meet with Plaintiffs.  In that meeting, the Amtrak officials proposed that, instead of paying Casualty Value (which could trigger various unrelated liabilities according to Amtrak's financial statements), Amtrak simply terminate the Lease and buy out Plaintiffs' equity interest in the Locomotives.

89.    Amtrak promised to send Plaintiffs a written proposal memorializing this relief within a few weeks.  Amtrak confirmed its intent to submit a buyout proposal on December 9, 2016, when Senior Director Vabner advised Plaintiffs by e-mail that Amtrak is "finishing up running numbers (including numbers on an equity-only basis)," and that Plaintiffs should "[p]lease expect to hear from [Amtrak] shortly."[93]  Relying on these representations, and expecting Amtrak to act in good faith and consistent with the spirit of the parties' agreements, Plaintiffs did not commence any legal action at the time—instead waiting, as Amtrak had expressly urged Plaintiffs to do, for a proposed buyout solution.

[91] *See supra* note 50, Ex. 20.

[92] *See* Ex. 30.

[93] *See* Ex. 31 (E-mail from Amtrak (Vabner) to Plaintiffs dated December 9, 2016).

41

90.    On December 16, 2016, after Plaintiffs and Amtrak had confirmed residual payment totals, Vabner wrote that Amtrak "plan[s] to come back to [Plaintiffs] with a proposal. Hopefully, within [the] next week."[94]  The "next week" passed without any proposal from Amtrak.

91.    On January 4, 2017, Plaintiffs e-mailed Amtrak to follow up on the buyout proposal, which Amtrak had failed to provide despite its repeated promises.  Amtrak responded that it was "behind schedule" in getting its proposal to Plaintiffs, but stated that it "ha[d] a complete analysis in front of top finance dept. management and [is] hoping for go-ahead to communicate a proposal to [Plaintiffs] very shortly."[95]

92.    On January 13, 2017, Amtrak wrote Plaintiffs that the Treasury team's recommendation regarding an early termination has "made it up to the CFO level who said [the team] should go ahead and take it to [Amtrak's then-]President, Wick Moorman, for his review."[96] Amtrak stated that it hoped to revert to Plaintiffs with the proposal by the end of the following week—representing, and again reassuring, Plaintiffs that a buyout proposal would be forthcoming.[97]  Reasonably relying on these representations given Treasury's stated progress on the proposal and referral to Amtrak's CEO, Plaintiffs continued to wait for the promised terms.

### B.    Amtrak Stalls and Terminates Key Members of the Negotiating Team

93.    Unbeknownst to Plaintiffs, Amtrak was in early 2017 executing a major reorganization in which Treasurer Michael McGee, who was part of the team that proposed the buyout to Plaintiffs in 2016, left Amtrak and was replaced by Rhonda Lynn Seegal, who would

---

[94] *See* Ex. 32 (E-mail from Amtrak (Vabner) to Plaintiffs dated December 16, 2016).

[95] *See* Ex. 33 (E-mail from Amtrak (Vabner) to Plaintiffs dated January 13, 2017).

[96] *See id.*

[97] *See id.*

serve briefly as Treasurer under new Chief Financial Officer William Feidt before she, too, abruptly departed.

94.     In February 2017, Amtrak's Senior Director Vabner advised Plaintiffs that they would have to wait another month for Amtrak's buyout proposal.  Vabner did not reveal that individuals involved in the buyout negotiations would be impacted by Amtrak's reorganization and instead reassured Plaintiffs that Amtrak was proceeding as discussed.

95.     On March 10, 2017, Plaintiffs e-mailed Amtrak to follow up, once again, on the status of the promised proposal.  Vabner replied that he and the new Treasurer, Rhonda Seegal, were planning to meet with new CFO Feidt and then-President Moorman about the proposal. Vabner further stated that, "[d]epending on guidance given, we may be ready to come back to you by end of next week.  If there is any delay, I would still hope we can be back to you within March 2017."[98]

96.     In April 2017, after months of promising to provide its own buyout proposal, Amtrak abruptly reversed course, asking Plaintiffs to send Amtrak written buyout terms instead. On April 25, 2017, Plaintiffs in good faith complied with Amtrak's request and provided Amtrak with two alternative buyout proposals.[99]

97.     Hearing nothing from Amtrak for approximately two weeks, Plaintiffs contacted Senior Director Vabner on or about May 8, 2017 to follow up on the buyout proposals.

98.     On May 16, 2017, Plaintiffs again followed up, this time by e-mailing both Amtrak Treasurer Rhonda Seegal and Senior Director Vabner with a request to discuss the pending buyout terms.[100]  On May 17, 2017, Vabner replied that he and Seegal would "coordinate a time to discuss

---

[98] *See* Ex. 34 (E-mail from Amtrak (Vabner) to Plaintiffs dated March 10, 2017).

[99] *See* Ex. 35 (E-mail from Plaintiffs to Amtrak (Vabner and Seegal) dated June 2, 2017).

[100] *See id.*

with you and come back with that proposed time.  It should be within this week [by May 19,

2017]."[101]  But May 19 passed, and no time was proposed to discuss the buyout terms.

99.     On June 2, 2017, Plaintiffs again wrote to Vabner and Seegal expressing concerns

about Amtrak's delay in finalizing a buyout to address Amtrak's lease defaults:

> It has been over six months since [Plaintiffs] met with [Amtrak] to discuss the
> issues outlined in our letter dated November 21, 2016. When we met . . . on
> December 1st 2016, Reuben [Vabner] and Michael [McGee] said that Amtrak
> would be coming back to [Plaintiffs] within weeks with a proposal to address the
> matter but after several months you asked us instead to make a proposal. On an
> April 21st telephone call we verbally made a proposal to modify the leases to which
> you asked if we could put the proposal in writing. On April 24th [Plaintiffs]
> forwarded the written proposal and to date are still waiting for your response.
>
> [Plaintiffs] have been very patient. First waiting for the proposal you said that
> Amtrak would provide but never did and now waiting for a response to the proposal
> we sent you. [Plaintiffs] very much would like to arrive at an arrangement that
> works for all of us but if [Plaintiffs] do not hear from [Amtrak] shortly and make
> progress toward a solution [Plaintiffs] will have to proceed as outlined in [the]
> November 21st letter.[102]

100.    That same day, on June 2, 2017, Seegal responded to Plaintiffs and scheduled a call

for June 6, 2017, to discuss buyout terms.

101.    On June 6, 2017, Plaintiffs spoke with Vabner and Seegal, who advised Plaintiffs

that Amtrak was planning to present a revised proposal to Plaintiffs soon and offered to speak

again the week of June 19, 2017—hopefully with that proposal in hand.  In reliance on this express

reassurance from Amtrak, which included a specific date for follow-up, Plaintiffs reserved their

right to take further legal action.

---

[101] *Id.*

[102] *See id.*

102.     But less than two weeks later, on June 15, 2017, Seegal e-mailed Plaintiffs to say she was leaving Amtrak and that the company would continue to "work through these important issues" with Vabner and others.[103]

103.     On June 23, 2017, more than six months after Amtrak offered a buyout proposal to address Plaintiffs' contract claims, Vabner e-mailed Plaintiffs and acknowledged that Amtrak had affirmatively misrepresented its intention and ability to make a buyout proposal.  Vabner explained that "[Amtrak] set [Plaintiffs'] expectations towards the prompt delivery of a bid from Amtrak to terminate the [Lease] between [Plaintiffs] and Amtrak," but Amtrak had decided not to honor those expectations, and had instead "decided not to make a proposal at this time."  Vabner then admitted that Amtrak's representations that led Plaintiffs to "expect[]" a "prompt" bid in December 2016 were false, for Amtrak was actually in no position to offer one.  In reality, Vabner explained, "*[a]t the earliest*, [Amtrak] will be in a position to make a proposal *after our 2018 budget process has moved towards completion*, at the end of July 2017."[104]

104.     In the same e-mail, Vabner noted that he would be Plaintiffs' new "point of contact from here on" and encouraged further discussion of the buyout proposal.[105]  But shortly thereafter Vabner, too, abruptly departed Amtrak.  On information and belief, he was terminated due to disagreements with Amtrak's management about honoring Plaintiffs' contract claims and buyout proposal.

---

[103] *See* Ex. 36 (E-mail from Amtrak (Seegal) to Plaintiffs dated June 15, 2017).

[104] *See supra* note 9, Ex. 2.

[105] *See id.*

## V.   AMTRAK RENEGES ON THE BUYOUT PROPOSAL AND DENIES PLAINTIFFS' CLAIMS FOR CONTRACT BREACH AND RELATED RELIEF

### A.   Amtrak Reverses Course and Plaintiffs Invoke Their Contract Rights

105.   In October 2017, after Amtrak's repeated assurances and specific reference to a proposal option following Amtrak's "2018 budget process," Amtrak's new Treasurer Swati Sharma sent a letter to Lessor WTC (Plaintiffs' trustee) in which Amtrak conceded its "operational decision to transfer the [leased] locomotives to *reserve status* from active service," but asserted that this "action did not violate the Lease."[106]   Amtrak further asserted its "disagreement as to the proper interpretation of (i) the findings of the Witt inspection, (ii) the maintenance provisions of the Lease; and (iii) [Amtrak's] statements contained in the report of Amtrak's Inspector General."[107]   Amtrak then accused Lessor of asserting the maintenance Lease Default under Section 12 "not with the goal of having the locomotives maintained, but in the hope of leveraging its position with Amtrak (and EDC as the equity guarantor) with respect to all of the leased equipment and thereby shifting this residual risk to Amtrak."[108]

106.   On December 15, 2017, WTC (Plaintiffs' trustee) responded to Amtrak's October 2017 correspondence by sending Amtrak a formal Notice of Lease Events of Default for both (i) Amtrak's failure to pay Casualty Value as required under Section 7 of the Lease; and (ii) Amtrak's failure properly to maintain and use the Units as required by Section 12.1 of the Lease.[109]   In contrast to the sweeping and unsupported assertions in Amtrak's October letter, WTC's December 2017 Notice supported the claimed Lease Events of Default (and responded to Amtrak's October correspondence) with a detailed recitation of evidence and relevant Lease provisions, notably:

---

[106] *See* Ex. 37 at 1.

[107] *Id.*

[108] *Id.* at 2.

[109] *See* Ex. 38 (Letter dated Dec. 15, 2017, from WTC to Amtrak (Sharma)).

- **Lease Events of Default – Locomotive Use and Maintenance**:

  - "Lessor hereby notifies Amtrak that a Lease Event of Default has occurred and is continuing under clauses (i) and (v) of Section 13.1 of the Lease due to (1) the failure of Amtrak to pay Casualty Value within 5 Business Days of the respective Casualty Value Determination Dates for each of the Locomotives it has retired from service and (2) the failure of Amtrak to cure the [maintenance] Lease Defaults identified in the Notice of Lease Default within 30 days of Amtrak's receipt of such notice," Ex. 38 at 2;

  - Amtrak's "assertion" that "[n]othing in the Lease limits Amtrak's right to make operational decisions with respect to scheduling and utilization of the locomotives" is "clearly contradicted by the terms of Section 12 of the Lease, which is entitled USE AND MAINTENANCE" and expressly "limits Amtrak's rights with respect to scheduling of the Locomotives by requiring that the Locomotives not be scheduled for maintenance on a basis less frequent than [that] for other rolling stock similar to the Locomotives owned by or operated for Amtrak," and also "require[s] that each Locomotive [be] used in a manner consistent with its design and intended use . . . [and] in a manner that permits all of the maintenance and service required by the Lease," *id.* ¶ 2;

- **Casualty Occurrence – Locomotive Retirement**

  - Amtrak's "statutory duty to provide common carrier intercity rail service to the public" does not excuse Lease liability for "remov[ing] the Locomotives due to their unacceptable reliability issues," because any determination that the Locomotives are "unfit for commercial use for ***any cause whatsoever*** during the Lease Term" is expressly defined in the Lease as a "Casualty Occurrence," *id.*;

  - In invoking these provisions of the Lease and other Operative Contracts, "Lessor and Owner Participant are not attempting to shift any risk or obligation to the Lessee that it has not ***already assumed*** when it agreed to comply with the provisions of the Lease," during which "Amtrak as Lessee assumes responsibility for all costs and expenses associated with the use and maintenance of the Locomotives including the obligation to pay Casualty Value and all other amounts due under Section 7.3," *id.*; and

- **Casualty Occurrence – Locomotive Maintenance**

  - "Amtrak has failed to maintain the Locomotives in accordance with Section 12 of the Lease, and in making the determination that the Locomotives are unfit for commercial use without paying Casualty Value has failed to comply with . . . [Lease] Section 7," *id.* ¶ 6.

107.   In parallel with serving the December 15, 2017 Notice of Lease Events of Default on Amtrak, Plaintiffs issued a Demand to EDC for the payment of Equity Casualty Value in the

amount of US$92,947,365.00 (the "Guaranteed Amount"), on the basis of the defaults detailed in the Amtrak Notice.[110]

108.    The Demand stated that the following Triggering Events "have occurred and are continuing":   1)   a "Triggering Event under [] Section 3.1[(A)] of the Guarantee" for a "Lease Event of Default . . . due to [Amtrak's] failure to pay Casualty Value within 5 Business Days of the respective Casualty Value Determination Dates for each of the Locomotives that it has retired from service;" and 2) a "Triggering Event [] Section 3.1[(C)] of the Guarantee" for a "Lease Event of Default . . . due to [Amtrak's] failure to cure Lease Defaults under Section 12.1 of the Lease [requiring proper use and maintenance of the Units] within 30 days of [Amtrak's] receipt of notice of such default."[111]   The Demand then attached Plaintiffs' December 2017 Notice to Amtrak, including Schedule 1, which detailed evidence of:

> (a)   Amtrak communications confirming that Amtrak "removed the Locomotives from service because the unacceptable reliability issues with the Locomotives rendered them unfit to provide the intercity rail service Amtrak is statutorily obligated to provide," thus triggering a "Casualty Occurrence under Section 7 of the Lease," Ex. 39, Schedule 1 at I; and

> (b)   "Lease Events of Default" under the maintenance provisions of the Lease that "exist and are continuing," including under:

>> (i)    "Section 12(i) of the Lease, [which] requires Amtrak to 'use the Equipment in any manner consistent with [its] design and intended use,'" *id.* Schedule 1 at II(1);

>> (ii)   "Section 12.1(i)(a)(w) of the Lease, [which] requires Amtrak to 'maintain and service each Unit . . . (w) so that each Unit is in as good condition as when delivered (ordinary wear and tear excepted),'" *id.* Schedule 1 at II(2);

>> (iii)  "Section 12.1(i)(a)(y) of the Lease, [which] requires Amtrak to 'maintain and service each Unit . . . (y) . . . in accordance with the

---

[110] *See* Ex. 39 (Letter Demand from Plaintiffs to EDC dated Dec. 15, 2017).

[111] *See id.*

Amtrak maintenance plan for the Locomotives,'" *id.* Schedule 1 at II(3);

(iv) "Section 12.1(i)(a)(z) of the Lease, [which] requires Amtrak to 'maintain and service each Unit . . . (z) in a manner that will permit the Units to be capable of operation (A) . . . (2) in the case of Locomotives, [at] a maximum continuous speed of up to 125 miles per hour in revenue service and a maximum continuous test speed of up to 140 miles per hour . . .,'" *id.* Schedule 1 at II(4);

(v) "Section 12.1(ii) of the Lease, [which] prohibits Amtrak from maintaining the Locomotives 'with less care of schedul[ing] the [Locomotives] for maintenance on a basis less frequent than either the maintenance or maintenance scheduling basis employed by [Amtrak] for other rolling stock similar to the [Locomotives] . . . ,'" *id.* Schedule 1 at II(5); and

(vi) "the second sentence of Section 12.1(ii) of the Lease, [which] permits Amtrak to 'take a [Locomotive] out of service while awaiting repair . . . so long as [Amtrak] takes reasonable care to prevent deterioration of the condition of such [Locomotive] beyond that attributable to the circumstances necessitating such repair . . . ,'" *id.* Schedule 1 at II(6).

**B.     Amtrak Further Breaches the Operative Contracts and Harms Plaintiffs**

109.    On December 29, 2017, Amtrak responded to Plaintiffs' December 15 Notice of Default by "reject[ing] [Plaintiffs'] allegations."[112]   Notably, Amtrak asserted a "wholly unrestricted right, as it deems appropriate, to deploy or hold idle any of its rolling stock," and "reject[ed] any allegation to the contrary" despite the terms of numerous Lease provisions.[113]

110.    On January 26, 2018, in knowing disregard of Plaintiffs' December 15, 2017 Notice of Lease Events of Default and accompanying evidence, Amtrak's Treasurer certified in Amtrak's January 26, 2018, Financial Statements that "no default or event of default nor any event or condition, which, with the giving of notice or lapse of time or both, would become an event of

---

[112] *See supra* note 11, Ex. 4.

[113] *Id.*

default under the financing agreement(s) with respect to Amtrak, has occurred and is continuing."[114]

111.    On March 13, 2018, "[b]ased on Amtrak's responses" to the December 2017 Notice of Lease Event of Default, EDC "reject[ed] [Plaintiffs'] December 15, 2017 Guarantee [demand]" on the grounds that "there is no basis to conclude that a Triggering Event has occurred that would obligate EDC to make any payment to you in accordance with the terms of the Guarantee."[115] EDC then "filed a Notice of Application before the Ontario Superior Court of Justice to address [Plaintiffs'] demand for immediate payment, which was made notwithstanding the fact that alleged Triggering Events were in dispute."[116]   EDC's Application asked the Ontario Court for a "declaration that the Guarantee Agreement . . . requires the occurrence of a 'Triggering Event' before payment can be due," and "alternative[ly]" for a ruling on the "issue of whether EDC has any liability under the Guarantee."[117]

112.    After its Application was on file, EDC asked to "arrange a call between counsel for the parties to discuss" the Canadian lawsuit.[118]   These discussions culminated in the Standstill Agreement.   Meanwhile, on April 10, 2018, Amtrak's Senior Debt Portfolio Manager Jaret Ings e-mailed Plaintiffs requesting a phone call to discuss the parties' dispute.[119]   On May 3, 2018, Plaintiffs spoke with Ings and Amtrak's Assistant Treasurer Nathan Maciver.   In that discussion, Plaintiffs recounted the events to date, emphasizing that Plaintiffs had responded to Amtrak's

---

[114] *See* Ex. 40 (Amtrak Financial Statement Compliance Certificate dated January 26, 2018).

[115] Ex. 41 (Letter from EDC to Plaintiffs dated March 13, 2018).

[116] *See* Ex. 42 (Letter from EDC counsel to Plaintiffs dated March 13, 2018).

[117] *See supra* note 14, Ex. 5.

[118] *See supra* note 116, Ex. 42.

[119] *See* Ex. 43 (E-mail from Amtrak (Ings and Maciver) to Plaintiffs dated April 10, 2018).

request for a buyout proposal over a year ago and that a response or counterproposal would be productive.  Maciver and Ings responded that they wished to keep communications "open."

113.    On May 15, 2018, Plaintiffs e-mailed Ings and Maciver to follow up on their May 3, 2018, call and reiterated "[Plaintiffs'] expectation that Amtrak will provide us in good faith with a reasonable written counter-proposal."[120]  Plaintiffs concluded the May 15 e-mail with a request that Amtrak "please let [Plaintiffs] know whether and when we can expect [a written counter-proposal]."[121]

114.    On June 18, 2018, Amtrak notified Plaintiffs that all of the Locomotives had allegedly undergone maintenance and offered to schedule a new inspection.  To verify Amtrak's representations before incurring the cost of a third inspection, Plaintiffs wrote Amtrak on July 2, 2018, and, reserving all rights, requested that Amtrak send complete maintenance records for the Units for the period following their removal from service.[122]  Despite the parties' dispute, Plaintiffs anticipated that Amtrak would act in good faith and provide the complete set of requested records in keeping with its obligations under the Participation Agreement and other Operative Contracts.

115.    Instead, on September 12, 2018, Amtrak provided an incomplete set of maintenance records that excluded several documents, including Form FRA F 6180–49A, which Amtrak is required to maintain pursuant to 49 C.F.R. § 229.23, and shop-originated maintenance records. After reviewing the September production and noting the deficiencies, Plaintiffs wrote Amtrak on October 16, 2018, again requesting a complete set of maintenance records for the Units.[123]

---

[120] *See* Ex. 44 (E-mail from Plaintiffs to Amtrak (Ings and Maciver) dated May 15, 2018).

[121] *See id.*

[122] *See* Ex. 45 (E-mail from Plaintiffs to Amtrak (Ings) dated July 2, 2018).

[123] *See* Ex. 46 (E-mail from Plaintiffs to Amtrak (Ings) dated October 16, 2018).

116.    On January 8, 2019, Amtrak provided only some of the missing records, and again failed to include any shop-originated maintenance documents.

117.    On January 28, 2019, Amtrak's Treasurer again certified that "no default or event of default nor any event or condition, which, with the giving of notice or lapse of time or both, would become an event of default under the financing agreement(s) with respect to Amtrak, has occurred and is continuing."[124]

118.    This certification echoed the 2018 certification that prompted EDC to refuse Plaintiffs' Guarantee demand, *see supra* note 114, and both certifications were issued in relation to Consolidated Financial Statements highlighting the consequences to Amtrak of acknowledging any Lease Events of Default:

> Amtrak is subject to various covenants and restrictions under its leasing arrangements.  Amtrak has given guarantees or entered into reimbursement agreements in connection with certain of these lease transactions.  ***A default by Amtrak or acceleration of Amtrak's indebtedness may result in cross-default to other Amtrak indebtedness, and may have a material adverse effect on the Company***.[125]

119.    Both Amtrak's 2017 and 2018 certifications implicate Amtrak's obligations under the Operative Contracts, including Section 8 of the Participation Agreement, as well as Amtrak's obligations to its auditors at Ernst & Young LLP, whose audit reports state that "[Amtrak's] Management is responsible for the preparation and fair presentation of [its] consolidated financial statements . . . free of material misstatement, whether due to fraud or error."[126]  Amtrak's 2017 and 2018 certifications were signed on January 26, 2018 and January 28, 2019, respectively, by

---

[124] *See* Ex. 47 (Amtrak Financial Statement Compliance Certificate dated January 28, 2019).

[125] *See supra* note 48, Notes at 27; *see also supra* note 114, Notes at 27.

[126] *See supra* note 10 (citing Ex. 3), note 48; Ex. 19 at 1; Ex. 48 (Amtrak's FY 2018 Audited Consolidated Financial Statements) at 1.

Amtrak Treasurer Swati Sharma,[127] who was copied on Amtrak's September and December 2017 notices of default.[128]   On information and belief, Ms. Sharma was a "Responsible Officer of Amtrak" as that term is used and defined in Section 8 and Annex A of the Participation Agreement. Accordingly, and her denial of any defaults on Plaintiffs' contracts breached Amtrak's obligations under the Participation Agreement, and were undeniably material to Amtrak's associated Financial Statements, which expressly state that a "default" on Amtrak's obligations under its "lease transactions" may "have a material adverse effect on the Company."[129]

120.   Amtrak's certifications confirm that Amtrak had a strong motive to conceal its treatment of Plaintiffs' equipment, mislead Plaintiffs in the buyout negotiations, and deny Lease Events of Default that Plaintiffs could assert as a basis for demanding payment under the Equity Guarantee.

121.   Amtrak's 2019 certification mirrors its 2018 certification that "no default or event of default . . . has occurred and is continuing."  *See supra* note 124.  This language expressly tracks the Guarantee language that:  (i) EDC relied upon to refuse Plaintiffs' demand on the basis that "Amtrak has categorically denied that any Lease Event of Default has occurred";[130] and (ii) EDC cited in its Canadian lawsuit for a declaration that there "is no obligation for EDC to pay any sum under the Guarantee unless a Triggering Event has occurred and is continuing."[131]

122.   Amtrak made the 2018 certification in knowing disregard of the unrebutted evidence of defaults referenced in Plaintiffs' December 2017 Notice.   Amtrak's Treasurer

---

[127] *See* Exs. 40, 47.

[128] *See* Exs. 28, 38.

[129] *See supra* note 126, Ex. 48 at 28.

[130] *See supra* note 115, Ex. 41 at 1.

[131] *See supra* note 14, Ex. 5 ¶ 2(i).

certification states that it concerns matters through the end of Amtrak's 2017 fiscal year, and that Amtrak "ha[d] evaluated subsequent events through January 26, 2018 . . . [and t]here were no other events that require adjustments to or disclosure in the Company's financial statements for FY2017."[132]

123.     Amtrak's repeat certification in 2019 further evidences Amtrak's deliberate failure to disclose known claims and risks of default.   That is particularly true because the 2019 certification contradicts the portions of EDC's 2018 Canadian suit:  (i) acknowledging a "dispute" over the Lease Events of Default Plaintiffs cited as Triggering Events under the Guarantee, Ex. 5 ¶¶ 2(f)-(k); and (ii) expressly reserving the right to adjudicate the "issue of whether EDC has any liability under the Guarantee," which proceedings *could* establish—in direct contravention of Amtrak's 2019 certification denying any default—that one or more Triggering Events *did* "occur" and *is* "continuing,"  *id*. ¶¶ 2(m)-(n) ("nam[ing]" "Amtrak . . . [as] a necessary party whose rights may be affected by the outcome of this application").

C.     **The Standstill of EDC's Canadian Suit**

124.     The Standstill Agreement that Plaintiffs ultimately executed with Amtrak and EDC in the spring of 2019 explicitly allows Plaintiffs to seek judgment in this Court that Amtrak breached its Lease obligations.[133]   The Standstill Agreement reflects the fact that the Operative Contracts provide that New York—not Canada—is the proper venue for Plaintiffs and Amtrak to litigate whether Amtrak breached the contractual obligations at issue here, *see supra* ¶¶ 21–23. The Standstill Agreement thus provides that EDC's Canadian action will be "stayed . . . until such time as the dispute among [Plaintiffs] and Amtrak [] concerning Amtrak's compliance with the

---

[132] *See supra* note 48, Ex. 19 at 46.

[133] Exs. 6; 55.

Lease and related documents, including but not limited to the existence of any Lease Event of Default ('Underlying Dispute'), is resolved."[134]  The Standstill Agreement defines "resolution" as "a final non-appealable court judgment on all claims on the merits" or "a settlement."[135]

125.    While the Standstill Agreement stays EDC's Canadian suit, it makes clear that it does not "limit or otherwise constrain" Plaintiffs' "pursuit" of their claims against Amtrak. Specifically, Section 3 of the Standstill Agreement provides:

> [Amtrak and Plaintiffs] shall not seek to adjudicate the subject matter of the Application in any other jurisdiction during the Standstill Period; ***provided, however, that nothing in this Agreement is intended to or shall limit or otherwise prejudice [Amtrak's or HNB's] rights or positions concerning the Underlying Dispute***, and for the avoidance of doubt ***shall not limit or otherwise constrain the jurisdiction, venue, adjudication, or other pursuit of proceedings concerning the Underlying Dispute***.[136]

126.    The Standstill Agreement further specifies that it does not prevent Plaintiffs "***from pursuing third party discovery or other legal process against [EDC] . . . in resolving the Underlying Dispute***."[137]

127.    In May 2019, the Canadian court entered an order "stay[ing]" EDC's Canadian suit "in accordance with the [S]tandstill [A]greement," which was publicly filed on the Court's docket in the form executed by EDC and the parties to this case.[138]

128.    For the foregoing reasons, the parties' dispute over Amtrak's Lease defaults and related liabilities is ripe for resolution in this Court.  Plaintiffs worked with Amtrak in good faith to finalize a buyout solution to their claims on terms that would complement Amtrak's efforts to

---

[134] *See supra* note 15;  Standstill Agreement sched. A §§ 1–2.

[135] Standstill Agreement sched. A § 2.

[136] Ex. 6 sched. A § 3.

[137] Ex. 6 sched. A § 4.

[138] *See id.* at 1.

comply with federal demands for improved operations and accounting procedures.  These demands grew out of a 2005 Government Accountability Office (GAO) Report and 2008 legislation designed to improve Amtrak's business practices.[139]  Notably, a 2016 Inspector General Audit Report cited continuing concern with Amtrak business decisions that "increase[] the risk that revenues and expenses . . . will be misstated."[140]  And Amtrak's subsequent financial statements concede the railroad's "history of recurring operating losses" and "dependen[ce] on subsidies from the Federal Government" before expressly tying the company's financial prospects to avoiding any acknowledged lease defaults.[141]

129.    The buyout Amtrak proposed in December 2016 would have addressed Plaintiffs' claims in a manner that could avoid such exposure and this litigation.  But Amtrak eschewed this solution in favor of perpetuating the unsound business practices that have prompted mounting criticism of Amtrak operations.  A 2019 industry report observed that, in response to this criticism, Amtrak tied "short- and long-term management bonus incentives" to "slashing expenses," including "cost cutting through 2017 management buyouts [that] eliminated field personnel and resulted in a loss of institutional knowledge . . . that has permanently diminished U.S. passenger-rail expertise."[142]

130.    This history helps explain—but does not excuse—Amtrak's efforts to avoid

---

[139] *See* Ex. 49, No. CR-2013-56, Federal Railroad Administration, Office of Inspector General Audit Report, *Amtrak's New Cost Accounting System Is a Significant Improvement But Concerns Over Precision and Long Term Viability Remain*, at 1 (March 27, 2013) (citing a 2005 Government Accountability Office Report and the Passenger Rail Investment and Improvement Act of 2008 (PRIIA), Pub. L. No. 110-432 Div. B.).

[140] *See* Ex. 50, GAO Report 16-67, *Better Reporting, Planning, and Improved Financial Information Could Enhance Decision Making*, at 24 (January 2016), *available at* https://www.gao.gov/assets/680/674520.pdf.

[141] *See supra* note 10, Ex. 3 at 9; *supra* note 48, Ex. 19 at 9; *supra* note 126; Ex. 48 at 9.

[142] *See* Ex. 51 (B. Johnston, *Amtrak's Money Mystery*, TrainsMag.com (January 2019)).

liability for its Lease defaults and corresponding interference with Plaintiffs' contract rights.  As noted, the heavily negotiated Operative Contracts document Amtrak's business decision to lease the Bombardier-Alstom Units "as-is," with no warranty, and that Amtrak's decision to stop using and maintaining them in accordance with the Operative Contracts before the end of the Lease term constituted defaults and Casualty Occurrences entitling Plaintiffs to an array of remedies.

131.    Amtrak's improper denial of these facts has frustrated Plaintiffs' claims arising out of the Casualty Value provisions of the Lease, as well as Plaintiffs' rights under other provisions of the Lease, Participation Agreement, and Indenture.  Further, Amtrak's conduct has unjustly deprived Plaintiffs of contractual and other remedies, and occasioned Plaintiffs' dispute with EDC over the existence of triggering events sufficient to justify Plaintiffs' demand for a Guarantee payment.  As a result of Amtrak's actions, Plaintiffs have been forced to incur the time and expense of responding to EDC's declaratory action in Canada, negotiating the Standstill Agreement, and bringing this action.  Amtrak's efforts to delay and frustrate Plaintiffs' attempts to recover under the Operative Contracts is ongoing, as evidenced by exchanges between Plaintiffs and Amtrak through the filing of this suit and the response to Plaintiffs' complaint.

132.    ***Amtrak Continues to Mislead and Harm Plaintiffs.***  After the parties executed the May 2019 Standstill Agreement on the Canadian action, Amtrak agreed to meet with Plaintiffs to discuss the claims the Standstill Agreement reserved for this litigation.  Amtrak refused to allow counsel to participate in the proposed meeting, and invited only Plaintiffs' business personnel to Amtrak headquarters on July 11, 2019, to meet with Amtrak's Assistant Treasurer Nathan Maciver and Senior Debt Portfolio Manager Jaret Ings.  Plaintiffs presented a business proposal that Amtrak said it needed to discuss internally, and that, if accepted, would have to be approved by Amtrak's Board and possibly the Secretary of Transportation.  Amtrak did not respond to the proposal within the timeframe the parties discussed at the July 11 meeting.  Accordingly, Plaintiffs followed up in

August 2019 about Amtrak's position.  On August 9, 2019, Plaintiffs spoke by telephone with Ings and Maciver.  During the call, Ings advised that he would be leaving Amtrak in the coming weeks, and the Amtrak representatives asked some clarifying questions about Plaintiffs' proposal that focused on the possibility of allowing Amtrak to retain the Trainsets after returning the Locomotives.  Plaintiffs requested a counterproposal, but Amtrak's representatives declined to provide one.

133.    On November 7, 2019, in the wake of Amtrak's repeated stonewalling and misdirection, Plaintiffs (via Lessor) formally declared the Lease to be in default, and demanded remedies under the Operative Contracts including and particularly Lease § 13.2.[143]  The same day, Plaintiffs filed suit in this Court.

134.    On December 19 and 20, 2019, non-party EDC sent Plaintiffs letters objecting to certain allegations in the November complaint under the Canadian Standstill Agreement and the Indenture, and demanded that Plaintiffs amend the complaint as well as withdraw certain notices of the defaults at issue in this action.[144]

135.    On December 20, 2019, Amtrak moved to dismiss the November complaint, and attached the December 19, 2019 EDC letter as an exhibit to the motion.[145]

136.    On December 23, 2019, Plaintiffs and EDC agreed that Plaintiffs would respond on or before January 21, 2020, to the demands in EDC's December 19 letter.

137.    On December 26, 2019, the Court entered an order permitting Plaintiffs to file "any amended complaint by January 21, 2020."

---

[143] *See* Ex. 52 (Notice of Default from Lessor (Plaintiffs' trust) to Amtrak dated Nov. 7, 2019).

[144] *See* Ex. 54 (Letters from EDC to Plaintiffs dated December 19, 2019 and December 20, 2019).

[145] *See* Dkt. 23-1.

138.    On January 16, 2020, EDC sent Plaintiffs a letter copying Amtrak counsel that: (i) clarified the dates of the notices of default addressed in EDC's December 2019 letters; and (ii) articulated EDC's position on the "overlap between (a) the Canadian Stay and the Standstill Agreement, on the one hand, and (b) the requirements of Indenture Section 6.10(d), on the other hand."[146]  Specifically, EDC's January 16 letter states that the Standstill Agreement/Canadian Stay and the Indenture Agreement "are separate, as applicable, contracts and/or orders that govern the relationships between the parties subject thereto."  The letter further states that, notwithstanding EDC's assertion that "Section 6.10(d) of the Indenture prevents the Owner Trustee from issuing notices of default or events of default under the Lease":

> [T]he Owner Trustee and Owner Participant are able to seek declaratory relief as to whether a default or event of default is in existence under the Lease.  In fact, ***the Standstill Order, as approved by the Ontario Court, expressly contemplates the Owner Trustee and Owner Participant are able to seek declaratory relief as to whether a default or event of default is in existence under the Lease***.  In fact, the Standstill Order, as approved by the Ontario Court, expressly contemplates the Owner Trustee and Participant pursuing such a declaratory action.

139.    Plaintiffs' First Amended Complaint ("FAC") addresses these and other developments since Plaintiffs filed this action on November 7, 2019.  Notably, and although Plaintiffs do not concede the legal (including choice of law) arguments and other objections that EDC and Amtrak raised with respect to the November complaint, the FAC contains factual allegations and other amendments that confirm the propriety and consistency of this action in relation to the Canadian Action and Standstill Agreement.  To that end, and in keeping with Plaintiffs' execution of the Canadian Standstill Agreement and EDC's December 2019 requests in regard thereto, the FAC does not presently assert—but hereby expressly preserves—the tortious interference claim alleged in Count Four of the November 7, 2019 complaint.  The FAC's

---

[146] Ex. 55 (Letter from EDC to Plaintiffs dated January 16, 2020).

reservation of this claim is intended solely to avoid the disputes and associated litigation burden that EDC and Amtrak represented would accompany Plaintiffs' assertion of the claim at the present time.  In reserving this claim and all associated and available relief, including but not limited to the right to seek leave to amend or replead, Plaintiffs hereby expressly reserve all rights and positions on the legal and procedural aspects of the tortious interference claim against Amtrak, including as it relates back to the facts, transactions, and occurrences alleged in, and giving rise to, the original complaint in this action.

* * * * *

140.    For any or all of the foregoing reasons, the causes of action in this First Amended Complaint are ripe for relief under the declaratory, legal, and equitable causes set forth below, including relief under Lease Section 13.2, which renders Amtrak "liable for . . . all reasonable legal fees and other costs and expenses incurred by [Plaintiffs] by reason of the occurrence of any Lease Event of Default or the exercise of any of Lessor's rights, powers or remedies with respect thereto."

141.    Left unaddressed, Amtrak's refusal to abide by the Operative Contracts will chill investment in finance arrangements necessary to serve public markets by signaling to investors that they cannot rely on contracts with Amtrak—or foreign equipment manufacturers like Bombardier and its guarantor EDC—to price risk, protect their equity, and otherwise ensure that such parties will honor their obligations to U.S. stakeholders.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DECLARATORY JUDGMENT OF AMTRAK LEASE EVENTS OF DEFAULT

142.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

143.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, "any court of the

60

United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

144.    Amtrak has repeatedly denied the occurrence of its Lease Events of Default and deliberately subverted good faith discussions to resolve this dispute through the buyout Amtrak proposed in 2016, through Plaintiffs' demands under other provisions of the Operative Contracts, and through the buyout Plaintiffs proposed in July 2019.

145.    As a result of the acts described herein, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that Amtrak has engaged in one or more Lease Events of Default that have occurred and are continuing for purposes of the Operative Contracts.

**SECOND CAUSE OF ACTION**
**<u>BREACH OF CONTRACT BY AMTRAK</u>**

146.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

147.    As alleged above, Amtrak, a sophisticated party represented by counsel, executed the Operative Contracts with Plaintiffs, and in so doing undertook various duties and obligations, including the obligation to:

(a)     pay Casualty Value following a Casualty Occurrence under Lease § 7;

(b)     properly maintain the Units consistent with Lease § 12.1;

(c)     comply with all federal laws and regulations pursuant to Lease § 11;

(d)     properly maintain all records and logs as required by Lease § 12.1(i)(b);

(e)     properly provide information, including accurate equipment reports and financial disclosures, as required by the Participation Agreement; and

(f)      indemnify or otherwise protect Plaintiffs from losses as required by the Participation Agreement.

148.      Amtrak materially breached each of these sections of the Lease by:

(a)      failing to pay Casualty Value after determining that the Leased Equipment was unfit for commercial use and/or uneconomical to repair during the Lease term;

(b)      failing properly to use and maintain the locomotives;

(c)      failing to comply with all applicable laws and regulations with respect to the use and maintenance of the locomotives;

(d)      failing properly to maintain all records and logs as required by Lease § 12.1(i)(b); and

(e)      failing to provide accurate information and to protect Plaintiffs from losses as required by the Participation Agreement.

149.      These breaches caused Plaintiffs to suffer damages, including, *inter alia*, (a) the loss of their share of the Aggregate Casualty Payment; (b) impairment of the Units' residual value due to Amtrak's failure properly to use and maintain the Units; (c) damages and costs resulting from Plaintiffs' pursuit of rights relating to their December 2017 demand for an Equity Guarantee payment, both in this suit and in the Canadian Action; (d) damages and loss resulting from Amtrak's breach of its obligations under the Participation Agreement; and (e) payment of legal costs and attorneys' fees that Amtrak is "liable for" where, as here, they are "incurred by [Plaintiffs] by reason of the occurrence of any Lease Event of Default or the exercise of any of Lessor's rights, powers or remedies with respect thereto."

**THIRD CAUSE OF ACTION**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING**

150.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

151.    The Operative Contracts imply a promise that Amtrak would uphold its end of the bargain in good faith and deal fairly with Plaintiffs during the Lease term, and this promise prohibited Amtrak from taking any actions that injured Plaintiffs' right to receive the benefit of their bargain under the Operative Contracts.

152.    In breach of this promise and covenant, and independent of its breaches of specific provisions in the Operative Contracts, Amtrak acted in bad faith to deprive Plaintiffs of the benefits and remedies intended and contemplated by the purpose, structure, and spirit of the Lease transaction, including Plaintiffs' right to monetary compensation for Amtrak's premature decommissioning and improper maintenance of the leased equipment.

153.    Amtrak failed to notify Plaintiffs of the Casualty Occurrences that attended its decision permanently to retire the leased Units as unfit for service or uneconomical to repair.

154.    Amtrak also failed properly to use and maintain the Units in the manner contemplated by the spirit and structure of the Lease transaction when it decommissioned and effectively abandoned them for scrap, "cannibaliz[ing]" and "robb[ing]" their parts.[147]

155.    In addition, Amtrak failed to honor its covenants and the spirit and structure of the Participation Agreement when it failed to provide Plaintiffs with accurate information and to protect Plaintiffs from losses resulting from Amtrak's misuse of the leased equipment.

156.    Further, following proper notice of its maintenance defaults, Amtrak failed diligently to attempt to cure any of those defaults, to the extent they were curable, thereby

---

[147] *See supra* ¶ 65.

exacerbating Plaintiffs' injuries from Amtrak's breach of its covenant of good faith and fair dealing.

157.   Instead of working with Plaintiffs in good faith to resolve the Lease dispute, Amtrak engaged in subterfuge to delay Plaintiffs' claims.[148]  Indeed, Amtrak admitted that while it had "set [Plaintiffs'] expectations towards the prompt delivery of a bid from Amtrak" in late 2016, it was actually "in no position to make a proposal" at that time.[149]

158.   Amtrak's conduct deliberately and inequitably interfered with Plaintiffs' position and rights in violation of the spirit and structure of the Lease transaction.  Amtrak's conduct has thus deprived Plaintiffs of the benefit of their bargain under the spirit and structure of the Lease transaction, including by causing Plaintiffs to incur the cost and delays associated with responding, directly and through the filing of this action, to EDC's filing of the Canadian Action concerning Plaintiffs' Guarantee demand.  As a result, Amtrak has improperly and needlessly prolonged this dispute and forced Plaintiffs to incur further and unnecessary risk, damages, and dispute-related costs.[150]

## FOURTH CAUSE OF ACTION
## EQUITABLE AND JUDICIAL ESTOPPEL

159.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

160.   Amtrak engaged in a course of conduct designed to justify or otherwise avoid liability for its contract breaches and other misconduct.

---

[148] *See supra* ¶¶ 105–132.

[149] *See supra* ¶ 95.

[150] *See supra* ¶ 111.

161.    This course of conduct included affirmative misrepresentations regarding Amtrak's treatment of Plaintiffs' equipment, deliberate concealment or omission of material facts and information concerning Amtrak's use and maintenance of Plaintiffs' equipment, and refusal to provide complete maintenance records for the equipment as Plaintiffs requested.

162.    Plaintiffs were not on actual or constructive notice of the facts and evidence that Amtrak concealed or misrepresented, despite Plaintiffs' exercise of diligence, which included public research and repeated inquiries to Amtrak regarding equipment use and records that were in Amtrak's sole possession, custody, or control.

163.    Plaintiffs reasonably relied on Amtrak's assertions regarding, among other things, the "reserve" status of the leased Units prior to November 21, 2016, as well as on Amtrak's response to Plaintiffs' default notices on the merits, and various other statements and representations Amtrak made before, in, and after Amtrak's execution of the Standstill Agreement regarding Plaintiffs' right to bring this action on the terms the Canadian court endorsed in its May 2019 order.

164.    By reason of this conduct, Amtrak is equitably and judicially estopped from defending this action on grounds that contradict the foregoing or other Amtrak representations or positions on which Plaintiffs and/or the Canadian court reasonably relied to Amtrak's benefit.

### FIFTH CAUSE OF ACTION
### FRAUDULENT CONCEALMENT

165.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

166.    Amtrak engaged in a course of conduct designed deliberately to conceal and/or misrepresent evidence of its contract breaches and other misconduct.

167.    This course of conduct included affirmative misrepresentations regarding Amtrak's treatment of Plaintiffs' equipment, as well as knowing concealment or omission of material facts and information concerning Amtrak's use and maintenance of Plaintiffs' equipment, and Amtrak's refusal to provide complete maintenance records for the equipment as Plaintiffs requested.

168.    Plaintiffs were not on actual or constructive notice of the facts and evidence that Amtrak concealed, despite Plaintiffs' exercise of diligence, which included public research and repeated inquiries to Amtrak regarding equipment use and records that were in Amtrak's sole possession, custody, or control.

169.    Plaintiffs reasonably relied on Amtrak's misstatements and omissions to their detriment.

170.    By reason of Amtrak's misrepresentations, concealment, and omissions, Plaintiffs were deprived of notice and evidence relevant to their claims under the Operative Contracts, and are entitled to all available relief and recovery from Amtrak alleged and requested herein, including tolling of the start of any applicable limitations periods until at least November 21, 2016.

**SIXTH CAUSE OF ACTION**
**QUANTUM MERUIT**

171.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

172.    By leasing the Units to Amtrak, Plaintiffs provided both goods and services that conferred a benefit on Amtrak by, among other things, enabling Amtrak to use the Units to service its intercity passenger route from Washington, D.C. to Boston.

173.    Amtrak accepted these goods and services for the Lease term.

174.    Plaintiffs provided these goods and services with the expectation that they would be compensated by Amtrak if Amtrak determined that any of the Units was "unfit for commercial use" or "uneconomical to repair," or if any of the Units was inadequately maintained.

175.    By reason of Amtrak's inequitable conduct, Plaintiffs are entitled to recover from Amtrak in equity Plaintiffs' fair share of the Units' unpaid Casualty Value, as well as just compensation for all monetary and business harms that Plaintiffs have unjustly suffered as a result of Amtrak's actions.

### SEVENTH CAUSE OF ACTION IN THE ALTERNATIVE
### UNJUST ENRICHMENT

176.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

177.    Plaintiffs conferred a benefit on Amtrak by, among other things, leasing the Units to Amtrak with the option to retire them in return for Casualty Value.

178.    Plaintiffs provided this benefit with the expectation that they would be compensated by Amtrak if Amtrak determined that any of the Units was "unfit for commercial use" or "uneconomical to repair" or if any of the Units were inadequately maintained.

179.    Plaintiffs relied on Amtrak's representations to that effect in the Lease and elsewhere.

180.    Amtrak had knowledge of the benefit that Plaintiffs conferred upon it.

181.    Amtrak has not provided Plaintiffs with compensation for that benefit.

182.    Accordingly, Amtrak has been unjustly enriched at Plaintiffs' expense, and its retention of this benefit without compensating Plaintiffs would be inequitable.

183.    By reason of Amtrak's inequitable conduct, Amtrak was unjustly enriched, and Plaintiffs unjustly deprived of the value of all monetary and business harm that Plaintiffs suffered as a result of Amtrak's unjust and inequitable conduct.

**EIGHTH CAUSE OF ACTION**
**BREACH OF CONTRACT – THIRD PARTY BENEFICIARY**

184.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

185.    As alleged above, Amtrak, a sophisticated party represented by counsel, entered into the Lease, which on its face demonstrates an intent to benefit Plaintiffs in identifying "Amtrak Trust HS-EDC-1," a trust of which Plaintiffs are the sole beneficial owner,[151] as the "Lessor."

186.    The Lease defines the parties' rights and obligations in relation to the other Operative Contracts,[152] which:  (a) mention Plaintiffs by name;[153]  (b) explicitly provide that Plaintiffs' participation in the Lease "inure[s] to the[ir] benefit;"[154] and (c) make clear that any payments received by the Lessor "shall be promptly paid to" Plaintiffs.[155]

187.    As alleged above, Amtrak owed Plaintiffs various duties and obligations under the Lease.  Amtrak was required to, *inter alia*:

    (a)    pay Casualty Value following a Casualty Occurrence pursuant to Lease § 7;

    (b)    properly maintain the Units consistent with Lease § 12.1;

---

[151] *See* Owner Trust Agreement § 2.02, Ex. 11 (noting that the trust was established "for the use and benefit of [Plaintiffs]").

[152] *See* Lease § 22 ("*Except for the other Operative [Contracts]*, this Lease exclusively and completely states the rights of Lessor and Lessee with respect to the leasing of the Units . . . ." (emphasis added)).

[153] *See, e.g.*, Participation Agreement, at PA-1 ("HNB INVESTMENT CORP., a Delaware corporation ('*Owner Participant*') . . . .").

[154] *See id.* § 14.2.

[155] *See* Owner Trust Agreement § 5.01(b).

     (c)    comply with all federal laws and regulations pursuant to Lease § 11;

     (d)    properly maintain all records and logs as required by Lease § 12.1(i)(b); and

     (e)    comply with its obligations under the Lease for the benefit of Plaintiffs under Participation Agreement §9.4(ii).

188.    As alleged above, Amtrak materially breached each of these sections of the Lease by failing to:

     (a)    pay Casualty Value after determining that the locomotives were unfit for commercial use and/or uneconomical to repair;

     (b)    properly use and maintain the locomotives;

     (c)    comply with numerous laws and regulations with respect to the use and maintenance of the Locomotives;

     (d)    properly maintain all records and logs as required by Lease § 12.1(i)(b); and

     (e)    comply with its obligations under the Lease for the benefit of Plaintiff under Participation Agreement § 9.4(ii).

189.    These Amtrak breaches caused Plaintiffs to suffer damages, including, *inter alia*, (a) Plaintiffs' lost share of the Aggregate Casualty Payment to which the Lease entitles them; (b) a decline in the Units' residual value caused by Amtrak's failure properly to use and maintain the Units; and (c) the cost and harm associated with the pursuit of legal proceedings, in this Court and in the Canadian Action governed by the Standstill Agreement, to resolve Plaintiffs' claims against

Amtrak and the claims EDC has raised in the Canadian Action covered by the Standstill Agreement.

**PRAYER FOR RELIEF**

190.   WHEREFORE, Plaintiffs respectfully request that the Court:

(a)   Declare that a Lease Event of Default resulting from Amtrak's failure to pay Casualty Value under Lease § 7 has occurred and is continuing;

(b)   Declare that a Lease Event of Default resulting from Amtrak's failure properly to use and maintain the Units in accordance with Lease § 12.1 has occurred and is continuing;

(c)   Declare that a Lease Event of Default resulting from Amtrak's failure to comply with all applicable laws and regulations under Lease § 11 has occurred and is continuing;

(d)   Declare Lease Events of Default, breaches of Amtrak's covenants, or other liability for Amtrak's failure to honor its obligations under the Participation Agreement;

(e)   Find Amtrak liable on all counts alleged herein;

(f)   Award Plaintiffs damages or equitable monetary relief in an amount to be determined at trial;

(g)   Award Plaintiffs all attorneys' fees and costs due and payable under the Operative Contracts, including Lease § 13.2,[156] or otherwise available in law or equity; and

(h)   Order such other, further, and general relief as is just and proper.

---

[156] Pursuant to Lease § 13.2, Amtrak is "liable for . . . all reasonable legal fees and other costs and expenses incurred by [Plaintiffs] by reason of the occurrence of any Lease Event of Default or the exercise of any of Lessor's rights, powers or remedies with respect thereto."   Additionally, pursuant to Lease § 9(iii), Amtrak is liable for inspections of the Units "[d]uring the continuance of a . . . Lease Event of Default."

70

Dated: New York, New York
     February 6, 2020

GIBSON, DUNN & CRUTCHER LLP
By:  */s/ Mark A. Kirsch*

Mark A. Kirsch
Patrick Hayden
200 Park Avenue
New York, NY, 10166
(212) 351-2662
(212) 351-6362 (fax)
mkirsch@gibsondunn.com
phyaden@gibsondunn.com

Elizabeth Papez (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8608
(202) 530-9698 (fax)
epapez@gibsondunn.com

WINSTON & STRAWN LLP
Lawrence Slusky (*pro hac vice*)
1700 K Street, N.W.
Washington, DC 20036
(202) 282-5322
(202) 282-5100 (fax)
lslusky@winston.com

*Counsel for Plaintiffs*
*Philip Morris Capital Corporation*
*and HNB Investment Corp.*

71