# EXHIBIT 7

# PARTICIPATION AGREEMENT

Dated as of November 6, 2000

among

## NATIONAL RAILROAD PASSENGER CORPORATION,
as Lessee

## HNB INVESTMENT CORP.,
as Owner Participant

## EXPORT DEVELOPMENT CORPORATION,
as Loan Participant

## ALLFIRST BANK,
as Indenture Trustee

## WILMINGTON TRUST COMPANY,
in its individual capacity only to the extent expressly stated herein,

and

## AMTRAK TRUST HS-EDC-1

Eight (8) Dual Cab, High-Horsepower Electric Locomotives and
Ten (10) High-Speed Trainsets

## AMTRAK TRUST HS-EDC-1

# TABLE OF CONTENTS

Page

SECTION 1.   DEFINITIONS......................................................................................3

SECTION 2.   OBLIGATIONS OF PARTIES ............................................................3
2.1   Obligations of Owner Trustee................................................3
2.1A   Obligations of Trust Company....................................................4
2.2   Obligations of Amtrak .................................................................4
2.3   Obligations of Loan Participant..................................................4
2.4   Obligations of Indenture Trustee ................................................5
2.5   Obligations of Owner Participant ...............................................5
2.6   Economic Terms For Each Closing ............................................5

SECTION 3.   CLOSING DATE ..................................................................................6
3.1   Closing ........................................................................................6
3.2   Funding Procedures ....................................................................7
3.3   Payment of Loan Participant's Commitment and Owner
Participant's Commitment.........................................................8
3.4   Return of Funds...........................................................................8
3.5   Acceptance of Equipment ...........................................................8

SECTION 4.   REPRESENTATIONS AND WARRANTIES ....................................8
4.1   Representations, Warranties and Agreements of Amtrak.......8
4.2   Representations, Warranties and Agreements of the
Participants, Trust Company, Owner Trustee and
Indenture Trustee .....................................................................13

SECTION 5.   CONDITIONS PRECEDENT ............................................................18
5.1   Conditions to Obligations of the Participants ...........................18
5.2   Conditions to Obligations of Amtrak.....................................26

SECTION 6.   INDEMNITIES BY AMTRAK ...........................................................27
6.1   General Tax Indemnity ...............................................................27
6.2   General Indemnity ......................................................................38
6.3   Survival ......................................................................................42

SECTION 7.   EXPENSES..........................................................................................42
7.1   Transaction Expenses..................................................................42
7.2   Ongoing Expenses ......................................................................43
7.3   Amendments, Waivers, Etc.........................................................44

SECTION 8.   FINANCIAL INFORMATION; OTHER INFORMATION .............44

SECTION 9.   CERTAIN OTHER COVENANTS....................................................47
9.1   Trust Company Covenants..........................................................47

| | 9.2 | Owner Participant Covenants | 47 |
|---|---|---|---|
| | 9.3 | Additional Covenants of Trust Company, Owner Participant, Owner Trustee and Indenture Trustee | 49 |
| | 9.4 | Additional Amtrak Covenants | 49 |
| | 9.5 | Additional Covenants Regarding Replacement Units | 50 |
| | 9.6 | Bankruptcy of Owner Participant | 50 |
| | 9.7 | Limitation on Amendments | 51 |
| SECTION 10 | | TRANSFERS | 51 |
| | 10.1 | Transfer of Owner Participant's Interest | 51 |
| | 10.2 | Transfer of Secured Notes | 53 |
| | 10.3 | Special Transfer of Beneficial Interest | 53 |
| SECTION 11. | | NON-RECOURSE OBLIGATIONS | 55 |
| SECTION 12. | | EXCESS AMOUNTS | 56 |
| SECTION 13. | | NOTICES; PAYMENTS | 56 |
| | 13.1 | Notices | 56 |
| | 13.2 | Payments | 58 |
| SECTION 14. | | MISCELLANEOUS | 58 |
| | 14.1 | Amendments, Etc | 58 |
| | 14.2 | Benefits and Binding Effect | 59 |
| | 14.3 | Severability | 59 |
| | 14.4 | Governing Law | 59 |
| | 14.5 | Liabilities of Participants | 59 |
| | 14.6 | Further Assurances | 59 |
| | 14.7 | Section 1168 Applicability; Waiver | 59 |
| | 14.8 | Refundings; Amendments | 60 |
| | 14.9 | Successor Bank and Trustees | 61 |
| | 14.10 | Confidentiality | 61 |
| | 14.11 | Quiet Enjoyment | 62 |
| | 14.12 | Entire Agreement | 62 |
| | 14.13 | Service of Process; Jurisdiction; Waiver of Jury Trial | 62 |
| | 14.14 | Applicability of Provisions Concerning French Documents | 63 |

SECTION 15.   SURVIVAL OF COVENANTS, AGREEMENTS, ETC ..................................63

SECTION 16.   ADJUSTMENTS TO RENT, CASUALTY VALUE FACTORS
AND TERMINATION VALUE FACTORS ......................................................63

SECTION 17.   EXECUTION...................................................................................................66

SECTION 18.   ASSUMPTION OF SECURED NOTES BY AMTRAK....................................66

SECTION 19.   SPECIAL EVENT ...........................................................................................68


Schedule I       Information Relating to Loan Participant
Schedule II      UCC Filings
Schedule III     Closing Date Assumptions
Schedule IV      Rent Factors for first Closing Date
Schedule V       Participants' Commitments for first Closing Date
Schedule VI      Casualty Value Factors for first Closing Date
Schedule VII     Termination Value Factors for first Closing Date
Schedule VIII    Amortization Schedule for first Closing Date
Schedule IX      EBO Price and EBO Date for first Closing Date
Schedule X       Equity TV Amounts
Schedule XI      Disclosure
Schedule XII     Table:  Measurement Test of Operating Self-Sufficiency

Exhibit A        Form of Transferee Assumption Agreement
Exhibit B        Form of Parent Guarantee
Exhibit C        Form of Equity Guarantee Agreement

Annex A          Definitions

## PARTICIPATION AGREEMENT
## (AMTRAK TRUST HS-EDC-1)

THIS PARTICIPATION AGREEMENT (Amtrak Trust HS-EDC-1) dated as of November 6, 2000, is entered into among NATIONAL RAILROAD PASSENGER CORPORATION, a corporation organized under the Rail Passenger Service Act and the laws of the District of Columbia ("*Amtrak*"), HNB INVESTMENT CORP., a Delaware corporation ("*Owner Participant*"), EXPORT DEVELOPMENT CORPORATION, a corporation established by an Act of the Parliament of Canada ("*EDC*" and "*Loan Participant*"), AMTRAK TRUST HS-EDC-1, a Delaware business trust (the "*Trust*"), all of the activities of which shall be conducted by Wilmington Trust Company, a Delaware banking corporation, not in its individual capacity but solely as trustee for the Trust ("*Owner Trustee*", which term, unless the context otherwise requires, includes the Trust), and WILMINGTON TRUST COMPANY, a Delaware banking corporation, in its individual capacity only to the extent expressly provided herein, and ALLFIRST BANK, a Maryland banking corporation, as Indenture Trustee ("*Indenture Trustee*").

### W I T N E S S E T H :

WHEREAS, on or prior to each Closing Date in respect of a Unit;

(i)        Manufacturer has sold such Unit to French Lessor; and

(ii)        French Lessor and Amtrak have entered into (a) a French Lease, whereby, French Lessor leases such Unit to Amtrak, and (b) a Lessor Security Agreement, whereby, French Lessor grants to Amtrak a first priority collateral security interest in all of French Lessor's right, title and interest in and to such Unit in order to secure French Lessor's obligation to deliver title to such Unit to Amtrak (or its assignee) in accordance with the terms of such French Lease and the Amtrak Delegation related to such Unit;

WHEREAS, immediately prior to the execution and delivery of this Agreement, Owner Participant and Trust Company entered into the Trust Agreement, whereby, among other things, Owner Participant appointed Trust Company as trustee of the trust created thereby;

WHEREAS, subject to the terms and conditions set forth herein, the parties hereto propose to take the following actions on each Closing Date;

(i)        Amtrak proposes to:

(a)        sell, transfer and assign to Lessor all of its right, title and interest in and to the Units to be financed on such Closing Date and the related French Leasehold Interest, pursuant to an Assignment (Cession) with respect to the Units to be delivered on such Closing Date;

(b)        delegate French Lessor to Owner Trustee for the performance by French Lessor directly to Owner Trustee of French Lessor's obligations set forth

in Clause 21 of the French Lease relating to the Units to be financed on such Closing Date;

    (c)    together with French Lessor, appoint Wilmington Trust Company as escrow agent to hold in escrow an undated bill of sale executed by French Lessor; and

    (d)    enter into a Lease Supplement with Owner Trustee subjecting the Units to be delivered on such Closing Date to the Lease.

    (ii)    Owner Participant proposes to furnish funds to Owner Trustee equal to Owner Participant's Commitment for the Units delivered on such Closing Date plus funds sufficient to pay Transaction Expenses in accordance with Section 7.1 hereof;

    (iii)    Loan Participant proposes to make a secured loan to Owner Trustee in an aggregate principal amount equal to Loan Participant's Commitment for the Units to be delivered on such Closing Date against receipt of Secured Notes of the appropriate series in an aggregate principal amount equal to such amount;

    (iv)    Indenture Trustee proposes to enter into an Indenture Supplement with Owner Trustee subjecting the Units to be delivered on such Closing Date to the Lien of the Indenture; and

    (v)    Owner Trustee proposes to:

    (a)    enter into a Lease Supplement with Amtrak subjecting such Units to the Lease;

    (b)    execute and deliver an Indenture Supplement subjecting such Units to the Lien of the Indenture;

    (c)    issue Secured Notes of the appropriate series under the Indenture to Loan Participant as evidence of the making of secured loans by Loan Participant to Owner Trustee in an aggregate principal amount equal to Loan Participant's Commitment for the Units to be delivered on such Closing Date;

    (d)    purchase Amtrak's right, title, and interest in and to such Units and the applicable French Leasehold Interest, pursuant to the Assignment (Cession), with respect to the Units to be delivered on such Closing Date; and

    (e)    accept the benefit of the delegation of French Lessor for the performance by French Lessor directly to Owner Trustee of French Lessor's obligations set forth in Clause 21 of the applicable French Lease.

    (vi)    Wilmington Trust Company proposes to accept appointment as escrow agent to hold in escrow an undated bill of sale covering the Units to be financed on such Closing Date executed by French Lessor.

WHEREAS, the parties hereto desire to set forth herein the terms and conditions agreed upon with respect to the Overall Transaction.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

## SECTION 1.   DEFINITIONS.

Capitalized terms and phrases used and not otherwise defined herein shall for all purposes of this Agreement, including the preceding recitals, have the respective meanings specified therefor in Annex A hereto, and the rules of interpretation set forth in Annex A shall apply to this Agreement.

## SECTION 2.   OBLIGATIONS OF PARTIES.

Upon and subject to the terms and conditions hereof and in each party's reliance upon the representations, warranties, covenants and agreements of each other party contained herein or made, performed or to be performed pursuant hereto or in connection herewith, each of Trust Company, Owner Trustee, Amtrak, Owner Participant, Indenture Trustee and Loan Participant shall fulfill its obligations as set forth in this Section 2.

2.1   **Obligations of Owner Trustee.** Owner Participant agrees that its release to Owner Trustee in accordance with the terms of Section 2.5(i) of funds in the amount of Owner Participant's Commitment for the Units to be delivered on each Closing Date shall, without further act, constitute authorization and direction by Owner Participant to Owner Trustee, and upon such release of Owner Participant's Commitment, Owner Trustee shall be so authorized and directed, to perform the obligations of Owner Trustee set forth in this Section 2.1 in respect of such Units.   On each Closing Date, Owner Trustee agrees to, subject to the terms and conditions of the Operative Documents (including performance by Amtrak, Loan Participant, Indenture Trustee and Equity Guarantor of their respective obligations under this Section 2):

(i)   execute and deliver a Lease Supplement with respect to the Units to be delivered on such Closing Date;

(ii)   execute and deliver an Indenture Supplement with respect to the Units to be delivered on such Closing Date;

(iii)   issue Secured Notes of the appropriate series to Loan Participant in an aggregate principal amount equal to Loan Participant's Commitment with respect to the Units to be delivered on such Closing Date;

(iv)   immediately upon receipt in full of each Participant's Commitment, together with instructions from such Participant or its special counsel to release such Participant's Commitment, apply such funds in the manner set forth in Section 3.2; and

(v)      purchase from Amtrak all of its right, title and interest in and to such Units and the applicable French Leasehold Interest, pursuant to the Assignment (Cession) and the Amtrak Bill of Sale, with respect to the Units to be delivered on such Closing Date;

(vi)      execute and deliver the Amtrak Delegation covering the Units to be delivered on such Closing Date in order to receive the benefit of the delegation of French Lessor for the performance by French Lessor directly to Owner Trustee of French Lessor's obligations set forth in Clause 21 of the applicable French Lease; and

(vii)      perform its obligations (or confirm that it has performed) under each Operative Document due on or prior to such Closing Date.

2.1A      **Obligations of Trust Company**.      On each Closing Date, Trust Company agrees to, subject to the terms and conditions of the Operative Documents, execute and deliver the Escrow Agreement in order to accept appointment as escrow agent to hold an undated bill of sale executed by French Lessor covering the Units to be delivered on such Closing Date.

2.2      **Obligations of Amtrak**.      On each Closing Date, Amtrak agrees to, subject to the terms and conditions of the Operative Documents:

(i)      sell, transfer and assign to Lessor all of its right, title and interest in and to such Units and the applicable French Leasehold Interest, pursuant to the Assignment (Cession) and the Amtrak Bill of Sale with respect to the Units to be delivered on such Closing Date and arrange for the due execution and delivery of the applicable Consent to Assignment (Cession);

(ii)      execute and deliver a Lease Supplement with respect to the Units to be delivered on such Closing Date;

(iii)      execute and deliver the Amtrak Delegation covering the Units to be delivered on such Closing Date in order to delegate French Lessor to Owner Trustee for the performance by French Lessor directly to Owner Trustee of French Lessor's obligations set forth in Clause 21 of the applicable French Lease;

(iv)      execute and deliver the Escrow Agreement together with French Lessor, in order to appoint Wilmington Trust Company as escrow agent to hold in escrow an undated bill of sale covering the Units to be delivered on such Closing Date executed by French Lessor; and

(v)      perform its obligations under each Operative Document due on or prior to such Closing Date.

2.3      **Obligations of Loan Participant**.      On each Closing Date, Loan Participant agrees to, subject to the terms and conditions of the Operative Documents:

(i)      make a secured loan to Owner Trustee in an amount equal to Loan Participant's Commitment in respect of the Units to be delivered on such Closing Date; provided, that (a) the principal amount of such loan made by Loan Participant on such Closing Date, together with the aggregate initial principal amount of the loans made by Loan Participant on any prior Closing Dates (if any) shall not exceed the Loan Participant's Maximum

Commitment, (b) the maturity of the loan to be made by Loan Participant on such Closing Date shall not exceed 20 years, (c) the weighted average life to maturity of the loan to be made by Loan Participant on such Closing Date shall not exceed 15 years, (d) the aggregate principal amount of the loan to be made by Loan Participant on such Closing Date shall not exceed 80% of the Lessor's Cost of the Units to be delivered on such Closing Date and (e) the payment by Owner Participant contemplated by Section 2.5(i) shall be made prior or concurrently thereto or concurrently therewith; and

(ii)     accept one or more Secured Notes of the appropriate series dated such Closing Date in an aggregate principal amount equal to the amount of the secured loan being made by Loan Participant on such Closing Date.

2.4     **Obligations of Indenture Trustee**.  On each Closing Date, Indenture Trustee agrees to, subject to the terms and conditions of the Operative Documents, perform its obligations under each Operative Document due on or prior to such Closing Date.

2.5     **Obligations of Owner Participant**.  On each Closing Date, Owner Participant agrees to, subject to the terms and conditions of the Operative Documents:

(i)     provide immediately available funds to Owner Trustee equal to Owner Participant's Commitment in respect of the Units to be delivered on such Closing Date plus an amount sufficient to pay the Transaction Expenses to be paid on such Closing Date; provided, that (x) the secured loans to Owner Trustee from Loan Participant contemplated by Section 2.3 shall be made prior thereto or concurrently therewith in accordance with Section 2.3; (y) that Owner Participant's Commitment including Transaction Expenses together with Owner Participant's Commitment and Transaction Expenses previously disbursed hereunder cannot exceed Owner Participant's Maximum Commitment and (z) Amtrak shall have performed its obligations pursuant to Section 2.2; and

(ii)     perform its obligations under each Operative Document due on such Closing Date.

2.6     **Economic Terms for Each Closing**.     (i) Owner Participant's Commitment, Loan Participant's Commitment, Rent Factors, Casualty Value Factors, Termination Value Factors, amortization schedules for the Secured Notes, Adjusted EBO Price and EBO Date, Equity TV Amounts and Closing Date assumptions for the first Closing Date are set forth on Schedules III through X inclusive as such items have been determined pursuant to the terms of this Section 2.6, and such schedules shall operate as indicative schedules for each subsequent Closing Date (the "*Indicative Schedules*"). Owner Participant's Commitment, Loan Participant's Commitment, Rent Factors, Casualty Value Factors, Termination Value Factors, amortization schedules for the Secured Notes, Adjusted EBO Price and EBO Date and Equity TV Amounts for each subsequent Closing Date will be adjusted pursuant to Section 16 hereof.

(ii)     Following Loan Participant's receipt of each Closing Notice in accordance with Section 3.1, Loan Participant shall determine the Debt Rate for the Secured Notes to be issued on the Closing Date specified in such Closing Notice (the "*Relevant Secured Notes*") at approximately 10:00 a.m. (New York time) on the date 2 Business Days next

preceding such Closing Date.  Upon the determination by Loan Participant of the Debt Rate for the Relevant Secured Notes, Loan Participant shall notify Amtrak and Owner Participant of such Debt Rate.  The "*Debt Rate*" for any Secured Notes shall be the per annum rate equal to the sum of the Treasury Rate (as defined below) as of the date and time specified above plus the Margin. For the purposes of determining the Debt Rate for any Secured Note, the "*Treasury Rate*" shall mean the per annum rate equal to the yield of United States Treasury Securities for a weighted average life to maturity equal to the Specified Average Life (as determined in Section 3.1) determined by interpolation between the weighted average yield to maturity for (x) United States Treasury Securities with maturities of 10 years and (y) United States Treasury Securities with maturities of thirty years, on display on Dow Jones Markets Service 7677 (or such other display screen as may replace Dow Jones Markets Service 7677).  For the purposes of this Section 2.6(ii), the "*Margin*" shall mean 1.25% per annum.

(iii)    Upon receipt of notice of the Debt Rate for a Closing Date, Amtrak and Owner Participant shall promptly adjust the Indicative Schedules in accordance with Section 16 hereof, and Amtrak and Owner Participant shall promptly implement such adjustments.

(iv)    Promptly upon the determination of the adjustments made pursuant to Section 2.6(iii) (and in any event no later than 9:00 a.m. (New York time) one Business Day prior to the scheduled Closing Date), Amtrak shall notify Loan Participant, Owner Participant, Owner Trustee and Indenture Trustee of the final Owner Participant's Commitment, Loan Participant's Commitment, Rent Factors, Casualty Value Factors, Termination Value Factors, amortization schedules for the Secured Notes, Adjusted EBO Price, EBO Date and Equity TV Amounts for such Closing Date.  The actual weighted average life to maturity of the Secured Notes shall be within 0.5 years of the Specified Average Life and shall not exceed 15 years and the Loan Participant's Commitment shall not be greater or less than the Specified Loan Participant's Commitment (as defined in Section 3.1) by more than 5%.

(v)    On each Closing Date, Amtrak and Owner Trustee shall enter into a Lease Supplement which shall include as exhibits thereto schedules in the forms of Schedules IV through X inclusive hereto which include the actual Rent Factors, Rent Payment Dates, Casualty Value Factors, Termination Value Factors, Adjusted EBO Price, EBO Date, Equity TV Amounts and amortization schedules for the Secured Notes, in each case in respect of the Units to be delivered on such Closing Date, and shall attach a list of the Units to be financed on such date.

(vi)    On each Closing Date, Owner Trustee shall enter into an Indenture Supplement which shall include as exhibits thereto the Debt Rate, original principal amounts and amortization schedules for the Secured Notes, in each case in respect of the Units to be delivered on such Closing Date, and shall attach a list of the Units to be financed on such date.

**SECTION 3.**    CLOSING DATE.

3.1    <u>Closing</u>.  There shall be no more than six (6) Closing Dates.  The closing of the transactions contemplated hereby on each Closing Date will be held, and the Secured Notes to be issued and delivered at such closing will be issued and delivered, at the offices of Thelen Reid & Priest LLP, 40 West 57th Street, New York, New York 10019 at 10 a.m. New York time or as soon thereafter as possible on such Closing Date.  Each Closing Date shall be on

a Business Day on or prior to September 30, 2001 as may be designated by Amtrak in a written notice (a "*Closing Notice*") given to Loan Participant, Owner Participant, Indenture Trustee and Owner Trustee at least 4 Business Days prior to such designated Closing Date; provided, however, that if no Units are subjected to the Lease on such designated Closing Date, Amtrak may deliver another Closing Notice under this Section 3.1 designating a new proposed Closing Date. Such written notice shall specify the Units to be subjected to the Lease on such Closing Date, the Lessor's Cost therefor, the expected Loan Participant's Commitment for such Units (the "*Specified Loan Participant's Commitment*") and the weighted average life to maturity of the Secured Notes (which may not exceed 15 years) (the "*Specified Average Life*"); provided, however, that if prior to such Closing Date Amtrak determines that a Casualty Occurrence shall have occurred with respect to a Unit referred to in a Closing Notice, Amtrak shall promptly advise the other parties hereto or their special counsel, and, except for any indemnity payment in respect therewith and as may be required by Section 3.4, such Unit shall automatically no longer be deemed a Unit for any purpose of the Operative Documents and Owner Participant's Commitment and Loan Participant's Commitment in respect thereof shall be appropriately reduced.

   3.2 **Funding Procedures**. (i) Subject to the terms and conditions hereof, by 10:30 a.m. New York time on each Closing Date designated in a Closing Notice, (a) Owner Participant will wire transfer immediately available funds to an account, designated in the Closing Notice, of Owner Trustee in the amount of Owner Participant's Commitment for the Units to be delivered on such Closing Date plus the estimated aggregate amount of Transaction Expenses to be paid on such Closing Date pursuant to Section 7, and (b) Loan Participant will wire transfer immediately available funds or otherwise make available funds in the amount of Loan Participant's Commitment as directed in the Closing Notice. If any Participant shall default in its obligation under this Section 3, no other Participant shall have any obligation to make any portion of such defaulted amount available or to increase the amount of its Commitment and the obligation of such nondefaulting party shall remain subject to the terms and conditions of this Agreement.

   (ii) Loan Participant hereby authorizes and directs Owner Trustee, and Owner Participant hereby authorizes and directs Owner Trustee, and Owner Trustee agrees, to hold and invest in accordance with Section 3.4 all such funds received by Owner Trustee pursuant to Section 3.2(i), for the account of Loan Participant with respect to the Loan Participant's Commitment, and for the account of Owner Participant with respect to the Owner Participant's Commitment, until such funds are released in accordance with this Section 3.2(ii) or Section 3.4. Owner Trustee shall hold any such funds received from Loan Participant and from Owner Participant in trust, and not as part of the Trust Estate under the Trust Agreement, until such funds are released in accordance with the immediately succeeding sentence. Provided that with respect to each Closing Date, all conditions precedent to the obligations of Loan Participant shall have been complied with to the satisfaction of Loan Participant, and that all conditions precedent to the obligations of Owner Participant shall have been complied with to the satisfaction of Owner Participant (or waived in writing by the applicable Participant) and such Participant or its special counsel shall have so notified Owner Trustee in writing, (a) Loan Participant authorizes and directs Owner Trustee to pay the Loan Participant's Commitment relating to the Units to be delivered on such Closing Date in the manner described in Section 3.3, and (b) Owner Participant authorizes and directs Owner Trustee to pay the Owner Participant's

Commitment relating to the Units to be delivered on such Closing Date in the manner described in Section 3.3 and to take the other actions described hereunder relating to the Overall Transaction. If special counsel for Owner Participant orally notifies Owner Trustee on such Closing Date that such actions may be taken by Owner Trustee, such conditions precedent to the obligations of Owner Participant shall be deemed satisfied or waived by Owner Participant for purposes of this Section 3.2(ii).

   3.3 **Payment of Loan Participant's Commitment and Owner Participant's Commitment**. On each Closing Date, subject to the terms and conditions of this Agreement, Owner Trustee shall remit to Amtrak, or as Amtrak may direct, the Loan Participant's Commitment and the Owner Participant's Commitment in the manner and in the amount set forth in the Closing Notice for the Units to be delivered on such Closing Date.

   3.4 **Return of Funds**. If for any reason whatsoever the Units specified in any Closing Notice have not become subject to the Lease by 2:00 p.m. New York time on the Closing Date designated in such Closing Notice, (a) Owner Trustee agrees that it will return any amounts received by it from Loan Participant and Owner Participant pursuant to Section 3.2(i), by wire transfer to the same account in the same bank from which such funds were made available by or on behalf of Loan Participant and Owner Participant, as the case may be, at 2:00 p.m. New York time on the designated Closing Date (or, if requested by a Participant on or before 2:00 p.m. New York time, and if such Participant shall have executed and delivered to Owner Trustee, via facsimile or otherwise, such form as is required by Owner Trustee, Owner Trustee shall invest such Participant's funds in overnight Federal funds or in such other manner as such Participant may instruct in writing, and return such funds together with any earnings thereon (net of any costs or losses relating thereto) to such Participant on the next succeeding Business Day) and (b) Amtrak shall reimburse such Participant for the loss of the use of any funds that it made available to Owner Trustee by paying to such Participant upon demand interest at a rate per annum equal to, with respect to Owner Participant, the Prime Rate plus 1%, and with respect to Loan Participant, the Debt Rate, on the amount of such funds for the period from and including the Closing Date designated in such Closing Notice but excluding the Business Day on which such funds shall be returned to such Participant (or, if returned after 2:00 p.m., New York City time, on such Business Day, then to but excluding the next succeeding Business Day after such funds are so returned to such Participant) less the amount of net earnings returned to such Participant pursuant to the preceding clause (a). Any funds invested by Owner Trustee shall be at the risk of Amtrak and Amtrak shall reimburse each Participant for any losses incurred on such investments.

   3.5 **Acceptance of Equipment** Upon execution and delivery of a Lease Supplement by Amtrak and Owner Trustee, the Units described therein shall be deemed to have been delivered to and accepted by Amtrak for all purposes of this Agreement and the Lease and thereupon shall be subject to all the terms and conditions of the Lease.

### SECTION 4. REPRESENTATIONS AND WARRANTIES

   4.1 **Representations, Warranties and Agreements of Amtrak**. Amtrak hereby represents and warrants to, and agrees with, Loan Participant, Owner Participant, Indenture Trustee and Owner Trustee that:

(i)      Amtrak is a corporation duly organized under the Rail Passenger Service Act and the laws of the District of Columbia, is validly existing and in good standing under 49 U.S.C. §24301 and the laws of the District of Columbia, has full power, corporate and otherwise, and authority to carry on its business as currently being conducted, to own or hold under lease all properties owned or leased by it and to enter into and perform its obligations under this Agreement and the other Operative Documents to which it is or is to become a party, is a railroad carrier under Parts A, C, D and E of subtitle V of Title 49 of the United States Code, and Amtrak is deemed, thereunder, qualified to do business in each state that Amtrak carries out an activity authorized under said section.

(ii)      The execution and delivery by Amtrak of, and the performance by Amtrak of its obligations under, this Agreement, the Lease, each Lease Supplement, the Tax Indemnity Agreement and all other Operative Documents to which Amtrak is or is to become a party, have been or by the applicable Closing Date shall have been, duly authorized by all necessary corporate action on the part of Amtrak, and each of such agreements or instruments constitutes, or when executed and delivered by Amtrak will constitute, a legal, valid and binding obligation of Amtrak, enforceable against Amtrak in accordance with its terms.

(iii)      Neither the execution and delivery by Amtrak of this Agreement or any of the other Operative Documents to which it is or is to become a party, nor the performance by Amtrak of its obligations hereunder or thereunder, (a) conflicts or will conflict with or violate in any material respect any currently existing law or governmental rule, regulation, judgment or order or any judicial or administrative order or decree applicable to or binding upon Amtrak or on any of its properties, (b) conflicts or will conflict with the articles of incorporation or by-laws of Amtrak, (c) conflicts or will conflict with, or contravene, violate or result in a breach of, any indenture, mortgage, loan agreement or in any material respect conflicts with any other agreement or instrument to which Amtrak is a party or by which any of its properties is bound, (d) results or will result in the creation or imposition of any Lien (other than Permitted Liens) upon any Unit or any material properties, real, personal or mixed, tangible or intangible, of Amtrak, (e) other than the FRA Termination, requires or will require, on the part of Amtrak, the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in respect of, any federal, state or local governmental or public commission, board, authority or agency or (f) other than the FRA Termination, requires or will require the consent or approval of its shareholders or any trustee or holders of any currently existing indebtedness or obligations of Amtrak.

(iv)      With respect to Units to be delivered on any Closing Date, except for the filing of the Termination and Release, the Lease and a Lease Supplement (or appropriate memoranda thereof), the Indenture and an Indenture Supplement (or appropriate memoranda thereof), a French Lease (or appropriate memoranda thereof), an FRA Termination, a Lessor Security Agreement, an Assignment (Cession) and an Amtrak Delegation, in each case covering the Units to be delivered on such Closing Date, with the STB pursuant to Section 11301 of the Act and deposited with the Registrar General of Canada, as appropriate (all of which filings shall have been duly made on or prior to such Closing Date), the filing of Uniform Commercial Code financing statements described in Schedule II (true, correct and complete copies of which financing statements shall have been delivered to Loan Participant, Owner Participant, Indenture Trustee and Owner Trustee on or before such Closing Date), publication of an appropriate notice

in *The Canada Gazette*, and performance of the French Actions, no filing, recording, publication or registration of any financing statement or other document or instrument is or will be necessary or advisable in order to establish and protect the right, title and interest of Owner Trustee in and to such Units and under the applicable French Lease, the Lease, the applicable Assignment (Cession), the applicable Amtrak Bill of Sale, the applicable Amtrak Delegation and the applicable Lessor Security Agreement to create for the benefit of the holders of Secured Notes pursuant to the Indenture a valid prior perfected security interest in the Trust Indenture Estate, including such Units and Owner Trustee's rights under the Lease, the applicable French Lease and the applicable Lessor Security Agreement in each such case subject only to Permitted Liens not of record.

(v)     Except as described in Schedule XI, as of the date hereof, there are no actions, suits or proceedings pending or, so far as is known to a Responsible Officer of Amtrak, threatened before any court or by or before any other federal, state or local governmental or public commission, board, authority or agency, any arbitrator, which, if adversely determined, could reasonably be expected to have a material adverse effect on Amtrak's business, condition (financial or other) or results from operations, property or assets or its ability to perform its obligations under this Agreement or any other Operative Document to which it is, or is to become, a party, or which call into question the validity of such agreement or instrument.

(vi)     All licenses, permits, rights of way and other authorizations, consents and other filings required by law to be obtained or made in order to permit the use and operation of the Equipment in the manner contemplated by the Operative Documents have been obtained or made, where the failure to obtain any such license, permit, authorization or consent or make any such filing might have a material adverse effect on Amtrak's ability to perform its obligations under this Agreement and each of the other Operative Documents to which Amtrak is or is to become a party.

(vii)     Amtrak is not an "investment company" or an "affiliated person" of an "investment company" within the meaning of the Investment Company Act of 1940.

(viii)     Neither Amtrak, nor any Affiliate of Amtrak, nor any other Person authorized to act on behalf of Amtrak or any Affiliate of Amtrak, has directly or indirectly offered the Trust Estate or the Secured Notes, any interest in either thereof or any security similar to either thereof for sale to, or solicited offers to buy any of the same from, or otherwise approached or negotiated with respect to any of the same with, anyone other than, (a) in the case of any interest in the Trust Estate, Owner Participant and not more than 30 other Institutional Investors and (b) in the case of any Secured Notes, Loan Participant and not more than 5 other Institutional Investors.

(ix)     Amtrak is not in default in any material respect under any of the Operative Documents to which it is a party.  No Casualty Occurrence has occurred and all insurance required under the Lease is in effect and all premiums due and payable in respect of such insurance have been paid in full.

(x)       The chief executive office or chief place of business (as either of such terms is used in Article 9 of the Uniform Commercial Code) of Amtrak is located at 60 Massachusetts Avenue, N.E., Washington, D.C. 20002.

(xi)      On each Closing Date, upon Owner Trustee's application of the Lessor's Cost in accordance with this Agreement with respect to the Units to be made subject to the Lease on such Closing Date, Owner Trustee shall, subject to the rights of the French Lessor under the French Lease, be the owner of such Units free and clear of all Liens other than Permitted Liens.

(xii)     Assuming that (i) Loan Participant is not acquiring the Secured Notes to be acquired by it hereunder, and Owner Participant is not acquiring its interest in the Trust Estate, with the "plan assets" of any "employee benefit plan" (or its related trust) as defined in Section 3(3) of ERISA or with the assets of any "plan" (or its related trust) as defined in Section 4975(e)(1) of the Code and (ii) none of the Participants or any subsequent holder of a Participant's interest has or will have any conflict of interest involving the investment that might give rise to a violation of Section 406(b) of ERISA or Section 4975(C)(1)(E) or (F) of the Code, neither the execution and delivery by Amtrak of this Agreement and the other Operative Documents to which Amtrak is or is to become a party nor any of the transactions contemplated by the Operative Documents will involve any prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code.

(xiii)    The audited financial statements of Amtrak as at September 30, 1999, and the unaudited financial statements of Amtrak contained in its quarterly report for its fiscal quarter ended March 30, 2000, and the related statements of operations, cash flows, and changes in capitalization for the year or period then ended, copies of which have been furnished to each Participant, are correct in all material respects and fairly present the financial position of Amtrak as at such dates and the results of its operations for such periods in conformity with generally accepted accounting principles applied on a consistent basis.  Since September 30, 1999, there has been no material adverse change in the financial condition of Amtrak.

(xiv)     Amtrak has not retained or employed any broker, finder or financial advisor (other than Babcock & Brown) to act on its behalf in connection with the Overall Transaction and it has not authorized any broker, finder or financial advisor retained or employed by any other Person so to act.

(xv)      Amtrak is subject to the civil and commercial laws of the United States of America and the jurisdictions in which it does business in respect of its obligations generally and is not entitled to claim for itself or its assets immunity from jurisdiction, suit, judgment, set off, execution, attachment or other legal process in respect of its obligations under this Agreement or any other Operative Document to which Amtrak is or is to become a party.

(xvi)     Amtrak is in compliance with all Applicable Law with respect to the Units to which it is subject, the failure to comply with which could reasonably be expected to have a material adverse effect on the financial condition or the business or assets of Amtrak or its ability to perform its obligations under this Agreement or any other Operative Document to which it is, or is to become, a party, or which call into question the validity of such agreement or instrument.

(xvii)    None of the proceeds from the issuance of the Secured Notes or from the acquisition by Owner Participant of its beneficial interest in the Trust Estate will be used directly or indirectly by Amtrak so as to result in a violation of Regulation G or U of the Board of Governors of the Federal Reserve System.

(xviii)    The preferred stock of Amtrak held by the Secretary of Transportation confers no liquidation preference to the Secretary of Transportation.

(xix)    The amounts set forth opposite the captions for each line item in the Table attached as Schedule XII hereto were transcribed from the GAAP financial statements shown in Amtrak's Annual Report entitled Consolidated Statements of Operations and Comprehensive Loss and notes thereto dated September 30, 1999, audited by the Independent Auditors (the "*Annual Report*"), except for the amounts set forth opposite the following captioned line items, all of which were prepared in accordance with GAAP but not reflected as separate line items in such financial statements: (i) "Capital Funds for Progressive Overhaul and Other" (derived from Amtrak's General Ledger), (ii) "Depreciation and Other Non-Cash" (derived from Amtrak's General Ledger and actuarial data) and (iii) "Excess Mandatory Railroad Retirement Taxes" (derived from information received from the Railroad Retirement Board). Amtrak records the net gain received from the sale of an asset under a sale and leaseback transaction as a deferred credit on its balance sheet; therefore, this credit is amortized into income over the term of the leaseback. As of September, 2000, Amtrak anticipates (based on its good faith estimates as to which no assurances of accuracy can be given) that for purposes of calculating revenues in Amtrak's Strategic Business Plan, commercial revenues for Fiscal Year 2000 are expected to be $67,000,000, commercial revenues for Fiscal Year 2001 are expected to be $70,000,000 and commercial revenues for Fiscal Year 2002 are expected to be $80,000,000.

(xx)    Upon conditional acceptance of each Unit from the Manufacturer, such Unit shall be in conformity in all material respects with the specifications of the Commercial Contract, except for the matters set forth in the applicable Certificate of Conditional Acceptance, and shall be qualified by the FRA and capable of:

(a)    in the case of the Trainsets, a maximum continuous speed of up to 150 miles per hour in revenue service and a maximum continuous test speed of up to 165 miles per hour;

(b)    in the case of the Locomotives, a maximum continuous speed of up to 125 miles per hour in revenue service and a maximum continuous test speed of up to 140 miles per hour; and

(c)    immediate commercial operation in revenue service by Amtrak.

(xxi)    The Amtrak Documents constitute all of the documents to which Amtrak is a party relating to the Units and Amtrak's sale, transfer and assignment all of its right, title and interest in and to the Units to be financed on such Closing Date and the related French Leasehold Interest.

(xxii)    True, correct and complete copies of the French Documents have been delivered to the Participants.

4.2    **Representations, Warranties and Agreements of the Participants, Trust Company, Owner Trustee and Indenture Trustee.**

(i)    *Loan Participant hereby represents and warrants to, and agrees with* Amtrak, Owner Participant, Owner Trustee and Indenture Trustee as follows:

(a)    Any Secured Note acquired by Loan Participant on any Closing Date has been acquired by it for its own account and not with a view to the distribution or resale thereof except in accordance with the Securities Act and any applicable state securities law or in accordance with any exemption therefrom.

(b)    No part of the assets used by Loan Participant in acquiring Secured Notes hereunder is being acquired through the investment, either directly or indirectly, of the assets of any "employee benefit plan", as defined in subsection (3) of Section 3 of ERISA, or any other entity subject to Section 4975 of the Code.

(ii)    Owner Participant hereby represents and warrants to, and agrees with, Amtrak, Loan Participant, Owner Trustee and Indenture Trustee as follows:

(a)    Owner Participant is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has full power, corporate and otherwise, and authority to enter into and perform its obligations under the Owner Participant Documents.

(b)    The execution and delivery by Owner Participant of, and the performance by Owner Participant of its obligations under, each Owner Participant Document have been duly authorized by all necessary corporate action on the part of Owner Participant, and (assuming the due authorization, execution and delivery by each other party thereto) each Owner Participant Document constitutes, or when executed and delivered by Owner Participant will constitute, a legal, valid and binding obligation of Owner Participant, enforceable against Owner Participant in accordance with its terms.

(c)    Neither the execution or delivery by Owner Participant of Owner Participant Documents nor the performance by Owner Participant of its obligations thereunder, (1) conflicts or will conflict with or violate in any material respect any currently existing law or governmental rule, or regulation, or any judgment or order or any judicial or administrative order or decree applicable to or binding upon Owner Participant or any of its properties, (2) conflicts or will conflict with or violate the articles of incorporation or by-laws of Owner Participant, (3) conflicts or will conflict with, or contravene, violate or result in a breach of, any indenture, mortgage, loan agreement or in any material respect conflicts with any other agreement or instrument to which Owner Participant is a party or by which any of its properties is bound, in any such case which does or will materially adversely affect the financial condition or the business or assets of Owner Participant or its ability to perform its obligations under any Owner

Participant Document, (4) results or will result in the creation or imposition of any Owner Participant's Lien upon any Unit or Owner Participant's interest in the Trust Estate under the Trust Agreement, or upon the interest of Owner Trustee in, to or under the Lease, (5) requires or will require, on the part of Owner Participant, the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in respect of, any governmental or public commission, board, authority or agency, except for filings, if any, made pursuant to any notice reporting requirement applicable to it, or (6) requires or will require the consent or approval of its shareholders or any trustee or holders of any currently existing indebtedness or obligations of Owner Participant (provided that no representation and warranty is made as to ERISA in this subsection (c)).

(d)     Owner Participant is not in default of its obligations under Section 9.2(i) hereof.

(e)     Owner Participant, or if applicable, Owner Participant Guarantor, shall on the Closing Date have a tangible net worth equal to or greater than $75,000,000.

(f)     The Trust Estate and the Trust Indenture Estate are free of Owner Participant's Liens.

(g)     Neither Owner Participant nor any Person authorized to act on behalf of Owner Participant has directly or indirectly offered any interest in the Secured Notes or any security similar to either thereof for sale to, or solicited offers to buy any of the same from, or otherwise approached or negotiated with respect to any of the same with, any Person.

(h)     Owner Participant is acquiring its interest in the Trust Estate for its own account for investment and not with a view to the distribution or resale thereof, other than in compliance with the terms hereof, and in a manner which does not require registration or qualification under Applicable Law.

(i)     There are no actions, suits or proceedings pending or, to the best knowledge of Owner Participant, threatened before any court or by or before any other federal, state or local government or public commission, board, authority or agency, or any arbitrator, domestic or foreign, which can reasonably be expected to have a materially adverse effect on Owner Participant's ability to perform its obligations under any Owner Participant Document or which call into question the validity of any Owner Participant Document.

(j)     Owner Participant is not an "investment company" or a company controlled by an "investment company" within the meaning of the Investment Company Act of 1940.

(k)     Assuming the correctness of the representations made in Section 4.1(xii) and 4.2(i)(b), no part of Owner Participant's Commitment is being acquired through the investment, either directly or indirectly, of the assets

of any "employee benefit plan", as defined in subsection (3) of Section 3 of ERISA, or any other entity subject to Section 4975 of the Code.

(l)     Owner Participant has not retained or employed any broker, finder or financial advisor to act on its behalf in connection with the transaction contemplated hereby and it has not authorized any broker, finder or financial advisor retained or employed by any other Person to so act.

(iii)     Trust Company with respect to clauses (iii)(a), (b), (c), (e), (f), (g), (h), (i) and (m), as they apply to Trust Company, and Owner Trustee with respect to clauses (iii) (a), (c), (d), (e), (f), (h), (j), (k), and (l), as they apply to Owner Trustee, hereby represent and warrant to, and agree with, Loan Participant, Amtrak, Indenture Trustee and Owner Participant that:

(a)     Trust Company is a Delaware banking corporation, and the Trust is a Delaware business trust, in each case duly organized, validly existing and in good standing under the laws of the State of Delaware and Trust Company has full corporate power, authority and legal right to execute, deliver and perform its obligations under the Trust Agreement and (assuming due authorization, execution and delivery of the Trust Agreement by Owner Participant) Owner Trustee has full power, authority and legal right to execute, deliver and perform its obligations under this Agreement and the other Operative Documents to which it is or is to become a party and to issue, execute, deliver and perform its obligations under the Secured Notes.

(b)     Trust Company has been duly constituted as Owner Trustee by the Trust Agreement.

(c)     The Trust Agreement, the Indenture, each Secured Note and the other Operative Documents to which Trust Company or Owner Trustee is or is to become a party have been duly executed and delivered by Trust Company or Owner Trustee, as the case may be, and (assuming due authorization, execution and delivery of the Trust Agreement by Owner Participant) the Trust Agreement constitutes a legal, valid and binding obligation of Trust Company, enforceable against Trust Company in accordance with its terms.

(d)     Assuming due authorization, execution and delivery of the Trust Agreement by Owner Participant, this Agreement, each Secured Note and the other Operative Documents to which Owner Trustee is or is to become a party have been duly authorized by Owner Trustee and constitute, or when executed and delivered by Owner Trustee will constitute, legal, valid and binding agreements or instruments of Owner Trustee, enforceable against Owner Trustee in accordance with their respective terms.

(e)     Neither the execution or delivery by Trust Company or (assuming due authorization, execution and delivery of the Trust Agreement by Owner Participant) Owner Trustee of this Agreement, each Secured Note or any other Operative Document to which it is or is to be a party, nor the performance or

observance by Owner Trustee of the terms, conditions or provisions hereof or thereof, (1) conflicts or will conflict with or violate any currently existing applicable Delaware or federal law, governmental rule, regulation, judgment or order governing the banking or trust powers of Trust Company or any judicial or administrative order or decree applicable to or binding upon Trust Company or any of its Affiliates, or on any of their respective properties in any material respect, (2) conflicts or will conflict with or violate Trust Company's charter or by-laws, (3) conflicts or will conflict with, contravene, violate or result in a breach of any agreement or instrument to which Trust Company or any of its Affiliates is a party or by which any of their respective properties are bound in any material respect, or does or will constitute a material default thereunder or (4) requires or will require, on the part of Trust Company or any Affiliate of Trust Company, the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in respect of, any governmental or public commission, board, authority or agency of the State of Delaware or any political subdivision thereof or the United States of America governing the banking or trust powers of Trust Company.

(f)     On and as of each Closing Date, title to the Units delivered on such Closing Date and the related French Leasehold Interest will be free and clear of all Lessor's Liens attributable to Trust Company.

(g)     On and as of each Closing Date, Trust Company will not be in default with respect to any covenants and agreements expressly made by it in its individual capacity in any of the Operative Documents to which it is a party in its individual capacity.

(h)     The chief executive office or chief place of business (as either of such terms is used in Article 9 of the Uniform Commercial Code) of Trust Company is located at Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001 and Owner Trustee's and Trust Company's records with respect to the Lease are located at such address.

(i)     Neither Trust Company, nor any Person authorized to act on behalf of Trust Company, has directly or indirectly offered any interest in the Trust Estate, the Trust Indenture Estate or the Secured Notes or any security similar to either thereof for sale to, or solicited offers to buy any of the same from, or otherwise approached or negotiated with respect to any of the same with, any Person.

(j)     Owner Trustee is not in default under any of the Operative Documents to which it is a party.

(k)     Except to the extent, and in the manner, contemplated by the Lease and the Indenture, Owner Trustee has not assigned or transferred any of its right, title or interest in, to or under the Lease or in or to any Unit.

(l)     There are no Taxes which may be imposed on or asserted against the Trust Estate, the Trust Indenture Estate or any part thereof or any interest therein, Amtrak, Loan Participant or Owner Participant by any applicable state or local government or taxing authority (except Taxes imposed on the fees payable to Owner Trustee) required to be paid under the laws of the State of Delaware in connection with the execution, delivery or performance of any Operative Document by Owner Trustee or Trust Company, as the case may be, or in connection with the issuance of the Secured Notes, which Taxes result solely from the participation therein by a trust company located in the State of Delaware as Owner Trustee.

(m)     There are no proceedings pending or, to the knowledge of Trust Company, threatened against or affecting Trust Company in any court or before any Governmental Authority or arbitration board or tribunal which, if adversely determined, might, individually or in the aggregate, materially and adversely affect the Trust Estate or the Trust Indenture Estate or adversely affect the right, power and authority of Trust Company to enter into and perform its obligations under this Agreement, the Indenture and the Trust Agreement.

(iv)     Indenture Trustee, in its individual and trust capacity, hereby represents and warrants to, and agrees with, Amtrak, the Participants, and Owner Trustee that, under present law:

(a)     Indenture Trustee is a Maryland banking corporation duly organized, validly existing and in good standing under the laws of Maryland and has full power and authority (corporate and other) to enter into and perform its obligations under this Agreement and the Indenture.

(b)     This Agreement and the Indenture have been duly authorized by all necessary corporate action on the part of Indenture Trustee, and (assuming the due authorization, execution and delivery by each other party thereto) constitute, or when executed and delivered by Indenture Trustee will constitute, legal, valid and binding agreements or instruments of Indenture Trustee, enforceable against Indenture Trustee in accordance with their respective terms.

(c)     Neither the execution or delivery by Indenture Trustee of this Agreement or the Indenture, nor the performance or observance by Indenture Trustee of the terms, conditions or provisions hereof or thereof, (1) conflicts or will conflict with or violate any currently existing federal or Maryland law or governmental rule, regulation, judgment or order or any judicial or administrative order or decree applicable to or binding upon Indenture Trustee or on any of its properties in any material respect, (2) conflicts or will conflict with or violate the articles of association or by-laws of Indenture Trustee, (3) conflicts or will conflict with, contravene, violate or result in a breach of any mortgage, indenture, loan agreement or any other agreement or instrument to which Indenture Trustee is a party or by which any of its properties are bound in any material respect, or does or will constitute a material default thereunder or (4) conflicts or will

require, on the part of Indenture Trustee, the consent or approval of, the giving notice to, the registration with, or the taking of any other action in respect of, any federal, state or local governmental or public commission, board, authority or agency under federal or Maryland law.

(d)     Indenture Trustee is not in default under any of the Operative Documents to which it is a party.

(e)     Neither Indenture Trustee, nor any Person authorized to act on behalf of Indenture Trustee, has directly or indirectly offered any interest in the Trust Estate or Secured Notes or any security similar to either thereof for sale to, or solicited offers to buy any of the same from, or otherwise approached or negotiated with respect to any of the same with, any Person.

(f)     There are no Taxes which may be imposed on or asserted against the Trust Indenture Estate or any part thereof or any interest therein, Amtrak, Owner Trustee, Trust Company, Loan Participant or Owner Participant by any Maryland state or local government or taxing authority (except Taxes imposed on the fees payable to Indenture Trustee) required to be paid under the laws of Maryland in connection with the execution, delivery or performance by Indenture Trustee of this Agreement, the Indenture or the authentication of the Secured Notes, which Taxes result solely from the participation therein by a trust company located in Maryland as Indenture Trustee.

(g)     There are no proceedings pending or, to the knowledge of Indenture Trustee, threatened against or affecting Indenture Trustee in any court or before any Governmental Authority or arbitration board or tribunal which, if adversely determined, might, individually or in the aggregate, materially and adversely affect the Trust Indenture Estate or would adversely affect the right, power and authority of Indenture Trustee to enter into or perform its obligations under this Agreement and the other Operative Documents to which it is a party.

## SECTION 5.     CONDITIONS PRECEDENT.

5.1     **Conditions to Obligations of the Participants**. The obligation of each of the Participants to perform its obligations set forth in Section 2 on each Closing Date is subject to the fulfillment to the satisfaction of or waiver by such Participant prior to or on such Closing Date, of each of the following conditions precedent, except that (1) the obligation of any party shall not be subject to such party's own performance or compliance with the terms hereof and of the other Operative Documents (it being understood that special counsel to any party shall not be deemed to be within such party's control to the extent that such special counsel is unable to render a favorable opinion as to matters of law reasonably requested by such party to be addressed in such counsel's opinion), (2) paragraphs (iii)(b), (ix) (insofar as it relates to Loan Participant) (v)(a)(7), (xiii), (xiv), (xviii) (excluding the last sentence), (xxii) and (xxvii) of this Section 5.1 shall not be a condition precedent to the obligations of Loan· Participant, (3) paragraphs (iii)(a), (vii)(b), (vii)(c), (insofar as each such paragraph relates to Owner Participant), and (xvi)(b) of this Section 5.1, shall not be a condition precedent to the obligations

of Owner Participant and (4) if any condition precedent cannot be satisfied or is not waived with respect to one or more Units being delivered on such Closing Date, Amtrak may withdraw such Unit or Units and the transactions described herein shall be completed on such Closing Date with respect to the remaining Unit or Units so delivered:

(i)   <u>Notice of Closing Date</u>.  Such Participant shall have received a Closing Notice pursuant to Section 3.1 hereof with respect to the Units to become subject to the Lease on such Closing Date.

(ii)   <u>No Illegality</u>.  No change shall have occurred after the date of the execution and delivery of this Agreement in Applicable Law or regulations thereunder or interpretations thereof by regulatory authorities that, in the opinion of such Participant or its counsel, would make it illegal for such Participant to enter into any transaction contemplated by the relevant Operative Documents.

(iii)   <u>Participants' Investments</u>.

(a)   With respect to such Closing Date, Owner Participant shall have made available its Commitment and amounts necessary for Transaction Expenses in accordance with Sections 2.5(i) and 3.2(i)(a).

(b)   With respect to such Closing Date, Loan Participant shall have made its secured loan to Owner Trustee in the amount specified in, and otherwise in accordance with, Sections 2.3(i) and 3.2(i)(b).

(iv)   <u>Consents</u>.  All approvals and consents of any trustees or holders of any indebtedness or obligations of Amtrak, which in the reasonable opinion of such Participant are required in connection with the transactions contemplated by this Agreement, shall have been duly obtained and be in full force and effect.

(v)   <u>Operative and Other Documents</u>.  (a) On or prior to the first Closing Date, each of the following documents shall have been duly authorized, executed and delivered by the respective parties thereto: (1) this Agreement, (2) the Trust Agreement, (3) the Lease, (4) the Indenture, (5) the Tax Indemnity Agreement (which shall be delivered solely to Owner Participant and Amtrak), (6) the Equity Guarantee Agreement and (7) the Equity Guarantee Fee Undertaking. (b) On or prior to each Closing Date, the following documents shall have been duly authorized, executed and delivered by the respective party or parties thereto (other than by such party), shall each be satisfactory in form and substance to such party and shall each be in full force and effect, and executed counterparts of each thereof (or copies thereof where indicated) shall have been delivered to such party or its counsel on or prior to such Closing Date for such Units:

(1)   a Lease Supplement, dated such Closing Date, relating to such Units;

(2)   an Indenture Supplement, dated such Closing Date, subjecting such Units to the Lien of the Indenture;

(3)     Secured Notes, dated such Closing Date, in aggregate principal amount equal to Loan Participant's Commitment for such Units;

(4)     an Equity Guarantee Agreement Supplement, dated such Closing Date, relating to such Units;

(5)     a Termination and Release, dated such Closing Date, relating to such Units;

(6)     the Assignment of Warranties, dated such Closing Date, relating to such Units;

(7)     the Consent, dated such Closing Date, relating to such Units;

(8)     the FRA Termination, dated such Closing Date, relating to such Units; and

(9)     the French Documents applicable to such Units.

(vi)     <u>Filings and Financing Statements</u>.  With respect to the Units to be delivered on such Closing Date, Amtrak shall have filed with the STB, pursuant to Section 11301 of the Act, an FRA Termination, a Termination and Release, the Lease and a Lease Supplement (or appropriate memoranda thereof), the Indenture and an Indenture Supplement (or appropriate memoranda thereof), the French Lease (or appropriate memoranda thereof), the Lessor Security Agreement, the Assignment (Cession) and the Amtrak Delegation.  With respect to the Units to be delivered on such Closing Date, Amtrak shall have deposited with the Registrar General of Canada pursuant to Section 105 of the Canada Transportation Act, the Lease and a Lease Supplement (or appropriate memoranda thereof), and the Indenture and an Indenture Supplement (or appropriate memoranda thereof).  A Uniform Commercial Code financing statement or statements covering all of the security interests created by or pursuant to the Indenture that are not covered by the recording system established by the STB shall have been executed and delivered by Owner Trustee or Amtrak, as the case may be, and such financing statement or statements in form and substance satisfactory to Loan Participant shall have been duly filed in all places set forth on Schedule II copies of which are to be delivered to Loan Participant, Indenture Trustee, Owner Trustee and Owner Participant in form and substance satisfactory to Loan Participant, Owner Trustee and Owner Participant.  A precautionary Uniform Commercial Code financing statement or statements describing the Lease and the Units to be delivered on such Closing Date shall have been executed and delivered by Amtrak, as "debtor", naming Owner Trustee as Lessor and noting Indenture Trustee as assignee of Lessor shall have been duly filed in all places listed on Schedule II, copies of which are to be delivered to Loan Participant, Indenture Trustee, Owner Trustee and Owner Participant in form and substance satisfactory to Loan Participant, Owner Trustee and Owner Participant.  The French Actions shall have been performed with respect to the Units to be delivered on the Closing Date.

(vii)     <u>Corporate Documents</u>. Such Participant with respect to Amtrak, Owner Participant, Trust Company, Indenture Trustee, and Manufacturer shall have received the following, in each case in form and substance reasonably satisfactory to it:

(a)    a current and complete copy of the articles of incorporation and by-laws or other organic documents of each of Amtrak, Owner Participant, Owner Participant Guarantor, if applicable, Trust Company, Indenture Trustee, and Manufacturer, a copy of resolutions of the board of directors or other such governing body of each such Person (or the executive committee authorized to act on behalf of such Person), duly authorizing the execution and delivery by such Person of the Operative Documents to which it is or will be a party and each other document required to be executed and delivered by such Person on such Closing Date in accordance with the provisions hereof and the performance by such Person of its obligations thereunder, and an incumbency certificate of such Person as to the Person or Persons authorized to execute and deliver such Operative Documents and such other documents on behalf of such Person and including specimens of the signatures of such Person or Persons, each certified as of such Closing Date by the Secretary or an Assistant Secretary of such Person;

(b)    a good-standing certificate from the Secretaries of State (or comparable Governmental Authority) of the respective jurisdiction of incorporation of each of Amtrak, Owner Participant, Owner Participant Guarantor, if applicable, Trust Company, Indenture Trustee, and Manufacturer; and

(c)    such other documents and evidence with respect to Amtrak, Owner Participant, Owner Participant Guarantor, if applicable, Trust Company, Indenture Trustee, and Manufacturer as such Participant, or its counsel, may reasonably request in order to establish the authority of such parties to consummate the transactions contemplated by this Agreement and the taking of all corporate proceedings in connection herewith.

(viii)   <u>Assignment (Cession); Lien of Indenture</u>.  On such Closing Date, such Participant shall have received evidence reasonably satisfactory to it that (a) Amtrak shall have assigned to Owner Trustee all of its right, title and interest in and to the Units being delivered on such Closing Date and the French Leasehold Interest with respect thereto and that such Units and such French Leasehold Interest shall be free and clear of any and all Liens except Permitted Liens, (b) the French Documents are in full force and effect and (c) Owner Trustee shall have duly and validly subjected to the Lien of the Indenture all property and property rights (free and clear of all Liens except Permitted Liens) which are then required to be subject to the security interest created by the Indenture, and the recording and filings contemplated by Section 5.1(vi) shall have been made, and such recording and filings shall be the only action necessary or advisable in order to establish and protect the right, title and interest of Owner Trustee in such Units and such French Leasehold Interest and to create for the benefit of the holders of the Secured Notes a valid prior perfected security interest in the Trust Indenture Estate under the Indenture.

(ix)   <u>Representations and Warranties True; No Default</u>.  On such Closing Date, (a) the representations and warranties of Amtrak, Equity Guarantor, Owner Participant, Owner Participant Guarantor, if applicable, Owner Trustee, Indenture Trustee and Loan Participant contained in Section 4 of this Agreement and in any other Operative Document to

which it is a party shall be true and correct on such date as though made on and as of such date except to the extent that such representations and warranties relate solely to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date), (b) no event shall have occurred and be continuing, or would result from the purchase, sale, lease or sublease of such Units, that constitutes (or would, with the passage of time or the giving of notice or both, constitute) a Special Event, a Lease Event of Default or an Indenture Event of Default, (c) all of the Operative Documents shall be in full force and effect, and (d) none of such Units shall have suffered a Casualty Occurrence.

(x)   Amtrak Counsel Opinions.

(a)   Such Participant shall have received an opinion addressed to the Opinion Addressees and dated such Closing Date from Thelen Reid & Priest LLP, special counsel for Amtrak, in form, scope and substance reasonably satisfactory to the Opinion Addressees.

(b)   Such Participant shall have received an opinion addressed to the Opinion Addressees and dated such Closing Date from the General Solicitor of Amtrak or his designee, in form, scope and substance reasonably satisfactory to the Opinion Addressees.

(c)   Such Participant shall have received an opinion concerning STB matters addressed to the Opinion Addressees and dated such Closing Date from Alvord and Alvord, STB counsel for Amtrak, in form, scope and substance reasonably satisfactory to the Opinion Addressees.

(d)   Such Participant shall have received an opinion concerning Canadian filings and related matters addressed to the Opinion Addressees and dated such Closing Date from McCarthy Tétrault, Canadian counsel to Amtrak, in form, scope and substance reasonably satisfactory to the Opinion Addressees.

(xi)   Owner Trustee's and Indenture Trustee's Counsel Opinions.

(a)   Such Participant shall have received an opinion addressed to the Opinion Addressees and dated such Closing Date from Morris, James, Hitchens & Williams LLP, special counsel for Owner Trustee, in form, scope and substance reasonably satisfactory to the Opinion Addressees.

(b)   Such Participant shall have received an opinion addressed to the Opinion Addressees and dated such Closing Date from Miles & Stockbridge, P.C., special counsel for Indenture Trustee, in form, scope and substance reasonably satisfactory to the Opinion Addressees.

(xii)   Owner Participant's Counsel Opinions.

(a)   Loan Participant shall have received an opinion addressed to the Opinion Addressees and dated such Closing Date from Hunton & Williams, special counsel for Owner Participant, and Owner Participant Guarantor, if

applicable, in form, scope and substance reasonably satisfactory to the Opinion Addressees.

(b)    Loan Participant shall have received an opinion addressed to the Opinion Addressees and dated such Closing Date from corporate counsel for Owner Participant, and Owner Participant Guarantor, if applicable, in form, scope and substance reasonably satisfactory to the Opinion Addressees.

(xiii)    Owner Participant's Tax Opinion.  Owner Participant shall have received from Hunton & Williams, special counsel for Owner Participant, a favorable opinion, in form and substance reasonably satisfactory to Owner Participant and dated such Closing Date, with respect to certain Federal income tax consequences arising out of its participation in the Overall Transaction.

(xiv)    Opinions concerning EDC and Equity Guarantee Agreement.  Owner Participant shall have received opinions concerning EDC and the Equity Guarantee Agreement addressed to Owner Participant and Owner Trustee and dated the Closing Date from William Doyle, Esq., corporate counsel for EDC, and from McCarthy Tétrault, Canadian counsel to Amtrak, as to the enforceability of the Equity Guarantee Agreement in form, scope and substance reasonably satisfactory to Amtrak, Trust Company, Owner Trustee, Indenture Trustee and Owner Participant.

(xv)    Opinions Concerning French Law Matters.  Owner Participant shall have received from Watson, Farley and Williams, special French counsel to the Owner Participant, an opinion in form, scope and substance reasonably satisfactory to Owner Participant, dated as of such closing date, with respect to certain matters relating to French law.

(xvi)    Manufacturer's Counsel Opinion.

(a)    Such Participant shall have received an opinion addressed to the Opinion Addressees and dated such Closing Date from counsel for Manufacturer, in form, scope and substance reasonably satisfactory to the Opinion Addressees.

(b)    Such Participant shall have received an opinion addressed to the Opinion Addressees and dated such Closing Date from special counsel for Manufacturer, in form, scope and substance reasonably satisfactory to the Opinion Addressees.

(xvii)    Certificates of Amtrak and Owner Participant.

(a)    Such Participant shall have received a certificate signed by a duly authorized representative of Amtrak, dated such Closing Date, addressed to each Participant and certifying as to the matters stated in Section 5.1(ix) (insofar as such matters relate to Amtrak).

(b)    Loan Participant and Amtrak shall have received a certificate signed by a duly authorized representative of Owner Participant, dated such Closing Date, addressed to Loan Participant and Amtrak and certifying as to the

matters stated in Section 5.1(ix) (insofar as such matters relate to Owner Participant).

(xviii)   Certificates of Owner Trustee and Indenture Trustee.  Such Participant shall have received (a) a certificate signed by the President, any Vice President, any Assistant Vice President, the Secretary or any Assistant Secretary of Indenture Trustee, dated such Closing Date, addressed to Loan Participant, Owner Trustee, Owner Participant and Amtrak and certifying as to the matters stated in Section 5.1(ix) hereof (insofar as such matters relate to Indenture Trustee) and (b) a certificate signed by the President, any Vice President, any Assistant Vice President or any other authorized officer of Trust Company, dated such Closing Date, addressed to Loan Participant, Owner Participant, Indenture Trustee and Amtrak and certifying as to the matters stated in Section 5.1(ix) hereof (insofar as such matters relate to Owner Trustee).

(xix)   Appraisal.  Owner Participant shall have received an appraisal, addressed to and in form and substance satisfactory to Owner Participant, from the Appraiser (a) setting forth the Fair Market Value as of such Closing Date of the Units to be delivered on such Closing Date, which shall be equal to the Lessor's Cost thereof, (b) setting forth the estimated remaining useful life of such Units as of such Closing Date, which shall not be less than 30 years, (c) to the effect that such Units are reasonably expected to have a Fair Market Value equal to at least 20% of the Lessor's Cost thereof (without taking into account any increase or decrease for inflation or deflation during such period) on the 23rd anniversary of the Base Lease Commencement Date, (d) to the effect that at the EBO Date, it is estimated that such Units will have a Fair Market Value that is not greater than the Adjusted EBO Price (after taking into account the reasonably estimated increase or decrease for inflation or deflation during the Base Lease Term to such EBO Date), (e) to the effect that the Fixed Rate Renewal Rent is not less than 105% of the projected (after taking into account the reasonable estimated increase or decrease for inflation or deflation during Base Lease Term to the Base Lease Expiration Date) of Fair Market Rental as of the Base Lease Expiration Date and (f) to the effect that at the end of the Base Lease Term and any Renewal Term, the use of each such Unit by a Person (other than Amtrak or an Affiliate of Amtrak) will be commercially feasible to such Person from an economic viewpoint and addressing such other matters as are deemed necessary by Owner Participant and its tax counsel. Loan Participant shall have received a letter, addressed to and in form and substance satisfactory to Loan Participant, from the Appraiser setting forth the Fair Market Value as of such Closing Date of the Units to be made subject to the Lease on such Closing Date, the Appraiser's basis therefor and confirming its expertise and independence.

(xx)   Payment of Taxes.  All Taxes, if any, payable in connection with the execution, delivery, recording and filing of the documents and instruments referred to in Section 5.1(vi), or in connection with the issuance of the Secured Notes and the making by Owner Participant of its investment on such Closing Date, shall have been duly paid in full by Amtrak or otherwise provided for by Amtrak. All sales taxes and duties, if applicable, related to the consummation of the transactions contemplated by the Operative Documents on such Closing Date shall, if then due, have been duly paid in full by Amtrak, to the extent not included in the Lessor's Cost of the Equipment.

(xxi)    <u>Governmental Actions</u>.  All actions required to have been taken on or prior to such Closing Date in connection with the transactions contemplated by this Agreement on such Closing Date shall have been taken by any governmental or political agency, subdivision or instrumentality of the United States and all orders, permits, waivers, exemptions, authorizations and approvals of such entities required to be in effect on such Closing Date in connection with the transactions contemplated by this Agreement on such Closing Date shall have been issued, and all such orders, permits, waivers, exemptions, authorizations, and approvals shall be in full force and effect, on such Closing Date.

(xxii)    <u>No Threatened Proceedings</u>.  No action or proceeding shall have been instituted nor shall governmental action be threatened before any court or governmental agency, nor shall any order, judgment or decree have been issued or proposed to be issued by any court or governmental agency at the time of such Closing Date, to set aside, restrain, enjoin or prevent the completion and consummation of this Agreement or the transactions contemplated hereby.

(xxiii)    <u>Withholding Exemption</u>.    Indenture Trustee shall have received a complete and effective original signed copy of United States Internal Revenue Service Form W-8 ECI and/or W-8 BEN (as applicable) evidencing Loan Participant's qualification for complete exemption from U.S. federal income tax with respect to payments of interest made under the Indenture and the Secured Notes.

(xxiv)    <u>Insurance</u>.  Such Participant, Indenture Trustee and Owner Trustee shall have received satisfactory evidence as to the due compliance by Amtrak with the terms of the Lease relating to any required insurance with respect to the Units delivered on such Closing Date.

(xxv)    <u>Secured Notes</u>.  Owner Trustee shall have duly issued and executed, and Indenture Trustee shall have authenticated and delivered to Loan Participant Secured Notes of the appropriate series dated such Closing Date in aggregate principal amount equal to Loan Participant's Commitment for such Units.

(xxvi)    <u>Satisfactory Proceedings</u>.  All proceedings taken in connection with the transactions contemplated hereby and all documents and papers relating thereto shall be reasonably satisfactory to the Participants and their counsel, and such Participants and their counsel shall have received copies of such documents and papers as such Participants or their counsel reasonably may request in connection therewith or as a basis for such counsel's closing opinion, all in form and substance reasonably satisfactory to such Participants and their counsel.

(xxvii)    <u>Closing Date</u>.    Such Closing Date shall occur not later than September 30, 2001.

(xxviii)    <u>Change in Tax Law or Proposed Change in Tax Law</u>.  No Change in Tax Law or Proposed Change in Tax Law shall have occurred on or prior to such Closing Date that in the reasonable opinion of Owner Participant would adversely affect (a) the Federal tax treatment to Owner Participant of the transactions contemplated by this Agreement, or (b) Owner Participant's Net Economic Return, in each case, with respect to which an adjustment under Section 16(i) is not feasible.

(xxix) <u>Babcock & Brown Letter</u>.   Such Participant shall receive a letter satisfactory in form and substance from Babcock & Brown as to certain matters described in Section 4.1(viii).

(xxx) <u>Weighted Average Cost of Capital Letter</u>.   Owner Participant shall receive a weighted average cost of capital letter acceptable in form and substance from Amtrak.

(xxxi) <u>French Lease Opinion</u>.   The Participants shall have received an opinion with respect to the French Documents from Norton Rose, special French counsel to the French Lessors, in form and substance reasonably satisfactory to the Participants.

(xxxii) <u>Certificate of Conditional Acceptance</u>.   Owner Participant shall receive a copy of a Certificate of Conditional Acceptance with respect to the Units delivered on such Closing Date.

(xxxiii) <u>FRA Qualification</u>.   The Participants shall receive a copy of the FRA qualification with respect to the Units delivered on such Closing Date.

A copy of each instrument, opinion or other document referred to in this Section 5.1 (other than the Tax Indemnity Agreement, the opinions referred to in paragraphs (xiii) and (xiv) and the appraisal referred to in paragraph (xviii) of this Section 5.1) shall be delivered to Owner Trustee and Indenture Trustee, and Owner Trustee and Indenture Trustee shall be entitled to rely on such instruments, opinions or other documents as true copies of the originals thereof.

5.2   **Conditions to Obligations of Amtrak**.   The obligation of Amtrak to accept delivery of any Unit under the Lease on each Closing Date is subject to the fulfillment to the satisfaction of or waiver by Amtrak prior to or on such Closing Date of the following conditions (provided that the following conditions shall be deemed fulfilled with respect to such Unit if Amtrak accepts delivery of such Unit under the Lease):

(i) <u>Governmental Actions</u>.   All appropriate actions required to have been taken on or prior to such Closing Date in connection with the transactions contemplated by this Agreement shall have been taken by any governmental or political agency, subdivision or instrumentality of the United States and all orders, permits, waivers, exemptions, authorizations and approvals of such entities required to be in effect on such Closing Date in connection with the transactions contemplated by this Agreement shall have been issued, and all such orders, permits, waivers, exemptions, authorizations and approvals shall be in full force and effect, on such Closing Date.

(ii) <u>Certain Participants' Conditions Satisfied</u>.   The conditions precedent specified in Sections 5.1(ii), (iii) and (iv) shall have been satisfied.

(iii) <u>Operative Documents</u>.   The Operative Documents relating to the Units to be delivered on such Closing Date shall each be reasonably satisfactory in form, scope and substance to Amtrak, shall have been duly authorized, executed and delivered by the respective party or parties thereto (other than Amtrak) in the manner specified in Section 5.1(v) and shall each be in full force and effect on such Closing Date, and an executed counterpart of each

thereof (or copies thereof where indicated in Section 5.1(v)) shall have been delivered to Amtrak or its special counsel.

(iv)   Receipt of Certain of the Participants' Closing Documents.   Amtrak shall have received a copy of the documents referred to in Section 5.1(vii) (other than those relating to Amtrak) and the certificates described in Sections 5.1(xvi)(b), (xvii) and (xxii) in form, scope and substance reasonably satisfactory to Amtrak.

(v)   Certain Legal Opinions.   Amtrak shall have received the opinions described in Sections 5.1(xi), (xii)(a and b), (xiv) and (xvi), in each case addressed to Amtrak and dated such Closing Date and in form, scope and substance reasonably satisfactory to Amtrak.

(vi)   No Threatened Proceedings.   No action or proceeding shall have been instituted nor shall governmental action be threatened before any court or governmental agency, nor shall any order, judgment or decree have been issued or proposed to be issued by any court or governmental agency at the time of such Closing Date, to set aside, restrain, enjoin or prevent the completion and consummation of this Agreement or the transactions contemplated hereby.

(vii)   No Illegality.   No change shall have occurred after the date of the execution and delivery of this Agreement in Applicable Law or regulations thereunder or interpretations thereof by appropriate regulatory authorities that would make it illegal for Amtrak to enter into any transaction contemplated by the Operative Documents relating to the Units to be delivered on such Closing Date.

(viii)   Change in Tax Law; Adjustments.   No Change in Tax Law shall have occurred on or prior to such Closing Date that in the reasonable opinion of Amtrak affects or could affect the  tax treatment to Amtrak of the transactions contemplated by this Agreement, with the result that, in the reasonable judgment of Amtrak, such tax treatment is adversely affected or the value to Amtrak of its contemplated use of such Units will or could be diminished.  No event of the type described in Section 16(i)(a) or (b) shall have occurred on or prior to such Closing Date that in the reasonable opinion of Amtrak would result in an adjustment to Base Rent under Section 16 which increases the net present value of Base Rent by more than 100 basis points.

(ix)   Babcock & Brown Letter.   Amtrak shall receive a letter satisfactory in form and substance from Babcock & Brown as to certain matters described in Section 4.1(viii).

## SECTION 6.   INDEMNITIES BY AMTRAK

### 6.1   General Tax Indemnity

(i)   General.   Amtrak agrees that each payment of Rent shall be free and clear of, and without deduction for, any and all withholdings on account of Taxes (as defined below) of any nature whatsoever.  If any such deduction or withholding is required, Amtrak shall pay an additional amount such that the net amount actually received by the recipient of such payment, after such deduction or withholding, will be equal to the amount that would have been received if no such deduction or withholding had been required.  If Amtrak pays an additional amount pursuant to the preceding sentence in respect of any Taxes that are not subject to indemnification

pursuant to the following provisions of this Section 6.1(i), then the Indemnified Party for whose account such Taxes were paid (or, if Lessor, Owner Participant) shall reimburse Amtrak for such Taxes within 30 days of written notice accompanied by evidence of payment of such Taxes paid by Amtrak.   Amtrak agrees to pay and assume the liability for, and does hereby agree to indemnify, protect, defend and hold harmless on an After-Tax Basis each Indemnified Party from and against, any and all taxes (including income, franchise, doing business, excise, sales, use, value-added, gross receipts, ad valorem, property and stamp taxes), duties, assessments, fees (including documentation, license, filing, recording and registration fees) and charges, together with any penalties, fines, additions to tax, interest or other charges in respect thereof, however imposed, whether levied or imposed upon such Indemnified Party, Amtrak or the Equipment or any Unit thereof or any user thereof by any federal, state or local government or other taxing authority of or in the United States, any territory or possession of the United States, any international authority or any foreign country or political subdivision or taxing authority thereof or therein (all such taxes, duties, assessments, fees, charges, penalties, fines, additions to tax and interest imposed as aforesaid, whether now existing or hereafter enacted or adopted, being hereinafter referred to as "*Taxes*") upon or with respect to: each Unit or any part thereof or interest therein, the manufacture, financing, refinancing, mortgaging, construction, acceptance, rejection, transfer, control, operation, condition, occupancy, servicing, maintenance, repair, abandonment, substitution, replacement, purchase, sale, ownership, delivery, nondelivery, registration, reregistration, leasing, subleasing, hire, presence, location, alteration, addition, renovation, insuring, possession, repossession, use, non-use, interchange, storage or the imposition of any lien, modification, improvement, transfer of title, return or other disposition thereof; any indebtedness with respect thereto; the rentals, receipts or earnings arising therefrom; the execution or delivery of, or the exercise of any rights or remedies under, the Operative Documents, or any amendment or supplement thereto and any other documents contemplated thereby or the transaction contemplated thereby; the payment or receipt of any amounts pursuant to the Operative Documents, or any amendment or supplement thereto and any other documents contemplated thereby or the transaction contemplated thereby, or otherwise in connection with the transactions contemplated by the Operative Documents, excluding, however:

(a)   Taxes imposed on Trust Company or Indenture Trustee that are with respect to or measured by any trustee fees received by Owner Trustee or Indenture Trustee for services rendered under the Trust Agreement or the Indenture;

(b)   Taxes imposed on any Indemnified Party to the extent that such Taxes result from the gross negligence or willful misconduct of such Indemnified Party, or from the breach by such Indemnified Party of any of its representations, covenants or obligations under the Operative Documents;

(c)   Taxes imposed on Owner Trustee or Owner Participant as a result of a voluntary sale, assignment, transfer or other disposition by Owner Participant or Owner Trustee of any interest in the Equipment, any Unit or any part thereof, or the Trust Estate or any Operative Document, or of an involuntary sale, assignment, transfer or other disposition in connection with any bankruptcy or other proceedings for the relief of debtors in which Owner Participant is the debtor, or any foreclosure by a creditor of Owner Participant, unless, in each case, such sale, assignment, transfer or other disposition results from a transfer or disposition made pursuant to an exercise of remedies following a Lease Event of Default, arising in

connection with any Casualty Occurrence, the use or maintenance of any Unit during the Lease (including replacement and substitution of parts and modifications and improvements to any Units), any sublease or assignment of Amtrak's or any sublessee's rights during the Lease, the return of any Unit upon termination of the Lease with respect to that Unit, the purchase of the Equipment or any Unit by Amtrak pursuant to Section 16 of the Lease, the substitution of any Replacement Unit pursuant to Section 7 of the Lease, or a purchase of any Unit pursuant to Section 17.1(iii) of the Lease, or a termination of the Lease with respect to any Unit under Section 26 of the Lease;

(d)     Taxes imposed on Indenture Trustee, any holder of a Secured Note or the Trust Indenture Estate as a result of a sale, assignment, transfer or other disposition (whether voluntary or involuntary) by such Indemnified Party of any interest in the Equipment or any Unit or any part thereof, or a Secured Note, Trust Estate or the Trust Indenture Estate other than a sale, assignment, transfer or other disposition (1) following a Lease Event of Default or (2) arising in connection with any Casualty Occurrence, the use or maintenance of any Unit during the Lease (including replacement and substitution of parts and modifications and improvements to any Units), any sublease or assignment of Amtrak's or any sublessee's rights during the Lease, the return of any Unit upon termination of the Lease with respect to that Unit, the purchase of the Equipment by Amtrak pursuant to the Operative Documents, the substitution of any Replacement Unit pursuant to Section 7 of the Lease or a termination of the Lease with respect to any Unit under Section 26 of the Lease;

(e)     Taxes imposed on an Indemnified Party with respect to any period commencing after the later of (i) the expiration or earlier termination of the Lease and (ii)(1) possession of the Equipment has been redelivered to Owner Trustee in accordance with the terms of the Lease or (2) in the case of any holder of a Secured Note, if later, the Secured Notes or the notes issued pursuant to Article II of the Indenture are no longer Outstanding, unless such Taxes relate to events or matters occurring prior to or coincident with such expiration, termination or redelivery;

(f)     Taxes (without regard to whether such Taxes are collected by withholding or otherwise) imposed on an Indemnified Party (other than Indenture Trustee, Loan Participant, any holder of a Secured Note and their respective successors and assigns and the Affiliates, agents, officers, directors, servants and employees of any thereof) by any state or local government or taxing authority in the United States (and any interest, additions to tax, penalties, fines or other charges in respect thereof) that are imposed on, based on or measured by net income (including without limitation capital gains taxes, excess profits tax, minimum taxes, alternative minimum taxes and taxes on tax preference items), provided, however, that the exclusion provided in this clause (f) shall not apply to taxes in the nature of property, sales, use, transfer, rental, license, excise, ad valorem, value added or stamp Taxes; provided further, however, that the exclusion provided in this clause (f) shall not apply to Taxes imposed by any state other than (i) states in which any of the Equipment will operate as of the Closing Date, (ii) Virginia or (iii) North Carolina or (iv) the District of Columbia, (a "*Non-Northeast Corridor State*") or any local government or political subdivision or tax authority of a Non-Northeast Corridor State to the extent such Taxes result from, or would not have been imposed but for (x) the location, operation, registration, or use of a Unit in such jurisdiction, (y) the identity, location, place of business, activities or presence of Lessee, any sublessee, user or person in

possession of any Unit or any Affiliate of the foregoing in such jurisdiction (including the execution and delivery by such Person of any Operative Document in such jurisdiction), or (z) the making of any payment under the Operative Documents by, or on behalf of, Lessee to an Indemnified Party in or from such jurisdiction.

(g)     Taxes (without regard to whether such Taxes are collected by withholding or otherwise) imposed on an Indemnified Party (other than Indenture Trustee, Loan Participant, any holder of a Secured Note and their respective successors and assigns and the Affiliates, agents, officers, directors, servants and employees of any thereof) by any state or local government or taxing authority in the United States (and any interest, additions to tax, penalties, fines or other charges in respect thereof) that are based on or measured by capital, receipts, net worth or intangibles, accumulated earnings tax, personal holding company tax or taxes in the nature of franchise or conduct of business taxes; provided, however, that the exclusion provided in this clause (g) shall not apply to property, sales, use, transfer, rental, license, excise, ad valorem, value added, stamp, or similar Taxes; provided further, however, that the exclusion provided in this clause (g) shall not apply to Taxes to the extent such Taxes result from, or would not have been imposed but for (x) the location, operation, registration, or use of a Unit in such jurisdiction, (y) the identity, location, place of business, activities or presence of Lessee, any sublessee, user or person in possession of any Unit or any Affiliate of the foregoing in such jurisdiction (including the execution and delivery by such Person of any Operative Document in such jurisdiction), or (z) the making of any payment under the Operative Documents by, or on behalf of, Lessee to an Indemnified Party in or from such jurisdiction.

(h)     Taxes (without regard to whether such Taxes are collected by withholding or otherwise) imposed by any foreign government or political subdivision or taxing authority thereof or any territory or possession of the United States or any international authority (and any interest, additions to tax, penalties, fines or other charges in respect thereof) on an Indemnified Party that are imposed on, based on or measured by gross or net income or gross or net receipts, capital gains taxes, excess profits tax, minimum taxes, alternative minimum taxes and taxes on tax preference items or that are capital, net worth, franchise, doing business, accumulated earnings tax, personal holding company tax or similar taxes and, in the case of a Loan Participant, any holder of a Secured Note and their respective successors and assigns and the Affiliates, agents, officers, directors, servants and employees of any thereof, that are imposed by reason of such Indemnified Party's being organized in or having any presence or activities in such jurisdiction unrelated to the transactions contemplated by the Operative Documents; provided, however, that the exclusion provided in this clause (h) shall not apply to (1) property, sales, use, rental, license, excise, value-added, ad valorem or stamp Taxes or Taxes imposed under Section 4975 of the Code or (2) such Taxes that would not have been imposed but for (x) the location, operation, registration, or use of a Unit in such jurisdiction, (y) the identity, location, place of business, activities or presence of Lessee, any sublessee, user or person in possession of any Unit or any Affiliate of the foregoing in such jurisdiction (including the execution and delivery by such Person of any Operative Document in such jurisdiction), or (z) the making of any payment under the Operative Documents by Lessee, or on behalf of, to an Indemnified Party in or from such jurisdiction;

(i)     Taxes (without regard to whether such Taxes are collected by withholding or otherwise) imposed on an Indemnified Party (other than Indenture Trustee, Loan

Participant or any holder of a Secured Note (in each case that is a Non-U.S. Person and either EDC or a Permitted Loan Participant (as defined in the Indenture)) and their respective successors and assigns and the Affiliates, agents, officers, directors, servants and employees of any thereof) by the United States government (and any interest, additions to tax, penalties, fines or charges in respect thereof), that are imposed on, based on or measured by gross or net income or receipts, or accumulated earnings taxes, personal holding company taxes, capital, net worth, excise taxes, capital gains taxes, minimum taxes, taxes imposed by Section 59A of the Code and taxes on or measured by tax preference items; provided, however, the exclusion provided in this clause (i) shall not apply to property, sales, use, rental, license, excise, value-added, ad valorem or stamp Taxes or Taxes imposed under Section 4975 of the Code;

(j)     Taxes (without regard to whether such Taxes are collected by withholding or otherwise) imposed on Owner Trustee or Owner Participant by any taxing authority of any jurisdiction to the extent that such Taxes would not have been imposed by such authority in the absence of activities of Owner Participant or Owner Trustee, as the case may be, in such jurisdiction unrelated to the transactions contemplated by the Operative Documents, and Taxes imposed on Indenture Trustee, Loan Participant or any holder of a Secured Note by reason of such Indemnified Party's being organized in or having any presence or activities in such jurisdiction unrelated to its participation in the transactions contemplated by the Operative Documents;

(k)     Taxes imposed on any Indemnified Party in the nature of penalties, additions to tax, interest or fines in connection with the performance of, or failure to perform, any requirement imposed on such Indemnified Party under this Section 6.1 if such Indemnified Party failed to perform such requirement or, with respect to any return otherwise required to be filed by such Indemnified Party without regard to the transactions contemplated by the Operative Documents, in connection with the preparation or filing of such tax returns by such Indemnified Party or the payment of such Indemnified Party's taxes required to be shown in such returns or the conduct of any proceeding in respect thereof;

(l)     Taxes imposed on an Indemnified Party to the extent they exceed the amount of Taxes that would have been imposed had that Indemnified Party been the original Indemnified Party from which such Indemnified Party's interest in any Unit, any interest in the Trust Estate, any interest in or under any Operative Documents or any proceeds thereunder, or any interest in the Trust Indenture Estate or the Secured Notes, was directly or indirectly derived; provided, however, the exclusion provided in this clause (l) shall not apply to transferees that acquired their interest in connection with the exercise of remedies following a Lease Event of Default the purchase of a Unit or a beneficial interest in the Trust Estate pursuant to Section 16 or to any Permitted Loan Participant that is a Non-U.S. Person (as those terms are defined in the Indenture); and shall not apply to "gross-up" amounts necessary to make payments on After Tax Basis, as required under the Operative Documents;

(m)     Taxes imposed on Owner Trustee or Owner Participant resulting from, or which would not have occurred but for, a Lessor's Lien or Owner Participant's Lien, respectively;

(n)     Taxes that are being contested as provided in Section 6.1(ii), unless required to be paid pursuant to Section 6.1(ii), but only for so long as Amtrak is complying with its obligations under Section 6.1(ii);

(o)     Taxes included in Equipment Cost and if paid by Lessee to the proper taxing authority;

(p)     Any Taxes imposed on an Indemnified Party to the extent such Taxes are actually utilized by such Indemnified Party as determined in good faith in the same taxable year (or, if the Taxes are imposed on Owner Trustee, to the extent they are actually utilized by Owner Trustee or Owner Participant) as a credit against Taxes not indemnified under this Section 6.1(i);

(q)     Taxes that would not have been imposed but for any failure of an Indemnified Party to comply with (1) certification, information, documentation, reporting or other similar requirements concerning the nationality, residence, identity or connection with the jurisdiction imposing such Taxes, or (2) any other certification, information, documentation, reporting or other similar requirements under the Tax laws or regulations of the jurisdiction imposing such Taxes that would establish entitlement to otherwise applicable relief or exemption from such taxes, if in either case, such compliance is required by law as a condition to relief or exemption from such tax and such Indemnified Party was eligible to comply with such requirement and avail itself of the applicable exemption, provided that this exclusion (q) will not apply if such failure results from the failure of Lessee to notify the Indemnified Party of such requirements with respect to taxes and provide reasonable assistance in complying with such requirements (and reimburse the out-of-pocket expenses of such party with respect to such compliance) or the Indemnified Party determines in good faith that such compliance would expose it or any Affiliate to any adverse consequence or risk thereof;

(r)     Taxes to the extent imposed on Owner Participant or Owner Trustee by reason of the trust described in the Trust Agreement being taxed in the same manner as a corporation;

(s)     Taxes that would not have been imposed but for any amendment to any Operative Document to which any Indemnified Party is a party and to which Lessee is not a party which amendment is not initiated or requested by or consented to by Lessee or any Affiliate in writing, other than any amendment (A) that may be necessary or appropriate to, and is in conformity with any Amendment to any Operative Document initiated or requested by or consented to by Lessee or any Affiliate in writing, or (B) that is due to or in connection with an Event of Default; or

(t)     Taxes imposed on an Indemnified Party which are in the nature of value added taxes imposed by the United States to the extent clearly and demonstrably imposed in replacement of or substitution for an income tax.

Notwithstanding the exclusions set forth in this Section 6.1 or any other provision of the Operative Documents, Lessee hereby agrees to indemnify and hold harmless on a net After-Tax Basis the Trust Estate, Owner Trustee and Owner Participant for any failure to withhold taxes

upon payments of principal, interest, premium or discount on the Secured Notes (or any other debt outstanding with respect to the Equipment), including interest and penalties thereon.

(ii)    Contests.    Amtrak shall be entitled, at its expense, to require the imposition of any Tax for which it is obligated to indemnify hereunder to be contested and to withhold payment during pendency of such contest (if such forbearance is permitted by law) unless prior payment is a condition to such contest. At Amtrak's election, such contest shall be conducted by it in its name, but only if Amtrak is permitted as a matter of law to so contest such Taxes, the Indemnified Party has determined in good faith that its interests will not be materially adversely affected by Amtrak contesting in its own name, and such contest does not involve any Taxes not indemnified by Amtrak under Section 6.1(i) which cannot be severed and separately contested by the Indemnified Party and Amtrak shall have previously acknowledged in writing its obligation to indemnify the Indemnified Party in respect of such Taxes. Amtrak may conduct and control any other contest contemplated herein if consented to by the Indemnified Party (contests other than (i) those permitted in Amtrak's name, (ii) consented to be contested by Amtrak or (iii) in the case of Owner Participant or Owner Trustee involve the statutory exemption contained in 49 U.S.C. § 24301(k) or (l) (as amended, supplemented or superseded from time to time)(referred to as an "*Indemnified Party Controlled Contest*"). If any written claim is made or any proceeding is commenced against any Indemnified Party for any Taxes as to which Amtrak has an indemnity obligation pursuant to subsection (i) of this Section 6.1, such Indemnified Party shall promptly notify Amtrak of notice of any such claim or proceeding, but the failure to provide such notice shall not release Amtrak from its indemnity obligation hereunder except to the extent that Amtrak's contest is effectively precluded thereby. Amtrak shall have no right to require a contest hereunder at any time during which a Lease Event of Default shall have occurred and be continuing. If an Indemnified Party is requested by Amtrak in writing within 30 days of receipt of such notice from the Indemnified Party (provided that in the case of any such claim or proceeding, if such Indemnified Party shall be required by law or by regulation to take action prior to the end of such 30-day period, such Indemnified Party shall, in such notice to Amtrak, so inform Amtrak, and such Indemnified Party shall not take any action with respect to such claim or proceeding without the consent of Amtrak before the date on which the Indemnified Party shall be required by law or regulation to take such action) to contest an indemnifiable Tax and provided Amtrak is not contesting such Tax in its own name, the Indemnified Party shall, in good faith, with due diligence and at Amtrak's expense, contest the validity, applicability or amount of such Taxes by, in Amtrak's sole discretion or in the case of an Indemnified Party Controlled Contest, in such Indemnified Party's sole discretion, (a) resisting payment thereof, (b) not paying the same except under protest, if protest is necessary and proper, or (c) if payment is made, using reasonable efforts to obtain a refund thereof in appropriate administrative and judicial proceedings; provided, however, that the Indemnified Party shall not be required to take any action pursuant to this sentence unless and until Amtrak shall have agreed to pay on demand on an After-Tax Basis to such Indemnified Party all reasonable costs and expenses that such Indemnified Party may incur in contesting such claim (including, without limitation, all costs, expenses, losses, reasonable legal and accounting fees, disbursement, penalties, fines, additions to tax or interest thereon). In addition to any other conditions set forth herein, Amtrak shall be entitled to contest or to cause an Indemnified Party to contest a Tax pursuant to the foregoing provisions only (i) if such Indemnified Party shall have determined that the action to be taken will not result in a sale, forfeiture or loss of, or the creation of any Lien (other than a Permitted Lien) (unless Amtrak shall have adequately bonded

such Lien or otherwise made provision to protect the interests of the Indemnified Party and, if different, the interests of Owner Participant and Indenture Trustee, such other provision to be reasonably satisfactory to the applicable Indemnified Party and Indenture Trustee in their sole discretion) on, the Equipment or any Unit, (ii) if the amount of the Tax subject to the contest is at least $35,000, and (iii) if requested by such Indemnified Party provide the Indemnified Party with an opinion of tax counsel for Amtrak (including Amtrak's internal tax counsel with respect to matters arising under the statutory exemption set forth in 49 U.S.C. 24301(k) or (l), as amended, supplemented or superceded from time to time) to the effect that there is a reasonable basis for contesting such claim. Such amount shall be payable not later than 30 days after such refund, credit or benefit is received, realized or allowed. If any such contest involves payment of the Tax in question, Amtrak shall either make such payment directly to the appropriate authority or furnish to such Indemnified Party sufficient funds on an After-Tax Basis and interest free to make such payment (an "*Advance*").

In the case of any contest, other than an Indemnified Party Controlled Contest, Amtrak shall conduct and control such contest (including, without limitation, selecting the forum for such contest), provided in the case of any contest in the name of an Indemnified Party, such Indemnified Party shall have, upon request, the right to participate (including its counsel) in all proceedings and Amtrak shall (a) keep the Indemnified Party informed as to all material developments in such contest and afford the Indemnified Party a reasonable opportunity to discuss with Amtrak the Indemnified Party's interests with respect to such contest and (b) if requested by such Indemnified Party provide the Indemnified Party with an opinion of tax counsel for Amtrak (including Amtrak's internal tax counsel with respect to matters arising under the statutory exemption set forth in 49 U.S.C. 24301(k) or (l), as amended, supplemented or superceded from time to time) to the effect that there is a reasonable basis for contesting such claim. In the case of an Indemnified Party Controlled Contest, the Indemnified Party, shall conduct and control such contest, provided the Indemnified Party shall keep Amtrak informed as to all material developments in such contest and afford Amtrak a reasonable opportunity to discuss with such Indemnified Party, Amtrak's interests with respect to such contest, but the Indemnified Party shall have ultimate control over all aspects of such contest. In the case of an Indemnified Party Controlled Contest, in addition to any other conditions set forth herein, the Indemnified Party shall not be required to contest any such claim unless the Indemnified Party has been provided with an opinion of tax counsel for Amtrak (including Amtrak's internal tax counsel with respect to matters arising under the statutory exemption set forth in 49 U.S.C. 24301(k) or (l), as amended, supplemented or superceded from time to time) to the effect that there is a reasonable basis for contesting such claims. In no event shall an Indemnified Party be required (and Amtrak shall not have the right) to appeal any adverse determination to the United States Supreme Court.

If any Indemnified Party shall actually obtain or realize a refund of any Tax paid or indemnified against by Amtrak, or shall obtain a refund, credit, or other tax benefit (whether by way of deduction, offsets, allocation or apportionment of income or otherwise) in respect of Taxes not indemnified against under Section 6.1(i) as a result of any Tax paid or indemnified by Amtrak (which refund, credit or other tax benefit was not taken into account in computing the amount of the indemnity payable by Amtrak), such Indemnified Party shall pay Amtrak an amount equal to the amount of such refund, credit or tax benefit, including interest received attributable thereto, reduced by reasonable out of pocket expenses incurred in connection with

obtaining such refund, credit or tax benefit not previously reimbursed, for which reasonable and customary documentation of such payment has been provided to Amtrak, plus any net tax benefit (and minus any net tax detriment) realized (or sustained) by such Indemnified Party as a result of any refund received, credits, tax benefit or interest and payment by such Indemnified Party made pursuant to this sentence; provided, however, that (a) the amount of any such payment by the Indemnified Party to Amtrak shall not exceed the aggregate amounts previously paid by Amtrak to such Indemnified Party pursuant to this Section 6.1 plus the interest thereon received or credited by such Indemnified Party as described above, but any such excess shall be carried forward and reduce Amtrak's obligations to make subsequent payments to such Indemnified Party pursuant to Section 6.1(i) hereof and (b) such amount shall not be payable so long as a Specified Default or Lease Event of Default has occurred and is continuing.  Such amount shall be payable not later than 30 days after such refund, credit or benefit is received, realized or allowed.  If any such Tax refund, credit or benefit is subsequently disallowed, the amount so disallowed shall be treated as a Tax subject to indemnification under this Section 6.1 without regard to the exclusions or contest provisions in this Section 6.1.

Notwithstanding anything contained in this Section 6.1 to the contrary, the Indemnified Party shall not be required to contest any claim if the subject matter thereof shall be of a continuing nature and shall previously have been decided adversely by a court of competent jurisdiction pursuant to the contest provisions of this Section 6.1(ii), unless there shall have been a change in law (or interpretation thereof) or a change in facts after the date with respect to which such previous contest shall have been decided, and the Indemnified Party shall have received, at Amtrak's expense, an opinion of independent tax counsel selected by such Indemnified Party and reasonably acceptable to Amtrak to the effect that as a result of such change in law (or interpretation thereof) or change in facts, it is more likely than not that the Indemnified Party will prevail in such contest.

Nothing contained in this Section 6.1 shall require any Indemnified Party to contest or permit Amtrak to contest a claim which it would otherwise be required to contest pursuant to this Section 6.1 if such Indemnified Party shall (a) waive payment by Amtrak of any amount that might otherwise be payable by Amtrak under this Section 6.1 by way of indemnity in respect of such claim and (b) repay to Amtrak any amounts paid by Amtrak as an Advance pursuant to the last sentence of the first paragraph of this subsection (ii) of Section 6.1.

(iii)   Payments.  All Taxes shall be paid when due and payable and all amounts payable as indemnities pursuant to this Section 6.1 shall be payable to the extent not theretofore paid, on written demand by the appropriate Indemnified Party; provided, however, that in the case of Taxes which are being contested pursuant to subsection (ii) of this Section 6.1, any amount payable by Amtrak pursuant to subsection (i) of this Section 6.1, shall, unless otherwise required by Subsection (ii) of this Section 6.1, not be required to be paid, until 30 days after the time such contest is finally resolved.

(iv)   Reports and Returns.  In case any report or return shall be required to be made with respect to any Tax which is indemnifiable by Amtrak under or arising out of this Section 6.1, Amtrak shall (a) to the extent required or permitted by law, timely make and file in its own name such return, statement or report, and in the case of any other such return, statement or report required to be made in the name of any Indemnified Party, advise such Indemnified

Party of such fact and prepare such return, statement or report for filing by such Indemnified Party or (b) where such return, statement or report shall be required to reflect items in addition to any obligation of Amtrak under or arising out of this Section 6.1 and such Indemnified Party elects to file such return, statement or report, provide such Indemnified Party with information sufficient to permit such return, statement or report to be properly made with respect to any obligations of Amtrak under or arising out of this Section 6.1.

(v)     Records and Receipts; Best Efforts.  Amtrak agrees to use its best efforts to obtain official receipts indicating the payment of all Taxes that are subject to indemnification under this Section 6.1 and that are paid by Amtrak and shall promptly send to the Indemnified Party each such receipt obtained by Amtrak.  Amtrak and Owner Participant agree to use their best efforts to avoid the imposition of any sales taxes in connection with a disposition of any Unit.

Within a reasonable time after Amtrak receives from an Indemnified Party a written request for specified information or copies of specified records reasonably necessary to enable such Person to file its Tax returns or to contest Taxes imposed upon it, including information specifying the location of the Equipment during the Tax filing period to which the return or contest relates, Amtrak shall, if reasonably available, provide such information or copies of such records to the requesting party.

(vi)    Tax Indemnity Payments as Supplemental Rent.  All indemnities payable by Amtrak pursuant to this Section 6.1 shall be treated as obligations of Amtrak under the Lease and shall constitute Supplemental Rent under the Lease; provided, however, that all such amounts shall be payable directly to the Indemnified Party entitled thereto.

(vii)   Payments on After-Tax Basis.   Amtrak agrees that, notwithstanding anything to the contrary that may be contained herein, with respect to any payment or indemnity under this Section 6.1, Amtrak's indemnity obligation shall include any amount necessary to hold the Indemnified Party harmless on an After-Tax Basis.

(viii)  [Reserved].

(ix)    Interest.  Amtrak will pay as Supplemental Rent to each Indemnified Party, with the payment to which it relates without the necessity of demand to the extent permitted by Applicable Law, interest at the Overdue Rate on the amount of any indemnity not paid when due pursuant to this Section 6.1 until the same shall be paid.  Each Indemnified Party shall pay interest to Amtrak, to the extent permitted by Applicable Law, at the Overdue Rate, on the amount of any payment due from such Indemnified Party to Amtrak from the due date until paid.  Such interest shall be paid in the same manner as the unpaid amount in respect of which such interest is due.

(x)     Affiliated Group.  For purposes of this Section 6.1, the term "*Indemnified Party*" shall include any combined, consolidated or affiliated group (and any member thereof) of which Owner Participant is or shall become a member if combined or consolidated returns are or shall be filed for such affiliated group for foreign, federal, state or local Tax purposes.

(xi)     Survival.    All indemnities, obligations, adjustments and payments provided for in this Section 6.1 shall survive, and remain in full force and effect, notwithstanding the expiration or other termination of this Agreement, the Lease or any other Operative Document.    The obligations of Amtrak in respect of all such indemnities, obligations, adjustments and payments are expressly made for the benefit of, and shall be enforceable by, the Indemnified Party entitled thereto, without declaring the Lease to be in default or taking other action thereunder, and notwithstanding any provision of the Indenture.

(xii)    Verification.    The computations required to be made under this Section 6.1 shall, at Amtrak's expense and written request, be verified in writing by any nationally recognized firm of certified public accountants selected by Amtrak and reasonably acceptable to the Indemnified Party; provided that, the costs of such verification shall be borne by the Indemnified Party if, according to such verification, the Indemnified Party's computation should be reduced by 5% or more in the case of an indemnity payment or increased by 5% or more in the case of a tax benefit payment. Such determination shall be final and binding, absent manifest error on the part of the certified public accountants. Indemnified Parties hereby agree to provide the accountants with all information and materials (other than tax returns or books) as shall be reasonably necessary or desirable in connection therewith. Any information provided to such accountants by any Person shall be deemed by the parties to be (and the accountants will confirm in writing that they will treat such information as) the private, proprietary and confidential property of such Person, and no Person other than such Person and the accountants shall be entitled thereto, other than as required by law. Amtrak and the Indemnified Party agree that the accountant's sole responsibility shall be to verify the amount of any payment hereunder and that matters of interpretation are not within the scope of the accountant's responsibility.

(xiii)    Withholding.    Notwithstanding anything to the contrary in this Section 6.1, all payments to EDC as a holder of the Secured Notes, to the extent permitted by law, will be made without deduction for and free from any present or future Taxes, except those levied or imposed by or within Canada. Amtrak covenants and agrees to pay or cause to be paid all present or future Taxes levied or imposed (other than by or within Canada) on or in connection with the execution, issuance, delivery, registration and enforcement of this Participation Agreement, the Indenture or the Secured Notes or the payment of principal or interest thereunder or of any other sums payable to EDC, in its capacity as a Note Holder, by Amtrak or Owner Trustee pursuant hereto or with respect to the Overall Transaction, including all additional amounts and penalties payable in respect of any delay or failure of Owner Trustee to pay any such Taxes. Amtrak shall not be required to pay or discharge any such Taxes, provided that no Lease Event of Default shall have occurred and be continuing, and so long as it shall in good faith and by appropriate administrative or legal proceedings contest the validity thereof in a reasonable manner which will not affect or endanger the right, title or interest of Owner Trustee or the security interest of Indenture Trustee in the Trust Indenture Estate, and Amtrak shall reimburse Owner Trustee and EDC for any damages or expenses resulting from such failure to pay or discharge. If any such Taxes are deducted or withheld from any such payments, Amtrak hereby agrees to promptly remit to EDC or to Owner Trustee to the extent the amount of the payment to EDC was increased pursuant to Section 2.04(b) of the Indenture the equivalent of the amounts so deducted or withheld; provided, however, unless Amtrak otherwise consents, Amtrak shall be released from its obligations under this Section 6.1(xiii), (1) following any transfer by succession or assignment of EDC's complete interest as a Note Holder (or, if a

part of its interest is transferred, to the extent of such part) as a holder of the Secured Note, (2) with respect to withholdings resulting from the failure of EDC to provide the information or certificates to Owner Trustee and Indenture Trustee pursuant to Section 2.04 of the Indenture or (3) if EDC (A) is not now or ceases to be an agent of or beneficially owned by Her Majesty in right of Canada or an instrumentality of Canada, (B) is now or becomes subject to tax in Canada or (C) carries on business in the United States through a permanent establishment in the United States, to the extent that the obligations of Amtrak under this Section would be greater than such obligations prior to such transfer or change in status of EDC as provided above. In the event of any conflict between this Section 6.1(xiii) and any other provision of Section 6.1 hereof with respect to any Taxes on payments to EDC, the terms of Section 6.1(xiii) shall control. Any payment by Amtrak pursuant to this clause (xiii) will be made on an After-Tax Basis to Owner Participant and Owner Trustee.

6.2    **General Indemnity**.

(i)    <u>Indemnity</u>. Whether or not any of the transactions contemplated by the Operative Documents are consummated, Amtrak hereby agrees to assume liability for, and does hereby agree to indemnify, protect, defend, and keep harmless each Indemnified Party, on an After-Tax Basis, from and against any and all liabilities, obligations, losses, damages, penalties, claims (including claims involving strict or absolute liability in tort or ordinary negligence), actions, suits, demands, judgments, costs, expenses and disbursements (including reasonable legal fees and expenses), of any kind and nature whatsoever ("*Claims*") which may be imposed on, incurred by or asserted against an Indemnified Party, whether or not such Indemnified Party shall also be indemnified as to any such Claim by any other Person, in any way relating to or arising or alleged to arise out of

(a)    this Agreement, any other Operative Document, any transactions contemplated hereby or thereby, any payments made pursuant thereto or the performance or enforcement of any of the terms hereof or thereof (including but not limited to any amendments, supplements, waivers or consents hereto or thereof, or a preservation of rights hereunder or thereunder);

(b)    the manufacture, construction, assembly, acquisition, improvements, preparation, installation, restoration, abandonment, dismantling application, testing, condition, modification, design, purchase, acceptance, rejection, ownership, documenting, mortgaging, delivery, nondelivery, lease, sublease, possession, use, non-use, operation, maintenance, registration, sale, ownership, rental, return, storage (other than storage pursuant to Section 17.1 of the Lease), transfer of title, or other disposition of the Equipment or any Unit thereof, or any event or occurrence (including but not limited to any accident) in connection therewith, including any relating to or arising out of latent or other defects, whether or not discoverable;

(c)    patent, trademark or copyright infringement relating to the transactions contemplated by the Operative Documents;

(d)     any injury to or the death of any Person (including without limitation any passengers, shippers or other Persons) or any damage to or loss of property on or near the Equipment or in any manner arising out of or connected with, or alleged to arise out of or be connected with, the ownership, use, replacement, operation or maintenance of the Equipment or of any other equipment in connection with the Equipment or resulting or alleged to result from the condition of any thereof;

(e)     any violation, or alleged violation, by Amtrak of any provision of this Agreement, the Lease, or any other Operative Document to which Amtrak is a party, or of any agreement, law, rule, regulation, ordinance or restriction, affecting or applicable to the Equipment, Owner Trustee or Owner Participant or the leasing, subleasing, ownership, use, replacement, operation or maintenance of the Equipment;

(f)     any injury to the environment or public health or safety, including Claims resulting from the generation, transportation, handling, transfer, delivery, disposition or discharge of hazardous or toxic wastes or substances including all claims involving the clean-up or remediation of environmental discharges; and

(g)     any governmental investigation or inquiry relating to any of the foregoing;

provided, that Amtrak shall not be required to indemnify an Indemnified Party under this Section 6.2 in respect of any Claim to the extent:

(a)     attributable to acts or events which occur after the Equipment is no longer leased under the Lease, unless such Claim arises in connection with a Lease Default or Lease Event of Default;

(b)     attributable to the gross negligence or willful misconduct of such Indemnified Party, or any Affiliates, agents, officers, directors, servants or employees thereof (other than gross negligence or willful misconduct imputed as a matter of law to such Indemnified Party solely by reason of its interest in the Equipment);

(c)     constituting or attributable to a Loss (other than with respect to Indenture Trustee, Equity Guarantor or Loan Participant) or to Taxes, whether or not Amtrak is required to indemnify therefor pursuant to Section 6.1 hereof or the Tax Indemnity Agreement, except to the extent that any payments are required to be made on an After-Tax Basis;

(d)     arising out of any sale, assignment, transfer or other disposition (whether voluntary or involuntary) of its interest in or to any part of the Trust Estate by Owner Participant or Owner Trustee or, in the case of Loan Participant, of any part of any Secured Note by any Note Holder thereof other than, in any such case, in connection with the exercise of rights or remedies following a Lease

Event of Default or the performance of an act required by any Operative Document or in connection with the transfer contemplated by Section 10.3 hereof;

(e)   attributable to the incorrectness in any respect of any representation or warranty by such Indemnified Party in the Operative Documents except to the extent based on representations and warranties made by Amtrak;

(f)   attributable to the failure by such Indemnified Party to perform or observe in any respect any agreement, covenant or condition on its part required to be performed or observed in any of the Operative Documents including the creation or existence, in the case of Trust Company, of a Lessor's Lien or, in the case of Owner Participant, of an Owner Participant's Lien;

(g)   arising out of the offer or sale by or on behalf or for the account of such Indemnified Party of the Secured Notes or any interest in the Trust Estate or the Trust Agreement or any similar interest (other than arising in connection with the exercise of rights or remedies following a Lease Event of Default or the performance of any act required by any Operative Document or at the request of Amtrak);

(h)   in the case of Indenture Trustee or Owner Trustee, respectively, arising out of a failure on the part of Indenture Trustee or Owner Trustee, as the case may be, to distribute in accordance with the Indenture or Trust Agreement any amounts received and distributable by it thereunder;

(i)   arising out of the authorization or giving or withholding of any future amendments, supplements, waivers or consents by such Indemnified Party with respect to any of the Operative Documents other than (A) such as have been requested or consented to by Amtrak or (B) in connection with the exercise of rights or remedies following a Lease Event of Default;

(j)   for any expense that is incurred by any such Indemnified Party (or any successor, assign, director, officer, employee, servant or agent of such Indemnified Party) to the extent that such Indemnified Party shall have expressly agreed in any Operative Document to bear such expense without right of reimbursement under any Operative Document;

(k)   for any amount payable by Owner Trustee under the Indenture resulting from an Indenture Event of Default that does not also constitute or result from a Lease Event of Default and was caused by an act or omission of Owner Participant;

(l)   in the case of Owner Participant, arising out of any expense that would not have been incurred but for the appointment of a successor Owner Trustee pursuant to Section 10.01 of the Trust Agreement; or

(m)     with respect to any Indemnified Party, any Claim to the extent attributable to transactions or business activities of such Indemnified Party not related to the Operative Documents or the transactions contemplated thereby.

(ii)     _Procedures, Etc._   If any Claim is made against Amtrak or any Indemnified Party, such party receiving notice of such Claim shall promptly notify Amtrak or such Indemnified Party, as the case may be, but if an Indemnified Party having received such notice fails to notify or delays in notifying Amtrak, Amtrak shall not be relieved from any liability it may have to such Indemnified Party or of any liability it may have to any other Indemnified Party with respect to such Claim except (in the case of the Indemnified Party required to notify Amtrak) to the extent of any increase in the amount of such Claim resulting from such failure or delay.  Subject to the rights of any insurer under any policy of insurance maintained pursuant to Section 8 of the Lease, Amtrak shall have (so long as it shall have confirmed in writing to the affected Indemnified Parties its obligation to indemnify such Claim) the right, at its sole cost and expense, acting through counsel selected by it with the consent of the respective Indemnified Party (such consent not to be unreasonably withheld or delayed) to investigate and defend or compromise any Claim for which it indemnifies under this Section and each Indemnified Party agrees to cooperate (at Amtrak's cost and expense) with all reasonable requests of Amtrak in connection therewith; provided, however, that (a) Amtrak shall have no such right (i) during the continuation of any Specified Default or any Lease Event of Default, or (ii) if such contest could, in the good faith opinion of the affected Indemnified Party (I) entail a significant risk to such Indemnified Party or an Affiliate thereof of (1) civil liability which exceeds Amtrak's ability to pay (as reasonably demonstrated to such Indemnified Party, taking into account the availability of insurance proceeds) or (2) claims not fully indemnified against by Amtrak or (II) entail any risk to such Indemnified Party or an Affiliate thereof of any criminal liability, and (b) Amtrak shall not take any action in connection with the investigation, defense or compromise of any Claim without the prior written concurrence of such Indemnified Party, not to be unreasonably withheld (except in the case of clause (ii) below), (i) if any such investigation, defense or compromise would create any danger (in the good faith opinion of such Indemnified Party) of the sale, forfeiture or loss of, or the creation of any Lien (other than a Permitted Lien) upon, the Equipment or any part thereof, the Trust Estate or the Trust Indenture Estate which would not otherwise occur, or (ii) if any such investigation, defense or compromise would, in the good faith opinion of such Indemnified Party, be inappropriate under applicable standards of legal professional conduct due to actual or potential conflicting interests.  Such Indemnified Party may participate at its own expense and with its own counsel reasonably satisfactory to Amtrak in any proceeding controlled by Amtrak pursuant to the preceding provisions; provided, however, that Amtrak shall pay the fees and expenses of such counsel if (x) the employment of such counsel has been specifically requested by Amtrak or (y) the named parties to such action (including any impleaded parties) include both such Indemnified Party and Amtrak and representation of such Indemnified Party and Amtrak by the same counsel would be inappropriate under applicable standards of legal professional conduct due to actual or potential conflicting interests between them (which are not waived by the parties).  The Indemnified Party shall supply Amtrak with such information as is available to the Indemnified Party and is requested by Amtrak as in the reasonable opinion of counsel to Amtrak is necessary or advisable for Amtrak to control or participate in any proceeding to the extent permitted by this Section 6.2. Unless such Indemnified Party waives its right to be indemnified with respect to a Claim under this Section or such claim, in the reasonable opinion of the Indemnified Party, exposes such

Indemnified Party to a risk of criminal liability, no Indemnified Party shall enter into a settlement or other compromise with respect to such Claim without the prior written consent of Amtrak, which consent shall not be unreasonably withheld or delayed. Each Indemnified Party further agrees, in the case of any Claim covered by any policy of insurance maintained pursuant to Section 8 of the Lease, to cooperate with the insurers in the exercise of their rights to investigate, defend or compromise such Claim as may be required by such policy to maintain the insurance coverage provided. To the extent that any Indemnified Party in fact receives complete and full indemnification payments from or on behalf of Amtrak under the indemnification provisions of this Section 6.2, Amtrak (or its insurers), without any further action, shall be subrogated, to the extent of such Indemnified Party's rights with respect to the transaction or event requiring or giving rise to such indemnity other than with respect to such Indemnified Party's rights in respect of insurance policies maintained by such Indemnified Party and other than with respect to such Indemnified Party's rights against Owner Participant under the Trust Agreement.

(iii)    Tax Benefits. If any Indemnified Party is entitled to a tax benefit (whether by way of deduction, credit or otherwise) as a result of the matter for which an indemnity has been paid pursuant to this Section 6.2 that was not taken into account in determining the amount of such payment, such tax benefit shall be treated as an amount payable pursuant to, and subject to the provisions of, the third paragraph of Section 6.1(ii). If it is subsequently determined that any such tax benefit is not allowable, the amount of such benefit shall be treated as a Tax subject to indemnification pursuant to Section 6.1 without regard to the exclusions or contest provisions of such Section 6.1. Without limiting the foregoing obligations of Amtrak, at Amtrak's request, any Indemnified Party claiming a payment or indemnity from Amtrak under this Section 6.2 will, to the extent such payment or indemnity included a "gross-up" for Taxes or takes into account any tax benefits of such Indemnified Party, and to the extent such Indemnified Party is required by the terms of this Section 6.2 to pay to Amtrak any additional tax benefit attributable to the matter indemnified against under this Section 6.2, have the reasonableness of the calculation by such Indemnified Party of the amount of any such "gross-up" for Taxes or the amount of any such additional tax benefit payable to Amtrak verified in accordance with the procedures set forth in Section 6.1(xii). In no event shall an Indemnified Party be obligated to pay Amtrak any amount pursuant to this paragraph that exceeds the amount of the indemnity paid by Amtrak in respect of the matters that gave rise to the tax benefit.

6.3    **Survival**. The indemnities contained in this Section 6 shall survive the expiration or termination of this Agreement and the other Operative Documents and payment in full of all sums due under the Operative Documents.

## SECTION 7.    EXPENSES.

### 7.1    **Transaction Expenses**

(i)    If Units become subject to the Lease as contemplated hereunder, (x) Owner Participant shall pay the following expenses (hereinafter referred to as *"Transaction Expenses"*) up to the amount specified in Schedule III (the *"Transaction Expenses Cap"*), and Amtrak shall pay the balance thereof: (a) the initial (but not ongoing) fees and disbursements of Owner Trustee and Indenture Trustee and Trust Company in its capacity as escrow agent under each Escrow Agreement and (b) all costs and expenses reasonably incurred by Owner

Participant, Owner Trustee, Equity Guarantor, if applicable, Indenture Trustee, Loan Participant or Amtrak in connection with the preparation, execution and delivery of the Operative Documents and any other documents referred to herein or therein (including the delivery of each Secured Note), including (1) the reasonable fees, expenses and disbursements of Thelen Reid & Priest LLP, special counsel for Amtrak; McCarthy Tétrault, special Canadian counsel for Amtrak; Alvord and Alvord, special STB counsel for Amtrak; Babcock & Brown, financial advisor for Amtrak; Morris, James, Hitchens & Williams LLP, special counsel for Owner Trustee; Hunton & Williams, special counsel for Owner Participant; Watson, Farley and Williams, special French counsel to Owner Participant; Osler Hoskin & Harcourt, special Canadian counsel to Owner Participant; Vedder, Price, Kaufman & Kammholz, special counsel to Loan Participant and Equity Guarantor; Miles & Stockbridge, P.C., counsel for Indenture Trustee; and the independent appraiser in connection with the appraisal required by Section 5.1(xviii), for services rendered in connection with any such transactions by any such Persons, and (2) all other expenses in connection with such transactions, including Owner Participant's "out-of-pocket" expenses, internal documentation fees, printing and reproduction expenses, any travel costs of Loan Participant or Equity Guarantor and all fees, taxes and other charges payable in connection with the recording or filing of instruments (including financing statements) described in, or the recording or filing of which is contemplated by or required under the provisions of, this Agreement, the Lease, the Trust Agreement or the Indenture; provided, that, if there shall be any Transaction Expenses in excess of the Transaction Expenses Cap, Owner Participant shall have the right to specify by notice to Amtrak which of the Transaction Expenses shall be paid by Owner Participant (up to the Transaction Expenses Cap), on the one hand, and Amtrak on the other hand, so long as the total amount of the Transaction Expenses paid, or so specified as to be paid, by Owner Participant is not less than the Transaction Expenses Cap.

(ii)     If Units do not become subject to the Lease for any reason whatsoever, except as set forth in the immediately succeeding proviso, Amtrak shall bear and be responsible for all Transaction Expenses; provided, however, if the Units do not become subject to the Lease because of a failure of any party (other than Amtrak) to comply with its obligations set forth in Section 2 after satisfaction of all conditions set forth in Section 3 to such party's satisfaction, then such party shall be responsible for its own Transaction Expenses including the fees and expenses of its counsel (but not for the Transaction Expenses of any other party).  A party's acceptance of primary responsibility for all or any portion of Transaction Expenses under this Section 7.1(ii) shall not constitute a waiver by such party of any rights against a breaching party for damages, including reimbursement of such Transaction Expenses.

(iii)     Each of the Transaction Expenses shall be evidenced by appropriate bills or invoices and approved by Amtrak, insofar as practicable, prior to the Closing Date to which such Transaction Expense relates.  Amtrak shall have the right to receive and review any reasonable substantiation relating to any Transaction Expenses as it may reasonably request prior to approving same for inclusion in Transaction Expenses.  It is expressly understood and agreed that, insofar as practicable, all Transaction Expenses up to the Transaction Expenses Cap, to the extent properly evidenced and approved in accordance with this Section 7.1, shall be paid by Owner Participant on or after such Closing Date.

7.2     **Ongoing Expenses**.  Amtrak agrees to pay as Supplemental Rent all ongoing fees and reasonable out-of-pocket expenses (including reasonable legal fees) of Owner

Trustee and Indenture Trustee incurred in connection with the performance of their duties under the Operative Documents and of Trust Company in its capacity as escrow agent under each Escrow Agreement. Each of the expenses referred to in this Section 7.2 shall be evidenced by appropriate bills or invoices. Amtrak shall have the right to receive and review any substantiation relating to such ongoing expenses as it may reasonably request.

7.3 **Amendments, Waivers, Etc**. Amtrak will pay all reasonable out-of-pocket costs and expenses of Owner Trustee, Indenture Trustee, Trust Company, Equity Guarantor and the Participants (including fees and reasonable expenses of their respective counsel; provided, that there shall be only one counsel for all Note Holders in each relevant jurisdiction) incurred in connection with any restructurings, amendments, waivers or consents requested by Amtrak in connection with any of the Operative Documents or resulting from a Lease Default or Lease Event of Default (whether or not requested by Amtrak), any action pursuant to Sections 19 or 27 of the Lease, and all recording and filing fees, stamp taxes and other recording or filing taxes in connection with the recording or filing of any such amendments, waivers and consents and in connection with any continuation statements or other documents filed to maintain and protect the rights of the parties under the Operative Documents, whether or not the same shall become effective. Amtrak agrees to pay upon request, all reasonable, out-of-pocket costs and expenses incurred by any Note Holder in connection with actions which may be required to be taken by Loan Participant pursuant to Sections 2.04, 2.16, 3.02, 5.06 or 10.01 of the Indenture, (it being understood that in any case where conflicts of interest and similar considerations do not render the same inadvisable each Note Holder shall, if outside counsel is used, use the same outside counsel).

### SECTION 8.   FINANCIAL INFORMATION; OTHER INFORMATION.

Amtrak hereby agrees to deliver or cause to be delivered to Indenture Trustee, each Note Holder, Owner Participant, Equity Guarantor and Owner Trustee the following financial statements and other information at the respective times specified below:

(i) Annual Statements. As soon as practicable after the end of each fiscal year of Amtrak and in any event within 120 days thereafter (a) duplicate copies of a balance sheet of Amtrak as of the end of such fiscal year and statements of operations, changes in financial position and changes in capitalization of Amtrak for such fiscal year, all in reasonable detail and setting forth, in each case in comparative form, the figures for the previous fiscal year, certified by independent public accountants of recognized national standing selected by Amtrak stating that (1) except as otherwise specified in such opinion, the financial statements (A) were prepared in accordance with generally accepted accounting principles and practices applied on a basis consistent with that of the preceding fiscal year and (B) present fairly the financial condition of Amtrak and its consolidated Affiliates as of the end of such fiscal year and the results of operations for the period then ended and (2) the audit by such accountants was made in accordance with generally accepted auditing standards and (b) a certificate of a Responsible Officer of Amtrak (i) to the effect that such Responsible Officer has no actual knowledge that any Lease Default or Lease Event of Default has occurred and is continuing, or if one has occurred, describing the status thereof and (ii) stating that the insurance for the Units is in compliance with the Lease and is in full force and effect;

(ii)    Quarterly Statements.  Within 60 days after the end of each of the first three fiscal quarters in each financial year, prepare and deliver quarterly unaudited financial statements setting forth, in each case, in comparative form the figures for the comparable period in the previous fiscal year, certified by a Responsible Officer as being prepared in accordance with generally accepted accounting principles consistently applied and as fairly presenting the financial condition of Amtrak and its consolidated Affiliates as of the end of such fiscal year and the results of operations for the period then ended subject to normal year-end adjustment;

(iii)    Other Reports.  Promptly upon their becoming available, copies of (a) all regular or periodic reports, if any, Amtrak shall file with the Securities and Exchange Commission or any Governmental Authority or agency substituted therefor, or with any national securities exchange and (b) all reports, proxy statements and financial statements delivered or sent by Amtrak to its stockholders pursuant to the requirements of the Securities and Exchange Commission, any Governmental Authority or agency substituted therefor or any instrumentality or other Governmental Authority or agency;

(iv)    Notice of Default.  Promptly after a Responsible Officer of Amtrak becomes aware of the existence thereof, a notice specifying any condition that constitutes a Lease Default or a Lease Event of Default and the actions being taken by Amtrak to remedy the same;

(v)    Requested Information.  With reasonable promptness, such other data and information as from time to time may be reasonably requested by Owner Participant, Equity Guarantor, any Note Holder, Indenture Trustee or Owner Trustee;

(vi)    Major Legislation.  Within 30 days after enactment into law, a copy of any final legislation, and within reasonable promptness after adoption by both the United States Congress and the United States Senate, a copy of any proposed legislation, subject to a House-Senate conference resolution, affecting in any material respect the corporate organization or authority, ownership, financial condition or funding of Amtrak; and

(vii)    Strategic Business Plan.  From time to time, but not more than once in any 12 month period, upon the request of Lessor, Owner Participant or Lender, Lessee shall provide a copy of the then current Amtrak Strategic Business Plan.

(viii)    Self-Sufficiency.  As soon as practicable after the end of each fiscal year of Amtrak commencing fiscal year 2002, and in any event within 120 days thereafter (a) a certificate of a Responsible Officer of Amtrak (1) certifying an attached or accompanying table (each, a "*Certified Table*") for such period prepared on a basis consistent with (including calculations, compositions of line items, methodology, accounting principles and categories) the Table set forth in Schedule XII hereto and taking into account any restatement of any financials or components thereof required by any Person and otherwise complying with the requirements set forth in clause (iii) of the definition of "Self Sufficient" (each such certificate shall contain a representation with respect to the Certified Table attached thereto to the same effect as the representation given in Section 4.1(xix) of the Participation Agreement given with respect to the Table set forth in Schedule XII hereto), (2) certifying whether, for the Fiscal Year then ended, (A) the Amtrak Reform Council has made a finding under Section 204 of the Amtrak Reform

Act that (x) Amtrak's business performance meets the financial goals set forth in Section 24101(d) of Title 49 United States Code and (y) Amtrak will not require operating grant funds or operating subsidies (or any similar funds or subsidies by any name or designation whatsoever that are intended to subsidize Amtrak for its operating costs) from The United States of America, for Fiscal Year 2002 or for any Fiscal Year thereafter or (B) Amtrak has requested operating grant funds or operating subsidies (or any similar funds or subsidies by any name or designation whatsoever that are intended to subsidize Amtrak for its operating costs) from The United States of America, any State thereof, any municipality or other local governmental body, or any agency of any thereof (excluding operating subsidies specifically designated to fund tax liabilities under Section 3221 of the Code that are more than the amount needed for the benefits of individuals who retire from Amtrak and for their beneficiaries and operating subsidies granted to Amtrak by any State, any municipal or other local governmental body, or any agency or any thereof to maintain a particular rail service (as such intent is evidenced by appropriate public record) in lieu of termination or reduction of such service) and (3) certifying that each requirement set forth in clause (iii) of the definition of "Self Sufficiency" has been met and (b) evidence that the Independent Auditors have audited or otherwise certified the amounts described in clauses (i), (ii) and (iii) of Section 4.1(xix), and to the matters specified in clause (iii) of the term "Self-Sufficient" as defined in the Equity Guarantee Agreement, as they apply to each Certified Table; provided, that if Amtrak is not Self-Sufficient as demonstrated by such Certified Table, Amtrak shall not be required to cause the Independent Auditors to perform such audit or certification. For purposes of this clause (viii), it is understood that the terms "operating grant funds" and "operating subsidies" do not include capital grant funds or capital subsidies from The United States of America or any capital grant funds or capital subsidies from any State thereof, any municipality or other local governmental body, or any agency of any thereof.

(ix) <u>Operating Subsidy Requests</u>. Within 5 Business Days of any request, Amtrak will deliver or cause to be delivered to all Persons named in the first sentence of Section 8 duplicate copies of all requests made by Amtrak for any operating grant funds or operating subsidies (or any similar funds or subsidies by any name or designation whatsoever that are intended to subsidize Amtrak for its operating costs) from The United States of America, any State thereof, any municipality or other local governmental body, or any agency of any thereof.

The obligation of Amtrak to provide the certificate (and attachments) described in the preceding clause (viii) and the copies of requests described in the preceding clause (ix) shall terminate and be of no further force and effect on the end of the fiscal year following the last fiscal year in which any accounting or other adjustments could be required by any Person that have the effect of restating any of the financials required to have been delivered under this Section 8 or any line item (or component thereof) of any Certified Table that was used to demonstrate the occurrence of a Release Event if the effect of any such required adjustment, whether or not actually made, would be to change the amount on the line item titled "Test for Self Sufficiency" in any Certified Table to be less than "$0".

(x) <u>Modifications and Amendments to Qualification</u>. Promptly upon the same becoming available, copies of material modifications and amendments to the FRA qualification with respect to any Unit.

## SECTION 9.    CERTAIN OTHER COVENANTS.

9.1    **Trust Company Covenants**.   Trust Company hereby unconditionally agrees with and for the benefit of the other parties to this Agreement, Equity Guarantor and each Note Holder that Trust Company will not directly or indirectly create, incur, assume or suffer to exist any Lessor's Lien attributable to Trust Company on or against any part of the Trust Estate or the Trust Indenture Estate and Trust Company agrees that it will, at its own cost and expense, promptly take such action as may be necessary to duly discharge and satisfy in full any such Lessor's Lien attributable to Trust Company on the Trust Estate or the Trust Indenture Estate; provided that Trust Company may contest any such Lessor's Lien in good faith by appropriate proceedings so long as such proceedings do not involve any material risk of the sale, forfeiture or loss of the Equipment or any interest therein and do not interfere with the use, operation, or possession of the Equipment by Amtrak or any permitted sublessee under the Lease or the rights of Loan Participant under the Indenture or the subrogation rights of the Equity Guarantor under the Equity Guarantee Agreement.   Trust Company hereby indemnifies and holds harmless the Trust Estate, the Trust Indenture Estate, Owner Participant, Amtrak, Indenture Trustee, Equity Guarantor, each Note Holder and Loan Participant from and against any loss, cost or expense (including reasonable legal fees and expenses) which may be suffered or incurred by any of them as the result of the failure of Trust Company to discharge and satisfy any such Lessor's Lien. Trust Company shall give Amtrak, Owner Participant, Indenture Trustee, Equity Guarantor and Loan Participant prior written notice of any relocation of its chief executive office or chief place of business or the office where it keeps its records with respect to the Lease and concerning its accounts relating to the transactions contemplated hereby.   Trust Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence in good standing and in accordance with its organizational documents and to observe, conform to and comply with the provisions of its organizational documents.

9.2    **Owner Participant Covenants**.    (i) Owner Participant hereby unconditionally agrees with and for the benefit of the other parties to this Agreement and the other Operative Documents and each Note Holder and the Equity Guarantor, that Owner Participant will not directly or indirectly create, incur, assume or suffer to exist any Owner Participant's Lien and Owner Participant agrees that it will, at its own cost and expense, promptly take such action as may be necessary to duly discharge and satisfy in full any such Owner Participant's Lien; provided, however, that Owner Participant may contest any such Owner Participant's Lien in good faith by appropriate proceedings so long as such proceedings do not involve any material risk of the sale, forfeiture or loss of the Equipment or any interest therein and do not interfere with the use, operation, or possession of the Equipment by Amtrak or any permitted sublessee under the Lease or the rights of Loan Participant under the Indenture, including the amounts payable to Indenture Trustee pursuant to the Operative Documents and the subrogation rights of the Equity Guarantor under the Equity Guarantee Agreement.   Owner Participant hereby indemnifies and holds harmless Amtrak, the Trust Estate, the Trust Indenture Estate, Owner Trustee, Indenture Trustee, Equity Guarantor, each Note Holder and Loan Participant from and against any loss, cost or expense (including reasonable legal fees and expenses) which may be suffered or incurred by any of them as the result of the failure of Owner Participant to discharge and satisfy any such Owner Participant's Lien.

(ii)    Until the lien and security interest of the Indenture on the Trust Indenture Estate shall have been released and until full payment of the principal and premium, if any, and interest on the Secured Notes and all other amounts secured by the Indenture shall have been made and the Lease shall have terminated in accordance with its terms, Owner Participant shall not terminate or elect to terminate the trust created by the Trust Agreement.

(iii)   Owner Participant shall not instruct Owner Trustee to take any action that is prohibited by this Participation Agreement or any other Operative Document or that is in violation of Applicable Law. Owner Participant shall, if requested by another party hereto, instruct Owner Trustee, subject to the rights of Loan Participant or Indenture Trustee, to take all actions that Owner Trustee shall be required to take under the Operative Documents and Applicable Law.

(iv)   Owner Participant hereby agrees that so long as no Lease Event of Default has occurred and is continuing or the Lien of the Indenture is in effect, it shall not take any action or cause any action to be taken that shall submit the Trust Estate as a debtor to any proceeding under any Applicable Law involving bankruptcy, insolvency, reorganization or other laws affecting the rights of creditors generally.

(v)    Owner Participant hereby unconditionally agrees with Amtrak, and only with Amtrak (and not with any other party to this Agreement), that, so long as no Lease Event of Default has occurred and is continuing, it will pay or cause to be paid to Indenture Trustee with respect to the first Closing Date, $154,678.75 on January 3, 2001, and with respect to each subsequent Closing Date, such amount on such date as may be specified in the applicable Lease Supplement for such Closing Date (each such payment being referred to as a "*Deferred Payment*" and each such date on which such amount is due being referred to as a "*Deferred Payment Date*"). Owner Participant and Owner Trustee hereby direct Indenture Trustee, and Indenture Trustee hereby agrees, to apply the Deferred Payment to the payment of principal and interest on the Secured Notes which may be due and payable pursuant to the provisions of the Indenture on such Deferred Payment Date. Owner Participant agrees to make the Deferred Payment in immediately available funds on or before 11:00 a.m., New York City time, on the Deferred Payment Date, if required to do so. Owner Participant agrees to give Amtrak notice by 11:00 a.m., New York City time, on the Deferred Payment Date if it has failed to make the Deferred Payment due on such date, if required to do so. If Owner Participant is not required to make the Deferred Payment on the Deferred Payment Date due to the occurrence and continuation of a Lease Event of Default, Owner Participant will make such payment to Amtrak within 5 Business Days after the discontinuance of such Lease Event of Default, and such payment shall be deemed to be the Deferred Payment. In the event Owner Participant fails to make the Deferred Payment pursuant to this Section 9.2(v), if required to do so, Amtrak may immediately demand repayment (to the extent not so repaid). Amtrak may obtain reimbursement in the manner provided in Section 4.3 of the Lease for any Amtrak Advance, together with interest on such amount at the Overdue Rate from (and including) the date of such Deferred Payment Date to (but excluding) the date of reimbursement by Owner Participant or the date Amtrak deducts such Amtrak Advance from other payments as provided in Section 4.3 of the Lease and, without duplication of the foregoing, shall have such remedies as may be available to it against Owner Participant at law or in equity in respect of any such Amtrak Advance. All amounts paid to Amtrak by Owner Participant in respect of an Amtrak Advance or deducted by

Amtrak pursuant to Section 4.3 of the Lease shall be applied first to payment to Amtrak of interest and then to payment to Amtrak of amounts equal to the Amtrak Advance.

    9.3    **Additional Covenants of Trust Company, Owner Participant, Owner Trustee and Indenture Trustee.**

        (i)    Owner Participant and Trust Company each hereby covenants and agrees with each other party hereto, each subsequent Note Holder and Equity Guarantor that it will not (a) terminate or, in the case of Owner Participant, revoke the trust created by the Trust Agreement except in accordance with the provisions of Section 9.2(ii) hereof and Article IX of the Trust Agreement or (b) by affirmative act convey, or cause the conveyance of, its (or in the case of Trust Company, Owner Trustee's) interests under the Operative Documents or the Equipment, except (x) in the case of Owner Participant and Trust Company (in its individual capacity), in accordance with the Operative Documents, and (y) in the case of Trust Company in its capacity as Owner Trustee, as required by the terms of any Operative Document other than the Trust Agreement. Nothing in clause (a) of this subsection (i) shall impair any right of Owner Trustee or Owner Participant under Article X of the Trust Agreement.

        (ii)    Owner Participant and Trust Company each hereby covenants and agrees with Amtrak and Loan Participant, each subsequent Note Holder and Equity Guarantor that (a) it will not amend, supplement, terminate or otherwise modify any provision of the Trust Agreement in a way that would adversely affect Amtrak, Loan Participant, any Note Holder or Equity Guarantor, and (b) it shall not cause the Trust to engage in any business or other activity except as contemplated by the Operative Documents.

        (iii)    Owner Trustee and Indenture Trustee each hereby covenants and agrees with Amtrak that it will comply with the provisions of the Indenture and will not (a) take any action not expressly provided for in the Indenture to increase the interest rate, principal payment or other payment provisions of the Secured Notes that would cause an upward adjustment in Amtrak's obligation to pay Base Rent, Casualty Value, Termination Value, Adjusted EBO Price, Equity TV Amounts or Supplemental Rent under the Lease, or (b) amend, supplement, terminate or otherwise modify any provision of Sections 2.16, 4.04, 4.05, 4.06 and 10.05 of the Indenture in a way that would adversely affect Amtrak.

        (iv)    Trust Company and Owner Trustee agree to give each Participant and Indenture Trustee at least 30 days' prior written notice of (x) any change in its jurisdiction of incorporation or formation, as the case may be, and (y) any relocation of its chief executive office or chief place of business from its present location.

    9.4    **Additional Amtrak Covenants.** Amtrak hereby covenants and agrees that, for the benefit of Loan Participant, Owner Participant, each Note Holder, Equity Guarantor and Owner Trustee, Amtrak shall:

        (i)    not, and shall not permit any of its Affiliates to, acquire, directly or indirectly, any ownership interest in any Secured Note (other than in connection with the acquisition of the Equipment or the Trust Estate and other than as provided in Section 19 hereof; provided that if it shall at any time purchase the Secured Notes pursuant to Section 19 hereof, it

shall dispose of such Secured Notes on or before the date 180 days from the date of such purchase);

(ii)     comply with its obligations under the Lease and the Equity Guarantee Fee Undertaking;

(iii)    give each Participant, Owner Trustee and Indenture Trustee at least 30 days' prior written notice of any relocation of its chief executive office or chief place of business from its present location;

(iv)    cause to be done all things necessary to maintain its existence as a corporation, to be in good standing and to observe, conform and comply with the provisions of its organizational documents, as may be amended from time to time;

(v)     not enter into a restructuring of the transactions contemplated by the French Documents, as provided in Clause 13 of any All Parties Agreement, if the effect of such restructuring would have a material adverse effect on Loan Participant, Owner Participant, any Note Holder, Equity Guarantor or Owner Trustee;

(vi)    promptly after each Closing Date, cause to be made, pursuant to Section 105 of the Canada Transportation Act, a publication of an appropriate notice in *The Canadian Gazette* of the deposit of documents contemplated by Section 5.1(vi); and

(vii)   give Owner Participant at least 30 days' prior written notice of any change in its Fiscal Year.

9.5    **Additional Covenants Regarding Replacement Units**.  If Amtrak shall have elected pursuant to Section 7.2 of the Lease to cause a Replacement Unit to become subject to the Lease and satisfied all of the requirements of such Section 7.2, the parties hereto hereby covenant and agree as follows:

(i)     Amtrak and Owner Trustee shall execute and deliver a Lease Supplement covering the Replacement Unit;

(ii)    Owner Trustee shall execute and deliver an Indenture Supplement to include the Replacement Unit in the Trust Indenture Estate;

(iii)   Indenture Trustee shall execute and deliver a release of the replaced Unit from the Lien of the Indenture (including Uniform Commercial Code amending statements); and

(iv)    Owner Trustee shall execute and deliver a release of the replaced Unit from the Lease (including Uniform Commercial Code amending statements).

9.6    **Bankruptcy of Owner Participant**.  The bankruptcy, insolvency or other similar incapacity of Owner Participant shall not (i) operate to terminate the Trust Agreement, (ii) entitle Owner Participant's legal representatives to claim an accounting or to take any action in any court for a partition or winding up of the Trust Estate or (iii) otherwise affect the rights, obligations and liabilities of the parties hereto.

9.7    **Limitation on Amendments**.  Notwithstanding any provision in any Operative Document to the contrary, Trust Company shall not, without the prior written consent of Indenture Trustee and without the prior written notice thereof to Amtrak, execute any amendment of Article IX or Section 10.01 of the Trust Agreement or any other amendment to the Trust Agreement that might result in the trust created thereunder being terminated or that would adversely affect the Trust Indenture Estate or the Note Holders prior to the satisfaction and discharge of the lien and security interest of the Indenture on the Trust Indenture Estate or prior to the payment in full of the principal of and premium, if any, and interest on the Secured Notes.

9.8    **Certain Amendments.**    Notwithstanding anything herein to the contrary, so long as no Lease Event of Default shall have occurred and be continuing, Loan Participant, Owner Participant and Owner Trustee hereby agree for the benefit of Amtrak that, without the consent of Amtrak, they will not amend, modify or supplement any Operative Document to which Amtrak is not a party in a way that would adversely affect Amtrak (except as set forth in Sections 9.3(ii) and 9.7 with respect to the Trust Agreement and except as set forth in Section 9.3(iii) with respect to the Indenture).  In addition, Amtrak shall not amend, modify or supplement any French Document in a way that would adversely affect Owner Participant, Owner Trustee, Trust Company, Loan Participant, Indenture Trustee or Equity Guarantor.  Loan Participant, Owner Participant and Owner Trustee further agree that any such amendment, modification, supplement, consent or waiver without Amtrak's consent in violation of the previous sentence shall be void and ineffective as against Amtrak. Loan Participant, Owner Participant and Owner Trustee agree promptly to furnish to Amtrak copies of any supplement, amendment, waiver, consent or modification of any of the Operative Documents to which Amtrak is not a party.

## SECTION 10.    TRANSFERS.

10.1    **Transfer of Owner Participant's Interest**.

(i)    Prior to the later of (i) the discharge of the Lien of the Indenture and (ii) expiration of the Lease Term, Owner Participant shall not, without the prior written consent of Amtrak, Loan Participant, Indenture Trustee and Equity Guarantor, directly or indirectly assign, convey or otherwise transfer any of its right, title or interest in and to the Trust Estate, this Agreement, the Trust Agreement, the Tax Indemnity Agreement or any other Operative Document or any proceeds therefrom; <u>provided</u> that, subject to the conditions set forth below, Owner Participant may transfer to a Transferee any or all of its right, title and interest in and to the Trust Estate, this Agreement, the Trust Agreement, the Tax Indemnity Agreement, and each other Operative Document to which Owner Participant is a party or by which Owner Participant is bound.  Each such transfer shall be subject to the following conditions:

(a)    the Transferee shall be (1) any Affiliate of Owner Participant so long as all of its obligations are guaranteed by Owner Participant pursuant to a guaranty substantially in the form of Exhibit B hereto; or (2) any corporation or financial institution (who may be an Affiliate of Owner Participant) with a combined capital, surplus and undivided profits of at least $75,000,000, or a corporation or financial institution whose consolidated tangible net worth is at

least $75,000,000 or a wholly owned subsidiary of any such corporation or financial institution and all of the obligations of such subsidiary are guaranteed by such corporation or financial institution pursuant to a parent guaranty substantially in the form of Exhibit B hereto;

(b)      the Transferee shall have entered into an assumption agreement substantially in the form of Exhibit A hereto, whereby such Transferee shall agree to become a party to Owner Participant Documents and to be bound by the terms thereof and shall make representations and warranties as to the Transferee to the effect in all material respects as Owner Participant's representations and warranties set forth in Section 4.2(ii);

(c)      Owner Participant shall transfer to the Transferee all of its right, title and interest in, and to the Trust Estate, this Agreement, the Trust Agreement, the Tax Indemnity Agreement or any other Operative Document or any proceeds therefrom exclusive of Excepted Payments and Excepted Rights accruing prior to the date of such transfer or relating to acts, conditions or events occurring or existing prior to the date of such transfer;

(d)      an opinion of counsel of the Transferee in a form reasonably satisfactory to Amtrak, Owner Trustee, Loan Participant, Equity Guarantor and Indenture Trustee, shall be provided, at least 3 Business Days prior to such transfer, to Amtrak, Loan Participant, Indenture Trustee, Equity Guarantor and Owner Trustee;

(e)      if the Transferee is a Non-U.S. Person, such person agrees to administer the Overall Transaction from an office located in the United States; and

(f)      after giving effect to such transfer, there are not more than 2 Owner Participants.

(ii)      Upon any such transfer, (a) the Transferee shall be deemed to have paid the original investment previously made by the transferring Owner Participant in respect of the right, title and interest so transferred, and each reference herein to Owner Participant and in the other Operative Documents to Owner Participant shall thereafter be deemed to be a reference to the Transferee for all purposes to the extent of the right, title and interest so transferred and (b) in the case of a transfer permitted by Section 10.1(i)(a)(2), Owner Participant shall be released from any obligations under the Operative Documents arising after such transfer only in respect of the right, title and interest so transferred; provided, however, that in no event shall any such transfer or assignment waive or release the transferring Owner Participant of any liability on account of any breach of any representations or warranties, covenants or obligations set forth in any of the Operative Documents, in any such case occurring prior to the effective date of such transfer or assignment.

(iii)      An Owner Participant proposing to transfer any interest described in Section 10.1(i) shall, at least 10 Business Days prior to the proposed date of transfer, give written

notice thereof to Owner Trustee, Indenture Trustee, Loan Participant, Equity Guarantor and Amtrak, which notice shall specify the name and address of the proposed Transferee and shall include draft copies of all documents required hereby to be executed and delivered in connection with such transfer other than the opinion required under Section 10.1(i)(d) which shall be provided as set forth in such section. Whether or not a proposed transfer described in such a notice is consummated (including a proposed transfer under clause (i) of this Section 10.1), Owner Participant shall reimburse each party hereto and Equity Guarantor for all reasonable expenses of each such party, including, without limitation, the reasonable out-of-pocket expenses incurred in connection therewith (including legal fees and disbursements).

10.2     **Transfer of Secured Notes**.  Notwithstanding any provision herein or any Operative Document to the contrary, Amtrak shall not be required to indemnify Loan Participant or assume any obligation to Loan Participant arising out of any assignment, conveyance, or grant of a participation in all or any part of the Secured Notes (except a transfer or exchange of Secured Notes as provided in Section 2.04, 2.09, 2.13 or 2.16 of the Indenture) by Loan Participant or any successor Note Holder other than following the occurrence of a Lease Event of Default. Loan Participant or any successor Note Holder shall not transfer any interest therein unless, concurrently with any such transfer, Loan Participant or holder provides to Amtrak, Owner Participant, Owner Trustee and Indenture Trustee the representation set forth in Section 4.2(i)(b) and a covenant to obtain the same such representation from any subsequent transferee.

10.3     **Special Transfer of Beneficial Interest**.

(i)     Transfer of Entire Beneficial Interest.  If Amtrak (A) exercises its right to purchase the Equipment pursuant to Section 16.1 or 16.2 of the Lease, (B) exercises its rights to terminate the Lease pursuant to Section 26.1 of the Lease, or (C) elects (or is deemed to have elected) Section 7.3 of the Lease upon the occurrence of a Casualty Occurrence relating to all the units then subject to the Lease, then, in lieu of a direct transfer of the Equipment pursuant to such sections from Lessor to Amtrak (or such other party who has agreed to purchase the Equipment pursuant to Section 26.1 of the Lease), in exchange for payment by Amtrak (or by such other party who has agreed to purchase the Equipment pursuant to Section 26.1 of the Lease) to Owner Participant of a sum equal to all amounts due pursuant to the relevant provision relating to such transfer (less an amount required to retire the Secured Notes in accordance with their terms) (the "*Purchase Price*"), Owner Participant may elect, by written notice provided to Amtrak and Owner Trustee not less than 10 Business Days prior to the date specified for the transfer of the Equipment by Lessor to Amtrak, to transfer to Amtrak all of its beneficial interest in the Trust Estate; provided that such payment of the Purchase Price shall in no way affect Amtrak's obligations to concurrently make all other payments (other than payments of amounts equal to the Purchase Price) that would otherwise be payable by Amtrak under the Operative Documents. Upon such election and payment of the Purchase Price and all other amounts then due and owing by Amtrak to Owner Participant under the Operative Documents, Owner Participant shall, subject to the next sentence, transfer, at Amtrak's expense, its beneficial interest in the Trust Estate to Amtrak free and clear of all Liens, but excluding any Excluded Rights and Excluded Obligations (as defined in clause (iv) below).  Immediately prior to such transfer, Amtrak shall pay or cause to be paid all amounts then due and payable by it to all other parties under the Operative Documents (which amounts payable under the Lease shall include the amount required

to retire the Secured Notes which, unless the Secured Notes have previously been retired, shall be paid directly to Indenture Trustee in accordance with the provisions of the Operative Documents). Following such payments and the transfer of the beneficial interest in the Trust Estate to Amtrak, Owner Trustee shall, at Amtrak's expense, transfer to Amtrak (or such other party who has agreed to purchase the Equipment pursuant to Section 26.1 of the Lease) all the Trust's right, title and interest in and to the Equipment in accordance with Article IX of the Trust Agreement. Amtrak shall prepare and Lessor shall execute a termination of the Lease and a transfer of the Equipment and such other documents and opinions as Amtrak may reasonably request and upon such termination and transfer, the Trust shall be terminated in accordance with Article IX of the Trust Agreement.

(ii)     Transfer of a Portion of the Beneficial Interest.  If Amtrak elects (or is deemed to have elected) Section 7.3 of the Lease upon the occurrence of a Casualty Occurrence relating to less than all the Units then subject to the Lease, then, in lieu of a direct transfer of the Equipment relating to the Units suffering the Casualty Occurrence pursuant to such Section 7.3 from Lessor to Amtrak, in exchange for payment by Amtrak to Owner Participant of a sum equal to all amounts due pursuant to such section (less an amount required to retire the Secured Notes relating to such Units in accordance with their terms) (the "*Special Purchase Price*"), Owner Participant may elect, by written notice provided to Amtrak and Owner Trustee not less than 10 Business Days prior to the date specified for the transfer of such Equipment by Lessor to Amtrak, to transfer, at Amtrak's expense, to Amtrak its beneficial interest in the Units suffering the Casualty Occurrence; provided that such payment of the Special Purchase Price shall in no way affect Amtrak's obligations to concurrently make all other payments (other than payments of amounts equal to the Special Purchase Price) that would otherwise be payable by Amtrak under the Operative Documents.  If Owner Participant makes such an election, in order to implement such transfer Owner Participant shall, subject to the next sentence, immediately instruct Owner Trustee to transfer the Equipment, at Amtrak's expense, with respect to such Units to a trust to be established by Owner Participant (the "*Other Trust*") and, upon payment of the Special Purchase Price and all other amounts then due and owing by Amtrak to Owner Participant under the Operative Documents, Owner Participant shall transfer, at Amtrak's expense, its beneficial interest in the Other Trust to Amtrak free and clear of all Liens, but excluding any Excluded Rights and Excluded Obligations relating to such Units.  Immediately prior to such transfer, Amtrak shall pay or cause to be paid all amounts then due and payable to the other parties under the Operative Documents (which amounts payable under the Lease shall include the amount required to pay the Secured Notes relating to such Units which, unless such Secured Notes have previously been retired, shall be paid directly to Indenture Trustee in accordance with the provisions of the Operative Documents).  Following such payment and the transfer, at Amtrak's expense, of the beneficial interest referred to above, Amtrak shall instruct the Other Trust to transfer its right, title and interest in and to such Equipment to Amtrak.  Upon the transfer, at Amtrak's expense, of such Equipment to Amtrak, the Other Trust shall be terminated.

(iii)     Application of Other Transfer Restrictions.   The provisions of Section 15.3 shall not apply to transfers made pursuant to this Section 10.3.

(iv)     Excluded Rights and Obligations.  For the purposes of this Section 10.3, "*Excluded Rights*" shall mean those rights of the transferor Owner Participant or Owner Trustee

under the Operative Documents (in respect of which the transferor Owner Participant has not been paid as part of the Purchase Price or the Special Purchase Price, as the case may be) to make claims and receive payments under the Operative Documents (including, without limitation, under Section 6 and under the Tax Indemnity Agreement) that accrue or that are attributable to acts, omissions or events occurring on or prior to the date on which Owner Participant transfers its beneficial interest in the Trust Estate as provided in clauses (i) and (ii) above (the "*Purchase Date*").  "*Excluded Obligations*" shall mean any obligations of Owner Participant under the Operative Documents that accrue or that are attributable to acts, omissions or events occurring on or prior to the Purchase Date.

## SECTION 11.    NON-RECOURSE OBLIGATIONS.

It is expressly understood and agreed by and among all parties hereto and their respective successors and assigns that:

(i)      all representations, warranties, covenants, and agreements of Owner Trustee in this Participation Agreement and in the other Operative Documents constitute the obligations of the Trust, and except for the provisions of this Agreement and any of the other Operative Documents which expressly apply to Trust Company, nothing contained in this Agreement or any of such other Operative Documents or arising in any way from the transactions contemplated hereby or thereby shall be construed as creating any liability of Trust Company for the failure to perform any covenant or agreement, either expressed or implied, of Owner Trustee, or for the inaccuracy of any representation or warranty, contained herein of Owner Trustee, all such liability (except as aforesaid) being expressly waived by all parties hereto, and by each and every Person now or hereafter claiming by, through or under any Person; provided, however, that Trust Company shall be liable hereunder on the same basis as set forth in Sections 6.04, 7.01 and 7.03 of the Trust Agreement (a) for its own willful misconduct or gross negligence, (b) for liabilities that may result from the incorrectness of any representation or warranty expressly made by Trust Company or from the failure of Trust Company to perform the covenants and agreements of Trust Company set forth in this Agreement and any of the other Operative Documents to which Trust Company is a party, (c) for any Tax based on or measured by any fees, commission or compensation received by it for acting as trustee in connection with any of the transactions contemplated by this Agreement or the other Operative Documents or (d) for any loss resulting from its failure to use ordinary care in respect of the handling or investment of moneys constituting any portion of the Trust Estate.  It is understood and agreed that, except as provided in the preceding proviso and except for the provisions of this Agreement and any other Operative Documents which expressly apply to Trust Company:   (1) Trust Company shall have no personal liability under any of the Operative Documents as a result of acting pursuant to and consistent with any one or other of the Operative Documents; (2) all such personal liability of Trust Company is expressly waived and released as a condition of, and as consideration for, the execution and delivery of the Operative Documents by Trust Company or Owner Trustee, as the case may be; and (3) this Agreement and each of the other Operative Documents (other than the Trust Agreement) are executed and delivered by Owner Trustee solely in the exercise of the powers expressly conferred upon it as trustee under the Trust Agreement.  It is further understood and agreed that Owner Participant shall not be personally liable for, or for any loss in respect of, any action taken or omitted to be taken by, or any representation, warranty, undertaking or agreement of Trust Company or Owner Trustee, as the

case may be, under this Agreement, the Secured Notes, or any other Operative Document, unless taken or omitted to be taken pursuant to the express instructions of Owner Participant. Notwithstanding the foregoing provisions of this Section 11, nothing herein shall be deemed to prevent any party hereto from having recourse to and seeking enforcement against the Trust Estate for performance and observance of covenants, agreements and conditions required to be performed or observed by Owner Trustee in this Agreement and the other Operative Documents;

(ii)     Except for payments made by Owner Participant, Equity Guarantor or Owner Trustee in effecting cure payments pursuant to Section 4.03 of the Indenture or effecting a purchase pursuant to Section 2.13 of the Indenture, Indenture Trustee and any Note Holder, and any Person claiming by, through or under any such Person, shall (except as aforesaid) look solely to the Trust Indenture Estate for the payment of any indebtedness under the other Operative Documents due from Owner Trustee and that neither Owner Participant nor Trust Company shall be personally liable to Indenture Trustee or any Note Holder for any amount payable under the Secured Notes or the Indenture or for any liability under the Indenture except as provided in the Indenture and this Agreement; and

(iii)     it is expressly understood and agreed that (a) the representations and warranties contained in Section 4 hereof shall be for the benefit of Trust Company as well as Owner Trustee, (b) the agreements of Amtrak contained in Section 6 hereof shall run to Trust Company as well as Owner Trustee, and (c) Excepted Payments shall include amounts paid or payable to Trust Company as well as Owner Trustee.

### SECTION 12.     EXCESS AMOUNTS.

If (i) the Trust Estate becomes a debtor subject to the reorganization provisions of the federal bankruptcy laws or other insolvency laws as now or hereafter in effect, (ii) pursuant to such reorganization provisions, Owner Participant is required, by reason of Owner Participant being held to have recourse liability (other than by way of separate agreement between Owner Participant and Indenture Trustee or any Note Holder), to make payment on account of any amount payable as principal, interest or premium on the Secured Notes and (iii) Indenture Trustee or any Note Holder actually receives any Excess Amount (as defined below) which reflects any payment by Owner Participant on account of clause (ii) above, then Indenture Trustee or such Holder shall promptly refund to Owner Participant such Excess Amount. For purposes of this paragraph, *"Excess Amount"* means the amount by which such payment by Owner Participant on account of clause (ii) above received by Indenture Trustee or such holder exceeds the amount which would have been received by Indenture Trustee or such Holder if Owner Participant had not become subject to the recourse liability referred to in clause (ii) above. It is the intent of the parties in this Section 12 to give effect to the agreement of the parties that the obligations to the Note Holders are nonrecourse to Owner Participant, and not to affect in any way any other rights of the Note Holders under this Agreement or any of the other Operative Documents.

### SECTION 13.     NOTICES; PAYMENTS.

13.1     **Notices**.  Unless otherwise expressly specified or permitted by the terms hereof, notices and other communications required or permitted to be given or made under the

terms hereof shall be in writing.  Any such communication or notice shall be deemed to have been duly made or given (i) when delivered personally, (ii) in the case of mail delivery, upon receipt, refusal of delivery or return for failure of the intended recipient to retrieve such communication or (iii) in the case of transmission by facsimile, upon telephone and return facsimile confirmation of receipt and, in each case, if addressed to the intended recipient as follows (subject to the next sentence of this Section 13.1):

| Name of Party | Address |
|---|---|
| Amtrak | National Railroad Passenger Corporation<br>60 Massachusetts Avenue, NE<br>Washington, DC  20002<br>Attention:  Treasurer<br>Facsimile No.:  (202) 906-2174 |
| Owner Participant | HNB Investment Corp.<br>c/o Philip Morris Capital Corporation,<br>200 First Stamford Place, Suite 400<br>Stamford, CT  06902<br>Attention:  John J. Mulligan, VP-Portfolio<br>Facsimile No.:  (914) 335-8297 |
| with a copy to: | the General Counsel<br>Facsimile No.:  (914) 335-8256 |
| Owner Trustee | Wilmington Trust Company<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE  19890-0001<br>Attention:  Corporate Trust Administration<br>Facsimile No.:  (302) 651-8882 |
| with a copy to: | |
| Equity Guarantor | Export Development Corporation<br>151 O'Connor Street<br>Ottawa, Canada  K1A 1K3<br>Attention:  Loans Operations<br>Facsimile No.:  (613) 598-2514 |
| Loan Participant | Export Development Corporation<br>151 O'Connor Street<br>Ottawa, Canada K1A 1K3<br>Attention:  Loans Operations<br>Facsimile No.:  (613) 598-2514 |

| | |
|---|---|
| Indenture Trustee | Allfirst Bank<br>25 South Charles Street<br>Mail Code 101-591<br>Baltimore, MD 21201<br>Attention: Corporate Trust Administration<br>Facsimile No.: (410) 244-4236 |
| Each Note Holder | The address contained in the Note Register. |

Each party hereto may from time to time designate by notice in writing to the other parties hereto a different address for communications and notices.

>    13.2    **Payments**.

(i)    Unless otherwise expressly specified or permitted by the terms hereof, all payments provided for in any Operative Document to be made to Indenture Trustee shall be made to it at Allfirst Bank, 25 South Charles Street, Mail Code 101-591, Baltimore, Maryland 21201 (ABA No. 052000113), Credit Trust Receipts Account No. 090-02-764, Reference: Amtrak Trust HS-EDC-1, Attention: Robert D. Brown, Corporate Trust Administration, or at such other address and/or to the attention of such other department as Indenture Trustee shall from time to time designate by notice in writing to the other parties hereto.

(ii)    Unless otherwise expressly specified or permitted by the terms hereof, all payments provided for in any Operative Document to be made to Trust Company shall be made at Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001, ABA No. 021000089, Credit: Account No. 52997-0, Attention: Corporate Trust Administration, Re: Amtrak Trust HS-EDC-1 or at such other address and/or to the attention of such other department as Owner Trustee shall from time to time designate by notice in writing to the other parties hereto.

(iii)    Unless otherwise expressly specified or permitted by the terms hereof, all payments provided for in any Operative Document to be made to Owner Participant shall be made to Citibank, N.A., 399 Park Avenue, New York, New York 10043, ABA No. 021-000-089, Credit: Account No. 3024-1278, Attention: Will Holland, Re: Philip Morris Capital Corporation, or to such other account as Owner Participant shall from time to time designate by notice in writing to the other parties hereto.

(iv)    Unless otherwise expressly specified or permitted by the terms hereof, all payments provided for in any Operative Document to be made to Loan Participant shall be made as specified in Schedule I or at such other address and/or to the attention of such other department as Loan Participant shall from time to time designate by notice in writing to the other parties hereto.

## SECTION 14.    MISCELLANEOUS.

>    14.1    **Amendments, Etc**.    Except as otherwise expressly provided in Section 16 hereof, neither this Agreement nor any of the terms hereof (including the terms of this Section 14) may be terminated, amended, supplemented, waived or modified, except by an

instrument in writing signed (i) in the case of waivers, by the party against which enforcement of the waivers is sought or (ii) in the case of termination, amendments, supplements or modifications, by all parties hereto.

14.2    **Benefits and Binding Effect**.   The terms of this Agreement shall be binding upon the parties hereto and their respective successors and permitted assigns (including any Note Holder, and, in the case of Owner Participant, any Transferee), and shall inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns (including, in the case of Loan Participant, any Note Holder, and, in the case of Owner Participant, any Transferee).   Notwithstanding the foregoing, except as expressly provided in Section 27 of the Lease, Amtrak may not assign or transfer all or any part of its rights or obligations hereunder without the prior written consent of the Participants and Equity Guarantor.

14.3    **Severability**.   Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without invalidating, prohibiting the observance of or rendering unenforceable the remaining provisions hereof, and any such invalidity, illegality or unenforceability in any jurisdiction shall not invalidate, prohibit the observance of or render unenforceable such provision in any other jurisdiction.

14.4    **Governing Law**.   The terms of this Agreement and all rights and obligations hereunder shall be governed by the law of the District of Columbia without regard to conflicts or choice of law provisions; provided, that the parties shall be entitled to all rights conferred by Section 11301 of the Act.

14.5    **Liabilities of Participants**.   No Participant shall have any obligation to any other Participant or to Amtrak, Indenture Trustee or Owner Trustee with respect to the transactions contemplated by the Operative Documents except those obligations of such Participant expressly set forth in the Operative Documents or except as set forth in the instruments delivered in connection therewith, and no Participant shall be liable for performance by any other party hereto of such other party's obligations under the Operative Documents except as otherwise set forth.

14.6    **Further Assurances**.   Each of the parties hereto shall cause to be promptly and duly taken, executed, acknowledged and delivered all such further acts, documents and assurances as Amtrak, Owner Participant or Loan Participant from time to time may reasonably request in order to carry out more effectively the intent and purposes of this Agreement, the other Operative Documents and the transactions contemplated hereby and thereby.

14.7    **Section 1168 Applicability; Waiver**.   (i) It is the intention of each of the parties hereto that Lessor (and Indenture Trustee as a consequence thereof) will be entitled to possession of the Equipment pursuant to Section 1168 of the United States Bankruptcy Code upon Amtrak's becoming the subject of Chapter 11 of the Bankruptcy Code as provided in such Section.

(ii)     Amtrak agrees that this Agreement and the other Operative Documents and transactions contemplated herein and therein constitute a commercial activity and Amtrak hereby irrevocably waives, to the extent permitted by law, any right of immunity which it or any of its property has or may acquire in respect of its obligations hereunder and under the other Operative Documents and irrevocably waives, to the extent permitted by law, any immunity from jurisdiction, suit, judgment, set-off, execution, attachment (and in any action *in rem*, arrest, detention, seizure and forfeiture) or other legal process (including, without limitation, relief by way of injunction and specific performance) to which it or any of its property may otherwise be entitled in any suit or proceeding arising out of or relating to this Agreement or any of the other Operative Documents.

14.8     **Refundings; Amendments**.

(i)     Amtrak Requests.  Subject to the limitations set forth in Section 14.8(iii) below, Owner Trustee and Owner Participant each agree to cooperate with Amtrak to implement not more than two (2) refundings (the second such refunding to be subject to payment by Amtrak to Owner Participant of a fee of $50,000) or amendments of the Secured Notes (including the execution, delivery and/or provision of any appropriate additional or modified amendment, representation, warranty, certificate, opinion or other document that may reasonably be requested by Amtrak or any other Person in connection with such refunding or amendment and as are reasonably satisfactory to Owner Participant and Owner Trustee, provided, that no such refunding, amendment, representation, warranty, certificate, opinion or other document shall, taken as a whole, result in, or cause any risk of, any increase in any of Owner Participant's, Equity Guarantor's or Owner Trustee's obligations under any Operative Documents) at such interest rates and on such other terms and conditions as may be reasonably satisfactory to Amtrak, the  Equity Guarantor and Owner Participant (such terms and conditions to be no less favorable, taken as a whole, to Owner Participant, Equity Guarantor or Owner Trustee than those rates and terms and conditions applicable to the Secured Notes being refunded or amended and shall be such as to preserve Owner Participant's Net Economic Return).  Amtrak shall provide a notice to Owner Participant, Loan Participant, the Equity Guarantor and Owner Trustee at least 30 days prior to the date specified in such notice for the refunding.  For the avoidance of doubt, no such refunding shall increase the principal amount of the Secured Notes.  Any adjustments to the Rent Factors, Termination Value Factors, Adjusted EBO Price, Casualty Value Factors, Equity TV Amounts or debt amortization schedules pursuant to any such refunding or amendment shall satisfy the requirements set forth in Section 16 and shall satisfy Section 4.1(ii) of the Lease.   The documentation relating to any such refunding or amendment shall be reasonably satisfactory to Owner Participant and Equity Guarantor.

(ii)     Payment of Expenses.  Whether or not any refunding, amendment or payment of Supplemental Rent pursuant to this Section 14.8 is consummated, Amtrak hereby agrees to pay on an After-Tax Basis the out-of-pocket costs and expenses (including all legal fees and expenses) of each Participant, Indenture Trustee and Owner Trustee.

(iii)     Limitation on Refundings, Etc.  No refunding (including any refinancing described in clause (i) above) shall be permitted at any time during the continuation of any Specified Default or any Lease Event of Default or if any Specified Default or Lease Event of Default would occur immediately after giving effect to such refunding.  The Secured Notes shall

not be subject to optional refunding or amendment by Owner Trustee or Indenture Trustee without the consent of Amtrak. In addition, as a precondition to any such refinancing, Amtrak shall provide either (a) an opinion of independent tax counsel selected by Owner Participant to the effect that there would be no material adverse tax consequences to Owner Participant of such refinancing or (b) a tax indemnity (in addition to the Tax Indemnity Agreement) as to any adverse tax consequences to Owner Participant of such refinancing satisfactory in form and substance to Owner Participant (including as to collateral or such other credit support for such indemnity as Owner Participant shall require in its good faith discretion).   Notwithstanding anything to the contrary contained herein, Owner Participant shall have the right to consent or withhold its consent to the refinancing, which consent Owner Participant may withhold in its sole discretion, exercised in good faith, provided that Owner Participant shall have no such consent right if Thelen Reid & Priest LLP or such other counsel as shall be selected by Lessee and reasonably acceptable to Owner Participant shall deliver an opinion (the "*Refinancing Opinion*") to Owner Participant to the effect that such refinancing (and any actions in connection therewith) (A) will not result in contingent rent under Section 467 of the Code and the Regulations thereunder, and (B) will not adversely affect the eligibility of the Lease for initial or, if relevant, continued compliance with Section 1.467-3(c)(3) and (4) of the Regulations or any successor provision thereto, or otherwise result in any adverse consequences for Owner Participant under Section 467 of the Code and the Regulations thereunder, in each case as of the Closing Date and as of the date of the refinancing.

14.9   **Successor Bank and Trustees**.  If a successor trustee is appointed in accordance with the terms of the Trust Agreement or Indenture, such successor trustee shall, without further act, succeed to all the rights, duties, immunities and obligations of the entity then serving as Owner Trustee or Indenture Trustee, as the case may be, hereunder and under each other Operative Document to which it is a party or by which it is bound, and the predecessor shall be released from all further duties and obligations hereunder and thereunder, all without the necessity of any consent or approval by the parties hereto (except as provided in the Trust Agreement or Indenture) and without in any way altering the terms of this Agreement or any other document or the obligations of any party hereto or thereto.  Each party hereto or thereto consents to the provisions of the Trust Agreement or Indenture relating to the appointment from time to time of one or more co-trustees or separate trustees to exercise or hold any or all of the rights, power and title of Owner Trustee or Indenture Trustee, as the case may be, hereunder or thereunder, without the necessity of any consent or approval by any of the parties hereto (except as provided in the Trust Agreement or Indenture) and without in any way altering the terms of this Agreement or any other document or the obligations of any party hereto or thereto.

14.10   **Confidentiality**.  No party hereto will itself use or intentionally disclose, directly or indirectly, any information obtained from Amtrak or Owner Participant hereunder or in connection herewith which is reasonably designated in writing by Amtrak or Owner Participant as confidential or proprietary, except as required by law or by the express terms of any Operative Document, and will use all reasonable efforts to have all such information kept confidential and not used in any way known to such party to be detrimental to Amtrak or to Owner Participant; provided, that (i) each party may use, retain and disclose any such information to its counsel or special counsel and public accountants, any potential Transferees or successor trustees or subsequent Note Holders or transferees of the Trust's interest in the Equipment upon exercise of remedies in connection with a Lease Event of Default and any

Governmental Authority or Instrumentality requesting such disclosure, provided that such counsel, special counsel, public accountants or potential Transferees, successor trustees, transferees of the Trust's interest in the Equipment upon exercise of remedies in connection with a Lease Event of Default or subsequent Note Holders agree in advance to keep such information confidential, (ii) each party may use, retain and disclose any such information which has been publicly disclosed (other than by such party or any Affiliate thereof in breach of this Section 14.10) or has rightfully come into the possession of such party or any Affiliate thereof, (iii) each party may disclose any such information to any Governmental Authority or Instrumentality, having jurisdiction over such party in the course of any review of the books and records of such party by such Governmental Authority or Instrumentality (including, as to EDC, any requirement that such information be disclosed by virtue of EDC's status as an agent of Her Majesty in right of Canada or by virtue of any law, regulation, order-in-council, court or administrative order, or Canadian government policy), (iv) in the case of any Note Holder such Note Holder may disclose any such information as it determines is reasonably necessary to satisfy its disclosure obligations under Applicable Laws, rules or regulations, or to any proposed transferee of any Secured Note provided such proposed transferee agrees in advance to keep such information confidential and (v) to the extent that such party or any Affiliate thereof may have received a subpoena or other written demand under color of legal right for such information, such party or Affiliate may disclose such information, but such party shall first to the extent permitted by law or order of any court, as soon as practicable upon receipt of such demand, furnish a copy thereof to the party as to which disclosure is proposed and afford such party reasonable opportunity to obtain a protective order or other reasonably satisfactory assurance of confidential treatment for the information required to be disclosed.

14.11   **Quiet Enjoyment**.   Each party to this Participation Agreement acknowledges notice of, and consents in all respects to, the terms of the Lease, and expressly, severally and as to its own actions only, agrees that, so long as no Lease Event of Default thereunder has occurred and is continuing, (a) it shall not take or cause to be taken any action contrary to Amtrak's rights under the Lease, including, without limitation, the right to possession, use and quiet enjoyment by Amtrak or any permitted sublessee, assignee or transferee in accordance with the terms of the Lease, and (b) it shall not (directly or indirectly) give the notice of the exercise of the purchase option under clause 4.1 of any French Lease (provided, that to the extent that Amtrak has not already done so, Owner Participant, Owner Trustee and Indenture Trustee shall each be entitled to give such notice in the event that Amtrak has exercised its right of Voluntary Termination). Notwithstanding the immediately preceding sentence, each party to this Participation Agreement agrees that Owner Participant, Owner Trustee and Indenture Trustee shall each have the right to exercise the purchase option set forth under Clause 4.2.1 of each French Lease.

14.12   **Entire Agreement**.   This Participation Agreement, together with the other Operative Documents, embodies the entire agreement and understanding among the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof and thereof.

14.13   **Service of Process; Jurisdiction; Waiver of Jury Trial.**   Any suit, action or proceeding against Amtrak, Owner Trustee, Trust Company, Loan Participant and Owner Participant (each individually a "Party" and collectively, the "Parties") with respect to

this Agreement or any other Operative Document or any judgment entered by any court in respect of any thereof may be brought in the Supreme Court of the State of New York, County of New York or the United States District Court for the Southern District of New York (provided that such jurisdiction shall be non-exclusive) and each Party hereby submits to non-exclusive jurisdiction in such courts. Each Party hereby irrevocably consents to the service of process in any suit, action or proceeding in said courts by the giving of notice thereof to such Party in accordance with Section 13.1 at its address specified therein. Nothing herein shall affect the right to serve process in any other manner permitted by law. Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or such other Operative Documents or any judgment entered by any court in respect of any thereof brought in any of the aforesaid courts and hereby further irrevocably waives any claim that any such suit, action or proceeding has been brought in an inconvenient forum. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ITS RIGHT TO A JURY TRIAL OF ANY SUCH SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER OPERATIVE DOCUMENTS.

14.14 **Applicability of Provisions Concerning French Documents.**     If any Unit was never subject to a French Lease, then any and all provisions herein or in any other Operative Document concerning the French Documents shall have no operative effect with respect to such Unit.

## SECTION 15.     SURVIVAL OF COVENANTS, AGREEMENTS, ETC.

All covenants, agreements (including indemnities), representations and warranties made herein and in certificates delivered pursuant hereto or in connection herewith by any party hereto shall survive the execution and delivery of this Agreement and consummation of the transactions contemplated hereby, and such representations and warranties are, and shall be deemed to have been, material and relied upon by each other party hereto as being true and correct on the date or dates as of which such representations and warranties are or were made, regardless of any investigation made by such other party or any of them, or on their behalf. In addition, the representations, warranties and agreements (including indemnities) of the parties provided for herein or in any other Operative Document, and the parties' obligations under such Operative Documents, shall unless otherwise expressly provided therein survive the expiration or other termination of such Operative Documents.

## SECTION 16.     ADJUSTMENTS TO RENT, CASUALTY VALUE FACTORS AND TERMINATION VALUE FACTORS.

(i)     Adjustments Prior to Closing.  On or prior to any Closing Date, if (a) any Closing Date assumptions set forth in Schedule III hereto relating to the Units to be delivered on such Closing Date are determined to be inaccurate or (b) a change in any of the Federal Tax Benefit Assumptions occurs as a result of a Change in Tax Law or a Proposed Change in Tax Law or (c) a change occurs in 5-year United States Treasury rates from the rate used on the first Closing Date of 5.69%, which shall result in an equal change in Owner Participant's pretax full term and EBO yield in subsequent closings, the Indicative Schedules, in respect of Units to be

delivered and Secured Notes to be issued on such Closing Date, shall be appropriately adjusted upward or downward:

(a) to preserve the Net Economic Return (computed using the same methodology and assumptions (other than the changed assumptions giving rise to the adjustment in question) used by Owner Participant in computing the Indicative Schedules in respect of Units delivered on the first Closing Date) that would have been realized by Owner Participant if such condition had not existed;

(b) to the extent consistent with the foregoing, minimizing the net present value of the resulting Base Rent through the EBO Date and the Base Lease Termination Date (discounted at the Debt Rate applicable to such Units and compounded semi-annually) and complying with Section 4.1(ii) of the Lease; and

(c) to take into account the number of Units to be financed on such Closing Date;

provided, that, if any such adjustments under this clause (i) cause such net present value to increase by more than 100 basis points (or if the adjustment is due to a Proposed Tax Law Change, in any amount), Amtrak shall have the right, after consultation with Owner Participant and considering in good faith any such adjustment, not to proceed with the transactions contemplated by such Closing.

(ii)     [Reserved].

(iii)     Adjustments By Reason of Refunding of the Secured Notes.  Upon any refunding or amendment of any Secured Notes pursuant to Section 14.8 or 19, the Rent Factors, Casualty Value Factors, Termination Value Factors, Adjusted EBO Price, EBO Date and Equity TV Amounts, in each case in respect of the Units delivered on such Closing Date corresponding to such Secured Notes, and the maturity and the amortization schedules relating to such Secured Notes (to the extent such Secured Notes are being amended), shall be appropriately adjusted upward or downward to take into account the terms of such refunding or amendment:

(a) to preserve the Net Economic Return (computed using the same methodology and assumptions (other than the changed assumptions giving rise to the adjustment in question) used by Owner Participant in computing the Indicative Schedules in respect of Units delivered on the first Closing Date) that would have been realized by Owner Participant if such Secured Notes had not been amended or refunded, and

(b) to the extent consistent with the foregoing, minimizing the net present value of the resulting Base Rent through the EBO Date and the Base Lease Termination Date (discounted at the Debt Rate applicable to such Units and compounded semi-annually) and complying with Section 4.1(ii) of the Lease.

(iv)     Documentation and Verification of Adjustments.  Any adjustment required by this Section 16 shall be evidenced by the execution and delivery by Lessor and Amtrak of a written amendment to Schedules III through X inclusive, as appropriate, to the

applicable Lease Supplement reflecting such adjustment but failure to execute and deliver such amendment shall not affect the making of such adjustment (and Amtrak agrees that it will, promptly after such adjustment, furnish Loan Participant and Indenture Trustee with a written notice thereof).  Notwithstanding the immediately preceding sentence, any adjustment required by Section 16(i) shall be evidenced by the execution and delivery by Lessor and Amtrak of a Lease Supplement with the appropriately adjusted Schedules attached thereto on or prior to the relevant Closing Date.  Any computation of such an adjustment shall be provided by Owner Participant to Amtrak in a notice setting forth in reasonable detail the computations and methods used in computing such amount, with the information required to be set forth in such notice to be provided by Owner Participant.  Amtrak shall be entitled to review such computations with a financial advisor selected by it and reasonably satisfactory to Owner Participant, provided that such financial advisor shall agree to maintain the confidentiality of all information provided by Owner Participant (including Owner Participant's assumptions); provided, however, that Owner Participant shall not be required to disclose its tax returns or other proprietary information.  If requested by Amtrak, such determination shall be verified by one of the 5 largest nationally recognized independent certified public accounting firms or other mutually acceptable party, which firm shall be selected by Amtrak and reasonably acceptable to Owner Participant; provided, that in each such case, any such Person shall agree to maintain the confidentiality of all information provided by Owner Participant (including Owner Participant's assumptions) ) (but Owner Participant shall under no conditions be required to furnish such firm with its tax returns or books).  Whoever is selected shall advise Amtrak and Owner Participant as to whether the calculations submitted by Owner Participant are based on the correct assumptions, are mathematically correct and satisfy the tests set forth in Section 16(i) or (iii) hereof.  The results of the verification by such firm shall be final and binding on the parties hereto except in the case of manifest error.  Amtrak shall not be informed as to, and shall not have any right to review any of the data used by such firm in rendering its conclusion.  The cost of such verification shall be paid by Amtrak unless the net present value of the adjusted Base Rent payments which had been proposed by Owner Participant exceeds the net present value of the verified Base Rent payments by an amount in excess of 0.10% of the aggregate Lessor's Cost of all Units then subject to the Lease.

(v)     Constraints on Adjustments.  All adjustments to Base Rent under this Section 16 shall be made in a manner that complies with Revenue Procedures 75-21 and 75-28 and complies with Section 467 of the Code and any Treasury Regulations thereunder to the same extent the indicative Base Rent set forth on Schedule IV hereto complies at the time of such adjustment.  Notwithstanding anything to the contrary contained herein or in any other Operative Document: (a) any adjustment pursuant to this Section 16 implemented prior to the Closing Date to which such adjustment relates shall constrain the final maturity, amortization schedules and aggregate principal for the Secured Notes to be issued on such Closing Date, such that (w) the maturity of such Secured Notes will not exceed 20 years after the relevant Closing Date, (x) the weighted average life of the Secured Notes will not be greater or less than the relevant Specified Average Life for such Secured Notes by more than 6 months (but in no event shall the weighted average life of the Secured Note be greater than 15 years), (y) the aggregate principal amount of such Secured Notes will not increase and (z) Loan Participant's Commitment (as defined in Section 3.1) will not be greater or less than the relevant Specified Loan Participant's Commitment by more than 5%; (b) any adjustments pursuant to this Section 16 implemented after the Closing Date to which such adjustment relates shall not change the amortization

schedules in a manner which changes the amount of Owner Participant's Commitment, increases any Equity CV Amounts (as defined in the Equity Guarantee Agreement) or increases or decreases the average life of the Secured Notes by more than 6 months from the original average life of such Secured Notes or changes the principal amount or final maturity of such Secured Note; and (c) in all events and irrespective of any adjustment thereto, each installment of Base Rent shall be at least in an amount such that, as and when received by Indenture Trustee, it shall be sufficient to pay the installment of principal and accrued interest in respect of all Secured Notes then Outstanding under the Indenture which is due on the Rent Payment Date of such installment of Base Rent, and each amount of Casualty Value and Termination Value, any payment of Adjusted EBO Price and each unpaid balance payable on any Termination Date with respect to a Voluntary Termination, shall be at least in an amount such that, as and when received by Indenture Trustee, shall be sufficient to pay the full unpaid balance of principal, and interest then due and payable in respect of all Secured Notes then Outstanding under the Indenture. Nothing in this subsection (v) shall be deemed to constitute a guarantee by Amtrak of the indebtedness evidenced by the Secured Notes or a guarantee of the residual value of any Unit or an indemnity with respect to any Taxes required to be withheld or deducted.

### SECTION 17.    EXECUTION.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts (or upon separate signature pages bound together into one or more counterparts), each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

### SECTION 18.    ASSUMPTION OF SECURED NOTES BY AMTRAK.

(i)    In connection with the purchase by Amtrak of any Units on any EBO Date pursuant to Section 16.1 of the Lease (and provided Amtrak shall not have elected to pay the Adjusted EBO Price in installments pursuant to said Section 16.1) and subject to the terms of, and the satisfaction of the conditions set forth in, this Section 18, Amtrak may deliver notes ("*New Notes*") having an aggregate principal amount equal to the aggregate principal amount of the Secured Notes that would have been mandatorily prepaid pursuant to Section 2.14 of the Indenture had Amtrak paid a purchase price for such Units entirely in cash, provided that Amtrak shall have delivered a written notice to Indenture Trustee not less than 30 days prior to the EBO Date specifying the aggregate principal amount of Secured Notes to be exchanged hereunder (the "*Assumed Principal Amount*").

(ii)    If Amtrak elects to issue New Notes in exchange for all of the Secured Notes of a series Outstanding on an EBO Date in connection with the purchase by Amtrak of all of the related Units on such EBO Date, each such Secured Note shall be exchanged on such EBO Date for one or more New Notes of Amtrak having an aggregate principal amount equal to the aggregate principal amount of such Secured Notes. If Amtrak elects to issue New Notes in exchange for less than all of the Secured Notes of a series Outstanding on an EBO Date in connection with the purchase by Amtrak of certain Units on such EBO Date, each such Secured Note of such series shall be exchanged on such EBO Date for (a) one or more New Notes of Amtrak having an aggregate principal amount equal to (1) the Assumed Principal Amount multiplied by (2) a fraction, the numerator of which shall be the principal amount of the Secured

Notes being exchanged and the denominator of which shall be the aggregate principal amount of all Secured Notes of such series Outstanding on the EBO Date before giving effect to any exchange under this Section 18 and (b) one or more replacement Secured Notes of the same series delivered in accordance with Section 2.09 of the Indenture having an aggregate principal amount equal to the difference between the aggregate principal amount of such Secured Notes being exchanged and the aggregate principal amount of such New Notes to be issued in exchange for such Secured Note pursuant to the immediately preceding clause (a). Any Secured Note not tendered for exchange hereunder on the EBO Date shall automatically be deemed to represent a right to receive the New Notes and replacement Secured Notes which would have been exchanged for such Secured Note had it been so tendered. Upon Amtrak's execution and delivery to the applicable Note Holders of any such New Notes and subject to the terms of, and the satisfaction of the conditions set forth in, this Section 18, Owner Trustee shall be released from all of its obligations under all of the Secured Notes of such series Outstanding to the extent of the Assumed Principal Amount, whether or not tendered for exchange hereunder, provided that with respect to such Secured Notes not so tendered, Owner Trustee shall remain liable for the principal and interest portion thereof that would have been payable under any replacement Secured Note which would have been exchanged for such Secured Note had it been so tendered. Each Secured Note tendered in exchange for a New Note shall have the marking "CANCELLED" prominently written on each page of such Secured Note.

(iii)     Notwithstanding the foregoing provisions of this Section 18, (a) no Note Holder shall be obligated to accept any such New Note issued by Amtrak unless: (1) such New Note is a full recourse obligation of Amtrak, requires payment of interest, principal (as scheduled amortization, mandatory prepayment, payment upon maturity or otherwise), and Make Whole Premium Amount on the same basis as, and is in substantially the same form as, the Secured Notes and is in all respects, and is issued pursuant to a new indenture and security agreement (the "*New Indenture*") in all reasonable respects, satisfactory to each Note Holder; (2) such New Indenture provides, among other things, for: a first priority security interest in the Units purchased pursuant to Section 16.1 of the Lease; representations, warranties and agreements of Amtrak comparable to those in Section 4.1 hereof, covenants of Amtrak comparable to Amtrak's covenants in Sections 4.1, 6, 7.1, 7.2, 7.3, 8, and 9.4 hereof and Sections 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19 and 27 of the Lease and otherwise reasonably satisfactory in all respects to each Note Holder and events of default substantially similar in scope and effect to those set forth in the Lease and the Indenture; (3) such security interest is duly perfected by all necessary filings and recordings as reasonably determined by such holder of the New Notes including Uniform Commercial Code financing statements, filing of the New Indenture and any supplements thereto or memoranda thereof with the STB and under the Canada Transportation Act; (4) such holder receives such opinions (including, without limitation, a due authorization, execution, delivery and enforceability opinion as to the New Notes and New Indenture, a perfection opinion as to the security interests intended to be created by the New Indenture and an opinion to the effect that the protections afforded to such holder by Section 1168 of the Bankruptcy Code will not be less than such protections immediately prior to giving effect to such transactions), certificates, insurance certificates, insurance reports and other documents as such holder reasonably requires to provide adequate assurance that the New Indenture provides to the trustee thereunder and the holders of the New Notes rights and protections in respect of the Units purchased pursuant to Section 16.1 of the Lease in all material respects equivalent to the rights and protections in respect of the Units afforded Indenture Trustee under the Operative Documents; (5) Amtrak shall

have indemnified on an After-Tax Basis, in form and substance reasonably satisfactory to each thereof, each Note Holder and Indenture Trustee for all taxes, losses, and expenses (including, without limitation, legal fees and disbursements) incurred in connection with the transactions contemplated by this Section 18; (6) no Specified Default or Lease Event of Default shall have occurred and be continuing either immediately before or after giving effect to the issuance of such New Notes; (7) no Lease Event of Default under Section 13.1(i), (ii), (vi), (vii), (viii), (ix) or (x) shall have occurred at any time during the Lease Term; and (8) the EBO Date for the Units relating to any series of Secured Notes being assumed shall not be earlier than 6 months from the indicative EBO Date for such Unit set forth in Schedule IX hereto (without giving effect to any amendment or supplement to such Schedule); and (b) all such New Notes and the New Indenture shall be independent of the Indenture and Indenture Trustee's and Owner Trustee's respective rights and obligations thereunder.  Without limiting the generality of the foregoing, a default under any of such New Notes, New Indenture or any documents, instruments or agreements entered into in connection therewith, shall neither constitute nor result in an Indenture Default or Indenture Event of Default (whether or not such default is cured or waived or remedies are exercised in connection therewith) and no part or item of the Trust Indenture Estate shall be pledged as collateral for, or otherwise secure, any of Amtrak's obligations under such New Notes, New Indenture or any documents, instruments or agreements related thereto.

(iv)     It shall be a condition of any transaction contemplated by clause (i) of this Section 18 that such instruments as Owner Trustee or Owner Participant may reasonably request, prepared at the sole cost and expense of Amtrak, evidencing the release and discharge of Owner Trustee from any liability on or with respect to the New Notes and discharging the Lien of Indenture Trustee with respect to the Units purchased pursuant to Section 16.1 of the Lease shall be delivered to Owner Trustee, and that Loan Participant shall have tendered to Owner Trustee each Secured Note marked "CANCELLED" in exchange for a New Note.

(v)     Neither Amtrak nor any other Person may assume the Secured Notes except pursuant to and in accordance with the provisions of this Section 18.  Amtrak shall pay on an After-Tax Basis all reasonable costs and expenses (including reasonable counsel's fees and disbursements) of Owner Trustee, Owner Participant, Indenture Trustee and Loan Participant in connection with the consummation of the transactions contemplated by this Section 18.

### SECTION 19.    SPECIAL EVENT.

So long as EDC is a Note Holder, if a Special Event (as defined below) occurs, then within 90 days of such occurrence EDC may suspend any further loans under this Participation Agreement and/or request that Amtrak either (i) cause Owner Trustee to effect a refunding of the Secured Notes (in accordance with Section 14.8) without premium or penalty, or (ii) provide additional credit support in the form of a letter of credit (in form and substance reasonably satisfactory to EDC) or an unconditional guarantee (in form and substance reasonably satisfactory to EDC) for the repayment of the loans made by EDC from a Person who is reasonably satisfactory to EDC.  Any such request shall be in writing, specify in reasonable detail the nature of the Special Event and be delivered to each of Amtrak, Owner Trustee, Indenture Trustee and Owner Participant. Upon any such request, EDC's obligation to make any further loans under this Participation Agreement shall be suspended and Amtrak shall be obligated to effect within 120 days thereafter either (i) a refunding of the Secured Notes in

accordance with Section 14.8 (it being agreed that Amtrak shall, in its sole discretion, have the right to purchase such Secured Notes for its own account, provided, that Amtrak shall dispose of such Secured Notes within 180 days of such purchase) which results in EDC receiving an amount equal to the then outstanding principal amount of the Secured Notes held by it together with accrued interest thereon through the date of such refunding, without penalty or premium, or (ii) delivery of such credit support.   For purposes of this Section 19, a "*Special Event*" shall occur if, as a result of (i) a change in ownership of Amtrak involving a cessation of Amtrak's (or any assignee of Amtrak's) support from the United States government, (ii) a change in any law which modifies or affects the principal purpose of Amtrak (or any assignee of Amtrak) or (iii) the revocation, suspension or non-renewal of any authorization, license, or consent necessary for the operation of the business of Amtrak (or any assignee of Amtrak), there is a material adverse change in the business, operation or properties of Amtrak such that its ability to perform its obligations under the Lease and other Operative Documents is materially and adversely affected.

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by their respective officers thereunto duly authorized, as of the day and year first above written.

NATIONAL RAILROAD PASSENGER CORPORATION

By: _____
    Name: Carol J. Dillon
    Title: Treasurer

ALLFIRST BANK, not in its individual capacity but solely as Indenture Trustee, except as otherwise expressly provided herein

By: _____
    Name:
    Title:

HNB INVESTMENT CORP.

By: _____
    Name:
    Title:

EXPORT DEVELOPMENT CORPORATION

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Participation Agreement (Amtrak Trust HS-EDC-1)

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by their respective officers thereunto duly authorized, as of the day and year first above written.

NATIONAL RAILROAD PASSENGER CORPORATION

By: _____
    Name: Carol J. Dillon
    Title: Treasurer

ALLFIRST BANK, not in its individual capacity but solely as Indenture Trustee, except as otherwise expressly provided herein

By: _____
    Name:  ROBERT D. BROWN
    Title:    VICE PRESIDENT

HNB INVESTMENT CORP.

By: _____
    Name:
    Title:

EXPORT DEVELOPMENT CORPORATION

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by their respective officers thereunto duly authorized, as of the day and year first above written.

NATIONAL RAILROAD PASSENGER
CORPORATION

By: _____
Name: Carol J. Dillon
Title: Treasurer

ALLFIRST BANK, not in its individual capacity
but solely as Indenture Trustee, except as
otherwise expressly provided herein

By: _____
Name:
Title:

HNB INVESTMENT CORP.

By: _____
Name: Joan D. Woodroof
Title: Authorized Signatory

EXPORT DEVELOPMENT CORPORATION

By: _____
Name:
Title:

By: _____
Name:
Title:

Participation Agreement (Amtrak Trust HS-EDC-1)

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by their respective officers thereunto duly authorized, as of the day and year first above written.

NATIONAL RAILROAD PASSENGER CORPORATION

By: _____
Name: Carol J. Dillon
Title: Treasurer

ALLFIRST BANK, not in its individual capacity but solely as Indenture Trustee, except as otherwise expressly provided herein

By: _____
Name:
Title:

HNB INVESTMENT CORP.

By: _____
Name:
Title:

EXPORT DEVELOPMENT CORPORATION

By: _____
Name: SEAN MITCHELL
Title: Financial Services Manager

By: _____
Name: Chris Timbrell
Title: Financial Services Manager

AMTRAK TRUST HS-EDC-1

By:    Wilmington Trust Company, not in
its individual capacity but solely
as Owner Trustee

By:    _____
Name:
Title:
        *W. CHRIS SPONENBERG*
        *ASSISTANT VICE PRESIDENT*

WILMINGTON TRUST COMPANY,
in its individual capacity only to the extent
expressly provided herein

By:    _____
Name:
Title:
        *W. CHRIS SPONENBERG*
        *ASSISTANT VICE PRESIDENT*

SCHEDULE I TO
PARTICIPATION AGREEMENT

**<u>Information Relating to Loan Participant</u>**

1.   <u>Loan Participant and Address</u>.   All communications, other than payments and notices regarding payments to Loan Participant, should be addressed as follows:

> Export Development Corporation
> 151 O'Connor Street
> Ottawa, Canada K1A 1K3
> Attention:  Loans Operations
> Facsimile No.:  (613) 598-2514

2.   <u>Payment Instructions</u>.  All payments to Loan Participant should be made in immediately available funds to the following account, with sufficient information to identify the source and application of funds:

> Account No. 36236357 at Citibank, N.A.
> ABA No. 021000089
> 111 Wall Street
> New York, NY, USA
> Reference: 880-USA-7370

SCHEDULE II TO
PARTICIPATION AGREEMENT

## UCC FILINGS

| Operative Document | Place of Filing |
|---|---|
| Lease (Precautionary)<br>    Debtor:  Amtrak<br>    Secured Party:  Owner Trustee<br>    Assignee:  Indenture Trustee | District of Columbia |
| Indenture<br>    Debtor:  Owner Trustee<br>    Secured Party:  Indenture Trustee | Delaware Secretary of State |
| UCC-3 Partial Release (concerning procurement loan agreement)<br>    Debtor:  Amtrak<br>    Secured Party:  EDC, as Collateral Agent | District of Columbia |

CLOSING DATE ASSUMPTIONS – LOCOMOTIVES

The foregoing Closing Date Rent Factors are based on the following Closing Date Assumptions:

1.  Transaction Expenses equal 1.649832592% of aggregate Lessor's Cost.

2.  Lessor's Cost equals $ 7,161,300.00 per Unit.

3.  Such Closing Date is November 15, 2000.

4.  The Debt Rate for the Secured Notes for such Closing Date is 7.017%.

5.  The Base Lease Commencement Date is February 15, 2000.

6.  Owner Participant's Commitment: 76.95331467% of Lessor's Cost.

7.  Loan Participant's Commitment: 23.04668533% of Lessor's Cost.

8.  EBO Price: 33.32829325% of Lessor's Cost.

9.  EBO Date is January 3, 2018.

10. Tax Rates
    (i) Federal Rate                 35.000%
    (ii) State Rate                   1.000%
    (iii) Combined Tax Rate          35.650%

**RENT FACTORS - LOCOMOTIVES**

Expressed as percentages of Lessor's Cost

| Rent Payment Date | Base Rent |
|---|---|
| Nov 15 2000 | 0.00000000 |
| Jan  3 2001 | 0.00000000 |
| Jul  3 2001 | 2.69990705 |
| Jan  3 2002 | 2.69990705 |
| Jul  3 2002 | 2.69990705 |
| Jan  3 2003 | 2.69990705 |
| Jul  3 2003 | 2.69990705 |
| Jan  3 2004 | 2.69990705 |
| Jul  3 2004 | 4.23840536 |
| Jan  3 2005 | 2.64592883 |
| Jul  3 2005 | 4.45602594 |
| Jan  3 2006 | 2.58242157 |
| Jul  3 2006 | 4.51953320 |
| Jan  3 2007 | 2.51445801 |
| Jul  3 2007 | 4.58749676 |
| Jan  3 2008 | 2.44172545 |
| Jul  3 2008 | 4.66022933 |
| Jan  3 2009 | 2.36388924 |
| Jul  3 2009 | 4.73806554 |
| Jan  3 2010 | 2.70384331 |
| Jul  3 2010 | 4.39811146 |
| Jan  3 2011 | 21.29063613 |
| Jul  3 2011 | 1.59782430 |
| Jan  3 2012 | 7.30485432 |
| Jul  3 2012 | 1.37531263 |
| Jan  3 2013 | 7.52045670 |
| Jul  3 2013 | 1.15971025 |
| Jan  3 2014 | 7.75173799 |
| Jul  3 2014 | 0.92842896 |
| Jan  3 2015 | 7.99983839 |
| Jul  3 2015 | 0.68032856 |
| Jan  3 2016 | 8.26598101 |
| Jul  3 2016 | 0.41418594 |
| Jan  3 2017 | 7.16818145 |
| Jul  3 2017 | 0.17722201 |
| Jan  3 2018 | 0.52289030 |
| Jul  3 2018 | 9.49204014 |
| Jan  3 2019 | 8.50294494 |
| Jul  3 2019 | 0.17722201 |
| Jan  3 2020 | 7.98288607 |
| Jul  3 2020 | 0.69728088 |
| Jan  3 2021 | 5.61154215 |
| Jul  3 2021 | 0.52486402 |
| Jan  3 2022 | 0.52486402 |
| Jul  3 2022 | 0.52486402 |
| Nov 15 2022 | 0.38490028 |

## CASUALTY VALUE FACTORS - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| Casualty Value Determination Date | Casualty Value | Rent Adjustment | Casualty Value Factor |
|---|---|---|---|
| Dec  3 2000 | 104.43199860 | 0.00000000 | 104.43199860 |
| Jan  3 2001 | 104.99528312 | 0.00000000 | 104.99528312 |
| Feb  3 2001 | 105.69318681 | 0.00000000 | 105.69318681 |
| Mar  3 2001 | 106.02265603 | 0.35509774 | 106.37775377 |
| Apr  3 2001 | 106.11696575 | 0.94692730 | 107.06389305 |
| May  3 2001 | 106.14655559 | 1.53875687 | 107.68531246 |
| Jun  3 2001 | 106.22149633 | 2.13058643 | 108.35208277 |
| Jul  3 2001 | 106.23158737 | 2.72241600 | 108.95400337 |
| Aug  3 2001 | 106.28689862 | 0.61433852 | 106.90123714 |
| Sep  3 2001 | 106.34353134 | 1.20616808 | 107.54969942 |
| Oct  3 2001 | 106.33519164 | 1.79799765 | 108.13318929 |
| Nov  3 2001 | 106.37194862 | 2.38982721 | 108.76177583 |
| Dec  3 2001 | 106.40990271 | 2.98165678 | 109.39155949 |
| Jan  3 2002 | 106.38275918 | 3.57348634 | 109.95624553 |
| Feb  3 2002 | 106.40058630 | 1.46540886 | 107.86599516 |
| Mar  3 2002 | 106.41948364 | 2.05723842 | 108.47672206 |
| Apr  3 2002 | 106.43945838 | 2.64906799 | 109.08852637 |
| May  3 2002 | 106.41611905 | 3.24089755 | 109.65701660 |
| Jun  3 2002 | 106.42317315 | 3.83272712 | 110.25590027 |
| Jul  3 2002 | 106.38682657 | 4.42455668 | 110.81138326 |
| Aug  3 2002 | 106.38078625 | 2.31647920 | 108.69726546 |
| Sep  3 2002 | 106.37565619 | 2.90830877 | 109.28396496 |
| Oct  3 2002 | 106.32704377 | 3.50013833 | 109.82718210 |
| Nov  3 2002 | 106.30865540 | 4.09196790 | 110.40062330 |
| Dec  3 2002 | 106.29109452 | 4.68379746 | 110.97489198 |
| Jan  3 2003 | 106.22996796 | 5.27562703 | 111.50559499 |
| Feb  3 2003 | 106.19898158 | 3.16754955 | 109.36653112 |
| Mar  3 2003 | 106.16873824 | 3.75937911 | 109.92811735 |
| Apr  3 2003 | 106.13924293 | 4.35120868 | 110.49045161 |
| May  3 2003 | 106.08002099 | 4.94303824 | 111.02305923 |
| Jun  3 2003 | 106.04167263 | 5.53486780 | 111.57654044 |
| Jul  3 2003 | 105.97353830 | 6.12669737 | 112.10023567 |
| Aug  3 2003 | 105.92621781 | 4.01861989 | 109.94483770 |
| Sep  3 2003 | 105.87953089 | 4.61044945 | 110.48998034 |
| Oct  3 2003 | 105.80300210 | 5.20227902 | 111.00528112 |
| Nov  3 2003 | 105.74723089 | 5.79410858 | 111.54133948 |
| Dec  3 2003 | 105.69203661 | 6.38593815 | 112.07797476 |
| Jan  3 2004 | 105.60694345 | 6.97776771 | 112.58471116 |
| Feb  3 2004 | 105.54255045 | 4.86969023 | 110.41224068 |
| Mar  3 2004 | 105.47867659 | 5.46151980 | 110.94019639 |
| Apr  3 2004 | 105.41532535 | 6.05334936 | 111.46867471 |
| May  3 2004 | 105.33211137 | 6.64517893 | 111.97729030 |
| Jun  3 2004 | 105.26288295 | 7.23700849 | 112.49989144 |
| Jul  3 2004 | 105.17375240 | 7.82883806 | 113.00259045 |
| Aug  3 2004 | 105.08957137 | 4.18226226 | 109.27183363 |

SCHEDULE V TO
PARTICIPATION AGREEMENT

## **PARTICIPANTS' COMMITMENTS - LOCOMOTIVES**

1.      Owner Participant's Commitment for Closing Date: 23.0467 % of Lessor's Cost.

2.      Loan Participant's Commitment for Closing Date: 76.9533 % of Lessor's Cost.

### CASUALTY VALUE FACTORS - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| Casualty Value Determination Date | Casualty Value | Rent Adjustment | Casualty Value Factor |
|---|---|---|---|
| Sep  3 2004 | 105.00583715 | 4.77409182 | 109.77992897 |
| Oct  3 2004 | 104.90216387 | 5.36592139 | 110.26808526 |
| Nov  3 2004 | 104.81239932 | 5.95775095 | 110.77015027 |
| Dec  3 2004 | 104.72304414 | 6.54958052 | 111.27262466 |
| Jan  3 2005 | 104.61371223 | 7.14141008 | 111.75512231 |
| Feb  3 2005 | 104.51825112 | 5.08731081 | 109.60556193 |
| Mar  3 2005 | 104.42316120 | 5.67914038 | 110.10230158 |
| Apr  3 2005 | 104.32844496 | 6.27096994 | 110.59941491 |
| May  3 2005 | 104.21404296 | 6.86279951 | 111.07684247 |
| Jun  3 2005 | 104.11325984 | 7.45462907 | 111.56788891 |
| Jul  3 2005 | 103.99275029 | 8.04645864 | 112.03920892 |
| Aug  3 2005 | 103.87523413 | 4.18226226 | 108.05749639 |
| Sep  3 2005 | 103.75801229 | 4.77409182 | 108.53210411 |
| Oct  3 2005 | 103.62102478 | 5.36592139 | 108.98694617 |
| Nov  3 2005 | 103.49757571 | 5.95775095 | 109.45532666 |
| Dec  3 2005 | 103.37438118 | 6.54958052 | 109.92396170 |
| Jan  3 2006 | 103.23138096 | 7.14141008 | 110.37279104 |
| Feb  3 2006 | 103.10187887 | 5.15081807 | 108.25269694 |
| Mar  3 2006 | 102.97259076 | 5.74264764 | 108.71523839 |
| Apr  3 2006 | 102.84351805 | 6.33447720 | 109.17799525 |
| May  3 2006 | 102.69496625 | 6.92630677 | 109.62127302 |
| Jun  3 2006 | 102.55963138 | 7.51813633 | 110.07776771 |
| Jul  3 2006 | 102.40477543 | 8.10996589 | 110.51474133 |
| Aug  3 2006 | 102.25176690 | 4.18226226 | 106.43402915 |
| Sep  3 2006 | 102.09889070 | 4.77409182 | 106.87298252 |
| Oct  3 2006 | 101.92645179 | 5.36592139 | 107.29237318 |
| Nov  3 2006 | 101.76714562 | 5.95775095 | 107.72489657 |
| Dec  3 2006 | 101.60792957 | 6.54958052 | 108.15751009 |
| Jan  3 2007 | 101.42910832 | 7.14141008 | 108.57051840 |
| Feb  3 2007 | 101.26337702 | 5.21878163 | 106.48215865 |
| Mar  3 2007 | 101.09769279 | 5.81061120 | 106.90830399 |
| Apr  3 2007 | 100.93205594 | 6.40244076 | 107.33449670 |
| May  3 2007 | 100.75959024 | 6.99427033 | 107.75386056 |
| Jun  3 2007 | 100.59171083 | 7.58609989 | 108.17781072 |
| Jul  3 2007 | 100.41698753 | 8.17792946 | 108.59491699 |
| Aug  3 2007 | 100.23471331 | 4.18226226 | 104.41697556 |
| Sep  3 2007 | 100.05245652 | 4.77409182 | 104.82654834 |
| Oct  3 2007 | 99.86334072 | 5.36592139 | 105.22926211 |
| Nov  3 2007 | 99.67878087 | 5.95775095 | 105.63653182 |
| Dec  3 2007 | 99.49422314 | 6.54958052 | 106.04380366 |
| Jan  3 2008 | 99.30872098 | 7.14141008 | 106.45013106 |
| Feb  3 2008 | 99.12384566 | 5.29151420 | 104.41535986 |
| Mar  3 2008 | 98.93897034 | 5.88334376 | 104.82231410 |
| Apr  3 2008 | 98.75409501 | 6.47517333 | 105.22926834 |
| May  3 2008 | 98.56926001 | 7.06700289 | 105.63626290 |

## CASUALTY VALUE FACTORS - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| Casualty Value Determination Date | Casualty Value | Rent Adjustment | Casualty Value Factor |
|---|---|---|---|
| Jun 3 2008 | 98.38439840 | 7.65883246 | 106.04323085 |
| Jul 3 2008 | 98.20550720 | 8.25066202 | 106.45616922 |
| Aug 3 2008 | 98.00970319 | 4.18226226 | 102.19196545 |
| Sep 3 2008 | 97.81391288 | 4.77409182 | 102.58800471 |
| Oct 3 2008 | 97.62410669 | 5.36592139 | 102.99002808 |
| Nov 3 2008 | 97.43037419 | 5.95775095 | 103.38812514 |
| Dec 3 2008 | 97.23666927 | 6.54958052 | 103.78624979 |
| Jan 3 2009 | 97.04896244 | 7.14141008 | 104.19037252 |
| Feb 3 2009 | 96.85734337 | 5.36935041 | 102.22669378 |
| Mar 3 2009 | 96.66576605 | 5.96117997 | 102.62694602 |
| Apr 3 2009 | 96.47423077 | 6.55300954 | 103.02724030 |
| May 3 2009 | 96.28913559 | 7.14483910 | 103.43397469 |
| Jun 3 2009 | 96.09986069 | 7.73666866 | 103.83652935 |
| Jul 3 2009 | 95.91704105 | 8.32849823 | 104.24553928 |
| Aug 3 2009 | 95.71062477 | 4.18226226 | 99.89288703 |
| Sep 3 2009 | 95.50878667 | 4.77409182 | 100.28287849 |
| Oct 3 2009 | 95.31340410 | 5.36592139 | 100.67932549 |
| Nov 3 2009 | 95.11385736 | 5.95775095 | 101.07160831 |
| Dec 3 2009 | 94.91438372 | 6.54958052 | 101.46396424 |
| Jan 3 2010 | 94.72138147 | 7.14141008 | 101.86279155 |
| Feb 3 2010 | 94.51124478 | 5.02939633 | 99.54064112 |
| Mar 3 2010 | 94.30976769 | 5.62122590 | 99.93099359 |
| Apr 3 2010 | 94.10835077 | 6.21305546 | 100.32140623 |
| May 3 2010 | 93.91376667 | 6.80488503 | 100.71865170 |
| Jun 3 2010 | 93.71477411 | 7.39671459 | 101.11148870 |
| Jul 3 2010 | 93.52263061 | 7.98854416 | 101.51117477 |
| Aug 3 2010 | 93.30261688 | 4.18226226 | 97.48487913 |
| Sep 3 2010 | 93.09174157 | 4.77409182 | 97.86583339 |
| Oct 3 2010 | 92.88770119 | 5.36592139 | 98.25362257 |
| Nov 3 2010 | 92.67925446 | 5.95775095 | 98.63700541 |
| Dec 3 2010 | 92.47088668 | 6.54958052 | 99.02046720 |
| Jan 3 2011 | 92.26934629 | 7.14143444 | 99.41078073 |
| Feb 3 2011 | 91.94044231 | -13.55700680 | 78.38343551 |
| Mar 3 2011 | 91.62070636 | -12.96481191 | 78.65589445 |
| Apr 3 2011 | 91.30103571 | -12.37261702 | 78.92841870 |
| May 3 2011 | 90.99199913 | -11.78042213 | 79.21157700 |
| Jun 3 2011 | 90.67605400 | -11.18822723 | 79.48782677 |
| Jul 3 2011 | 90.37076791 | -10.59603234 | 79.77473557 |
| Aug 3 2011 | 90.05792581 | -11.60166175 | 78.45626406 |
| Sep 3 2011 | 89.74564362 | -11.00946686 | 78.73617677 |
| Oct 3 2011 | 89.44404502 | -10.41727196 | 79.02677305 |
| Nov 3 2011 | 89.13558773 | -9.82507707 | 79.31051066 |
| Dec 3 2011 | 88.82727135 | -9.23288218 | 79.59438917 |
| Jan 3 2012 | 88.52092164 | -8.63194380 | 79.88897784 |
| Feb 3 2012 | 88.05183341 | -15.21345087 | 72.83838254 |

**CASUALTY VALUE FACTORS - LOCOMOTIVES**

Expressed as percentages of Lessor's Cost

| Casualty Value Determination Date | Casualty Value | Rent Adjustment | Casualty Value Factor |
|---|---|---|---|
| Mar 3 2012 | 87.58291303 | -14.49010363 | 73.09280940 |
| Apr 3 2012 | 87.11416160 | -13.76675638 | 73.34740522 |
| May 3 2012 | 86.66166512 | -13.04340913 | 73.61825599 |
| Jun 3 2012 | 86.19872446 | -12.32006189 | 73.87866257 |
| Jul 3 2012 | 85.75207769 | -11.59671464 | 74.15536304 |
| Aug 3 2012 | 85.29502593 | -12.24868003 | 73.04634590 |
| Sep 3 2012 | 84.83822269 | -11.52533278 | 73.31288991 |
| Oct 3 2012 | 84.39775449 | -10.80198554 | 73.59576895 |
| Nov 3 2012 | 83.94692271 | -10.07863829 | 73.86828442 |
| Dec 3 2012 | 83.49638113 | -9.35529105 | 74.14109009 |
| Jan 3 2013 | 83.06221656 | -8.63194380 | 74.43027276 |
| Feb 3 2013 | 82.58179695 | -15.42905325 | 67.15274369 |
| Mar 3 2013 | 82.10171007 | -14.70570601 | 67.39600406 |
| Apr 3 2013 | 81.62195815 | -13.98235876 | 67.63959939 |
| May 3 2013 | 81.15982875 | -13.25901151 | 67.90081723 |
| Jun 3 2013 | 80.68663114 | -12.53566427 | 68.15096687 |
| Jul 3 2013 | 80.23109998 | -11.81231702 | 68.41878295 |
| Aug 3 2013 | 79.76454484 | -12.24868003 | 67.51586481 |
| Sep 3 2013 | 79.29841537 | -11.52533278 | 67.77308258 |
| Oct 3 2013 | 78.84999971 | -10.80198554 | 68.04801417 |
| Nov 3 2013 | 78.39060777 | -10.07863829 | 68.31196948 |
| Dec 3 2013 | 77.93168951 | -9.35529105 | 68.57639846 |
| Jan 3 2014 | 77.49053340 | -8.63194380 | 68.85858960 |
| Feb 3 2014 | 76.99990278 | -15.66033454 | 61.33956824 |
| Mar 3 2014 | 76.50979483 | -14.93698730 | 61.57280753 |
| Apr 3 2014 | 76.02021305 | -14.21364005 | 61.80657300 |
| May 3 2014 | 75.54973399 | -13.49029281 | 62.05944118 |
| Jun 3 2014 | 75.06753064 | -12.76694556 | 62.30058508 |
| Jul 3 2014 | 74.60447947 | -12.04359832 | 62.56088116 |
| Aug 3 2014 | 74.12975380 | -12.24868003 | 61.88107378 |
| Sep 3 2014 | 73.65565741 | -11.52533278 | 62.13032462 |
| Oct 3 2014 | 73.20076752 | -10.80198554 | 62.39878199 |
| Nov 3 2014 | 72.73425784 | -10.07863829 | 62.65561955 |
| Dec 3 2014 | 72.26843250 | -9.35529105 | 62.91314145 |
| Jan 3 2015 | 71.82186911 | -8.63194380 | 63.18992531 |
| Feb 3 2015 | 71.32239167 | -15.90843494 | 55.41395672 |
| Mar 3 2015 | 70.82365475 | -15.18508770 | 55.63856705 |
| Apr 3 2015 | 70.32566332 | -14.46174045 | 55.86392286 |
| May 3 2015 | 69.84837677 | -13.73839321 | 56.10998357 |
| Jun 3 2015 | 69.35867655 | -13.01504596 | 56.34363059 |
| Jul 3 2015 | 68.88973680 | -12.29169872 | 56.59803808 |
| Aug 3 2015 | 68.40843931 | -12.24868003 | 56.15975928 |
| Sep 3 2015 | 67.92800420 | -11.52533278 | 56.40267142 |
| Oct 3 2015 | 67.46839165 | -10.80198554 | 56.66640612 |
| Nov 3 2015 | 66.99648389 | -10.07863829 | 56.91784560 |

SCHEDULE VI TO
PARTICIPATION AGREEMENT

## CASUALTY VALUE FACTORS - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| Casualty Value Determination Date | Casualty Value | Rent Adjustment | Casualty Value Factor |
|---|---|---|---|
| Dec  3 2015 | 66.52550144 | -9.35529105 | 57.17021040 |
| Jan  3 2016 | 66.07540492 | -8.63194380 | 57.44346112 |
| Feb  3 2016 | 65.56871986 | -16.17457756 | 49.39414230 |
| Mar  3 2016 | 65.06302432 | -15.45123032 | 49.61179400 |
| Apr  3 2016 | 64.55832494 | -14.72788307 | 49.83044187 |
| May  3 2016 | 64.07606463 | -14.00453582 | 50.07152881 |
| Jun  3 2016 | 63.58066673 | -13.28118858 | 50.29947815 |
| Jul  3 2016 | 63.10777026 | -12.55784133 | 50.54992893 |
| Aug  3 2016 | 62.62179895 | -12.24868003 | 50.37311892 |
| Sep  3 2016 | 62.13695600 | -11.52533278 | 50.61162321 |
| Oct  3 2016 | 61.67468522 | -10.80198554 | 50.87269968 |
| Nov  3 2016 | 61.19941082 | -10.07863829 | 51.12077253 |
| Dec  3 2016 | 60.72533649 | -9.35529105 | 51.37004544 |
| Jan  3 2017 | 60.27390650 | -8.63194380 | 51.64196270 |
| Feb  3 2017 | 59.77005158 | -15.07677800 | 44.69327358 |
| Mar  3 2017 | 59.26746986 | -14.35343075 | 44.91403910 |
| Apr  3 2017 | 58.76616988 | -13.63008351 | 45.13608637 |
| May  3 2017 | 58.28891726 | -12.90673626 | 45.38218100 |
| Jun  3 2017 | 57.79794480 | -12.18338902 | 45.61455578 |
| Jul  3 2017 | 57.33108892 | -11.46004177 | 45.87104715 |
| Aug  3 2017 | 56.85058289 | -10.91391654 | 45.93666636 |
| Sep  3 2017 | 56.37150657 | -10.19056929 | 46.18093728 |
| Oct  3 2017 | 55.91662657 | -9.46722204 | 46.44940453 |
| Nov  3 2017 | 55.44817668 | -8.74387480 | 46.70430188 |
| Dec  3 2017 | 54.98123731 | -8.02052755 | 46.96070976 |
| Jan  3 2018 | 54.53857561 | -7.29718031 | 47.24139530 |
| Feb  3 2018 | 54.07162452 | -7.09672337 | 46.97490115 |
| Mar  3 2018 | 53.61339492 | -6.37337612 | 47.24001881 |
| Apr  3 2018 | 53.15674435 | -5.65002887 | 47.50671548 |
| May  3 2018 | 52.72444773 | -4.92668163 | 47.79776611 |
| Jun  3 2018 | 52.27872772 | -4.20333438 | 48.07539334 |
| Jul  3 2018 | 51.85743493 | -3.47998714 | 48.37744779 |
| Aug  3 2018 | 51.13172429 | -12.24868003 | 38.88304426 |
| Sep  3 2018 | 50.59984530 | -11.52533278 | 39.07451252 |
| Oct  3 2018 | 50.09181604 | -10.80198554 | 39.28983050 |
| Nov  3 2018 | 49.56985577 | -10.07863829 | 39.49121748 |
| Dec  3 2018 | 49.04904735 | -9.35529105 | 39.69375631 |
| Jan  3 2019 | 48.55216287 | -8.63194380 | 39.92021907 |
| Feb  3 2019 | 47.78126099 | -16.41154149 | 31.36971949 |
| Mar  3 2019 | 47.18328311 | -15.68819425 | 31.49508886 |
| Apr  3 2019 | 46.58594756 | -14.96484700 | 31.62110056 |
| May  3 2019 | 46.01202301 | -14.24149976 | 31.77052326 |
| Jun  3 2019 | 45.42372578 | -13.51815251 | 31.90557327 |
| Jul  3 2019 | 44.85890012 | -12.79480526 | 32.06409486 |
| Aug  3 2019 | 44.27976277 | -12.24868003 | 32.03108274 |



SCHEDULE VI TO
PARTICIPATION AGREEMENT

## CASUALTY VALUE FACTORS - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| Casualty Value Determination Date | Casualty Value | Rent Adjustment | Casualty Value Factor |
|---|---|---|---|
| Sep  3 2019 | 43.70139403 | -11.52533278 | 32.17606124 |
| Oct  3 2019 | 43.14656341 | -10.80198554 | 32.34457787 |
| Nov  3 2019 | 42.57748809 | -10.07863829 | 32.49884980 |
| Dec  3 2019 | 42.00924882 | -9.35529105 | 32.65395778 |
| Jan  3 2020 | 41.46461558 | -8.63194380 | 32.83267178 |
| Feb  3 2020 | 40.66537439 | -15.89148262 | 24.77389177 |
| Mar  3 2020 | 40.02518572 | -15.16813538 | 24.85705034 |
| Apr  3 2020 | 39.38536182 | -14.44478813 | 24.94057369 |
| May  3 2020 | 38.76869612 | -13.72144088 | 25.04725524 |
| Jun  3 2020 | 38.13735888 | -12.99809364 | 25.13926524 |
| Jul  3 2020 | 37.52923672 | -12.27474639 | 25.25449033 |
| Aug  3 2020 | 36.89009940 | -12.24868003 | 24.64141937 |
| Sep  3 2020 | 36.26226782 | -11.52533278 | 24.73693504 |
| Oct  3 2020 | 35.65767482 | -10.80198554 | 24.85568928 |
| Nov  3 2020 | 35.03849119 | -10.07863829 | 24.95985290 |
| Dec  3 2020 | 34.41981313 | -9.35529105 | 25.06452209 |
| Jan  3 2021 | 33.82443500 | -8.63194380 | 25.19249120 |
| Feb  3 2021 | 33.16939099 | -13.52013870 | 19.64925229 |
| Mar  3 2021 | 32.52573871 | -12.79679145 | 19.72894726 |
| Apr  3 2021 | 31.88262060 | -12.07344421 | 19.80917639 |
| May  3 2021 | 31.26378638 | -11.35009696 | 19.91368942 |
| Jun  3 2021 | 30.62982192 | -10.62674972 | 20.00307220 |
| Jul  3 2021 | 30.02020269 | -9.90340247 | 20.11680022 |
| Aug  3 2021 | 29.37911411 | -9.70491925 | 19.67419486 |
| Sep  3 2021 | 28.74951080 | -8.98157200 | 19.76793880 |
| Oct  3 2021 | 28.14428196 | -8.25822476 | 19.88605720 |
| Nov  3 2021 | 27.52401408 | -7.53487751 | 19.98913656 |
| Dec  3 2021 | 26.90443710 | -6.81153027 | 20.09290683 |
| Jan  3 2022 | 26.30930179 | -6.08818302 | 20.22111877 |
| Feb  3 2022 | 25.68279421 | -5.88969980 | 19.79309441 |
| Mar  3 2022 | 25.06786963 | -5.16635255 | 19.90151707 |
| Apr  3 2022 | 24.45367177 | -4.44300531 | 20.01066646 |
| May  3 2022 | 23.91662139 | -3.71965806 | 20.19696333 |
| Jun  3 2022 | 23.32987578 | -2.99631082 | 20.33356496 |
| Jul  3 2022 | 22.82046164 | -2.27296357 | 20.54749807 |
| Aug  3 2022 | 22.24513662 | -2.07448035 | 20.17065627 |
| Sep  3 2022 | 21.68173767 | -1.35113310 | 20.33060456 |
| Oct  3 2022 | 21.19582668 | -0.62778586 | 20.56804082 |
| Nov  3 2022 | 20.66056323 | 0.09556139 | 20.75612461 |
| Nov 15 2022 | 20.00000000 | 0.38490028 | 20.38490028 |



SCHEDULE VII TO
PARTICIPATION AGREEMENT

## TERMINATION VALUE FACTORS - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| Termination Date | Termination Value | Rent Adjustment |
|---|---|---|
| Dec  3 2000 | 104.43199860 | 0.00000000 |
| Jan  3 2001 | 104.99528312 | 0.00000000 |
| Feb  3 2001 | 105.69318681 | 0.00000000 |
| Mar  3 2001 | 106.02265603 | 0.35509774 |
| Apr  3 2001 | 106.11696575 | 0.94692730 |
| May  3 2001 | 106.14655559 | 1.53875687 |
| Jun  3 2001 | 106.22149633 | 2.13058643 |
| Jul  3 2001 | 106.23158737 | 2.72241600 |
| Aug  3 2001 | 106.28689862 | 0.61433852 |
| Sep  3 2001 | 106.34353134 | 1.20616808 |
| Oct  3 2001 | 106.33519164 | 1.79799765 |
| Nov  3 2001 | 106.37194862 | 2.38982721 |
| Dec  3 2001 | 106.40990271 | 2.98165678 |
| Jan  3 2002 | 106.38275918 | 3.57348634 |
| Feb  3 2002 | 106.40058630 | 1.46540886 |
| Mar  3 2002 | 106.41948364 | 2.05723842 |
| Apr  3 2002 | 106.43945838 | 2.64906799 |
| May  3 2002 | 106.41611905 | 3.24089755 |
| Jun  3 2002 | 106.42317315 | 3.83272712 |
| Jul  3 2002 | 106.38682657 | 4.42455668 |
| Aug  3 2002 | 106.38078625 | 2.31647920 |
| Sep  3 2002 | 106.37565619 | 2.90830877 |
| Oct  3 2002 | 106.32704377 | 3.50013833 |
| Nov  3 2002 | 106.30865540 | 4.09196790 |
| Dec  3 2002 | 106.29109452 | 4.68379746 |
| Jan  3 2003 | 106.22996796 | 5.27562703 |
| Feb  3 2003 | 106.19898158 | 3.16754955 |
| Mar  3 2003 | 106.16873824 | 3.75937911 |
| Apr  3 2003 | 106.13924293 | 4.35120868 |
| May  3 2003 | 106.08002099 | 4.94303824 |
| Jun  3 2003 | 106.04167263 | 5.53486780 |
| Jul  3 2003 | 105.97353830 | 6.12669737 |
| Aug  3 2003 | 105.92621781 | 4.01861989 |
| Sep  3 2003 | 105.87953089 | 4.61044945 |
| Oct  3 2003 | 105.80300210 | 5.20227902 |
| Nov  3 2003 | 105.74723089 | 5.79410858 |
| Dec  3 2003 | 105.69203661 | 6.38593815 |
| Jan  3 2004 | 105.60694345 | 6.97776771 |
| Feb  3 2004 | 105.54255045 | 4.86969023 |
| Mar  3 2004 | 105.47867659 | 5.46151980 |
| Apr  3 2004 | 105.41532535 | 6.05334936 |
| May  3 2004 | 105.33211137 | 6.64517893 |
| Jun  3 2004 | 105.26288295 | 7.23700849 |
| Jul  3 2004 | 105.17375240 | 7.82883806 |
| Aug  3 2004 | 105.08957137 | 4.18226226 |



### TERMINATION VALUE FACTORS - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| Termination Date | Termination Value | Rent Adjustment |
|---|---|---|
| Sep  3 2004 | 105.00583715 | 4.77409182 |
| Oct  3 2004 | 104.90216387 | 5.36592139 |
| Nov  3 2004 | 104.81239932 | 5.95775095 |
| Dec  3 2004 | 104.72304414 | 6.54958052 |
| Jan  3 2005 | 104.61371223 | 7.14141008 |
| Feb  3 2005 | 104.51825112 | 5.08731081 |
| Mar  3 2005 | 104.42316120 | 5.67914038 |
| Apr  3 2005 | 104.32844496 | 6.27096994 |
| May  3 2005 | 104.21404296 | 6.86279951 |
| Jun  3 2005 | 104.11325984 | 7.45462907 |
| Jul  3 2005 | 103.99275029 | 8.04645864 |
| Aug  3 2005 | 103.87523413 | 4.18226226 |
| Sep  3 2005 | 103.75801229 | 4.77409182 |
| Oct  3 2005 | 103.62102478 | 5.36592139 |
| Nov  3 2005 | 103.49757571 | 5.95775095 |
| Dec  3 2005 | 103.37438118 | 6.54958052 |
| Jan  3 2006 | 103.23138096 | 7.14141008 |
| Feb  3 2006 | 103.10187887 | 5.15081807 |
| Mar  3 2006 | 102.97259076 | 5.74264764 |
| Apr  3 2006 | 102.84351805 | 6.33447720 |
| May  3 2006 | 102.69496625 | 6.92630677 |
| Jun  3 2006 | 102.55963138 | 7.51813633 |
| Jul  3 2006 | 102.40477543 | 8.10996589 |
| Aug  3 2006 | 102.25176690 | 4.18226226 |
| Sep  3 2006 | 102.09889070 | 4.77409182 |
| Oct  3 2006 | 101.92645179 | 5.36592139 |
| Nov  3 2006 | 101.76714562 | 5.95775095 |
| Dec  3 2006 | 101.60792957 | 6.54958052 |
| Jan  3 2007 | 101.42910832 | 7.14141008 |
| Feb  3 2007 | 101.26337702 | 5.21878163 |
| Mar  3 2007 | 101.09769279 | 5.81061120 |
| Apr  3 2007 | 100.93205594 | 6.40244076 |
| May  3 2007 | 100.75959024 | 6.99427033 |
| Jun  3 2007 | 100.59171083 | 7.58609989 |
| Jul  3 2007 | 100.41698753 | 8.17792946 |
| Aug  3 2007 | 100.23471331 | 4.18226226 |
| Sep  3 2007 | 100.05245652 | 4.77409182 |
| Oct  3 2007 | 99.86334072 | 5.36592139 |
| Nov  3 2007 | 99.67878087 | 5.95775095 |
| Dec  3 2007 | 99.49422314 | 6.54958052 |
| Jan  3 2008 | 99.30872098 | 7.14141008 |
| Feb  3 2008 | 99.12384566 | 5.29151420 |
| Mar  3 2008 | 98.93897034 | 5.88334376 |
| Apr  3 2008 | 98.75409501 | 6.47517333 |
| May  3 2008 | 98.56926001 | 7.06700289 |

## TERMINATION VALUE FACTORS - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| Termination Date | Termination Value | Rent Adjustment |
|---|---|---|
| Jun 3 2008 | 98.38439840 | 7.65883246 |
| Jul 3 2008 | 98.20550720 | 8.25066202 |
| Aug 3 2008 | 98.00970319 | 4.18226226 |
| Sep 3 2008 | 97.81391288 | 4.77409182 |
| Oct 3 2008 | 97.62410669 | 5.36592139 |
| Nov 3 2008 | 97.43037419 | 5.95775095 |
| Dec 3 2008 | 97.23666927 | 6.54958052 |
| Jan 3 2009 | 97.04896244 | 7.14141008 |
| Feb 3 2009 | 96.85734337 | 5.36935041 |
| Mar 3 2009 | 96.66576605 | 5.96117997 |
| Apr 3 2009 | 96.47423077 | 6.55300954 |
| May 3 2009 | 96.28913559 | 7.14483910 |
| Jun 3 2009 | 96.09986069 | 7.73666866 |
| Jul 3 2009 | 95.91704105 | 8.32849823 |
| Aug 3 2009 | 95.71062477 | 4.18226226 |
| Sep 3 2009 | 95.50878667 | 4.77409182 |
| Oct 3 2009 | 95.31340410 | 5.36592139 |
| Nov 3 2009 | 95.11385736 | 5.95775095 |
| Dec 3 2009 | 94.91438372 | 6.54958052 |
| Jan 3 2010 | 94.72138147 | 7.14141008 |
| Feb 3 2010 | 94.51124478 | 5.02939633 |
| Mar 3 2010 | 94.30976769 | 5.62122590 |
| Apr 3 2010 | 94.10835077 | 6.21305546 |
| May 3 2010 | 93.91376667 | 6.80488503 |
| Jun 3 2010 | 93.71477411 | 7.39671459 |
| Jul 3 2010 | 93.52263061 | 7.98854416 |
| Aug 3 2010 | 93.30261688 | 4.18226226 |
| Sep 3 2010 | 93.09174157 | 4.77409182 |
| Oct 3 2010 | 92.88770119 | 5.36592139 |
| Nov 3 2010 | 92.67925446 | 5.95775095 |
| Dec 3 2010 | 92.47088668 | 6.54958052 |
| Jan 3 2011 | 92.26934629 | 7.14143444 |
| Feb 3 2011 | 91.94044231 | -13.55700680 |
| Mar 3 2011 | 91.62070636 | -12.96481191 |
| Apr 3 2011 | 91.30103571 | -12.37261702 |
| May 3 2011 | 90.99199913 | -11.78042213 |
| Jun 3 2011 | 90.67605400 | -11.18822723 |
| Jul 3 2011 | 90.37076791 | -10.59603234 |
| Aug 3 2011 | 90.05792581 | -11.60166175 |
| Sep 3 2011 | 89.74564362 | -11.00946686 |
| Oct 3 2011 | 89.44404502 | -10.41727196 |
| Nov 3 2011 | 89.13558773 | -9.82507707 |
| Dec 3 2011 | 88.82727135 | -9.23288218 |
| Jan 3 2012 | 88.52092164 | -8.63194380 |
| Feb 3 2012 | 88.05183341 | -15.21345087 |



SCHEDULE VII TO
PARTICIPATION AGREEMENT

## TERMINATION VALUE FACTORS - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| Termination<br>Date | Termination Value | Rent<br>Adjustment |
|---|---|---|
| Mar  3 2012 | 87.58291303 | -14.49010363 |
| Apr  3 2012 | 87.11416160 | -13.76675638 |
| May  3 2012 | 86.66166512 | -13.04340913 |
| Jun  3 2012 | 86.19872446 | -12.32006189 |
| Jul  3 2012 | 85.75207769 | -11.59671464 |
| Aug  3 2012 | 85.29502593 | -12.24868003 |
| Sep  3 2012 | 84.83822269 | -11.52533278 |
| Oct  3 2012 | 84.39775449 | -10.80198554 |
| Nov  3 2012 | 83.94692271 | -10.07863829 |
| Dec  3 2012 | 83.49638113 | -9.35529105 |
| Jan  3 2013 | 83.06221656 | -8.63194380 |
| Feb  3 2013 | 82.58179695 | -15.42905325 |
| Mar  3 2013 | 82.10171007 | -14.70570601 |
| Apr  3 2013 | 81.62195815 | -13.98235876 |
| May  3 2013 | 81.15982875 | -13.25901151 |
| Jun  3 2013 | 80.68663114 | -12.53566427 |
| Jul  3 2013 | 80.23109998 | -11.81231702 |
| Aug  3 2013 | 79.76454484 | -12.24868003 |
| Sep  3 2013 | 79.29841537 | -11.52533278 |
| Oct  3 2013 | 78.84999971 | -10.80198554 |
| Nov  3 2013 | 78.39060777 | -10.07863829 |
| Dec  3 2013 | 77.93168951 | -9.35529105 |
| Jan  3 2014 | 77.49053340 | -8.63194380 |
| Feb  3 2014 | 76.99990278 | -15.66033454 |
| Mar  3 2014 | 76.50979483 | -14.93698730 |
| Apr  3 2014 | 76.02021305 | -14.21364005 |
| May  3 2014 | 75.54973399 | -13.49029281 |
| Jun  3 2014 | 75.06753064 | -12.76694556 |
| Jul  3 2014 | 74.60447947 | -12.04359832 |
| Aug  3 2014 | 74.12975380 | -12.24868003 |
| Sep  3 2014 | 73.65565741 | -11.52533278 |
| Oct  3 2014 | 73.20076752 | -10.80198554 |
| Nov  3 2014 | 72.73425784 | -10.07863829 |
| Dec  3 2014 | 72.26843250 | -9.35529105 |
| Jan  3 2015 | 71.82186911 | -8.63194380 |
| Feb  3 2015 | 71.32239167 | -15.90843494 |
| Mar  3 2015 | 70.82365475 | -15.18508770 |
| Apr  3 2015 | 70.32566332 | -14.46174045 |
| May  3 2015 | 69.84837677 | -13.73839321 |
| Jun  3 2015 | 69.35867655 | -13.01504596 |
| Jul  3 2015 | 68.88973680 | -12.29169872 |
| Aug  3 2015 | 68.40843931 | -12.24868003 |
| Sep  3 2015 | 67.92800420 | -11.52533278 |
| Oct  3 2015 | 67.46839165 | -10.80198554 |
| Nov  3 2015 | 66.99648389 | -10.07863829 |



## TERMINATION VALUE FACTORS - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| Termination Date | Termination Value | Rent Adjustment |
|---|---|---|
| Dec  3 2015 | 66.52550144 | -9.35529105 |
| Jan  3 2016 | 66.07540492 | -8.63194380 |
| Feb  3 2016 | 65.56871986 | -16.17457756 |
| Mar  3 2016 | 65.06302432 | -15.45123032 |
| Apr  3 2016 | 64.55832494 | -14.72788307 |
| May  3 2016 | 64.07606463 | -14.00453582 |
| Jun  3 2016 | 63.58066673 | -13.28118858 |
| Jul  3 2016 | 63.10777026 | -12.55784133 |
| Aug  3 2016 | 62.62179895 | -12.24868003 |
| Sep  3 2016 | 62.13695600 | -11.52533278 |
| Oct  3 2016 | 61.67468522 | -10.80198554 |
| Nov  3 2016 | 61.19941082 | -10.07863829 |
| Dec  3 2016 | 60.72533649 | -9.35529105 |
| Jan  3 2017 | 60.27390650 | -8.63194380 |
| Feb  3 2017 | 59.77005158 | -15.07677800 |
| Mar  3 2017 | 59.26746986 | -14.35343075 |
| Apr  3 2017 | 58.76616988 | -13.63008351 |
| May  3 2017 | 58.28891726 | -12.90673626 |
| Jun  3 2017 | 57.79794480 | -12.18338902 |
| Jul  3 2017 | 57.33108892 | -11.46004177 |
| Aug  3 2017 | 56.85058289 | -10.91391654 |
| Sep  3 2017 | 56.37150657 | -10.19056929 |
| Oct  3 2017 | 55.91662657 | -9.46722204 |
| Nov  3 2017 | 55.44817668 | -8.74387480 |
| Dec  3 2017 | 54.98123731 | -8.02052755 |
| Jan  3 2018 | 54.53857561 | -7.29718031 |
| Feb  3 2018 | 54.07162452 | -7.09672337 |
| Mar  3 2018 | 53.61339492 | -6.37337612 |
| Apr  3 2018 | 53.15674435 | -5.65002887 |
| May  3 2018 | 52.72444773 | -4.92668163 |
| Jun  3 2018 | 52.27872772 | -4.20333438 |
| Jul  3 2018 | 51.85743493 | -3.47998714 |
| Aug  3 2018 | 51.13172429 | -12.24868003 |
| Sep  3 2018 | 50.59984530 | -11.52533278 |
| Oct  3 2018 | 50.09181604 | -10.80198554 |
| Nov  3 2018 | 49.56985577 | -10.07863829 |
| Dec  3 2018 | 49.04904735 | -9.35529105 |
| Jan  3 2019 | 48.55216287 | -8.63194380 |
| Feb  3 2019 | 47.78126099 | -16.41154149 |
| Mar  3 2019 | 47.18328311 | -15.68819425 |
| Apr  3 2019 | 46.58594756 | -14.96484700 |
| May  3 2019 | 46.01202301 | -14.24149976 |
| Jun  3 2019 | 45.42372578 | -13.51815251 |
| Jul  3 2019 | 44.85890012 | -12.79480526 |
| Aug  3 2019 | 44.27976277 | -12.24868003 |



SCHEDULE VII TO
PARTICIPATION AGREEMENT

## TERMINATION VALUE FACTORS - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| Termination Date | Termination Value | Rent Adjustment |
|---|---|---|
| Sep  3 2019 | 43.70139403 | -11.52533278 |
| Oct  3 2019 | 43.14656341 | -10.80198554 |
| Nov  3 2019 | 42.57748809 | -10.07863829 |
| Dec  3 2019 | 42.00924882 | -9.35529105 |
| Jan  3 2020 | 41.46461558 | -8.63194380 |
| Feb  3 2020 | 40.66537439 | -15.89148262 |
| Mar  3 2020 | 40.02518572 | -15.16813538 |
| Apr  3 2020 | 39.38536182 | -14.44478813 |
| May  3 2020 | 38.76869612 | -13.72144088 |
| Jun  3 2020 | 38.13735888 | -12.99809364 |
| Jul  3 2020 | 37.52923672 | -12.27474639 |
| Aug  3 2020 | 36.89009940 | -12.24868003 |
| Sep  3 2020 | 36.26226782 | -11.52533278 |
| Oct  3 2020 | 35.65767482 | -10.80198554 |
| Nov  3 2020 | 35.03849119 | -10.07863829 |
| Dec  3 2020 | 34.41981313 | -9.35529105 |
| Jan  3 2021 | 33.82443500 | -8.63194380 |
| Feb  3 2021 | 33.16939099 | -13.52013870 |
| Mar  3 2021 | 32.52573871 | -12.79679145 |
| Apr  3 2021 | 31.88262060 | -12.07344421 |
| May  3 2021 | 31.26378638 | -11.35009696 |
| Jun  3 2021 | 30.62982192 | -10.62674972 |
| Jul  3 2021 | 30.02020269 | -9.90340247 |
| Aug  3 2021 | 29.37911411 | -9.70491925 |
| Sep  3 2021 | 28.74951080 | -8.98157200 |
| Oct  3 2021 | 28.14428196 | -8.25822476 |
| Nov  3 2021 | 27.52401408 | -7.53487751 |
| Dec  3 2021 | 26.90443710 | -6.81153027 |
| Jan  3 2022 | 26.30930179 | -6.08818302 |
| Feb  3 2022 | 25.68279421 | -5.88969980 |
| Mar  3 2022 | 25.06786963 | -5.16635255 |
| Apr  3 2022 | 24.45367177 | -4.44300531 |
| May  3 2022 | 23.91662139 | -3.71965806 |
| Jun  3 2022 | 23.32987578 | -2.99631082 |
| Jul  3 2022 | 22.82046164 | -2.27296357 |
| Aug  3 2022 | 22.24513662 | -2.07448035 |
| Sep  3 2022 | 21.68173767 | -1.35113310 |
| Oct  3 2022 | 21.19582668 | -0.62778586 |
| Nov  3 2022 | 20.66056323 | 0.09556139 |
| Nov 15 2022 | 20.00000000 | 0.38490028 |



## AMORTIZATION SCHEDULE - LOCOMOTIVES

### Expressed as percentages of Lessor's Cost

| Installment Payment Date | Principal | Interest | Debt Service | Balance |
|---|---|---|---|---|
| Nov 15 2000 | 0.00000000 | 0.00000000 | 0.00000000 | 76.95331467 |
| Jan  3 2001 | 0.00000000 | 0.71997521 | 0.71997521 | 76.95331467 |
| Jul  3 2001 | 0.00000000 | 2.69990705 | 2.69990705 | 76.95331467 |
| Jan  3 2002 | 0.00000000 | 2.69990705 | 2.69990705 | 76.95331467 |
| Jul  3 2002 | 0.00000000 | 2.69990705 | 2.69990705 | 76.95331467 |
| Jan  3 2003 | 0.00000000 | 2.69990705 | 2.69990705 | 76.95331467 |
| Jul  3 2003 | 0.00000000 | 2.69990705 | 2.69990705 | 76.95331467 |
| Jan  3 2004 | 0.00000000 | 2.69990705 | 2.69990705 | 76.95331467 |
| Jul  3 2004 | 1.53849832 | 2.69990704 | 4.23840536 | 75.41481635 |
| Jan  3 2005 | 0.00000000 | 2.64592883 | 2.64592883 | 75.41481635 |
| Jul  3 2005 | 1.81009711 | 2.64592883 | 4.45602594 | 73.60471924 |
| Jan  3 2006 | 0.00000000 | 2.58242157 | 2.58242157 | 73.60471924 |
| Jul  3 2006 | 1.93711163 | 2.58242157 | 4.51953320 | 71.66760761 |
| Jan  3 2007 | 0.00000000 | 2.51445801 | 2.51445801 | 71.66760761 |
| Jul  3 2007 | 2.07303875 | 2.51445801 | 4.58749676 | 69.59456886 |
| Jan  3 2008 | 0.00000000 | 2.44172545 | 2.44172545 | 69.59456886 |
| Jul  3 2008 | 2.21850388 | 2.44172545 | 4.66022933 | 67.37606498 |
| Jan  3 2009 | 0.00000000 | 2.36388924 | 2.36388924 | 67.37606498 |
| Jul  3 2009 | 2.15570801 | 2.36388924 | 4.51959725 | 65.22035697 |
| Jan  3 2010 | 0.00000000 | 2.28825622 | 2.28825622 | 65.22035697 |
| Jul  3 2010 | 1.67124923 | 2.28825622 | 3.95950545 | 63.54910774 |
| Jan  3 2011 | 18.62110448 | 2.22962044 | 20.85072492 | 44.92800326 |
| Jul  3 2011 | 0.00000000 | 1.57629899 | 1.57629899 | 44.92800326 |
| Jan  3 2012 | 5.72855532 | 1.57629900 | 7.30485432 | 39.19944794 |
| Jul  3 2012 | 0.00000000 | 1.37531263 | 1.37531263 | 39.19944794 |
| Jan  3 2013 | 6.14514407 | 1.37531263 | 7.52045670 | 33.05430387 |
| Jul  3 2013 | 0.00000000 | 1.15971025 | 1.15971025 | 33.05430387 |
| Jan  3 2014 | 6.59202774 | 1.15971025 | 7.75173799 | 26.46227613 |
| Jul  3 2014 | 0.00000000 | 0.92842896 | 0.92842896 | 26.46227613 |
| Jan  3 2015 | 7.07140943 | 0.92842896 | 7.99983839 | 19.39086670 |
| Jul  3 2015 | 0.00000000 | 0.68032856 | 0.68032856 | 19.39086670 |
| Jan  3 2016 | 7.58565245 | 0.68032856 | 8.26598101 | 11.80521425 |
| Jul  3 2016 | 0.00000000 | 0.41418594 | 0.41418594 | 11.80521425 |
| Jan  3 2017 | 6.75399550 | 0.41418595 | 7.16818145 | 5.05121875 |
| Jul  3 2017 | 0.00000000 | 0.17722201 | 0.17722201 | 5.05121875 |
| Jan  3 2018 | 0.00000000 | 0.17722201 | 0.17722201 | 5.05121875 |
| Jul  3 2018 | 0.00000000 | 0.17722201 | 0.17722201 | 5.05121875 |
| Jan  3 2019 | 0.00000000 | 0.17722201 | 0.17722201 | 5.05121875 |
| Jul  3 2019 | 0.00000000 | 0.17722201 | 0.17722201 | 5.05121875 |
| Jan  3 2020 | 0.13695749 | 0.17722201 | 0.31417950 | 4.91426126 |
| Jul  3 2020 | 0.00000000 | 0.17241686 | 0.17241686 | 4.91426126 |
| Jan  3 2021 | 4.91426126 | 0.17241686 | 5.08667812 | 0.00000000 |
| Jul  3 2021 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 |
| Jan  3 2022 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 |
| Jul  3 2022 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 |
| Nov 15 2022 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 |

## EBO PRICE - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| EBO Dates | EBO Price | Rent Adjustment | Adjusted EBO Price |
|---|---|---|---|
| Jan  3 2018 | 33.32829325 | -7.29718031 | 26.03111294 |
| Apr 15 2018 | 4.52001509 | 0.00000000 | 4.52001509 |
| Jun 15 2018 | 4.52001509 | 0.00000000 | 4.52001509 |
| Sep 15 2018 | 4.52001509 | 0.00000000 | 4.52001509 |
| Dec 15 2018 | 4.52001509 | 0.00000000 | 4.52001509 |

**EQUITY TV AMOUNT - LOCOMOTIVES**

| Equity TV Determination Dates | Percentage of Lessor's Cost |
|---|---|
| Dec  3 2000 | 27.20869322 |
| Jan  3 2001 | 27.32199323 |
| Feb  3 2001 | 28.28988763 |
| Mar  3 2001 | 28.52447008 |
| Apr  3 2001 | 28.76062486 |
| May  3 2001 | 28.93205975 |
| Jun  3 2001 | 29.14884555 |
| Jul  3 2001 | 29.30078165 |
| Aug  3 2001 | 29.49793795 |
| Sep  3 2001 | 29.69641573 |
| Oct  3 2001 | 29.82992109 |
| Nov  3 2001 | 30.00852313 |
| Dec  3 2001 | 30.18832227 |
| Jan  3 2002 | 30.30302381 |
| Feb  3 2002 | 30.46269597 |
| Mar  3 2002 | 30.62343837 |
| Apr  3 2002 | 30.78525818 |
| May  3 2002 | 30.90376390 |
| Jun  3 2002 | 31.05266306 |
| Jul  3 2002 | 31.15816154 |
| Aug  3 2002 | 31.29396628 |
| Sep  3 2002 | 31.43068127 |
| Oct  3 2002 | 31.52391391 |
| Nov  3 2002 | 31.64737059 |
| Dec  3 2002 | 31.77165477 |
| Jan  3 2003 | 31.85237327 |
| Feb  3 2003 | 31.96323194 |
| Mar  3 2003 | 32.07483366 |
| Apr  3 2003 | 32.18718341 |
| May  3 2003 | 32.26980653 |
| Jun  3 2003 | 32.37330322 |
| Jul  3 2003 | 32.44701395 |
| Aug  3 2003 | 32.54153852 |
| Sep  3 2003 | 32.63669665 |
| Oct  3 2003 | 32.70201292 |
| Nov  3 2003 | 32.78808677 |
| Dec  3 2003 | 32.87473755 |
| Jan  3 2004 | 32.93148944 |
| Feb  3 2004 | 33.00894150 |
| Mar  3 2004 | 33.08691270 |
| Apr  3 2004 | 33.16540651 |
| May  3 2004 | 33.22403759 |
| Jun  3 2004 | 33.29665423 |
| Jul  3 2004 | 33.34936873 |
| Aug  3 2004 | 33.41602913 |
| Sep  3 2004 | 33.48313634 |

## EQUITY TV AMOUNT - LOCOMOTIVES

| Equity TV Determination Dates | Percentage of Lessor's Cost |
|---|---|
| Oct  3 2004 | 33.53030449 |
| Nov  3 2004 | 33.59138136 |
| Dec  3 2004 | 33.65286761 |
| Jan  3 2005 | 33.69437713 |
| Feb  3 2005 | 33.74975744 |
| Mar  3 2005 | 33.80550894 |
| Apr  3 2005 | 33.86163413 |
| May  3 2005 | 33.89807356 |
| Jun  3 2005 | 33.94813186 |
| Jul  3 2005 | 33.97846374 |
| Aug  3 2005 | 34.02237355 |
| Sep  3 2005 | 34.06657768 |
| Oct  3 2005 | 34.09101614 |
| Nov  3 2005 | 34.12899303 |
| Dec  3 2005 | 34.16722448 |
| Jan  3 2006 | 34.18565022 |
| Feb  3 2006 | 34.21757410 |
| Mar  3 2006 | 34.24971196 |
| Apr  3 2006 | 34.28206522 |
| May  3 2006 | 34.29493939 |
| Jun  3 2006 | 34.32103048 |
| Jul  3 2006 | 34.32760051 |
| Aug  3 2006 | 34.34734520 |
| Sep  3 2006 | 34.36722224 |
| Oct  3 2006 | 34.36753655 |
| Nov  3 2006 | 34.38098361 |
| Dec  3 2006 | 34.39452080 |
| Jan  3 2007 | 34.38845277 |
| Feb  3 2007 | 34.39547470 |
| Mar  3 2007 | 34.40254370 |
| Apr  3 2007 | 34.40966008 |
| May  3 2007 | 34.40994760 |
| Jun  3 2007 | 34.41482142 |
| Jul  3 2007 | 34.41285136 |
| Aug  3 2007 | 34.41545246 |
| Sep  3 2007 | 34.41807099 |
| Oct  3 2007 | 34.41383052 |
| Nov  3 2007 | 34.41414599 |
| Dec  3 2007 | 34.41446358 |
| Jan  3 2008 | 34.41383675 |
| Feb  3 2008 | 34.41383675 |
| Mar  3 2008 | 34.41383675 |
| Apr  3 2008 | 34.41383675 |
| May  3 2008 | 34.41387707 |
| Jun  3 2008 | 34.41389078 |
| Jul  3 2008 | 34.41987490 |

**EQUITY TV AMOUNT - LOCOMOTIVES**

| Equity TV Determination Dates | Percentage of Lessor's Cost |
|---|---|
| Aug  3 2008 | 34.42191892 |
| Sep  3 2008 | 34.42397664 |
| Oct  3 2008 | 34.43201847 |
| Nov  3 2008 | 34.43613399 |
| Dec  3 2008 | 34.44027710 |
| Jan  3 2009 | 34.45041830 |
| Feb  3 2009 | 34.45664725 |
| Mar  3 2009 | 34.46291796 |
| Apr  3 2009 | 34.46923069 |
| May  3 2009 | 34.48198354 |
| Jun  3 2009 | 34.49055667 |
| Jul  3 2009 | 34.50558505 |
| Aug  3 2009 | 34.29115402 |
| Sep  3 2009 | 34.29976944 |
| Oct  3 2009 | 34.31484040 |
| Nov  3 2009 | 34.32574719 |
| Dec  3 2009 | 34.33672707 |
| Jan  3 2010 | 34.35417835 |
| Feb  3 2010 | 33.93890810 |
| Mar  3 2010 | 33.94788454 |
| Apr  3 2010 | 33.95692114 |
| May  3 2010 | 33.97279057 |
| Jun  3 2010 | 33.98425153 |
| Jul  3 2010 | 34.00256157 |
| Aug  3 2010 | 33.56416798 |
| Sep  3 2010 | 33.57351883 |
| Oct  3 2010 | 33.58970461 |
| Nov  3 2010 | 33.60148404 |
| Dec  3 2010 | 33.61334242 |
| Jan  3 2011 | 33.63205254 |
| Feb  3 2011 | 33.19271574 |
| Mar  3 2011 | 33.20245819 |
| Apr  3 2011 | 33.21226593 |
| May  3 2011 | 33.23270773 |
| Jun  3 2011 | 33.24624101 |
| Jul  3 2011 | 33.27043331 |
| Aug  3 2011 | 33.26554429 |
| Sep  3 2011 | 33.28274050 |
| Oct  3 2011 | 33.31062029 |
| Nov  3 2011 | 33.33164140 |
| Dec  3 2011 | 33.35280340 |
| Jan  3 2012 | 33.38467557 |
| Feb  3 2012 | 33.40971582 |
| Mar  3 2012 | 33.43492391 |
| Apr  3 2012 | 33.46030096 |
| May  3 2012 | 33.50193296 |

**EQUITY TV AMOUNT - LOCOMOTIVES**

| Equity TV Determination Dates | Percentage of Lessor's Cost |
|---|---|
| Jun  3 2012 | 33.53312076 |
| Jul  3 2012 | 33.58060247 |
| Aug  3 2012 | 33.61767919 |
| Sep  3 2012 | 33.65500442 |
| Oct  3 2012 | 33.70866469 |
| Nov  3 2012 | 33.75196139 |
| Dec  3 2012 | 33.79554829 |
| Jan  3 2013 | 33.85551219 |
| Feb  3 2013 | 33.90515477 |
| Mar  3 2013 | 33.95513010 |
| Apr  3 2013 | 34.00544039 |
| May  3 2013 | 34.07337319 |
| Jun  3 2013 | 34.13023779 |
| Jul  3 2013 | 34.20476882 |
| Aug  3 2013 | 34.26827589 |
| Sep  3 2013 | 34.33220862 |
| Oct  3 2013 | 34.41385517 |
| Nov  3 2013 | 34.48452543 |
| Dec  3 2013 | 34.55566938 |
| Jan  3 2014 | 34.64457547 |
| Feb  3 2014 | 34.72255394 |
| Mar  3 2014 | 34.80105508 |
| Apr  3 2014 | 34.88008238 |
| May  3 2014 | 34.97821241 |
| Jun  3 2014 | 35.06461814 |
| Jul  3 2014 | 35.17017606 |
| Aug  3 2014 | 35.26405948 |
| Sep  3 2014 | 35.35857217 |
| Oct  3 2014 | 35.47229137 |
| Nov  3 2014 | 35.57439077 |
| Dec  3 2014 | 35.67717452 |
| Jan  3 2015 | 35.79922022 |
| Feb  3 2015 | 35.90970193 |
| Mar  3 2015 | 36.02092416 |
| Apr  3 2015 | 36.13289188 |
| May  3 2015 | 36.26556449 |
| Jun  3 2015 | 36.38582342 |
| Jul  3 2015 | 36.52684282 |
| Aug  3 2015 | 36.65550448 |
| Sep  3 2015 | 36.78502852 |
| Oct  3 2015 | 36.93537513 |
| Nov  3 2015 | 37.07342652 |
| Dec  3 2015 | 37.21240323 |
| Jan  3 2016 | 37.37226585 |
| Feb  3 2016 | 37.51989705 |
| Mar  3 2016 | 37.66851777 |

### EQUITY TV AMOUNT - LOCOMOTIVES

| Equity TV Determination Dates | Percentage of Lessor's Cost |
|---|---|
| Apr  3 2016 | 37.81813464 |
| May  3 2016 | 37.99019059 |
| Jun  3 2016 | 38.14910895 |
| Jul  3 2016 | 38.33052873 |
| Aug  3 2016 | 38.49887367 |
| Sep  3 2016 | 38.66834698 |
| Oct  3 2016 | 38.86039245 |
| Nov  3 2016 | 39.03943432 |
| Dec  3 2016 | 39.21967624 |
| Jan  3 2017 | 39.42256251 |
| Feb  3 2017 | 39.61251782 |
| Mar  3 2017 | 39.80374635 |
| Apr  3 2017 | 39.99625661 |
| May  3 2017 | 40.21281424 |
| Jun  3 2017 | 40.41565202 |
| Jul  3 2017 | 40.64260639 |
| Aug  3 2017 | 40.85591061 |
| Sep  3 2017 | 41.07064453 |
| Oct  3 2017 | 41.30957477 |
| Nov  3 2017 | 41.53493512 |
| Dec  3 2017 | 41.76180600 |
| Jan  3 2018 | 42.01295454 |
| Feb  3 2018 | 41.89414540 |
| Mar  3 2018 | 42.12972605 |
| Apr  3 2018 | 42.36688572 |
| May  3 2018 | 42.62839935 |
| Jun  3 2018 | 42.87648958 |
| Jul  3 2018 | 43.14900703 |
| Aug  3 2018 | 33.80228850 |
| Sep  3 2018 | 33.96421976 |
| Oct  3 2018 | 34.15000075 |
| Nov  3 2018 | 34.32185072 |
| Dec  3 2018 | 34.49485255 |
| Jan  3 2019 | 34.69177831 |
| Feb  3 2019 | 26.28896374 |
| Mar  3 2019 | 26.38479611 |
| Apr  3 2019 | 26.48127080 |
| May  3 2019 | 26.60115650 |
| Jun  3 2019 | 26.70666951 |
| Jul  3 2019 | 26.83565410 |
| Aug  3 2019 | 26.95032698 |
| Sep  3 2019 | 27.06576849 |
| Oct  3 2019 | 27.20474812 |
| Nov  3 2019 | 27.32948304 |
| Dec  3 2019 | 27.45505402 |
| Jan  3 2020 | 27.60423101 |

**EQUITY TV AMOUNT - LOCOMOTIVES**

| Equity TV Determination Dates | Percentage of Lessor's Cost |
|---|---|
| Feb 3 2020 | 19.83089436 |
| Mar 3 2020 | 19.88531679 |
| Apr 3 2020 | 19.94010400 |
| May 3 2020 | 20.01804940 |
| Jun 3 2020 | 20.08132326 |
| Jul 3 2020 | 20.16781220 |
| Aug 3 2020 | 19.69842196 |
| Sep 3 2020 | 19.76520149 |
| Oct 3 2020 | 19.85521959 |
| Nov 3 2020 | 19.93064706 |
| Dec 3 2020 | 20.00658011 |
| Jan 3 2021 | 20.10581308 |
| Feb 3 2021 | 19.64925229 |
| Mar 3 2021 | 19.72894726 |
| Apr 3 2021 | 19.80917639 |
| May 3 2021 | 19.91368942 |
| Jun 3 2021 | 20.00307220 |
| Jul 3 2021 | 20.11680022 |
| Aug 3 2021 | 19.67419486 |
| Sep 3 2021 | 19.76793880 |
| Oct 3 2021 | 19.88605720 |
| Nov 3 2021 | 19.98913656 |
| Dec 3 2021 | 20.09290683 |
| Jan 3 2022 | 20.22111877 |
| Feb 3 2022 | 19.79309441 |
| Mar 3 2022 | 19.90151707 |
| Apr 3 2022 | 20.01066646 |
| May 3 2022 | 20.19696333 |
| Jun 3 2022 | 20.33356496 |
| Jul 3 2022 | 20.54749807 |
| Aug 3 2022 | 20.17065627 |
| Sep 3 2022 | 20.33060456 |
| Oct 3 2022 | 20.56804082 |
| Nov 3 2022 | 20.75612461 |
| Nov 15 2022 | 20.38490029 |

SCHEDULE XI TO
PARTICIPATION AGREEMENT

## DISCLOSURE

Amtrak is involved in various litigation and arbitration proceedings in the normal course of business. The proceeding described below may be material and any liability of Amtrak in connection therewith would not be covered by insurance. While the outcome of any of these matters, including the proceedings described below, cannot be predicted with certainty, it is the opinion of Amtrak that the disposition of these matters, even if determined adversely to Amtrak's interest, will not materially affect Amtrak's business operations or its ability to satisfy its obligations under the Operative Documents to which Amtrak is a party.

*Campbell et al. v. Amtrak*

On November 9, 1999, a class action race discrimination complaint was filed against Amtrak in the U.S. District Court for the District of Columbia. The lawsuit was subsequently amended on March 16, 2000 and includes 71 named plaintiffs and one union. Plaintiffs purport to represent all Amtrak agreement covered employees, except Brotherhood of Maintenance of Way Employees' employees working in the Northeast Corridor, and applicants to those positions. The lawsuit alleges race discrimination with regard to promotion, training and discipline and creating a hostile work environment. The plaintiffs are seeking unspecified monetary damages, as well as declaratory and injunctive relief and punitive damages.

On May 15, 2000, Amtrak filed a Motion to Dismiss and a Motion to Stay Discovery pending resolution of the Motion to Dismiss. The court has granted Amtrak's Motion to Stay Discovery and a hearing on the Motion to Dismiss is scheduled for November 1, 2000.

SCHEDULE XII TO
PARTICIPATION AGREEMENT

**Table:  Measurement Test of Operating Self-Sufficiency**

($ in millions; any discrepancy is due to rounding)

|  | Fiscal Year 1999 |
|---|---|
| **GAAP Revenue** | $2,042.3 |
| **Adjustment**[1] | (214.3) |
| **Adjusted Revenue** | $1,827.9 |
| **GAAP Expense** | $2,744.6 |
| **Operating Profit (Loss)** | (916.7) |
| **Capital Funds for Progressive Overhaul and Other**[2] | 103.3 |
| **Depreciation and Other Non-Cash**[2] | 337.3 |
| **Budget Result** | $(476.1) |
| **Excess Mandatory Railroad Retirement Taxes** | 166.0 |
| **Test for Self Sufficiency**[3] | $(310.1) |

---

[1]  Excludes Taxpayer Relief Act revenues and related interest income of $214.3 for Fiscal Year 1999 which is accounted for on a GAAP basis as revenue.

[2]  Capital funds for operations, capital funds for progressive overhauls, depreciation and other non-cash expenses are included as expenses, because they are considered operating expenses under GAAP.  However, under Amtrak's accounting methodology, these expenses are funded from federal capital appropriations and hence added back to the operating profit/(loss) to calculate the budget result.

[3]  Each of Amtrak's Business Plans assumes that operational self-sufficiency will be achieved when the amount drawn from federal capital appropriations for qualified maintenance expenses is less than or equal to the value of such excess railroad retirement tax payments.  The calculation of operational self-sufficiency excludes depreciation.

EXHIBIT A
TO THE
PARTICIPATION
AGREEMENT

## FORM OF TRANSFEREE ASSUMPTION AGREEMENT

THIS TRANSFEREE ASSUMPTION AGREEMENT (this "Agreement") is made by [Name of Transferee], a _____ ("Transferee"), and agreed to and acknowledged by [Name of Transferor], a _____ ("Transferor"), on _____.

## W I T N E S S E T H :

WHEREAS, Transferor is party to that certain Participation Agreement (Amtrak Trust HS-EDC-1), dated as of November ___, 2000, among Transferor, National Railroad Passenger Corporation ("Lessee"), Amtrak Trust HS-EDC-1, a Delaware business trust (the "Trust"), all of the activities of which shall be conducted by Wilmington Trust Company, a Delaware banking corporation, not in its individual capacity but solely as trustee for the Trust, Wilmington Trust Company, a Delaware banking corporation, in its individual capacity only to the extent expressly provided therein, Allfirst Bank, as Indenture Trustee, and Export Development Corporation, as Loan Participant (the "Participation Agreement");

WHEREAS, subject to the terms and conditions hereof, pursuant to Section 10.1 of the Participation Agreement, Transferor desires to transfer all (except as provided below) of its right, title and interest in and to the Trust Estate, the Equipment and the Operative Documents to which Transferor is a party to Transferee and Transferee desires to acquire [part] [all (except as provided below)] of such right, title and interest in the Trust Estate, the Equipment and the Operative Documents;

WHEREAS, subject to the terms and conditions hereof, pursuant to Section 10.1 of the Participation Agreement Transferee is required, inter alia, to become a party to the Participation Agreement and to all of the other Operative Documents to which Transferor is a party, to provide all of the representations, warranties and agreements set forth in Section 2 hereof and to be bound by all of the terms of, and to undertake all of the obligations of Transferor contained in, the Operative Documents, except as provided below and Transferor acknowledges and consents to the assumption of such agreements and obligations by Transferee;

NOW THEREFORE, in consideration of the premises and the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

Section 1.    Definitions.

Capitalized terms used but not defined herein shall, except as such definitions may be specifically modified in the body of this Agreement for the purposes of a particular

section, paragraph or clause, have the meanings given such terms in Annex A to the Participation Agreement.

Section 2.   Agreements.

(a)   Transfer and Assumption.

Transferor hereby sells, transfers and assigns to Transferee all of Transferor's right, title and interest in and to the Trust Estate, the Equipment and the Operative Documents and Transferee hereby (A) purchases and assumes all of such right, title and interest in and to the Trust Estate, the Equipment and the Operative Documents, (B) confirms that from and after the date hereof it shall be deemed a party to the each of the Operative Documents to which Transferor is a party and (C) from and after the date hereof agrees to be bound by all the terms of, and undertakes all the obligations of Transferor contained in such Operative Documents with respect to the interest; provided that (x) Transferor's rights to indemnification under Section 6 of the Participation Agreement and under the Tax Indemnity Agreement and rights to Excepted Payments and Excepted Rights to the extent relating to acts, conditions or events occurring or existing prior to the date hereof shall be retained in full by Transferor, provided, however that the Transferor shall have the right to direct the Trustee with respect to such rights retained by the Transferor and that the Transferee shall be entitled to give the Trustee such instructions as are permitted to be given by the Owner Participant under the Trust Agreement and (y) any obligations of Transferor arising or accruing prior to the date hereof shall be retained by Transferor and not assumed by Transferee.   The right, title and interest so transferred are hereinafter called the "Interest".

Transferor and Transferee hereby confirm that Transferee shall, with respect to the Interest, be entitled to all rights and benefits and be subject to all obligations and responsibilities of Transferor with respect to such Interest under the Operative Documents (except as described above), and, as between Transferor and Transferee, upon consummation of the transfer of the Interest, Transferor will be relieved of and Transferee will thereupon assume all obligations of Transferor with respect to the Interest (except as described above).

(b)   Representations and Warranties of Transferee.

Transferee, for the benefit of Trustee, Trust Company, Loan Participant and Lessee, hereby represents and warrants that:

(i)   Transferee is acquiring its interest in the Trust Estate, the Equipment and the Operative Documents for investment by it, and not with a view to any resale or distribution thereof, other than in compliance with, and in a manner which does not require registration or qualification under Applicable Law;

(ii)   [no broker's or finder's fees or commissions or advisory fees are or may become payable as a result of any act or failure to act on Transferee's part, except such as will be paid by Transferee;]

(iii)   no part of the funds to be used by Transferee to acquire the Interest constitute assets (within the meaning of ERISA and any applicable rules, regulations and

- 2 -

court decisions) of an "employee benefit plan" as defined in subsection (3) of Section 3 of ERISA or to the extent such funds constitute assets of such a plan the ownership of the Interest will be exempt from the prohibited transaction provisions of ERISA and Section 4975 of the Code under the exemption provided by prohibited transaction Class Exemption 95-60;

(iv)   Transferee is a _____ duly organized, validly existing and in good standing pursuant to the laws of _____, and has the [corporate] power and authority to enter into and perform its obligations under this Agreement and the Operative Documents to which it will become a party as a result of the execution and delivery of this Agreement;

(v)   the execution, delivery and performance by Transferee of this Agreement and the performance by Transferee of the Operative Documents to which it will become a party as a result of the execution and delivery of this Agreement have been duly authorized by all necessary [corporate] action on the part of Transferee, do not require any stockholder approval, or approval or consent of any trustee or holders of any indebtedness or obligations of Transferee except such as have been duly obtained, and none of such agreements will contravene in any material respect any applicable law, [corporate] charter or by-law, or contravene in any material respect the provisions of, or constitute a material default under, any indenture, mortgage, contract or other agreement to which Transferee is a party or by which it may be bound or affected provided that no representation or warranty is made under this Section 2(b)(v) with respect to ERISA;

(vi)   none of the execution and delivery by Transferee of this Agreement, the performance by Transferee of the Operative Documents to which it will become a party as a result of the execution and delivery of this Agreement, or the consummation by Transferee of any of the transactions contemplated hereby or thereby, nor the performance by Transferee of the obligations hereunder or under other documents contemplated hereby or thereby requires the consent or approval of, the giving of notice to, the registration with or the taking of any other action in respect of, any federal, state or governmental authority or agency except such as have been obtained and, except for filings, if any, made pursuant to any notice reporting requirements applicable to it;

(vii)   this Agreement has been duly executed and validly delivered by Transferee and each of this Agreement and each of the Operative Documents to which Transferee will become a party as a result of the execution and delivery of this Agreement constitutes the legal, valid and binding obligation of Transferee enforceable against Transferee in accordance with the terms hereof and thereof;

(viii)   there are no pending or, to Transferee's knowledge, threatened actions or proceedings before any court or administrative agency which can reasonably be expected to  materially adversely affect the ability of Transferee to perform its obligations under this Agreement or the Operative Documents to which Transferee will become a party as a result of the execution and delivery of this Agreement;

- 3 -

(ix)    on the date hereof and after giving effect to the transfer of the Interest contemplated by Section 2(a) hereof the Trust Estate will be free of Owner Participant's Liens attributable to Transferee;

(x)    the conveyance contemplated hereby does not violate (a) Section 5 of the United States Securities Act of 1933, as amended, or (b) any other applicable laws (or create a relationship which would be in violation thereof) provided that applicable laws shall not include ERISA; and

(xi)    [Transferee is an Affiliate of the Transferor which has executed a Guaranty in the form of Exhibit B to the Participation Agreement] [Transferee has a combined capital, surplus and undivided profits of at least $75,000,000 or has a consolidated tangible net worth of at least $75,000,000 or is a direct or indirect wholly-owned subsidiary of such a Person which has executed a Guaranty in the form of Exhibit B to the Participation Agreement.]

(c)    Third Party Beneficiaries.

Transferor and Transferee hereby expressly agree that Lessee, Trust Company, Trustee and Loan Participant are third-party beneficiaries of this Agreement.

Section 3.    Miscellaneous.

(a)    Notices.

The address of Transferee, for notices and payments under the Operative Documents, is until further notice, as follows:

[address]
[address]
[address]

(b)    Governing Law.

THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY THE LAW OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE WITHOUT REFERENCE TO ANY CONFLICT OF LAW RULES WHICH MIGHT LEAD TO THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

(c)    Counterparts.

This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

(d)    Benefit and Binding Effect.

The terms of this Agreement shall be binding upon, and shall inure to the benefit of, Transferor, Transferee and their respective successors and permitted assigns.

(e)     Entire Agreement.

This Agreement, together with the agreements, instruments and other documents required to be executed and delivered in connection herewith, represents the entire agreement between Transferor and Transferee and supersedes all prior agreements and understanding of Transferor and Transferee with respect to the subject matter covered hereby.

(f)     Effective Date.

This Agreement and the assignment and assumption effected hereby shall be effective from and after the date first above written.

(g)     Amendment.

Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing signed by the party against which the enforcement of the termination, amendment, supplement, waiver or modification is sought.

(h)     Expenses.

All of the costs and expenses of Trust Company, Trustee, Lessee and Loan Participant incurred in connection with the assignment and assumption effected hereby (including, without limitation, the reasonable out-of-pocket expenses of any thereof incurred in connection with the review, negotiation, execution and delivery of this Agreement or the consummation of the transactions contemplated hereby and reasonable fees and expenses of counsel to each thereof) shall be paid promptly by Transferee upon the receipt by Transferee of copies of invoices relating to such costs, fees and expenses.

(i)     Certain Assurances.

Each of Transferor and Transferee shall do, execute, acknowledge and deliver, or shall cause to be done, executed, acknowledged and delivered, all such further acts, conveyances and assurances as any party to the Participation Agreement shall reasonably require for accomplishing the purposes of and carrying out obligations of such party under this Agreement and the other Operative Documents.

IN WITNESS WHEREOF, the undersigned has caused this Transferee Assumption Agreement to be duly executed by its officer thereunto duly authorized on the day and year first above written.

[Transferee]

By: _____
       Name:
       Title:

Agreed to and Acknowledged by
[Transferor] as of this _____ day of
_____, ____:

By: _____
       Name:
       Title:

NY #354815 v4

## Schedule A

[Lessee]

[Trustee]

[Loan Participant]

**EXHIBIT B
TO THE
PARTICIPATION
AGREEMENT**

[LETTERHEAD OF GUARANTOR]

**PARENT GUARANTY**

Dated as of November ___, 2000

[Lessee]
[Trustee]
[Loan Participant]
and the holders of the Secured
Notes from time to time

[Equipment]

Ladies and Gentlemen:

       Reference is hereby made to the Participation Agreement (Amtrak Trust HS-EDC-1) (as from time to time amended or supplemented, the "Participation Agreement"), dated as of November ___, 2000, among National Railroad Passenger Corporation (the "Lessee"), HNB Investment Corp. ("Owner Participant"), Allfirst Bank, as Indenture Trustee, Amtrak Trust HS-EDC-1, a Delaware business trust (the "Trust"), all of the activities of which shall be conducted by Wilmington Trust Company, a Delaware banking corporation, not in its individual capacity, but solely as trustee for the Trust, Wilmington Trust Company, a Delaware banking corporation, in its individual capacity, only to the extent expressly provided therein, (the "Trustee" and "Lessor") under the Trust Agreement (Amtrak Trust HS-EDC-1) dated as of November ___, 2000 between the Trustee and Owner Participant (the "Trust Agreement"), and Export Development Corporation, as Loan Participant. Capitalized terms used herein without definition have the respective meanings specified in Annex A to the Participation Agreement.

       Pursuant to Section 10.1 of the Participation Agreement and in connection with the transfer of the Interest (as defined in the Transferee Assumption Agreement dated as of the date hereof between [Transferor], a _____ ("Transferor"), and [Transferee], a _____ ("Transferee") (the "Assumption Agreement")) to be consummated as of the date hereof from Transferor to Transferee, the wholly-owned subsidiary of [_____] ("Guarantor"), and the execution by Guarantor of the guaranty of Transferee's obligations as contemplated by the Assumption Agreement (this "Guaranty"), Guarantor represents and warrants to, and covenants with, Lessee, Trustee and Loan Participant, as follows:

       1.    Ownership of Transferee. Guarantor directly or indirectly owns and holds all of the issued and outstanding shares of capital stock of Transferee.

2.     Additional Representations and Warranties.

(i)     Guarantor is a corporation duly organized and validly existing pursuant to the laws of [_____], and has the [corporate] power and authority to enter into and perform this Guaranty.

(ii)     The execution, delivery and performance by Guarantor of this Guaranty has been duly authorized by all necessary corporate action on the part of Guarantor, does not require any stockholder approval, or approval or consent of any trustee or holders of any indebtedness or obligations of Guarantor except such as have been duly obtained, and this Guaranty will not contravene any applicable law or corporate charter or by-law, or contravene the provisions of, or constitute a default under, any indenture, mortgage, contract or other agreement to which Guarantor is a party or by which it may be bound or affected.

(iii)     Neither the execution and delivery by Guarantor of this Guaranty, nor the consummation of the transactions by Guarantor contemplated hereby, nor the performance of the obligations hereunder or under any other documents contemplated hereby or thereby by Guarantor requires the consent or approval of, the giving of notice to, or the registration with, or the taking of any other action in respect of, any United States Federal, state, or foreign governmental authority or agency except such as have been obtained and except for routine reporting requirements applicable to it.

(iv)     This Guaranty has been duly executed and validly delivered by Guarantor and constitutes the legal, valid and binding obligation of Guarantor enforceable against Guarantor in accordance with its terms.

(v)     There are no pending or, to Guarantor's knowledge, threatened actions or proceedings before any court or administrative agency which can reasonably be expected to materially adversely affect the consolidated financial condition, business or operations of Guarantor, or the ability of Guarantor to perform its obligations under this Guaranty.

(vi)     No broker's or finder's fees or commissions or advisory fees are or may become payable in connection with this Guaranty or the Assumption Agreement or, if any such fee is payable, such fee will be the responsibility of Guarantor.

(vii)     On the date hereof and after giving effect to the transfer of the Interest under the Assumption Agreement, the Trust Estate will be free of Owner Participant's Liens attributable to Guarantor.

(viii)     Guarantor has a combined capital, surplus and undivided profits of at least $75,000,000 or has a tangible net worth of at least $75,000,000.

3     Guaranty.     (a) Guarantor hereby unconditionally and irrevocably guarantees, not merely as surety but as obligor:

(i)     the due and punctual payment of any and all sums which are payable by Transferee pursuant to any provision of the Assumption Agreement (and in

particular, Section 2 thereof) and the Participation Agreement, the Tax Indemnity Agreement and any other Operative Document assumed by Transferee pursuant to the Assumption Agreement (collectively, the "Guaranteed Agreements"), and

(ii)     the due and punctual performance of and compliance with and observance of all other obligations, covenants, warranties and undertakings of or conditions contained in or arising under the Guaranteed Agreements binding upon or made by Transferor and assumed by Transferee under the Assumption Agreement,

in each case, whether or not Guarantor shall have contributed funds to Lessor or Transferee, as the case may be, for such payment or performance by Lessor or Transferee (such payments and other obligations guaranteed hereunder hereinafter referred to as the "Obligations").

(b)     Guarantor agrees that this Guaranty is an unconditional and absolute guaranty of payment and performance (not merely enforceability or collection) and that its undertakings hereunder are not contingent upon your bringing any action against Transferee or resorting to any security and hereby expressly waives any claim that its undertakings hereunder are so contingent.

(c)     Guarantor hereby waives promptness, diligence, demand and all notices whatsoever as to the obligations and covenants guaranteed hereby and acceptance of this Guaranty, and, to the maximum extent permitted by applicable law, waives any other circumstance which might otherwise constitute a defense available to, or a discharge of, the undersigned (including, without limitation, release by any beneficiary of any other guaranty, security or collateral in respect of any of the Obligations), and agrees that it shall not be required to consent to, or receive any notice of, any amendment or modification of, or waiver, consent or extension with respect to, the Guaranteed Agreements or any other Operative Document that may be made or given as provided therein.

(d)     Guarantor agrees to pay any costs and expenses (including reasonable fees and disbursements of counsel) that may be paid or incurred by the beneficiaries hereof in enforcing any rights with respect to, or collecting, any or all of the Obligations and/or enforcing any rights with respect to, or collecting against, Guarantor under this Guaranty.

(e)     Guarantor understands and agrees that its obligations hereunder shall be construed as continuing, absolute and unconditional without, to the maximum extent permitted by applicable law, regard to (i) the validity, regularity or enforceability of any Operative Document, any of the obligations or any collateral security therefor or guaranty or right of offset with respect thereto at any time or from time to time held by any beneficiary hereof, (ii) any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to or be asserted by Transferee against any beneficiary hereof or (iii) any other circumstances whatsoever (with or without notice to or knowledge of Transferee or Guarantor) that constitutes, or might be construed to constitute, an equitable or legal discharge of Transferee for the Obligations, or of Guarantor under this Guaranty, in bankruptcy or in any other instance.

4.     Quiet Enjoyment.  So long as no Lease Event of Default shall have occurred and be continuing, Guarantor will not permit Transferee to take or cause to be taken any action contrary to Lessee's rights under the Lease, including, without limitation, Lessee's rights to possession and use of the Equipment in accordance with the terms of the Lease.

5.     No Discharge.  The obligations of Guarantor hereunder are absolute, unconditional and irrevocable and will not be discharged by, and this Guaranty shall remain in full force and effect notwithstanding:  (a) the assignment, conveyance or other transfer by Guarantor of any or all of its interest in or capital stock of Transferee, unless such assignment, conveyance or transfer of all of its interest is to a transferee meeting the requirements set forth in Section 10.1 of the Participation Agreement and otherwise complies with the requirements for a transfer as set forth in Section 10.1 of the Participation Agreement, in which event Guarantor shall be discharged from any and all liabilities arising hereunder (to the extent such liabilities arise after such transfer); (b) the assignment, conveyance or other transfer by Transferee of any or all of its interest in the Trust Estate (as defined in the Trust Agreement), unless such assignment, conveyance or transfer of all of its interest is to a transferee meeting the requirements set forth in Section 10.1 of the Participation Agreement and otherwise complies with the requirements for a transfer as set forth in Section 10.1 of the Participation Agreement, in which event Guarantor shall be discharged from any and all liabilities arising hereunder (to the extent such liabilities arise after such transfer) unless Guarantor guarantees the obligations of the transferee under Section 10 of the Participation Agreement; (c) the assignment, conveyance or other transfer by Lessor of any or all of its interest in the Equipment; (d) any extension or renewal with respect to any obligation of Transferee or Lessor under the Guaranteed Agreements; (e) any modification of, or amendment or supplement to, any of the Guaranteed Agreements; (f) any furnishing or acceptance of additional security or any release of any security; (g) any waiver, consent or other action or inaction or any exercise or non-exercise of any right, remedy or power with respect to Transferee or Lessor, or any change in the structure of Transferee or Lessor; or (h) any insolvency, bankruptcy, reorganization, arrangement, composition, liquidation, dissolution, or similar proceedings with respect to the Trustee or Transferee; or any other occurrence whatsoever, except payment in full of all amounts payable by Transferee under the Guaranteed Agreements and performance in full of all obligations of Transferee in accordance with the terms and conditions of the Guaranteed Agreements.

6.     Reinstatement.  Guarantor agrees that this Guaranty shall be automatically reinstated with respect to any payment made prior to any termination of the Guaranty by or on behalf of Transferee pursuant to the Participation Agreement or the other Operative Documents to which Transferee is a party if and to the extent that such payment is rescinded or must be otherwise restored, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

7.     No Subrogation.  Notwithstanding any payment or payments made by Guarantor hereunder or any set-off or application of funds of Guarantor by any beneficiary hereof, Guarantor shall not be entitled to be subrogated to any of the rights of any beneficiary hereof against Transferee or any collateral, security or guarantee or right of set-off held by any beneficiary hereof for the payment of the Obligations, nor shall Guarantor seek or be entitled to seek any reimbursement from Transferee in respect of payment made by Guarantor hereunder,

until all amounts and performance owing to the beneficiaries hereof by Transferee on account of the Obligations are paid and performed in full.

8.      Severability.  Any provision of this Guaranty Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.      Miscellaneous.  This Guaranty shall:  (a) be binding upon Guarantor, its successors and assigns; (b) inure to the benefit of, and be enforceable by, Lessee, Trustee and Loan Participant, and their respective successors and assigns and each other holder from time to time of any interest in the Equipment or the Operative Documents, but shall not, and is not intended to, create rights in any other third parties; (c) not be waived, amended or modified without the written consent of Lessee, Trustee and the Required Note Holders; (d) BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF NEW YORK; and (e) subject to Section 6 hereof, remain in full force and effect until, and shall be terminated upon (1) the payment in full of all sums payable by Transferee, as the case may be, under the Guaranteed Agreements, and by Guarantor hereunder, and performance in full of Transferee, in accordance with the terms and provisions of the Guaranteed Agreements and Guarantor in accordance with the terms of this Guaranty or (2) the date on which Transferee shall meet the requirements set forth in Section 10.1 of the Participation Agreement without benefit of this Guaranty; provided that Guarantor hereby covenants and agrees that if Transferee shall at any time thereafter (while Transferee shall be Owner Participant under the Participation Agreement) fail to meet such requirements, Guarantor shall immediately reinstate this Guaranty or execute and deliver to the addressees of this Guaranty a guaranty substantially identical hereto.  All notices to, or requests of, demands on and other communications with Guarantor shall be made in writing and shall be personally delivered or sent by registered or certified mail, postage prepaid, or by telecopier or by prepaid courier service to Guarantor at: _____.

Very truly yours,

[GUARANTOR]

By:      _____

Name:
Title:

EXHIBIT C
TO THE
PARTICIPATION
AGREEMENT

THIS GUARANTEE AGREEMENT, dated as of November 6, 2000 (as amended, modified or supplemented from time to time in accordance with the terms hereof, this "Guarantee Agreement"), between HNB Investment Corp., a Delaware corporation, as Beneficiary (the "Beneficiary"), and Export Development Corporation, a corporation established by an Act of the Parliament of Canada (the "Guarantor").

## W I T N E S S E T H:

WHEREAS, the Manufacturer has agreed or will agree to sell certain locomotives and trainsets (as more particularly described in the Guarantee Agreement Supplements hereto) (collectively, the "Equipment") to the French Lessor;

WHEREAS, the French Lessor and Amtrak have entered into the French Lease whereby the French Lessor has agreed to lease the Equipment to Amtrak;

WHEREAS, Amtrak has sold and assigned or will sell and assign to the Lessor the French Leasehold Interest in the Equipment pursuant to the Amtrak Delegation and the Assignment of French Leasehold Interest;

WHEREAS, the Lessor has entered into the Participation Agreement, Trust Agreement and the Lease with respect to the Equipment;

WHEREAS, Lessee has requested that the Guarantor provide a guarantee to the Beneficiary as more specifically set out herein;

WHEREAS, in order to induce the Beneficiary to participate in the transactions contemplated by the Participation Agreement, and to satisfy a condition thereto, the Guarantor is entering into this Guarantee Agreement and any applicable Guarantee Agreement Supplements with the Beneficiary;

NOW, THEREFORE, in consideration of the premises, the fee arrangement between the Guarantor and the Lessee and the mutual covenants herein contained, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

1.1     Definitions. Capitalized terms and phrases used and not otherwise defined herein shall for all purposes of this Guarantee Agreement, including the preceding recitals, have the respective meaning therefore in Annex A to the Participation Agreement dated as of November 6, 2000, among National Railroad Corporation, as Lessee, the Beneficiary, Export Development Corporation, as Loan Participant, Allfirst Bank, as Indenture Trustee and Wilmington Trust Company, as Owner Trustee (as amended, modified or supplemented, the "Participation Agreement"), and the rules of usage set forth in Annex A to the Participation Agreement shall

apply to this Guarantee Agreement.  For purposes of this Guarantee Agreement, the following terms shall have the meanings assigned respectively below:

"Debt Portion of Base Rent" as at any Rent Payment Date on or prior to the Base Lease Termination Date shall mean, in respect of the Units delivered on any Closing Date, that portion of Base Rent in respect of such Units scheduled to become due and payable on such Rent Payment Date that is equal to the principal of and accrued interest on the Secured Notes relating to such Units scheduled to become due and payable on such Rent Payment Date.

"Dollars", "U.S. Dollars" and "$" shall mean lawful currency of the United States.

"Equity CV Amount" in respect of the Units delivered on any Closing Date, (a) as at any Equity CV Determination Date shall mean the amount equal to the product of Lessor's Cost in respect of such Units (including any Replacement Units) multiplied by the percentage set forth on Schedule 1 to the Equity Guarantee Agreement Supplement related to such Units opposite such Equity CV Determination Date, as such Schedule 1 is adjusted from time to time pursuant to Section 4.1 hereof, and (b) as at any other date, shall mean the amount equal to the product of Lessor's Cost in respect of such Units multiplied by the Interpolated Percentage as of such other date.  "Interpolated Percentage" as of any other date shall mean (I) if the percentage set forth on Schedule 1 to the applicable Guarantee Agreement Supplement delivered on such Closing Date (as such Schedule 1 is adjusted from time to time pursuant to Section 4.1 hereof) opposite the Equity CV Determination Date next following such other date (the "Following Percentage") is greater than the percentage set forth on Schedule 1 hereto (as such Schedule 1 is adjusted from time to time pursuant to Section 4.1 hereof) opposite the Equity CV Determination Date next preceding such other date (the "Preceding Percentage"), the sum of (x) the Preceding Percentage plus (y) the absolute value of the difference between the Preceding Percentage and the Following Percentage multiplied by a fraction, the numerator of which is the number of days from and including the Equity CV Determination Date next preceding such other date to but excluding such other date and the denominator of which is the number of days from and including the Equity CV Determination Date next preceding such other date to but excluding the Equity CV Determination Date next following such other date, (II) if the Following Percentage is less than the Preceding Percentage, the sum of (x) the Preceding Percentage minus (y) the absolute value of the difference between the Preceding Percentage and the Following Percentage multiplied by a fraction, the numerator of which is the number of days from and including the Equity CV Determination Date next preceding such other date to but excluding such other date and the denominator of which is the number of days from and including the Equity CV Determination Date next preceding such other date to but excluding the Equity CV Determination Date next following such other date, and (III) if the Following Percentage is equal to the Preceding Percentage, the Preceding Percentage.

"Equity CV Determination Date" in respect of the Units delivered on any Closing Date, shall mean each of the dates set forth on Schedule 1 to the applicable Guarantee Agreement Supplement delivered on such Closing Date.

"Guaranteed Amount" shall have the meaning set forth in Section 2.2 hereof.

"Guarantor Payment Date" shall have the meaning set forth in Section 3.3(a) hereof.

"Judgment Currency" shall have the meaning set forth in Section 6.8 hereof.

"Lessor's Cost", in respect of the Units delivered on any Closing Date, means the amounts in Schedule 2 to the Guarantee Agreement Supplement delivered on such Closing Date, as such amount may be adjusted from time to time pursuant to Section 4.1 hereof. Any Replacement Unit shall be deemed to have the Lessor's Cost of the Unit it replaced.

"Participation Agreement" shall mean the Participation Agreement defined in the first sentence of Section 1.1.

"Triggering Event" shall have the meaning set forth in Section 3.1 hereof.

"Unpaid Equity Rent Amount" as of any Rent Payment Date on or prior to the Base Lease Expiration Date shall mean, in respect of those Units delivered on any Closing Date, the excess (if any) of (i) the scheduled amount of the installment of Base Rent in respect of such Units due on such Rent Payment Date over (ii) the sum of (x) the Debt Portion of Base Rent in respect of such Units as at such Rent Payment Date plus (y) the portion (if any) of such installment of Base Rent actually paid by Amtrak and distributed on such Rent Payment Date by the Indenture Trustee to the Owner Trustee under Section 3.01 of the Indenture for distribution by the Owner Trustee to the Beneficiary pursuant to the Trust Agreement.

## ARTICLE 2

## THE GUARANTEE

2.1     Guarantee.   Subject to the terms and conditions hereinafter set forth, the Guarantor as primary obligor and not merely as surety hereby guarantees the prompt payment to the Beneficiary, and undertakes to make payment in accordance with the terms hereof, of the Guaranteed Amount as such Guaranteed Amount may be varied in accordance with the provisions of Section 4 hereof.

2.2     Coverage of Guarantee.   For all purposes of this Guarantee Agreement, the "Guaranteed Amount" with respect to the Units delivered on any Closing Date shall mean, as at any particular date, an amount equal to the sum (without duplication) of the following:

(A)     the Equity CV Amount for the relevant Units as at such date (less any corresponding amounts actually received by the Owner Trustee); plus

(B)     the aggregate amount of the Unpaid Equity Rent Amount for all Rent Payment Dates on or prior to such date for the relevant Units, plus

(C)     interest at the Overdue Rate on any amount referred to in Sections 2.2(A) and 2.2(B) hereof not paid when due pursuant to the Lease for the period for which the same shall

have been overdue, but in no event shall such interest be paid for a period in excess of sixty-two (62) days after such due date.

2.3     Binding Guarantee. The obligations of the Guarantor hereunder shall be irrevocable, absolute and unconditional, shall not be subject to any counterclaim, set-off, deduction, recoupment, reduction or defense, and shall remain in full force and effect and shall not in any manner be affected by reason of any illegality, unenforceability or invalidity of the obligations hereunder or under the Lease or any other Operative Document, any other guarantee or other obligations, or any other circumstance or condition, including without limitation:

(i)     any termination, amendment or modification of, or deletion from, or addition or supplement to, or other change in the Lease, or any other Operative Document or any other instrument or agreement applicable to any of the parties to such agreements, or to any Unit or any part thereof, or any assignment, mortgage, refinancing or transfer of any thereof, or of any interest therein, or any leasing or subleasing of any Unit, or any furnishing or acceptance of additional security, or any release of any security, for the obligations of the Lessee under the Lease or the other Operative Documents, or the failure of any security or the failure of any Person to perfect or maintain the perfection or priority of perfection of any interest in any collateral or any discharge, disallowance or termination of any lien or any purported lien;

(ii)     any failure, omission or delay on the part of the Lessee, the Beneficiary, the Owner Trustee or any other Person to conform or comply with any term of the Lease, or any other Operative Document;

(iii)     any waiver of the payment, performance or observance of any of the obligations, conditions, covenants or agreements contained in the Lease, or any other Operative Document, or any other waiver, consent, extension, indulgence, compromise, settlement, release or other action or inaction under or in respect of the Lease, or any other Operative Document, or any obligation or liability of the Lessee, the Beneficiary, the Owner Trustee or any other Person under the Operative Documents, or any exercise or nonexercise of any right, remedy, power or privilege under or in respect of the Lease, or any other Operative Document or any such obligation or liability;

(iv)     any extension of time for payment of Rent under the Lease, or of any other obligation thereunder, or of the time for performance of any other obligations, covenants or agreements under or arising out of the Lease, or any other Operative Document or the extension or the renewal of any thereof;

(v)     any taking, exchange, surrender, substitution or modification of any collateral security for any of the obligations of the Lessee under the Operative Documents, or any taking, release or amendment or waiver of or consent to departure from any other guaranty of any of obligations of the Lessee, or any manner of application of the collateral, or proceeds thereof, to the Lessee's obligations under the Operative Documents, or any manner of sale or other disposition of any collateral;

(vi)    any voluntary or involuntary bankruptcy, insolvency, reorganization, arrangement, readjustment, assignment for the benefit of creditors, composition, receivership, conservatorship, custodianship, liquidation, marshaling of assets and liabilities or similar proceedings with respect to the Lessee, the Beneficiary, the Owner Trustee, the Guarantor, any other Person or any of their respective properties or creditors, or the disaffirmance of any of the Operative Documents in any such proceeding or any action taken by any trustee or receiver or by any court in any such proceeding;

(vii)    any limitation on the liability or obligations of any party to the Operative Documents or any discharge, termination, cancellation, frustration, irregularity, invalidity or unenforceability, in whole or in part, of the Lease, or any other Operative Document or any change, impairment or suspension of any right or remedy of any party to the Operative Documents;

(viii)    any defect in the title, compliance with specifications, condition, design, operation or fitness for use of, or any damage to or loss or destruction of, any Unit, or any interruption or cessation in the use of any Unit or any portion thereof by the Lessee, or any other Person for any reason whatsoever (including without limitation any governmental or military authority, or any act of God or of the public enemy) regardless of the duration thereof (even though such duration would otherwise constitute a frustration of the Lease, or any other Operative Document), whether or not resulting from accident and whether or not without fault on the part of the Lessee;

(ix)    any change, restructuring or termination of the corporate or other structure, or merger or consolidation of any party to the Operative Documents into or with any other Person or any sale, lease or other transfer of any of the assets of any Person or any liquidation of any Person or any change in ownership of any Person;

(x)    any failure by any Person to pay any fee to the Guarantor in respect of this Guarantee Agreement; and

(xi)    any other condition or circumstance which might otherwise constitute a legal or equitable discharge, release or defense of a surety or guarantor, or which might otherwise limit recourse against the Guarantor, including, without limitation, any discharge, release, setoff, counterclaim, recoupment, termination, defense or limitation arising out of any laws of Canada or the United States of America or any Province or State thereof which would either exempt, modify or delay the due or punctual payment and performance of the obligations of the Guarantor hereunder or the obligations of the Lessee under the Operative Documents.

The obligations of the Guarantor to pay the Guaranteed Amount under this Guarantee Agreement are due and payable on the date specified in Section 3.2 hereof, and all other amounts due and payable by the Guarantor hereunder are payable when due hereunder, in each case notwithstanding that the obligations of the Lessee under the Lease, or any other Operative Document, are not due and payable at such time.

In case any Operative Document shall be terminated as a result of the rejection or disaffirmance thereof by any trustee, receiver, liquidator, agent or other representative of Lessee or any other Person or any of its property in any assignment for the benefit of creditors or in any bankruptcy, insolvency, dissolution or similar proceeding, or the exercise of any of the remedies under such Operative Document is stayed, enjoined or prohibited in any such assignment or proceeding, the obligations of the Guarantor hereunder shall continue to the same extent as if such Operative Document had not been so rejected or disaffirmed and as if such exercise had not been so stayed, enjoined or prohibited.  In furtherance of the foregoing, the Guarantor agrees that notwithstanding any stay, injunction or prohibition against causing to become due and payable any obligation of the Lessee under the Operative Documents, or any failure of the Indenture Trustee under the Indenture (as assignee of the Owner Trustee) to declare the Lease in default or demand payment of Base Rent or Termination Value under the Lease, the same may for purposes of this Guarantee Agreement be deemed due and payable, and the Guarantor will pay the Guaranteed Amount and all other amounts due and payable by the Guarantor on and subject to the terms of this Guarantee Agreement.  The Guarantor shall and does hereby waive all rights and benefits that might accrue to it by reason of any such assignment or proceeding, and the Guarantor agrees that it shall be liable for the full amount of the Guaranteed Amount and all other amounts due and payable by the Guarantor, irrespective of and without regard to any modification, limitation or discharge or liability of Lessee that may result from or in connection with any such assignment or proceeding.

Regardless of whether this Guarantee Agreement is terminated, this Guarantee Agreement shall continue to be effective, or shall be automatically reinstated without any notice or other action on the part of any Person, if at any time any payment, or any part thereof, of any of the Guaranteed Amount or other amount due and payable hereunder (or any amount of Base Rent, Termination Value, Casualty Value, EBO Price or interest at the Overdue Rate previously paid by Lessee during the period in which this Guarantee is in full force and effect and the Beneficiary is entitled to make a claim for payment hereunder) is avoided, rescinded or must otherwise be returned by the Owner Trustee, the Beneficiary or any other Person upon the insolvency, bankruptcy or reorganization of the Guarantor or any other Person, or otherwise, all as though such payment had not been made.

In addition, the Guarantor agrees to remain liable to pay the Guaranteed Amount that the Lessee otherwise would be obligated to pay under the Lease or any of the other Operative Documents, but for any illegality, unenforceability or invalidity of the obligations thereunder or any other circumstances or condition, including, without limitation, those listed in clauses (i) to (xi) of this Section 2.3.

2.4    Claims Unaffected.  Nothing in this Guarantee Agreement shall prohibit the Guarantor from pursuing in separate and independent actions, any rights and remedies which the Guarantor may have against the Owner Trustee in its individual capacity or as trustee or against the Beneficiary arising out of a breach of any provision of this Guarantee Agreement or of any other Operative Document; provided that such rights and remedies shall not create any defense to, or right of set off against, the obligations of the Guarantor under this Guarantee Agreement.

2.5    Claim Period. Notwithstanding any provision herein to the contrary, the Beneficiary may make demands hereunder from time to time automatically (without any further notice or action of any kind by either Beneficiary or any other Person) at any time on or after October 1. 2002 until the date a Release Event shall have occurred, provided that no Release Event shall occur if at such time a Lease Default or a Lease Event of Default of the type described in Section 13.1(i), (ii), (vi) through (x). (xii), (xiii), (xiv) (xv) or (xvi) of the Lease shall have occurred and be continuing.

For purposes of this Section 2.5, the following terms have the meanings defined below.

"*Amtrak Reform Act*," means the Amtrak Reform and Accountability Act of 1997 (Pub. L. No. 105-135 (Dec. 2, 1997)).

"*Amtrak Reform Council*" means the independent commission created under Section 203 of the Amtrak Reform Act.

"*Certified Table*" has the meaning specified in Annex A to the Participation Agreement.

"*Fiscal Year*" means the 12-month accounting period from and including October 1 of any calendar year through to and including September 30 of the following calendar year.

"*Moody's*" means Moody's Investors Service, Inc., and its successors and assigns, and, if Moody's Investors Service, Inc. and its successors and assigns no longer issues securities ratings, the term "Moody's" shall include at the option of Amtrak, any other Person that issues internationally accepted securities ratings designated by Amtrak in a written notice to the Owner Participant and reasonably acceptable to the Owner Participant, and, upon the inclusion in this definition of such other Person, each reference in this Agreement to a rating issued by Moody's shall be deemed automatically replaced with a reference to the comparable rating issued by such Person.

"*Release Event*" means the earliest to occur of either of the following events: (i) at any time after September 30, 2002 and before December 31, 2002 (but only with respect to demonstrating self-sufficiency as of September 30, 2002) and thereafter, at any time after September 30, 2005, Amtrak (a) has been rated at least BBB- by S&P and at least Baa1 by Moody's for the immediately preceding 36 consecutive months (in each case so long as there has been no negative credit watch or negative outlook for such 36-month period) and (b) has been Self-Sufficient for the immediately preceding 36 consecutive months, and (ii) at any time after September 30, 2002 and before December 31, 2002 (but only with respect to demonstrating self-sufficiency as of September 30, 2002) and thereafter, at any time after September 30, 2005 Amtrak (a) is rated at least A+ by S&P and at least A1 by Moody's (in each case with no negative credit watch or negative outlook ) and (b) is Self-Sufficient; provided that in no event shall a Release Event occur at any time if (x) on September 30, 2002, Amtrak is rated at or below BBB- by S&P or at or below Baa3 by Moody's, or is not, as at such date, Self Sufficient or (y) Amtrak has not delivered the financials as required under Section 8(i) of the Participation Agreement and the delivery of the certificate (and all attachments) as required under

Section 8(viii) of the Participation Agreement and such other information as the Owner Participant shall have requested to independently verify such Self Sufficiency.

"*S&P*" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and its successor and assigns and if Standard & Poor's Ratings Group and its successor and assigns no longer issues securities ratings, the term "S&P" shall include, at the option of Amtrak, any other Person that issues internationally accepted securities ratings designated by Amtrak in a written notice to the Owner Participant and reasonably acceptable to the Owner Participant and, upon the inclusion in this definition of such other Person, each reference in this Agreement to a rating issued by S&P shall be deemed automatically replaced with a reference to the comparable rating issued by such Person.

"*Self-Sufficient*" means, at any date of determination, that (i) the Amtrak Reform Council has made (on or prior to such date of determination) a finding under Section 204 of the Amtrak Reform Act that (a) Amtrak's business performance meets the financial goals set forth in Section 24101(d) of Title 49 United States Code and (b) Amtrak will not require operating grant funds or other operating subsidies (or any similar funds or subsidies by any name or designation whatsoever that are intended to subsidize Amtrak for its operating costs) from The United States of America for Fiscal Year 2002 (or any Fiscal Year thereafter), (ii) Amtrak has not requested operating grant funds or other operating subsidies (or any similar funds or subsidies by any name or designation whatsoever that are intended to subsidize Amtrak for its operating costs) from The United States of America (or any State thereof, any municipality or other local governmental body, or any agency of any thereof) at any time during the preceding 12 consecutive months (excluding operating subsidies specifically designated to fund tax liabilities under Section 3221 of the Code that are more than the amount needed for the benefit of individuals who retire from Amtrak and for their beneficiaries and operating subsidies granted to Amtrak by any State of The United States of America, any municipality or other local governmental body or any agency of any thereof, to maintain a particular rail service in lieu of termination or reduction of such service) and (iii) commencing no earlier than Fiscal Year 2002, the line item titled "Test for Self Sufficiency" set forth in each Certified Table delivered by Amtrak pursuant to Section 8(viii) of the Participation Agreement prepared for the period ending on such date of determination is equal to or greater than $0, provided that the requirement set forth in this clause (iii) shall not be have been met unless (w) the calculation and composition of each line item included in each Certified Table for such fiscal year has been calculated or determined on a basis consistent with (including methodology, accounting principles and categories) the calculation made for, and the compositions of such items in, Amtrak's Fiscal Years 1999 through 2002 (or any Fiscal Year thereafter, as applicable), as set forth in such Certified Table, (x) the numbers set forth in each Certified Table reflect and are otherwise comprised of numbers set forth in the GAAP financials, (y) the line item titled "GAAP Revenues" in each Certified Table includes only the net gain received from the sale of an asset under a sale and leaseback transaction which Amtrak records as a deferred credit on its balance sheet, and such credit is amortized into income over the term of the leaseback and (z) for purposes of calculating the line item titled "GAAP Revenues" in each Certified Table, commercial revenues for Fiscal Year 2000 do not exceed $73,700,000, commercial revenues for Fiscal Year 2001 do not exceed $77,000,000 and commercial revenues for Fiscal Year 2002 do not exceed $88,000,000. For the avoidance of doubt, the terms "operating grant funds" and "operating subsidies" do not include capital grant funds or capital

subsidies from The United States Federal Government or any capital grant funds or capital subsidies from any State thereof, any municipality or other local governmental body, or any agency of any thereof.

2.6     Reinstatement after Release Date.  If after the date of any Release Event, there shall be required a restatement of any of the financials or components thereof that has (or would have) the effect of restating any line item or component thereof of any Certified Table on which the determination of a Release Event was made, and if no Release Event would have occurred had such Certified Table reflected such restatement, this Guarantee Agreement shall be reinstated automatically, without any notice or other action on the part of any Person, all as though such Guarantee Agreement had never ceased to be effective.

## ARTICLE 3

## PAYMENT OF THE GUARANTEED AMOUNT

3.1     Triggering Events.  If an Event of Default as set out in Section 13.1 (vi), (vii), (viii), (ix), or (x) of the Lease has occurred prior to October 1, 2002 or the Lease has been terminated prior to October 1, 2002, this Guarantee shall automatically terminate, it being understood and agreed that any demand for payment hereunder can be made only after October 1, 2002.  For all purposes of this Guarantee Agreement, each of the following events shall be a "Triggering Event":

(A)     any Lease Event of Default resulting from a failure to pay Base Rent, Termination Value or Casualty Value (or amount measured by reference thereto), which shall have occurred and be continuing (whether or not such Lease Event of Default has been waived (unless such Lease Event of Default has been waived with the written consent of the Beneficiary) or any failure by Lessee to pay any installment of EBO Price payable under the Lease after the EBO Date); or

(B)     within five Business Days after the scheduled due date of any payment of Base Rent, Termination Value, Casualty Value (or amount measured by reference thereto) or EBO Price, the Owner Trustee shall not have received from the Indenture Trustee for distribution by the Owner Trustee to the Beneficiary pursuant to the Trust Agreement, the portion of any such payment which, absent the occurrence of a Default or Event of Default under the Indenture, would be distributable to the Owner Trustee; or

(C)     any Lease Event of Default specified in Section 13.1 (iv) (but only in respect of Lessee's representation in Section 4.1 (xix) of the Participation Agreement), (v) (but only in respect of Lessee's obligations set forth in Section 12.1 of the Lease), (vi), (vii), (viii), (ix), (x) or (xi) of the Lease shall have occurred (whether or not such Lease Event of Default has been waived); or

(D)     the Secured Notes shall have been declared due and payable pursuant to the Indenture as the result of a Lease Event of Default, or the Indenture Trustee or the Owner

Trustee shall have initiated the exercise of any other material remedies under the Indenture or the Lease.

3.2    Demand on the Guarantor.  After the occurrence and during the continuance of a Triggering Event the Beneficiary may make a single demand for payment on the Guarantor under this Guarantee Agreement (it being agreed that a demand for payment that is deemed withdrawn or not to have been made under this Section 3.2 shall not be deemed a demand hereunder); provided, however, that in the event of a Lease Event of Default resulting from a failure of Lessee to timely pay Base Rent, Guarantor may within 5 Business Days of such Event of Default, pay the Beneficiary the Unpaid Equity Rent Amount in respect of such Unit.  Any such payment by Guarantor shall be deemed to remedy any Lease Event of Default to the same extent that like performance by Lessee itself would have remedied such Lease Event of Default (but any such payment shall not relieve Lessee of its duty to pay all Rent pursuant to the Lease). If, on the basis specified in the preceding sentence, such Lease Event of Default shall have been remedied and provided Guarantor or Beneficiary shall have cured the corresponding Indenture Event of Default (if any) in accordance with Section 4.03 of the Indenture then any demand for payment pursuant to this Guarantee Agreement, based upon such Lease Event of Default, shall be deemed rescinded, and Guarantor shall be subrogated to the rights of Owner Participant to receive such Unpaid Base Rent Amount in respect of such Unit from Lessee (and the payment of interest on account of such Rent being overdue), and shall be entitled, so long as no other Lease Event of Default shall have occurred or would result therefrom, to received such payment upon receipt thereof by Owner Trustee.  Guarantor may exercise such cure right described in the preceding sentence at any time until two years and one day prior to the Base Lease Termination Date; provided however, that the number of cure rights available under this Section 3.2 shall not exceed the number of cure rights under the Indenture.  Any demand on the Guarantor must (a) be made on the Guarantor at the address referred to in Section 6.2 hereof, (b) be made only by the Beneficiary and (c) identify the Guarantor Payment Date.  If a demand for payment hereunder does not conform to the requirements of Section 3.2 hereof, the Beneficiary may attempt to correct any such non-conforming demand for payment (and any such non-conforming demand for payment will be deemed never to have been made).

3.3    Payment by the Guarantor.  (a) After the Beneficiary has made a demand on the Guarantor for payment in accordance with Section 3.2 hereof (which shall not have been deemed withdrawn pursuant to Section 3.2 hereof), the Guarantor will, on the payment date specified in such demand (the "Guarantor Payment Date", which Guarantor Payment Date shall not be less than five (5) Business Days following the date such demand is delivered or received by EDC at the address specified in Section 6.2), pay to the Beneficiary in Dollars, in immediately available funds, the Guaranteed Amount as at such Guarantor Payment Date, receipt thereof to be promptly acknowledged by the Beneficiary.

(b)    In addition, the Guarantor shall pay interest at the Overdue Rate, on demand of the Beneficiary, in Dollars on any part of the Guaranteed Amount and any other amount due hereunder not paid when due until the same shall have been paid in full.

(c)    Payments to be made by the Guarantor under this Guarantee Agreement shall be made to the Beneficiary at the Beneficiary's account identified in Section 13.2 of the

Participation Agreement, or to such other account of the Beneficiary (which account shall be in the United States) requested in a notice by the Beneficiary to the Guarantor at least five (5) Business Days prior to the date a payment by the Guarantor is due hereunder.

    3.4    <u>Subrogation Rights after Payment by the Guarantor</u>. (a) Upon payment in full of the Guaranteed Amount in respect of any Unit or Units and all other amounts due and payable by the Guarantor under this Guarantee Agreement:

        (i)    the Guarantor shall be subrogated to the full extent of such Guaranteed Amount payment made by it, together with interest on the unrecovered portion thereof at the Overdue Rate from the date of payment of the Guaranteed Amount until the same is recovered, to the rights of the Beneficiary under the Operative Documents with respect to such Unit or Units(other than with respect to Exceptional Payments) and the Beneficiary shall cause the Owner Trustee to assign to EDC all of its rights, title and interest in and to such Unit or Units and the Operative Documents with respect to such Unit or Units other than Excepted Payments (including, without limitation, the Owner Participant's rights with respect to the directing the Owner Trustee and the Trust Company with respect to the Equipment and the Operative Documents) and, without limiting the generality of the foregoing, shall be entitled, subject to the Indenture, to pursue all remedies available to it with respect to such subrogated rights and to receive for its own account payments from any proceeds received by the Indenture Trustee from any sale, lease or description of the Equipment, the lease and the other property of the Trust Estate; it being agreed and understood, however, that any amounts realized by the Guarantor pursuant to subrogation rights granted hereunder that are attributable to any sale or disposition of the Units then covered by the Lease shall be applied pari passu (a) to the payment of any accrued and unpaid amounts of the type referred to in clauses (i), (iv), (vi) and (viii) of the definition of "Excepted Payments" that are payable to the Beneficiary or the Owner Trustee in its individual capacity under the Operative Documents and (b) to the payment of any corresponding amounts owed to the Guarantor after it has been subrogated to the rights of the Beneficiary pursuant to this Section;

        (ii)    the Beneficiary agrees that at any time and from time to time upon payment of the Guaranteed Amount and all other amounts due and payable by the Guarantor as aforesaid, upon the written request, and at the expense, of the Guarantor, to promptly and duly execute and deliver any and all such further instruments and documents and take such action as may be required in order to obtain the full benefits of the subrogation rights contained herein and by action of law; and

        (iii)    in furtherance of Section 3.4(i) hereof, upon the Guarantor's payment under this Guarantee Agreement of the Guaranteed Amount and all other amounts due and payable as aforesaid, the Beneficiary shall hold in trust for the Guarantor and forward promptly to the Guarantor any payment which the Beneficiary receives subsequent to such payment by the Guarantor from a party other than the Guarantor to which Guarantor is entitled by reason of such subrogation or assignment.

3.5    Canadian Taxes. (a) Payments by the Guarantor under this Guarantee Agreement to any Person will be made free and clear of and without deduction or withholding for or on account of all present or future taxes imposed by Canada or any province thereof or by any taxing authority thereof or therein (other than taxes which are imposed in Canada on the basis of net taxable income), unless such deduction or withholding is required by law. In the event that any payment by the Guarantor under this Guarantee Agreement to any Person is subject to the deduction or withholding for or on account of taxes imposed by Canada or any province thereof or by any taxing authority thereof or therein (other than taxes which are imposed in Canada on the basis of net taxable income), the Guarantor will remit to the appropriate taxing authority the full amount of all such taxes required to be deducted or withheld and shall promptly provide an official receipt issued by such taxing authority showing payment thereof and pay such additional amounts as may be necessary in order that the net amounts received by such Person after all such deductions or withholdings, including in respect of the payments of such additional amounts, shall equal on an after-tax basis the amount that would have been received for the relevant payment in the absence of such deductions or withholdings. If any taxes required to be deducted or withheld are not so remitted when due or if required receipts or other documentary evidence are not furnished with respect to such remittance, the Guarantor shall indemnify the Beneficiary and each of them for any incremental taxes, interest or penalties that may become payable by any of them as a result of any such failure.

(b)    The Guarantor's obligations under this Section 3.5 shall survive any termination of this Guarantee Agreement and the payment of all amounts payable under the other provisions of this Guarantee Agreement.

3.6    Waiver. The Guarantor hereby waives diligence, presentment, protest, any right of set-off and any requirement that the Beneficiary exhaust any right or take any action against or give notice to the Lessee or the Guarantor or any other Person, except for any demand for payment to the Guarantor expressly required under Section 3.2 of this Guarantee Agreement.

3.7    Termination. Except for (i) any obligations of the Guarantor set forth in Section 3.3 hereof, based on a demand for the Guaranteed Amount with respect to the Units covered by by a Guarantee Agreement Supplement delivered prior to the Termination Date with respect to such Units and (ii) obligations provided in the penultimate paragraph of Section 2.3 and in Section 3.5 hereof, the obligations hereunder shall terminate on the occurrence of the earliest of the following (the "Termination Date"):

(a)    full and final payment of the Guaranteed Amount and all other amounts payable hereunder;

(b)    the occurrence of a Release Event unless a Lease Event of Default as set out in Section 2.5 hereof or a Triggering Event has occurred and is continuing as of such date; or

(c)    the Base Lease Termination Date.

## ARTICLE 4

## UNDERTAKINGS OF THE BENEFICIARY

4.1     Adjustments. (a) Schedule 1 to the applicable Guarantee Agreement Supplement shall be appropriately adjusted from time to time by the Beneficiary to reflect any adjustments to Lessor's Cost, Rent Factors, EBO Price, Casualty Value Factors or Termination Value Factors pursuant to Section 16 of the Participation Agreement. Promptly following any such adjustment, the Beneficiary shall deliver to the Guarantor a substitute Schedule 1 reflecting any such adjustments. Promptly following any event referred to in the second sentence of this Section 4.1 or the delivery of such substitute Schedule 1, the Guarantor and the Beneficiary shall enter into an amendment to the applicable Guarantee Agreement Supplement to reflect the change in Lessor's Cost or the substitute Schedule 1, as the case may be, provided that in no event shall the adjustment to Lessor's Cost or Schedule 1 exceed two (2) per cent.

(b)     The Beneficiary shall take all action and steps necessary or required to ensure that there are no Owner Participant Liens attributable to it and existing at the time of the transfer of title to the Equipment to the Guarantor, provided any breach of this covenant shall not affect in any way the Guarantor's obligations under Article II or Article III hereof, including creating any defense or offset to any such obligations.

## ARTICLE 5

## REPRESENTATIONS AND COVENANTS OF THE GUARANTOR/BENEFICIARY

5.1.     Guarantor's Representations and Warranties.  The Guarantor hereby represents and warrants to the Beneficiary as follows:

(a)     The Guarantor is a corporation established by an Act of the Parliament of Canada, has been duly organized and is validly existing and in good standing under the laws of Canada, is an agent of Her Majesty in right of Canada ("Canada") for all purposes, and has full power, corporate and otherwise, and authority to enter into and perform its obligations under this Guarantee Agreement.

(b)     The execution and delivery by the Guarantor of, and the performance by the Guarantor of its obligations under, this Guarantee Agreement have been duly authorized by all necessary corporate action on the part of the Guarantor, and (assuming the due authorization, execution and delivery by the Beneficiary) this Guarantee Agreement constitutes a legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms.

(c)     This Guarantee Agreement and the obligations of the Guarantor hereunder are and shall be construed as a commercial activity.

(d)   The 1999 annual audited financial statements of the Guarantor are complete, accurate and fairly represent the financial condition of the Guarantor as of the date thereof and the period covered thereby and show all material indebtedness and other indebtedness of the Guarantor direct or indirect.

(e)   Neither the execution or delivery by the Guarantor of this Guarantee Agreement nor the performance by the Guarantor of its obligations hereunder: (1) conflicts or will conflict with or violate in any respect any currently existing law or governmental regulation or any judgment or order or any judicial or administrative order or decree applicable to or binding upon the Guarantor or any of its properties, (2) conflicts or will conflict with or violate the articles of incorporation or by-laws of the Guarantor, (3) conflicts or will conflict with, or contravene, violate or result in breach of, any indenture, mortgage, loan agreement or any other agreement or instrument to which the Guarantor is a party or by which any of its properties is bound, (4) requires or will require, on the part of the Guarantor, the consent or approval of, the giving of notice to, the registration with or the taking of any other action in respect of any governmental or public commission, board, authority or agency, or (5) requires or will require the consent or approval of its shareholders or any trustee or holders of any currently existing indebtedness or obligations of the Guarantor.

(f)   The obligations of the Guarantor under this Guarantee Agreement constitute direct, general, unconditional, unsubordinated and unsecured obligations of the Guarantor and as such constitute direct general unconditional, unsubordinated and unsecured obligations of Canada.

(g)   Under the laws of Canada and the Provinces thereof, the Guarantor is not entitled to claim any sovereign or other similar immunity from suit in its own courts.

(h)   There are no actions, suits or proceedings pending, or to the best knowledge of the Guarantor, threatened before any court or by or before any other federal, state or local government or public commission, board, authority or agency, or any arbitrator, domestic or foreign, which can reasonably by expected to have a materially adverse effect on the Guarantor's ability to perform its obligations under this Guarantee Agreement or which call into question the validity of this Guarantee Agreement.

(i)   The Guarantor is fully aware of the terms and conditions of the Participation Agreement, the Lease and the other Operative Documents.

5.2   Certain Covenants of the Guarantor.   The Guarantor shall (a) deliver to the Beneficiary its annual report when so requested by the Beneficiary and such other financial information as may be reasonably requested by the Beneficiary relating to the transactions contemplated by this Guarantee Agreement, and (b) promptly, and in any event within five Business Days, notify the Beneficiary if any action is taken that could result in the obligations of the Guarantor hereunder ceasing to constitute obligations of Canada.

ARTICLE 6

MISCELLANEOUS

**6.1** **Proper Law.** **THIS GUARANTEE AGREEMENT HAS BEEN EXECUTED AND DELIVERED IN OTTAWA, CANADA AND SHALL BE DEEMED TO BE MADE UNDER AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE PROVINCE OF ONTARIO AND THE FEDERAL LAWS OF CANADA APPLICABLE THEREIN.**

6.2   Notices.  Unless otherwise expressly specified or permitted by the terms hereof, notices and other communications required or permitted to be given or made under the terms hereof shall be in writing.  Any such communication or notice shall be deemed to have been duly made or given (i) when delivered personally, (ii) in the case of mail or courier delivery, upon receipt, refusal of delivery or return for failure of the intended recipient to retrieve such communication or (iii) in the case of transmission by facsimile, upon telephone and return facsimile confirmation of receipt and, in each case, if addressed to the intended recipient as follows (subject to the next sentence of this Section 6.2):

| Name of Party | Address |
|---|---|
| Beneficiary | HNB Investment Corporation<br>c/o Philip Morris Capital Corporation<br>200 Stamford Place, Suite 400<br>Stamford, Connecticut 06902<br>Attention: John J. Mulligan, VP Portfolio<br>Facsimile No.:  (914) 335-8297 |
| with a copy to: | The General Counsel<br>Facsimile No.: (914) 335-8256 |
| Guarantor | Export Development Corporation<br>151 O'Connor Street<br>Ottawa, Canada K1A 1K3<br>Attention:  Loans Operations<br>Facsimile No.:(613) 598-2514 |

Each party hereto may from time to time designate by notice in writing to the other parties hereto a different address for communications and notices.

6.3   Further Assurances.  The Guarantor agrees that at any time and from time to time and the Beneficiary agrees at any time and from time to time after the payment of the Guaranteed Amount, upon the written request and at the expense of the other party hereto, it will promptly and duly execute and deliver any and all such further instruments and documents and take such action as may reasonably be requested by such other party in order to obtain the full benefits of

the agreements contained herein, including executing and delivering such instruments and assurances as may be reasonably necessary or advisable to confirm or evidence the rights hereunder of the Beneficiary or any successor, transferee or assignee to or of the Beneficiary.

6.4     Amendments; Successors and Assigns.     Any provision of this Guarantee Agreement may be modified or waived only by an instrument or instruments in writing signed by the Guarantor and the Beneficiary.  The Guarantor shall not assign its obligations hereunder without the prior written consent of the Beneficiary, provided that such obligations may be assigned to a successor of the Guarantor or any department or agency of Her Majesty the Queen in Right of Canada without the prior consent of the Beneficiary if (and only if) prior to and as a condition to any such transfer, (1) the assignee shall have delivered to the Beneficiary an agreement satisfactory in form and substance to the Beneficiary pursuant to which such assignee unconditionally and expressly assumes all of the liabilities and obligations of the Guarantor hereunder and such obligations continue to constitute the direct, general, unconditional, unsubordinated and unsecured obligations of Canada,  and (2) the Beneficiary shall have received a favorable opinion in form and substance and from counsel satisfactory to the Beneficiary as to the due authorization, execution, delivery and enforceability of the agreement referred to in clause (1) and as to such other matters as the Beneficiary may reasonably request. The Beneficiary shall not assign or otherwise transfer without the prior written consent of the Guarantor (a) the right to make demand for payment on, and receive payment from, the Guarantor in accordance with the provisions of Section 3.2 hereof, or (b) any of its other rights, duties or responsibilities under this Guarantee Agreement, provided that such rights, duties or obligations referred to in clauses (a) and (b) may be assigned or otherwise transferred to any transferee of all or a part of the Beneficiary's rights under the other Operative Documents so long as such assignment or transfer complies with the terms of Section 10.1 of the Participation Agreement.  This Guarantee Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

6.5     Counterparts.     This Guarantee Agreement may be executed in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

6.6     Submission to Jurisdiction. Each of the Guarantor and the Beneficiary agrees that any legal action or proceeding with respect to this Guarantee Agreement, or to enforce any judgment obtained against it in respect of any of the foregoing (a certified or exemplified copy of which judgment shall be conclusive evidence of the fact and of the amount of any indebtedness therein described), may be brought in the Courts of the Province of Ontario, Canada, and by the execution and delivery of this Guarantee Agreement, each such Person irrevocably consents and submits to the non-exclusive jurisdiction of each such court, acknowledges its competence and irrevocably agrees to be bound by a final judgment of such court.  Each such Person irrevocably waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such court and any claim that any such proceeding brought in such court has been brought in an inconvenient forum. Each such Person hereby further irrevocably consents to the service of process in any such action or proceeding by United States or Canadian registered or certified mail, postage prepaid, to such Person at the address for notices to such Person provided pursuant to Section 6.2 hereof.

Nothing herein shall affect the right of any party hereto to bring any action or proceeding against the other party hereto or their property in the courts of other jurisdictions, either initially or to enforce a judgment.

6.7    <u>Waiver of Jury Trial</u>. EACH OF THE GUARANTOR AND THE BENEFICIARY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY OR RIGHT TO REQUEST A TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

6.8    <u>Payment Currency.</u> (a) The Guarantor agrees that the payment obligations of the Guarantor hereunder will be paid in U.S. Dollars in immediately available funds. The Guarantor acknowledges that this is an international transaction and therefore payment in U.S. Dollars is of the essence and U.S. Dollars shall be the currency of account and payment in all events.

(b)    If, for the purposes of obtaining judgment in, or enforcing the judgment of, any court, it is necessary to convert a sum due hereunder in Dollars into another currency (the "Judgment Currency"), the rate of exchange used shall be that at which in accordance with normal banking procedures the Beneficiary could purchase freely transferable Dollars in New York or Toronto with the Judgment Currency on the Business Day preceding that on which payment is made.

(c)    The obligation of the Guarantor in respect of any sum due from it to the Beneficiary hereunder shall, notwithstanding any judgment or order of enforcement in such Judgment Currency, be discharged only to the extent that on the Business Day following receipt by the Beneficiary of any sum adjudged to be so due in the Judgment Currency, the Beneficiary may in accordance with normal banking procedures purchase freely transferable Dollars in New York or Toronto with the Judgment Currency; if the amount of the Dollars so purchased minus the amount of any commissions or other expenses incurred by the Beneficiary in connection with such purchase are less than the sum originally due to the Beneficiary in Dollars, the Guarantor agrees, as a separate obligation and notwithstanding any such judgment or order of enforcement, to indemnify the Beneficiary against such loss attributable to any of its obligations hereunder, and if the amount of the Dollars so purchased minus the amount of any commissions or other expenses incurred by the Beneficiary in connection with such purchase exceed the sum originally due to the Beneficiary in Dollars, the Beneficiary shall remit to the Guarantor such excess. Any additional amount due from the Guarantor under this Section 6.8 will be due as a separate debt and shall not be affected by judgment or order of enforcement being obtained for any other sums due under or in respect of this Guarantee Agreement.

6.9    <u>Certain Expenses</u>. Each of the Guarantor and, except as provided in Sections 3.5 and 6.8 hereof or in the following sentences of this Section 6.9, the Beneficiary shall pay its own costs and expenses incurred in connection with the payment of the Guaranteed Amount. As between the Guarantor and the Beneficiary, the Guarantor shall be responsible for payment of any sales, transfer or other taxes associated with the Guarantor's rights of subrogation

contemplated by this Guarantee Agreement. The Guarantor shall reimburse the Beneficiary on demand for any and all costs and expenses (including reasonable fees and disbursements of legal counsel) paid or incurred by the Beneficiary in enforcing any of its rights under this Guarantee Agreement.

6.10   Severability.   If any terms or provisions of this Guarantee Agreement or application thereof to any Person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Guarantee Agreement, or the application of such terms or provisions to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Guarantee Agreement shall be valid and enforceable to the fullest extent permitted by law.

6.11   Entire Agreement.   This Guarantee Agreement, together with any and all applicable Guarantee Agreement Supplements constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes in their entirety all prior agreements between the parties with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Guarantee Agreement to be duly executed and delivered as of the date first above written.


EXPORT DEVELOPMENT CORPORATION

By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____

HNB INVESTMENT CORP., as Beneficiary

By: _____
Name: JOAN D. WOODROOF
Title: DIRECTOR, STRUCTURED FINANCE

EXHIBIT A to EDC Guarantee Agreement

GUARANTEE AGREEMENT SUPPLEMENT NO. __

This Guarantee Agreement Supplement No. __ dated _____ __, 200_ (this "Guarantee Agreement Supplement") between Owner Participant, as Beneficiary ("Beneficiary") and Export Development Corporation, a corporation established by an Act of the Parliament of Canada ("Guarantor"). Unless otherwise provided herein, capitalized terms used in this Guarantee Agreement Supplement shall have the meanings set forth in the Guarantee Agreement dated as of November 6, 2000 ("Guarantee Agreement") between Beneficiary and Guarantor.

1. The Equity CV Amount applicable for each Unit is set forth on Schedule 1 hereto.

2. The Units covered by this Guarantee Agreement Supplement are described on Schedule 2 hereto.

3. The Lessor's Cost for each Unit covered by this Guarantee Agreement Supplement is set forth on Schedule 2 hereto. The total aggregate original Lessor's Cost for all Units covered by this Guarantee Agreement Supplement is $_____.

For purposed of Section 3.7 of the Guarantee Agreement the Expiry Date with respect to the Units covered by this Guarantee Agreement Supplement is _____.

This Guarantee Agreement Supplement may be executed in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

All of the terms and provisions of the Guarantee Agreement are hereby incorporated by reference in this Guarantee Agreement Supplement to the same extent as if fully set forth herein.

THIS GUARANTEE AGREEMENT SUPPLEMENT HAS BEEN EXECUTED AND DELIVERED IN OTTAWA, CANADA AND SHALL BE DEEMED TO BE MADE UNDER AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE PROVINCE OF ONTARIO AND THE FEDERAL LAWS OF CANADA APPLICABLE THEREIN.

IN WITNESS WHEREOF, the parties hereto have caused this Guarantee Agreement Supplement to be duly executed and delivered as of the date first above written.

EXPORT DEVELOPMENT CORPORATION


By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____


HNB INVESTMENT CORP.,
as Beneficiary


By: _____

Name: _____

Title:

SCHEDULE  1 to EDC Guarantee Agreement Supplement

EQUITY CV AMOUNT

Equity CV (expressed as at percentage of Lessor's Cost)

<u>Determination Date</u>                                          <u>Equity CV Amount</u>

SCHEDULE  2 to EDC Guarantee Agreement Supplement


DESCRIPTION OF EQUIPMENT                    LESSOR'S COST
(INCLUDING AMTRAK ID NUMBERS)

**AMTRAK TRUST HS-EDC-1**

<u>ANNEX A</u>

<u>DEFINITIONS AND RULES OF INTERPRETATION</u>

   1. The following rules apply to interpretation of the terms defined herein and any Operative Document to which Annex A is attached or is incorporated by reference or which uses the terms defined herein:

   (i) the singular includes the plural and the plural includes the singular;

   (ii) "or" is not exclusive and "include" and "including" are not limiting;

   (iii) a reference to any agreement or other contract includes, exhibits, schedules, supplements and amendments;

   (iv) unless the context otherwise requires, a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor;

   (v) a reference to a Person includes its successors and permitted assigns;

   (vi) a reference herein to an Article, Section, Exhibit, Schedule or Appendix without further reference is to the relevant Article, Section, Exhibit, Schedule or Appendix of the Agreement in which it is referenced;

   (vii) unless expressly stated otherwise, any right may be exercised at any time and from time to time;

   (viii) all obligations are continuing obligations; and

   (ix) the headings of the Articles, Sections and subsections are for convenience and shall not affect the meaning of this Agreement.

   2. The following terms shall have the following meanings for all purposes of the agreement to which this Annex A is appended:

   "*AAR*" means American Association of Railroads.

   "*Act*" means the Interstate Termination Act of 1995 (49 U.S.C. §10101 <u>et seq</u>.).

   "*Actual Knowledge*" means, with respect to any Person (other than an individual) as to any event or circumstance, the actual knowledge of a Responsible Officer of such Person or receipt by such Person from a party to the Participation Agreement (or any successor or assignee thereof) of notice of such event or circumstance and the relevance thereof under the Operative Documents.

   "*Additional Insureds*" means Trust Company, Owner Trustee, Owner Participant, Indenture Trustee, Equity Guarantor, Loan Participant, and each Note Holder.

"*Adjusted EBO Price*" means with respect to any Unit the percentage of Lessor's Cost applicable to such Unit specified in Schedule VII to the Lease Supplement applicable to such Unit, subject to adjustment in accordance with the terms of the Operative Documents.

"*Affiliate*", with respect to any Person, means any other Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such Person. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"*After-Tax Basis*" means with respect to any payment to be received (actually or constructively) by a Person, the amount of such payment plus a further payment or payments so that the net amount received (actually or constructively) by such Person, after deducting from such payments and such further payments the amount of all Taxes imposed on the Person receiving (actually or constructively) such payments by any taxing authority with respect to such payments (net of any current credits, deductions or other Tax benefits arising from the payment by such Person of any amount, including Taxes, with respect to the payment received or arising by reason of the receipt or accrual by such Person of the payment received) is equal to the original payment required to be received (actually or constructively). In making calculations pursuant to this definition with respect to Owner Participant, it shall be assumed that the Owner Participant is fully taxable for all income tax purposes at the highest Federal rate and the highest Virginia state and local rates applicable to corporations in the relevant jurisdiction at the time such amount is taxable to Owner Participant.

"*Aggregate Casualty Payment*" has the meaning specified in Section 7.3 of the Lease.

"*All Parties Agreement*" means for any Closing Date the All Parties Agreement delivered in respect of the Units financed on such Closing Date, in each case in substantially the form delivered on the first Closing Date.

"*Amtrak*" means National Railroad Passenger Corporation, a corporation organized under the Rail Passenger Services Act and the laws of the District of Columbia, also known as Amtrak.

"*Amtrak Advance*" means with respect to any Closing Date an amount equal to the Deferred Payment relating to such Closing Date.

"*Amtrak Bill of Sale*" means for any Closing Date the Bill of Sale and Assignment (Amtrak Trust HS-EDC-1) of Amtrak delivered in respect of the Units financed on such Closing Date, whereby Amtrak transfers, assigns and conveys certain of its rights and interests, but not its obligations, in the French Leasehold Interest and in the Units financed on such Closing Date, as and when acquired by Amtrak, to Owner Trustee, in each case in substantially the form delivered on the first Closing Date.

"*Amtrak Delegation*" means for any Closing Date the Delegation Agreement between Amtrak and French Lessor delivered in respect of the Units financed on such Closing Date, whereby Amtrak delegates French Lessor to Owner Trustee for the performance by French Lessor of its obligations set forth in Clause 21 of the French Lease, in each case in substantially the form delivered on the first Closing Date.

"*Amtrak Documents*" means, collectively, the Participation Agreement, the Lease, each Lease Supplement, each Memorandum of Lease, the Tax Indemnity Agreement, each Assignment of Warranties, each Termination and Release, each Amtrak Bill of Sale, the Equity Guarantee Fee Undertaking, each FRA Termination and the French Documents.

"*Applicable Law*" means all applicable laws, statutes, treaties, rules, codes, ordinances, regulations, permits, certificates, orders, interpretations, licenses and permits of any Federal, state, county, municipal, foreign, international, regional or other Governmental Authority, agency, board, body or instrumentality and judgments, decrees, injunctions, writs, orders or like action of any court, arbitrator or other administrative, judicial or quasi-judicial tribunal or agency of competent jurisdiction.

"*Applicable Locomotives*" means, as of the applicable EBO Date, those Locomotives which are described in the applicable Lease Supplement for such EBO Date.

"*Applicable Trainsets*" means, as of the applicable EBO Date, and with respect to the Trainsets described in the EBO Purchase Option Notice, those Trainsets which are described in the applicable Lease Supplement for such EBO Date.

"*Appraiser*" means Norman W. Seip & Associates.

"*Assignment (Cession)*" means for any Closing Date the Assignment (Cession) delivered in respect of the Units financed on such Closing Date, pursuant to which, Amtrak assigns and transfers to Lessor, among other things, certain of its rights, title and interests as lessee under the French Lease and in and to such Units, in each case in substantially the form delivered on the first Closing Date.

"*Assignment of Warranties*" means for any Closing Date the Assignment of Warranties (Amtrak Trust HS-EDC-1) between Amtrak and Owner Trustee delivered in respect of the Units financed on such Closing Date whereby Amtrak assigns certain rights under the Purchase Agreement to Owner Trustee, and Manufacturer, pursuant to the Consent, consents and agrees to the terms and conditions of such assignment, in each case in substantially the form delivered on the first Closing Date.

"*Assumed Principal Amount*" has the meaning specified in Section 18(i) of the Participation Agreement.

"*Authorized Officer*" means the President, any Vice President, any Assistant Vice President, or any other officer of the entity who has been authorized by the Board of Directors or the Executive Committee of the Board of Directors of such entity to perform the specific act or duty or to sign the specific document in question, and, with respect to Owner Trustee, any officer or other authorized person in the Corporate Trust Administration of Trust Company.

"*Bankruptcy Code*" means the Federal Bankruptcy Code (11 U.S.C. § 101 et seq.).

"*Base Lease Commencement Date*" means for any Unit the Closing Date for such Unit, as confirmed in the Lease Supplement for such Unit.

"*Base Lease Term*" with respect to any Unit means the period described in the first sentence of Section 3 of the Lease.

"*Base Lease Termination Date*" means for any Unit the Base Lease Termination Date specified in the Lease Supplement applicable to such Unit.

"*Base Rent*" with respect to any Unit (i) as of any Rent Payment Date for such Unit during the Base Lease Term means the Lessor's Cost of such Unit multiplied by the Rent Factor applicable to such Unit for such Rent Payment Date as set forth in Schedule II to the Lease Supplement applicable to such Unit and (ii) as of any Rent Payment Date for such Unit during a Renewal Term means the applicable Renewal Rent then due.

"*Business Day*" means any day other than (i) a Saturday or Sunday and (ii) a day on which state, provincial or national banking institutions are authorized or obligated by law or executive order to remain closed in New York City, Wilmington, Delaware, Maryland or the District of Columbia.

"*Casualty Occurrence*" with respect to any Unit means any of the following events with respect to such Unit:  (i) such Unit suffers an actual or constructive total loss (including any damage to any Unit which results in an insurance settlement on the basis of a total loss) or shall be or become worn out or shall be destroyed or irreparably damaged, or uneconomical to repair, or rendered unfit for commercial use from any cause whatsoever during the Lease Term or until such Unit is returned pursuant to Section 14 or Section 17 of the Lease, (ii) title to such Unit shall be taken by any Governmental Authority by condemnation or otherwise, (iii) use of such Unit shall be taken or requisitioned (a) by the United States government for a period which shall exceed 12 months (or beyond the end of the remaining Lease Term, if it first occurs) or (b) any other Governmental Authority for a period which shall exceed 180 days (or beyond the end of the remaining Lease Term, if it first occurs), (iv) such Unit shall be or become lost or stolen for a period in excess of 180 days (or beyond the end of the remaining Lease Term, if it first occurs), or (v) as a result of any rule, regulation, order or other action by the United States government or any Instrumentality, the use of such Unit in a manner consistent with Lessee's normal business activities shall have been prohibited for a period of 18 consecutive months (or beyond the end of the remaining Lease Term, if it first occurs).

"*Casualty Value*" has the meaning specified in Section 7.5 of the Lease.

"*Casualty Value Determination Date*" means (i) with respect to any Casualty Occurrence relating to any Unit, the first monthly Casualty Value Determination Date set forth in Schedule IV to the Lease Supplement applicable to such Unit that is at least 90 days after such Casualty Occurrence or (ii) with respect to any calculation under Section 13.2 of the Lease

relating to any Unit, the monthly Casualty Value Determination Date set forth in Schedule IV to the Lease Supplement applicable to such Units specified in such Section 13.2.

"*Casualty Value Factor*" with respect to any Unit as of any Casualty Value Determination Date (i) during the Base Lease Term means the percentage of Lessor's Cost applicable to such Unit set forth opposite such Casualty Value Determination Date on Schedule IV to the Lease Supplement applicable to such Unit, in each case as such Casualty Value Factors may have been adjusted pursuant to Section 16 of the Participation Agreement or Section 4.3 of the Lease or (ii) during the Renewal Term means the percentage for such Casualty Value Determination Date determined in accordance with Section 7.5 of the Lease.

"*Certificate of Trust*" has the meaning specified in Section 2.01(a) of the Trust Agreement.

"*Certified Table*" has the meaning specified in Section 8(viii) of the Participation Agreement.

"*Change in Tax Law*" means any of the following: (i) any addition, amendment, modification or change in or to the Code (including for this purpose any non-codified provision of legislation affecting the Code, such as transition rules or effective date provisions, and including, without limitation, any change in corporate tax rates, or any non-Code provision otherwise affecting Federal taxation), or in or to Federal tax regulations (including temporary regulations), or (ii) the enactment of any other statute affecting Federal taxation, or (iii) the issuance or decision of any ruling, revenue procedure, announcement, notice or other administrative interpretation, or of any case, in each case adversely affecting the Net Economic Return of the Owner Participant or the Federal tax treatment of the transaction.

"*Claims*" has the meaning specified in Section 6.2(i) of the Participation Agreement.

"*Closing Date*" with respect to any Unit means the date on or as of which the French Leasehold Interest with respect to such Unit is purchased by Owner Trustee pursuant to an Assignment (Cession) and such Unit is leased to Amtrak under and subject to the Lease.

"*Closing Notice*" has the meaning specified in Section 3.1 of the Participation Agreement.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Commitment*" of a Participant for any Closing Date means (i) in the case of Owner Participant, Owner Participant's Commitment for such Closing Date, and (ii) in the case of Loan Participant, Loan Participant's Commitment for such Closing Date.

"*Consent*" means for any Closing Date the Consent and Agreement (Amtrak Trust HS-EDC-1) of Manufacturer delivered in respect of the Units financed on such Closing Date, whereby Manufacturer consents and agrees to the terms and conditions of the Assignment of Warranties relating to such Units, in each case in substantially the form delivered on the first Closing Date.

"*Consent to Assignment (Cession)*" means for any Closing Date each Acknowledgment and Agreement (Amtrak Trust HS-EDC-1) of the applicable French Lessor and of the Relevant Parties (as such term is defined therein) delivered in respect of the Units financed on such Closing Date in connection with the Assignment (Cession) relating to such Units whereby such French Lessor and such Relevant Parties consent and agree to the terms and conditions of such Assignment (Cession), in each case in substantially the form delivered on the first Closing Date.

"*Debt Rate*" means with respect to any series of the Secured Notes issued on any Closing Date, the rate per annum, calculated on the basis of a 360-day year of twelve 30-day months, as determined in accordance with Section 2.6(ii) of the Participation Agreement, and set forth in the Indenture Supplement dated the date the Secured Notes of such series are issued.

"*Deferred Payment*" has the meaning specified in Section 9.2(v) of the Participation Agreement.

"*Deferred Payment Date*" has the meaning specified in Section 9.2(v) of the Participation Agreement.

"*Dollars*", "*U.S. Dollars*" and "*$*" means lawful currency of the United States.

"*EBO Date*" means with respect to any Unit the date specified for such Unit in the Lease Supplement applicable to such Unit or, if such date is not a Business Day, the next succeeding Business Day.

"*EBO Purchase Option*" means the option to purchase the Equipment set forth in Section 16.1 of the Lease.

"*EDC*" means Export Development Corporation, a corporation established by an Act of Parliament of Canada.

"*Equipment*" means up to (i) Eight (8) Locomotives and (ii) Ten (10) Trainsets, to the extent and for so long as they are accepted under and subject to the Lease, together with related appliances, parts, accessories, appurtenances, additions, improvements and other equipment or components of any nature installed thereon, as specified in the applicable Lease Supplement and replacements thereof and substitutions therefor, including any Replacement Units substituted for Units in accordance with Section 7.2 of the Lease (each Locomotive and each Trainset are individually referred to as a "*Unit*" and collectively referred to as the "*Equipment*" or the "*Units*").

"*Equity Guarantee Agreement*" means the Guarantee Agreement to be dated the date of its issuance between Owner Participant and EDC in the form attached to the Participation Agreement as Exhibit C. Unless the context otherwise requires, "Equity Guarantee Agreement" shall include each Equity Guarantee Agreement Supplement.

"*Equity Guarantee Agreement Supplement*" means a supplement to the Equity Guarantee Agreement adopted in accordance with the terms thereof.

"*Equity Guarantee Fee Undertaking*" means the Equity Guarantee Fee Undertaking dated as of November 6, 2000 between Amtrak and EDC.

"*Equity Guarantor*" means EDC.

"*Equity TV Amounts*" means, with respect to any Unit, the Equity TV Amounts set forth opposite a Determination Date in Schedule 1 to the Equity Guarantee Agreement Supplement applicable to such Unit, as such Equity TV Amounts may have been adjusted pursuant to Section 16 of the Participation Agreement or Section 4.3 of the Lease.

"*ERISA*" means the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 331 et seq.).

"*Escrow Agreement*" means for any Closing Date the Escrow Agreement among Amtrak, French Lessor and Wilmington Trust Company, a Delaware banking corporation, delivered in respect of the Units financed on such Closing Date, whereby Amtrak and French Lessor appoint Wilmington Trust Company as escrow agent and Wilmington Trust Company accepts such appointment and agrees to hold in escrow an undated bill of sale covering such Units that has been executed by French Lessor, in each case in substantially the form delivered on the first Closing Date.

"*Excepted Payments*" has the meaning specified in Section 1.01 of the Indenture.

"*Excepted Rights*" has the meaning specified in Section 1.01 of the Indenture.

"*Excess Amount*" has the meaning specified in Section 12 of the Participation Agreement.

"*Excess Payment Condition*" has the meaning specified in Section 6.1(xiii) of the Participation Agreement.

"*Exchange Act*" means the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.).

"*Expenses*" has the meaning specified in Section 8.01 of the Trust Agreement.

"*Fair Market Renewal Term*" has the meaning specified in Section 16.4(i)(b) of the Lease.

"*Fair Market Rental*" for a Unit means the semi-annual rent that would be obtained in an arm's length transaction between an informed and willing lessee and an informed and willing lessor, in each case under no compulsion to lease. In determining the Fair Market Rental for a Unit for purposes of Section 16 and 17.4 of the Lease, it shall be assumed that (a) Lessee has complied with all of the terms, provisions and conditions of the Lease and that such Unit is in the condition and configuration required upon its return to Lessor as provided therein, and (b) Lessee is in the railroad passenger business. In determining the Fair Market Rental for a Unit for purposes of Section 13 of the Lease, such Unit shall be valued "as-is, where is" in its actual condition and in the available rental market for such Unit. In determining the Fair Market

Rental of any Unit the value of, and any enhancement of value attributable to, any severable improvements that are not described in Section 12.2(ii) of the Lease shall be disregarded and it shall be otherwise assumed that such Unit is not subject to the Lease or any other Operative Document.

"*Fair Market Value*" for a Unit means the cash price that would be obtained in an arm's length transaction between an informed and willing buyer/user under no compulsion to buy, and an informed and willing seller under no compulsion to sell.  In determining the Fair Market Value for a Unit for purposes of Section 16 of the Lease, it shall be assumed that (a) Lessee has complied with all of the terms, provisions and conditions of the Lease and that such Unit is in the condition and configuration required upon its return to Lessor as provided therein, and (b) the buyer/user is in the railroad passenger business.  In determining the Fair Market Value for a Unit (or addition, modification or improvement) for purposes of Section 12.2(iii) or Section 13 of the Lease, such Unit (or addition, modification or improvement) shall be valued "as-is, where is" in its actual condition and in the available market for such Unit (or addition, modification or improvement).  In determining the Fair Market Value of any Unit the value of, and any enhancement of value attributable to, any severable improvements that are not described in Section 12.2(ii) of the Lease shall be disregarded and it shall otherwise be assumed that such Unit is not subject to the Lease or any other Operative Document.

"*Fiscal Year*" means the 12-month accounting period from and including October 1 of any calendar year through to and including September 30 of the following calendar year.

"*Fixed Rate Renewal Rent*" with respect to any Unit means an amount equal to 105% of the estimated semi-annual Fair Market Rental for the Fixed Rate Renewal Term for such Unit as of the Base Lease Termination Date as set forth in the appraisal delivered to Owner Participant on the first Closing Date; provided, if, in the good faith determination of Owner Participant, there shall have occurred a clarification prior to the commencement of the Fixed Rate Renewal Term that lessee renewal options at Fair Market Rental value do not extend the lease term for purposes of Section 467 of the Code and the regulations thereunder, then "*Fixed Rate Renewal Rent*" shall mean, with respect to any Unit, an amount equal to 100% of the estimated Fair Market Rental Value for such Unit as of the Base Lease Termination Date as set forth in the appraisal delivered to Owner Participant on the first Closing Date.

"*Fixed Rate Renewal Term*" has the meaning specified in Section 16.4(i)(a) of the Lease.

"*FRA*" means the Federal Railroad Administrator of the Department of Transportation.

"*FRA Termination*" means for any Closing Date the Termination and Release of Lien (Amtrak Trust HS-EDC-1) of the FRA delivered in respect of the Units financed on such Closing Date, in each case in substantially the form delivered by the first Closing Date, whereby the FRA releases the Lien in its favor created by that certain Security Agreement, dated October 5, 1983 between the FRA and Amtrak.

"*French Actions*" means in respect of any Unit (i) service upon the applicable French Lessor of a copy of the related Assignment (Cession) pursuant to Article 1690 of the French Civil Code, with such service being effected by a Hussier and (ii) deposit into escrow of an undated bill of sale executed by such French Lessor covering such Units pursuant to the Escrow Agreement.

"*French Lease*" with respect to each Unit means that certain Credit Bail identified as applying to such Unit as set forth in Schedule I to the Lease Supplement applicable to such Unit, which French Lease is entered into between the French Lessor identified on such Lease Supplement, as lessor, and Amtrak, as lessee.  Unless the context otherwise requires "French Lease" shall include each amendment and supplement thereto.

"*French Documents*" means each French Lease, each Memorandum of French Lease, each Lessor Security Agreement, each Assignment (Cession), each Consent to Assignment (Cession), each Waiver Agreement, each Amtrak Delegation, each Escrow Agreement, each French Lessor Bill of Sale, each Interim Assignment (Cession), each Termination of Interim Assignment (Cession), each All Parties Agreement, each Operating Agreement, each Subordinated Loan Agreement, each Purchase Agreement Assignment and the PUA Agreement.

"*French Leasehold Interest*" means, with respect to any Unit, Amtrak's rights and interests, but not its obligations, as lessee, under the French Lease for such Unit.

"*French Lessor*" means with respect to a French Lease identified on a Lease Supplement, the particular groupement d'interet economique, organized under French law, identified on such Lease Supplement.

"*French Lessor Bill of Sale*" means each bill of sale executed (but not dated) by a French Lessor covering the Units to be financed on a Closing Date and deposited into escrow pursuant to the Escrow Agreement.

"*Governmental Authority*" means any federal, state or local government or other governmental authority in the United States or any foreign government or any political subdivision or Governmental Authority thereof or any territory or possession of the United States or any international authority.

"*Indemnified Parties*" means for purposes of Sections 6.1 and 6.2 of the Participation Agreement, Owner Participant, Owner Trustee, Trust Company, Indenture Trustee, Equity Guarantor, Loan Participant, each Note Holder and their respective successors and assigns, and the Affiliates, agents, officers, directors, servants and employees of any thereof. "*Indemnified Party*" means any such Person individually.

"*Indenture*" means that certain Trust Indenture and Security Agreement (Amtrak Trust HS-EDC-1) dated as of November 6, 2000, between Owner Trustee and Indenture Trustee. Unless the context otherwise requires, "Indenture" shall include each Indenture Supplement.

"*Indenture Default*" means an event or condition which, after notice or lapse of time, or both, would become an Indenture Event of Default.

"*Indenture Event of Default*" means an "Event of Default" as specified in Section 4.02 of the Indenture.

"*Indenture Supplement*" has the meaning specified in Section 1.01 of the Indenture.

"*Indenture Trustee*" means Allfirst Bank, a Maryland banking corporation.

"*Independent*" means, when used with respect to any specified Person, such a Person who (1) is in fact independent, (2) does not have any direct financial interest or any material indirect financial interest in Owner Trustee, Owner Participant, Loan Participant, Indenture Trustee or Amtrak or in any Affiliate of any of them and (3) is not connected with Owner Participant, Owner Trustee, Loan Participant, Indenture Trustee or Amtrak or any such Affiliate as an officer, employee, promoter, trustee, partner, director or person performing similar functions. Except for purposes of Section 6.1 of the Participation Agreement and the Tax Indemnity Agreement, whenever it is provided that any Independent Person's opinion or certificate shall be furnished to Amtrak or Lessor, such Person shall be appointed by Amtrak and approved by Lessor in the exercise of reasonable care and such opinion or certificate shall state that the signer has read this definition and is Independent within the meaning thereof.

"*Independent Auditors*" shall mean KPMG LLC and its successors and assigns, or any independent accounting firm of national standing and reputation selected by Amtrak, who is performing its annual audit.

"*Indicative Schedules*" has the meaning specified in Section 2.6(i) of the Participation Agreement.

"*Installment Payment Date*" with respect to any Secured Note means each Installment Payment Date set forth in Annex A to such Secured Note.

"*Institutional Investor*" means a bank, pension fund, insurance company, finance company, investment company, mutual fund or similar institution.

"*Instrumentality*" means a United States governmental agency, instrumentality, authority, entity or establishment.

"*Interim Assignment (Cession)*" means for any Closing Date (other than the first Closing Date) the Interim Assignment (Cession) delivered in respect of the Units to be financed on a Closing Date, pursuant to which, Amtrak assigns and transfers to EDC, as collateral agent, among other things, certain of its rights, title and interests as lessee under the French Lease applicable to such Units and in and to such Units.

"*Investment Grade*" with respect to any Person shall mean that the long-term unsecured indebtedness of such Person is rated "BBB-" or better by Standard & Poor's or "Baa3" or better by Moody's.

"*Lease*" means that certain Lease of Railroad Equipment (Amtrak Trust HS-EDC-1) dated as of November 6, 2000, between Owner Trustee, as lessor, and Amtrak, as lessee. Unless the context otherwise requires, "Lease" shall include each Lease Supplement.

"*Lease Default*" means any event which with the lapse of time or the giving of notice, or both, would constitute a Lease Event of Default.

"*Lease Event of Default*" has the meaning specified in Section 13.1 of the Lease.

"*Lease Supplement*" means a supplement to the Lease adopted in accordance with the terms thereof substantially in the form of Exhibit A to the Lease, entered into between Lessor and Lessee (collectively, the "*Lease Supplements*").

"*Lease Term*" with respect to any Unit means the period commencing on the Base Lease Commencement Date therefor and continuing to and including the Base Lease Termination Date for such Unit, or if Lessee exercises any renewal options contained in Section 16.4 of the Lease with respect to such Unit, the last day of the last Renewal Term for such Unit, in each case unless earlier terminated pursuant to the terms of the Lease.

"*Lessee*" means Amtrak.

"*Lessor*" means Owner Trustee in its capacity as lessor under the Lease.

"*Lessor Security Agreement*" means for any Closing Date the Lessor Security Agreement (U.S.) delivered in respect of the Units to be financed on such Closing Date, whereby the French Lessor grants to Amtrak a first priority security interest in all of its right, title and interest in and to such Units in order to secure its obligations pursuant to Clause 21 of the French Lease and the Amtrak Delegation, in each case in substantially the form delivered on the first Closing Date.

"*Lessor's Cost*" means, with respect to each Unit, the amount set forth in the Lease Supplement applicable to such Unit. Any Replacement Unit shall be deemed to have the Lessor's Cost of the Unit for which it was substituted in accordance with Section 7.2 of the Lease.

"*Lessor's Liens*" means any Lien affecting or in respect of the Equipment, the Lease, the Trust Estate, the Trust Indenture Estate or the Rent arising as a result of (i) claims by or against Lessor, or Trust Company, unrelated to the transactions contemplated by the Operative Documents or (ii) any breach of any covenant or agreement of Lessor, or Trust Company, set forth in any of the Operative Documents, or (iii) Taxes imposed against Lessor, or Trust Company, or the Trust Estate which are not indemnified against by Lessee pursuant to the Participation Agreement.

"*Liability Insurance*" has the meaning specified in Section 8.1(i)(b) of the Lease.

"*Lien*" means any mortgage, pledge, lien, charge, claim, encumbrance, lease, sublease, sub-sublease or security interest (including, any payments of withholding Taxes in respect thereof).

"*Loan Participant*" means EDC in its capacity as holder of a Secured Note and any subsequent holder of a Secured Note from time to time.

"*Loan Participant's Commitment*" for each Closing Date means the product of the Lessor's Cost with respect to the Units to be made subject to the Lease on such Closing Date and the percentage set forth in Schedule III to the Lease Supplement applicable to such Units.

"*Loan Participant's Maximum Commitment*" means $302,880,000.

"*Locomotives*" means the dual cab, high-horsepower electric locomotives identified as such in Schedule I to each Lease Supplement.

"*Loss*" has the meaning set forth in Section 5(a) of the Tax Indemnity Agreement.

"*Majority in Interest of Note Holders*" has the meaning specified in Section 1.01 of the Indenture.

"*Make Whole Premium Amount*" has the meaning specified in Section 1.01 of the Indenture.

"*Manufacturer*" means the consortium of Bombardier Corporation, an Idaho corporation and Alsthom Inc., a New York corporation.

"*Material Civil Liability*" with respect to any Indemnified Party or Person, means any material civil liability in excess of the self insurance allowed Amtrak under Section 8 of the Lease, against which risk Amtrak has neither obtained third-party insurance nor set aside reserves and with respect to which, in the reasonable opinion of such Indemnified Party or Person, exceeds Amtrak's ability to discharge such liability.

"*Memorandum of French Lease*" means each Memorandum of Lease of Railroad Equipment between the applicable French Lessor, as lessor, and Amtrak, as lessee, delivered with respect to the applicable French Lease. Unless the context otherwise requires "Memorandum of French Lease" shall include each amendment and supplement thereto.

"*Memorandum of Indenture*" means each Memorandum of Trust Indenture and Security Agreement (Amtrak Trust HS-EDC-1) between Owner Trustee and Indenture Trustee delivered on a Closing Date in respect of the Units financed on such Closing Date, substantially in the form delivered on the first Closing Date.

"*Memorandum of Lease*" means each Memorandum of Lease of Railroad Equipment (Amtrak Trust HS-EDC-1) between Owner Trustee, as lessor, and Amtrak, as lessee delivered on a Closing Date in respect of the Units financed on such Closing Date, substantially in the form delivered on the first Closing Date.

"*Minimum Number*" means (a) with respect to Locomotives, for purposes of the exercise of any renewal or voluntary termination or purchase option under the Lease, all or none of the Locomotives originally subject to the Lease, and (b) with respect to Trainsets, (i) for purposes of the exercise of the EBO Purchase Option, one or more of the Trainsets originally

subject to the Lease, as selected by the Unit Selection Process, and (ii) for purposes of the exercise of any renewal or voluntary termination or other purchase option under the Lease, all or none of the Trainsets then subject to the Lease.

"*Moody's*" means Moody's Investors Service, Inc., and its successors and assigns, and, if Moody's Investors Service, Inc. and its successors and assigns no longer issues securities ratings, the term "Moody's" shall include at the option of the Lessee, any other Person that issues internationally accepted securities ratings designated by the Lessee in a written notice to the Owner Participant and reasonably acceptable to the Owner Participant, and, upon the inclusion in this definition of such other Person, each reference in the Operative Documents to a rating issued by Moody's shall be deemed automatically replaced with a reference to the comparable rating issued by such Person.

"*NEC-MsC*" is a joint enterprise between Amtrak and the Manufacturer.

"*Net Economic Return*" means Owner Participant's nominal after-tax multiple investment sinking fund yield and aggregate after-tax cash flow both through the EBO Date and the full term of the Lease, and not less than 90% of the after-tax cash flow generated by the transaction in each of the first 5 calendar years ending following the commencement of the Lease Term, determined on the same assumptions as the method originally used by Owner Participant in calculating the Rent Factors originally set forth in Schedule IV to the Participation Agreement.

"*New Indenture*" has the meaning specified in Section 18(iii) of the Participation Agreement.

"*New Notes*" has the meaning specified in Section 18(i) of the Participation Agreement.

"*Non-U.S. Person*" means any Person other than (i) a citizen or resident of the United States, as defined in Section 7701(a)(9) of the Code (for purposes of this definition, the "United States"), (ii) a corporation, partnership or other entity created or organized under the laws of the United States or any political subdivision thereof or therein or (iii) any estate or trust that is subject to United States Federal income taxes regardless of the source of its income.

"*Note Holder*" has the meaning specified in Section 1.01 of the Indenture.

"*Note Register*" has the meaning specified in Section 1.01 of the Indenture.

"*Obligor*" with respect to a Secured Note, means Owner Trustee.

"*Officer's Certificate*" with respect to any corporation or other entity means a certificate executed on behalf of such corporation or other entity by its Chief Executive Officer, President, Chief Financial Officer, one of its Vice Presidents or its Treasurer (including, with respect to Owner Trustee, any Authorized Officer).

"*Operating Agreement*" means for any Closing Date the Operating Agreement delivered in respect of the Units financed on such Closing Date, in each case in substantially the form delivered on the first Closing Date.

"*Operative Documents*" means, collectively, the Participation Agreement, the Trust Agreement, the Indenture, each Indenture Supplement, each Memorandum of Indenture, the Lease, each Lease Supplement, each Memorandum of Lease, the Tax Indemnity Agreement, the Secured Notes, each Assignment of Warranties, each Consent, each Termination and Release, each Amtrak Bill of Sale, the Equity Guarantee Agreement, each Equity Guarantee Agreement Supplement, the Equity Guarantee Fee Undertaking, each FRA Termination, the French Documents, any Owner Participant Guaranty, and any security agreement between Amtrak and Lessor pursuant to Section 16.1 of the Lease.

"*Opinion Addressees*" means Loan Participant, Owner Trustee, Trust Company, Indenture Trustee, Equity Guarantor, Owner Participant, and Amtrak.

"*Outstanding*" with respect to Secured Notes, means, as of the date of determination, all Secured Notes theretofore delivered under the Indenture, except:

(i)     Secured Notes theretofore canceled by Owner Trustee or delivered to Owner Trustee for cancellation; and

(ii)    Secured Notes in exchange or replacement for which other Secured Notes shall have been delivered under the Indenture.

"*Overall Transaction*" means the arrangements and transactions contemplated by and reflected in the Operative Documents.

"*Overdue Rate*" means a rate of interest equal to the lesser of (i) the higher of (x) the highest Debt Rate applicable to any Secured Note plus 2% per annum and (y) the Prime Rate plus 1%, and (ii) the highest rate of interest permitted by Applicable Law.

"*Owner Participant*" means HNB Investment Corp., a Delaware corporation, so long as such party shall have any interest in the Trust Estate, and transferees thereof as permitted by Section 10.1 of the Participation Agreement.

"*Owner Participant Documents*" means the Trust Agreement, the Participation Agreement, the Equity Guarantee Agreement, and the Tax Indemnity Agreement.

"*Owner Participant Guarantor*" means any party executing an Owner Participant Guaranty, if any.

"*Owner Participant Guaranty*" means (i) a parent guaranty executed and delivered on the first Closing Date, if any, and (ii) a parent guaranty executed and delivered pursuant to Section 10.1(i)(a) of the Participation Agreement, if any.

"*Owner Participant's Commitment*" for each Closing Date shall mean the product of the Lessor's Cost with respect to the Units to be made subject to the Lease on such Closing Date and the percentage set forth in Schedule III to the Lease Supplement applicable to such Units.

"*Owner Participant's Lien*" means any Lien affecting, on or in respect of the Equipment, the Lease, the Trust Estate, the Trust Indenture Estate or the Rent arising as a result of (i) claims against or affecting Owner Participant not related to the transactions contemplated by the Operative Documents, or (ii) any breach of any covenant or agreement of Owner Participant set forth in any of the Operative Documents, or (iii) Taxes imposed against Owner Participant, Lessor or the Trust Estate which are not indemnified against by Lessee pursuant to the Participation Agreement or under the Tax Indemnity Agreement.

"*Owner Participant's Maximum Commitment*" means $93,500,000.

"*Owner Trustee*" means Wilmington Trust Company, a Delaware banking corporation, not in its individual capacity but solely as Owner Trustee under the Trust Agreement, and which term, unless the context otherwise requires, shall include the Trust.

"*Participant*" or "*Participants*" means Loan Participant and Owner Participant.

"*Participation Agreement*" means that certain Participation Agreement (Amtrak Trust HS-EDC-1) dated as of November 6, 2000, among Amtrak, Owner Participant, Indenture Trustee, Loan Participant, Owner Trustee and Trust Company.

"*Payment Instructions*" with respect to Loan Participant means the payment instructions set forth in Schedule I to the Participation Agreement.

"*Permitted Investment*" means (i) direct obligations of the United States of America and agencies guaranteed by the United States government having a final maturity of no more than 90 days from the date of purchase thereof; (ii) certificates of deposit issued by, or bankers' acceptances of, or time deposits with, any bank, trust company or national banking association incorporated or doing business under the laws of the United States of America or one of the states thereof having combined capital and surplus and retained earnings as of its last report of condition of at least $500,000,000 and having a short-term deposit debt rating of A1 by S&P or P1 by Moody's (or, if neither such organization shall rate such short-term deposits at any time, a rating equal to the highest ratings assigned by any nationally recognized rating organization in the United States of America) and having a final maturity of no more than 90 days from date of purchase thereof; (iii) commercial paper of any holding company of a bank, trust company or national banking association described in clause (ii) and commercial paper of any corporation or finance company incorporated or doing business under the laws of the United States of America or any state thereof having a rating assigned to such commercial paper of A1 by S&P or P1 by Moody's (or, if neither such organization shall rate such commercial paper at any time, a rating equal to the highest ratings assigned by any nationally recognized rating organization in the United States of America) and having a final maturity of no more than 90 days from the date of purchase thereof; and (iv) any money market or short-term investment fund investing in or consisting solely of and secured by investments described in clauses (i), (ii) and (iii) above, including any such fund maintained by the Indenture Trustee (including any proprietary mutual fund of the Indenture Trustee by which the Indenture Trustee or an affiliate of the Indenture Trustee serves as investment advisor and receives reasonable compensation therefor); provided that except for investments described in clause (i) above, no more than the greater of $10,000,000 or 50% of the principal amount may be invested as "Permitted

Investments" in any one corporation, bank holding company, bank, trust company or national banking association at any given time.  If none of the above investments is available, the entire amount to be invested may be used to purchase Federal Funds overnight from an entity described in clause (ii) above.

"*Permitted Liens*" means (i) Liens for taxes, assessments or governmental charges or levies in each case not due and delinquent, (ii) inchoate materialmen's, mechanics', workmen's, repairmen's or other like Liens arising in the ordinary course of Amtrak's business and in each case not delinquent, (iii) the Lien of the Indenture, (iv) Lessor's Liens, (v) Owner Participant's Liens, (vi) subleases or assignments permitted under the Lease and (vii) the rights of French Lessor under the French Lease.

"*Person*" or "*Persons*" means any individual, firm, partnership, corporation, limited liability company, trust, unincorporated association or joint venture, a government or any department or agency thereof, or any other entity.

"*Prime Rate*" shall mean for any day the rate of interest publicly announced from time to time by Citibank, N.A. (or its successors) at its principal office in New York, New York as its "base" rate for domestic (United States) commercial loans in effect on such day.

"*Privatized*" shall mean, with respect to Amtrak, that Persons other than the United States government, or its agencies, own more than 50% of voting rights of the stock of Amtrak.

"*Property Insurance*" has the meaning specified in Section 8.1(i)(a) of the Lease.

"*Proposed Change in Tax Law*" means any of the following:

(i)      A bill (a) reported out of the Senate Finance Committee or the House Ways and Means Committee or (b) passed by the U.S. Senate or the U.S. House of Representatives (including an amendment to a bill separately passed by the Senate or the House) or reported out of the Conference Committee for such bill.

(ii)     The issuance or amendment of a proposed Treasury Regulation.

(iii)    A bill (including in the case of item (b), any provision contained in a Chairman's mark) which is (a) introduced, sponsored or co-sponsored in the United States Congress, or publicly supported or endorsed, by a member of the Senate Finance Committee, the Senate Majority Leader, the Senate Minority Leader, a member of the House Ways and Means Committee, the House Majority Leader, the House Minority Leader or the Speaker of the House, or (b) the subject of a "chairman's Mark" in the House Ways and Means Committee or the Senate Finance Committee.

(iv)    A bill or proposal which is introduced, sponsored or co-sponsored or publicly supported or endorsed by the Executive Branch or the Treasury.

"*PUA Agreement*" has the meaning specified therefor in the applicable French Lease.

"*Purchase Agreement*" means, collectively, the Agreement for Purchase and Sale of High Speed Rail Equipment and Design and Construction of Maintenance Facilities, dated as of May 1, 1996, between Manufacturer and Lessee and the Agreement for Purchase and Sale of High Speed Electric Locomotives dated as of May 1, 1996 between the Manufacturer and Lessee.

"*Purchase Agreement Assignment*" means for any Closing Date the Purchase Agreement Assignment among Amtrak, French Lessor and Manufacturer delivered in respect of the Units financed on such Closing Date, in each case in substantially the form delivered on the first Closing Date.

"*Rail Passenger Service Act*" means the Rail Passenger Service Act (formerly 49 U.S.C. § 501 et seq. recodified at 49 U.S.C. § 24301 et seq. pursuant to Public Law No. 103-272, July 5, 1994).

"*Redelivery Location*" has the meaning specified in Section 17.1 of the Lease.

"*Reference Base Lease Termination Date*" means the Base Lease Termination Date applicable to the Units subject to Lease Supplement No. 1.

"*Reference Closing Date*" means the date of Lease Supplement No. 1.

"*Reference EBO Date*" means the EBO Date applicable to the Units subject to Lease Supplement No. 1.

"*Reference Renewal Term*" means the end of any Renewal Term for the Units subject to Lease Supplement No. 1.

"*Renewal Rent*" means, with respect to a Renewal Term, Fair Market Rental or Fixed Rate Renewal Rent, as the case may be.

"*Renewal Term*" means a Fair Market Renewal Term or a Fixed Rate Renewal Term, as the case may be.

"*Rent*" means Base Rent, Renewal Rent and Supplemental Rent, collectively.

"*Rent Factor*" for any Rent Payment Date means with respect to any Unit, the percentage of Lessor's Cost applicable to such Unit set forth opposite such Rent Payment Date on Schedule II to the Lease Supplement applicable to such Unit, in each case as such Rent Factors may have been adjusted pursuant to Section 4.3 of the Lease or Section 16 of the Participation Agreement.

"*Rent Payment Date*" with respect to any Unit delivered on any Closing Date means (i) during the Base Lease Term, each Rent Payment Date set forth on Schedule II to the Lease Supplement applicable to such Unit and (ii) during any Renewal Term, the semi-annual dates having the same periodicity as the Rent Payment Dates during the Base Lease Term applicable to such Unit.  A Rent Payment Date shall in any event fall on each Installment Payment Date.

"*Replacement Unit*" for a Unit suffering a Casualty Occurrence means a Locomotive or Trainset, as the case may be, of the same make and model, or an improved make and model, having a fair market value, utility and remaining useful life (as determined by an independent appraiser of recognized standing if requested by Lessor) at least equal to the Unit being replaced, assuming that the Unit being replaced was in such condition as required by the terms of the Lease immediately prior to such Casualty Occurrence.

"*Responsible Officer*" of an entity means any corporate officer (or in the case of a non-corporate entity, any corporate authority) of such entity who is designated as the recipient of a notice pursuant to the provisions of any Operative Document or who, in the normal performance of such officer's operational responsibilities, would have knowledge of the matter at issue and the relevant provisions of any applicable Operative Document. When used with respect to Owner Trustee or Indenture Trustee, "Responsible Officer" means any officer within the corporate trust office or the corporate trust administration (or any successor group) thereof assigned by Trust Company or Indenture Trustee to administer the trust created (as appropriate) by the Trust Agreement or the Indenture.

"*S&P*" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and its successor and assigns and if Standard & Poor's Ratings Group and its successor and assigns no longer issues securities ratings, the term "S&P" shall include, at the option of the Lessee, any other Person that issues internationally accepted securities ratings designated by the Lessee in a written notice to the Owner Participant and reasonably acceptable to the Owner Participant and, upon the inclusion in this definition of such other Person, each reference in the Operative Documents to a rating issued by S&P shall be deemed automatically replaced with a reference to the comparable rating issued by such Person.

"*Secretary*" means the Secretary of the Department of Transportation.

"*Section 1168 of the Bankruptcy Code*" means Section 1168 of the Bankruptcy Code or a successor provision intended to afford lessors of rolling stock equipment and accessories used on such equipment benefits comparable to those afforded by said Section 1168 as in effect on the date hereof.

"*Secured Note*" or "*Note*" has the meaning specified in Section 1.01 of the Indenture.

"*Securities Act*" means the Securities Act of 1933 (15 U.S.C. § 77a et seq.).

"*Self-Sufficient*" has the meaning specified therefor in the Equity Guarantee Agreement.

"*Special Event*" has the meaning specified in Section 19 of the Participation Agreement.

"*Specified Average Life*," has the meaning specified in Section 3.1 of the Participation Agreement.

"*Specified Default*" means a Lease Default specified in Sections 13.1(i), (ii), (iii), (vi), (vii), (viii), (ix) and (x) of the Lease.

"*Specified Loan Participant's Commitment*" has the meaning specified in Section 3.1 of the Participation Agreement.

"*State Rate*" has the meaning specified in Section 2(f) of the Tax Indemnity Agreement.

"*STB*" means the Surface Transportation Board of the United States Department of Transportation or any successor agency thereto.

"*Subordinated Loan Agreement*" means for any Closing Date the Subordinated Loan Agreement delivered in respect of the Units financed on such Closing Date, in each case in substantially the form delivered on the first Closing Date.

"*Supplemental Rent*" means any and all amounts, liabilities and obligations (other than Base Rent or Renewal Rent) which Lessee assumes or agrees to pay to any Person under the Lease or under the Participation Agreement, including, without limitation, Section 4.2 of the Lease and Sections 6 and 7 of the Participation Agreement, or under any other Operative Document, including, without limitation, payments of Adjusted EBO Price, Casualty Value, Termination Value and amounts measured by reference thereto, indemnity payments and payments pursuant to the Tax Indemnity Agreement.

"*Tax Affiliate*" means any member of the "lessee group" of Lessee as that term is defined in Revenue Procedure 75-21, 1975-1C.B. 715.

"*Tax Assumptions*" has the meaning specified in Section 2 of the Tax Indemnity Agreement.

"*Tax Indemnity Agreement*" means that certain Tax Indemnity Agreement (Amtrak Trust HS-EDC-1) dated as of November 6, 2000, between Owner Participant and Amtrak.

"*Taxes*" has the meaning specified in Section 6.1(i) to the Participation Agreement.

"*Termination and Release*" means for any Closing Date the Termination and Release (Amtrak Trust HS-EDC-1) of EDC in its individual capacity, or as collateral agent, as the case may be, delivered in respect of the Units financed on such Closing Date, in each case in substantially the form delivered on the first Closing Date.

"*Termination Date*" has the meaning specified in Section 26.1 of the Lease.

"*Termination of Interim Assignment (Cession)*" means for any Closing Date (other than the first Closing Date) the Termination of Interim Assignment (Cession) delivered in respect of the Units to be financed on such Closing Date, in each case in substantially the form delivered on the second Closing Date.

"*Termination Value*" has the meaning specified in Section 26.5 of the Lease.

"*Termination Value Factor*" with respect to any Unit as of the applicable Termination Date, means *the percentage of Lessor's Cost set forth under the column labeled* "Termination Value" opposite such Termination Date on Schedule V to the Lease Supplement applicable to such Unit, as such Termination Value Factors may have been adjusted pursuant to Section 16 of the Participation Agreement or Section 4.3 of the Lease, subject to adjustment in accordance with the terms of the Operative Documents.

"*Trainsets*" means the high-speed trainsets, each trainset consisting of one (1) first class coach car, one (1) bistro car, three (3) coach cars, one (1) end coach car, and two (2) power cars identified as such in Schedule I to each Lease Supplement.

"*Transaction*" means the transactions contemplated by the Participation Agreement and the other Operative Documents.

"*Transaction Expenses*" has the meaning specified in Section 7.1 of the Participation Agreement.

"*Transaction Expenses Cap*" has the meaning specified in Section 7.1 of the Participation Agreement.

"*Transferee*" means the Person to whom Owner Participant has transferred its interest in the Trust Estate in accordance with Section 10 of the Participation Agreement.

"*Trust*" means AMTRAK TRUST HS-EDC-1, a Delaware business trust, all of the activities of which shall be conducted by Owner Trustee on behalf of the Trust.

"*Trust Agreement*" means that certain Trust Agreement (Amtrak Trust HS-EDC-1) dated as of November 6, 2000, between Owner Participant and Wilmington Trust Company, a Delaware banking corporation, as Owner Trustee and Trust Company.

"*Trust Company*" means Wilmington Trust Company, a Delaware banking corporation, in its individual capacity.

"*Trust Estate*" means all estate, right, title and interest of Owner Trustee in and to the Equipment, the French Leasehold Interest, the French Documents and the Lease and any other property contributed by Owner Participant, including all amounts of Rent, insurance proceeds and requisition, indemnity or other payments of any kind for or with respect to the Equipment. Notwithstanding the foregoing, (i) "Trust Estate" shall not include any Excepted Rights or Excepted Payments, and (ii) "Trust Estate" shall include all property purported to be covered by the Granting Clause of the Indenture.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939 (15 U.S.C. § 77aaa et seq.).

"*Trust Indenture Estate*" has the meaning specified in Section 1.01 of the Indenture.

"*UCC*" means the Uniform Commercial Code, as adopted in the relevant jurisdiction.

"*Unit*" and "*Units*" have the meanings set forth under "*Equipment*".

"*Unit Selection Process*" means the following procedure for selecting Units for purposes of the exercise of purchase options and renewal options under Section 16 of the Lease, and the voluntary termination option under Section 26 of the Lease with respect to such Units: Amtrak shall designate, and Amtrak and Lessor shall attempt to agree on, such Units. If Amtrak and Lessor are unable to agree within 15 days after Amtrak's designation, the Units actually chosen shall be randomly selected on a blind basis by an Independent third party chosen by Amtrak and Lessor (and if Amtrak and Lessor are unable to select such Independent third party within 30 days after Amtrak's designation, by an Independent third party chosen by the American Arbitration Association), without regard to the condition of any such Unit.

"*U.S. Lessor*" means the Trust.

"*Voluntary Termination*" with respect to any Unit means a termination of the Lease with respect to such Unit pursuant to Section 26 of the Lease.

"*Waiver Agreement*" means for any Closing Date the Waiver Agreement delivered in respect of the Units financed on such Closing Date, executed by the Procurement Lenders and the US Lease Parties in favor of, *inter alia*, the Lessor, the Manager and the Members (as each such party is defined in the French Lease relating to such Units), in each case in substantially the form delivered on the first Closing Date.

3.      Capitalized terms not otherwise defined herein shall have the meanings assigned thereto in the Indenture.