# EXHIBIT 8

AMTRAK TRUST HS-EDC-1

CERTAIN RIGHTS OF LESSOR UNDER THIS LEASE OF RAILROAD EQUIPMENT HAVE BEEN ASSIGNED AS SECURITY TO, AND ARE SUBJECT TO A SECURITY INTEREST IN FAVOR OF, ALLFIRST BANK, AS INDENTURE TRUSTEE UNDER THE TRUST INDENTURE AND SECURITY AGREEMENT DATED AS OF THE DATE HEREOF BETWEEN LESSOR AND INDENTURE TRUSTEE, FOR THE BENEFIT OF LOAN PARTICIPANT.   THIS LEASE HAS BEEN EXECUTED IN SEVERAL COUNTERPARTS.   ONLY THE ORIGINAL COUNTERPART MARKED "ORIGINAL COUNTERPART NO. 1" AND BEARING THE RECEIPT THEREFOR EXECUTED BY ALLFIRST BANK, AS INDENTURE TRUSTEE, ON THE SIGNATURE PAGE THEREOF, SHALL CONSTITUTE CHATTEL PAPER WITHIN THE MEANING OF THE UNIFORM COMMERCIAL CODE.   SEE SECTION 24 HEREOF FOR INFORMATION CONCERNING THE RIGHTS OF HOLDERS OF THE VARIOUS COUNTERPARTS OF THIS LEASE OF RAILROAD EQUIPMENT.

# LEASE OF RAILROAD EQUIPMENT

Dated as of November 6, 2000

between

## AMTRAK TRUST HS-EDC-1,
as Lessor

and

## NATIONAL RAILROAD PASSENGER CORPORATION,
Lessee

Eight (8) Dual Cab, High-Horsepower Electric Locomotives and
Ten (10) High-Speed Trainsets

AMTRAK TRUST HS-EDC-1

---

NOTICE IS HEREBY GIVEN TO ALL CONTRACTORS, SUBCONTRACTORS, LABORERS, MATERIALMEN AND OTHER PERSONS THAT LESSOR WILL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIALS FURNISHED TO LESSEE AND THAT NO LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT LESSOR'S INTEREST IN THE UNITS.

---

A Memorandum of Lease with respect hereto has been filed with the Surface Transportation Board pursuant to 49 U.S.C. §11301 on November 15, 2000 at 11:16 a.m. Recordation Number 23229, and deposited in the office of the Registrar General of Canada pursuant to §105 of the Canada Transportation Act on November 15, 2000 at 11:40 a.m.

# TABLE OF CONTENTS

Page

SECTION 1.    DEFINITIONS..................................................................................1

SECTION 2.    AGREEMENT TO LEASE; DELIVERY AND ACCEPTANCE.....................1
       2.1    Agreement to Lease ...........................................................1
       2.2    Delivery and Acceptance ...................................................1

SECTION 3.    BASE LEASE TERM..........................................................................1

SECTION 4.    RENT.............................................................................................2
       4.1    Base Rent..........................................................................2
       4.2    Supplemental Rent.............................................................2
       4.3    Advance Reimbursement ...................................................3
       4.4    Adjustments to Schedules..................................................3
       4.5    Manner of Making Payments; Payment to Indenture Trustee ..............3

SECTION 5.    NET LEASE; NONTERMINABILITY ...................................................4
       5.1    Net Lease ..........................................................................4
       5.2    Nonterminability.................................................................4

SECTION 6.    IDENTIFICATION MARKS ..................................................................5

SECTION 7.    CASUALTY.....................................................................................6
       7.1    Notice; Elections...............................................................6
       7.2    Substitution. ......................................................................6
       7.3    Payment of Casualty Value................................................7
       7.4    Requisition Not Constituting a Casualty Occurrence ..............8
       7.5    Amount of Casualty Value.................................................8
       7.6    No Release ........................................................................8

SECTION 8.    INSURANCE....................................................................................8
       8.1    Insurance to Be Maintained. ..............................................8
       8.2    Insurance Proceeds...........................................................11

SECTION 9.    INSPECTION ..................................................................................12

SECTION 10.   LESSOR'S REPRESENTATIONS AND WARRANTIES;
       DISCLAIMER OF WARRANTIES; QUIET ENJOYMENT.....................13
       10.1   Disclaimer .......................................................................13
       10.2   Quiet Enjoyment ..............................................................13

SECTION 11.   LAWS AND RULES..........................................................................13
       11.1   Compliance ......................................................................13
       11.2   Reports by Lessee .............................................................14

## TABLE OF CONTENTS
### (continued)

Page

SECTION 12. USE AND MAINTENANCE ............................................................14
    12.1   Use and Maintenance. ...........................................................14
    12.2   Additions and Accessions. .....................................................15

SECTION 13. LEASE DEFAULT ..........................................................................16
    13.1   Lease Events of Default .........................................................16
    13.2   Remedies. ...............................................................................19
    13.3   Remedies Not Exclusive ........................................................22
    13.4   1168 Matters ...........................................................................22
    13.5   Waivers ...................................................................................22

SECTION 14. RETURN OF UNITS UPON DEFAULT ........................................22
    14.1   Return of Units .......................................................................22
    14.2   Lessor Appointed Agent of Lessee .........................................23

SECTION 15. ASSIGNMENT, POSSESSION AND USE ....................................23
    15.1   Assignment; Consent; Security for Lessor's Obligations to
          Indenture Trustee. ..................................................................23
    15.2   No Liens; Lessee's Rights to Use the Units, to Permit Use
          Thereof by Others and to Sublease the Units.........................23
    15.3   Transfers by Lessor or Owner Participant ..............................24

SECTION 16. PURCHASE OPTIONS; RENEWAL OPTIONS .............................25
    16.1   EBO Purchase Option .............................................................25
    16.2   End of Term Purchase Options. ..............................................26
    16.3   Further Assurances..................................................................26
    16.4   Renewal Options. ...................................................................26
    16.5   Determination of Fair Market Value and Fair Market Rental. ...............27

SECTION 17. RETURN OF UNITS UPON EXPIRATION OF TERM ..................28
    17.1   Redelivery. ..............................................................................28
    17.2   Return. ....................................................................................29
    17.3   Inspections. ............................................................................29
    17.4   Continuing Obligations ..........................................................30

SECTION 18. RECORDING ..................................................................................30
    18.1   Recordings ..............................................................................30
    18.2   Continuing Obligations ..........................................................30

# TABLE OF CONTENTS
## (continued)

Page

SECTION 19.   LESSOR'S RIGHT TO PERFORM FOR LESSEE..........................................31

SECTION 20.   NOTICES............................................................................................31

SECTION 21.   SEVERABILITY ..................................................................................31

SECTION 22.   EFFECT AND MODIFICATION OF THIS LEASE.......................................31

SECTION 23.   NATURE OF THIS LEASE .....................................................................31

SECTION 24.   EXECUTION........................................................................................31

SECTION 25.   LAW GOVERNING ..............................................................................32

SECTION 26.   VOLUNTARY TERMINATION BY LESSEE ..............................................32
            26.1   Termination.......................................................................32
            26.2   Solicitation of Bids...........................................................32
            26.3   Third-Party Sale ...............................................................33
            26.4   Notice to Indenture Trustee ...............................................33
            26.5   Amount of Termination Value.............................................34

SECTION 27.   ASSIGNMENT......................................................................................34

SECTION 28.   LESSOR...............................................................................................35

SECTION 29.   LIABILITY OF LESSOR LIMITED ..........................................................35

SECTION 30.   NO MERGER ........................................................................................35

EXHIBIT A -   FORM OF LEASE SUPPLEMENT

ANNEX A -    DEFINITIONS

SCHEDULE I - PERFORMANCE CRITERIA

## LEASE OF RAILROAD EQUIPMENT
## (AMTRAK TRUST HS-EDC-1)

THIS LEASE OF RAILROAD EQUIPMENT (Amtrak Trust HS-EDC-1) dated as of November 6, 2000 between AMTRAK TRUST HS-EDC-1, a Delaware business trust (the "*Trust*"), all of the activities of which shall be conducted by Wilmington Trust Company, a Delaware banking corporation, not in its individual capacity, but solely as trustee for the Trust (the "*Owner Trustee*", which term, unless the context otherwise requires, shall include the Trust), as lessor, and NATIONAL RAILROAD PASSENGER CORPORATION (also known as Amtrak), a corporation organized under the Rail Passenger Service Act and the laws of the District of Columbia, as lessee.

## W I T N E S S E T H :

### SECTION 1.   DEFINITIONS

Capitalized terms and phrases used and not otherwise defined herein shall for all purposes of this Lease have the respective meanings specified therefor in Annex A hereto, and the rules of interpretation set forth in Annex A shall apply to this Agreement.

### SECTION 2.   AGREEMENT TO LEASE; DELIVERY AND ACCEPTANCE

2.1   **Agreement to Lease**.  Lessor and Lessee agree (subject to satisfaction or waiver by Lessor or Lessee, as the case may be, of the conditions precedent to its obligations set forth in Section 5 of the Participation Agreement) to subject each Unit to this Lease for the Rent and upon and subject to the terms and conditions herein set forth herein, for the Lease Term with respect to such Unit, commencing on the date of delivery of a fully executed Lease Supplement with respect to such Unit.

2.2   **Delivery and Acceptance**.  Upon delivery by Lessor and Lessee of a fully executed Lease Supplement, the Units described therein shall be deemed to have been delivered to and accepted by Lessee for all purposes of this Lease and thereupon shall be subject to all the terms and conditions of this Lease. Lessee's execution and delivery of a Lease Supplement shall be conclusive proof that the Units listed therein have been subjected to this Lease on the terms hereof, notwithstanding any defect with respect to the design, manufacture, condition or any other matter or the failure of any of the Units to comply with the specifications applicable thereto or with any applicable United States Department of Transportation or STB requirements and specifications or AAR recommended standards for new railroad equipment of the character of the Equipment as of the date hereof, and that as between Lessor and Lessee, such Unit is in good order and condition.

### SECTION 3.   BASE LEASE TERM

The Base Lease Term for any Unit shall commence on the Base Lease Commencement Date for such Unit and end on the Base Lease Termination Date for such Unit,

or such earlier date on which this Lease shall be terminated pursuant to the terms hereof with respect to such Unit.

### SECTION 4.   RENT

4.1   **Base Rent.**

(i)   Payment and Allocation.  Lessor and Lessee agree that Base Rent for any particular Unit shall be paid in such amounts and allocated as set forth on Schedule II to the Lease Supplement to which such Unit relates.  Lessee shall pay to Lessor, as Base Rent for each Unit, semi-annual installments of Base Rent on each of the Rent Payment Dates for such Unit during the Base Lease Term.  Subject to adjustment as provided herein, the Base Rent due on a Rent Payment Date with respect to any Unit is equal to the product of (a) the applicable Rent Factor for such Rent Payment Date as set forth in Schedule II to the Lease Supplement to which such Unit relates and (b) the Lessor's Cost for such Unit.  During any Renewal Term for any Unit, Lessee shall pay to Lessor Renewal Rent for such Unit on each Rent Payment Date.

(ii)   Minimum Payments.  Notwithstanding anything to the contrary contained herein or in any other Operative Document, in all events and irrespective of any adjustment thereto, (a) the aggregate amount of Base Rent payable on each Rent Payment Date in respect of all Units shall be at least in an amount such that, as and when received by Indenture Trustee, it shall be sufficient to pay the aggregate amount of principal and accrued interest in respect of all Secured Notes then Outstanding under the Indenture which is due on such Rent Payment Date, and (b) each amount of Casualty Value payable on a Casualty Value Determination Date, any payment of Adjusted EBO Price in connection with a purchase pursuant to Section 16.1 (and, in the case of Adjusted EBO Price payable in installments, the first installment thereof), and each amount of Termination Value payable on any Termination Date with respect to a Voluntary Termination, together in each case with any Base Rent due on such date, shall be at least in an amount such that, as and when received by Indenture Trustee, Indenture Trustee shall have sufficient amounts remaining (after payment of all obligations having higher priority under the Indenture) to pay the full unpaid balance of principal and interest then due and payable in respect of the Secured Notes then Outstanding to be prepaid in accordance with the Indenture in connection with the applicable Casualty Occurrence (or exercise of remedies under Section 13.2 hereof), purchase or Voluntary Termination, as the case may be.  Nothing in this Section 4.1(ii) shall be deemed to constitute a guarantee by Lessee of the indebtedness evidenced by the Secured Notes or a guarantee of the residual value of any Unit or an indemnity for any Taxes required to be deducted or withheld.

4.2   **Supplemental Rent** .  In addition to its obligation to pay Base Rent and Renewal Rent hereunder, Lessee shall pay (or cause to be paid) Supplemental Rent to Lessor or to whomever shall be entitled thereto, as and when the same shall become due and owing in accordance with the provisions of the Operative Document that requires such payment.  Lessee also agrees to pay to Lessor or such other Person as shall be entitled thereto with the payment to which it relates, without necessity of demand, as Supplemental Rent (i) to the extent permitted by applicable law, interest at the Overdue Rate on (a) any part of any installment of Base Rent or Renewal Rent, as the case may be, not paid when due for each day for which the same shall be overdue and (b) any payment of Supplemental Rent (other than such interest) not paid when due

for each day for which the same shall be overdue, until the same shall be received by the party entitled thereto, and (ii) any Make Whole Premium Amount due in respect of the Secured Notes, other than any Make Whole Premium Amount that may be due under Section 2.13 of the Indenture. The amounts described in clause (ii) of the preceding sentence shall be paid to Lessor on an After-Tax Basis.

4.3 **Advance Reimbursement** . Lessee shall pay each Amtrak Advance to Indenture Trustee (as Lessor's assignee hereof) on each Deferred Payment Date; provided, however, that Lessee shall not be obligated to pay an Advance if and to the extent that Indenture Trustee on or before (i) in the case of the first Deferred Payment of $154,678.75 on January 3, 2001 and (ii) in the case of any Deferred Payment for any other closing, the applicable Deferred Payment Date, shall have received the amount required to be paid by Owner Participant pursuant to Section 9.2(v) of the Participation Agreement. Lessee shall be entitled to offset and deduct (without duplication) against each succeeding payment (other than as limited by the proviso to this sentence) due from Lessee to Persons other than Note Holders, Equity Guarantor, Indenture Trustee and Trust Company (including, without limitation, payments of Base Rent due hereunder, payments due under the Tax Indemnity Agreement and payments due to Persons other than Note Holders, Indenture Trustee, Equity Guarantor and Trust Company under Section 7 of the Participation Agreement) the amounts (including interest) due and owing by Owner Participant to Lessee from time to time under Section 9.2(v) of the Participation Agreement, or the amount of any such damages suffered by Lessee (including interest at the Overdue Rate) until Lessee has been fully reimbursed for such amounts (including interest); provided that, in the case of any payment due from Lessee (including without limitation, Base Rent, Casualty Value and Termination Value payments) which is subject to the Lien of or is distributable under the terms of the Indenture, Lessee's right to offset and deduction shall be limited to amounts which following application thereunder are distributable to Lessor thereunder (and shall not include any amounts distributable to Indenture Trustee or to Note Holders or to the Trust Company). No such offset or aggregate combined effect of separate offsets shall be effected if a Lease Event of Default shall be continuing or shall reduce the amount of (i) any installment of Base Rent to an amount that is insufficient to pay in full the payments then required to be made on account of the principal of and interest on the Secured Notes then outstanding or (ii) any payment of Casualty Value or Termination Value to an amount that, together with any other amounts then required to be paid by Lessee hereunder in connection therewith, will be at least sufficient to pay in full as of the date of payment thereof, the aggregate unpaid principal of the outstanding Secured Notes, together with all unpaid interest thereon accrued to the date on which such amount is paid in accordance with the terms hereof.

4.4 **Adjustments to Schedules**. Subject to Section 4.1(ii), Rent Factors, Adjusted EBO Price, EBO Date, Termination Value Factors and Casualty Value Factors shall be adjusted in accordance with Section 16 of the Participation Agreement.

4.5 **Manner of Making Payments; Payment to Indenture Trustee**. All payments pursuant to this Lease shall be made by 12:00 noon Washington, D.C. time on the date payment is due in United States Dollars in immediately available funds. Any payment not made on the date and on or prior to the time payment is due shall be payable with interest at the Overdue Rate as provided in Section 4.2. If any such date is not a Business Day, then payment shall be due on the next succeeding Business Day and if paid on such Business Day in

accordance with the foregoing, such payment shall be without interest or penalty.  All payments of Rent (other than Excepted Payments, which shall be paid to the Person entitled thereto) shall be paid by Lessee to Lessor at its office at Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001, ABA No. 021000089, Credit: Account No. 52997-0, Reference: Amtrak Trust HS-EDC-1, Attention: Corporate Trust Administration, or as Lessor may otherwise direct from time to time in writing; provided, that so long as the Indenture shall not have been discharged pursuant to Section 10.01 thereof, Lessor hereby irrevocably directs, and Lessee agrees, that all payments of Rent and all other amounts payable to Lessor hereunder (other than Excepted Payments, which shall be paid to the Person entitled thereto) shall be paid by wire transfer or other commercially acceptable, generally used electronic medium directly to Indenture Trustee at Allfirst Bank, 25 South Charles Street, Mail Code 101-591, Baltimore, Maryland 21201, ABA No. 052000113, Credit: Trust Receipts Account No. 090-02-764, Reference: Amtrak Trust HS-EDC-1, Attention: Robert D. Brown, with a copy of the wire instructions to be provided to Lessor, and Indenture Trustee will acknowledge receipt thereof to Lessor on the date received or as Indenture Trustee may otherwise direct in a writing received by Lessee at least 10 Business Days prior to the applicable payment date.

### SECTION 5.    NET LEASE; NONTERMINABILITY

5.1    **Net Lease**.  This Lease is a net lease, and, as between Lessee and Lessor, it is intended that Lessee shall pay all costs and expenses of every character, whether foreseen or unforeseen, ordinary or extraordinary, in connection with the Units, whether with respect to construction, delivery, ownership, use, possession, control, operation, maintenance, repair, insurance, improvement and return of the Units, or otherwise, including the costs and expenses particularly set forth in this Lease.  All obligations of Lessee in this Lease shall be done, performed or complied with at Lessee's cost and expense, unless otherwise expressly stated.

5.2    **Nonterminability**.

(i)    Each of Lessee's obligations to pay Rent hereunder shall be absolute and unconditional, and Lessee shall not be entitled to any abatement, deferral or suspension of Rent, reduction thereof or setoff against Rent, including abatements, reductions, deferrals, suspensions or setoffs due, or alleged to be due, by reason of any past, present or future claims of Lessee against Lessor, Owner Participant, Equity Guarantor, Manufacturer, Indenture Trustee, Note Holders or any other Person, either under this Lease or otherwise; nor, except as otherwise expressly provided herein and on the terms hereof, shall this Lease terminate, or the obligations of Lessee be otherwise affected, by reason of any defect in or damage to or loss of possession or loss of use or destruction of all or any of the Units from whatsoever cause, any Liens or rights of others with respect to any of the Units, the prohibition of or other restriction against Lessee's use of all or any of the Units, the interference with such use by any Person (including confiscation, requisition or other taking by any Governmental Authority, any Person acting under Governmental Authority or otherwise, or action of any public or private Person, whether by eviction by paramount title or for any other reason whatsoever), the invalidity or unenforceability or lack of due authorization of this Lease or any other Operative Document, any action or inaction by Lessor as lessor under this Lease, any defect in the title to, compliance with plans or specifications for, condition, design or fitness for use of all or any of the Units, any insolvency of

or any bankruptcy, reorganization or other proceeding against Lessee, Lessor or any other Person, or for any other cause whether similar or dissimilar to the foregoing, any present or future law to the contrary notwithstanding, it being the intention and agreement of the parties hereto, and the basis of the bargain, that (to the extent permitted by Applicable Law) Base Rent, Renewal Rent, Supplemental Rent and other amounts payable by Lessee hereunder shall continue to be payable in all events in the manner and at the times herein provided unless and until the obligation to pay the same shall be terminated pursuant to the express provisions of this Lease (in the case of any return of the Equipment to Lessor, any Unit shall not be deemed to have been returned to Lessor's possession until all of Lessee's obligations with respect to the return, transportation and arranging for storage thereof have been performed).  To the extent permitted by Applicable Law, Lessee hereby waives any and all rights which it may now have or which at any time hereafter may be conferred upon it, by statute or otherwise, to terminate, cancel or quit this Lease or surrender any of the Units except in accordance with the express terms hereof.  Except as provided in the Tax Indemnity Agreement and Section 6 of the Participation Agreement with respect to certain payments of Supplemental Rent, each Base Rent, Renewal Rent, Supplemental Rent or other payment made by Lessee hereunder shall be final and Lessee shall not seek to recover all or any part of such payment (except for any excess payment made in manifest error) from Lessor, Owner Participant, Indenture Trustee or any Note Holder for any reason whatsoever.

(ii)     Without limiting the generality of the foregoing, Lessee covenants that it will remain obligated under this Lease in accordance with the terms hereof and will not take any action to terminate (except in accordance with the express provisions hereof), rescind or avoid this Lease for any reason whatsoever.

(iii)     Lessee agrees that it will duly perform and observe all the covenants, agreements and obligations on its part to be performed and observed under the Participation Agreement and under each of the other Operative Documents to which it is a party.

(iv)     Nothing in this Section 5.2 or in any other provision of this Lease shall preclude any separate, independent claim (other than by way of abatement or reduction of any amount at any time payable by Lessee hereunder) by Lessee for the breach of any representation, covenant, undertaking or agreement made herein and in any other Operative Document for the benefit of Lessee by Lessor or Owner Participant.

## SECTION 6.    IDENTIFICATION MARKS

Lessee will cause each Unit to be kept numbered with the road number and serial number as shall be set forth in any Lease Supplement hereto extending this Lease to cover such Unit, and, at any time that a Unit will be operated outside of the United States, will affix a metal nameplate approximately four by six inches in size located in a prominent position inside such Unit marked in large letters with the words "OWNERSHIP SUBJECT TO A LEASE AND TO A TRUST INDENTURE AND SECURITY AGREEMENT FILED WITH THE UNITED STATES SURFACE TRANSPORTATION BOARD".  Lessee shall not allow the name of any other Person to be placed on any Unit as a designation that might be identified as a claim of ownership or any other interest therein; provided, however, that nothing herein contained shall prohibit Lessee or its permitted sublessees from placing its name, customary colors and insignia

on any Unit or from naming each Unit. Lessee will not change the identification number of any Unit unless and until (i) a statement of a new number or numbers to be substituted therefor shall have been delivered to Indenture Trustee and Lessor and filed, recorded and deposited by Lessee in all appropriate public offices, including the public offices where this Lease and the Indenture shall have been filed, recorded and deposited and (ii) Lessee shall have furnished to Indenture Trustee and Lessor, an opinion of counsel in form and substance reasonably satisfactory to Indenture Trustee and Lessor to the effect that such statement has been so filed, recorded and deposited, that such filing, recordation and deposit will protect Lessor's interest in the Units, the security interests of Indenture Trustee under the Indenture and that no other filing, recording, deposit or giving of notice to any Instrumentality or other Governmental Authority is necessary to protect such interests.

### SECTION 7.   CASUALTY

7.1     **Notice; Elections**.  Lessee shall notify Lessor, Indenture Trustee, Equity Guarantor and the Participants within 5 Business Days after a determination that a Casualty Occurrence has occurred with respect to a Unit and shall, within 30 days after such determination, notify Lessor, Indenture Trustee, Equity Guarantor and the Participants whether Lessee intends to proceed in accordance with Section 7.2 or 7.3; provided, however, that Lessee's failure to provide such notice of election shall constitute an election to proceed in accordance with Section 7.3; and provided, further, that no election to proceed in accordance with Section 7.2 shall be effective (i) if a Specified Default or Lease Event of Default has occurred and is continuing and (ii) unless Lessee shall have provided either (a) an opinion of independent tax counsel selected by Owner Participant to the effect that there would be no material adverse tax consequences to Owner Participant of such substitution or (b) a tax indemnity (in addition to the Tax Indemnity Agreement) as to any adverse tax consequences to Owner Participant of such substitution satisfactory in form and substance to Owner Participant (including as to any collateral or such other credit support for such indemnity as Owner Participant shall require in its good faith discretion) in which case Lessee shall be deemed to have elected to proceed in accordance with Section 7.3.  In addition, Lessee shall promptly notify Lessor and Indenture Trustee of any damage to a Unit in an amount greater than $500,000 per occurrence, regardless of whether such damage constitutes a Casualty Occurrence.

7.2     **Substitution.**

(i)     If pursuant to Section 7.1 Lessee shall have elected to proceed in accordance with this Section 7.2 with respect to a Unit that has suffered a Casualty Occurrence, Lessee shall not later than the 90th day following the date of such Casualty Occurrence convey or cause to be conveyed to Lessor a Replacement Unit, title to which shall immediately vest in Lessor, without further act or deed, free and clear of all Liens other than Permitted Liens not of record to be leased to Lessee hereunder.

(ii)     Prior to or at the time of any substitution under Section 7.2(i), Lessee, at its own cost and expense, shall (a) cause a Lease Supplement and an Indenture Supplement covering the Replacement Unit to be prepared and, promptly upon execution thereof by Lessor, filed for recording with the STB and in all other public offices where this Lease shall be filed, recorded or deposited, (b) furnish Lessor and Indenture Trustee with evidence of compliance

with the provisions of Sections 8, 15.2 and 18 hereof, and of Section 5.06 of the Indenture, with respect to such Replacement Unit, including an opinion of counsel to the effect that such filings have been duly made, that a review of the records of the STB shows no Lien with respect to such Unit other than Permitted Liens and that Lessor, and Indenture Trustee as assignee, is entitled to the benefits of Section 1168 of the Bankruptcy Code with respect to such Replacement Unit to the same extent as was available immediately prior to such substitution with respect to the Unit suffering such Casualty Occurrence, and (c) cause a Uniform Commercial Code financing statement or statements covering the Replacement Unit to be filed in such place or places as are deemed necessary or desirable by Lessor or Indenture Trustee to perfect their respective interests therein under the Operative Documents.  In connection with such substitution, Lessee shall prepare and Lessor shall execute or forward to Indenture Trustee for execution, as the case may be, a release of the replaced Unit from the Lien of the Indenture (including Uniform Commercial Code amending statements).

(iii)     Upon compliance by Lessee with the foregoing provisions of this Section 7.2, (a) Lessor shall promptly convey the replaced Unit to Lessee without recourse, representation or warranty as to any matter whatsoever except as to the absence of all Owner Participant's Liens and Lessor's Liens, (b) Lessee shall be subrogated to all claims of Lessor, if any, against third parties for damage to or loss of the replaced Unit to the extent of any casualty insurance proceeds received in respect of such Unit as a result of such Casualty Occurrence under insurance policies maintained by Lessee or any sublessee, and (c) for all purposes hereof and the other Operative Documents, the Replacement Unit shall be deemed part of the property leased hereunder and shall be deemed a "*Unit*" as defined herein.

7.3     **Payment of Casualty Value**.  If pursuant to Section 7.1 Lessee shall have elected or have been deemed to have elected to proceed in accordance with Section 7.3 with respect to a Unit that has suffered a Casualty Occurrence, Lessee shall pay to Lessor (or to Indenture Trustee, if the Indenture is then in effect, for application pursuant thereto, other than with respect to Excepted Payments), on the Casualty Value Determination Date with respect to such Unit or Units suffering a Casualty Occurrence, (A) the Casualty Value for such Unit determined in accordance with Section 7.5 as of such Casualty Value Determination Date, (B) any Supplemental Rent due on or before such Casualty Value Determination Date in respect of such Unit or Units, and (C) all other amounts due hereunder with respect to such Unit, including unpaid Base Rent due prior to such Casualty Value Determination Date (but excluding Base Rent due on such Casualty Value Determination Date).  The sum of the amounts described in clauses (A), (B) and (C) of the immediately preceding sentence, is hereinafter referred to as an "*Aggregate Casualty Payment*".  Upon the making of such Aggregate Casualty Payment, the Base Rent for the applicable Unit shall cease to accrue, the term of this Lease as to such Unit shall terminate and Lessee shall be entitled to retain possession of such Unit.  Lessor shall transfer to Lessee such right, title and interest, if any, as Lessor may have in such Unit, "as-is, where-is and with all faults" and without recourse, representation or warranty, express or implied, as to any matter whatsoever except that the Unit is free and clear of all Lessor's Liens and Owner Participant's Liens.  If no Specified Default or Lease Event of Default shall have occurred and be continuing, then Lessee shall be entitled to receive and retain for its own account solely out of all condemnation or requisition payments paid in respect of such Unit up to an amount equal to the sum of (a) the Aggregate Casualty Payment (but only if such amount shall have been previously received by Lessor) and (b) deemed interest thereon at the Debt Rate

applicable to the Secured Notes to which such Unit relates from the date of payment of such Aggregate Casualty Amount to Lessor to but excluding the date of receipt of such condemnation or requisition payments by Lessee. If a Specified Default or Lease Event of Default shall have occurred and be continuing all such payments shall be paid to Indenture Trustee (unless the Indenture has terminated in accordance with its terms) and otherwise to Lessor to be held as security for Lessee's obligations hereunder, and shall be invested by Lessor or Indenture Trustee, as the case may be, as directed from time to time in writing by and at the expense and risk of Lessee in Permitted Investments and any gain (including interest received) realized as the result of any such investment (net of any fees, commissions and other expenses, if any, incurred in connection with such investment) shall be applied or reinvested in the same manner as the principal invested.

7.4    **Requisition Not Constituting a Casualty Occurrence**. In the event of the requisition for use of any Unit which does not, or does not yet, constitute a Casualty Occurrence hereunder, all of Lessee's obligations under this Lease with respect to such Unit (including the obligation to make all payments of Base Rent, Renewal Rent and Supplemental Rent) shall continue to the same extent as if such requisition had not occurred. All payments received by Lessor or Lessee from the United States government or any other governmental entity for the use of such Unit during the term of this Lease (other than a use of such Unit constituting a Casualty Occurrence) shall be paid over to, or retained by, Lessee if no Specified Default or Lease Event of Default shall have occurred and be continuing. If a Specified Default or Lease Event of Default shall have occurred and be continuing all such payments shall be paid to Indenture Trustee (unless the Indenture has terminated in accordance with its terms) and otherwise to Lessor to be held as security for Lessee's obligations hereunder, and shall be invested by Lessor or Indenture Trustee, as the case may be, as directed from time to time in writing by and at the expense and risk of Lessee in Permitted Investments and any gain (including interest received) realized as the result of any such investment (net of any fees, commissions and other expenses, if any, incurred in connection with such investment) shall be applied or reinvested in the same manner as the principal invested.

7.5    **Amount of Casualty Value**. Subject to Section 4.1(ii), during the Base Lease Term the "*Casualty Value*" for a Unit as of any Casualty Value Determination Date (whether determined pursuant to Section 7.4 or Section 13.2) shall be (i) the Lessor's Cost of such Unit multiplied by (ii) the applicable Casualty Value Factor for such Casualty Value Determination Date. The "*Casualty Value*" for a Unit during a Renewal Term shall decrease on a straight-line basis from the Fair Market Value of such Unit on the first day of such Renewal Term to the Fair Market Value of such Unit on the last day of such Renewal Term as determined in accordance with Section 16.5.

7.6    **No Release**. Except as provided in Section 7.3 with respect to the payment of Base Rent and Section 17, Lessee shall not be released from its obligations hereunder in the event of, and shall bear the risk of, any Casualty Occurrence to any Unit from and after delivery and acceptance thereof by Lessee hereunder.

## SECTION 8.    INSURANCE

8.1    **Insurance to Be Maintained.**

(i) Subject to Section 8.1(ii), Lessee will, at all times prior to the return to Lessor of the Units pursuant to the terms hereof (and in any event while the Units are being collected for delivery to Lessor and as provided in Sections 14 and 17) and at Lessee's own expense (except as otherwise provided in Section 17), cause the following insurance to be carried and maintained with insurers of recognized standing who provide insurance to the railroad industry:

(a) "all risk" property insurance in respect of each Unit and in an amount not less than the Casualty Value for such Unit from time to time naming the Indenture Trustee as sole loss payee (while the Indenture is in effect) and, otherwise, Lessor ("*Property Insurance*"); and

(b) liability insurance with respect to employer's liability and third-party personal injury, death and property damage (including contractual liability insurance), Federal Employee Liability Act coverage and sudden and accidental pollution and evacuation coverage against such risks as is consistent with prudent industry practice for a railroad engaged in passenger carriage and otherwise as is maintained by Lessee in respect of other rolling stock owned or leased by Lessee similar to the Units in an amount not less than the greater of (1) $100,000,000 per occurrence and (2) such amount per occurrence as shall be required by Federal law or regulation applicable to Lessee ("*Liability Insurance*").

Lessee may self-insure (for purposes of this Section 8.1, "*self-insure*" and "*self-insurance*" shall mean uninsured risk, deductibles and co-insurance) such Units (i) in amounts (unless otherwise consented to by Lessor and, so long as the Indenture is outstanding, Indenture Trustee, which consents shall not be unreasonably withheld) no greater than (A) in the case of Property Insurance, the lesser of (x) the extent to which Lessee customarily self-insures other rolling stock similar to the Units owned or leased by it, and (y) $10,000,000 per occurrence; (B) in the case of Liability Insurance, the lesser of (x) the extent to which Lessee customarily self-insures other rolling stock similar to the Units owned or leased by it with respect to liability, and (y) $30,000,000 per occurrence, and (ii) in any case consistent with prudent industry practice for a railroad operating in intercity and commuter passenger service in the United States. If Lessee shall be Privatized, at any time and so long as Lessee shall not be Investment Grade, Lessee shall, notwithstanding the preceding sentence, maintain Liability Insurance in an amount not less than $50,000,000 per occurrence and shall not self-insure with respect to Liability Insurance in an amount greater than $15,000,000 per occurrence.

(ii) If any Liability Insurance required by this Lease shall not be available to Lessee at renewal on a commercially reasonable basis on substantially the same terms and conditions as then carried by Lessee and the obtaining of such insurance is, in Lessee's reasonable judgment, commercially impracticable (taking into account both terms and premiums), Lessee shall obtain a written report of an independent insurance advisor of recognized national standing, chosen by Amtrak and reasonably acceptable to Lessor confirming in reasonable detail that such insurance, in respect of amount or scope of coverage, is not so available on a commercially reasonable basis from insurers of recognized standing who provide insurance to the railroad industry. During any period with respect to which any Liability Insurance is not so available, Lessee shall nevertheless maintain public liability insurance to the

extent, with respect to amount and scope of coverage, that is available on a commercially reasonable basis from insurers of recognized standing who provide insurance to the railroad industry.  If any insurance which was previously discontinued because of its commercial unavailability later becomes available on a commercially reasonable basis, Lessee shall reinstate such insurance.

(iii)     Not later than 48 hours prior to the expiration of any Liability Insurance or Property Insurance required to be carried hereunder, Lessee shall provide Lessor, Equity Guarantor, Owner Participant and, so long as Secured Notes are Outstanding, Indenture Trustee and each Additional Insured with certificates of insurance evidencing that such insurance has been replaced or renewed in compliance with this Section 8.1 or an Officer's Certificate of Lessee stating whether Lessee intends to renew or replace such Liability Insurance or Property Insurance, as the case may be, in compliance with this Section 8.1.  If Lessee shall have provided such an Officer's Certificate in lieu of such certificates of insurance, Lessee shall facilitate requests of Lessor or any Participant to verify that the applicable Insurance has been renewed or replaced and in any event shall provide the parties referred to in the preceding sentence with such a certificate of insurance within 30 days after the expiration of the policies of such Insurance to be renewed or replaced.  The foregoing requirements shall not eliminate the obligation of Lessee under Section 8(iv)(a) hereof or of any insurer to provide the notice required by such Section.

(iv)     The insurance policies carried in accordance with the terms of this Lease shall, to the extent available on a commercially reasonable basis from insurers of recognized standing who provide insurance to the railroad industry:

(a)     require 30 days' prior notice to the Additional Insureds of termination, expiration, lapse or cancellation for any reason or material change in the types or limits of coverage;

(b)     not require contributions from other policies held by the Additional Insureds;

(c)     waive any right of subrogation of the insurers against the Additional Insureds;

(d)     name the Additional Insureds (1) as additional insureds, as their respective interests may appear, in the case of Liability Insurance, and (2) as additional insureds and loss payees, as their respective interests may appear, in the case of Property Insurance (provided that such Property Insurance shall be made payable to Indenture Trustee under a standard mortgage loss payable clause meeting the provisions of the Operative Documents and satisfactory to Indenture Trustee, unless and until the Lien of the Indenture ceases to be outstanding and thereafter such Property Insurance shall be made payable to Lessor under a standard loss payable clause meeting the provisions of the Operative Documents and satisfactory to Lessor);

(e)     continue to insure the Additional Insureds regardless of any breach or violation of any warranty, declaration or condition contained in such policy by Lessee or any Person; and

(f)     waive any right to claim any premium or commissions against the Additional Insureds.

(v)     If Lessee is in default of its obligation to maintain the insurance coverages specified herein, each of the Additional Insureds may, at its option, but shall not be required to, provide such insurance (but without duplication of any such insurance obtained by any other Additional Insured pursuant to this Section 8.1(v) or by Lessee), and in such event, Lessee shall, upon demand from time to time, reimburse such Additional Insured for the cost to such Additional Insured of such insurance which Lessee shall have failed to maintain and which such Additional Insured shall have obtained in accordance herewith together with interest thereon at the Overdue Rate, from the date of payment for such insurance to but excluding the date of receipt of such reimbursement.

(vi)     Nothing in this Section 8.1 shall prohibit Lessor, Owner Participant, Indenture Trustee, Equity Guarantor or a Note Holder from obtaining insurance for its own account and any proceeds payable thereunder shall be as provided in the insurance policy relating thereto; provided, that no such insurance may be obtained that would limit or otherwise adversely affect the coverage of any insurance required to be obtained or maintained by Lessee pursuant to this Section 8.1, it being understood that all salvage rights to the Units in the event of a Casualty Occurrence shall remain with Lessee or its insurers at all times.

(vii)     Lessee shall provide or cause to be provided (a) certificates of insurance evidencing that the insurance required by Section 8.1 is in effect and (b) a report, signed by a broker or insurer, describing in reasonable detail the insurance then carried and maintained and stating the opinion of such firm that the insurance then carried and maintained with respect to the Units complies with the terms hereof, in each case, on an annual basis, but not more than once in any 12 month period (or such other period as shall constitute the term of the insurance policies).

8.2     **Insurance Proceeds**.  If no Specified Default or Lease Event of Default shall have occurred and be continuing, Lessee shall be entitled to receive and retain for its own account all proceeds of Property Insurance (except under policies described in Section 8.1(vi)) and third party payments in respect of any Unit suffering a Casualty Occurrence up to the Aggregate Casualty Payment set forth in Section 7.3, but only if such Aggregate Casualty Payment shall have been previously paid to and received by Lessor or Indenture Trustee, as the case may be.  If no Specified Default or Lease Event of Default shall have occurred and be continuing, all such proceeds or payments, if any, in excess of the Aggregate Casualty Payment shall be paid to, or retained by, Lessee.  All Property Insurance proceeds (except under policies described in Section 8.1(vi)) or third party payments in respect of any Unit not suffering a Casualty Occurrence in respect of which Unit Lessee has elected to repair shall be held by Lessor or, until the Lien of the Indenture has been released, Indenture Trustee, and paid to Lessee upon a written application signed by Lessee to reimburse Lessee for the costs of repairing, restoring or replacing the damaged Unit.  If no Specified Default or Lease Event of Default shall have occurred and be continuing, any amounts so held by Lessor or Indenture Trustee, as the case may

be (which amounts shall be held by Lessor or Indenture Trustee, as the case may be, as security for the obligation of Lessee to make such repairs), and any proceeds or payments (and net earnings thereon) remaining after Lessee notifies Lessor and Indenture Trustee that such repairs have been made shall be paid to Lessee.   Any such amounts which are held by Lessor or Indenture Trustee, as the case may be, pending payment to Lessee shall, until paid to Lessee as provided herein or, as long as the Indenture is in effect, until applied as provided in the Indenture, be invested by Lessor or Indenture Trustee, as the case may be, as directed from time to time in writing by and at the expense and risk of Lessee in Permitted Investments.   Any gain (including interest received) realized as the result of any such investment (net of any fees, commissions and other expenses, if any, incurred in connection with such investment) shall be applied or reinvested in the same manner as the principal invested.   The proceeds of any Liability Insurance shall be paid to or for the account of Lessee and the Additional Insureds as their interests may appear.   If a Specified Default or Lease Event of Default shall have occurred and be continuing, all such payments of Property Insurance shall be paid to Indenture Trustee (unless the Indenture has terminated in accordance with its terms) and otherwise to Lessor to be held as security for Lessee's obligations hereunder, and shall be invested by Lessor or Indenture Trustee, as the case may be, as directed from time to time in writing by and at the expense and risk of Lessee in Permitted Investments and any gain (including interest received) realized as the result of any such investment (net of any fees, commissions and other expenses, if any, incurred in connection with such investment) shall be applied or reinvested in the same manner as the principal invested.

## SECTION 9.   INSPECTION

(i)      At all reasonable times, Lessor, each Participant, Equity Guarantor, Indenture Trustee or their respective authorized representatives shall each have the right at its own risk and expense (except as set forth below) to inspect any Unit and inspect (and make copies of) Lessee's records with respect thereto and with respect to any subleases of the Equipment (and have appropriate access to appropriate Lessee officials to explain such records and subleases); provided, that (a) no exercise of such inspection right shall interfere with the normal operation or maintenance of such Unit by, or the business of, Lessee (or any sublessee), (b) Lessee (and any sublessee) incurs no out-of-pocket expenses, and (c) Lessor, Indenture Trustee, Equity Guarantor and each Participant shall hold confidential all information obtained thereby in accordance with the terms of Section 14.10 of the Participation Agreement.

(ii)      None of Lessor, Indenture Trustee, the Participants, Equity Guarantor or any other Person shall have any duty to make any such inspection nor shall any of them incur any liability or obligation by reason of not making any such inspection.

(iii)      During the continuance of a Specified Default or Lease Event of Default, such inspection shall be at Lessee's expense.

**SECTION 10.    LESSOR'S REPRESENTATIONS AND WARRANTIES; DISCLAIMER OF WARRANTIES; QUIET ENJOYMENT**

10.1    **Disclaimer**.  LESSEE AGREES THAT IT LEASES THE EQUIPMENT AS-IS, WHERE-IS, WITH ALL FAULTS, AND IN WHATEVER CONDITION IT MAY BE. NEITHER OWNER TRUSTEE, TRUST COMPANY, ANY PARTICIPANT, EQUITY GUARANTOR NOR INDENTURE TRUSTEE MAKES OR HAS MADE, OR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE VALUE, QUALITY, DURABILITY, COMPLIANCE WITH SPECIFICATIONS, CONDITION, DESIGN, OPERATION, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE OF THE UNITS, OR ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY UNIT, EITHER UPON DELIVERY THEREOF TO LESSEE OR OTHERWISE, (which Units were selected by Lessee on the basis of its own judgment without reliance upon any statements, representations or warranties made by Lessor, any Participant or Indenture Trustee); it being agreed that all such risks, as between Lessor, Trust Company, any Participant, Indenture Trustee, Equity Guarantor and the holder of any Secured Note on the one hand and Lessee on the other hand, are to be borne by Lessee.  Lessee's delivery of a Lease Supplement relating to a Unit shall be conclusive evidence as between Lessee and Lessor that such Unit is in all respects satisfactory to Lessee, and Lessee will not assert any claim of any nature whatsoever against Lessor, each Participant, Equity Guarantor or Indenture Trustee based on any of the foregoing matters. Notwithstanding the foregoing, Lessee shall have the right to assert warranty claims against the Manufacturer or against any dealers, vendors, installers, suppliers, contractors and subcontractors relating to the Units.

10.2    **Quiet Enjoyment**.  Lessor covenants that so long as no Lease Event of Default shall have occurred and be continuing, neither it nor any Person acting through it (a) shall take or cause to be taken any action contrary to Lessee's rights under the Lease, including, without limitation, the right to possession, use and quiet enjoyment by Lessee or any permitted sublessee, assignee or transferee in accordance with the terms of the Lease, and (b) shall (directly or indirectly) give the notice of the exercise of the purchase option under clause 4.1 of any French Lease (provided, that to the extent that Lessee has not already done so, Lessor shall be entitled to give such notice in the event that Lessee has exercised its right of Voluntary Termination).

**SECTION 11.  LAWS AND RULES**

11.1    **Compliance**.  Lessee agrees, for the benefit of Lessor, each Participant, and Indenture Trustee, to comply in all material respects with all laws, rules or regulations of (i) the United States and any jurisdictions into which its operations involving the Units may extend, and (ii) the AAR, the United States Department of Transportation, the Federal Railroad Administration, the Environmental Protection Agency, the STB (or, in each case, any successor entity), and any other legislative, executive, administrative or judicial body exercising any power or jurisdiction over the Units, in each case to the extent such laws, rules or regulations are applicable to the Units.  If such laws, rules or regulations require any alteration, replacement or addition of or to any part on any Unit, Lessee will conform therewith at its own expense.  Lessee

may at its own expense and after written notice to Lessor (and, so long as the Indenture is in effect, Indenture Trustee) with respect thereto, in good faith, contest the validity or application of any such laws, rules or regulations in any reasonable manner which does not in the reasonable opinion of Lessor, Indenture Trustee or Owner Participant, (i) materially and adversely affect the property or rights of Lessor, Owner Participant or any Note Holder or Indenture Trustee under this Lease or under the Indenture (ii) have any risk of resulting in any criminal liability or (iii) have a reasonable risk of resulting in any Material Civil Liability on the part of Lessor, Indenture Trustee, Owner Participant or any Note Holder or involve any material risk of loss, forfeiture or sale of the Equipment, provided that, in no event shall any contest in respect of any Unit continue beyond the date that is 3 months prior to the end of the Lease Term of such Unit without the prior written consent of Lessor and Indenture Trustee in their respective sole discretion.

    11.2   **Reports by Lessee**.   Lessee agrees to prepare and deliver to Lessor, Equity Guarantor and Owner Participant within a reasonable time prior to the required date of filing (or, to the extent permissible, file on behalf of Lessor and Indenture Trustee) any and all reports (other than income tax returns) to be filed by Lessor, Owner Participant or Indenture Trustee with any federal, state or other regulatory authority by reason of the interests of Lessor, Indenture Trustee and Owner Participant in the Units created pursuant to the Operative Documents or the leasing thereof Lessee.   Lessor and Owner Participant agree to inform and provide Lessee (within a reasonable time period prior to the required date of filing to the extent received prior to the date of filing) with a copy of any written request received by Lessor or Owner Participant, as the case may be, for such reports.   Lessee shall, with reasonable promptness, provide Lessor, Indenture Trustee and Loan Participant such other information concerning the Units as may be reasonably requested from time to time by Lessor, Indenture Trustee or Loan Participant, including statements setting forth aggregate Unit mileage and usage by state.

## SECTION 12.  USE AND MAINTENANCE

    12.1   **Use and Maintenance.**

    (i)   Lessee (and any permitted sublessee) shall use the Equipment in any manner consistent with the design and intended use of the Equipment and in compliance with Section 11.  Lessee agrees that, at its own cost and expense, it will:

    (a)   maintain and service each Unit subject to scheduling in the ordinary course of Lessee's maintenance program:

    (w)   so that each Unit is in as good condition as when delivered (ordinary wear and tear excepted) and eligible under Manufacturer's warranties,

    (x)   in compliance with Section 11 and the requirements of any insurance policies required pursuant to Section 8,

    (y)   in accordance with Amtrak's FRA-approved maintenance plan for the Trainsets (which, as of the initial Closing Date, is being performed by NEC-MsC

pursuant to a long-term maintenance agreement) and in accordance with the Amtrak maintenance plan for the Locomotives, and

(z)      in a manner that will permit the Units to be capable of operation (A) (1) in the case of the Trainsets, at a maximum continuous speed of up to 150 miles per hour in revenue service and a maximum continuous test speed of up to 165 miles per hour and (2) in the case of the Locomotives, a maximum continuous speed of up to 125 miles per hour in revenue service and a maximum continuous test speed of up to 140 miles per hour, and (B) in the case of the Trainsets, in conformity with the Performance Criteria set forth in Schedule I hereto; and

(b)      maintain all records, logs and other materials required by the AAR or the United States Department of Transportation, or any other Governmental Authority having jurisdiction over the Units or Lessee, to be maintained in respect of each Unit.

(ii)      In no event shall any Unit be maintained with less care or scheduled for maintenance on a basis less frequent than either the maintenance or maintenance scheduling basis employed by Lessee for other rolling stock similar to the Units owned by or operated for or by Lessee.  Subject to the preceding sentence and without relieving Lessee of any obligation relating to the physical condition of Units to be returned under Section 17, Lessee may take a Unit out of service while awaiting repair so long as Lessee takes reasonable care to prevent deterioration of the condition of such Unit beyond that attributable to the circumstances necessitating such repair and keeps such Unit otherwise eligible for applicable Manufacturer's warranties and in compliance with Section 11.

### 12.2   **Additions and Accessions.**

(i)      Subject in all events to Sections 11 and 12.1, Lessee, at its own cost and expense, may from time to time make additions, modifications and improvements to the Units during the Lease Term, provided such additions, modifications and improvements do not diminish the value, utility or remaining useful life of the Units or cause the Units to become "limited use property" within the meaning of Revenue Procedure 76-30, 1976-2 C.B. 647 (or such other successor tax provision), as interpreted as of the time of such addition, modification or improvement.  The additions, modifications and improvements made by Lessee under the preceding sentence which are readily severable without causing damage to such Units (other than to a *de minimis* extent) and without adversely affecting the value, utility or remaining useful life of the Units (other than to a *de minimis* extent), except to the extent such additions, modifications or improvements are made in order to comply with Section 11.1 and 12.2(ii) or are described in or otherwise subject to Section 12.2(ii), shall be owned by Lessee.   All such additions, modifications and improvements shall be properly maintained and serviced by Lessee, and Lessee shall promptly repair any damage to any Unit resulting from the removal of any addition, improvement or modification.

(ii)      Any and all parts installed on and additions, modifications and improvements made to any Units (a) which are replacements of existing parts constituting part of the Units, (b) which are not readily removable without causing damage to such Unit (other than to a *de minimis* extent), (c) the cost of which is included in the Lessor's Cost of such Unit, (d) in

the course of ordinary and proper maintenance of the Units, or (e) which are required by Applicable Law or by the regulations of the STB, the United States Department of Transportation, any agency thereof, or any other applicable Governmental Authority regulatory body, for the operation or use of such Unit, shall constitute accessions to such Unit and constitute property of Lessor subject to the French Lease and the lien of the Indenture and shall immediately, and without further act or instrument, be deemed subject to this Lease, and Lessee shall comply with all provisions of this Lease, including Section 18, applicable to such accessions.

(iii)    Upon termination of this Lease, Lessor shall have the option to purchase from Lessee any additions, modifications or improvements not described in Section 12.2(ii) above, at the Fair Market Value of such additions, modifications or improvements. Lessee may remove any additions, modifications or improvements described in the preceding sentence not purchased by Lessor; provided, however, any such additions, modifications or improvements which are not removed shall become the property of Lessor without charge, subject to the French Lease, free of any claim of Lessee, upon redelivery of the Unit to Lessor pursuant to this Lease.

## SECTION 13. LEASE DEFAULT

13.1    **Lease Events of Default**.   The following events shall constitute Lease Events of Default and each such event shall continue to be a Lease Event of Default (whether any such event shall be voluntary or involuntary or shall come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) so long as, but only as long as, it shall not have been remedied:

(i)    Lessee shall fail to make any payment of Base Rent, Casualty Value, Termination Value, Adjusted EBO Price or purchase price payable pursuant to Section 16.2(i) within 5 Business Days after the same shall become due;

(ii)    Lessee shall fail to make any payment of Supplemental Rent (other than any failure to make a payment specified in clause (i) above) when due and such failure shall continue for 20 Business Days after Lessee shall have received written notice from the Person entitled to such Supplemental Rent, provided that any such failure shall not constitute a Lease Event of Default until, in the case of Supplemental Rent payable to Equity Guarantor or any Affiliate of Equity Guarantor, written notice is given by Equity Guarantor and, prior to payment in full by Equity Guarantor of the Guaranteed Amount under the Equity Guarantee Agreement, the Owner Participant, to Lessor and Lessee, and, so long as the Lien of the Indenture has not been discharged, Indenture Trustee that such failure constitutes a Lease Event of Default and such failure shall have continued for 15 days after such notice;

(iii)    Lessee shall fail to carry and maintain insurance on or with respect to any Unit in accordance with the requirements of this Lease; provided, that in the case of insurance with respect to which cancellation for any reason or material change in the types or limits of coverage shall not be effective as to any Additional Insured for 30 days after receipt by any Additional Insured of notice of such cancellation, no such failure to carry and maintain insurance shall constitute a Lease Event of Default until the earlier of (a) the date such failure shall have

continued unremedied for a period of 30 days after receipt by any Additional Insured of the notice of cancellation referred to in Section 8.1(iv)(a) or (b) the date on which such insurance is not in effect as to any Additional Insured;

(iv)     any written representation or warranty made by Lessee herein, in the Participation Agreement or in any other Operative Document to which it is a party (other than the Tax Indemnity Agreement and the French Documents) or made by Lessee or any other Person in any certificate or other document delivered by Lessee in connection herewith or therewith (other than any such representation or warranty made by Lessee in the Equity Guarantee Fee Undertaking, in the Participation Agreement (solely to the extent any such representation or warranty relates to the Equity Guarantee Fee Undertaking) or in any such certificate or other document (solely to the extent any such representation or warranty relates to the Equity Guarantee Fee Undertaking), in each case unless Equity Guarantor (and prior to payment in full by Equity Guarantor of the Guaranteed Amount under the Equity Guarantee Agreement, Owner Participant) in its sole discretion shall elect in writing to waive the exclusion set forth in this parenthetical clause by notice to Lessor and Lessee, and so long as the Lien of the Indenture has not been discharged, Indenture Trustee) shall prove at any time to have been incorrect or misleading in any material respect when made and such error shall be material at the time when the notice referred to below shall have been given to Lessee, if curable together with its consequences, and shall not have been cured, together with its consequences, within 30 days after written notice thereof to Lessee by Lessor, Indenture Trustee or Owner Participant, or, if such error is curable but is not capable of being cured within such 30-day period, such longer period not to exceed 60 additional days during which (a) Lessee shall be diligently attempting to cure such error and (b) such attempt to cure could not reasonably be expected to result in a sale, forfeiture or loss of the Equipment or of the interest of Owner Participant or of the interest of Indenture Trustee in any portion of the Trust Indenture Estate or adversely affect Owner Participant's entitlement to the tax benefits contemplated by the Tax Indemnity Agreement;

(v)     Lessee shall fail to perform or observe any material covenant (other than covenants relating to matters covered by subsections (i), (ii) and (iii) above and (xii), (xiii), (xiv) or (xv) below), condition or agreement to be performed or observed by it hereunder, under the Participation Agreement or in any other Operative Document to which it is a party (other than the Tax Indemnity Agreement, the French Documents (other than each Assignment (Cession), each Consent to Assignment (Cession), each Delegation and each Escrow Agreement) and, unless Equity Guarantor (and prior to payment in full by Equity Guarantor of the Guaranteed Amount under the Equity Guarantee Agreement, Owner Participant) in its sole discretion shall elect in writing to waive such exclusion by notice to Lessor and Lessee (and so long as the Lien of the Indenture has not been discharged, Indenture Trustee), the Equity Guarantee Fee Undertaking (or, for the avoidance of doubt, Section 9.4(ii) of the Participation Agreement, insofar as said section relates to the Equity Guarantee Fee Undertaking)), and such failure shall not have been cured within 30 days after written notice thereof to Lessee by Lessor, Indenture Trustee or Owner Participant, or, if such failure is curable but not capable of being cured within such 30-day period, such longer period not to exceed 90 days (or 365 days in the case of a maintenance default with respect to not more than two (2) Locomotives or one (1) Trainset at any point in time) during which (a) Lessee shall be diligently attempting to cure such failure and (b) such attempt to cure could not reasonably be expected to result in a sale, forfeiture or loss of the Equipment or of the interest of Owner Participant or of the interest of Indenture Trustee in

any portion of the Trust Indenture Estate or adversely affect Owner Participant's entitlement to the tax benefits contemplated by the Tax Indemnity Agreement;

(vi)    Lessee shall consent to the appointment of a custodian, receiver, trustee or liquidator (or other similar official) of itself, or of a substantial part of its property, or shall admit in writing its inability to pay its debts generally as they come due, or a court of competent jurisdiction shall determine that Lessee is generally not paying its debts as such debts become due, or Lessee shall make a general assignment for the benefit of creditors or shall take any corporate action to authorize any of the foregoing;

(vii)    Lessee shall file a voluntary petition in bankruptcy or a voluntary petition or an answer seeking reorganization in a proceeding under any bankruptcy laws (as now or hereafter in effect) or an answer admitting the material allegations of a petition filed against Lessee in any such proceeding, or Lessee shall, by voluntary petition, answer or consent, seek relief under the provisions of any now existing or future bankruptcy or other similar law providing for the reorganization or winding-up of debtors, or providing for an agreement, composition, extension or adjustment with its creditors or shall take any corporate action to authorize any of the foregoing;

(viii)    an order, judgment or decree shall be entered in any proceeding by any court of competent jurisdiction appointing, without the consent (express or legally implied) of Lessee, a custodian, receiver, trustee or liquidator (or other similar official) of Lessee, or any substantial part of its property, or sequestering any substantial part of the property of Lessee, and any such order, judgment or decree or appointment or sequestration shall remain in force undismissed, unstayed or unvacated for a period of 60 days after the date of entry thereof;

(ix)    a petition against Lessee in a proceeding under applicable bankruptcy laws or other insolvency laws, as now or hereafter in effect, shall be filed and shall not be stayed, withdrawn or dismissed within 60 days thereafter, or if, under the provisions of any law providing for reorganization or winding-up of debtors which may apply to Lessee, any court of competent jurisdiction shall assume jurisdiction, custody or control of Lessee, or any substantial part of its property and such jurisdiction, custody or control shall remain in force unrelinquished, unstayed or unterminated for a period of 60 days;

(x)    any additional procedure similar to those referred to in subsections (vi), (vii), (viii) or (ix) above, for the relief of financially distressed debtors under Applicable Laws is entered into by Lessee voluntarily or involuntarily and, if such procedure shall have been entered into involuntarily, shall be unstayed and remain in effect for a period of 60 consecutive days;

(xi)    (a) the Equity Guarantee shall cease to be binding on the Equity Guarantor, or shall be rendered unenforceable in any material respect, or (b) the Equity Guarantor shall expressly repudiate or renounce in writing its obligations thereunder or (c) the circumstances described in clauses (iv), and (vi) through (x) of this Section 13.1 with respect to Lessee shall have occurred with respect to the Equity Guarantor (but only if Owner Participant shall agree in writing to treat the circumstances set forth in this clause (xi) as a Lease Event of Default);

(xii)   any breach by Lessee of the merger covenant or assignment covenant set forth in Section 27 that is not cured within 30 days of notice of such breach;

(xiii)   if, following a Special Event, Loan Participant shall have requested a refunding of the Secured Notes pursuant to Section 19 of the Participation Agreement, and Lessee shall have failed to either cause Owner Trustee to effect a refunding of the Secured Notes or provide additional credit support, in either case in accordance with the requirements of Section 19 of the Participation Agreement;

(xiv)   a breach by Lessee of its covenant set forth in the proviso of Section 9.4(i) of the Participation Agreement;

(xv)   a breach of Lessee to redeliver any Unit in accordance with Section 17.1 and 17.2 that is not cured within 30 days of the end of the Lease Term for such Unit; or

(xvi)   (A) the invalidity, voidness or unenforceability in any material respect of the provisions under the French Documents obligating a French Lessor to transfer title to U.S. Lessor in accordance with the French Documents, or (B) the repudiation or renouncement by a French Lessor of its obligations under the French Documents to transfer title to U.S. Lessor in accordance with the French Documents (as such term is defined therein) and, within 30 days thereafter, Lessee shall not have either procured a retraction of such repudiation or renouncement, or (C) title to any Unit is not transferred to U.S. Lessor in accordance with the terms of the French Documents with respect to such Unit following termination or expiration of any French Lease.

13.2   **Remedies**.   If a Lease Event of Default shall have occurred and be continuing, then, in any such case, Lessor, at its option, may declare this Lease in default by a written notice to Lessee (provided, that this Lease shall be deemed to have been declared in default without the necessity of written notice upon any Lease Event of Default described in clauses (vi), (vii), (viii), (ix) or (x) of Section 13.1) and at any time thereafter, Lessor may exercise one or more of the following rights, powers or remedies as Lessor in its sole discretion shall determine to the extent not prohibited by, and subject to compliance with any mandatory requirements of, Applicable Law then in effect:

(i)   proceed by appropriate court action or actions, either at law or in equity, to enforce performance by Lessee of the applicable covenants of this Lease or to recover damages for the breach thereof;

(ii)   by notice in writing to Lessee, cancel or terminate this Lease, whereupon all right of Lessee to the possession and use of the Equipment shall absolutely cease and terminate as though this Lease had never been made, but Lessee shall remain liable as hereinafter provided; and thereupon, Lessor may demand that Lessee, and Lessee shall, upon written demand of Lessor and at Lessee's expense forthwith return all of the Equipment to Lessor or its designee in the manner and condition required by, and otherwise in accordance with all of the provisions of, Section 14, in which event Lessee's obligation to pay Base Rent with respect to such Unit hereunder due on or after the date of such return shall terminate (except to the extent

that Base Rent is to be included in computations under paragraph (v), (vi), or (ix) below if Lessor elects to exercise its rights under any of said paragraphs);

(iii)     sell any Unit at public sale in a commercially reasonable manner, free and clear of any rights of Lessee but subject to the duty to account to Lessee with respect to such sale or for the proceeds thereof as required by paragraph (vi) below, in which event Lessee's obligation to pay Base Rent with respect to such Unit hereunder due on or after the date of such sale shall terminate (except to the extent that Base Rent is to be included in computations under paragraph (v), (vi), or (ix) below if Lessor elects to exercise its rights under any of said paragraphs);

(iv)     hold, keep idle or lease to others any Unit as Lessor in its sole discretion may determine, free and clear of any rights of Lessee and without any duty to account to Lessee with respect to such action or inaction or for any proceeds with respect thereto, except that Lessee's obligation to pay Base Rent with respect to such Unit due on or after the date upon which Lessee shall have been deprived of possession and use of such Unit pursuant to this Section 13 shall terminate (except to the extent that Base Rent is to be included in computations under paragraph (v), (vi) or (ix) below if Lessor elects to exercise its rights under any of said paragraphs);

(v)     whether or not Lessor shall have exercised, or shall thereafter at any time exercise, any of its rights under paragraph (i), (ii), (iii) or (iv) above or paragraph (ix) below with respect to any Unit, Lessor, by written notice to Lessee specifying a payment date (which date shall be a Casualty Value Determination Date for the purposes of computing Casualty Value) which shall be not earlier than the next monthly Casualty Value Determination Date after the date of such notice, may demand that Lessee pay to Lessor, and Lessee shall pay to Lessor, on the payment date specified in such notice, as liquidated damages for loss of a bargain and not as a penalty (in lieu of the Base Rent due for such Unit due on or after the payment date specified in such notice), whichever of the following amounts Lessor, in its sole discretion, shall specify in such notice: (a) any unpaid Base Rent for such Unit due prior to the Rent Payment Date next preceding the date specified in such notice plus (b) either (x) an amount equal to the excess, if any, of the Casualty Value for such Unit, over the present value of the Fair Market Rental of such Unit or, if Lessor has leased such Unit to others pursuant to paragraph (iv) above, for the period of such lease the periodic rent payable thereunder, in each case for the remainder of the Base Lease Term or any Renewal Term then in effect, as the case may be, as of the payment date specified in such notice, such present values to be computed on the basis of a per annum rate of discount equal to the Debt Rate, compounded semi-annually, from the respective dates upon which such rents would be paid; or (y) an amount equal to the excess, if any, of the Casualty Value for such Unit computed as of the payment date specified in such notice over the Fair Market Value of such Unit as of the payment date specified in such notice; plus (c) interest on the amounts specified in clause (a) of this paragraph (v) at the Overdue Rate from and including the date on which such amount was due to the date of payment of such amount in full plus (d) interest on the amounts specified in clause (b) of this paragraph (v) at the Overdue Rate from and including the Casualty Value Determination Date as of which such Casualty Value is computed to the date of payment of such amount in full;

(vi)    if Lessor shall have sold any Unit pursuant to paragraph (iii) above, Lessor, in lieu of exercising its rights under paragraph (v) above with respect to such Unit may, if it shall so elect, demand that Lessee pay to Lessor, and Lessee shall pay to Lessor, as liquidated damages for loss of a bargain and not as a penalty (in lieu of the Base Rent for such Unit due on or subsequent to the Rent Payment Date next preceding such sale), (a) any unpaid Base Rent for such Unit due prior to the Rent Payment Date next preceding the date of such sale, plus (b) the amount, if any, by which the Casualty Value of such Unit computed as of the Rent Payment Date next preceding the date of such sale, exceeds the net proceeds of such sale, plus (c) interest on the amounts specified in clause (a) of this paragraph (vi) at the Overdue Rate from and including the date on which any such amount was due to the date of payment of such amount in full, plus (d) interest on the amounts specified in clause (b) of this paragraph (vi) at the Overdue Rate from and including the Rent Payment Date as of which such Casualty Value is computed to the date of payment of such amount in full;

(vii)    apply to the obligations of Lessee hereunder or under any other Operative Document, in any such order as Lessor shall elect, any amounts held as security hereunder for Lessee's obligations;

(viii)    except as otherwise expressly agreed herein, exercise any other right, power or remedy which may then be available under any of the Operative Documents or which may be available to Lessor under Applicable Law or proceed by court action to enforce the terms hereof or to recover damages for the breach hereof or to rescind this Lease;

(ix)    whether or not Lessor shall have exercised or shall thereafter exercise any rights under paragraphs (i), (ii), (iii), (iv), (v) or (vi) above, with respect to any Unit Lessor may, upon written notice to Lessee, require Lessee to pay to Lessor, on the next Casualty Value Determination Date following the date of such notice (and specified in such notice), as liquidated damages for loss of a bargain and not as a penalty, (a) any unpaid Base Rent with respect to all Units covered by the Lease due prior to such date, plus (b) Casualty Value with respect to all Units covered by the Lease as of such date, plus (c) interest on the amounts specified in clause (a) of this paragraph (ix) at the Overdue Rate from and including the date on which any such amount was due to the date of payment of such amount in full, plus (d) interest on the amounts specified in clause (b) of this paragraph (ix) at the Overdue Rate from and including the date as of which such Casualty Value is computed to the date of payment of such amount in full; and

(x)    give notice of the exercise of the Purchase Option under Clause 4.1 of any French Lease and exercise any other rights available under the French Documents.

Upon receipt by Lessor of all amounts required to be paid under Section 13.2(ix) and subject to the payment of the amounts specified in the following paragraph and the discharge of the Lien of the Indenture pursuant to Section 10.01 thereof, Lessor shall transfer, or cause to be transferred, to Lessee, at Lessee's cost and expense, on an "as-is, where-is" basis and without recourse or warranty (except as to the absence of Lessor's Liens), the rights and interests of Lessor in and to the Equipment and the Lease, and Lessor and Owner Participant shall execute and deliver such documents evidencing such transfer and take such further action as may be required to effect such transfer.

In addition, Lessee shall be liable, except as otherwise provided above, for any and all unpaid Base Rent, Renewal Rent and Supplemental Rent due hereunder before or during the exercise of any of the foregoing rights, powers or remedies (including any Supplemental Rent payable after the relevant date in paragraphs (ii), (iii) and (iv) above relating to any event or circumstance occurring or arising prior to such date) and for all reasonable legal fees and other costs and expenses incurred by Lessor, Indenture Trustee, Equity Guarantor, Owner Participant or any Note Holder by reason of the occurrence of any Lease Event of Default or the exercise of any of Lessor's rights, powers or remedies with respect thereto, including all costs and expenses incurred in connection with the surrender of the Units or in placing the Units in the condition required hereby, together, in each case, with interest thereon at the Overdue Rate.

13.3   **Remedies Not Exclusive**.  Except as otherwise expressly agreed herein, the remedies provided in this Lease in favor of Lessor shall not be deemed exclusive, but shall be cumulative and may be exercised concurrently or consecutively, and shall be in addition to all other remedies in its favor existing at law or in equity.  The failure of Lessor, Owner Participant, or any Note Holder to exercise the rights granted it hereunder upon the occurrence of any of the contingencies set forth herein shall not constitute a waiver of any such right upon the continuation or recurrence of any such contingencies, or upon the occurrence of any similar contingencies.

13.4   **1168 Matters**.  Notwithstanding any provision herein to the contrary, it is intended, as between Lessor and Lessee that this Lease constitute a "true lease" for federal income tax purposes and the transactions contemplated by this Lease be entitled to the full benefits of Section 1168 of the Bankruptcy Code.  Without limiting the generality of the foregoing, Lessor and Lessee acknowledge that this Lease is a "lease" of rolling stock equipment and accessories within the meaning of Section 1168 of the Bankruptcy Code.  So long as such Section 1168 is in effect, Lessee agrees that it will not, in connection with any bankruptcy proceedings involving Lessee, take a position in the United States Bankruptcy Court that is inconsistent with the rights of Lessor such under Section 1168.

13.5   **Waivers**.  Lessee hereby waives any mandatory requirements of law, now or hereafter in effect, which might limit or modify the remedies herein provided, to the extent that such waiver is effective under Applicable Law.  Lessee hereby waives any and all existing or future claims to any offset against the Rent payments due hereunder, and agrees to make such payments regardless of any offset or claim which may be asserted by Lessee or on its behalf.  Except as otherwise provided in this Lease, Lessee, to the full extent effective under Applicable Law, hereby waives all statutory or other legal requirements for any notice of any kind, any other requirements with respect to the enforcement of Lessor's rights under this Lease and any and all rights of redemption and (to the extent that it may lawfully do so) any stay or extension of law which would prohibit or forgive Lessee from making payments under this Lease.

## SECTION 14.  RETURN OF UNITS UPON DEFAULT

14.1   **Return of Units**.  Upon the date of notice of cancellation or termination by Lessor pursuant to Section 13.2(ii), Lessee shall, without expense to Lessor, promptly redeliver the Units, or cause the Units to be redelivered, to Lessor with all reasonable dispatch, in the same manner and in the same condition as if such Units were being redelivered on the last

day of the Lease Term in accordance with the provisions of Section 17, and all obligations of Lessee under Section 17 shall apply to such redelivery. Lessor, without further notice, may, but shall be under no obligation to, retake such Units wherever found and take immediate possession of and remove the same by *ex parte* summary proceedings or otherwise without Lessor incurring any liability by reason of such retaking, whether for the restoration of damage to property caused by such retaking or otherwise.

14.2   **Lessor Appointed Agent of Lessee**. Without in any way limiting the obligation of Lessee under the foregoing provisions of this Section 14, Lessee hereby irrevocably appoints Lessor as the agent and attorney of Lessee, with full power and authority to exercise Lessee's rights under this Section 14, at any time while Lessee is obligated to deliver possession of any Unit to Lessor, to demand and take possession of such Unit in the name and on behalf of Lessee from whomever shall then be in possession of such Unit.

## SECTION 15.  ASSIGNMENT, POSSESSION AND USE

15.1   **Assignment; Consent; Security for Lessor's Obligations to Indenture Trustee.**

(i)     In order to secure the indebtedness evidenced by the Secured Notes, the Indenture provides, among other things, for the assignment, by Lessor to Indenture Trustee, of this Lease to the extent set forth therein and for the creation of a first priority security interest in the Trust Indenture Estate in favor of Indenture Trustee for the benefit of Note Holders. Lessee hereby consents to the assignment by Lessor of Lessor's right, title and interest in and to this Lease to Indenture Trustee pursuant to the terms of, and to the extent set forth in, the Indenture, and agrees that, so long as any Secured Notes are Outstanding, all payments of Base Rent, Termination Value, Adjusted EBO Price (unless Lessee assumes the Secured Notes as set forth in Section 16.1 hereof)  and Casualty Value payable hereunder shall be made to Indenture Trustee as provided in Section 4.4 hereof, or as Indenture Trustee may otherwise direct in a writing received by Lessee at least 10 Business Days prior to the applicable payment date, and thereafter by wire transfer to an account in New York, New York designated by Lessor or at such place or to the attention of such Person or department as Lessor may specify from time to time in writing delivered to Lessee not less than 10 Business Days prior to the due date of the payment to be made at the place specified in such writing.

(ii)    Unless and until Lessee shall have received written notice from Indenture Trustee that the Lien of the Indenture has been released, the terms and provisions of the Indenture shall govern as to whether the consent or agreement of either Lessor or Indenture Trustee, or both, shall be required in order to effect any consent, amendment or modification of, or waive any requirements under, this Lease and Lessee acknowledges receipt of an execution counterpart of the Indenture as in effect as of the date hereof.

15.2   **No Liens; Lessee's Rights to Use the Units, to Permit Use Thereof by Others and to Sublease the Units.**

(i)     Lessee (a) will not, directly or indirectly, create, incur, assume or suffer to exist any Lien (other than Permitted Liens) on or with respect to any Unit, any part thereof, the

title thereto or any interest therein and (b) at its own expense will promptly discharge any such Lien which arises; provided, that Lessee may at its own expense in good faith, contest the validity or application of any such Liens in any manner which does not (i) materially and adversely affect the property or rights of Lessor or Indenture Trustee under this Lease or under the Indenture or (ii) create any risk of any criminal liability or (iii) create a reasonable risk of any Material Civil Liability on the part of Lessor, Indenture Trustee, Owner Participant, Equity Guarantor or any Note Holders or involve any material risk of loss, forfeiture or sale of the Equipment.

(ii)     So long as no Specified Default or Lease Event of Default shall have occurred and be continuing, Lessee shall be entitled to sublease any Unit subject to all the terms and conditions of this Lease, to a sublessee that is not then subject to any bankruptcy proceedings. Lessee's obligations hereunder and under any other Operative Document shall continue in full force and effect as the obligations of a principal and not of a surety irrespective of any such sublease. Each such sublease shall be (a) expressly subject and subordinate to all of the provisions of this Lease and to the rights and remedies of Indenture Trustee under the Indenture and Lessor under this Lease in respect of the Units covered by such sublease (and Lessor shall have received an acknowledgment to such effect from the sublessee), (b) for a term not extending beyond the end of the Base Lease Term or the end of the Renewal Term then in effect, unless such sublease provides for Lessee's right to substitute similar equipment thereunder, and (c) shall contain no purchase option for the benefit of the sublessee.

(iii)    Lessee agrees not to operate or locate any Unit, or to suffer any Unit, by sublease or otherwise, to be operated or located, (a) outside of the United States or Canada or (b) so as to cause a violation of Section 12.1 or (c) in any area excluded from coverage by any insurance policy required by the terms of Section 8 hereof except in the case of a requisition for use by the United States Government, it being understood, however, that with respect to this clause (c), Lessee shall use its best efforts to seek indemnification from the United States Government against such risks covered by the insurance requirements of Section 8, or, in lieu of such indemnification, Lessee shall procure insurance against the risks and in the amounts required by, and in compliance with, Section 8 hereof covering such area.

(iv)     Lessee agrees to give written notice to Lessor of any sublease having a term in excess of 2 years; and any such sublease in excess of 2 years shall be assigned as collateral security to Lessor and further collaterally assigned to Indenture Trustee (such assignments to be in form and substance satisfactory to the Participants).

(v)      Lessee shall, within 5 Business Days after the execution of any such sublease, deliver a true and complete copy thereof to Owner Participant, Lessor and, so long as Secured Notes are Outstanding under the Indenture, Indenture Trustee.

(vi)     Lessee shall not be entitled to sublease the Equipment except as provided in this Section 15.2.

15.3    **Transfers by Lessor or Owner Participant**.  Lessor shall not transfer its interest in this Lease except in compliance with Article X of the Trust Agreement or pursuant to

and in accordance with the other Operative Documents.  No such transfer by Lessor shall interfere with Lessee's rights under this Lease with respect to Lessee's use of the Units.

## SECTION 16.  PURCHASE OPTIONS; RENEWAL OPTIONS

16.1   **EBO Purchase Option**.  If this Lease has not been earlier terminated, Lessee may by written irrevocable notice (the "*EBO Purchase Option Notice*") which notice shall describe in reasonable detail the Units in respect of which Lessee is exercising the EBO Purchase Option delivered to Lessor and Owner Participant not less than 90 days prior to the Reference EBO Date, elect to purchase on the applicable EBO Date all or a Minimum Number of Units then subject to this Lease at a purchase price equal to the applicable Adjusted EBO Price for such Units, which shall be payable as provided below; provided, that no Specified Default or Event of Default shall have occurred and be continuing on any EBO Date on which the Adjusted EBO Price is payable hereunder (unless Lessee delivers with such notice on any such EBO Date an opinion of independent counsel reasonably satisfactory to Owner Participant to the effect that no risk exists that Lessee's payment of the applicable Adjusted EBO Price will be voided or otherwise disallowed as a consequence of a bankruptcy, insolvency, dissolution or liquidation of Lessee).  If Lessee exercises the EBO Purchase Option by the giving of the EBO Purchase Option Notice as required above with respect to the Minimum Number of Units, Lessee shall pay the Adjusted EBO Price for the Applicable Units on the respective EBO Date for such Units.  Lessee may, at its option, pay the Adjusted EBO Price for any Units as provided above in installments in the amounts and on the dates set forth in Schedule VII to the Lease Supplement applicable to such Units, provided that the exercise of such option by Lessee shall be subject to (i) the payment in full by Lessee of the first installment of the Adjusted EBO Price for such Units on the applicable EBO Date, and (ii) the execution of documentation (and the making of any necessary filings related thereto) reasonably satisfactory to Lessor evidencing (x) Lessee's obligation to pay all subsequent installments on the dates and in the amounts set forth in such Schedule VII, (y) the release of the Lien of the Indenture in respect of such Units, and (z) the granting in favor of Lessor of a first priority perfected security interest in the Units so purchased.  So long as Lessee does not elect to pay the Adjusted EBO Price in installments pursuant to the preceding sentence, Lessee may elect to pay such portion of the purchase price under this Section 16.1 equal to the aggregate principal amount of the Secured Notes that would have been mandatorily prepaid pursuant to Section 2.14 of the Indenture had Lessee paid such Adjusted EBO Price entirely in cash by causing New Notes of Lessee to be issued in an aggregate principal amount equal to the principal amount of the Secured Notes, in exchange for the Secured Notes in accordance with Section 18 of the Participation Agreement; provided, that upon such assumption Indenture Trustee shall receive an opinion that it will be entitled to the benefits of Section 1168 of the United States Bankruptcy Code.  The balance of the Adjusted EBO Price, as reflected in Schedule VII to the Lease Supplement together with all other Rent then due on such EBO Date shall be paid to Lessor.  This Lease shall terminate with respect to such Units and Lessee's exercise of the purchase option under this Section 16.1 shall be effective, only upon payment in full (whether by payment solely in cash or other immediately available funds or by partial payment in cash or other immediately available funds and the issuance of New Notes as provided above) of the applicable Adjusted EBO Price or installment thereof, as the case may be, due on the applicable EBO Date, and all unpaid Base Rent due prior to the applicable EBO Date and any Supplemental Rent due on or before such EBO Date,

including without limitation any Make Whole Premium Amount in respect of the Secured Notes payable in connection with such termination.

16.2   **End of Term Purchase Options.**

(i)   If this Lease has not been earlier terminated, then Lessee may, by irrevocable written notice delivered not less than 360 days prior to the Reference Base Lease Termination Date, elect to purchase all or a Minimum Number of Units then subject to this Lease on the Base Lease Termination Date applicable to such Units (as described in the Lease Supplement applicable to such Units) at a purchase price equal to the Fair Market Value thereof (as determined below) payable on the applicable Base Lease Termination Date, together with all unpaid Base Rent and Supplemental Rent then due.  For the avoidance of doubt, the parties acknowledge that, once such irrevocable written notice has been delivered by Lessee, Lessee shall have a mandatory obligation to purchase such Units on the applicable Base Lease Termination Date.

(ii)   If this Lease has not been earlier terminated, then Lessee may by irrevocable written notice delivered not less than 360 days prior to the end of any Reference Renewal Term, elect to purchase all or a Minimum Number of Units then subject to this Lease on the last day of the applicable Renewal Term applicable to such Units at a purchase price equal to the Fair Market Value thereof (as determined below) payable on the last day of such Renewal Term together with all unpaid Base Rent and Supplemental Rent then due for such Units.  For the avoidance of doubt, the parties acknowledge that, once Lessee has delivered such notice, Lessee shall have a mandatory obligation to purchase such Units on the last day of the applicable Renewal Term for such Units.

16.3   **Further Assurances**.  Upon payment of the purchase price with respect to any Units purchased pursuant to an exercise by Lessee of any option to purchase under this Section 16 of all Rent due hereunder, Lessor shall execute and deliver to Lessee, or Lessee's assignee or nominee, such instrument as will transfer to Lessee Lessor's right, title and interest in and to such Units and the French Leasehold Interest in respect thereof, as-is, where-is, without recourse, representation or warranty of any kind other than that such Units are free and clear of all Lessor's Liens and Owner Participant's Liens.

16.4   **Renewal Options.**

(i)   Lease Renewal Terms.  If this Lease has not been earlier terminated and no Specified Default or Lease Event of Default shall be continuing on the effective date of the renewal, Lessee may elect, by irrevocable written notice delivered to Lessor not less than 360 days prior to the Reference Base Lease Termination Date (or, with respect to clause (b) below, the end of any Reference Renewal Term) to renew this Lease as of such date with respect to all or a Minimum Number of Units then subject to this Lease, as follows:

(a)   at the applicable Base Lease Termination Date, for a period of 1 year at a semi-annual Base Rent equal to the Fixed Rate Renewal Rent (each such renewal term under this clause (a) being referred to herein as a "*Fixed Rate Renewal Term*");

(b)     (i) at the end of the applicable Fixed Rate Renewal Term for each Unit, for a period of not less than 1 year, an initial Fair Market Renewal Term not to exceed a period to be determined based upon the appraisal delivered to Owner Participant on the initial Closing Date and ending on a Rent Payment Date for such Unit, and (ii) after any Fair Market Renewal Term, for a period of not less than 1 year, subsequent fair market renewal terms not to exceed with respect to each Unit (1) 80% of the economic useful life of such Unit as of the commencement of such fair market renewal term, and (2) the point at which the fair market value (disregarding inflation or deflation) of such Unit is not less than 20% of the remaining value of such Unit at the commencement of such fair market renewal term, and ending on a Rent Payment Date for such Unit, such determinations under clauses (1) and (2) to be established by an independent appraiser of railroad equipment mutually acceptable to Lessee and Lessor (or if no such mutually acceptable appraiser can be identified, then by a panel of appraisers selected in accordance with Section 16.5) as of the commencement of each such fair market renewal term (each such fair market renewal term under this clause (b) being referred to herein as a *"Fair Market Renewal Term"*), at an amount equal to 105% of the Fair Market Rental.

Lessor and Lessee agree that the percentage 105% as used in this Section 16 to determine any Renewal Rent shall be reduced to the percentage 100% if, in the good faith determination of Owner Participant, there shall have occurred a clarification prior to the commencement of the relevant Renewal Term that lessee renewal options at fair market rental value do not extend the lease term for purposes of section 467 of the Code and the regulations thereunder.

### 16.5    Determination of Fair Market Value and Fair Market Rental.

(i)     At any time within 15 months prior to the Base Lease Termination Date or the end of the then pending Renewal Term, at Lessee's request, Lessor and Lessee shall negotiate in good faith to determine the Fair Market Value and Fair Market Rental of the Units within 45 days after such request has been given. If after such 45 day period, Lessor and Lessee are unable to agree upon a determination of the Fair Market Value or Fair Market Rental, as the case may be, of the Units, the Fair Market Value or Fair Market Rental, as the case may be, shall be determined in accordance with the appraisal procedure set forth in this Section 16.5. If either party shall have given written notice to the other requesting determination of such Fair Market Value or Fair Market Rental by such appraisal procedure, the parties shall consult for the purpose of appointing a qualified independent appraiser by mutual agreement. If no such appraiser is appointed within 15 days after such notice is given, such determinations shall be made by a panel of three independent appraisers, one of whom shall be selected by Lessee and another of whom shall be selected by Lessor, both selections to be made and notice thereof given to the other party within 10 days after the end of such 15 day period, and the third of whom shall be selected by the two appraisers so selected. If Lessor or Lessee fails to appoint an appraiser within such 10 day period, no other appraiser shall be appointed and the appraisal shall be made solely by the appraiser appointed by the other party. If the two appraisers so selected cannot agree upon such third appraiser, such third appraiser shall be selected by the American Arbitration Association (or

any successor organization) from a pool of arbitrators having experience in the railroad industry and a familiarity with rolling stock comparable to the Units.

(ii)     If a single appraiser shall have been appointed by the parties, the determination of such appraiser shall be final and binding upon the parties.  If three appraisers shall have been appointed, the average of the appraisals of the two of the three appraisers whose appraisals are the closest shall constitute the determination of the appraisers (unless one appraisal is equally close to two different appraisals, in which case the average of the three appraisals shall constitute such determination) and be final and binding upon the parties.

(iii)     The appraiser or appraisers shall be provided with, and instructed to appraise in accordance with, the definitions of all terms appearing in the Operative Documents and having a bearing on the determinations subject to appraisal.

(iv)     The fees and expenses of each appraiser (a) selected by Lessee shall be paid by Lessee, (b) selected by Lessor shall be paid by Lessor and (c) selected jointly by Lessee and Lessor or selected by the appraisers selected by Lessee and Lessor or selected by the American Arbitration Association (or any successor organization) shall be paid one-half by Lessee and one-half by Lessor; provided, that the expenses of any appraisal carried out pursuant to Section 13 shall be paid in their entirety by Lessee.

## SECTION 17.  RETURN OF UNITS UPON EXPIRATION OF TERM

### 17.1  Redelivery.

(i)     When the Units are to be redelivered at the expiration of the Base Lease Term or any applicable Renewal Term with respect thereto or, if Lessor shall have requested storage with respect to the Units as provided herein below, at the termination of any applicable storage period or at one earlier time during such a storage period as Lessor may specify on at least 30 days' notice, Lessee shall assemble and deliver possession of the Units in accordance with the terms of this Lease, at Lessee's cost and expense, to any location selected by Lessor in the continental United States then served by Lessee by lines of service extending contiguously from the last place of use of such Units to the desired location (such location shall be specified in a written notice given by Lessor to Lessee at least 60 Business Days (and 30 days if the Units are being delivered out of storage) prior to such redelivery (the "*Redelivery Location*")).

(ii)     Lessee will, at the written request of Lessor made once not later than 30 days prior to the end of the Base Lease Term or any applicable Renewal Term with respect to any Unit, store such Unit free of charge and at Lessee's expense, except for the cost of any insurance taken out by Lessee for Lessor's benefit, on storage tracks selected by Lessee for a period of 60 days following the Base Lease Termination Date or the last day of the applicable Renewal Term, as the case may be.  Upon the request of Lessor prior to the end of such storage period, Lessee shall provide storage for an additional 30 days at such location at Lessor's sole risk, cost and expense.  Lessor shall bear all risk of loss to such Units during such storage period.

(iii)     If any Unit is inspected pursuant to Section 17.3(ii) and pursuant to Section 17.3(iii) is deemed not in the condition required by Section 17.2, Lessee, at its expense and risk, shall within 30 days thereafter make such repairs and perform such work as shall be

necessary to place such Unit in the condition required by Section 17.2; provided, however, that if Lessee reasonably determines that it cannot repair a Unit pursuant to this Section 17.1(iii) within the period permitted herein, Lessee may elect to purchase such Unit for the greater of Fair Market Value (determined on the assumption that such Unit was in the required condition) and Casualty Value determined as of the last day of the applicable Lease Term, together with all unpaid Base Rent and Supplemental Rent then due thereunder. Lessee will provide Lessor with notice when such Unit has been repaired so as to be in the condition required by Section 17.2.

17.2    **Return.**

(i)      At the time of any return, the Units shall be free and clear of all liens, security interests, charges and encumbrances and rights of others including, without limitation, any Lien of any French Lessor under any French Document (other than Lessor's Liens and Owner Participant's Liens) and shall be in the condition required by Section 12 (without regard to the scheduling of maintenance) and this Section 17.2. Each Unit returned to Lessor pursuant to this Section 17 shall (a) be in compliance with Section 11 (it being agreed that compliance with laws, rules or regulations will be without regard to extensions or waivers that are not assignable or otherwise transferable to third parties), (b) have attached or affixed thereto any addition, modification or improvement considered an accession thereto as provided in Section 12.2(ii), (c) have all exterior sides free of material rust and corrosion, (d) be clean by industry standards and (e) be configured for substantially the same use as when originally delivered. Lessee shall provide to Lessor, with respect to each Unit returned to Lessor pursuant to this Section 17, true, correct and complete copies of all records, logs and other materials maintained by Lessee in accordance with Section 12.1(ii).

(ii)      Upon the request of Lessor, and at Lessor's sole expense, Lessee shall cooperate with Lessor in obtaining the valid and effective issuance, or, as the case may be, transfer or amendment of all governmental action necessary or, in the reasonable opinion of Lessor, desirable for the ownership of any Unit by Lessor or any transferee, sublessee or assignee thereof.

17.3    **Inspections.**

(i)      When Units are redelivered at the expiration of the applicable Base Lease Term or any applicable Renewal Term with respect thereto, Lessee shall make any or all of such Units available for inspection at the Redelivery Location at such hours and for such length of time as are mutually agreed to by Lessor and Lessee in order to provide Lessor a reasonable opportunity to make the inspection described in Section 17.3(iii).

(ii)      Not later than 30 days after the redelivery of a Unit pursuant to Section 17.1 (including a redelivery to a storage location), Lessor or its agent may inspect such Unit to determine whether such Unit is in the condition required by Section 17.2. If Lessor fails to object to the condition of a Unit during such period or if Lessor removes or causes to be removed such Unit from any storage area or Redelivery Location prior to any inspection thereof, such Unit shall be deemed to have satisfied the conditions of Section 17.2.

(iii)   At any inspection pursuant to this Section 17.3, qualified independent inspectors or surveyors representing both Lessee and Lessor, or an independent inspector or surveyor, in each case, reasonably satisfactory to both Lessor and Lessee, shall be present at the inspection and shall within a reasonable time from the date of such inspection determine and specify in writing the agreed repairs or work, if any, necessary to place each Unit in the condition required by Section 17.2.

17.4   **Continuing Obligations**.   Any Unit not delivered on the date of expiration of the Lease Term in accordance with Section 14 or this Section 17, as the case may be, shall continue to be subject to all of the obligations of Lessee set forth in this Lease.   If Lessee shall, for any reason whatsoever, fail to return any Unit at the time specified herein, this Lease and the obligations of Lessee hereunder shall continue in effect with respect to such Unit at the higher of then Fair Market Rental and the average daily rental during the Base Term until such Unit is returned to Lessor; provided, however, that this Section 17.4 shall not be construed as permitting Lessee to fail to meet its obligations to return any Unit in accordance with the requirements of this Lease or constitute a waiver of a Lease Event of Default.

## SECTION 18. RECORDING

18.1   **Recordings**.   Lessee, at its own expense, pursuant to the Participation Agreement, will cause this Lease, each Lease Supplement relating to the Units being delivered on any Closing Date, the Indenture and the Indenture Supplements relating to the Units being delivered on any Closing Date, or other appropriate memoranda, to be filed pursuant to Section 11301 of the Act prior to the delivery and acceptance of any Unit and shall cause to be so filed promptly after execution and delivery thereof by all parties thereto any Lease Supplement and Indenture Supplement, or other appropriate memoranda, entered into in accordance with the Operative Documents.   Lessee, at its own expense, will further cause this Lease, any Lease Supplements, the Indenture, Indenture Supplements and/or appropriate financing statements or continuation statements to be filed and recorded and, from time to time when required, refiled and rerecorded, in accordance with the applicable provisions of the Uniform Commercial Code as in effect in the District of Columbia (and, if Lessee changes its chief executive office to any state, in such state) and in any jurisdiction in the United States or Canada where filing is necessary to the reasonable satisfaction of counsel to Owner Participant and counsel to Loan Participant and shall do such other things to preserve and maintain the perfection and priority of the Lien of the Indenture and the ownership of Lessor in the Equipment as such counsel may reasonably request.

18.2   **Continuing Obligations**.   Lessee, in addition to the requirements of Section 18.1 above, will from time to time do and perform in a timely manner any other act and will execute, acknowledge, deliver, file, register, record and deposit (and will refile, re-register, rerecord or redeposit whenever required) any and all further instruments required by law (including without limitation continuation statements) or reasonably requested by Lessor, Owner Participant, Equity Guarantor or Indenture Trustee for the purpose of proper protection, to its reasonable satisfaction, of its respective interests in the Units, or for the purpose of carrying out the intention of this Lease and the Indenture.

## SECTION 19.  LESSOR'S RIGHT TO PERFORM FOR LESSEE

If Lessee fails to perform or comply with any of its agreements contained herein, Lessor and (but without duplication) Indenture Trustee may upon notice to Lessee (but shall be under no obligation to) perform or comply with such agreement, and the amount of the reasonable costs and expenses of Lessor or Indenture Trustee, as the case may be, incurred in connection with such performance or compliance, together with interest on such amount at the Overdue Rate shall be payable by Lessee upon demand.  No such performance or compliance by Lessor or Indenture Trustee, as the case may be, shall be deemed a waiver of the rights and remedies of Lessor, Indenture Trustee or any assignee of Lessor against Lessee hereunder.

## SECTION 20.  NOTICES

Any notices, requests or other communication hereunder shall be given or made in accordance with Section 13.1 of the Participation Agreement.

## SECTION 21.  SEVERABILITY

Any provision of this Lease which is prohibited or unenforceable in any jurisdiction shall be, as to such jurisdiction, ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

## SECTION 22.  EFFECT AND MODIFICATION OF THIS LEASE

Except for the other Operative Documents, this Lease exclusively and completely states the rights of Lessor and Lessee with respect to the leasing of the Units and supersedes all other agreements, oral or written, with respect thereto.  Subject to Sections 6.10 and 10.05 of the Indenture, no variation or modification of this Lease and no waiver of any of its provisions or conditions shall be valid unless in writing and signed by duly authorized signatories for Lessor and Lessee, and if required by the Indenture, Indenture Trustee.

## SECTION 23.  NATURE OF THIS LEASE

It is the intention of the parties hereto that this Lease shall constitute an agreement of lease whereby Lessor will be treated as the owner and lessor of the Units and Lessee as Lessee of the Units, and prior to the exercise by Lessee of its rights to purchase the Units, nothing herein shall be construed as conveying to Lessee any title to or ownership of the Units, the rights and interest of Lessee hereunder with respect to and in the Units being those of a lessee only.

## SECTION 24.  EXECUTION

This Lease may be executed in any number of counterparts and by the different parties hereto on separate counterparts (or upon separate signature pages bound together into one or more counterparts), each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.  To the extent, if any, that this Lease or any Lease Supplement constitutes chattel paper or other collateral within

the meaning of the Uniform Commercial Code (or other law respecting security interests) as in effect in any applicable jurisdiction, no security interest in Lessor's interest under this Lease or any such Lease Supplement may be created through the transfer or possession of any counterpart of this Lease or such Lease Supplement other than the original executed counterpart No. 1 hereof or thereof, which shall be identified as the counterpart containing the receipt therefor executed by Indenture Trustee on the signature page hereof or thereof.

## SECTION 25.  LAW GOVERNING

The terms of this Lease and all rights and obligations hereunder shall be governed by the law of the District of Columbia without regard to conflicts or choice of law provisions; provided, that the parties shall be entitled to all rights conferred by Section 11301 of the Act. **LESSOR AND LESSEE AGREE THAT THIS LEASE IS A "FINANCE LEASE" FOR PURPOSES OF ARTICLE 2-A OF, AND AS DEFINED BY SECTION 2-A-103, OF THE UCC.**

## SECTION 26.  VOLUNTARY TERMINATION BY LESSEE

26.1    **Termination**.  Lessee shall have the right, at its option, to terminate this Lease with respect to all or a Minimum Number of Units then subject to this Lease, if Lessee shall have determined that such Units shall have become obsolete or operationally uneconomic or surplus to Lessee's requirements and shall have furnished to Lessor a certificate executed by a financial officer of Lessee having a title of Vice President or higher to such effect, by giving notice thereof to Lessor and Equity Guarantor no sooner than 90 days prior to the 5th anniversary of the Reference Closing Date (the "*Termination Notice*"), and Lessee shall specify in such Termination Notice the date such Units are to be terminated (which such date shall be the first monthly "Termination Date" set forth in Schedule V to the Lease Supplement applicable to such Unit that is at least 90 days after the Termination Notice and which falls on or after the 5th anniversary of the Closing Date applicable to such Unit) (a "*Termination Date*").  Lessor may, by notice to Lessee given on or before the 15th day after the date of Lessee's Termination Notice, elect to retain such Units as of the Termination Date without further liability or obligation of Lessee under this Section 26 with respect to such Units except the obligation to pay any unpaid Base Rent due prior to such Termination Date plus or minus the amount set forth under the column titled "Rent Adjustment" for such Termination Date in Schedule V to the Lease Supplement applicable to such Unit, any Supplemental Rent due on or before such Termination Date, and any Make Whole Premium Amount in respect of the Secured Notes payable in connection with this prepayment and Lessor will prepay the Secured Notes Outstanding pursuant to Section 2.14(b) of the Indenture.

26.2    **Solicitation of Bids**.  Unless Lessor shall have elected to retain such Units in accordance with the last sentence of Section 26.1, Lessee, as agent for Lessor, shall use commercially reasonable efforts to obtain bids for the cash purchase on the Termination Date of such Units during the period from the giving of such notice until the Termination Date.  Lessee, however, shall have no liability for any failure to obtain the best bid therefor.  Lessee shall certify to Lessor in writing the terms and amount of each bid received by Lessee and the name and address of the Person (who shall not be Lessee or any Person acting for or affiliated with Lessee or with which Lessee has an arrangement or understanding with respect to the future use

of such Units by Lessee or an affiliate thereof) submitting such bid.  Lessor may, at Lessor's expense, independently obtain bids for such purchase and certify them to Lessee as provided in the next preceding sentence.

26.3  **Third-Party Sale**.  On the Termination Date, unless Lessor shall have elected to retain such Units pursuant to the last sentence of Section 26.1, Lessor shall sell such Units for cash to a third party unaffiliated with Lessee who shall have submitted the highest bid prior to such date and Lessee may not (i) purchase or reacquire such interest after termination or (ii) buy or lease such Units from such third party buyer; provided, however, that Lessee shall have the right to withdraw its election to terminate and reject each bid, if any, theretofore received; provided, further, however, that Lessee may withdraw such election no fewer than 5 Business Days prior to the Termination Date and no more than 2 times and, upon any such revocation, Lessee shall reimburse on an After-Tax Basis each of Lessor, Owner Participant, Loan Participant, Equity Guarantor and Indenture Trustee for all reasonable out-of-pocket expenses incurred by it in connection with the revoked termination and this Lease shall continue in full force and effect with respect to such Units.  The total sale price realized at such sale, net of all fees and expenses of the sale incurred by Lessor, Lessee, Equity Guarantor, Indenture Trustee and each Participant in connection with the sale (including commissions) shall be received by Lessor and, in addition, on the date of such sale Lessee shall pay to Lessor the sum of: (i) the amount, if any, by which the Termination Value for such Units computed as of the Termination Date exceeds such total sales price net of such fees and expenses, (ii) any unpaid Base Rent due prior to such Termination Date, plus the amount, if positive, set forth under the column titled "Rent Adjustment" for such Termination Date in Schedule V to the Lease Supplement applicable to such Unit, and (iii) any Supplemental Rent due on or before such Termination Date owing by Lessee to Lessor, Owner Participant, Equity Guarantor, Indenture Trustee and any Note Holder under any Operative Document.  On such Termination Date, Lessor shall pay to Lessee, following satisfaction of all amounts due and payable to Note Holders, Owner Participant, Owner Trustee, Indenture Trustee, Equity Guarantor or Trust Company in respect of any such Termination Date, the amount, if negative, set forth under the column titled "Rent Adjustment" for such Termination Date in Schedule V to the Lease Supplement applicable to such Unit.  Lessor shall transfer to the purchaser named in the highest cash bid certified by Lessee (it being understood that Lessee shall have no liability for any failure to obtain the best bid for the Equipment) upon receipt of the purchase price therefor and payment of all other sums payable to Lessor under this Section 26, all Lessor's right, title and interest in and to such Units without recourse, representation or warranty, except as to the absence of Lessor's Liens and Owner Participant's Liens, and this Lease with respect to such Units shall terminate.  If no sale shall have occurred on the Termination Date or if Lessor elects to retain the Units and fails to prepay the Secured Notes, this Lease shall continue in full force and effect as to such Units as if no notice of termination had been given.

26.4  **Notice to Indenture Trustee**.  At least 30 days (or such shorter period as is acceptable to Indenture Trustee) prior to the Termination Date, Lessee shall furnish, or cause to be furnished, to Indenture Trustee and Owner Participant, in writing, all pertinent information required to be included in the notice to be given by Indenture Trustee pursuant to notice of the termination contemplated by this Section 26 and the amount of the Secured Notes to be prepaid on the Termination Date in accordance with Section 2.14(b) of the Indenture.

26.5   **Amount of Termination Value**.   Subject to Section 4.1(ii), the *"Termination Value"* for a Unit as of any Termination Date shall be (i) the Lessor's Cost of such Unit multiplied by (ii) the applicable Termination Value Factor for such Termination Date. The *"Termination Value"* for a Unit during a Renewal Term shall decrease on a straight-line basis from the Fair Market Value of such Unit on the first day of such Renewal Term to the Fair Market Value of such Unit on the last day of such Renewal Term as determined in accordance with Section 16.5.

### SECTION 27.  ASSIGNMENT

Lessee may not assign its rights and obligations under this Lease and the other Operative Documents without the prior written consent of Lessor, Loan Participant and Equity Guarantor except that no such consent shall be required in the case of an assignment to an Affiliate of Lessee, <u>provided</u>, that Lessee guarantees such Affiliate's obligations under this Lease and the other Operative Documents in a form of guaranty satisfactory to Owner Participant, Loan Participant and Equity Guarantor.  Notwithstanding the foregoing, Lessee may, without the consent of Lessor, Loan Participant and Equity Guarantor assign its interest hereunder to any corporation into or with which it shall be merged or consolidated or to whom it shall transfer substantially all of its property if (i) such assignee shall duly assume the obligations of Lessee under this Lease and the other Operative Documents, (ii) there shall be no Specified Default or Event of Default continuing following such event, and (iii) either (I) if the Equity Guarantee Agreement shall then be in effect, and shall be reaffirmed in light of such event, either (a) (x) the tangible net worth of the surviving entity shall be no less than 75% of the tangible net worth of Lessee immediately prior to such merger, consolidation or transfer and (y) the senior unsecured indebtedness of the surviving entity shall have a credit rating no lower than the credit rating of Lessee's senior unsecured indebtedness immediately prior to such merger, consolidation or transfer or an Investment Grade rating of such indebtedness no lower than two steps below the rating of such indebtedness of Lessee immediately prior to such merger, consolidation or transfer or (b) the tangible net worth of the surviving entity shall be not less than 100% of the tangible net worth of Lessee immediately prior to such merger, consolidation or transfer or (II) if the Equity Guarantee Agreement shall not then be in effect, or shall not have been reaffirmed in light of such event, (x) the tangible net worth of the successor shall be no less than 75% of the tangible net worth of Lessee immediately prior to such merger, consolidation or transfer and (y) the senior unsecured indebtedness of the surviving entity shall have a credit rating no lower than the credit rating of Lessee's senior unsecured indebtedness immediately prior to such merger, consolidation or transfer. In connection with any such assignment, Lessor, and Indenture Trustee as assignee, shall be entitled to the benefits of Section 1168 of the Bankruptcy Code to the same extent as they were immediately prior to such merger, consolidation or transfer, and the surviving entity, by merger, consolidation or otherwise, shall execute and deliver to Lessor, Owner Participant, Loan Participant, Equity Guarantor and Indenture Trustee instruments evidencing the express assumption of Lessee's obligations hereunder and a legal opinion confirming that this Lease is enforceable against the assignee and that any such guaranty is enforceable against Lessee.

### SECTION 28.  LESSOR

Whenever the term "Lessor" is used in this Lease it shall apply and refer to Lessor and (to the extent assigned by Lessor) any permitted assignee of Lessor (including, so long as any indebtedness evidenced by the Secured Notes or interest thereon shall remain unpaid or any other obligation thereunder be continuing, Indenture Trustee).

### SECTION 29.  LIABILITY OF LESSOR LIMITED

It is expressly agreed, anything herein to the contrary notwithstanding, that each and all of the representations, warranties, covenants, undertakings and agreements herein made on the part of Lessor are made and intended not as personal representations, warranties, covenants, undertakings and agreements by Trust Company or for the purpose or with the intention of binding Trust Company personally, but are made solely as the representations, warranties, covenants, undertakings and agreements of the Trust and are intended for the purpose of binding only the Trust Estate, and this Lease is executed and delivered by Trust Company not in its own right but solely in the exercise of the powers expressly conferred upon it as trustee under the Trust Agreement on behalf of the Trust; and no personal liability or personal responsibility, except in the case of willful misconduct or gross negligence of Trust Company (other than with respect to the handling of funds, in which case Trust Company shall be accountable for its failure to exercise ordinary care in the handling of funds actually received by it), is assumed by or shall at any time be asserted or enforceable against Trust Company on account of this Lease or on account of any representation, warranty, covenant, undertaking or agreement of Lessor, either expressed or implied herein, all such personal liability, if any, being expressly waived and released by Lessee and by all Persons claiming by, through or under it, and that all recourse against Trust Company or Owner Participant under this Lease shall be limited to the Trust Estate.

### SECTION 30.  NO MERGER

There shall be no merger of this Lease or of the leasehold interest hereby created with the title to the Units, or any portion thereof or interest therein by reason of the fact that the same Person may acquire or hold directly or indirectly this Lease or the leasehold interest created hereby or any interest in this Lease or in any such leasehold interest as well as the title to the Units.

IN WITNESS WHEREOF, Lessor and Lessee have caused this Lease to be executed in their respective corporate names as of the day and year first above written.

AMTRAK TRUST HS-EDC-1

By:    Wilmington Trust Company, not in its individual capacity but solely as Owner Trustee

By:    _____
Name:
Title:

*W. CHRIS SPONENBERG*
*ASSISTANT VICE PRESIDENT*

IN WITNESS WHEREOF, Lessor and Lessee have caused this Lease to be executed in their respective corporate names as of the day and year first above written.

NATIONAL RAILROAD PASSENGER
CORPORATION, Lessee

By: _____
Name: Carol J. Dillon
Title:  Treasurer

TO THE EXTENT, IF ANY, THAT THIS LEASE CONSTITUTES CHATTEL PAPER OR OTHER COLLATERAL WITHIN THE MEANING OF THE UNIFORM COMMERCIAL CODE (OR OTHER LAW RESPECTING SECURITY INTERESTS) AS IN EFFECT IN ANY APPLICABLE JURISDICTION, NO SECURITY INTEREST IN LESSOR'S INTEREST UNDER THIS LEASE MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART OTHER THAN THE ORIGINAL EXECUTED COUNTERPART NO. 1 HEREOF WHICH SHALL BE IDENTIFIED AS THE COUNTERPART CONTAINING THE RECEIPT THEREFOR EXECUTED BY ALLFIRST BANK, AS INDENTURE TRUSTEE, IMMEDIATELY FOLLOWING THIS LEGEND.

This counterpart is the only counterpart of the Lease that contains this legend.

Receipt of this original counterpart No. 1 of the foregoing Lease is hereby acknowledged this 15ᵗʰ day of November , 2000.

ALLFIRST BANK,
as Indenture Trustee

By: _____

Name: ROBERT A. BROWN
Title:    VICE PRESIDENT

SCHEDULE I TO LEASE OF
RAILROAD EQUIPMENT

## **PERFORMANCE CRITERIA**

- Starting Tractive Effort: 220 kN/49,400 lbs per power car

- Continuous Power: 4,600 kW/6,200 hp per power car

- Service Braking Distance: 3,170m/10,400 ft.

- Emergency Braking Distance: 2,695 m/8,840 ft.

- Minimum Radius of Horizontal Curve: 76 m/250 ft.

- Minimum Radius of Vertical Curve: 610 m/2,000 ft.

EXHIBIT A TO LEASE OF
RAILROAD EQUIPMENT

## LEASE SUPPLEMENT NO. ___

### (AMTRAK TRUST HS-EDC-1)

THIS LEASE SUPPLEMENT NO. ____ dated _____, 2000 (this "*Lease Supplement*") between AMTRAK TRUST HS-EDC-1, a Delaware business trust (the "*Trust*"), all of the activities of which shall be conducted by Wilmington Trust Company, a Delaware banking corporation, not in its individual capacity but solely as trustee for the Trust (the "*Owner Trustee*", which term, unless the context otherwise requires, shall include the Trust) under that certain Trust Agreement (Amtrak Trust HS-EDC-1) dated as of November 6, 2000 ("*Lessor*"), and NATIONAL RAILROAD PASSENGER CORPORATION (also known as AMTRAK), a corporation organized under the Rail Passenger Service Act and the laws of the District of Columbia, as lessee ("*Lessee*"), pursuant to and in accordance with the Lease of Railroad Equipment (Amtrak Trust HS-EDC-1) dated as of November 6, 2000 between Lessor and Lessee (as amended and supplemented to the date hereof, the "*Lease*").

1.  Capitalized terms and phrases used and not otherwise defined herein shall for all purposes of this Lease Supplement have the respective meanings specified therefor in Annex A to the Lease, as originally executed or as modified, amended or supplemented in accordance with the applicable provisions thereof and the rules of interpretation set forth in Annex A shall apply to this Agreement.

2.  The Units covered by this Lease Supplement are described in Schedule I attached hereto.

3.  The Lessor's Cost for each Unit covered by this Lease Supplement is set forth in Schedule I attached hereto. The total aggregate Lessor's Cost for all Units covered by this Lease Supplement is $_____.

4.  The Base Lease Term for the Units covered by this Lease Supplement shall commence on the date hereof (the "*Base Lease Commencement Date*") and shall terminate on _____ __, 20__ (the "*Base Lease Termination Date*")unless earlier terminated or extended pursuant to the terms of the Lease.

5.  By the execution and delivery of this Lease Supplement, Lessee and Lessor reaffirm all of the terms, provisions and conditions of the Lease.

6.  This Lease Supplement may be executed in several counterparts (or upon separate signature pages bound together into one or more counterparts), such counterparts together constituting but one and the same instrument. To the extent, if any, that this Lease Supplement constitutes chattel paper or other collateral within the meaning of the Uniform Commercial Code (or other law respecting security interests) as in effect in any applicable jurisdiction, no security interest in Lessor's interest under this Lease Supplement may be created

through the transfer or possession of any counterpart of this Lease Supplement other than the original executed counterpart No. 1 hereof which shall be identified as the counterpart containing the receipt therefor executed by Indenture Trustee on or immediately following the signature page hereof.

7.      Lessee hereby represents and warrants to Lessor that, effective on the date hereof, the Units described in Schedule I hereto have been delivered to Lessee, have been duly accepted by Lessee and that said Schedule I contains a correct and complete description of said Units sufficient for the purposes of the Lease.

8.      The Rent Factors applicable to the Units being made subject to the Lease pursuant to this Lease Supplement are as set forth in Part I of Schedule II (Rent Factors) attached hereto.

9.      The Allocation of Base Rent applicable to the Units being made subject to the Lease pursuant to this Lease Supplement are as set forth in Part II of Schedule II (Allocation of Base Rent) attached hereto.

10.     Owner Participant's Commitment, expressed as a percentage of Lessor's Cost, and Loan Participant's Commitment, expressed as a percentage of Lessor's Cost, are set forth in Schedule III attached hereto.

11.     The Casualty Value Factors applicable to the Units being made subject to the Lease pursuant to this Lease Supplement for the Casualty Value Determination Dates are as set forth in Schedule IV (Casualty Value Factors) attached hereto.

12.     The Termination Value Factors applicable to the Units being made subject to the Lease pursuant to this Lease Supplement are as set forth in Schedule V (Termination Value Factors) attached hereto.

13.     The Amortization Schedules for the Secured Notes related to the Units being made subject to the Lease pursuant to this Lease Supplement are as set forth in Schedule VI (Amortization Schedules) attached hereto.

14.     The Adjusted EBO Price for each Unit being made subject to the Lease pursuant to this Lease Supplement is set forth in Schedule VII (Adjusted EBO Price) attached hereto. The Adjusted EBO Date is _____.

15.     The Equity TV Amounts for each Unit being made subject to this Lease Supplement is set forth in Schedule VIII (Equity TV Amounts) attached hereto.

16.     The specific French Lease applying to each Unit is set forth opposite the description of such Unit on Schedule IX attached hereto.

IN WITNESS WHEREOF, the parties have caused this Lease Supplement to be duly executed by their respective duly authorized officers as of the date first set forth above.

AMTRAK TRUST HS-EDC-1

By: Wilmington Trust Company,
    not in its individual capacity, but solely as
    Owner Trustee, Lessor

By: _____
    Name:
    Title:

NATIONAL RAILROAD PASSENGER
    CORPORATION, Lessee

By: _____
    Name: Carol J. Dillon
    Title: Treasurer

TO THE EXTENT, IF ANY, THAT THIS LEASE SUPPLEMENT CONSTITUTES CHATTEL PAPER OR OTHER COLLATERAL WITHIN THE MEANING OF THE UNIFORM COMMERCIAL CODE (OR OTHER LAW RESPECTING SECURITY INTERESTS) AS IN EFFECT IN ANY APPLICABLE JURISDICTION, NO SECURITY INTEREST IN LESSOR'S INTEREST UNDER THIS LEASE SUPPLEMENT MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART OTHER THAN THE ORIGINAL EXECUTED COUNTERPART NO. 1 HEREOF WHICH SHALL BE IDENTIFIED AS THE COUNTERPART CONTAINING THE RECEIPT THEREFOR EXECUTED BY ALLFIRST BANK, AS INDENTURE TRUSTEE, IMMEDIATELY FOLLOWING THIS LEGEND.

This counterpart is the only counterpart of such Lease Supplement that contains this legend.

Receipt of this original counterpart No. 1 of the foregoing Lease Supplement is hereby acknowledged this _____ day of November, 2000.

ALLFIRST BANK
as Indenture Trustee

By _____

Name:
Title:

DISTRICT OF COLUMBIA
)
) ss
)

       On this ____ day of November, 2000, before me personally appeared Carol J. Dillon, to me personally known, who being by me duly sworn, says that she is the Treasurer of NATIONAL RAILROAD PASSENGER CORPORATION, that said instrument was signed on behalf of said corporation by authority of its Board of Directors, and she acknowledges that the execution of the foregoing instrument was the free act and deed of said corporation.

_____
Notary Public

My Commission Expires: _____


STATE OF DELAWARE
)
) ss.:
COUNTY OF NEW CASTLE
)

       On this ____ day of November, 2000 before me personally appeared _____, to me personally known, who, being by me duly sworn, says that he/she is the _____ of Wilmington Trust Company, that said instrument was signed on behalf of said Wilmington Trust Company, as trustee on behalf of AMTRAK TRUST HS-EDC-1, by authority of Wilmington Trust Company's Board of Directors, and he/she acknowledges that the execution of the foregoing instrument was the free act and deed of said Wilmington Trust Company.

_____
Notary Public

My Commission Expires: _____

SCHEDULE I TO LEASE
SUPPLEMENT NO. __

## DESCRIPTION OF UNITS – LOCOMOTIVES

### AMTRAK TRUST HS-EDC-1

| Equipment Type | Amtrak Equipment Numbers | Lessor's Cost |
|---|---|---|
| Three (3) Dual Cab, High Horsepower Electric Locomotives: | | |
| Locomotive | AMTK 654 | |
| Locomotive | AMTK 655 | |
| Locomotive | AMTK 656 | |

SCHEDULE I TO LEASE
SUPPLEMENT NO. ___

## <u>DESCRIPTION OF UNITS – TRAINSETS</u>

### AMTRAK TRUST HS-EDC-1

| <u>Equipment Type</u> | **Amtrak Equipment <u>Numbers</u>** | **Lessor's <u>Cost</u>** |
|---|---|---|
| Zero (0) High Speed Trainset consisting of: | | |
| Zero (0) Power Cars | | |
| Zero (0) End Club Car | | |
| Zero (0) Bistro Car | | |
| Zero (0) End Coach Car | | |
| Zero (0) Coach Car | | |

SCHEDULE II (PART I) TO LEASE
SUPPLEMENT NO. __

## <u>RENT FACTORS - LOCOMOTIVES</u>

<u>Expressed as percentages of Lessor's Cost</u>

| Rent<br><u>Payment Date</u> | <u>Rent Factor</u> | <u>Base Rent ($US)</u> |
|---|---|---|

SCHEDULE II (PART I) TO LEASE
SUPPLEMENT NO. ___

## <u>RENT FACTORS - TRAINSETS</u>

<u>Expressed as percentages of Lessor's Cost</u>

| Rent Payment Date | Rent Factor | Base Rent ($US) |
|---|---|---|

SCHEDULE II (PART II) TO LEASE
SUPPLEMENT NO. __

## ALLOCATION OF BASE RENT - LOCOMOTIVES

Expressed as percentages of Equipment Cost

| Payment Date | Payment Amount | Rental Period | | Base Rent Allocation |
| --- | --- | --- | --- | --- |
| | | From and Including | To and Including | |

SCHEDULE II (PART II) TO LEASE
SUPPLEMENT NO. __

## **ALLOCATION OF BASE RENT - TRAINSETS**

Expressed as percentages of Equipment Cost

| | | Rental Period | | Base Rent |
|---|---|---|---|---|
| Payment Date | Payment Amount | From and Including | To and Including | Allocation |

SCHEDULE III TO LEASE
SUPPLEMENT NO. ___

## PARTICIPANTS' COMMITMENTS - LOCOMOTIVES

1.     Owner Participant's Commitment:  _____% of Lessor's Cost.

2.     Loan Participant's Commitment:  _____% of Lessor's Cost.

SCHEDULE III TO LEASE
SUPPLEMENT NO. ___

## **PARTICIPANTS' COMMITMENTS - TRAINSETS**

1.    Owner Participant's Commitment: _____% of Lessor's Cost.

2.    Loan Participant's Commitment: _____% of Lessor's Cost.

SCHEDULE IV TO LEASE
SUPPLEMENT NO. ___

## CASUALTY VALUE FACTORS - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| Casualty Value Determination Date | Casualty Value | Rent Adjustment | Casualty Value Factor |
|---|---|---|---|

SCHEDULE IV TO LEASE
SUPPLEMENT NO. ___

## CASUALTY VALUE FACTORS - TRAINSETS

Expressed as percentages of Lessor's Cost

| Casualty Value Determination Date | Casualty Value | Rent Adjustment | Casualty Value Factor |
|---|---|---|---|

SCHEDULE V TO LEASE
SUPPLEMENT NO. ___

## <u>TERMINATION VALUE FACTORS - LOCOMOTIVES</u>

<u>Expressed as percentages of Lessor's Cost</u>

| <u>Termination Date</u> | <u>Termination Value</u> | <u>Rent Adjustment</u> |
|---|---|---|

SCHEDULE V TO LEASE
SUPPLEMENT NO. ___

## **TERMINATION VALUE FACTORS - TRAINSETS**

Expressed as percentages of Lessor's Cost

Termination Date        Termination Value        Rent Adjustment

SCHEDULE VI TO LEASE
SUPPLEMENT NO. ___

## AMORTIZATION SCHEDULE - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| Installment Payment Date | Debt Service | Interest | Principal | Balance |
| --- | --- | --- | --- | --- |

SCHEDULE VI TO LEASE
SUPPLEMENT NO. ___


## AMORTIZATION SCHEDULE - TRAINSETS

Expressed as percentages of Lessor's Cost

| Installment Payment Date | Debt Service | Interest | Principal | Balance |
|---|---|---|---|---|

SCHEDULE VI TO LEASE
SUPPLEMENT NO. ___

## AMORTIZATION SCHEDULE - TRAINSETS

Expressed as percentages of Lessor's Cost

| Installment Payment Date | Debt Service | Interest | Principal | Balance |
|---|---|---|---|---|

SCHEDULE VII TO LEASE
SUPPLEMENT NO. ___

## EBO PRICE - LOCOMOTIVES

Expressed as percentages of Lessor's Cost

| EBO Dates | EBO Price | Rent Adjustment | Adjusted EBO Price |
|---|---|---|---|
| | | | |

NY #28269 v15

SCHEDULE VII TO LEASE
SUPPLEMENT NO. ___

**EBO PRICE - TRAINSETS**

Expressed as percentages of Lessor's Cost

| EBO Dates | EBO Price | Rent Adjustment | Adjusted EBO Price |
|-----------|-----------|-----------------|--------------------|

SCHEDULE VIII TO LEASE
SUPPLEMENT NO. ___

## EQUITY TV AMOUNTS - TRAINSETS

| Equity TV Determination Dates | Percentage of Lessor's Cost |
| --- | --- |

SCHEDULE IX TO LEASE
SUPPLEMENT NO. ____

## **FRENCH LEASE**

[insert description of applicable French Lease]