# EXHIBIT 9

THIS GUARANTEE AGREEMENT, dated as of November 6, 2000 (as amended, modified or supplemented from time to time in accordance with the terms hereof, this "Guarantee Agreement"), between HNB Investment Corp., a Delaware corporation, as Beneficiary (the "Beneficiary"), and Export Development Corporation, a corporation established by an Act of the Parliament of Canada (the "Guarantor").

<u>W I T N E S S E T H</u>:

WHEREAS, the Manufacturer has agreed or will agree to sell certain locomotives and trainsets (as more particularly described in the Guarantee Agreement Supplements hereto) (collectively, the "Equipment") to the French Lessor;

WHEREAS, the French Lessor and Amtrak have entered into the French Lease whereby the French Lessor has agreed to lease the Equipment to Amtrak;

WHEREAS, Amtrak has sold and assigned or will sell and assign to the Lessor the French Leasehold Interest in the Equipment pursuant to the Amtrak Delegation and the Assignment of French Leasehold Interest;

WHEREAS, the Lessor has entered into the Participation Agreement, Trust Agreement and the Lease with respect to the Equipment;

WHEREAS, Lessee has requested that the Guarantor provide a guarantee to the Beneficiary as more specifically set out herein;

WHEREAS, in order to induce the Beneficiary to participate in the transactions contemplated by the Participation Agreement, and to satisfy a condition thereto, the Guarantor is entering into this Guarantee Agreement and any applicable Guarantee Agreement Supplements with the Beneficiary;

NOW, THEREFORE, in consideration of the premises, the fee arrangement between the Guarantor and the Lessee and the mutual covenants herein contained, the parties hereto agree as follows:

ARTICLE 1

DEFINITIONS

1.1    <u>Definitions</u>. Capitalized terms and phrases used and not otherwise defined herein shall for all purposes of this Guarantee Agreement, including the preceding recitals, have the respective meaning therefore in Annex A to the Participation Agreement dated as of November 6, 2000, among National Railroad Corporation, as Lessee, the Beneficiary, Export Development Corporation, as Loan Participant, Allfirst Bank, as Indenture Trustee and Wilmington Trust Company, as Owner Trustee (as amended, modified or supplemented, the "Participation Agreement"), and the rules of usage set forth in Annex A to the Participation Agreement shall

apply to this Guarantee Agreement.  For purposes of this Guarantee Agreement, the following terms shall have the meanings assigned respectively below:

"Debt Portion of Base Rent" as at any Rent Payment Date on or prior to the Base Lease Termination Date shall mean, in respect of the Units delivered on any Closing Date, that portion of Base Rent in respect of such Units scheduled to become due and payable on such Rent Payment Date that is equal to the principal of and accrued interest on the Secured Notes relating to such Units scheduled to become due and payable on such Rent Payment Date.

"Dollars", "U.S. Dollars" and "$" shall mean lawful currency of the United States.

"Equity CV Amount" in respect of the Units delivered on any Closing Date, (a) as at any Equity CV Determination Date shall mean the amount equal to the product of Lessor's Cost in respect of such Units (including any Replacement Units) multiplied by the percentage set forth on Schedule 1 to the Equity Guarantee Agreement Supplement related to such Units opposite such Equity CV Determination Date, as such Schedule 1 is adjusted from time to time pursuant to Section 4.1 hereof, and (b) as at any other date, shall mean the amount equal to the product of Lessor's Cost in respect of such Units multiplied by the Interpolated Percentage as of such other date.  "Interpolated Percentage" as of any other date shall mean (I) if the percentage set forth on Schedule 1 to the applicable Guarantee Agreement Supplement delivered on such Closing Date (as such Schedule 1 is adjusted from time to time pursuant to Section 4.1 hereof) opposite the Equity CV Determination Date next following such other date (the "Following Percentage") is greater than the percentage set forth on Schedule 1 hereto (as such Schedule 1 is adjusted from time to time pursuant to Section 4.1 hereof) opposite the Equity CV Determination Date next preceding such other date (the "Preceding Percentage"), the sum of (x) the Preceding Percentage plus (y) the absolute value of the difference between the Preceding Percentage and the Following Percentage multiplied by a fraction, the numerator of which is the number of days from and including the Equity CV Determination Date next preceding such other date to but excluding such other date and the denominator of which is the number of days from and including the Equity CV Determination Date next preceding such other date to but excluding the Equity CV Determination Date next following such other date, (II) if the Following Percentage is less than the Preceding Percentage, the sum of (x) the Preceding Percentage minus (y) the absolute value of the difference between the Preceding Percentage and the Following Percentage multiplied by a fraction, the numerator of which is the  number of days from and including the Equity CV Determination Date next preceding such other date to but excluding such other date and the denominator of which is the number of days from and including the Equity CV Determination Date next preceding such other date to but excluding the Equity CV Determination Date next following such other date, and (III) if the Following Percentage is equal to the Preceding Percentage, the Preceding Percentage.

"Equity CV Determination Date" in respect of the Units delivered on any Closing Date, shall mean each of the dates set forth on Schedule 1 to the applicable Guarantee Agreement Supplement delivered on such Closing Date.

"Guaranteed Amount" shall have the meaning set forth in Section 2.2 hereof.

"Guarantor Payment Date" shall have the meaning set forth in Section 3.3(a) hereof.

"Judgment Currency" shall have the meaning set forth in Section 6.8 hereof.

"Lessor's Cost", in respect of the Units delivered on any Closing Date, means the amounts in Schedule 2 to the Guarantee Agreement Supplement delivered on such Closing Date, as such amount may be adjusted from time to time pursuant to Section 4.1 hereof.   Any Replacement Unit shall be deemed to have the Lessor's Cost of the Unit it replaced.

"Participation Agreement" shall mean the Participation Agreement defined in the first sentence of Section 1.1.

"Triggering Event" shall have the meaning set forth in Section 3.1 hereof.

"Unpaid Equity Rent Amount" as of any Rent Payment Date on or prior to the Base Lease Expiration Date shall mean, in respect of those Units delivered on any Closing Date, the excess (if any) of (i) the scheduled amount of the installment of Base Rent in respect of such Units due on such Rent Payment Date over (ii) the sum of (x) the Debt Portion of Base Rent in respect of such Units as at such Rent Payment Date plus (y) the portion (if any) of such installment of Base Rent actually paid by Amtrak and distributed on such Rent Payment Date by the Indenture Trustee to the Owner Trustee under Section 3.01 of the Indenture for distribution by the Owner Trustee to the Beneficiary pursuant to the Trust Agreement.

## ARTICLE 2

## THE GUARANTEE

2.1     Guarantee.    Subject to the terms and conditions hereinafter set forth, the Guarantor as primary obligor and not merely as surety hereby guarantees the prompt payment to the Beneficiary, and undertakes to make payment in accordance with the terms hereof, of the Guaranteed Amount as such Guaranteed Amount may be varied in accordance with the provisions of Section 4 hereof.

2.2     Coverage of Guarantee.    For all purposes of this Guarantee Agreement, the "Guaranteed Amount" with respect to the Units delivered on any Closing Date shall mean, as at any particular date, an amount equal to the sum (without duplication) of the following:

(A)     the Equity CV Amount for the relevant Units as at such date (less any corresponding amounts actually received by the Owner Trustee); plus

(B)     the aggregate amount of the Unpaid Equity Rent Amount for all Rent Payment Dates on or prior to such date for the relevant Units, plus

(C)     interest at the Overdue Rate on any amount referred to in Sections 2.2(A) and 2.2(B) hereof not paid when due pursuant to the Lease for the period for which the same shall

have been overdue, but in no event shall such interest be paid for a period in excess of sixty-two (62) days after such due date.

    2.3    <u>Binding Guarantee</u>. The obligations of the Guarantor hereunder shall be irrevocable, absolute and unconditional, shall not be subject to any counterclaim, set-off, deduction, recoupment, reduction or defense, and shall remain in full force and effect and shall not in any manner be affected by reason of any illegality, unenforceability or invalidity of the obligations hereunder or under the Lease or any other Operative Document, any other guarantee or other obligations, or any other circumstance or condition, including without limitation:

        (i)    any termination, amendment or modification of, or deletion from, or addition or supplement to, or other change in the Lease, or any other Operative Document or any other instrument or agreement applicable to any of the parties to such agreements, or to any Unit or any part thereof, or any assignment, mortgage, refinancing or transfer of any thereof, or of any interest therein, or any leasing or subleasing of any Unit, or any furnishing or acceptance of additional security, or any release of any security, for the obligations of the Lessee under the Lease or the other Operative Documents, or the failure of any security or the failure of any Person to perfect or maintain the perfection or priority of perfection of any interest in any collateral or any discharge, disallowance or termination of any lien or any purported lien;

        (ii)    any failure, omission or delay on the part of the Lessee, the Beneficiary, the Owner Trustee or any other Person to conform or comply with any term of the Lease, or any other Operative Document;

        (iii)    any waiver of the payment, performance or observance of any of the obligations, conditions, covenants or agreements contained in the Lease, or any other Operative Document, or any other waiver, consent, extension, indulgence, compromise, settlement, release or other action or inaction under or in respect of the Lease, or any other Operative Document, or any obligation or liability of the Lessee, the Beneficiary, the Owner Trustee or any other Person under the Operative Documents, or any exercise or nonexercise of any right, remedy, power or privilege under or in respect of the Lease, or any other Operative Document or any such obligation or liability;

        (iv)    any extension of time for payment of Rent under the Lease, or of any other obligation thereunder, or of the time for performance of any other obligations, covenants or agreements under or arising out of the Lease, or any other Operative Document or the extension or the renewal of any thereof;

        (v)    any taking, exchange, surrender, substitution or modification of any collateral security for any of the obligations of the Lessee under the Operative Documents, or any taking, release or amendment or waiver of or consent to departure from any other guaranty of any of obligations of the Lessee, or any manner of application of the collateral, or proceeds thereof, to the Lessee's obligations under the Operative Documents, or any manner of sale or other disposition of any collateral;

(vi)     any voluntary or involuntary bankruptcy, insolvency, reorganization, arrangement, readjustment, assignment for the benefit of creditors, composition, receivership, conservatorship, custodianship, liquidation, marshaling of assets and liabilities or similar proceedings with respect to the Lessee, the Beneficiary, the Owner Trustee, the Guarantor, any other Person or any of their respective properties or creditors, or the disaffirmance of any of the Operative Documents in any such proceeding or any action taken by any trustee or receiver or by any court in any such proceeding;

(vii)    any limitation on the liability or obligations of any party to the Operative Documents or any discharge, termination, cancellation, frustration, irregularity, invalidity or unenforceability, in whole or in part, of the Lease, or any other Operative Document or any change, impairment or suspension of any right or remedy of any party to the Operative Documents;

(viii)   any defect in the title, compliance with specifications, condition, design, operation or fitness for use of, or any damage to or loss or destruction of, any Unit, or any interruption or cessation in the use of any Unit or any portion thereof by the Lessee, or any other Person for any reason whatsoever (including without limitation any governmental or military authority, or any act of God or of the public enemy) regardless of the duration thereof (even though such duration would otherwise constitute a frustration of the Lease, or any other Operative Document), whether or not resulting from accident and whether or not without fault on the part of the Lessee;

(ix)     any change, restructuring or termination of the corporate or other structure, or merger or consolidation of any party to the Operative Documents into or with any other Person or any sale, lease or other transfer of any of the assets of any Person or any liquidation of any Person or any change in ownership of any Person;

(x)      any failure by any Person to pay any fee to the Guarantor in respect of this Guarantee Agreement; and

(xi)     any other condition or circumstance which might otherwise constitute a legal or equitable discharge, release or defense of a surety or guarantor, or which might otherwise limit recourse against the Guarantor, including, without limitation, any discharge, release, setoff, counterclaim, recoupment, termination, defense or limitation arising out of any laws of Canada or the United States of America or any Province or State thereof which would either exempt, modify or delay the due or punctual payment and performance of the obligations of the Guarantor hereunder or the obligations of the Lessee under the Operative Documents.

The obligations of the Guarantor to pay the Guaranteed Amount under this Guarantee Agreement are due and payable on the date specified in Section 3.2 hereof, and all other amounts due and payable by the Guarantor hereunder are payable when due hereunder, in each case notwithstanding that the obligations of the Lessee under the Lease, or any other Operative Document, are not due and payable at such time.

In case any Operative Document shall be terminated as a result of the rejection or disaffirmance thereof by any trustee, receiver, liquidator, agent or other representative of Lessee or any other Person or any of its property in any assignment for the benefit of creditors or in any bankruptcy, insolvency, dissolution or similar proceeding, or the exercise of any of the remedies under such Operative Document is stayed, enjoined or prohibited in any such assignment or proceeding, the obligations of the Guarantor hereunder shall continue to the same extent as if such Operative Document had not been so rejected or disaffirmed and as if such exercise had not been so stayed, enjoined or prohibited. In furtherance of the foregoing, the Guarantor agrees that notwithstanding any stay, injunction or prohibition against causing to become due and payable any obligation of the Lessee under the Operative Documents, or any failure of the Indenture Trustee under the Indenture (as assignee of the Owner Trustee) to declare the Lease in default or demand payment of Base Rent or Termination Value under the Lease, the same may for purposes of this Guarantee Agreement be deemed due and payable, and the Guarantor will pay the Guaranteed Amount and all other amounts due and payable by the Guarantor on and subject to the terms of this Guarantee Agreement. The Guarantor shall and does hereby waive all rights and benefits that might accrue to it by reason of any such assignment or proceeding, and the Guarantor agrees that it shall be liable for the full amount of the Guaranteed Amount and all other amounts due and payable by the Guarantor, irrespective of and without regard to any modification, limitation or discharge or liability of Lessee that may result from or in connection with any such assignment or proceeding.

Regardless of whether this Guarantee Agreement is terminated, this Guarantee Agreement shall continue to be effective, or shall be automatically reinstated without any notice or other action on the part of any Person, if at any time any payment, or any part thereof, of any of the Guaranteed Amount or other amount due and payable hereunder (or any amount of Base Rent, Termination Value, Casualty Value, EBO Price or interest at the Overdue Rate previously paid by Lessee during the period in which this Guarantee is in full force and effect and the Beneficiary is entitled to make a claim for payment hereunder) is avoided, rescinded or must otherwise be returned by the Owner Trustee, the Beneficiary or any other Person upon the insolvency, bankruptcy or reorganization of the Guarantor or any other Person, or otherwise, all as though such payment had not been made.

In addition, the Guarantor agrees to remain liable to pay the Guaranteed Amount that the Lessee otherwise would be obligated to pay under the Lease or any of the other Operative Documents, but for any illegality, unenforceability or invalidity of the obligations thereunder or any other circumstances or condition, including, without limitation, those listed in clauses (i) to (xi) of this Section 2.3.

2.4   Claims Unaffected.   Nothing in this Guarantee Agreement shall prohibit the Guarantor from pursuing in separate and independent actions, any rights and remedies which the Guarantor may have against the Owner Trustee in its individual capacity or as trustee or against the Beneficiary arising out of a breach of any provision of this Guarantee Agreement or of any other Operative Document; provided that such rights and remedies shall not create any defense to, or right of set off against, the obligations of the Guarantor under this Guarantee Agreement.

2.5    Claim Period. Notwithstanding any provision herein to the contrary, the Beneficiary may make demands hereunder from time to time automatically (without any further notice or action of any kind by either Beneficiary or any other Person) at any time on or after October 1, 2002 until the date a Release Event shall have occurred, provided that no Release Event shall occur if at such time a Lease Default or a Lease Event of Default of the type described in Section 13.1(i), (ii), (vi) through (x), (xii), (xiii), (xiv) (xv) or (xvi) of the Lease shall have occurred and be continuing.

For purposes of this Section 2.5, the following terms have the meanings defined below.

"*Amtrak Reform Act*," means the Amtrak Reform and Accountability Act of 1997 (Pub. L. No. 105-135 (Dec. 2, 1997)).

"*Amtrak Reform Council*" means the independent commission created under Section 203 of the Amtrak Reform Act.

"*Certified Table*" has the meaning specified in Annex A to the Participation Agreement.

"*Fiscal Year*" means the 12-month accounting period from and including October 1 of any calendar year through to and including September 30 of the following calendar year.

"*Moody's*" means Moody's Investors Service, Inc., and its successors and assigns, and, if Moody's Investors Service, Inc. and its successors and assigns no longer issues securities ratings, the term "Moody's" shall include at the option of Amtrak, any other Person that issues internationally accepted securities ratings designated by Amtrak in a written notice to the Owner Participant and reasonably acceptable to the Owner Participant, and, upon the inclusion in this definition of such other Person, each reference in this Agreement to a rating issued by Moody's shall be deemed automatically replaced with a reference to the comparable rating issued by such Person.

"*Release Event*" means the earliest to occur of either of the following events: (i) at any time after September 30, 2002 and before December 31, 2002 (but only with respect to demonstrating self-sufficiency as of September 30, 2002) and thereafter, at any time after September 30, 2005, Amtrak (a) has been rated at least BBB÷ by S&P and at least Baa1 by Moody's for the immediately preceding 36 consecutive months (in each case so long as there has been no negative credit watch or negative outlook for such 36-month period) and (b) has been Self-Sufficient for the immediately preceding 36 consecutive months, and (ii) at any time after September 30, 2002 and before December 31, 2002 (but only with respect to demonstrating self-sufficiency as of September 30, 2002) and thereafter, at any time after September 30, 2005 Amtrak (a) is rated at least A+ by S&P and at least A1 by Moody's (in each case with no negative credit watch or negative outlook ) and (b) is Self-Sufficient; provided that in no event shall a Release Event occur at any time if (x) on September 30, 2002, Amtrak is rated at or below BBB- by S&P or at or below Baa3 by Moody's, or is not, as at such date, Self Sufficient or (y) Amtrak has not delivered the financials as required under Section 8(i) of the Participation Agreement and the delivery of the certificate (and all attachments) as required under

Section 8(viii) of the Participation Agreement and such other information as the Owner Participant shall have requested to independently verify such Self Sufficiency.

"*S&P*" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and its successor and assigns and if Standard & Poor's Ratings Group and its successor and assigns no longer issues securities ratings, the term "S&P" shall include, at the option of Amtrak, any other Person that issues internationally accepted securities ratings designated by Amtrak in a written notice to the Owner Participant and reasonably acceptable to the Owner Participant and, upon the inclusion in this definition of such other Person, each reference in this Agreement to a rating issued by S&P shall be deemed automatically replaced with a reference to the comparable rating issued by such Person.

"*Self-Sufficient*" means, at any date of determination, that (i) the Amtrak Reform Council has made (on or prior to such date of determination) a finding under Section 204 of the Amtrak Reform Act that (a) Amtrak's business performance meets the financial goals set forth in Section 24101(d) of Title 49 United States Code and (b) Amtrak will not require operating grant funds or other operating subsidies (or any similar funds or subsidies by any name or designation whatsoever that are intended to subsidize Amtrak for its operating costs) from The United States of America for Fiscal Year 2002 (or any Fiscal Year thereafter), (ii) Amtrak has not requested operating grant funds or other operating subsidies (or any similar funds or subsidies by any name or designation whatsoever that are intended to subsidize Amtrak for its operating costs) from The United States of America (or any State thereof, any municipality or other local governmental body, or any agency of any thereof) at any time during the preceding 12 consecutive months (excluding operating subsidies specifically designated to fund tax liabilities under Section 3221 of the Code that are more than the amount needed for the benefit of individuals who retire from Amtrak and for their beneficiaries and operating subsidies granted to Amtrak by any State of The United States of America, any municipality or other local governmental body or any agency of any thereof, to maintain a particular rail service in lieu of termination or reduction of such service) and (iii) commencing no earlier than Fiscal Year 2002, the line item titled "Test for Self Sufficiency" set forth in each Certified Table delivered by Amtrak pursuant to Section 8(viii) of the Participation Agreement prepared for the period ending on such date of determination is equal to or greater than $0, provided that the requirement set forth in this clause (iii) shall not be have been met unless (w) the calculation and composition of each line item included in each Certified Table for such fiscal year has been calculated or determined on a basis consistent with (including methodology, accounting principles and categories) the calculation made for, and the compositions of such items in, Amtrak's Fiscal Years 1999 through 2002 (or any Fiscal Year thereafter, as applicable), as set forth in such Certified Table, (x) the numbers set forth in each Certified Table reflect and are otherwise comprised of numbers set forth in the GAAP financials, (y) the line item titled "GAAP Revenues" in each Certified Table includes only the net gain received from the sale of an asset under a sale and leaseback transaction which Amtrak records as a deferred credit on its balance sheet, and such credit is amortized into income over the term of the leaseback and (z) for purposes of calculating the line item titled "GAAP Revenues" in each Certified Table, commercial revenues for Fiscal Year 2000 do not exceed $73,700,000, commercial revenues for Fiscal Year 2001 do not exceed $77,000,000 and commercial revenues for Fiscal Year 2002 do not exceed $88,000,000.  For the avoidance of doubt, the terms "operating grant funds" and "operating subsidies" do not include capital grant funds or capital

subsidies from The United States Federal Government or any capital grant funds or capital subsidies from any State thereof, any municipality or other local governmental body, or any agency of any thereof.

    2.6   <u>Reinstatement after Release Date</u>. If after the date of any Release Event, there shall be required a restatement of any of the financials or components thereof that has (or would have) the effect of restating any line item or component thereof of any Certified Table on which the determination of a Release Event was made, and if no Release Event would have occurred had such Certified Table reflected such restatement, this Guarantee Agreement shall be reinstated automatically, without any notice or other action on the part of any Person, all as though such Guarantee Agreement had never ceased to be effective.

ARTICLE 3

PAYMENT OF THE GUARANTEED AMOUNT

    3.1   <u>Triggering Events</u>. If an Event of Default as set out in Section 13.1 (vi), (vii), (viii), (ix), or (x) of the Lease has occurred prior to October 1, 2002 or the Lease has been terminated prior to October 1, 2002, this Guarantee shall automatically terminate, it being understood and agreed that any demand for payment hereunder can be made only after October 1, 2002. For all purposes of this Guarantee Agreement, each of the following events shall be a "Triggering Event":

    (A)   any Lease Event of Default resulting from a failure to pay Base Rent, Termination Value or Casualty Value (or amount measured by reference thereto), which shall have occurred and be continuing (whether or not such Lease Event of Default has been waived (unless such Lease Event of Default has been waived with the written consent of the Beneficiary) or any failure by Lessee to pay any installment of EBO Price payable under the Lease after the EBO Date); or

    (B)   within five Business Days after the scheduled due date of any payment of Base Rent, Termination Value, Casualty Value (or amount measured by reference thereto) or EBO Price, the Owner Trustee shall not have received from the Indenture Trustee for distribution by the Owner Trustee to the Beneficiary pursuant to the Trust Agreement, the portion of any such payment which, absent the occurrence of a Default or Event of Default under the Indenture, would be distributable to the Owner Trustee; or

    (C)   any Lease Event of Default specified in Section 13.1 (iv) (but only in respect of Lessee's representation in Section 4.1 (xix) of the Participation Agreement), (v) (but only in respect of Lessee's obligations set forth in Section 12.1 of the Lease), (vi), (vii), (viii), (ix), (x) or (xi) of the Lease shall have occurred (whether or not such Lease Event of Default has been waived); or

    (D)   the Secured Notes shall have been declared due and payable pursuant to the Indenture as the result of a Lease Event of Default, or the Indenture Trustee or the Owner

Trustee shall have initiated the exercise of any other material remedies under the Indenture or the Lease.

3.2     Demand on the Guarantor.  After the occurrence and during the continuance of a Triggering Event the Beneficiary may make a single demand for payment on the Guarantor under this Guarantee Agreement (it being agreed that a demand for payment that is deemed withdrawn or not to have been made under this Section 3.2 shall not be deemed a demand hereunder); provided, however, that in the event of a Lease Event of Default resulting from a failure of Lessee to timely pay Base Rent, Guarantor may within 5 Business Days of such Event of Default, pay the Beneficiary the Unpaid Equity Rent Amount in respect of such Unit.  Any such payment by Guarantor shall be deemed to remedy any Lease Event of Default to the same extent that like performance by Lessee itself would have remedied such Lease Event of Default (but any such payment shall not relieve Lessee of its duty to pay all Rent pursuant to the Lease).  If, on the basis specified in the preceding sentence, such Lease Event of Default shall have been remedied and provided Guarantor or Beneficiary shall have cured the corresponding Indenture Event of Default (if any) in accordance with Section 4.03 of the Indenture then any demand for payment pursuant to this Guarantee Agreement, based upon such Lease Event of Default, shall be deemed rescinded, and Guarantor shall be subrogated to the rights of Owner Participant to receive such Unpaid Base Rent Amount in respect of such Unit from Lessee (and the payment of interest on account of such Rent being overdue), and shall be entitled, so long as no other Lease Event of Default shall have occurred or would result therefrom, to received such payment upon receipt thereof by Owner Trustee.  Guarantor may exercise such cure right described in the preceding sentence at any time until two years and one day prior to the Base Lease Termination Date; provided however, that the number of cure rights available under this Section 3.2 shall not exceed the number of cure rights under the Indenture.  Any demand on the Guarantor must (a) be made on the Guarantor at the address referred to in Section 6.2 hereof, (b) be made only by the Beneficiary and (c) identify the Guarantor Payment Date.  If a demand for payment hereunder does not conform to the requirements of Section 3.2 hereof, the Beneficiary may attempt to correct any such non-conforming demand for payment (and any such non-conforming demand for payment will be deemed never to have been made).

3.3     Payment by the Guarantor.  (a) After the Beneficiary has made a demand on the Guarantor for payment in accordance with Section 3.2 hereof (which shall not have been deemed withdrawn pursuant to Section 3.2 hereof), the Guarantor will, on the payment date specified in such demand (the "Guarantor Payment Date", which Guarantor Payment Date shall not be less than five (5) Business Days following the date such demand is delivered or received by EDC at the address specified in Section 6.2), pay to the Beneficiary in Dollars, in immediately available funds, the Guaranteed Amount as at such Guarantor Payment Date, receipt thereof to be promptly acknowledged by the Beneficiary.

(b)     In addition, the Guarantor shall pay interest at the Overdue Rate, on demand of the Beneficiary, in Dollars on any part of the Guaranteed Amount and any other amount due hereunder not paid when due until the same shall have been paid in full.

(c)     Payments to be made by the Guarantor under this Guarantee Agreement shall be made to the Beneficiary at the Beneficiary's account identified in Section 13.2 of the

Participation Agreement, or to such other account of the Beneficiary (which account shall be in the United States) requested in a notice by the Beneficiary to the Guarantor at least five (5) Business Days prior to the date a payment by the Guarantor is due hereunder.

3.4    Subrogation Rights after Payment by the Guarantor.  (a)  Upon payment in full of the Guaranteed Amount in respect of any Unit or Units and all other amounts due and payable by the Guarantor under this Guarantee Agreement:

(i)    the Guarantor shall be subrogated to the full extent of such Guaranteed Amount payment made by it, together with interest on the unrecovered portion thereof at the Overdue Rate from the date of payment of the Guaranteed Amount until the same is recovered, to the rights of the Beneficiary under the Operative Documents with respect to such Unit or Units(other than with respect to Exceptional Payments) and the Beneficiary shall cause the Owner Trustee to assign to EDC all of its rights, title and interest in and to such Unit or Units and the Operative Documents with respect to such Unit or Units other than Excepted Payments (including, without limitation, the Owner Participant's rights with respect to the directing the Owner Trustee and the Trust Company with respect to the Equipment and the Operative Documents) and, without limiting the generality of the foregoing, shall be entitled, subject to the Indenture, to pursue all remedies available to it with respect to such subrogated rights and to receive for its own account payments from any proceeds received by the Indenture Trustee from any sale, lease or description of the Equipment, the lease and the other property of the Trust Estate; it being agreed and understood, however, that any amounts realized by the Guarantor pursuant to subrogation rights granted hereunder that are attributable to any sale or disposition of the Units then covered by the Lease shall be applied pari passu (a) to the payment of any accrued and unpaid amounts of the type referred to in clauses (i), (iv), (vi) and (viii) of the definition of "Excepted Payments" that are payable to the Beneficiary or the Owner Trustee in its individual capacity under the Operative Documents and (b) to the payment of any corresponding amounts owed to the Guarantor after it has been subrogated to the rights of the Beneficiary pursuant to this Section;

(ii)    the Beneficiary agrees that at any time and from time to time upon payment of the Guaranteed Amount and all other amounts due and payable by the Guarantor as aforesaid, upon the written request, and at the expense, of the Guarantor, to promptly and duly execute and deliver any and all such further instruments and documents and take such action as may be required in order to obtain the full benefits of the subrogation rights contained herein and by action of law; and

(iii)    in furtherance of Section 3.4(i) hereof, upon the Guarantor's payment under this Guarantee Agreement of the Guaranteed Amount and all other amounts due and payable as aforesaid, the Beneficiary shall hold in trust for the Guarantor and forward promptly to the Guarantor any payment which the Beneficiary receives subsequent to such payment by the Guarantor from a party other than the Guarantor to which Guarantor is entitled by reason of such subrogation or assignment.

3.5     Canadian Taxes.  (a) Payments by the Guarantor under this Guarantee Agreement to any Person will be made free and clear of and without deduction or withholding for or on account of all present or future taxes imposed by Canada or any province thereof or by any taxing authority thereof or therein (other than taxes which are imposed in Canada on the basis of net taxable income), unless such deduction or withholding is required by law.  In the event that any payment by the Guarantor under this Guarantee Agreement to any Person is subject to the deduction or withholding for or on account of taxes imposed by Canada or any province thereof or by any taxing authority thereof or therein (other than taxes which are imposed in Canada on the basis of net taxable income), the Guarantor will remit to the appropriate taxing authority the full amount of all such taxes required to be deducted or withheld and shall promptly provide an official receipt issued by such taxing authority showing payment thereof and pay such additional amounts as may be necessary in order that the net amounts received by such Person after all such deductions or withholdings, including in respect of the payments of such additional amounts, shall equal on an after-tax basis the amount that would have been received for the relevant payment in the absence of such deductions or withholdings.  If any taxes required to be deducted or withheld are not so remitted when due or if required receipts or other documentary evidence are not furnished with respect to such remittance, the Guarantor shall indemnify the Beneficiary and each of them for any incremental taxes, interest or penalties that may become payable by any of them as a result of any such failure.

(b)     The Guarantor's obligations under this Section 3.5 shall survive any  termination of this Guarantee Agreement and the payment of all amounts payable under the other provisions of this Guarantee Agreement.

3.6     Waiver.  The Guarantor hereby waives diligence, presentment, protest, any right of set-off and any requirement that the Beneficiary exhaust any right or take any action against or give notice to the Lessee or the Guarantor or any other Person, except for any demand for payment to the Guarantor expressly required under Section 3.2 of this Guarantee Agreement.

3.7     Termination.  Except for (i) any obligations of the Guarantor set forth in Section 3.3 hereof, based on a demand for the Guaranteed Amount with respect to the Units covered by by a Guarantee Agreement Supplement delivered prior to the Termination Date with respect to such Units and (ii) obligations provided in the penultimate paragraph of Section 2.3 and in Section 3.5 hereof, the obligations hereunder shall terminate on the occurrence of the earliest of the following (the "Termination Date"):

(a)     full and final payment of the Guaranteed Amount and all other amounts payable hereunder;

(b)     the occurrence of a Release Event unless a Lease Event of Default as set out in Section 2.5 hereof or a Triggering Event has occurred and is continuing as of such date; or

(c)     the Base Lease Termination Date.

## ARTICLE 4

## UNDERTAKINGS OF THE BENEFICIARY

4.1    Adjustments.  (a)  Schedule 1 to the applicable Guarantee Agreement Supplement shall be appropriately adjusted from time to time by the Beneficiary to reflect any adjustments to Lessor's Cost, Rent Factors, EBO Price, Casualty Value Factors or Termination Value Factors pursuant to Section 16 of the Participation Agreement.  Promptly following any such adjustment, the Beneficiary shall deliver to the Guarantor a substitute Schedule 1 reflecting any such adjustments.  Promptly following any event referred to in the second sentence of this Section 4.1 or the delivery of such substitute Schedule 1, the Guarantor and the Beneficiary shall enter into an amendment to the applicable Guarantee Agreement Supplement to reflect the change in Lessor's Cost or the substitute Schedule 1, as the case may be, provided that in no event shall the adjustment to Lessor's Cost or Schedule 1 exceed two (2) per cent.

(b)    The Beneficiary shall take all action and steps necessary or required to ensure that there are no Owner Participant Liens attributable to it and existing at the time of the transfer of title to the Equipment to the Guarantor, provided any breach of this covenant shall not affect in any way the Guarantor's obligations under Article II or Article III hereof, including creating any defense or offset to any such obligations.

## ARTICLE 5

## REPRESENTATIONS AND COVENANTS OF THE GUARANTOR/BENEFICIARY

5.1.    Guarantor's Representations and Warranties.  The Guarantor hereby represents and warrants to the Beneficiary as follows:

(a)    The Guarantor is a corporation established by an Act of the Parliament of Canada, has been duly organized and is validly existing and in good standing under the laws of Canada, is an agent of Her Majesty in right of Canada ("Canada") for all purposes, and has full power, corporate and otherwise, and authority to enter into and perform its obligations under this Guarantee Agreement.

(b)    The execution and delivery by the Guarantor of, and the performance by the Guarantor of its obligations under, this Guarantee Agreement have been duly authorized by all necessary corporate action on the part of the Guarantor, and (assuming the due authorization, execution and delivery by the Beneficiary) this Guarantee Agreement constitutes a legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms.

(c)    This Guarantee Agreement and the obligations of the Guarantor hereunder are and shall be construed as a commercial activity.

(d)     The 1999 annual audited financial statements of the Guarantor are complete, accurate and fairly represent the financial condition of the Guarantor as of the date thereof and the period covered thereby and show all material indebtedness and other indebtedness of the Guarantor direct or indirect.

(e)     Neither the execution or delivery by the Guarantor of this Guarantee Agreement nor the performance by the Guarantor of its obligations hereunder: (1) conflicts or will conflict with or violate in any respect any currently existing law or governmental regulation or any judicial or administrative order or decree applicable to or binding upon the Guarantor or any of its properties, (2) conflicts or will conflict with or violate the articles of incorporation or by-laws of the Guarantor, (3) conflicts or will conflict with, or contravene, violate or result in breach of, any indenture, mortgage, loan agreement or any other agreement or instrument to which the Guarantor is a party or by which any of its properties is bound, (4) requires or will require, on the part of the Guarantor, the consent or approval of, the giving of notice to, the registration with or the taking of any other action in respect of any governmental or public commission, board, authority or agency, or (5) requires or will require the consent or approval of its shareholders or holders of any currently existing indebtedness or obligations of the Guarantor.

(f)     The obligations of the Guarantor under this Guarantee Agreement constitute direct, general, unconditional, unsubordinated and unsecured obligations of the Guarantor and as such constitute direct general unconditional, unsubordinated and unsecured obligations of Canada.

(g)     Under the laws of Canada and the Provinces thereof, the Guarantor is not entitled to claim any sovereign or other similar immunity from suit in its own courts.

(h)     There are no actions, suits or proceedings pending, or to the best knowledge of the Guarantor, threatened before any court or by or before any other federal, state or local government or public commission, board, authority or agency, or any arbitrator, domestic or foreign, which can reasonably by expected to have a materially adverse effect on the Guarantor's ability to perform its obligations under this Guarantee Agreement or which call into question the validity of this Guarantee Agreement.

(i)     The Guarantor is fully aware of the terms and conditions of the Participation Agreement, the Lease and the other Operative Documents.

5.2     Certain Covenants of the Guarantor.   The Guarantor shall (a) deliver to the Beneficiary its annual report when so requested by the Beneficiary and such other financial information as may be reasonably requested by the Beneficiary relating to the transactions contemplated by this Guarantee Agreement, and (b) promptly, and in any event within five Business Days, notify the Beneficiary if any action is taken that could result in the obligations of the Guarantor hereunder ceasing to constitute obligations of Canada.

ARTICLE 6

MISCELLANEOUS

**6.1    Proper Law.  THIS GUARANTEE AGREEMENT HAS BEEN EXECUTED
AND DELIVERED IN OTTAWA, CANADA AND SHALL BE DEEMED TO BE MADE
UNDER AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE
WITH THE LAWS OF THE PROVINCE OF ONTARIO AND THE FEDERAL LAWS
OF CANADA APPLICABLE THEREIN.**

6.2    Notices.  Unless otherwise expressly specified or permitted by the terms hereof,
notices and other communications required or permitted to be given or made under the terms
hereof shall be in writing.  Any such communication or notice shall be deemed to have been duly
made or given (i) when delivered personally, (ii) in the case of mail or courier delivery, upon
receipt, refusal of delivery or return for failure of the intended recipient to retrieve such
communication or (iii) in the case of transmission by facsimile, upon telephone and return
facsimile confirmation of receipt and, in each case, if addressed to the intended recipient as
follows (subject to the next sentence of this Section 6.2):

| Name of Party | Address |
|---|---|
| Beneficiary | HNB Investment Corporation |
| | c/o Philip Morris Capital Corporation |
| | 200 Stamford Place, Suite 400 |
| | Stamford, Connecticut 06902 |
| | Attention:  John J. Mulligan, VP Portfolio |
| | Facsimile No.:  (914) 335-8297 |
| with a copy to: | The General Counsel |
| | Facsimile No.: (914) 335-8256 |
| Guarantor | Export Development Corporation |
| | 151 O'Connor Street |
| | Ottawa, Canada K1A 1K3 |
| | Attention:  Loans Operations |
| | Facsimile No.:(613) 598-2514 |

Each party hereto may from time to time designate by notice in writing to the other parties hereto
a different address for communications and notices.

6.3    Further Assurances.  The Guarantor agrees that at any time and from time to time
and the Beneficiary agrees at any time and from time to time after the payment of the Guaranteed
Amount, upon the written request and at the expense of the other party hereto, it will promptly
and duly execute and deliver any and all such further instruments and documents and take such
action as may reasonably be requested by such other party in order to obtain the full benefits of

the agreements contained herein, including executing and delivering such instruments and assurances as may be reasonably necessary or advisable to confirm or evidence the rights hereunder of the Beneficiary or any successor, transferee or assignee to or of the Beneficiary.

6.4     Amendments; Successors and Assigns.     Any provision of this Guarantee Agreement may be modified or waived only by an instrument or instruments in writing signed by the Guarantor and the Beneficiary.  The Guarantor shall not assign its obligations hereunder without the prior written consent of the Beneficiary, provided that such obligations may be assigned to a successor of the Guarantor or any department or agency of Her Majesty the Queen in Right of Canada without the prior consent of the Beneficiary if (and only if) prior to and as a condition to any such transfer, (1) the assignee shall have delivered to the Beneficiary an agreement satisfactory in form and substance to the Beneficiary pursuant to which such assignee unconditionally and expressly assumes all of the liabilities and obligations of the Guarantor hereunder and such obligations continue to constitute the direct, general, unconditional, unsubordinated and unsecured obligations of Canada,  and (2) the Beneficiary shall have received a favorable opinion in form and substance and from counsel satisfactory to the Beneficiary as to the due authorization, execution, delivery and enforceability of the agreement referred to in clause (1) and as to such other matters as the Beneficiary may reasonably request. The Beneficiary shall not assign or otherwise transfer without the prior written consent of the Guarantor (a) the right to make demand for payment on, and receive payment from, the Guarantor in accordance with the provisions of Section 3.2 hereof, or (b) any of its other rights, duties or responsibilities under this Guarantee Agreement, provided that such rights, duties or obligations referred to in clauses (a) and (b) may be assigned or otherwise transferred to any transferee of all or a part of the Beneficiary's rights under the other Operative Documents so long as such assignment or transfer complies with the terms of Section 10.1 of the Participation Agreement.  This Guarantee Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

6.5     Counterparts.     This Guarantee Agreement may be executed in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

6.6     Submission to Jurisdiction.  Each of the Guarantor and the Beneficiary agrees that any legal action or proceeding with respect to this Guarantee Agreement, or to enforce any judgment obtained against it in respect of any of the foregoing (a certified or exemplified copy of which judgment shall be conclusive evidence of the fact and of the amount of any indebtedness therein described), may be brought in the Courts of the Province of Ontario, Canada, and by the execution and delivery of this Guarantee Agreement, each such Person irrevocably consents and submits to the non-exclusive jurisdiction of each such court, acknowledges its competence and irrevocably agrees to be bound by a final judgment of such court.  Each such Person irrevocably waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such court and any claim that any such proceeding brought in such court has been brought in an inconvenient forum. Each such Person hereby further irrevocably consents to the service of process in any such action or proceeding by United States or Canadian registered or certified mail, postage prepaid, to such Person at the address for notices to such Person provided pursuant to Section 6.2 hereof.

Nothing herein shall affect the right of any party hereto to bring any action or proceeding against the other party hereto or their property in the courts of other jurisdictions, either initially or to enforce a judgment.

6.7    **Waiver of Jury Trial.** EACH OF THE GUARANTOR AND THE BENEFICIARY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY OR RIGHT TO REQUEST A TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

6.8    **Payment Currency.** (a) The Guarantor agrees that the payment obligations of the Guarantor hereunder will be paid in U.S. Dollars in immediately available funds. The Guarantor acknowledges that this is an international transaction and therefore payment in U.S. Dollars is of the essence and U.S. Dollars shall be the currency of account and payment in all events.

(b)    If, for the purposes of obtaining judgment in, or enforcing the judgment of, any court, it is necessary to convert a sum due hereunder in Dollars into another currency (the "Judgment Currency"), the rate of exchange used shall be that at which in accordance with normal banking procedures the Beneficiary could purchase freely transferable Dollars in New York or Toronto with the Judgment Currency on the Business Day preceding that on which payment is made.

(c)    The obligation of the Guarantor in respect of any sum due from it to the Beneficiary hereunder shall, notwithstanding any judgment or order of enforcement in such Judgment Currency, be discharged only to the extent that on the Business Day following receipt by the Beneficiary of any sum adjudged to be so due in the Judgment Currency, the Beneficiary may in accordance with normal banking procedures purchase freely transferable Dollars in New York or Toronto with the Judgment Currency; if the amount of the Dollars so purchased minus the amount of any commissions or other expenses incurred by the Beneficiary in connection with such purchase are less than the sum originally due to the Beneficiary in Dollars, the Guarantor agrees, as a separate obligation and notwithstanding any such judgment or order of enforcement, to indemnify the Beneficiary against such loss attributable to any of its obligations hereunder, and if the amount of the Dollars so purchased minus the amount of any commissions or other expenses incurred by the Beneficiary in connection with such purchase exceed the sum originally due to the Beneficiary in Dollars, the Beneficiary shall remit to the Guarantor such excess. Any additional amount due from the Guarantor under this Section 6.8 will be due as a separate debt and shall not be affected by judgment or order of enforcement being obtained for any other sums due under or in respect of this Guarantee Agreement.

6.9    **Certain Expenses.** Each of the Guarantor and, except as provided in Sections 3.5 and 6.8 hereof or in the following sentences of this Section 6.9, the Beneficiary shall pay its own costs and expenses incurred in connection with the payment of the Guaranteed Amount. As between the Guarantor and the Beneficiary, the Guarantor shall be responsible for payment of any sales, transfer or other taxes associated with the Guarantor's rights of subrogation

contemplated by this Guarantee Agreement. The Guarantor shall reimburse the Beneficiary on demand for any and all costs and expenses (including reasonable fees and disbursements of legal counsel) paid or incurred by the Beneficiary in enforcing any of its rights under this Guarantee Agreement.

6.10   Severability.   If any terms or provisions of this Guarantee Agreement or application thereof to any Person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Guarantee Agreement, or the application of such terms or provisions to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Guarantee Agreement shall be valid and enforceable to the fullest extent permitted by law.

6.11   Entire Agreement.   This Guarantee Agreement, together with any and all applicable Guarantee Agreement Supplements constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes in their entirety all prior agreements between the parties with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Guarantee Agreement to be duly executed and delivered as of the date first above written.

EXPORT DEVELOPMENT CORPORATION

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

HNB INVESTMENT CORP., as Beneficiary

By: Joan D. Woodroof
Name: JOAN D. WOODROOF
Title: DIRECTOR, STRUCTURED FINANCE

EXHIBIT A to EDC Guarantee Agreement

## GUARANTEE AGREEMENT SUPPLEMENT NO. __

This Guarantee Agreement Supplement No. __ dated _____ __, 200_ (this "Guarantee Agreement Supplement") between Owner Participant, as Beneficiary ("Beneficiary") and Export Development Corporation, a corporation established by an Act of the Parliament of Canada ("Guarantor"). Unless otherwise provided herein, capitalized terms used in this Guarantee Agreement Supplement shall have the meanings set forth in the Guarantee Agreement dated as of November 6, 2000 ("Guarantee Agreement") between Beneficiary and Guarantor.

1. The Equity CV Amount applicable for each Unit is set forth on Schedule 1 hereto.

2. The Units covered by this Guarantee Agreement Supplement are described on Schedule 2 hereto.

3. The Lessor's Cost for each Unit covered by this Guarantee Agreement Supplement is set forth on Schedule 2 hereto. The total aggregate original Lessor's Cost for all Units covered by this Guarantee Agreement Supplement is $_____.

For purposed of Section 3.7 of the Guarantee Agreement the Expiry Date with respect to the Units covered by this Guarantee Agreement Supplement is _____.

This Guarantee Agreement Supplement may be executed in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

All of the terms and provisions of the Guarantee Agreement are hereby incorporated by reference in this Guarantee Agreement Supplement to the same extent as if fully set forth herein.

THIS GUARANTEE AGREEMENT SUPPLEMENT HAS BEEN EXECUTED AND DELIVERED IN OTTAWA, CANADA AND SHALL BE DEEMED TO BE MADE UNDER AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE PROVINCE OF ONTARIO AND THE FEDERAL LAWS OF CANADA APPLICABLE THEREIN.

IN WITNESS WHEREOF, the parties hereto have caused this Guarantee Agreement Supplement to be duly executed and delivered as of the date first above written.

EXPORT DEVELOPMENT CORPORATION

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

HNB INVESTMENT CORP.,
as Beneficiary

By: _____
Name: _____
Title:

SCHEDULE 1 to EDC Guarantee Agreement Supplement

EQUITY CV AMOUNT

Equity CV (expressed as at percentage of Lessor's Cost)

Determination Date                                                     Equity CV Amount

SCHEDULE  2 to EDC Guarantee Agreement Supplement

DESCRIPTION OF EQUIPMENT                    LESSOR'S COST
(INCLUDING AMTRAK ID NUMBERS)