UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PHILIP MORRIS CAPITAL CORPORATION and
HNB INVESTMENT CORP.,

                    *Plaintiffs*,

          v.

NATIONAL RAILROAD PASSENGER
CORPORATION,

                    *Defendant*.

ORAL ARGUMENT REQUESTED

No. 19 Civ. 10378 (JMF)


## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT AMTRAK'S MOTION TO DISMISS AND/OR STRIKE PLAINTIFFS' AMENDED COMPLAINT


GIBSON, DUNN & CRUTCHER LLP
Mark A. Kirsch
Patrick Hayden
200 Park Avenue
New York, NY 10166
(212) 351-4000

Elizabeth Papez (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8500

WINSTON & STRAWN LLP
Lawrence Slusky (*pro hac vice*)
1901 L Street, N.W.
Washington, DC 20036
(202) 282-5322

*Attorneys for Plaintiffs Philip Morris Capital Corporation and HNB Investment Corp.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

LEGAL STANDARDS ..........................................................................................5

FACTUAL ALLEGATIONS AND RELEVANT PROCEDURAL HISTORY...........................7

ARGUMENT .....................................................................................................8

I.     PLAINTIFFS' CONTRACT CLAIMS ARE TIMELY ................................................8

     A.     Plaintiffs' Contract Claims Are Timely Without Tolling .................................9

     B.     Amtrak Cannot Strike the Buyout Allegations That Support Plaintiffs' Estoppel and Fraudulent Concealment Claims ..............................14

          1.     Plaintiffs' Fraud and Estoppel Claims Are Adequately Pled..............15

          2.     Amtrak's Rule 12(f) Motion to Strike Is Moot and Meritless ............17

II.     AMTRAK CANNOT DISMISS PLAINTIFFS' CONTRACT CLAIMS "INSOFAR AS" THEY "SEEK MONEY DAMAGES" ...........................................19

     A.     Amtrak's Damages Arguments Are Not Actionable Under Rule 12...............20

     B.     Plaintiffs' Claims Permit Declaratory, Damages, and Equitable Relief.......................................................................................20

          1.     The Parties' Agreements Expressly Allow Plaintiffs' Damages Claims ..........................................................................20

          2.     The U.C.C. Independently Authorizes Plaintiffs' Damages Claims ..........................................................................26

III.     PLAINTIFFS' REMAINING CLAIMS MUST ALSO PROCEED TO DISCOVERY..................................................................................27

     A.     Amtrak Cannot Avoid Plaintiffs' Implied Covenant Claim ...........................27

     B.     Plaintiffs Likewise State Claims for Quantum Meruit and Unjust Enrichment....................................................................................29

CONCLUSION.................................................................................................30

## TABLE OF AUTHORITIES

Page(s)

### Cases

*2002 Lawrence R. Buchalter Ala. Trust v. Phil. Fin. Life Assur. Co.*,
    96 F. Supp. 3d 182 (S.D.N.Y. 2015)..........................................................................27

*Abbas v. Dixon*,
    480 F.3d 636 (2d Cir. 2007)......................................................................................15

*Allco Fin. Ltd. v. Klee*,
    861 F.3d 82 (2d Cir. 2017)..........................................................................................6

*Am. Gen. Life Ins. Co. v. James*,
    2015 WL 730010 (N.D. Cal. Feb. 19, 2015) ..........................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................................6

*Athey v. Farmers Ins. Exchange*,
    234 F.3d 357 (8th Cir. 2000) ...................................................................................19

*Attestor Value Master Fund v. Republic of Argentina*,
    940 F.3d 825 (2d Cir. 2019) .......................................................................................6

*Attias v. CareFirst, Inc.*,
    365 F. Supp. 3d 1 (D.D.C. 2019) .......................................................................29, 30

*Axiom Inv. Advisors, LLC v. Deutsche Bank AG*,
    234 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................16

*B.W.P. Distributors, Inc. v. OE Plus, Ltd.*,
    2009 WL 1154102 (S.D.N.Y. Mar. 31, 2009) .........................................................18

*Bank of Am., N.A. v. District of Columbia*,
    80 A.3d 650 (D.C. 2013) ..........................................................................................25

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
    692 F.3d 42 (2d Cir. 2012)........................................................................................27

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................................6

*Berlin v. Bank of Am., N.A.*,
    101 F. Supp. 3d 1 (D.D.C. 2015) .............................................................................28

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*C & E Servs., Inc. v. Ashland Inc.*,
    601 F. Supp. 2d 262 (D.D.C. 2009) ....................................................................................28

*Cadet Mfg. Co. v. Am. Ins. Co.*,
    2006 WL 8455266 (W.D. Wash. June 28, 2006) ................................................................19

*Cashman v. Montefiore Med. Ctr.*,
    1993 WL 227700 (S.D.N.Y. June 21, 1993) ......................................................................14

*Cerni v. J.P. Morgan Sec. LLC*,
    208 F. Supp. 3d 533 (S.D.N.Y. 2016) ...............................................................................18

*City of New York v. Fedex Ground Package Sys., Inc.*,
    175 F. Supp. 3d 351 (S.D.N.Y. 2016) .........................................................................15, 16

*Csepel v. Republic of Hungary*,
    714 F.3d 591 (D.C. Cir. 2013) ...........................................................................................14

*Dennis v. JPMorgan Chase & Co.*,
    343 F. Supp. 3d 122 (S.D.N.Y. 2018) .................................................................................8

*Direct Capital Corp. v. New ABI Inc.*,
    822 N.Y.S.2d 684 (Sup. Ct. 2006) .....................................................................................26

*Dist. Attorney of N.Y.C. v. Republic of the Philippines*,
    307 F. Supp. 3d 171 (S.D.N.Y. 2018) ...............................................................14, 15, 16, 17

*DKR Cap., Inc. v. AIG Int'l W. B'way Fund, Ltd.*,
    2003 WL 22283836 (S.D.N.Y. Oct. 2, 2003) ...............................................................29, 30

*eAcceleration Corp. v. Trend Micro, Inc.*,
    408 F. Supp. 2d 1110 (W.D. Wash. 2006) .........................................................................19

*Elson v. Defren*,
    726 N.Y.S.2d 407 (1st Dep't 2001) ...................................................................................29

*Ernst Haas Studio, Inc. v. Palm Press, Inc.*,
    164 F.3d 110 (2d Cir. 1999) ..............................................................................................30

*Eskofot A/S v. E.I. Du Pont De Nemours & Co.*,
    872 F. Supp. 81 (S.D.N.Y. 1995) ......................................................................................18

*FCOF UB Sec. LLC v. MorEquity, Inc.*,
    663 F. Supp. 2d 224 (S.D.N.Y. 2009) ...............................................................................20

*FHFA v. WMC Mortg., LLC*,
    2013 WL 7144159 (S.D.N.Y. Dec. 17, 2013) ...................................................................20

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Fortgang v. Pereiras Architects Ubiquitous LLC*,
  2018 WL 1832184 (E.D.N.Y. Mar. 9, 2018) ...........................................................................19

*Fred Ezra Co. v. Psychiatric Inst. of D.C.*,
  687 A.2d 587 (D.C. 1996) .......................................................................................................16

*Good Luck Prod. Co. v. Crystal Cove Seafood Corp.*,
  60 F. Supp. 3d 365 (E.D.N.Y. 2014) .......................................................................................16

*Highland Capital Mgmt., LP v. Schneider*,
  551 F. Supp. 2d 175 (S.D.N.Y. 2008) .....................................................................................18

*Ace Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 ex rel. HSBC Bank USA,*
  *Nat'l Ass'n v. DB Struct. Prods., Inc.*,
  5 F. Supp. 3d 543 (S.D.N.Y. 2014) .........................................................................................20

*Jacobson v. Hofgard*,
  168 F. Supp. 3d 187 (D.D.C. 2016) ...................................................................................28, 30

*Kleinman v. Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013) ....................................................................................................12

*Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg.*
  *Funding, Inc.*,
  916 F.3d 116 (2d Cir. 2019) ......................................................................................................9

*Levick v. Kiser*,
  206 F. Supp. 3d 337 (D.D.C. 2016) .........................................................................................27

*Liberty Mut. Ins. Co. v. Precision Valve Corp.*,
  402 F. Supp. 2d 481 (S.D.N.Y. 2005) ................................................................................10, 14

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976) .................................................................................................6, 17

*McWilliams Ballard, Inc. v. Level 2 Dev.*,
  697 F. Supp. 2d 101 (D.D.C. 2010) .........................................................................................28

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  218 F.R.D. 76 (S.D.N.Y. 2003) ...............................................................................................18

*Miller v. Metro. Life Ins. Co.*,
  2019 WL 4450637 (S.D.N.Y. Sept. 17, 2019) .........................................................................15

*Nat'l R.R. Passenger Corp. v. Lexington Ins. Co.*,
  357 F. Supp. 2d 287, 293 (D.D.C. 2005) .....................................................................11, 12, 13

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*New London Assocs., LLC v. Kinetic Soc. LLC*,
    384 F. Supp. 3d 392 (S.D.N.Y. 2019)......................................................................12

*Noel v. City of New York*,
    2018 WL 6649969 (S.D.N.Y. Dec. 18, 2018) ........................................................18

*Nyhus v. Travel Mgmt. Corp.*,
    466 F.2d 440 (D.C. Cir. 1972)...............................................................................11

*Parr v. Ebrahimian*,
    774 F. Supp. 2d 234 (D.D.C. 2011) .......................................................................30

*Perini/O&G v. Usiminas Mecanica S.A.*,
    2015 WL 271404 (S.D.N.Y. Jan. 20, 2015) ..........................................................16

*Pierce v. F.R. Tripler & Co.*,
    955 F.2d 820 (2d Cir. 1992)...................................................................................18

*Plesha v. Ferguson*,
    725 F. Supp. 2d 106 (D.D.C. 2010) .......................................................................30

*PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*,
    520 F.3d 109 (2d Cir. 2008)...................................................................................19

*Rao v. Med. Soc. of State of N. Y.*,
    1998 WL 799191 (S.D.N.Y. Nov. 17, 1998) .........................................................16

*Schlaifer Nance & Co. v. Estate of Warhol*,
    119 F.3d 91 (2d Cir. 1997).....................................................................................25

*Sejin Precision Indus. Co. v. Citibank, N.A.*,
    235 F. Supp. 3d. 542 (S.D.N.Y. 2016)...................................................................15

*Skinner v. Switzer*,
    562 U.S. 521 (2011)..................................................................................................6

*Starter Corp. v. Converse, Inc.*,
    170 F.3d 286 (2d Cir. 1999)...................................................................................19

*Steak Umm Co., LLC v. Steak 'Em Up, Inc.*,
    2009 WL 3540786 (E.D. Pa. Oct. 29, 2009).........................................................18

*Stuart v. Am. Cyanamid Co.*,
    158 F.3d 622 (2d Cir. 1998)...............................................................................9, 10

*Town of Oyster Bay v. Lizza Indus., Inc.*,
    4 N.E.3d 944 (N.Y. 2013).........................................................................................8

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Trebor Sportswear Co. v. Limited Stores, Inc.*,
    865 F.2d 506 (2d Cir. 1989) ..................................................................................................18

*TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*,
    2010 WL 3034880 (D. Ariz. Aug. 3, 2010) ...........................................................................17

*U.S. Football League v. Nat'l Football League*,
    634 F. Supp. 1155 (S.D.N.Y. 1986) .......................................................................................19

*Vox Media, Inc. v. Mansfield*,
    322 F. Supp. 3d 19 (D.D.C. 2018) ...................................................................................14, 15

*Winklevoss Capital Fund, LLC v. Shrem*,
    351 F. Supp. 3d 710 (S.D.N.Y. 2019) .....................................................................................6

*Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*,
    2015 WL 5671724 (S.D.N.Y. Sept. 22, 2015) ....................................................................4, 20

*Xereas v. Heiss*,
    933 F. Supp. 2d 1 (D.D.C. 2013) ...........................................................................................30

*Xerox Corp. v. JCTB Inc.*,
    2018 WL 5776423 (W.D.N.Y. Nov. 2, 2018) .......................................................................10

**Statutes**

Conn. Gen. Stat. Ann. § 42a-2A-715 ..........................................................................................10

D.C. Code § 28:1-305 ..................................................................................................................27

D.C. Code § 28:2A-501 ......................................................................................................5, 26, 27

D.C. Code § 28:2A-506 ..................................................................................................10, 13, 26

N.Y. U.C.C. Law § 1-305 ...........................................................................................................27

N.Y. U.C.C. Law § 2-A-501 ...............................................................................................5, 26, 27

N.Y. U.C.C. Law § 2-A-506 .......................................................................................................10

U.C.C. art. 2-A ......................................................................................................................3, 26

**Rules**

Fed. R. Civ. P. 8 ..........................................................................................................................29

Fed. R. Civ. P. 12 ......................................................................................................................5, 6

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

Fed. R. Evid. 408 ...........................................................................................3, 17, 18, 19

N.Y. C.P.L.R. § 202 ...................................................................................................10

N.Y. C.P.L.R. § 203 .....................................................................................................9

N.Y. C.P.L.R. § 213 .....................................................................................................9

**Other Authorities**

5C Arthur R. Miller et al., *Federal Practice & Procedure* (3d ed.) ..............................19

Plaintiffs Philip Morris Capital Corporation ("PMCC") and HNB Investment Corp. ("HNB")[1] hereby respectfully oppose Defendant National Railroad Passenger Corporation's ("Amtrak's") February 25, 2020 motion (Dkt. 36) and memorandum (Dkt. 38 ("Mot.")) to dismiss and/or to strike Plaintiffs' corrected amended complaint ("Complaint" or "Compl.") (Dkt. 33).

## PRELIMINARY STATEMENT

Amtrak's motion confirms that this action should proceed on all counts, and that Amtrak will continue to violate the letter and spirit of the parties' $250 million lease transaction absent relief from this Court. The facts underlying the transaction are undisputed. Amtrak cannot afford to buy all the equipment it needs for its rail routes, so in 2000 Plaintiffs and another investor— "Export Development Canada ("EDC")," (Mot. 1)—financed Amtrak's lease of the high-speed trains at issue in this suit. Plaintiffs are "the ultimate owner[s] of the leased equipment," and EDC is both "the secured lender" of Amtrak's equipment loan and the "guarantor of certain payments due from Amtrak to [Plaintiffs]" if Amtrak violates the lease. (*Id*.)

These guaranteed contract payments for Amtrak lease violations are the backbone of the parties' transaction for a simple reason: the "base term of the Lease is 22 years." (Mot. 4.) The transaction agreements anticipate that over two decades Amtrak may have reason to discontinue using or maintaining the equipment as originally planned. But they also recognize that such decisions could harm investors' interests in the equipment, and that having to prove such harm on a case-by-case basis could either deter investors like Plaintiffs altogether, or significantly increase the cost of the financing they offer major transit providers. The contracts at issue here solve this problem by prescribing specific payments if Amtrak departs from the equipment use and maintenance standards in the Lease, which is exactly what happened.

---

[1] PMCC and HNB are both parties to the transaction at issue in this suit. (Compl. ¶¶ 26, 33.)

By 2016, Amtrak had "cannibalized" some of the leased equipment for parts, and permanently decommissioned the locomotives as "unreliable" and "uneconomical to repair." (Compl. ¶¶ 43–74.)   Amtrak concealed these contractual casualty events until 2017, when Plaintiffs demanded the required contract payments from both Amtrak, (*id.* Exs. 20, 28, 38), and EDC as Amtrak's guarantor, (*id*. Ex. 39).  In December 2017, Amtrak denied these payments in breach of the Lease.  (*Id*. Ex. 4.)  Then, "[b]ased on" this denial, (*id*. Ex. 41 at 1–2), EDC on March 13, 2018 rejected Plaintiffs' demand for the alternative and "prompt remedy" of a Guarantee payment, (Mot. 7), and simultaneously filed suit in Canada for a "declaration" that no Guarantee payment is due while the issue of a triggering Lease default is in "dispute."[2]  This action followed, because the parties' contracts provide for litigation of Lease "dispute[s]" in New York.  (*See* Compl. Ex. 7 § 14.13.)  Accordingly, in 2019 Amtrak, EDC, and Plaintiffs executed—and the Canadian Court endorsed—the "Standstill Agreement" Amtrak cites, (Mot. 8–9), which stays the Canadian case while Plaintiffs and Amtrak pursue this action to "resolve[] their 'Underlying Dispute'" over "Amtrak's compliance with the Lease and related documents," (*id*.).

Plaintiffs timely raised this dispute in their November 2019 complaint, which Amtrak moved to dismiss as to all but Plaintiffs' declaratory judgment counts.  (Dkt. 22.)  Plaintiffs responded by amending the complaint consistent with this Court's December 2019 scheduling order.  (Dkt. 33.)  Amtrak's renewed motion to dismiss fails for at least three reasons.

*1. Contract Claims – Limitations.*  The plain text of the Lease establishes that Plaintiffs' contract claims are timely, and thus alone defeats Amtrak's new bid to "dismiss[] all of [Plaintiffs'] causes of action" as time-barred.  (Mot. 1–2.)  Amtrak admits that under the parties' agreements

---

[2] Specifically, EDC sought a "declaration that the Guarantee [to Plaintiffs] requires the occurrence of a 'Triggering Event' before payment can be due and payable," or in the "alternative" a determination "whether [EDC] has any liability under the Guarantee."  (Compl. Ex. 5 at 3.)

(including the Standstill), "Plaintiffs may seek to pursue" certain "declaratory relief" in this Court. (*Id.* at 13.)  But unlike its prior motion, Amtrak's current motion asserts that even this agreed relief is "barred by" the D.C. Code's "*three-year* statute of limitations" for contract actions.  (*Id.* at 2, 26–27.)[3]  This argument, which is the only argument Amtrak asserts against Plaintiffs' declaratory judgment claims, fails because the Lease expressly states that it "is a 'finance lease' for purposes of Article 2-A of . . . the U.C.C.," (Compl. Ex. 8 § 25), and under Article 2-A "[a]n action for default under a lease contract . . . must be commenced within *four years* after the cause of action accrued," U.C.C. art. 2-A, § 506.  Accordingly, Plaintiffs' November 2019 claims for Amtrak lease defaults from 2016 forward are timely even accepting Amtrak's argument that the D.C. Code governs the contract counts in this case.  (Mot. 11.)

Further, and though unnecessary to reach for the reasons above, Amtrak's challenge to Plaintiffs' tolling (estoppel and fraudulent concealment) counts fails as a matter of law.  (Mot. 27–29); (Compl. ¶¶ 14, 53–55).  Amtrak admits that the allegations in these counts must be "accept[ed] . . . as true," (Mot. 10), and offers no valid Rule 12(b) basis for challenging them. Instead, Amtrak moves to "strike" under Rule 12(f) at least the allegations about its false buyout promises as "settlement communications" inadmissible under Federal Rule of Evidence 408. (Mot. 27–29.)  This motion fails for several reasons, starting with Amtrak's own cases prohibiting Rule 408 evidentiary rulings at the Rule 12 stage unless the challenged evidence has "*no possible bearing* on" the suit.  (*Id.* at 10.)  Amtrak does not even attempt to meet this standard.  (*See id.* at 27–29.)  And the communications it cites are in any event either business communications outside Rule 408(a)'s protection, or plainly admissible under Rule 408(b)'s exceptions for using settlement evidence to "negat[e] a contention of undue delay," or to show the defendant's bad faith.

---

[3]  All emphasis herein is supplied unless otherwise noted.

2. *Contract Claims – Damages.*  Lacking any valid basis for dismissing Plaintiffs' contract claims in their entirety, Amtrak devotes the bulk of its motion to the fallback argument that the Court should dismiss these claims "insofar as" they "seek monetary damages."  (Mot. 2, 11–15.) This request fails for two reasons.  First, the question whether "money damages" are "available remedies" is "premature at the motion to dismiss stage."  *E.g.*, *Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, 2015 WL 5671724, at *20 (S.D.N.Y. Sept. 22, 2015) (collecting cases).  Second, Amtrak's argument violates controlling contract provisions, (Mot. 12), most notably Section 13 of the Lease, which expressly *allows* Plaintiffs to "*proceed by appropriate court action*" to "*recover damages*"—as well as other "*concurrent*[]" and "*cumulative*" remedies including equitable relief and attorneys' fees—on the facts alleged in the Complaint.  (Compl. Ex. 8 §§ 13.2–13.3.)  The Indenture provision (§ 6.10(d)) at the heart of Amtrak's motion similarly recognizes these rights because:  (i) it allows Plaintiffs to pursue claims for "Excepted Payments" as defined in the Indenture, (Mot. 13 (quoting Compl. Ex. 10 § 6.10(d))); and (ii) Amtrak concedes that the Lease claims in this suit "fall[] within the category of an 'Excepted Payment,'" (*id*. at 14).

These and other points detailed in Part II below dispose of Amtrak's argument that the "interplay of § 6.10 of the Trust Indenture Agreement and § 13.2 of the Lease" prohibits Plaintiffs' contract claims "insofar as" they "seek monetary damages."  (Mot. 2, 11–15.)  Both contracts expressly *allow* the damages claims here to prevent Amtrak from exploiting EDC's dual role as Plaintiffs' equity guarantor and the lender that controls the Indenture Trustee.  This financing structure presented a foreseeable incentive for Amtrak to try to escape liability for Lease defaults that harm Plaintiffs' equity interest by doing exactly what it did here:  misuse Plaintiffs' equipment in breach of the Lease, and then deny that the misuse constituted a casualty occurrence triggering Plaintiffs' equity rights while continuing to pay EDC rent on its outstanding loan.  The rent

payments would satisfy EDC's interests as lender, and thus deter EDC from instructing its Indenture Trustee to support or join Plaintiffs' breach claims.  In the meantime, Amtrak's denial of any casualty occurrence would incent EDC (in its capacity as Guarantor) to deny Plaintiffs' demand for a Guarantee payment, thus shifting the entire cost of Amtrak's equipment misuse to Plaintiffs.  (*See* Compl. ¶¶ 16–40, 111.)  Section 13 of the Lease and the Indenture's "Excepted Payments" provision sensibly preclude this improper reallocation of transaction cost and risk by allowing Plaintiffs to pursue monetary remedies directly from both Amtrak and EDC in precisely these circumstances as alleged in the Complaint.  There is thus no Rule 12 or contractual basis for dismissing Plaintiffs' damages claims, which are independently authorized by the U.C.C. in any event.  *See* N.Y. U.C.C. § 2-A-501; D.C. Code § 28:2A-501.

    *3. Non-Breach Claims.*  Amtrak's request to dismiss Plaintiffs' remaining claims, (Mot. 15–19), also fails under settled law as applied to the Complaint, (*see id.* at 16); (*see, e.g.*, Compl. ¶¶ 20, 43–141).  Amtrak insists that these claims should be dismissed as "*identical* to" Plaintiffs' claims for breach of "express provisions of the contract."  (Mot. 16.)  But the Complaint—and Amtrak's (unsupported) motion to strike—confirm that Plaintiffs' equitable counts do *not* "stand[] or fall[] on whether . . . Amtrak breached its contractual obligations."  (*Id.*)  They allege fraud and other misconduct that Amtrak's own cases, (*id.*), permit Plaintiffs to plead in the *alternative* to breach of contract, (*see* Compl. ¶¶ 150–58, 171–83).

    For the foregoing reasons, the "declaratory relief" claims that Amtrak agrees "Plaintiffs may seek to pursue" in this Court (Mot. 13) are timely, and Amtrak's motion on Plaintiffs' remaining claims fails as a matter of law.  The case must therefore proceed on all counts.

## LEGAL STANDARDS

    In deciding a motion to dismiss under Rule 12(b)(6), this Court must "constru[e] the

complaint liberally, accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiffs' favor." *Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825, 830 (2d Cir. 2019) (*per curiam*) (alteration and citation omitted). A Rule 12(b)(6) motion must be denied if the complaint pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint meets this standard if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility question is "*not* whether [the plaintiff] will ultimately prevail," but "whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (internal quotation omitted). In answering this question, "the complaint is deemed to include any written instrument attached to it . . . or any statements or documents incorporated in it by reference." *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 97 n.13 (2d Cir. 2017) (citation omitted).

Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "To prevail on a Rule 12(f) motion to strike, a party must demonstrate that (1) *no* evidence in support of the allegations would be admissible; (2) the allegations have *no* bearing on the issues in the case; and (3) to permit the allegations to stand would result in prejudice to the movant." *Winklevoss Capital Fund, LLC v. Shrem*, 351 F. Supp. 3d 710, 721 (S.D.N.Y. 2019) (alteration and citation omitted). In evaluating a Rule 12(f) motion, "[e]videntiary questions . . . should especially be avoided," and courts should not "strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). "As such, motions to strike are viewed with disfavor and infrequently granted." *Winklevoss*, 351 F. Supp. 3d at 722 (internal quotation marks omitted).

## FACTUAL ALLEGATIONS AND RELEVANT PROCEDURAL HISTORY

This brief incorporates all factual allegations in the Complaint and exhibits, which control over Amtrak's contrary assertions at this stage of the case. (Mot. 10.) The transaction history, (Compl. ¶¶ 30–32), and relevant Lease provisions, (*see id*. ¶¶ 33–36), are undisputed. Section 7 of the Lease requires Amtrak to pay an agreed sum ("Casualty Value") if Amtrak deems: (i) any of the leased units "unfit for commercial use"; or (ii) "uneconomical to repair." (*Id.* ¶ 35, Ex. 8 § 7.) Section 12 of the Lease requires Amtrak to pay specified damages for failing to maintain the leased equipment "in as good condition as when delivered (ordinary wear and tear excepted)." (*Id.* ¶ 35, Ex. 8 § 12.1.) Section 13.2 of the Lease authorizes Plaintiffs to: (i) declare the Lease in default and demand payment of Casualty Value; and (ii) "proceed by appropriate court action . . . to recover damages for [its] breach." (*Id.* ¶ 36, Ex. 8 § 13.2.) And Section 13.3 of the Lease says that, "[e]xcept as otherwise expressly agreed herein, the remedies provided in this Lease in favor of [Plaintiffs] shall *not* be deemed exclusive, but shall be *cumulative* and may be exercised *concurrently or consecutively*, and shall be *in addition to all other remedies . . . existing at law or in equity*." (*Id.* ¶ 8, Ex. 8 § 13.3.)

Amtrak's motion disputes the Complaint's factual allegations regarding Amtrak's equipment use and timeline, (Mot. 19–22), Amtrak's buyout discussions under the Lease, (*id*. at 28–29), and the scope of the Equity Guarantee and Canadian Standstill Agreements, (*id*. at 8–9, 14). These differences must be resolved in Plaintiffs' favor under Rules 8 and 12, (*id*. at 10), and the terms of the Guarantee and Standstill Agreements speak for themselves, (Compl. Exs. 6, 9). The Guarantee—which Plaintiffs do not seek to adjudicate in this Court consistent with the terms of the Standstill—provides for "prompt payment" of a contractually-defined sum following a "Triggering Event," (*id*. Ex. 9 § 2.1), which the Guarantee defines to include "any Lease Event of

Default resulting from a failure to pay Base Rent, Termination Value, or Casualty Value . . . ," (*id.* Ex. 9 § 3.1). The existence of a "Lease Event of Default" is one of the Lease-related issues the parties *agreed* Plaintiffs could litigate in New York, as the Canadian Court recognized in staying EDC's Canadian action pending resolution of Plaintiffs' claims "concerning Amtrak's compliance with the Lease and related documents." (*Id.* ¶¶ 19, 124–25, Ex. 6 § 1.)

Plaintiffs filed their complaint on November 7, 2019. (Dkt. 1.) On December 20, 2019, Amtrak filed its first motion to dismiss, (Dkt. 22), and on December 26 the Court ordered Plaintiffs either to respond to Amtrak's motion or exercise their right to file an amended complaint, (Dkt. 25). On January 21, 2020, Plaintiffs amended their complaint, and on February 25, 2020, Amtrak filed the motion to dismiss and/or strike that Plaintiffs now oppose. (Dkt. 36.)

## ARGUMENT

## I.   PLAINTIFFS' CONTRACT CLAIMS ARE TIMELY

Amtrak's motion fails, first and foremost, because Amtrak's only argument for dismissing "all of the claims" in the Complaint—and specifically Plaintiffs' declaratory judgment claims—is based on a "three-year statute of limitations" that does *not* apply to this case. (Mot. 2, 26–27.)[4] As detailed below, the *shortest* limitations period applicable under Amtrak's own "choice of law" analysis, (*id.* at 11), is the "*four year*" U.C.C. period specified in the Lease, (*infra* I.A). That ends the limitations inquiry, because all of Plaintiffs' November 2019 claims were filed within four years of Amtrak's permanent retirement of Plaintiffs' equipment in "2016." (Mot. 4 n.2, 26 (citing

---

[4]   Amtrak does not independently analyze the timeliness of Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing (Count III), or breach of contract as a third-party beneficiary (Count VIII). (*See* Mot. 27.) In any event, these claims are subject to the same limitations periods that render Plaintiffs' other contract-based claims timely under Amtrak's own analysis. *See, e.g.*, *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 196 (S.D.N.Y. 2018) (implied covenant of good faith and fair dealing); *Town of Oyster Bay v. Lizza Indus., Inc.*, 4 N.E.3d 944, 947 (N.Y. 2013) (third-party beneficiary).

Compl. Exs. 16 and 19 and conceding that "an action for breach of contract generally accrues at the time of the breach")); (*see also* Compl. ¶ 54 (citing Amtrak certifications that "*no significant premature retirements*" occurred in 2015)); (*id.* Ex. 13, at 4 (2013 report referencing Amtrak's option to "refurbish or repurpose existing equipment").)  Accordingly, Amtrak's motion to dismiss Plaintiffs' claims as time-barred fails, and Amtrak's motion to strike Plaintiffs' tolling counts (Mot. 19–26) is moot as well as foreclosed by Rules 12 and 408 for the reasons below.

### A.    Plaintiffs' Contract Claims Are Timely Without Tolling

Amtrak concedes that "federal courts sitting in diversity apply the choice-of-law rules of the state in which [the federal court] sits," so this Court must "look[] to choice of law rules of New York to resolve [the] conflict of laws questions" relevant to Amtrak's limitations claims.  (Mot. 11 (citation omitted); *see* Compl. ¶ 21 (asserting diversity jurisdiction).)  This approach typically requires application of both "New York choice-of-law rules *and* statutes of limitations," *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998), which here would mean a limitations period of literally *double* the "three-year" period Amtrak asserts, (Mot. 2), because "[t]he statute of limitations on a breach of contract claim in New York is *six years*, and this period begins to run when a breach occurs," *Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 125 (2d Cir. 2019) (citing N.Y. C.P.L.R. §§ 203(a), 213(2)).

The New York statute would render Plaintiffs' November 2019 suit timely as to all conduct since November 8, 2013, including the first alleged "breach" that meets Amtrak's definition of accrual:  its refusal to pay Casualty Value for permanently "retir[ing]" the leased equipment in 2016.  (Mot. 4, 26.)  In an effort to avoid this conclusion, Amtrak argues that D.C.—not New York—law supplies the relevant limitations period, (*id.* at 11), which Amtrak says is "*three years*," (Mot. 26–27).  But this argument fails even under Amtrak's "choice of law" analysis, (*id.*), because Amtrak cites *the wrong D.C. law*.  As noted, the Lease states:  "LESSOR [PLAINTIFFS] AND

LESSEE [AMTRAK] AGREE THAT THIS LEASE IS A 'FINANCE LEASE' FOR PURPOSES OF ARTICLE 2-A . . . OF THE UCC."  (Compl. Ex. 8 § 25.)  Critically, Article 2-A, as adopted in D.C., provides that "[a]n *action for default under a lease contract* . . . must be commenced within *4 years* after the cause of action accrued."  D.C. Code § 28:2A-506(a); *see also id.* § 28:2A-506(b) ("A cause of action for default accrues when the act or omission on which the default or breach of warranty is based is or should have been discovered by the aggrieved party, or when the default occurs, *whichever is later*."); N.Y. U.C.C. Law § 2-A-506 (same).[5]  Thus, under Amtrak's own analysis, (Mot. 11), Plaintiffs' contract claims are timely if they accrued on or after *November 8, 2015*.[6]  Amtrak's motion confirms that they did.

Amtrak cites a *February 2016* document to argue that Plaintiffs "had ample advance notice" of Amtrak's permanent retirement of their equipment.  (Mot. 21–22 (citing Compl. Ex. 16).)  This citation alone establishes the timeliness of Plaintiffs' November 2019 suit under D.C.'s four-year limitations period even if this "advance notice" started the limitations clock, which it did not.  "Where a claim is based upon money due and owing under a contract, the statute of limitations does not begin to run *until payment is due and been rejected*."  *E.g.*, *Liberty Mut. Ins. Co. v. Precision Valve Corp.*, 402 F. Supp. 2d 481, 485 (S.D.N.Y. 2005); *see Nyhus v. Travel Mgmt.*

---

[5]  For limitations purposes, even "[i]f a transaction does not qualify as a finance lease, the parties may achieve the same result by agreement; no negative implications are to be drawn if the transaction does not qualify."  *Xerox Corp. v. JCTB Inc.*, 2018 WL 5776423, at *5 (W.D.N.Y. Nov. 2, 2018) (quoting U.C.C. official comments), *aff'd*, 787 F. App'x 43 (2d Cir. 2019).

[6]  This conclusion also accords with New York's "borrowing" statute, which provides that "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either:  (1) New York; or (2) the state where the cause of action accrued."  *Stuart*, 158 F.3d at 627 (citing N.Y. C.P.L.R. § 202).  Here, the borrowing statute directs the same result as the Lease.  Whether it points to the law of D.C. (which Amtrak discusses) or Connecticut (where Plaintiffs are headquartered, (Compl. ¶¶ 25–26)), Plaintiffs' contract claims are timely under U.C.C. Article 2-A's four-year statute of limitations as adopted in both jurisdictions.  *See* D.C. Code § 28:2A-506(a); Conn. Gen. Stat. Ann. § 42a-2A-715(a).

*Corp.*, 466 F.2d 440, 452 (D.C. Cir. 1972) (under D.C. law, "the statute of limitations does not commence to run until the demand is made" (collecting cases)).  Accordingly, Plaintiffs' contract claims on the retired equipment could not have accrued before Amtrak "rejected" payment on those claims.  Amtrak's earliest such rejection occurred *after* the equipment's permanent retirement in fiscal year 2016—well within the four-year limitations period under the D.C. Code (and even within the three-year period Amtrak erroneously cites in its motion).[7]

This point alone disposes of Amtrak's limitations argument.  Further, Amtrak's November 29, 2016 letter, (Compl. Ex. 30), suggests that Plaintiffs' contract claims did not actually accrue until December 29, 2017 under the definition above, which ties accrual to the time of breach, which "normally only occurs when performance is due."  *Nat'l R.R. Passenger Corp. v. Lexington Ins. Co*., 357 F. Supp. 2d 287, 293 (D.D.C. 2005).  Amtrak's November 2016 letter asserted that no Lease casualty payments were "due" on Plaintiffs' equipment.  *Id.*; (*see* Compl. Ex. 30.)  Specifically, Amtrak wrote that its treatment of the equipment did *not* implicate the Lease provisions requiring payment for any "[u]nit" deemed "'uneconomical to repair, or rendered unfit for commercial use from any cause whatsoever during the Lease Term,'" (*id*. (quoting Ex. 8)), because Amtrak merely "decided to take the Locomotives out of active service and *place them in reserve*," (*id*.).  According to Amtrak, this "reserve" status meant that Amtrak *could* "put [the Locomotives] in service" again "on the Northeast Corridor" ("NEC"), (*id*.), and only in *2017* did Amtrak file a report exposing these representations as false.

On January 27, 2017, Amtrak's report on its fiscal year ended September 30, 2016 revealed—for the first time—the date of its decision *permanently* to retire Plaintiffs' equipment:

---

[7] As discussed below, Plaintiffs filed this November 7, 2019 suit, (*see* Dkt. 1), within three years of Amtrak's rejection of their November 21, 2016 letter expressing "concern[] that Amtrak had permanently retired their locomotives," (Compl. ¶¶ 14, 53, 59; *id.* Exs. 20, 30).

> ***During [fiscal year] 2016*** [ending September 30, 2016] . . . [Amtrak] removed from active service older electric locomotives for use in the NEC [and] ***concluded that the locomotives would not be returned to active service***[;] as a result, $29.3 million in additional depreciation expense was recorded in FY2016.

(Compl. ¶ 54 (quoting Ex. 18, notes at 13).)   This *permanent* decommissioning of the leased equipment in fiscal year 2016—which Amtrak fraudulently concealed from Plaintiffs until at least January 27, 2017, (*see* Compl. ¶¶ 54, 85–87)—was the earliest "Casualty Occurrence" that caused the contract payments Plaintiffs seek to become "due," *Lexington*, 357 F. Supp. 2d at 293.

Critically, in acknowledging a "significant premature retirement[]" in fiscal year 2016, Amtrak certified that there "were *no* significant *premature retirements* . . . in [fiscal year] 2015," which ended September 30, 2015.  (Compl. ¶ 54 (quoting Ex. 18, notes at 13).)[8]  That certification confirms that the first retirement Casualty Occurrence at issue in this suit—which arose out of Amtrak's "conclu[sion] that [Plaintiffs'] locomotives would *not* be returned to active service"——occurred "[d]uring [fiscal year] 2016."  (*Id.*)  Even drawing all inferences *against* Plaintiffs and assuming that this Casualty Occurrence occurred on the *very first day* of fiscal year 2016 (*i.e.*, on October 1, 2015), Amtrak would have been required to pay Casualty Value by November 10, 2015.[9]  In that scenario (again, the *least* favorable to Plaintiffs), Amtrak's failure to pay Casualty Value ripened into an actionable Lease Event of Default, *at the earliest*, on November 11, 2015—

---

[8]  Amtrak likewise certified "no significant premature retirements" for both fiscal years 2013 and 2014.  *See* Consolidated Financial Statements: Years Ended Sept. 30, 2014 and 2013, at 14.  The Court may consider these reports in evaluating Amtrak's motion because they are "legally required public disclosure documents," *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (citation omitted), and "relevant matters of public record," *New London Assocs., LLC v. Kinetic Soc. LLC*, 384 F. Supp. 3d 392, 406 (S.D.N.Y. 2019) (citation omitted).

[9]  Assuming Amtrak deemed the Locomotives unfit and/or uneconomical to repair on October 1, 2015, it had 30 days to (i) substitute the Locomotives or (ii) pay Casualty Value.  (Ex. 8 § 7.1.)  It did not "provide notice of" substitution, (*id.*), so it was required to pay Casualty Value on a contractually-specified "Determination Date" (November 3, 2015), (*id.* § 7.3), subject to a 5-business day grace period, (*id.* § 13.1(i)), making its casualty payment due November 10, 2015.

within four years of the filing of this action on November 7, 2019. And in reality, it was not until December 29, 2017—after Amtrak fraudulently concealed its permanent retirement of the leased equipment and induced Plaintiffs to waste months on Amtrak's bad-faith buyout discussions, (Compl. ¶¶ 85–100)—that Amtrak "rejected" the casualty payments due on the breaches here, (*id.* ¶ 109; Ex. 4). Accordingly, *December 29, 2017* is the date on which Plaintiffs' contract claims should be deemed to have accrued, because before that date Plaintiffs did *not* have all of the facts necessary to their causes of action for Amtrak's "reject[ion]" of contract payments "due," *Lexington*, 357 F. Supp. 2d at 293, on Amtrak's permanent retirement of the leased equipment as "unfit for commercial use" or "uneconomic to repair." (Compl. ¶ 35, Ex. 8 § 7); *see, e.g.*, D.C. Code § 28:2A-506(b) (providing discovery rule for claim accrual under U.C.C. Article 2-A).

None of Amtrak's limitations arguments addresses these claims. (Mot. 19–22.) Amtrak's motion asserts only that, if "Plaintiffs exercised any 'due diligence,'" they would have had "notice that their leased Locomotives were going to be *replaced* by a fleet of locomotives that Amtrak *had the opportunity to purchase* in 2010." (*Id.* at 22.) Even if the Court could credit this assertion, it is irrelevant because Plaintiffs do *not* challenge Amtrak's decision to "purchase" or "replace" equipment. (*See* Compl. ¶¶ 5–14.) They challenge Amtrak's refusal to make agreed payments for failing to use and maintain their equipment to contractual standards. (*See id.*) The arguments and cherry-picked exhibits in Amtrak's motion, (Mot. 19–22; Compl. Ex. 12 at 6, Ex. 13 at 3), accord with these claims. Indeed, the 2012 and 2013 documents Amtrak cites, (*see id.*), stress its potential "*retention* of a reserve fleet" of Plaintiffs' locomotives, (Compl. Ex. 12 at 25), and state that the "ultimate disposal" of Plaintiffs' locomotives would "be addressed at a *later time*," (*id.* at 35), because Amtrak had *not* "determine[d] whether replacing the[m] would be more cost-effective than continuing to operate and maintain," or to "refurbish or repurpose," them, (Ex. 13 at 4). These

13

points alone confirm that the permanent retirement and other breaches giving rise to this suit did not occur—and thus Plaintiffs' claims did not accrue—before 2016 at the earliest.  *See, e.g.*, *Precision Valve*, 402 F. Supp. 2d at 486 ("If alternative theories can arguably support a claim, and any one of them carries a limitation period which would keep the claim alive, the claim should be sustained as timely[.]" (citation omitted)).[10]

For the foregoing reasons, all of Plaintiffs November 2019 contract claims are timely.[11]

## B.   Amtrak Cannot Strike the Buyout Allegations That Support Plaintiffs' Estoppel and Fraudulent Concealment Claims

Although Plaintiffs' claims are timely regardless of tolling, the Complaint properly pleads fraudulent concealment (Count V) and equitable estoppel (Count IV), which would toll until 2017 the limitations period on any claims that may have accrued more than four years before Plaintiffs filed this case.  (Compl. ¶¶ 159–70); *see, e.g.*, *Dist. Attorney of N.Y.C. v. Republic of the Philippines*, 307 F. Supp. 3d 171, 202 (S.D.N.Y. 2018) (equitable estoppel under New York law); *Vox Media, Inc. v. Mansfield*, 322 F. Supp. 3d 19, 24 (D.D.C. 2018) (fraudulent concealment under D.C. law).  Amtrak's motion aggressively targets these claims for two reasons.  First, they establish two independent grounds for tolling, which Amtrak mistakenly believes is necessary for this suit to proceed.  Second, they plead obstructive and deceptive acts that Amtrak is desperate to keep out of discovery.  (*See* Mot. 23–26.)  Amtrak thus couples its perfunctory Rule 12(b)(6) challenges

---

[10]  *See also, e.g.*, *Csepel v. Republic of Hungary*, 714 F.3d 591, 603 (D.C. Cir. 2013) ("[B]ecause statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred." (citation omitted)); *Cashman v. Montefiore Med. Ctr.*, 1993 WL 227700, at \*4 (S.D.N.Y. June 21, 1993) (a court must "draw[] all reasonable inferences in plaintiffs' favor" to decide if a complaint "survive[s] a motion to dismiss on statute of limitations grounds").

[11]  Plaintiffs' claims for Amtrak's maintenance-based breaches accrued even later—at the earliest, after June 2017 and October 2017 inspection reports showed that the leased equipment had been "robbed" or "cannibalized" for parts.  (*See* Compl. ¶¶ 65–73; *id.* Ex. 8 § 12.1.)

with an extraordinary Rule 12(f) motion to "strike" all of the Complaint's "buyout allegations" as inadmissible "settlement communications" under Federal Rule of Evidence 408.  (*Id.* at 19–22.) While unnecessary to reach given the timeliness of Plaintiffs' claims, both of these motions fail.

### 1.    Plaintiffs' Fraud and Estoppel Claims Are Adequately Pled

"Under New York law,[12] 'familiar principles of equitable estoppel will prevent a wrongdoer from asserting the statute of limitations defense and thereby take refuge behind the shield of his own wrong.'"  *Philippines*, 307 F. Supp. 3d at 202 (citation omitted).  Accordingly, "the doctrines of equitable tolling or equitable estoppel may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action."  *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) (citation omitted).  To plead estoppel, Plaintiffs must allege:  (i) "reasonable reliance on [Amtrak's] misrepresentations," and (ii) "due diligence in bringing a claim when the conduct relied upon as the basis for equitable estoppel ceases to be operational."  *City of New York v. Fedex Ground Package Sys., Inc.*, 175 F. Supp. 3d 351, 368 (S.D.N.Y. 2016) (citation omitted).  Similarly, to plead fraudulent concealment, Plaintiffs must allege that Amtrak "took affirmative steps to conceal [its breaches] or the resulting injury from plaintiffs."  *E.g.*, *Sejin Precision Indus. Co. v. Citibank, N.A.*, 235 F. Supp. 3d 542, 552 (S.D.N.Y. 2016).

Plaintiffs' Complaint pleads both estoppel and fraudulent concealment in detailing Amtrak's efforts to hide its misconduct and obstruct Plaintiffs' rights,[13] and Amtrak's arguments

---

[12]  "A federal court sitting in diversity" typically applies the law of the "forum state" (here, New York) with regard to "provisions that govern the tolling of the statute of limitations."  *E.g.*, *Miller v. Metro. Life Ins. Co.*, 2019 WL 4450637, at *8 (S.D.N.Y. Sept. 17, 2019) (citation omitted).  The same tolling principles, however, apply under D.C. law.  *See Vox Media*, 322 F. Supp. 3d at 24.

[13]  *See, e.g.*, (Compl. ¶¶ 14, 53, 59, 86–87, 91–99 (detailing Amtrak's concealment of the permanent decommissions revealed in its January 2017 report)); (*id.* ¶¶ 63–68 (detailing Amtrak's misrepresentations and omissions about the equipment's maintenance)); (*id.* ¶¶ 16, 103 (detailing

to the contrary fail under Rule 12(b).[14]  Amtrak's first argument—that Counts V and VI do not plead tolling because they do not allege an express promise to "ignore or extend the statute of limitations," (Mot. 24)—misstates the law.  Estoppel and fraud claims may proceed where, as here, they allege that the defendant "actively conceal[ed]" or "material[ly] misrepresent[ed]" facts that would have permitted Plaintiffs to sue earlier.  *E.g.*, *Philippines*, 307 F. Supp. 3d at 203–04.[15]

Amtrak's second argument is even weaker.  It asserts that Plaintiffs' "[a]llegations of fraud" are too "conclusory" to satisfy "Rule 9(b)," (Mot. 25), because "Plaintiffs cannot seriously contend that any of Amtrak's alleged actions or inaction beginning in *May 2016*" would "reasonably mislead Plaintiffs into believing that [they] had no need to take the most basic protective measures to preserve their ability to timely pursue any available legal remedies," (*id.*).  As a threshold matter, Amtrak's focus on conduct "beginning in May 2016" addresses a period within four years of this suit, and thus confirms there was nothing for Plaintiffs to "preserve" on their claims for Amtrak's fraudulent and inequitable conduct.  Further, and regardless, the

---

Amtrak's false offer of a "prompt" buyout proposal Amtrak knew it was in "no position" to make)).

[14] *See, e.g.*, *Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 539–40 (S.D.N.Y. 2017) (equitable estoppel adequately pled where plaintiff investors had "no way of knowing" that defendant had delayed their trades, and "acted with reasonable diligence . . . following news reports" of misconduct); *Fedex*, 175 F. Supp. 3d at 368 (same where estoppel claim would ultimately turn on the "frequency and substance of communications" between the parties); *Good Luck Prod. Co. v. Crystal Cove Seafood Corp.*, 60 F. Supp. 3d 365, 373 (E.D.N.Y. 2014) (same where defendant said it "intended to pay [plaintiffs] without an action being filed," but its "promises to pay were empty"); *Fred Ezra Co. v. Psychiatric Inst. of D.C.*, 687 A.2d 587, 593 (D.C. 1996) (allowing fraudulent concealment claim under D.C. law where defendants made false "assurances" that plaintiff "cannot be faulted for believing").

[15] The cases Amtrak cites are inapposite:  they involved plaintiffs who failed to "offer[] *any* evidence [a defendant] made a misrepresentation," *Perini/O&G v. Usiminas Mecanica S.A.*, 2015 WL 271404, at *4 (S.D.N.Y. Jan. 20, 2015), much less that they "relied on [that] misrepresentation to [their] detriment," *Rao v. Med. Soc. of State of N.Y.*, 1998 WL 799191, at *6 (S.D.N.Y. Nov. 17, 1998).  (*See* Mot. 24 (citing two decisions involving *no* allegations of deception (*Seck* and *Chung*), and one involving an improper attempt to revive previously settled claims (*Pearl*)).)

Complaint pleads with particularity both that Amtrak *did* "reasonably mislead Plaintiffs" about their equipment *and* that Plaintiffs diligently pursued this action despite Amtrak's deception.[16] *See, e.g.*, *Philippines,* 307 F. Supp. 3d at 202 (tolling applies where plaintiff alleges "due diligence" on suit that defendant's actions "prevented [the] plaintiff from commencing" earlier (citation omitted)).  Accordingly, Counts V and VI are adequately pled.

## 2.    Amtrak's Rule 12(f) Motion to Strike Is Moot and Meritless

Settled law likewise disposes of Amtrak's Rule 12(f) motion to strike the Complaint's "allegations about so-called 'buyout' negotiations" as "settlement discussions" inadmissible under Federal Rule of Evidence 408.  (Mot. 27–29.)  As noted, this motion is moot insofar as it attacks tolling grounds the Court need not reach to find Plaintiffs' claims timely under the controlling law above.  *See* Part I.A, *supra*.  The motion also fails under both Rule 12(f) and Rule 408.

Amtrak's motion to strike violates Rule 12(f) because the motion raises only Rule 408 "[e]videntiary questions . . . [that] should especially be *avoided*" at the pleadings stage.  *Lipsky*, 551 F.2d at 893.  As courts across the country have held, such "[d]isputes over Rule 408" should be addressed through "motions *in limine* rather than prematurely in Rule 12(f) motions."  *E.g.*, *TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*, 2010 WL 3034880, at *4 (D. Ariz. Aug. 3, 2010); *B.W.P. Distributors, Inc. v. OE Plus, Ltd.*, 2009 WL 1154102, at *10–11 (S.D.N.Y. Mar. 31, 2009) (denying motion to strike on Rule 408 grounds where there "[we]re still questions

---

[16] In particular, the Complaint alleges that Plaintiffs: (i) "contacted Amtrak in May 2016 to inquire about the status of all the Leased Equipment," (Compl. ¶ 53 (emphasis omitted)); (ii) demanded an update in August 2016, (*id.*); (iii) prophylactically demanded all contractual amounts due in November 2016, (*id.* ¶ 14); (iv) explored a Lease EBO (equity buy out) with Amtrak from January to June 2017, (*id.* ¶¶ 91–99); (v) issued formal notices of default in 2017 after discovering Amtrak's concealment of the permanent decommissions, (*id.* ¶¶ 16, 106); (vi) continued parallel buyout discussions in May 2018 in addition to seeking the 2019 stay of EDC's Canadian suit on terms that would permit lease default litigation in this Court, (*id.* ¶ 113); and (vii) repeatedly demanded Amtrak's maintenance records in June and September 2018, (*id.* ¶¶ 114–15).

regarding whether [the challenged discussions are] settlement negotiations, and whether the[y] might be admissible on other grounds" after "adequate discovery" (citation omitted)).[17]  Amtrak's Rule 12(f) motion should be denied on this basis alone.[18]

Amtrak's motion also fails under Rule 408.  As a threshold matter, the motion does not explain which of the "buyout discussions" it challenges are "settlement discussions" under Rule 408(a).  (Mot. 28.)  As Amtrak acknowledges, (*see id.* at 4–5), most of these "discussions" are facially *business* discussions among business personnel regarding Amtrak's offer to buy Plaintiffs' equity interest in accordance with, *inter alia*, Section 16.1 of the Lease.[19]  Amtrak's motion thus seeks to strike "business communications" to which Rule 408(a) *does not apply.  Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2d Cir. 1992) (citation omitted).  Further, and even if *all* of the buyout discussions *were* "settlement communications" under Rule 408(a), they are *admissible* under Rule 408(b)'s exception for evidence "offered" to "negative [Amtrak's] contention of undue delay," Fed. R. Evid. 408(b), or to plead Amtrak's "bad faith," *Athey v. Farmers Ins. Exchange*,

---

[17] *See also, e.g.*, *Cerni v. J.P. Morgan Sec. LLC*, 208 F. Supp. 3d 533, 540 (S.D.N.Y. 2016) ("[T]he admissibility of documents incorporated in the complaint [under Rule 408] is irrelevant at the dismissal stage." (citation omitted)); *Steak Umm Co., LLC v. Steak 'Em Up, Inc.*, 2009 WL 3540786, at *3 (E.D. Pa. Oct. 29, 2009) ("[Rule 408] is a rule of evidence and does not govern pleadings."); *Eskofot A/S v. E.I. Du Pont De Nemours & Co*., 872 F. Supp. 81, 94 (S.D.N.Y. 1995) (denying motion to strike on Rule 408 grounds in light of "the preliminary stage of th[e] proceeding" and questions regarding the ultimate admissibility of allegations).

[18] Amtrak's cases, (*see* Mot. 10, 27–28), are again inapposite.  With one exception, they do not address Rule 408 at the pleading stage.  *See Trebor Sportswear Co. v. Limited Stores, Inc.*, 865 F.2d 506, 509–11 (2d Cir. 1989) (summary judgment); *Noel v. City of New York*, 2018 WL 6649969, at *1, 3 (S.D.N.Y. Dec. 18, 2018) (discovery dispute); *Highland Capital Mgmt., LP v. Schneider*, 551 F. Supp. 2d 175, 196–97 (S.D.N.Y. 2008) (pretrial motions in *limine*).  And the only case that does (Mot. 10) involved "references to preliminary steps in litigations" that are not present here, and were not assessed under Rule 408(b) in any event.  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78–79 (S.D.N.Y. 2003).

[19] (*See* Compl. Ex. 8 § 16.1 ("EBO Purchase Option")); (Compl. Ex. 33 (Amtrak email recommending "early termination")); (Compl. Ex. 35 (Plaintiffs' email encouraging Amtrak "buyout of all of our equipment *under the lease*")).

234 F.3d 357, 362 (8th Cir. 2000); *see also Cadet Mfg. Co. v. Am. Ins. Co.*, 2006 WL 8455266, at

*2 (W.D. Wash. June 28, 2006) (Rule 408 is "inapplicable" where settlement evidence is offered

to show "bad faith and not for the purpose of establishing liability or the amount of damages").

These are the precise purposes for which the Complaint pleads the "buyout discussions"

Amtrak seeks to strike.  (*See, e.g.*, Compl. ¶¶ 91–99, 157.)  The Complaint thus uses the challenged

allegations in exactly the way Rule 408(b) *allows*.  It "offer[s]" them for "purpose[s] *other than* to

prove or disprove the validity of the claims that the [communications were allegedly] meant to

settle."  *E.g.*, *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293 (2d Cir. 1999) (citation omitted);

*accord PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 113–15 (2d Cir. 2008).

For any or all of the foregoing reasons, Amtrak's motion to strike must be denied,[20] and

the supporting affidavit from its counsel, (Mot. 28 & Ex. 1), must be disregarded.  *See, e.g.*, *U.S.

Football League v. Nat'l Football League*, 634 F. Supp. 1155, 1165 (S.D.N.Y. 1986) ("[O]n a

Rule 12(f) motion, [m]atter outside the pleadings normally is not considered." (citation omitted));

5C Arthur R. Miller et al., *Fed. Prac. & Proc.* § 1380 & nn.25–26 (3d ed.) (same).[21]

## II.   AMTRAK CANNOT DISMISS PLAINTIFFS' CONTRACT CLAIMS "INSOFAR AS" THEY "SEEK MONEY DAMAGES"

Apparently aware of the flaws in its limitations and Rule 12(f) arguments, Amtrak devotes

the bulk of its motion to the fallback proposition that Plaintiffs have "no right" to "seek what

---

[20]  *See, e.g.*, *Am. Gen. Life Ins. Co. v. James*, 2015 WL 730010, at *5 (N.D. Cal. Feb. 19, 2015) (denying Rule 408 motion to strike where settlement allegations showed "breach[] of good faith and fair dealing"); *eAcceleration Corp. v. Trend Micro, Inc.*, 408 F. Supp. 2d 1110, 1113 (W.D. Wash. 2006) (same where "evidence of prior settlement demands or negotiations relates to [the plaintiff's] delay in bringing these claims"); *see also Fortgang v. Pereiras Architects Ubiquitous LLC*, 2018 WL 1832184, at *4 (E.D.N.Y. Mar. 9, 2018) (R. & R.) (permitting use of settlement communications to show "bad faith"), *adopted*, 2018 WL 1505564 (E.D.N.Y. Mar. 27, 2018).

[21]  Although in no way required by Rule 408 or any other law for the reasons above, Plaintiffs hereby voluntarily withdraw Paragraph 132 of the Complaint, the only paragraph that references the July 11, 2019 meeting Amtrak attests was conducted under settlement privilege.  (*See* Dkt. 37.)

amounts to monetary damages" on the claims in this suit.  (Mot. 13.)  This argument is meritless.

### A.    Amtrak's Damages Arguments Are Not Actionable Under Rule 12

Amtrak's assertion that Plaintiffs may not seek monetary remedies in this case, (Mot. 11–

15), fails, first and foremost, because whether certain "relief, [such as] money damages . . . are

[among the] available remedies for Plaintiffs' claims . . . is *premature at the motion to dismiss*

*stage*."  *Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, 2015 WL 5671724, at *20

(S.D.N.Y. Sept. 22, 2015) (collecting cases).[22]  Because "it is premature to determine what form

of damages might be appropriate" here, this Court should reject Amtrak's "motion to dismiss as

to the issue of damages."  *FCOF UB Sec. LLC v. MorEquity, Inc.*, 663 F. Supp. 2d 224, 231 n.2

(S.D.N.Y. 2009); *see also FHFA v. WMC Mortg., LLC*, 2013 WL 7144159, at *1 (S.D.N.Y. Dec.

17, 2013) (holding that defendant's "request to strike the various forms of relief, specifically

money damages, is premature and should not be decided on a motion to dismiss").

### B.    Plaintiffs' Claims Permit Declaratory, Damages, and Equitable Relief

While unnecessary for this Court to reach, Amtrak's attack on Plaintiffs' damages claims

is also foreclosed by the parties' own contracts and the U.C.C. provisions they incorporate.

#### 1.    The Parties' Agreements Expressly Allow Plaintiffs' Damages Claims

Amtrak concedes that Section 13.2 of the Lease expressly allows Plaintiffs to pursue a

"court action" to "recover damages" if Amtrak commits a "Lease Event of Default":

> If a Lease Event of Default shall have occurred and be continuing, then, in any such
> case, Lessor [Plaintiffs' Trust], at its option, may ***declare th[e] Lease in default*** by
> a written notice to Lessee [Amtrak] . . . ***and at any time thereafter***, Lessor
> may . . . (i) ***proceed by appropriate court action or actions, either at law or in***

---

[22] *See also, e.g.*, *Ace Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 ex rel. HSBC Bank USA, Nat'l Ass'n v. DB Struct. Prods., Inc.*, 5 F. Supp. 3d 543, 557 (S.D.N.Y. 2014) (citing concerns with "strik[ing] remedies before the parties have presented any facts bearing on the suitability of equitable relief" in "declin[ing] to decide whether the sole remedy clauses [in the parties' contracts] bar[red] Plaintiffs['] rescissory damages claims." (citations omitted)).

> ***equity, to enforce performance by Lessee*** of the applicable covenants of th[e] Lease ***or to recover damages for the breach thereof***.

(Compl. Ex. 8 § 13.2.)  Amtrak further concedes that Plaintiffs sent the "written notice[s]" of default, (*id.* Exs. 30, 38),[23] which Section 13.2 identifies as the predicate for an "appropriate court action" to "recover damages" under the Lease, (*id.* Ex. 8).  Amtrak nonetheless argues that, "while the secured notes held by EDC are still outstanding," Plaintiffs' express rights under the Lease are implicitly subordinate to the terms of a *different* contract—the "Indenture Agreement" between Amtrak and EDC as note holder, (Mot. 7).  According to Amtrak, the Indenture gives EDC's agent (the "Indenture Trustee") "*exclusive* enforcement powers if there is an Event of Default under the Lease," (*id.* at 7).  Thus, Amtrak argues that, "so long as any debt under the Trust Indenture Agreement is outstanding, the Indenture Trustee, acting for EDC as the secured note holder, is the *only* entity that has the right—to the *exclusion* of [Plaintiffs]—to declare the Lease in default under § 13.2 of the Lease and to exercise the remedies available under that section."  (*Id.* at 12).  There are at least three fatal problems with this argument.

     ***Waiver and/or Estoppel***.  Amtrak's argument that the Indenture precludes Plaintiffs' damages claims fails based on waiver and estoppel issues Amtrak cannot resolve on the pleadings.  As noted, Amtrak admits that the Lease allows Plaintiffs to send Amtrak "written notice[s]" of Lease defaults, and to "proceed by appropriate court action" to "*recover damages*" at "*any time thereafter*."  (Compl. Ex. 8 § 13.2.)  Amtrak also admits that Plaintiffs sent such notices.  (*E.g.*, *id.* Ex. 30.)  Further, and critically, neither Amtrak nor the Indenture Trustee objected to the notices as unauthorized when they were sent.  Amtrak responded on the merits in 2016 and 2017.  (*See id.* Exs. 4, 30.)  And the Indenture Trustee—whom Amtrak contends had the "exclusive" right to

---

[23] On November 7, 2019 Amtrak sent a further "written notice" formally declaring a "Lease Event of Default."  (Compl. ¶ 133; *id.* Ex. 52.)

enforce the noticed defaults, (Mot. 13)—did not respond in either year, and has never "noticed any defaults that would implicate [the] provisions" Amtrak now asserts, (Compl. ¶ 39; *id.* ¶¶ 163–64 (alleging judicial estoppel)).  Settled principles of waiver and estoppel thus preclude Amtrak from asserting claims that it says belonged to the Indenture Trustee, (Mot. 13), and required "prompt written notice" to Plaintiffs, (Compl. ¶ 10.)

The Indenture Trustee's failure to provide such notice is not surprising, because Amtrak declared in November 2016 that it would "continue to pay all Base Rent" to EDC.  (Compl. Ex. 30.)  Accordingly, EDC—in its capacity as the lender that controls the Indenture Trustee—had no reason to "instruct[]" the trustee to notice or join Plaintiffs' breach claims.  (Mot. 6 ("absent instructions from" EDC as "note holder[]," the "Indenture Trustee 'shall be under no duty to take or refrain from taking any action with respect to [a Lease] Event of Default'" (quoting Ex. 10 § 5.01)).)  That remains the case today, and Amtrak does not explain why it may nonetheless raise in a Rule 12 motion rights purportedly committed to its lender.[24]  Nor does Amtrak say how the Court could credit these rights, which "turn on proof of the Indenture Trustee's performance of its obligations under the Indenture that Amtrak has not presented."  (Compl. ¶ 40 n.34.)[25]

**Contract Language.**  Even setting aside the issues above, the Indenture provision Amtrak cites—§ 6.10(d)—does *not* bar Plaintiffs' claim to "recover damages for the breach" of the Lease. (Mot. 12–14.)  That provision, which is the sole basis for Amtrak's Indenture argument, states:

> [The] Indenture Trustee shall at all times have the right, ***to the exclusion of [Plaintiffs and their trust]***, to (A) declare the Lease to be in default under Section 13.2 thereof ***<u>except</u> to the extent necessary to enforce the exercise of rights with respect to Excepted Payments*** and (B) subject only to the provisions of Sections 4.03 and

---

[24]  Indeed, the only parties to this suit that *may* assert such rights are *Plaintiffs* as the "ultimate and intended beneficiaries of the Indenture Trustee" provisions Amtrak cites.  (Compl. ¶¶ 38, 42.)

[25]  Amtrak does not contend that the Indenture Trustee or EDC (as note holder) must be joined as parties to this action.  (Mot. 12–14.)  The Complaint must therefore proceed as pled, and Plaintiffs reserve all rights to address through separate filings in this action any future Indenture claims.

4.04(a) hereof, exercise the remedies set forth in such Section 13.2 (***other than in connection with Excepted Payments***) and in Article IV.

(Compl. Ex. 10, Indenture § 6.10(d).)

Most of Amtrak's arguments under this provision, (Mot. 12–15), fail as a matter of law because they ignore everything after the "exclusion" language in the first two lines, (*see id.*). And when Amtrak finally addresses the express "*except[ion]*" to the "exclusion" clause at the heart of its motion, Amtrak improperly argues for extra-contractual limits on the controlling definition of "Excepted Payments" in the Indenture itself. (*Id.* at 13–14.) Specifically, Amtrak admits that the *Indenture* "allows [this suit] to proceed 'to the extent necessary to enforce the exercise of rights' with respect to Excepted Payments," (*id.* at 13 (quoting Ex. 10 § 6.10(d)), and that Plaintiffs' Lease default claims "fall[] within a category of an Excepted Payment." (Mot. 14.) Amtrak then pivots to the *Standstill* to argue that here, such claims are limited to "declaratory relief" on the "two Lease Events of Default [in Plaintiffs'] December 15, 2017 [Guarantee] Demand," (*id.* at 14). This Frankenstein combination of Indenture and Standstill arguments violates the plain text of both contracts, as well as the Lease and overall transaction structure.

The Indenture defines the "Excepted Payments" that Plaintiffs may pursue consistent with the "exclusivity" clause Amtrak cites. (Mot. 14–15.) That definition broadly includes:

- "***all right, title and interest of*** [Plaintiffs] in and to the Equity Guarantee Agreement and any payment paid or payable thereunder"; and
- "***any right to demand***, collect or otherwise receive and enforce ***the payment of any amount described*** [above], ***or*** to enforce the Equity Guarantee Agreement."

(Compl. ¶¶ 10, 40; *id.* Ex. 10 sched. I at I-6–I-7.)

It is undisputed that the contract claims in this case fall within this definition, (Mot. 13–14), because they address Lease defaults central to Plaintiffs' "right, title and interest" in the Equity Guarantee, (Compl. Ex. 10 sched. I at I-6–I-7). It is also undisputed that, in allowing these claims,

the Indenture does *not* limit the remedies authorized in Section 13.2 of the Lease.  The Indenture respects the agreement in Lease Section 13 that its remedies apply "[e]xcept as otherwise expressly agreed herein," (*i.e.*, in the Lease).  (*Id.* Ex. 8 § 13.3.)  This reading of the Indenture makes sense, because its "Excepted Payments" provision addresses precisely the situation in this case.  Where, as here, the Indenture Trustee has no reason to seek damages for Lease defaults that harm Plaintiffs' equity interest but do not interrupt Amtrak's payment of "base rent" on EDC's debt, (*id.* ¶ 30), Plaintiffs can:  (i) "notice" such defaults directly, (*id.* ¶ 37); and (ii) "at any time thereafter" pursue "appropriate court action" for Section 13.2 relief "concurrently" with the Guarantee or other "cumulative" remedies, (*id.* ¶  37, 114; Ex. 8 § 13.2; Ex. 10 § 6.10(d), sched I. at 1-6–1-7).

Again, Amtrak's motion concedes this in tying its Indenture argument to a gloss on the *Standstill* that this Court need not reach for Plaintiffs' claims to proceed.  (*See* Mot. 14–15.)  As noted, Amtrak admits that "Plaintiffs are pursuing rights under the [Equity] Guarantee Agreement, *which falls within a category of an [Indenture] 'Excepted Payment.*'"  (*Id*. at 14.)  This undisputed fact permits Plaintiffs' damages claims against Amtrak under the plain text of the Lease and Indenture.  And Amtrak's motion simply underscores the point in *departing* from these controlling contracts to argue that "the Standstill" permits Plaintiffs to seek only a "declaratory judgment" of Lease defaults.  (*Id.*)  The Standstill, the full text of which is attached as Exhibit 6 to the Complaint, says no such thing.  It broadly authorizes this suit to "resolve[]" issues concerning "Amtrak's compliance with the Lease and related documents, *including but not limited to* the existence of any Lease Event of Default ('Underlying Dispute')."  (Compl. ¶ 124 (quoting *id.* Ex. 6).)  In so doing, the Standstill expressly *allows* Lease claims *beyond* the mere "existence" of an "Event of Default," and for this reason alone forecloses Amtrak's assertion that Plaintiffs' "sole remedy" for the

alleged defaults is a "declaratory judgment."  (*Id*.)[26]

The foregoing points are critical because they establish that Plaintiffs' claims for Lease remedies (including damages "relating" to "Excepted Payments") do *not* require this Court to adjudicate any Guarantee issues covered by the Canadian Standstill.  (*See* Compl. ¶ 41, Ex. 6 ¶ 1.) The Lease declaration and damages Plaintiffs seek are just two of several "cumulative" remedies the Lease says "shall *not* be deemed exclusive," and that Plaintiffs may pursue "concurrently or consecutively."  (Compl. ¶ 8; *id.* Ex. 8 § 13.3.)   In sharp contrast, Amtrak's claim that the "interplay" between the Indenture and Lease prevents Plaintiffs from seeking Lease damages unless Amtrak "acquires and holds all the secured notes," (Mot. 6, 12), conflicts with the plain text of both contracts and the Standstill in violation of settled law.  (*See id*.); *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 100 (2d Cir. 1997) ("[A]ll provisions of a contract [must] be read together as a harmonious whole[.]" (collecting cases)); *Bank of Am., N.A. v. District of Columbia*, 80 A.3d 650, 678 (D.C. 2013) ("In interpreting a contract, [a court] consider[s] the document as whole so as to give effect, if possible, to all of the provisions." (internal quotation marks omitted)).

In sum, Plaintiffs' damages claims are expressly authorized by the parties' agreements. And Rule 12 forecloses Amtrak's last-ditch argument that these claims should nonetheless be dismissed because they are "not '*necessary*' [for Plaintiffs] to pursue [their] right[s]" here.  (Mot. 14.)  This argument fails, as a threshold matter, because Rule 12 does not empower Amtrak to decide which claims or remedies are "necessary" to vindicate Plaintiffs' Lease rights.  That is a decision the law—and Paragraph 4 of the Standstill—commit in the first instance to Plaintiffs as

---

[26] The Standstill further states that "'*nothing in this Agreement . . . limit[s] or otherwise constrain[s]*'" Plaintiffs' "'pursuit'" of Lease default claims against Amtrak, (Compl. ¶ 125, Ex. 6 ¶ 3), and reserves to the Canadian court *only* certain claims involving EDC "'*in its capacity as Guarantor*,'" (*id*. (quoting Ex. 6 ¶ 4)).  This language does not purport to cover claims (like Amtrak's Indenture arguments) that concern EDC in its capacity as "note holder."  (Mot. 12.)

masters of their complaint, and ultimately to this Court on the merits.  Amtrak cites no facts or authority otherwise.  (Mot. 14.)  Nor could it, because the parties agree the Lease claims in this suit are "necessary to enforce" Plaintiffs' guaranteed "right, title and interest" in the transaction, (Compl. Ex. 10 sched. I at I-6–I-7, I-38), which the Lease allows Plaintiffs to do through "concurrent[]" claims for Section 13 remedies, (Compl. Ex. 8).  A Rule 12 ruling recognizing this right would *not* "render[] illusory the primacy of the Indenture Trustee's rights and powers."  (Mot. 14.)  It would respect the Indenture Trustee's right to act (or not) in the event of a Lease default, while also respecting Plaintiffs' right to protect their interests directly—particularly where, as here, Amtrak has taken steps to ensure the Indenture Trustee does not do so.  (Compl. ¶ 11.)

**2.     The U.C.C. Independently Authorizes Plaintiffs' Damages Claims**

Amtrak's motion further overlooks the fact that Plaintiffs may independently seek the remedies specified in the Lease and Complaint—including damages—under the New York and D.C. versions of Article 2-A of the U.C.C.[27]  As noted, the Lease expressly identifies itself as a "'finance lease' for purposes of Article 2-A," (Compl. Ex. 8 § 25), which provides that "[if] the lessor or the lessee is in default under the lease contract, the party seeking enforcement *has rights and remedies* as provided in this Article and, except as limited by this Article, *as provided in the lease agreement*."  *See* N.Y. U.C.C. Law § 2-A-501(2); D.C. Code § 28:2A-501(2).  To enable these rights, Article 2-A authorizes "the party seeking enforcement [to] reduce the party's claim to judgment, or otherwise enforce the lease contract by self-help or any available judicial procedure," N.Y. U.C.C. Law § 2-A-501(3); D.C. Code § 28:2A-501(3), and stresses that "rights and remedies . . . are *cumulative*," N.Y. U.C.C. Law § 2-A-501(4); D.C. Code § 28:2A-501(4).

---

[27] *See, e.g.*, *Direct Capital Corp. v. New ABI Inc.*, 822 N.Y.S.2d 684, 694 (Sup. Ct. 2006) (New York adoption of U.C.C. Article 2-A); D.C. Code § 28:2A-506 (same under D.C. law).

The U.C.C. explains that "[t]he remedies provided" above "must be *liberally administered* to the end that the aggrieved party may be put in as good a position as if the other party had fully performed."  N.Y. U.C.C. Law § 1-305(a); D.C. Code § 28:1-305(a).  To effectuate that goal, Article 2-A does *not* limit "rights and remedies . . . in the lease agreement" simply because *another* contract (such as the Indenture here) identifies *other* parties (such as the Indenture Trustee) who may *also* pursue such "remedies."  N.Y. U.C.C. Law § 2-A-501(2); D.C. Code § 28:2A-501(2).  Accordingly, the U.C.C. independently precludes Amtrak's argument that the Indenture and/or Standstill prohibit Plaintiffs from pursuing damages or other "cumulative" remedies "provided in the lease."  *Id.*[28]

## III.   PLAINTIFFS' REMAINING CLAIMS MUST ALSO PROCEED TO DISCOVERY

### A.   Amtrak Cannot Avoid Plaintiffs' Implied Covenant Claim

Amtrak seeks dismissal of Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing (Count III) solely on the grounds that it "stands or falls" on whether "Amtrak breached its contractual obligations to Plaintiffs under the Lease."  (Mot. 15–17.)  This challenge fails under Amtrak's own cases, which concede that "every contract contains within it an implied covenant" of good faith and fair dealing, which means that neither party *shall* "*(1) evade[] the spirit of the contract, (2) willfully render[] imperfect performance, or (3) interfere[] with performance by the other party.*"[29]  (Mot. 15–16 (citation omitted)); *see also, e.g.*, *Levick v. Kiser*, 206 F. Supp. 3d 337, 346–47 (D.D.C. 2016) (allowing implied-covenant claim in addition to breach of contract claim); *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 208 (D.D.C. 2016) (same);

---

[28]  Indeed, Plaintiffs are third-party beneficiaries of the Indenture Trustee.  (*See* Compl. ¶¶ 38, 42); *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 52 (2d Cir. 2012).

[29]  Plaintiffs' covenant claim is governed by D.C. law.  (*See* Compl. ¶ 21, Ex. 8); *2002 Lawrence R. Buchalter Ala. Trust v. Phil. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 211–12 (S.D.N.Y. 2015).

*McWilliams Ballard, Inc. v. Level 2 Dev.*, 697 F. Supp. 2d 101, 107 (D.D.C. 2010) (same).  The Complaint pleads violations of these covenants for at least two independent reasons.

*First*, Amtrak repeatedly "evad[ed] the spirit of the [parties' financing] contract" by concealing and/or misstating the status of Plaintiffs' equipment, thereby frustrating their ability to issue default notices under Section 13.2 of the Lease.  *Id.*  Notably, from May through November 2016, Amtrak responded to Plaintiffs' repeated inquiries and demands by concealing and/or misrepresenting its decision permanently to retire Plaintiffs' locomotives, a decision that Amtrak's January 2017 fiscal report confirmed was complete by September 30, 2016.  (*See, e.g.*, Compl. ¶¶ 53, 86–87.)  Whether Amtrak's deception reflected "[s]ubterfuges and evasions" or "willful render[ing] [of] imperfect performance," it plainly "evade[d] the spirit of the parties' contract" by obstructing Plaintiffs' pursuit of contract and equitable remedies for Amtrak's departure from the Lease's use and maintenance provisions.  *Berlin v. Bank of Am., N.A.*, 101 F. Supp. 3d 1, 17 (D.D.C. 2015) (citation omitted) (allowing implied-covenant claim where plaintiffs "repeatedly alerted [defendant]" of "errors" and "tried contacting the [defendant] and its outside counsel at least nine times [without] a response"); *see also, e.g.*, *C & E Servs., Inc. v. Ashland Inc.*, 601 F. Supp. 2d 262, 276 (D.D.C. 2009) (similar where plaintiff "requested [certain] information" from defendant, who "said it did not exist or did not give it to [plaintiff]").

*Second*, Amtrak independently breached the implied covenant of good faith and fair dealing by misleading Plaintiffs with bad faith promises of a buyout in accordance with Section 16.1 of the Lease.  (*See, e.g.*, Compl. ¶ 2.)  Amtrak first suggested a buyout on December 1, 2016, and promised a "prompt" proposal that Amtrak later admitted it knew it was in "no position" to make.  (*Id.* ¶¶ 15, 88–92; *id.* Ex. 2.)  These and other factual allegations of Amtrak's bad faith,

which at this stage must be "accept[ed]" as true, (Mot. 10), amply plead a covenant claim.[30]  Under
Amtrak's own cases, this ground for dismissal applies only to equitable claims that are literally
"identical" to breach claims, (*id.* (citing cases)), which the claims at issue here plainly are not.[31]

### B.     Plaintiffs Likewise State Claims for Quantum Meruit and Unjust Enrichment

Amtrak next moves to dismiss Plaintiffs' claims for quantum meruit (Count VI) and unjust
enrichment (Count VII) solely on the ground that these claims are duplicative of, and thus barred
by, claims under "an express contract that clearly controls."  (Mot. 17–19.)   Again Amtrak
misapplies the law.[32]   Under Federal Rule of Civil Procedure 8(d)(2), a "party *may* set out 2 or
more statements of a claim or defense alternatively or hypothetically."  Fed. R. Civ. P. 8(d)(2).
Accordingly, Amtrak's own cases recognize that "in certain circumstances courts may permit a
party to plead unjust enrichment as an *alternative* cause of action to breach of an express contract,"
(Mot. 18 (citing *Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1, 25 (D.D.C. 2019)), just as they may
"sue on a contract, and at the same time *alternatively* repudiate the agreement and seek recovery
on a quantum meruit claim," *DKR Cap., Inc. v. AIG Int'l W. B'way Fund, Ltd.*, 2003 WL
22283836, at *5 (S.D.N.Y. Oct. 2, 2003) (citation omitted).  Amtrak nonetheless argues Plaintiffs'
claims for "unjust enrichment" and "quantum meruit" are barred because they "presuppose" the
*lack* of "'an express, *enforceable* contract" that governs Plaintiffs' claims, and "[h]ere, there is no
dispute that the Lease and other Operative Contracts control this dispute."  (Mot. 17–18 (quoting

---

[30]  *See, e.g.*, Compl. ¶¶ 15, 88–92, 96–105 (detailing Amtrak's obstruction of Plaintiffs' rights by,
among other things, promising a buyout bid it knew it was in "no position" to make).

[31]  Plaintiffs' Complaint details misconduct far beyond Amtrak's contract breaches, including:
(i) fraudulent misrepresentations and omissions regarding the status of Plaintiffs' equipment, (*see*
Compl. ¶¶ 53, 86–87); and (ii) a bad faith buyout proposal, (*see id.* ¶¶ 15, 88–92, 96–97).

[32]  The Court need not decide whether New York or D.C. law applies to Plaintiffs' claims for
quantum meruit and unjust enrichment, because "no conflict exists between the laws of the[se]
jurisdictions" on these equitable claims. *Elson v. Defren*, 726 N.Y.S.2d 407, 411 (1st Dep't 2001).

*Plesha v. Ferguson*, 725 F. Supp. 2d 106, 112 (D.D.C. 2010).)  This argument fails under settled law and Amtrak's own motion, which asserts that Plaintiffs have *no* enforceable contractual right to the "legal remedies against Amtrak" Plaintiffs seek.  (*Id.* at 12.)

Amtrak cannot have it both ways.  If Plaintiffs' equitable claims are truly duplicative of their contract claims, Amtrak must abandon its argument that Plaintiffs have "*no contractual right* to declare the Lease in default and exercise remedies available under § 13.2.*"  (Mot. 12.) Conversely, if Plaintiffs really have no such "contractual right," their equitable claims are proper. *See Xereas v. Heiss*, 933 F. Supp. 2d 1, 13 (D.D.C. 2013).  Because these conflicts "cannot" be resolved "at this point" in the case, Plaintiffs' equitable and contract claims proceed as alternatives. (Mot. 18 (citing *DKR Capital*, 2003 WL 22283836, at *5 ("quantum meruit [claim] *cannot* be dismissed on the pleadings" because the court cannot "conclude *at this point* that the [a]greement was in all respects a valid contract"))); *compare Attias*, 365 F. Supp. 3d at 25 (dismissing unjust enrichment claim only after the defendant "*confirmed at [a] hearing*" that it had "*not* taken the position that the contract [at issue] is invalid or unenforceable").[33]

## CONCLUSION

Amtrak's motion does not support dismissing or striking any part of the Complaint, and "new arguments may not be made in a reply brief."  *E.g.*, *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) (*per curiam*).  The case must therefore proceed on all counts.

---

[33] To the extent Amtrak argues that the Court should dismiss both Plaintiffs' contract and equitable claims, it will support new causes of action for "misrepresentations that *precede* the formation of the [parties'] contract[s]."  *E.g.*, *Jacobson*, 168 F. Supp. 3d at 189; *Parr v. Ebrahimian*, 774 F. Supp. 2d 234, 239 (D.D.C. 2011) (similar); (*see* Compl. ¶¶ 3–5).

Dated:    New York, New York        Respectfully submitted,
          April 15, 2020

GIBSON, DUNN & CRUTCHER LLP

By:  */s/ Mark A. Kirsch*
     Mark A. Kirsch
     Patrick Hayden
     200 Park Avenue
     New York, NY 10166
     (212) 351-4000
     MKirsch@gibsondunn.com
     PHayden@gibsondunn.com

     Elizabeth Papez (*pro hac vice*)
     1050 Connecticut Avenue, N.W.
     Washington, DC 20036
     (202) 955-8500
     EPapez@gibsondunn.com

WINSTON & STRAWN LLP
     Lawrence Slusky (*pro hac vice*)
     1901 L Street, N.W.
     Washington, DC 20036
     (202) 282-5322
     LSlusky@winston.com

*Attorneys for Plaintiffs Philip Morris Capital Corporation and HNB Investment Corp.*

31