UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- X
                                    :

PHILIP MORRIS CAPITAL CORPORATION and HNB    :
INVESTMENT CORP.,                                   :

                                 :

                 Plaintiffs,          :          19-CV-10378 (JMF)

                                 :

        -v-                           :

                                 :          <u>OPINION AND ORDER</u>

NATIONAL RAILROAD PASSENGER CORPORATION,  :

                                 :

              Defendant.          :

                                 :
---------------------------------------------------------------------- X

JESSE M. FURMAN, United States District Judge:

       This case arises from a $250 million leveraged lease transaction involving the National

Railroad Passenger Corporation, more commonly known as Amtrak.  Through a complicated set of

interrelated contracts, Amtrak leased eight locomotives and six high-speed trainsets for a period of

twenty-two years.  Under the terms of the contracts, Amtrak was required to maintain the rail

equipment and, in the event that any unit of the equipment became uneconomical to repair or unfit

for commercial use, to either replace the unit or make a "casualty value" payment.  Plaintiffs here,

Philip Morris Capital Corporation ("Philip Morris") and its subsidiary HNB Investment Corp.

("HNB"), allege that Amtrak breached these obligations and demanded a $92 million "casualty

value" payment.  When Amtrak rejected that demand, they filed this lawsuit, seeking a declaratory

judgment and damages for breach of contract and a slew of other state law claims.  Amtrak now

moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiffs'

claims and, pursuant to Rule 12(f), to strike various allegations in, and exhibits to, Plaintiffs'

pleadings.  ECF No. 36.  For the reasons that follow, Amtrak's Rule 12(b)(6) motion is GRANTED

in part and DENIED in part, and its Rule 12(f) motion is DENIED.

**BACKGROUND**

The following facts — drawn from the operative Corrected First Amended Complaint (the "Complaint"), ECF No. 33 ("FAC"), and documents attached to, incorporated by reference in, or integral to it — are assumed to be true for purposes of this motion.  *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

**A.  The Operative Contracts**

In 2000, Amtrak, HNB, and several other parties entered into a series of interrelated agreements (the "Operative Contracts"), pursuant to which Amtrak leased for a period of twenty-two years eight locomotives and six high-speed trainsets that were custom-manufactured for Amtrak by a Canadian manufacturer (the "Transaction").  FAC ¶¶ 5, 32.  HNB served as a principal investor in the Transaction and the ultimate owner of the leased equipment.  *Id*. ¶ 4.  Another key party, Export Development Canada ("EDC"), served as the secured lender and a guarantor of certain payments due from Amtrak to HNB.  *Id*. ¶¶ 5, 33.  In particular, EDC provided funds in exchange for notes that guaranteed repayment of the debt on certain terms.  *Id*. ¶¶ 4, 5, 12.  HNB then created a trust, Amtrak Trust HS-EDC-1, to hold its equity and the borrowed funds; Wilmington Trust Company ("WTC"), as trustee, helped to manage the trust and use the trust's assets to purchase the equipment and lease it to Amtrak.  *Id*. ¶¶ 4, 33(a)-(c).

The Operative Contracts included, among others, a Lease, ECF No. 33-8 (the "Lease"); a Participation Agreement, ECF No. 33-7 (the "Participation Agreement"); a Trust Indenture and Security Agreement, ECF No. 33-10 (the "Indenture"); a Guarantee Agreement, ECF No. 33-9 (the "Guarantee"); and an Owner Trust Agreement, ECF No. 33-11 (the "Trust Agreement").  The Lease is the agreement between Amtrak Trust HS-EDC-1 as Lessor and Amtrak as Lessee with respect to lease of the rail equipment.  FAC ¶ 33(a).  The Participation Agreement details the rights and obligations of the parties to the Transaction, including Amtrak as Lessee, HNB as Owner

Participant, WTC as Owner Trustee, M&T Bank (formerly AllFirst Bank) as Indenture Trustee acting for the benefit of the noteholders on the debt that financed the Transaction, and EDC as both Loan Participant (the entity that holds the secured debt) and Equity Guarantor of Plaintiffs' equity interest.  *Id*. ¶ 33(b).  The Guarantee Agreement is the contract in which EDC agreed to pay Plaintiffs a contractually specified amount for their equity interest in the event Amtrak engaged in a "[g]uarantee [t]riggering [e]vent," and the Indenture addresses the role and responsibilities of the trust created to represent the interest of noteholders entitled to repayment of the loan that financed the Transaction.  *Id*. ¶ 33(c)-(d).  Finally, the Trust Agreement outlines the relationship between HNB and WTC as manager of the lessor trust.  *Id*. ¶ 33(e).

To the extent relevant here, the Lease permitted Amtrak to stop using and maintaining the equipment before the end of the lease term.  *Id.* ¶ 5.  In either event, however, Amtrak was required to take title to the units and to make a contractually specified payment ("Casualty Value") to cover the remaining debt and HNB's ownership interest.  *Id*.  In particular, Section 7 of the Lease required that Amtrak pay HNB in exchange for title to any unit Amtrak deemed "uneconomical to repair" or "unfit for commercial use from any cause" during the Lease term, *see* Participation Agreement, Annex A-4; and Section 12 required Amtrak to pay damages for failing to maintain the equipment "in as good condition as when delivered (ordinary wear and tear excepted)."  Section 13.1 defines "Lease Events of Default" to include, among other things, Amtrak's "fail[ure] to make any payment of . . . Casualty Value" and Amtrak's "fail[ure] to perform or observe any material covenant." Section 13.2 states that Amtrak's uncured breach of various provisions and obligations, including any of the Lease provisions above, entitles Amtrak Trust HS-EDC-1 as Lessor to, among other things, declare the Lease in default by written notice to Amtrak and exercise specified "rights, powers or remedies," including bringing suit "either at law or in equity."  FAC ¶ 8; *see also* Lease §§ 7, 12.1, 13.1, 13.2.

Several other provisions of the Operative Contracts are relevant here.  For example, Section 8 of the Participation Agreement requires Amtrak to "present fairly [its] financial condition" following "the end of each fiscal year" by, among other things, including a certificate of a "[r]esponsible [o]fficer" certifying that the officer "has no actual knowledge that any Lease Default or Lease Event of Default has occurred and is continuing, or if one has occurred, describing the status thereof."  And Section 6.2(i) states that Amtrak indemnifies HNB and the Amtrak Trust HS-EDC-1 against all losses and damages incurred by Amtrak.  Meanwhile, Section 6.10(d) of the Indenture addresses some of the respective rights and roles of HNB, as Owner Participant, and M&T Bank, as Indenture Trustee.  First, it provides that, "at all times, . . . Owner Participant shall have the right, to the exclusion of Indenture Trustee, (i) to exercise any election or option or make any decision or determination or to give or receive any notice, consent, waiver or approval in respect of any Excepted Payment or (ii) to demand, collect, sue for or otherwise receive and enforce the payment of Excepted Payments due and payable to it."  At the same time, it states: "Indenture Trustee shall at all times have the right, to the exclusion of . . . Owner Participant, to (A) declare the Lease to be in default under Section 13.2 thereof except to the extent necessary to enforce the exercise of rights with respect to Excepted Payments and (B) . . . exercise the remedies set forth in such Section 13.2 (other than in connection with Excepted Payments) . . . ."  The term "Excepted Payments" is defined, in turn, to include "all right, title and interest of . . . Owner Participant in and to the Equity Guarantee Agreement and any payment paid or payable thereunder," and "any right to demand, collect or otherwise receive and enforce the payment of any amount described . . . above, or to enforce the Equity Guarantee Agreement."  Indenture § 1.01.

**B.  Amtrak's Alleged Breaches**

As early as 2012, Amtrak began to consider replacing the leased rail equipment due to reliability issues.  Specifically, in 2012, Amtrak issued a "Fleet Strategy" memorandum

recommending the replacement of the majority of its fleet of locomotives and cars for its Northeast passenger rail routes.  FAC ¶ 45.  Citing concerns about the reliability of the leased locomotives as a "critical issue," the Fleet Strategy memorandum included a plan to procure seventy new electric locomotives from Siemens that could replace some or all of the leased locomotives in the following decade.  *Id*. ¶¶ 45-46.  In 2013, Amtrak's then-President and CEO Joseph Boardman reiterated this concern and wrote in a report (the "Boardman Report") to Amtrak's Inspector General that Amtrak recommended eventually retiring its leased locomotives because it found them to be unreliable and otherwise unfit for continued use "despite several efforts to improve their performance."  *Id*. ¶ 47 (quoting ECF No. 33-13, app. III ("Boardman Rep."), at 34).  The Boardman Report also recommended the eventual retirement of the leased locomotives on the ground that they were uneconomical to repair.  *Id.* ¶ 48.  Their "maintenance," he explained, "is challenged by many parts no longer being in production by their original manufacturers." *Id*. (quoting Boardman Rep. 34). Although the Boardman Report acknowledged an observation from Amtrak's Office of Inspector General that "applying more intensive maintenance practices [to the leased locomotives could] extend [their] useful life indefinitely," it stated that "[Amtrak's engineers] are not confident that such a strategy would result in a level of improvement commensurate with the level of additional resources that would be required."  *Id*. ¶ 49 (quoting Boardman Rep. 34).

In February 2016, Amtrak issued a "Five Year Financial Plan" (the "Plan") for "FY 2016-2020." *Id.* ¶ 51.  With respect to locomotives, the Plan stated that Amtrak "expected" to receive "[a]ll of the seventy new electric locomotives being manufactured by Siemens . . . by the end of 2016" and that these locomotives would allow Amtrak "to retire the existing electric locomotive fleet and standardize the fleet to include only the new Siemens units."  *Id*. ¶ 51.  With respect to the trainsets, the Plan referenced an ongoing multi-year overhaul program which would "enable Amtrak to maintain [the] equipment in a state of good repair" and "to return" them "to current Amtrak

standards." *Id*. ¶ 52.  In May 2016, however, press reports suggested that Amtrak had contracted for trainsets that could cause the leased trainsets to be permanently retired. *Id*. ¶ 53.  In response, Plaintiffs "promptly" contacted Amtrak in May 2016 to inquire about the status of all the leased equipment. *Id*.  Even though the "Five Year Financial Plan" did not include the trainsets in the list of "Active Units," Amtrak responded that no decision had been made as to the trainsets. *Id*.  In August 2016, Plaintiffs asked Amtrak for an update, but "it was only in late 2016" that Plaintiffs "deduced from a combination of public information and Amtrak's evasive responses," that the leased locomotives (and presumably the trainsets) "likely had been permanently retired." *Id*.

After months of silence, on October 7, 2016, Amtrak finally responded that it was willing to discuss Plaintiffs' inquiry from August. *Id*. ¶ 87.  On October 21, 2016, Plaintiffs tried to arrange a meeting as soon as possible, but Amtrak did not reply. *Id*.  In a notice dated November 21, 2016, Plaintiffs informed Amtrak that it should have notified them as early as February 2015 that the locomotives were being retired and paid the Casualty Value by June 3, 2015. *Id*. ¶¶ 59, 87. Plaintiffs warned Amtrak that if it continued to disregard Plaintiffs' outreach efforts, they would direct WTC to issue a notice of Lease Event of Default for failure to pay the Casualty Value under Section 7 of the Lease and failure to use and maintain the equipment under Section 12. *Id*. ¶ 87. On November 29, 2016, Amtrak told Plaintiffs that it would meet to discuss a buyout of Plaintiffs' equity interest. *Id*. ¶ 88.  At their December 1, 2016 meeting, Amtrak's senior officials confirmed their proposal to terminate the Lease and buy out Plaintiffs' equity interest instead of paying the Casualty Value. *Id*.  Amtrak promised to send Plaintiffs a written proposal memorializing this relief within a few weeks, but it never did. *Id*. ¶ 89.  Instead, Amtrak delayed sending a proposal, citing its need to crunch some numbers, *id*. ¶¶ 89-91, and published its 2016 Consolidated Financial Statements revealing for the first time that it had indeed prematurely and permanently retired the locomotives in 2016, *id*. ¶ 54.  By October 2017, Amtrak had undergone a personnel reorganization

and abandoned altogether negotiating a buyout. *Id*. ¶¶ 93-105.

During that time, Plaintiffs noticed Amtrak for its failure to maintain the rail equipment as required by the Lease. A series of maintenance records available to Amtrak (but apparently not concurrently provided to Plaintiffs, *see id*. ¶ 115) revealed that Amtrak had cannibalized some of the equipment for parts and had failed to conduct proper inspections over the years. *Id*. ¶¶ 65-71. A June 2017 third-party inspection and report (the "Witt Report") revealed that Amtrak did not prevent the deterioration of the condition of the retired equipment and had stored at least four of the leased locomotives outdoors in various disassembled states. *Id*. ¶¶ 70-71. In response to the Witt Report, WTC, in its capacity as trustee, sent Amtrak a written Notice of Lease Default in September 2017 for the improper maintenance and use of the locomotives in breach of Section 12 of the Lease and advised Amtrak that it had thirty days to cure the default. *Id*. ¶ 74. On September 14, 2017, Amtrak responded, disclaiming any breach and averring that (1) the Lease did not require Amtrak to keep the locomotives in service and (2) the Witt Report had confirmed that the equipment was being maintained in accordance with the Lease because several locomotives were in the maintenance shop. *Id*. ¶ 76. In an October 13, 2017 letter, Amtrak repeated its position and maintained that holding the locomotives in reserve status did not violate the Lease. *Id*. ¶ 77.

On December 15, 2017, WTC made good on Plaintiffs' threat and responded to Amtrak's October correspondence by sending Amtrak a formal Notice of Lease Events of Default based on both Amtrak's failure to pay the Casualty Value and its failure to properly use and maintain the equipment. *Id*. ¶ 106. On the same date, Plaintiffs issued a demand to EDC, as guarantor, for the payment of almost $93 million, the amount of the Casualty Value. *Id.* ¶¶ 107-08. Two weeks later, Amtrak responded to the Notice of Default by rejecting Plaintiff's allegations. *Id*. ¶ 109. A few months later, citing Amtrak's response, EDC followed suit and rejected Plaintiffs' demand for payment of the guarantee. *Id.* ¶ 111. EDC then filed a lawsuit in the Ontario Superior Court of

Justice seeking, among other things, a declaration that it had no liability under the Guarantee

Agreement. *Id*. ¶ 111.  In May 2019, the Ontario Court stayed the lawsuit in accordance with a

Standstill Agreement among Plaintiffs, Amtrak, and EDC. *Id.* ¶¶ 124-27.  The Standstill

Agreement provides that EDC's Canadian action will be "stayed . . . until such time as the dispute

among [Plaintiffs] and Amtrak . . .  concerning Amtrak's compliance with the Lease and related

documents, including but not limited to the existence of any Lease Event of Default . . . , is

resolved." *Id.* ¶ 124.  The Agreement defines "resolution" as "a final non-appealable court

judgment on all claims on the merits" or "a settlement." *Id.*

## THE MOTION TO DISMISS

The Court begins with Amtrak's Rule 12(b)(6) motion to dismiss.  In evaluating the motion,

the Court must accept all facts set forth in the Complaint as true and draw all reasonable inferences

in Plaintiffs' favor.  *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir.

2008) (per curiam).  In addition to the allegations in the complaint itself, a court may consider

documents attached as exhibits, incorporated by reference, or relied upon by a plaintiff in bringing

suit, as well as any judicially noticeable matters.  *See Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d

Cir. 2011); *In re Harbinger Capital Partners Funds Inv'r Litig.*, No. 12-CV-1244 (AJN), 2013 WL

5441754, at *15 n.6 (S.D.N.Y. Sept. 30, 2013), *vacated in part on other grounds*, 2013 WL

7121186 (S.D.N.Y. Dec. 16, 2013).  A claim will survive a Rule 12(b)(6) motion, moreover, only if

a plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing

*Twombly*, 550 U.S. at 556).  A plaintiff must show "more than a sheer possibility that a defendant

has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim,

*Twombly*, 550 U.S. at 555.  If a plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Id.* at 570.[1]

Amtrak moves to dismiss all of Plaintiffs' claims for money damages on the ground that, under Section 6.10(d) of the Indenture, the Indenture Trustee has exclusive authority to sue for breach of the Lease.  Additionally, it moves to dismiss Plaintiffs' contract claims as time barred and Plaintiffs' remaining claims — for breach of the implied covenant of good faith and fair dealing, unjust enrichment, quantum meruit, equitable and judicial estoppel, and fraudulent concealment — for failure to state a claim.  The Court will address each argument in turn.[2]

## A.  Money Damages

First, Amtrak argues that Plaintiffs may not sue for money damages.  *See* ECF No. 38 ("Def.'s Mem."), at 11-15.  That argument turns on Section 6.10(d) of the Indenture, which provides, in relevant part, that the "Indenture Trustee shall at all times have the right, *to the exclusion of* [*Plaintiffs*], to (A) declare the Lease to be in default under Section 13.2 thereof except to the extent necessary to enforce the exercise of rights with respect to Excepted Payments."  Amtrak acknowledges that Plaintiffs "are pursuing rights under the Guarantee Agreement, which falls within the category of an 'Excepted Payment'" within the meaning of the Indenture.  Def.'s

---

[1]   To the extent that Plaintiffs allege fraudulent concealment, the Complaint is subject as well to the heightened pleadings standards set forth in Rule 9(b) of the Federal Rules of Civil Procedure.  *See Hodges v. Glenholme School*, 713 F. App'x 49, 51 (2d Cir. 2017) (summary order) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 88-89 (2d Cir. 1983)).  Amtrak, however, does not invoke Rule 9(b) in connection with its motion to dismiss.

[2]   If or when the Court needs to engage in a choice-of-law analysis with respect to Plaintiffs' claims, it may not be straightforward.  Among other things, the Lease and Participation Agreement include provisions specifying that District of Columbia law applies, *see* Lease § 25; Participation Agreement § 14.4; the Indenture provides that it is to be governed by, and construed in accordance with, New York law, *see* Indenture § 10.12; and the Guarantee points to the laws of Ontario, Canada, and the Federal Laws of Canada, *see* Guarantee §6.1.  The Court need not dwell on the issue for purposes of this Opinion because, as discussed below, the parties either agree as to the applicable law or there is no material difference between the laws that could apply.

9

Mem. 14.  It follows, Amtrak concedes, that Plaintiffs may "send EDC a demand for payment under the Guarantee Agreement" (which they have done) or, if timely, pursue a claim for declaratory relief in this Court.  *Id.*  "But," Amtrak continues, "that does not mean Plaintiffs had a right to pursue eight causes of action and seek monetary damages from Amtrak in this Court.  Those claims are patently not 'necessary' in order for [Plaintiffs] to subsequently pursue [their] right to receive a payment from EDC under the Guarantee Agreement in the currently stayed Canadian action."  *Id.*

    This argument has considerable force, but the Court declines to dismiss Plaintiffs' claims for money damages at this stage of the litigation for three reasons.  First, as a general matter, the issue of whether "money damages . . . are available remedies . . . is premature at the motion to dismiss stage."  *Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, No. 14-CV-7343 (ER), 2015 WL 5671724, at *20 (S.D.N.Y. Sept. 22, 2015) (citing cases).  Second, whether Section 6.10(d) of the Indenture precludes Plaintiffs' claims for money damages appears to turn on whether the claims are "necessary to enforce the exercise of rights with respect to Excepted Payments," a question that calls for close examination of the various contractual definitions of "Excepted Payments" (not to mention what qualifies as "necessary to enforce").  Yet the parties do little more than assert in conclusory fashion their respective positions on that question.  *Compare* Def.'s Mem. 14, *with* ECF No. 50 ("Pls.' Mem."), at 23-25.  Finally, Plaintiffs make a second argument for why they are entitled to seek damages despite Section 6.10(d) of the Indenture: namely, that they "may independently seek the remedies specified in the Lease and Complaint — including damages — under the New York and D.C. versions of Article 2-A of the U.C.C."  Pls.' Mem. 26-27.  Amtrak does not address the argument in its reply and, thus, has forfeited any counterarguments for purposes of this motion.  *Cf. Nigro v. City of New York*, No. 19-CV-2369 (JMF), 2020 WL 7629455, at *2 (S.D.N.Y. Dec. 22, 2020) (treating an argument that the defendant had failed to make in its reply brief as "forfeited").

Accordingly, Amtrak's motion to dismiss Plaintiffs' damages claims is denied without prejudice to renewal on a motion for summary judgment.

## B.  Breach of Contract

Next, Amtrak moves to dismiss Plaintiffs' breach-of-contract claims on the ground that they are barred by the statute of limitations.  Def.'s Mem. 26-27; ECF No. 54 ("Def.'s Reply"), at 1-6.[3] The parties agree that the Lease is a "finance lease" within the meaning of Article 2-A of the U.C.C. and, thus, that the limitations period is at least four years, whether the law of New York or D.C. applies.  Pls.' Mem. 8-10; Def.'s Reply 1.[4]  Under either law, "[a] cause of action for default accrues when the act or omission on which the default . . . is based is or should have been discovered by the aggrieved party, or when the default occurs, whichever is later."  D.C. Code § 28:2A-506(b); *see also* N.Y. U.C.C. Law § 2-A-506(2).[5]  Thus, to be timely, Amtrak's default or Plaintiffs' discovery thereof must have occurred on or after November 7, 2015.  Alternatively, there must be a basis to conclude that the limitations period was tolled.

In light of the foregoing, there is no question that one of Plaintiffs' breach claims — namely, that Amtrak breached the Lease by failing to maintain the locomotives, *see* FAC ¶¶ 61-83, 106 — is timely.  Indeed, although its motion refers broadly to all of Plaintiffs' contract claims being

---

[3]     Amtrak does not otherwise move to dismiss the contract claims.  For purposes of this Opinion, therefore, the Court assumes that both Plaintiffs are entitled to sue for breach of the Lease as third-party beneficiaries, even though neither Plaintiff is a signatory to the Lease.  (Indeed, Philip Morris is not a signatory to any of the Operative Contracts.)

[4]     Amtrak took a different position in its initial memorandum of law, *see* Def.'s Mem. 26-27, but concedes the point in its reply, *see* Def.'s Reply 1.

[5]     For the reasons stated in Plaintiffs' Sur-Reply, the Court rejects Amtrak's contention that federal common law governs when Plaintiffs' contract claims accrue.  *See* ECF No. 57 ("Pls.' Sur-Reply"), at 1-3; *see also, e.g.*, *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) (holding that where "there [i]s no underlying federal claim[,] the district court could not have looked to federal common law to determine when Plaintiff's breach of contract claim accrued").

untimely, Amtrak does not actually argue otherwise.  That is for good reason, as Plaintiffs' failure-to-maintain claim did not accrue until Amtrak (allegedly) failed to cure the purported breach upon receiving notice from Plaintiffs in September 2017.  *See* FAC ¶ 75 (alleging that "[u]nder Lease Section 13.1(v), Amtrak had 30 days after Plaintiffs' September 2017 notice to effect a cure or, "if such failure is curable but not capable of being cured within such 30-day period, such longer period not to exceed 90 days (or 365 days in the case of a maintenance default with respect to not more than two (2) Locomotives . . .) during which [Amtrak] shall be diligently attempting to cure such failure").  That is well within the four-year statute of limitations.

The accrual date of Plaintiffs' other contract claim — namely, that Amtrak breached the Lease by failing to pay the "Casualty Value" upon determining that the rail equipment was "unfit for commercial use" or "uneconomical to repair," *see* FAC ¶¶ 43-60, 106 — is a more complicated question.  Plaintiffs argue that the claims accrued upon Amtrak's December 29, 2017 rejection of their demand for payment.  *See* Pls.' Sur-Reply 3.  Under the plain terms of the Lease, however, Amtrak's default, if any, occurred as soon as it failed to pay the Casualty Value "within 5 Business Days after the same shall become due," Lease § 13.1(i), and the Casualty Value became due within a specified time after a "Casualty Occurrence," defined, as relevant here, as the moment when a "Unit" became "uneconomical to repair" or "rendered unfit for commercial use," Participation Agreement, Annex A-4; *see* Lease §§ 7.1, 7.3; *see also* FAC ¶ 57-58, 108.  Thus, the claim accrued before Amtrak rejected Plaintiffs' demand for payment, which was merely a "demand that seeks a remedy for a preexisting wrong" and did not affect the running of a limitations period.  *ACE Sec. Corp. v. DB Structured Prods., Inc.,* 25 N.Y.3d 581, 597 (2015).

That said, for two reasons, the Court cannot resolve at this stage of the litigation whether Plaintiffs' Casualty Value breach claim is timely.  First, the date or dates of any "Casualty Occurrence" that would have triggered Amtrak's obligation to pay a Casualty Value is a factual

question, the answer to which is not clear from the face of the Complaint.  *See, e.g.*, *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014) (noting that "a pre-answer motion to dismiss" on timeliness grounds "may be granted *only* if it is clear on the face of the complaint that the statute of limitations has run" (emphasis added) (internal quotation marks omitted)).  To be sure, as Amtrak notes, there is evidence attached to, or incorporated by reference in, the Complaint — including the "Fleet Strategy" memorandum, the Boardman Report, and Plaintiffs' own demand letters — suggesting that the alleged defaults occurred "'as early as 2012.'"  Def.'s Reply 3-4 (quoting ECF No. 33-20, at 2); *see* FAC ¶¶ 45-46, 59.  At the same time, there are allegations in the Complaint, and evidence attached to the Complaint, suggesting that Amtrak did not actually determine until 2016 that the rail equipment was "unfit for commercial use" or "uneconomical to repair."  *See, e.g.*, FAC ¶¶ 51-55; ECF No. 33-18, notes at 13.  Thus, the accrual date turns on facts that cannot be determined on a motion to dismiss.

Second, and in any event, the Court cannot resolve whether the Casualty Value breach claim is timely because Plaintiffs plausibly invoke the doctrines of equitable estoppel and fraudulent concealment.  In particular, assuming *arguendo* that Amtrak did determine prior to 2015 that the rail equipment was "unfit for commercial use" or "uneconomical to repair," Plaintiffs plausibly allege that Amtrak concealed that fact from them.  In May 2016, for example, when Plaintiffs inquired about the status of the leased rail equipment, Amtrak responded that no decisions had been made about the trainsets.  *See* FAC ¶ 53.  Plaintiffs followed up by email in August 2016, but got no response.  *See id.*  And as late as October 2017, Amtrak insisted that its "use and maintenance of the Units, including, the Locomotives, is in full compliance with the express terms of the Lease" and that it had merely "made the prudent operational decision to transfer the locomotives to reserve status from active service."  FAC ¶ 77.  These allegations certainly do not compel the conclusion that equitable estoppel or fraudulent concealment apply, but the Court is not able to "definitively"

resolve that question as the applicability of the doctrines is likely to turn on fact-intensive questions such as whether and when Amtrak made final determinations regarding the state of the rail equipment, whether Amtrak made misrepresentations upon which Plaintiffs reasonably relied, and whether or when Plaintiffs knew or should have known about Amtrak's determinations. *City of New York v. FedEx Ground Package Sys., Inc*., 175 F. Supp. 3d 351, 368 (S.D.N.Y. 2016); *see, e.g.*, *Twersky v. Yeshiva Univ*., 993 F. Supp. 2d 429, 442 (S.D.N.Y. 2014) (discussing equitable estoppel), *aff'd*, 579 F. App'x 7 (2d Cir. 2014) (summary order); *Sejin Precision Indus. Co., Ltd. v. Citibank, N.A*., 235 F. Supp. 3d 542, 551-52 (S.D.N.Y. 2016) (discussing fraudulent concealment).

Accordingly, Amtrak's motion to dismiss the breach of contract claims as untimely must be and is denied as premature.

## C.  Breach of the Implied Covenant of Good Faith and Fair Dealing

Next, Amtrak argues that Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing must be dismissed because it is duplicative of Plaintiffs' breach-of-contract claims and "stands or falls on whether, as Plaintiffs contend, Amtrak breached its contractual obligations to Plaintiffs under the Lease."  Def.'s Mem. 16; *see also* Def.'s Reply 10 (arguing that "Plaintiffs cannot establish a bad faith claim unless they prove that Amtrak breached its duties under the Lease and Operative Contracts (which they cannot).").  Although Amtrak is correct that an implied covenant claim is not an "independent cause of action when the allegations are identical to other claims for relief under an established cause of action," *Xereas v. Heiss*, 933 F. Supp. 2d 1, 8 (D.D.C. 2013) (internal quotation marks and alteration omitted), Plaintiffs here plausibly allege that Amtrak breached the implied covenant in at least two ways that are independent from their breach-of-contract claims.  First, Amtrak allegedly concealed the status of Plaintiffs' equipment, thereby frustrating Plaintiffs' ability to issue default notices under Section 13.2 of the Lease.  FAC ¶¶ 53, 86-87, 153.  Second, Amtrak allegedly strung Plaintiffs along with promises of a buyout that

14

Amtrak knew it was in no position to make. *Id*. ¶¶ 2, 15, 88-92, 157. These allegations, if true, plausibly show "injur[y to] the right of the [plaintiffs] to receive the fruits of the contract" and "bad faith." *See, e.g.*, *Levick v. Kiser*, 206 F. Supp. 3d 337, 346-47 (D.D.C. 2016) (allowing implied-covenant claim in addition to breach of contract claim); *see also, e.g.*, *Berlin v. Bank of Am., N.A.*, 101 F. Supp. 3d 1, 17 (D.D.C. 2015) (allowing an implied-covenant claim where the plaintiffs "repeatedly alerted" the defendant of "errors" and "tried contacting the [the defendant] and its outside counsel at least nine times . . . [without] receiv[ing] a response"); *C & E Servs., Inc. v. Ashland Inc*., 601 F. Supp. 2d 262, 276 (D.D.C. 2009) (similar where the plaintiff had "requested [certain] information" from the defendant, who "said it did not exist or did not give it to [plaintiff]"). Accordingly, Amtrak's motion to dismiss Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing must be and is also denied.

## D. Unjust Enrichment and Quantum Meruit

By contrast, Amtrak is on firm ground arguing that Plaintiffs' claims for unjust enrichment and quantum meruit claims must be dismissed as duplicative. For these quasi-contract claims, choice of law is not relevant because no "actual conflict" exists between the relevant law of New York and D.C. *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) ("[W]here the court has determined that the result would be the same under either jurisdiction's law, it need not decide which to apply." (emphasis omitted)). Under both New York and D.C. law, a party can pursue alternative claims for unjust enrichment or quantum meruit, on the one hand, and breach of contract, on the other, *only* "[w]here there is a bona fide dispute as to whether" an express contract governs the subject matter of the disagreement. *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 471 (S.D.N.Y. 2014) (collecting cases); *see Knudsen v. Quebecor Printing (U.S.A.), Inc*., 792 F. Supp. 234, 237 (S.D.N.Y. 1992) ("[C]ourts generally dismiss claims for quantum meruit on the pleadings only when it is clear from the face of the complaint that there

exists an express contract that clearly controls."); *see also Plesha v. Ferguson*, 725 F. Supp. 2d 106, 111-12 (D.D.C. 2010) (dismissing a claim for unjust enrichment and quantum meruit pleaded in the alternative where the plaintiff had attached a copy of the agreement to the complaint and neither party disputed the validity of the agreement).

There is no bona fide dispute here. *See, e.g.*, *He Depu v. Yahoo! Inc*., 306 F. Supp. 3d 181, 193-94 (D.D.C. 2018) (collecting cases). To be sure, as discussed above, Amtrak contends that Plaintiffs do not have the contractual right to declare the Lease in default and exercise the remedies available under Section 13.2 of the Lease. *See* Def.'s Mem. 12. But far from disputing the existence of a valid and binding contract, that argument presumes the existence and validity of the parties' contracts. So too does Plaintiffs' counterargument: that the express terms of the Indenture do, in fact, permit them to bring their claims for money damages. *See* Pls.' Mem. 20-21, 30. It follows that Plaintiffs' claims for unjust enrichment and quantum meruit must be and are dismissed as duplicative. *See, e.g.*, *Harrington v. Trotman*, 983 A.2d 342, 346-48 (D.C. 2009) (providing that a party "cannot avoid the bargain he made and claim recovery under a theory of unjust enrichment" "when there [i]s a valid contract between the parties"); *see also Attias v. CareFirst, Inc*., 365 F. Supp. 3d 1, 25 (D.D.C. 2019) (dismissing an unjust enrichment claim, pleaded in the alternative, where neither party disputed the contract's validity); *cf., e.g.*, *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556-58 (D.C. 2016) (per curiam) (holding that the appellant adequately stated a claim for unjust enrichment where she alleged that the late fee penalty provision at issue was unenforceable, but dismissing the claim on other grounds).

**E.  Equitable and Judicial Estoppel and Fraudulent Concealment**

Finally, Plaintiffs bring standalone claims of equitable and judicial estoppel and fraudulent concealment. The judicial estoppel claim is dismissed as abandoned, as Plaintiffs do not even attempt to respond to Amtrak's argument for dismissal. *See* Def.'s Reply 11 n.7; *see also, e.g.*,

*Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 392 (S.D.N.Y. 2013) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (internal quotation marks omitted)).  By contrast, Amtrak's motion must be and is denied as to the equitable estoppel and fraudulent concealment claims.[6]  As discussed above, Plaintiffs plausibly allege that Amtrak, even when directly asked by Plaintiffs, misrepresented whether and when it determined that the leased rail equipment was unfit for commercial use or uneconomical to repair.  Thus, Plaintiffs raise plausible equitable estoppel and fraudulent concealment claims that cannot, and will not, be dismissed at this stage.

## THE MOTION TO STRIKE

Amtrak's other motion — to strike from the Complaint allegations and exhibits concerning the proposed buyout, *see* Def.'s Mem. 9, 27-29 — requires only brief discussion.  Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "To prevail on a Rule 12(f) motion to strike, a party must demonstrate . . . (1) [that] no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant."  *Winklevoss Capital Fund, LLC v. Shrem*, 351 F. Supp. 3d 710, 721 (S.D.N.Y. 2019) (alteration and internal quotation marks omitted). In evaluating a Rule 12(f) motion, courts should not "strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone." *Lipsky v. Commonwealth United Corp*., 551 F.2d 887, 893 (2d Cir. 1976).  "As such, motions to strike are viewed with disfavor and infrequently granted."  *Winklevoss*, 351 F. Supp. 3d at 722

---

[6]     Amtrak notes that New York recognizes a standalone equitable estoppel claim, but D.C. does not.  *See* Def.'s Mem. 23.  Amtrak does not, however, argue that the equitable estoppel claim should be dismissed under D.C. law.  Nor do the parties otherwise address which law applies to these claims.  The Court will, therefore, defer judgment as to choice of law on these claims.

(internal quotation marks omitted).

Applying these standards here, Amtrak's motion to strike is easily denied.  Amtrak argues that various paragraphs in, and exhibits attached to, the Complaint refer to settlement negotiations that are inadmissible under Rule 408.  *See* Def.'s Mem. 27-29.  But the motion is moot with respect to Paragraph 132 of the Complaint, which Plaintiffs consent to withdraw.  *See* Pls.' Mem. 19 n.21. And otherwise, it is premature, as the Court cannot, and need not, decide on the basis of the pleadings alone whether the allegations and exhibits would be admissible at trial for some purpose — for example, with respect to the timeliness of Plaintiffs' contract claims.  *See Lipsky*, 551 F.2d at 893 (stating that "[e]videntiary questions . . . should especially be avoided" at the pleadings stage); *B.W.P. Distribs. Inc. v. OE Plus, Ltd*., No. 07-CV-9588 (KMK), 2009 WL 1154102, at *10-11 (S.D.N.Y. Mar. 31, 2009) (denying a motion to strike on Rule 408 grounds where there "[we]re still questions regarding whether [the challenged discussions were] settlement negotiations, and whether the[y] might be admissible on other grounds" after "adequate discovery" (internal quotation marks omitted)); *see also eAcceleration Corp. v. Trend Micro, Inc*., 408 F. Supp. 2d 1110, 1113 (W.D. Wash. 2006) (denying a motion to strike on Rule 408 grounds where "evidence of prior settlement demands or negotiations relates to [the plaintiff's] delay in bringing the[] claims").

Accordingly, Amtrak's motion to strike is denied.

## CONCLUSION

For the foregoing reasons, Amtrak's motion to dismiss is granted in part and denied in part and its motion to strike is denied in full (though Paragraph 132 of the Complaint is deemed withdrawn).  Specifically, Plaintiffs' claims of unjust enrichment, quantum meruit, and judicial estoppel are dismissed, and Amtrak's motion to dismiss the claims for money damages, breach of contract, breach of implied covenant of good faith and fair dealing, equitable estoppel, and fraudulent concealment is denied without prejudice to renewal on a motion for summary judgment.

The Court declines to grant Plaintiffs leave to amend their dismissed claims.  Although leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend," *Ahmed v. GEO USA LLC*, No. 15-CV-7486 (JMF), 2015 WL 1408895, at *5 (S.D.N.Y. Mar. 27, 2015) (internal quotation marks omitted).  Here, the problems with the dismissed claims are substantive, so amendment would be futile.  *See, e.g.*, *Maragh v. Roosevelt Island Operating Corp.*, No. 16-CV-7530 (JMF), 2018 WL 6573452, at *6 (S.D.N.Y. Dec. 13, 2018); *Croft v. AXA Equitable Life Ins. Co.*, No. 17-CV-9355 (JMF), 2018 WL 4007646, at *5 (S.D.N.Y. Aug. 22, 2018).  Moreover, Plaintiffs were on notice of Amtrak's arguments when they filed the Complaint following Amtrak's original motion to dismiss, and Plaintiffs were expressly warned that they would "not be given any further opportunity" to amend the Complaint.  *See* ECF Nos. 22, 25.  In light of these circumstances, the Court will not grant leave to amend.  *See, e.g.*, *Overby v. Fabian*, No. 17-CV-3377 (CS), 2018 WL 3364392, at *14 (S.D.N.Y. July 10, 2018) ("Plaintiff's failure to fix deficiencies in his previous pleading, after being provided ample notice of them, is alone sufficient ground to deny leave to amend *sua sponte*."); *see also Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first." (alteration and internal quotation marks omitted)).

Amtrak shall file an answer to the remaining claims **within three weeks of the date of this Opinion and Order**.  Additionally, the parties shall appear for an initial pretrial conference on **March 31, 2021**, at **4:00 p.m.** to discuss the next steps of this litigation, including whether (as Amtrak proposes) discovery should be bifurcated and focused initially on evidence relating to the timeliness of Plaintiffs' claims.  To facilitate that discussion, the parties shall confer and, no later

19

than the Thursday before the conference, submit a joint letter, the contents of which are described in the Court's Order scheduling the initial pretrial conference, as well as a proposed Civil Case Management Plan and Scheduling Order attached as an exhibit to the joint letter. *See* ECF No. 13.

The Clerk of Court is directed to terminate ECF No. 36.


SO ORDERED.

Dated: February 26, 2021
      New York, New York

                                          JESSE M. FURMAN
                                       United States District Judge